## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DINOSAUR FINANCIAL GROUP LLC<br>470 Park Avenue South<br>Ninth Floor<br>New York, NY  10016<br><br>SWISS LIFE INVESTMENT<br> MANAGEMENT HOLDING AG<br>General-Guisan-Quai 40<br>P.O. Box.<br>8022 Zurich<br>Switzerland<br><br>on behalf of themselves and all others<br>similarly situated,<br><br>            Plaintiffs,<br><br>      v.<br><br>CUSIP GLOBAL SERVICES<br>55 Water Street<br>New York, NY  10041<br><br>S&P GLOBAL, INC.<br>55 Water Street<br>New York, NY  10041<br><br>AMERICAN BANKERS ASSOCIATION<br>1120 Connecticut Ave., NW<br>Washington, DC  20036<br><br>FACTSET RESEARCH SYSTEMS INC.<br>45 Glover Avenue<br>Norwalk, CT  06850<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Civil Action No.: 1:22-cv-1860<br><br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Dinosaur Financial Group LLC and Swiss Life Investment Management Holding AG (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by their attorneys, Competition Law Partners PLLC, Kaplan, Fox & Kilsheimer LLP, and Irell & Manella LLP, for their Complaint in this action hereby state the following:

## I.   INTRODUCTION

1.      Defendants CUSIP Global Services ("CGS"), S&P Global, Inc. ("S&P"), and the American Bankers Association ("ABA") have conspired for decades to eliminate competition in the use of CUSIPs—the "CUSIP Use Market," as defined below. Defendant FactSet Research Systems Inc. ("FactSet") recently purchased CGS from S&P and has replaced S&P as a co-conspirator.

2.      CUSIP is an acronym that stands for Committee on Uniform Securities Identification Procedures. As its name implies, a CUSIP is a functional handle to identify a particular financial instrument. Each CUSIP is a nine-digit number that identifies specific North American financial instruments and thereby facilitates the processing, clearing, and settlement of trades of that instrument. Banks, investment funds, public employee pension funds, fund managers, and other financial institutions ("Financial Institutions"), both in the United States and abroad, need the CUSIPs to operate their businesses. The Plaintiffs named in this Complaint are Financial Institutions.

3.      Historically, S&P and CGS had a direct relationship with Financial Institutions; the Financial Institutions purchased physical books containing all CUSIP numbers in use. However, beginning in the 1980s, data vendors in the financial services industry (such as Bloomberg LP) began providing rich sets of value-added data services, including CUSIPs, directly to Financial Institutions. As a result, S&P and CGS lost their contractual relationships with Financial

Institutions and therefore could no longer control the Financial Institutions' use of the CUSIPs they received from their Data Vendors. Such uncontrolled use threatened S&P's monopoly power over the CUSIP Use Market.

4.     To forestall that loss of control, S&P and CGS inserted a new clause in their agreements with the Data Vendors that purported to give S&P and CGS control anew over the use of CUSIPs by the Financial Institutions. This clause purported to prohibit Data Vendors from providing CUSIPs to any Financial Institution that did not sign a "license agreement" directly with S&P. That "license agreement," in turn, prohibited Financial Institutions from using the CUSIPs they received from their Data Vendors in any way not specifically allowed by S&P and CGS. And that contract—which they called a license agreement—also required Financial Institutions to pay hefty "license fees" to S&P based on bogus and malleable claims that a copyright owned by the ABA allowed them to impose these restrictions.

5.     None of S&P, CGS, or the ABA had the legal right, and FactSet does not have the legal right, to control the use of CUSIPs by Financial Institutions, and therefore had and have no legal basis to impose either the "license agreements" or the "license fees" on Financial Institutions. That conduct violated Sections 1 and 2 of the Sherman Act and the Copyright Act.

6.     The "CUSIP Use Market" (defined below) is not competitive because S&P, CGS, and the ABA excluded all actual and potential competitors from that market, which in turn allowed them to impose the so-called "license"-based restrictions and "license fees" on Financial Institutions. These Defendants could not have engaged in this exploitive conduct and charged these monopoly rents in a competitive market.

7.     FactSet has pledged to continue S&P's unlawful conduct. It entered the same conspiracy that S&P participated in for decades, and it is excluding potential competitors from the CUSIP Use Market and is imposing unlawful license fees on Financial Institutions.

## II.     JURISDICTION AND VENUE

8.     This is an action (i) for declaratory judgment and restitution arising, in part, under the United States Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act"), and (ii) for injunctive relief and damages under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 4 of the Clayton Act, 15 U.S.C. § 15(a). As to monetary relief, this action seeks to recover threefold damages, restitution, costs of suit, and reasonable attorneys' fees.

9.     This Court has original jurisdiction of these claims under 28 U.S.C. §§ 1331, 1337, and 1338 and Section 4 of the Clayton Act, 15 U.S.C. § 15.

10.     This Court has subject matter jurisdiction over this matter pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4 and the Copyright Act.

11.     Defendants' conduct, as described in this Complaint, was within the flow of, and was intended to and did have a substantial effect on, the interstate commerce of the United States, including in this District. During the relevant period, each defendant used the instrumentalities of interstate commerce to join or effectuate their scheme. The Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

12.     Defendants engaged in conduct in the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

13.     This Court has personal jurisdiction over each Defendant, because each Defendant—throughout the United States and including in this District—has transacted business,

maintained substantial contacts, and/or committed overt acts in furtherance of its illegal scheme. The scheme has been directed at, and has had the intended effect of, causing injury to Plaintiffs and persons and entities residing in, located in, or doing business in this District, the United States and its territories, and the District of Columbia.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400 and Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22) because each Defendant resides, transacts business, is found, or has agents within this District, and because a substantial part of the alleged events giving rise to the claims occurred, and a substantial portion of the affected interstate trade and commerce described below was carried out, in this District.

## III.    THE PARTIES

15.     Dinosaur Financial Group LLC ("Dinosaur") is a financial institution based in New York in this District. It provides investment banking, institutional brokerage, and wealth management services. Dinosaur has entered into a license agreement with S&P and paid license fees directly to S&P in New York.

16.     Swiss Life Investment Management Holding AG ("Swiss Life") is a Switzerland-based holding company and provider of life insurance and pension solutions and services. Swiss Life has entered into a license agreement with S&P and paid license fees directly to S&P in New York; that agreement, and the relationship between Swiss Life and S&P established by the license agreement, is governed by New York Law.

17.     Defendant ABA is a trade association for the United States banking industry organized under Section 501(c)(6) of the Internal Revenue Code. It is headquartered in Washington, DC.

18.    Until March 1, 2022, CGS was owned by S&P and located in New York, New York. As of March 1, 2022, CGS is owned by FactSet.

19.    S&P is a provider of financial information and data analytics. It is headquartered in New York, New York.

20.    FactSet is a financial data analytics company. It is headquartered in Norwalk, Connecticut. FactSet is liable for the acts of CGS.

## IV.    NATURE OF THE ACTION

### A.  The Development of the CUSIP System

21.    Electronic trading systems require a standardized method for identifying financial instruments to facilitate the clearing and settlement of trades and other transactions. The standardized method must ensure that each financial instrument has a unique identifying number that electronic trading systems can read and process. CUSIPs are the numbering system for trading in all United States financial instruments.

22.    The CUSIP numbering system was the product of an industry-wide voluntary cooperative effort to develop a standard for identifying United States financial instruments. In the 1960s, government regulators, stock exchanges, and private firms recognized a need for such a standard because the then-new, but already rapidly growing number of, electronic systems managing the clearing and settlement of trades had no efficient way to identify a particular financial instrument.

23.    To remedy this shortcoming, representatives of the Securities and Exchange Commission ("SEC"), the New York Stock Exchange ("NYSE"), the American Stock Exchange, the National Association of Securities Dealers, the Association of Stock Exchange Firms, the Investment Bankers Association, and many financial institutions participated in the development

of a numbering system under the sponsorship of a committee they collectively formed for that purpose—the Committee on Uniform Security Identification Procedures (the "CUSIP Committee").

24.     Beginning in 1964, the CUSIP Committee coordinated the development of a numbering system and the creation of an entity to manage the real-time listing of CUSIPs. The CUSIP Committee completed the development of the numbering system in 1966. The numbering system was introduced to the financial markets in 1969.

25.     United States government agencies soon mandated the use of CUSIPs in regulatory reporting, effectively making CUSIPs a standard throughout the industry.

26.     On March 3, 1971, the SEC began using CUSIPs in its electronic data processing ("EDP") systems related to certain reporting forms, securities analyses, and the publication of certain directories.

27.     In 1971, the SEC required the use of CUSIPs on Form 3, the Initial Statement of Beneficial Ownership of Securities, and Form N-1R, a form for filing annual reports by management investment companies.

28.     In 1974, the ABA established the X9 standards committee to develop and review standards for the United States financial services industry. In 1979, the committee ratified CUSIP as a standard for identifying financial instruments.

29.     In 1977, the Municipal Securities Rulemaking Board ("MSRB") required the use of CUSIPs, if assigned, for the processing, clearance, and settlement of inter-dealer transactions in municipal securities.

30.     Also in 1977, the Federal Reserve revised Schedule B to Form TA-1 to include a box designed to ensure accurate entry of CUSIPs.

31.     By effectively adopting them as a standard, the United States government gave CUSIPs a significant advantage over the development of any competing numbering system for United States financial instruments. Issuers and Financial Institutions that were required to use the CUSIPs in their regulatory reporting had an absolute need for the CUSIPs and correspondingly had no need or use for any rival numbering system.

32.     The United States government has acknowledged that S&P had monopoly control of the market for financial instrument identification systems. The Department of the Treasury and the SEC have awarded contracts for issuing identifying numbers to CGS on a sole source basis.

33.     While financial regulators in the United States government have mandated the use of CUSIPs in regulatory filings, the Defendants did not and do not have legal authority to control Financial Institutions' use of CUSIPs after CGS issues them.

34.     Neither the Department of the Treasury, the SEC, nor any other government agency regulates the CUSIP Use Market.

### B.  The Relationship Among the ABA, S&P, and CGS

35.     The ABA asserts that it "owns" the CUSIP numbering system. The ABA claims to own a copyright to a compilation of data that includes data for every financial instrument associated with a CUSIP. The basis on which the ABA purports to claim a copyright in the data compilation is that it allegedly organizes the data in a novel way in that compilation.

36.     But the ABA's assertions do not stop there—it further asserts copyright ownership over every individual CUSIP, as opposed to the database in which they are embodied.

37.     The ABA contracted the management of the CUSIP numbering system to S&P and now to FactSet. The ABA states that CGS is operated "for the American Bankers Association."

38.     Within S&P, CGS was the entity responsible for managing the CUSIP numbering system on a day-to-day basis and will play the same role within FactSet. CGS performs two functions: it issues new CUSIPs; and it maintains the data compilation over which the ABA claims a copyright. CGS refers to this compilation as the "CGS Database."

39.     Financial Institutions executed license agreements either with CGS or with S&P. All payments of "license fees" by Financial Institutions—including Plaintiffs—were made to S&P in New York, not to CGS. The ABA is and will continue to be a third-party beneficiary of those contracts.

40.     In November 2020, S&P announced its intent to acquire IHS Markit, Ltd. ("IHS Markit"), a data and analytics provider headquartered in London that "provides pricing and reference data, identifiers, financial indices, valuation and trading services, as well as data feeds and data management solutions." *See* European Commission, Mergers: *Commission approves acquisition of IHS Markit by S&P Global, subject to conditions* (Oct. 22, 2021), https://ec.europa.eu/commission/presscorner/detail/en/IP_21_5461. S&P committed to divest CGS to alleviate the European Commission's stated concerns about the proposed acquisition. S&P entered into an agreement with FactSet under which FactSet purchased CGS.

## C.  The Structure and Utility of the CUSIPs

41.     Copyright protection in the United States subsists over creative works—such as sonnets, movies, and paintings—that result from human creativity. It may also extend to other works, such as compilations, evincing creativity through subjective selection and arrangement of components.

42.     By contrast, the content of each individual CUSIP results not from artistic, literary, or any other esthetic or subjective consideration. Instead, a convention established more than 50

years ago strictly determines the format of the CUSIP and each digit within it. The following chart describes the rigid structure of a CUSIP:

**Structure of a CUSIP**

**Example: Amazon.com Inc – Common Stock**

| ISSUER | ISSUE | CHECK | CUSIP IDENTIFIER |
|---|---|---|---|
| 023135 | 10 | 6 | 0231351 |
| **First 6 Characters** | **Next 2 Characters** | **Final Character** | **Resulting 9 Characters** |
| Identifies the unique name of the: | Identifies the type of instrument: | A mathematical formula checks accuracy of the previous 8 characters | A unique identifier |
| • Company<br>• Municipality<br>• Agency | • Equity<br>• Debt | | |
| A hierarchical alpha numeric convention linked to alphabetic issuer name | Uniquely identifies the issues within the issuer<br><br>A hierarchical alpha numeric convention | Delivers a 1 character check result | |

This structure is so rigid and predictable that an issuer knows the CUSIP number of its next issue before it receives the CUSIP and with no need to hear from CGS. Indeed, injecting novelty, creativity, or subjectivity into the CUSIP would destroy its utility because electronic trading systems could no longer identify financial instruments from the CUSIP. This consideration exerts decisive force over Defendants' putative claim of copyright, as discussed below.

43.     The CUSIPs also are an integral element of International Securities Identification Numbers ("ISINs"), which are 12-character numeric codes that identify securities around the world. ISINs for United States financial instruments incorporate the CUSIPs. Any entity outside the United States that trades the stock of a United States company on a foreign exchange must use the CUSIPs as an element of the ISIN that identifies that company's stock.

44.    Plaintiffs do not challenge the legality of the CUSIPs as the numbering system for financial instruments in the United States, nor do they challenge S&P's, CGS', or FactSet's right to issue CUSIPs for new financial instruments. Plaintiffs' challenge focuses on Defendants' leveraging their control of the issuance of CUSIPs into their unlawful control of the use of CUSIPs thereafter and their unlawful collection of "license fees" from Financial Institutions.

**D.   S&P Transformed a Staid, Lawful Business into a Behemoth that Unlawfully Exploits Financial Institutions**

45.    After the CUSIP numbering system was formed in 1968, S&P operated a dependable utility business in its CGS subsidiary. S&P distributed CUSIP numbers in physical books to financial institutions. The books contained a limited amount of information about each financial instrument that was linked to a CUSIP: the issuer number, issuer name, issue name, and CUSIP.

46.    S&P sold the books on a subscription model. Each customer bought a new book each year. S&P issued paper updates to the books throughout the year. At the end of the year, S&P required that subscribers return the books and paper updates, after which the subscribers would receive the next year's books. Under this physical distribution model, S&P purported to control the dissemination of the CUSIPs after issuance merely by controlling the physical books, and thereafter the CD-ROMs that later replaced the books.

47.    However, in the 1980s sophisticated data vendors began to distribute rich sets of financial markets' data, including CUSIPs, directly to Financial Institutions. This innovation disintermediated the direct contractual relationship S&P had enjoyed with Financial Institutions in the distribution of CUSIPs. The data vendors' distribution of CUSIPs directly to Financial Institutions meant that the Financial Institutions could use the CUSIPs without paying a fee to S&P. To reassert control over the use of CUSIPs, to ensure that it would face no competition in

the CUSIP Use Market, and to reap even higher amounts of "license fees," S&P changed its business model.

48.    This change in the business model coincided with a drive within S&P to increase year-over-year revenue by double digits. That goal put CGS in a dilemma because its numbering system was a utility. Dramatic price increases to existing subscribers were not feasible.

49.    S&P and CGS solved this dilemma by scrapping the historical subscription model in favor of a "license" model. Now, S&P also would seek a license from Financial Institutions on the false premise that receiving CUSIPs from data vendors resulted in Financial Institutions collecting— or "databasing"—CUSIPs, which in turn allegedly infringed the ABA's compilation copyright.

50.    Beginning in the 1980s, S&P demanded that Financial Institutions enter into license agreements with S&P for their use of CUSIPs. Financial Institutions understandably saw no need to enter into license agreements with S&P because they already were using CUSIPs as part of the data they obtained from their data vendors.

51.    S&P attempted to break that resistance among Financial Institutions by flexing its market power to force them to enter into license agreements. To that end, S&P inserted into its contracts with data vendors clauses that required the data vendors to cut off access to the CUSIPs for any Financial Institution that did not enter into a license agreement with S&P.

52.    S&P also used its market power in its other offerings to coerce Financial Institutions to enter a CUSIP license. S&P is a credit-rating agency that issues ratings for both government debt and company debt (public and private). As the largest of only three credit-rating agencies in the United States, S&P is a source of ratings data for Financial Institutions that trade, manage, or research debt offerings. S&P used its market power in ratings data to coerce Financial Institutions

into accepting a CUSIP license by refusing to provide its ratings data to Financial Institutions unless they entered into license agreements with S&P for use of the CUSIPs.

53.     These coercive and exclusionary tactics were effective. Today, nearly every significant Financial Institution, and many small ones, have entered into a license with S&P for use of the CUSIPs.

54.     By re-establishing their control of the use of CUSIPs in the downstream market after issuance, S&P and CGS also foreclosed an alternative avenue for potential competitors to enter that CUSIP Use Market.

55.     Electronic systems, including those the SEC has used for public filings, allowed potential competitors lawfully to accumulate all of the CUSIPs in use by capturing and storing in their own data systems each CUSIP as it appeared on the website of a federal agency, and thus compete with Defendants in providing databases of all issued CUSIPs.

56.     To eliminate this threat, S&P and CGS tried to identify entities that had accumulated an inventory of CUSIPs. They then threatened these entities with litigation and the loss of access to CUSIPs for the entity's own use if it did not destroy its inventory of CUSIPs. S&P and CGS also threatened these potential competitors with the loss of S&P's rating data if they did not destroy their inventory of CUSIPs. These threats prevented potential competitors from entering the CUSIP Use Market.

**E. S&P and CGS Executed and Enforced Their Exclusionary Conduct in Non-Negotiable Contractual Provisions**

57.     As described above, S&P and CGS required data vendors and Financial Institutions to execute written agreements that unlawfully excluded, and continue to exclude, competitors from the CUSIP Use Market. This allowed S&P and CGS to impose supra-competitive prices evidenced by the "license fees."

### 1.  The Data Vendor Agreements

58.     S&P and CGS prohibited data vendors from providing the CUSIPs to any Financial Institution that used CUSIPs and refused to sign a license agreement with S&P. These terms in the data vendors' agreements with S&P and CGS were non-negotiable. This requirement posed a very real threat. S&P and CGS demanded that data vendors cut off Financial Institutions' use of the CUSIPs, thereby jeopardizing the ability of those financial institutions to conduct their businesses.

59.     S&P and CGS forced the data vendors to agree to these provisions by threatening them with the loss of access to the CUSIPs and S&P ratings data. These threats guaranteed that substantially all data vendors agreed to these contract terms, which harmed competition by forcing data vendors to be the enforcement arm of S&P's and CGS' unlawful conduct. S&P and CGS thereby created a group boycott by the data vendors—who were horizontal competitors of each other and of S&P (itself a data vendor)—of Financial Institutions that refused to enter into license agreements with S&P to use the CUSIPs.

60.     The horizontal group boycott had the exclusionary effect of harming competition in the CUSIP Use Market by eliminating the entry of potential competitors into that market.

### 2.  The Financial Institution Agreements

61.     S&P required that each Financial Institution enter into two agreements: a "Subscription Agreement" and a "Use of Services Statement." Between them, the two agreements effectively prohibited Financial Institutions from using CUSIPs in any way not specifically permitted by S&P and CGS.

62.     The Subscription Agreement ("SA") prohibits Financial Institutions from publishing, distributing, or disseminating the CUSIPs, meaning that the agreement on its face purports to bar Financial Institutions from using publicly available information. The SA further

requires Financial Institutions to agree to "protect the CUSIPs" after the SA expires, meaning that

the SA purports to control how Financial Institutions use the CUSIPs even after the SA expires.

63.     The Use of Service Statement ("USS") dictates Financial Institutions' permitted

use of CUSIPs.  This requires each Financial Institution to report how many CUSIPs it maintains

in its databases. S&P and CGS used that information to set the level of their fee to the Financial

Institution.

64.     The specific language, to which S&P and CGS did not allow any changes, is as

follows:

> Subscriber agrees and acknowledges that the CUSIP Database and the information contained
> therein is and shall remain valuable intellectual property owned by, or licensed to, CUSIP
> Global Services ("CGS") and the American Bankers Association ("ABA"), and that no
> proprietary rights are being transferred to Subscriber in such materials or in any of the
> information contained therein. Any use by Subscriber outside of the clearing and settlement of
> transactions requires a license from CGS, along with an associated fee based on usage.
> Subscriber agrees that misappropriation or misuse of such materials will cause serious damage
> to CGS and ABA, and that in such event money damages may not constitute sufficient
> compensation to CGS and ABA; consequently, Subscriber agrees that in the event of any
> misappropriation or misuse, CGS and ABA shall have the right to obtain injunctive relief in
> addition to any other legal or financial remedies to which CGS and ABA may be entitled.

> Subscriber agrees that Subscriber shall not publish or distribute in any medium the CUSIP
> Database or any information contained therein or summaries or subsets thereof to any person
> or entity except in connection with the normal clearing and settlement of security transactions.
> Subscriber further agrees that the use of CUSIP numbers and descriptions is not intended to
> create or maintain, and does not serve the purpose of the creation or maintenance of, a master
> file or database of CUSIP descriptions or numbers for itself or any third party recipient of such
> service and is not intended to create and does not serve in any way as a substitute for the CUSIP
> MASTER TAPE, PRINT, DB, INTERNET, ELECTRONIC, CD-ROM Services and/or any
> other future services developed by the CGS.

65.     S&P's and CGS' agreements preclude Financial Institutions from using the CUSIPs

without signing a license agreement with S&P. The agreements also preclude Financial Institutions

from competing in the market for the use of CUSIPs and further undermine Financial Institutions'

potential challenge to Defendants' anticompetitive conduct, including by requiring that Financial

Institutions "admit" the validity of Defendants' claims of ownership and protection of intellectual property in the CUSIPs.

**F. Defendants' Copyright Justifications for the Agreements Are Invalid**

66.    S&P and CGS based the requirement of license agreements with Financial Institutions for the use of CUSIPs on the ABA's claimed copyright. Yet, the CUSIPs are not protected as a matter of United States copyright law.

**1. CUSIPs Are Not Copyrightable**

67.    A CUSIP is a nine-digit number, and each CUSIP is a number that has been known to humanity literally for millennia. Mathematicians, scientists, teachers, and financial markets' participants use numbers every day that happen to coincide with CUSIP numbers. Yet, Defendants assert that the ABA has copyrighted those numbers and therefore can control the use of those numbers. That assertion is legally baseless.

68.    Numbers used for identification ("identifying numbers"), such as parts numbers or CUSIPs, stand outside copyright protection because they lack the originality and creativity that is a constitutional and statutory requirement for copyright protection. Indeed, extending copyright protection to such numbers would unduly interfere with the legitimate use of the numbers in question. If such a copyright were allowed, *any* use of the number would potentially infringe the copyright. CUSIPs lack originality and creativity by design. Each part of the sequence of characters making up a CUSIP is dictated by the long-standing convention of the numbering system, and the utility of CUSIPs depends on S&P, CGS, and FactSet slavishly adhering to that system. CUSIPs would lose their utility were S&P, CGS, or FactSet to inject any subjectivity, originality, or creativity into them because electronic systems could not then read and process CUSIPs to identify the underlying financial instruments.

### 2. Even If the CGS Database Were Copyrightable, Its Protection Would Not Extend to the CUSIP Numbers

69.     The CGS Database is comprised of publicly available data. Plaintiffs do not concede that the CGS Database is copyrightable, but even were the CGS Database legitimately subject to copyright, its protection would not extend to the CUSIP numbers. Even if valid, the ABA's copyright in the CGS Database would protect only the data compilation in the form in which it has resided on S&P's and CGS' servers, comprising the selection and arrangement of those components as a whole. That copyright would not protect the individual pieces of data within the compilation.

70.     Thus, a Financial Institution could infringe that copyright only if it copied the selection and arrangement of the entire compilation. There is no infringement of the compilation copyright by using individual pieces of data in the compilation, such as one or more CUSIPs.

71.     For these reasons the ABA's copyright in the CGS Database—even if it is valid, which Plaintiffs do not concede—would not prevent financial institutions from using the CUSIPs in their businesses.

### G. Regardless of Any Fees from an Issuer for the Generation of a CUSIP, Defendants Are Not Entitled to Further Fees from Financial Institutions for the Use of CUSIPs

72.     S&P and CGS collected fees from issuers of financial instruments for the individual CUSIPs CGS generated for those new financial instruments. Plaintiffs do not challenge those fees in this lawsuit.

73.     Nonetheless, S&P was not, and FactSet and CGS are not, entitled to receive license fees from Financial Institutions for the use of CUSIPs.

74.     Issuers pay a relatively small fee based on the number of financial instruments they issue. An issuer of a large number of financial instruments may pay a lower price based on volume

discounts, but the fees are simple, as is the sales process. Conversely, the illegal "license fees" S&P and CGS imposed on Financial Institutions are substantial.

75.     S&P's and CGS' business of selling so-called "licenses" to Financial Institutions was elaborate and calibrated to the resistance level of the Financial Institution. This is one area where S&P and CGS were creative. At the first level, S&P and CGS set the license fees to each Financial Institution for use of the CUSIPs at a level just below what S&P and CGS believed would motivate the Financial Institution to challenge the fees. Because the CUSIPs were a critical element of an investment company's business, virtually all of S&P's and CGS' sales targets agreed to pay the license fees.

76.     Next, if a target Financial Institution initially refused to pay the fees, the sales employees threatened the Financial Institution that it would be cut off from the CUSIPs to the extent that it did not pay. This threat was sufficient to browbeat virtually all holdouts to sign a license and pay the license fees.

77.     Most interesting was the third tier of escalating threats: if the sales employees determined that a particular target Financial Institution would challenge the need for a license in court rather than pay, the employees were trained to back off and reengage with that target at a later time. This course of conduct confirms that S&P and CGS had no confidence in their claims of copyright. It gave S&P and CGS time to determine the optimum time and method of re-engaging, which S&P and CGS did as they pursued the conspiracy to eliminate competition in the CUSIP Use Market.

78.     Nearly every Financial Institution that trades or manages United States financial instruments was and is paying "license fees" to S&P and CGS, and now to FactSet. Because Defendants had and have no legal right to demand or collect any money on the basis that they are

"licensing" anything to a Financial Institution, the entire amount of the license fees is the measure of overcharge. On information and belief, the amount of the overcharge the Financial Institution Class is paying amounts to more than $100 million dollars per year.

## V.    RELEVANT MARKET AND DEFENDANTS' MARKET POWER

79.    The relevant product market is the market for using CUSIPs after initial issuance (the CUSIP Use Market). Because identifiers of financial instruments are national in scope, identifiers of non-United States financial instruments are not used to identify United States financial instruments. Thus, only the use of identifiers of United States financial instruments (CUSIPs) are included in the relevant product market.

80.    The relevant geographic market is the United States.

81.    S&P had a 100% share in the CUSIP Use Market, as does FactSet today. At all relevant times S&P had and FactSet has monopoly power in the CUSIP Use Market.

82.    Alternative numbering systems are inadequate substitutes for CUSIPs.

83.    The existence of other identifiers did not constrain S&P's and CGS' ability to raise or maintain prices of licenses for use of CUSIPs without losing substantial sales and does not constrain FactSet's ability to do the same now.

84.    S&P and CGS had the power to exclude competition in and maintain supra-competitive prices for licenses for the use of CUSIPs paid by Financial Institutions without losing substantial sales to potential rivals. FactSet now has that same power to exclude. S&P's long history of charging supra-competitive prices and excluding competitors demonstrates this monopoly power.

85.    A small but significant, non-transitory price increase in CUSIP licenses would not cause, and has not caused, a significant loss of sales to potential rivals to make such a price increase

unprofitable. Thus, the pricing of licenses for the use of CUSIPs does not exhibit significant, positive cross-elasticity of demand with respect to prices charged by any other entity.

86.     There are no natural barriers to entry into the CUSIP Use Market, but Defendants' anticompetitive exclusionary conduct has created substantial unnatural barriers to entry.

## VI.     CLASS ACTION ALLEGATIONS

87.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this action for themselves and on behalf of a class.

88.     The class is a "Financial Institution Class:"

> All persons or entities (other than data vendors) that directly paid a so-called "license fee" to S&P or FactSet pursuant to the Subscription Agreement and the Use of Services Statement at any time beginning at least four years prior to the filing of this Complaint until the anticompetitive acts end (the "Class Period").

89.     Excluded from the Financial Institution Class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, Defendants' officers, directors, employees, and immediate families thereof, any legal representative, heir, or assign of any Defendant, and any person acting on their behalf, any judicial officer presiding over or assigned to hear any aspect of this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

90.     The Financial Institution Class is readily ascertainable, and the members of the Class are readily identifiable from information and records maintained by S&P, CGS, and FactSet.

91.     Members of the Financial Institution Class are so numerous that joinder of all members is impracticable.  The members of the Class are numerous and widely dispersed throughout the United States and around the world.

92.     Plaintiffs' claims are typical of the claims of the members of the Financial

Institution Class. Within the Class, Plaintiffs' interests are not antagonistic to the claims of the

other members of the Class, and there are no material conflicts with any other members of the

Class that would make class certification inappropriate. Plaintiffs and all members of the Financial

Institution Class were damaged by the same wrongful conduct of Defendants.

93.     Plaintiffs will fairly and adequately protect and represent the interests of the

members of the Financial Institution Class. The interests of the Plaintiffs are coincident with, and

not antagonistic to, those of the members of the Class.

94.     Plaintiffs are represented by counsel (Competition Law Partners PLLC and Kaplan

Fox & Kilsheimer LLP) who are experienced and competent in the prosecution of class action

litigation, and who have particular experience with class action litigation involving alleged

violations of antitrust law in the financial services industry. Plaintiffs are further represented by

counsel (Irell & Manella LLP) who have particular experience with U.S. copyright doctrine.

95.     Questions of law and fact common to the members of the Financial Institution Class

predominate over questions that may affect only individual Class members because Defendants

have acted on grounds generally applicable to the entirety of the Class, thereby determining

damages with respect to the Class as a whole is appropriate. Such generally applicable conduct is

inherent in Defendants' wrongful conduct.

96.     There are legal and factual questions common to the Financial Institution Class,

which do not vary from Class member to Class member and which may be determined without

reference to individual circumstances of any Class member. These include, but are not limited to,

the following:

        (a)     Whether CUSIPs are copyrightable;

(b)     Even were an item of data included in a copyrighted data compilation, whether it is protected by the copyright when it is removed from the compilation;

(c)     Whether S&P and CGS had, and FactSet and CGS have, monopoly power in the CUSIP Use Market;

(d)     Whether the contractual restrictions on data vendors have furthered monopolization of the CUSIP Use Market;

(e)     Whether the contractual restrictions on data vendors have constituted an unreasonable restraint of trade;

(f)     Whether S&P's and CGS' tie of data vendors' access to S&P's ratings data to required licenses for Financial Institutions to use CUSIPs furthered their monopolization of the CUSIP Use Market;

(g)     Whether S&P's and CGS' tie of data vendors' access to S&P's ratings data to required licenses for Financial Institutions to use CUSIPs was an unreasonable restraint of trade;

(h)     Whether Defendants' conduct caused supra-competitive prices for the CUSIP licenses;

(i)     Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and other members of the Class;

(j)     What is the appropriate measure of damages;

(k)     Whether the alleged conspiracies alleged herein violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

(l)     Whether the alleged monopolization violated Section 2 of the Sherman Act, 15 U.S.C. § 2; and

(m)     Whether the Class is entitled to the injunctive relief sought.

97.     Class action treatment is a superior method to other available methods for the fair and efficient adjudication of the controversy.  The prosecution of separate actions by individual members of the Financial Institution Class would impose heavy burdens on the courts and

Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  Class action treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in management of this class action.

98.     Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VII.     THE ANTICOMPETITIVE EFFECT OF DEFENDANTS' CONDUCT

99.     During the Class Period, S&P and CGS engaged, and FactSet now engages,  in exclusionary conduct by (a) mandating that data vendors cut off Financial Institutions' access to the CUSIPs if Financial Institutions did not enter into the unlawful agreements to license use of CUSIPs; and (b) threatening to cut off a data vendor's access to CUSIPs and to S&P's ratings data if that data vendor refused to impose on Financial Institutions a requirement to enter into unlawful agreements to license use of CUSIPs, thereby foreclosing actual and potential competitors from any meaningful opportunity to enter the CUSIP Use Market. S&P and CGS further engaged, and now FactSet engages, in exclusionary conduct during the Class Period by forcing Financial Institutions to enter into "license agreements," thereby foreclosing potential competitors from any meaningful opportunity to enter the CUSIP Use Market. This exclusionary conduct barred competitors from the CUSIP Use Market for reasons other than competition on the merits. S&P

and CGS thereby were unlawfully to maintain and perpetuate their monopoly in the CUSIP Use Market.

100.    S&P's and CGS' conduct, and now FactSet's conduct, has raised the price of CUSIPs to supra-competitive levels.

101.    S&P and CGS extracted from Financial Institutions, on information and belief, at least one hundred million dollars each year of unjustified and supra-competitive charges that they would not have obtained absent their unlawful scheme.

102.    Defendants' unlawful conduct harmed and continues to harm competition by preventing competition in the CUSIP Use Market, thereby depriving Financial Institutions of the benefits of greater variety and increased competitive choices at lower prices, by stifling innovation that would exist in a competitive market, and by diverting financial resources to the Defendants that would otherwise be used by data vendors and Financial Institutions to innovate and improve their own services.  These anticompetitive effects ultimately result in higher costs and lower returns to Financial Institutions.

103.    Financial Institutions, including Plaintiffs, will continue to suffer such injury unless the relief sought in this Complaint is granted.

## VIII.   CLAIMS FOR RELIEF

### First Claim for Relief

**(Declaratory Judgment and Restitution Under the Declaratory Judgment Act, 28 U.S.C. § 2201 and the United States Copyright Act Of 1976, 17 U.S.C. § 101 *et seq*.**

104.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

105.    During the relevant period, Defendants have asserted (and continue to assert) a claim of copyright to CUSIP numbers, which are not entitled to copyright under the Copyright Act of 1976, 17 U.S.C. §101 *et seq*.

106.    Declaratory judgment is appropriate under the Declaratory Judgment Act, 28 U.S.C. §2201 to declare the rights of Plaintiffs by declaring that Defendants had (and have) no valid claim of copyright in and to the CUSIP numbers.

107.    Because 28 U.S.C. § 2202 empowers this Court to grant, "necessary or proper relief based on a declaratory judgment or decree . . . after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment," Plaintiffs are entitled restitution for all fees paid to Defendants during the past three years pursuant to the invalid "license agreements" that S&P and CGS imposed.

## Second Claim for Relief

### (Conspiracy in Violation of Section 1 of the Sherman Act)

108.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

109.    During the relevant period, S&P, CGS, and the ABA conspired and FactSet is now conspiring to impose on Financial Institutions, including Plaintiffs, unlawful license fees in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

110.    The conspiracy harmed Financial Institutions, including Plaintiffs, as set forth above.

111.    The conspiracy constituted a *per se* violation of Section 1 of the Sherman Act.

112.    During the relevant period, S&P and CGS leveraged, and now FactSet is leveraging, the ABA's purported copyright to require the execution of the data vendor agreement, SA, USS, and CUSIP license (collectively, the "Unlawful Agreements"). The Unlawful Agreements constituted an illegal restraint of trade or commerce in the United States CUSIP Use Market and a continuing violation of the Sherman Act.

113.    As a direct and proximate result of the S&P's, CGS', and the ABA's anticompetitive conduct, and now FactSet's anticompetitive conduct, as alleged herein, Financial Institutions, including Plaintiffs, were harmed and sustained substantial losses and damage to their businesses and property as set forth above.

114.    S&P's, CGS', the ABA's, and FactSet's agreements were a combination, contract, or conspiracy undertaken to produce adverse anticompetitive effects, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### Third Claim for Relief

### (Exclusionary Contracts in Violation of Section 1 of the Sherman Act)

115.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

116.    During the relevant period, S&P and CGS, and now FactSet have leveraged and are now leveraging the ABA's purported copyright, requiring the execution of Unlawful Agreements that unreasonably have restrained and are restraining trade or commerce in the United States CUSIP Use Market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

117.    The Unlawful Agreements harmed Financial Institutions, including Plaintiffs, as set forth above.

118.    The Unlawful Agreements constituted an illegal restraint of trade or commerce in the United States CUSIP Use Market and a continuing violation of the Sherman Act.

119.    There was and is no legitimate procompetitive justification for the Unlawful Agreements that outweighs their harmful effect. Even if there were some justifications, the Unlawful Agreements were not necessary to achieve such a purpose, nor were they the least restrictive means of achieving any such purpose.

120.    As a direct and proximate result of S&P's, CGS', the ABA's, and now FactSet's, anticompetitive conduct, as alleged herein, Financial Institutions, including Plaintiffs, have been harmed and have sustained substantial losses and damage to their businesses and property as set forth above.

121.    S&P's, CGS', the ABA's, and FactSet's agreements were and are a combination, contract, or conspiracy undertaken to produce adverse anticompetitive effects, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### Fourth Claim for Relief

### (Group Boycott in Violation of Section 1 of the Sherman Act)

122.    Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint.

123.    S&P, CGS, and the ABA agreed among themselves and forced data vendors to agree to refuse to deal with Financial Institutions, including Plaintiffs, unless Financial Institutions, including Plaintiffs, signed a license agreement with S&P.

124.    The purpose and effect of this group boycott was to restrain competition in the United States CUSIP Use Market.

125.    Financial Institutions, including Plaintiffs, were harmed and are being harmed by S&P's, CGS', the ABA's, and FactSet's conduct because they were deprived and are being deprived of a competitive market in which to obtain CUSIPs for use after their initial issuance, and as a result had to pay license fees that were and are unwarranted and unlawful.

126.    S&P's, CGS', the ABA's, and FactsSet's conduct was and is a substantial factor in causing Plaintiffs' harm.

**Fifth Claim for Relief**

**(Monopolization in Violation of Section 2 of the Sherman Act,
Unlawful Maintenance of Monopoly Power)**

127.     Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint.

128.     During the relevant period, S&P, CGS, and the ABA, and now FactSet willfully and unlawfully maintained, and FactSet is maintaining, their monopoly power in the United States CUSIP Use Market by engaging in exclusionary conduct that discouraged rather than encouraged competition on the merits. As explained in detail above, S&P, CGS, and the ABA excluded other potential competitors from entry into the United States CUSIP Use Market.

129.     The goal, purpose, and effect of S&P's, CGS', and the ABA's conduct, and now FactSet's conduct, was and is to maintain and extend S&P's  CGS' and FactSet's monopoly power. Defendants' illegal conduct enabled S&P and CGS to obligate Financial Institutions, including Plaintiffs, to execute the SA, USS, and CUSIP license.

130.     As a result of  the illegal conduct, as alleged herein, Financial Institutions, including Plaintiffs, were deprived and are being deprived of a competitive market in which to obtain data and CUSIPs and as a result have paid supra-competitive prices.

131.     The scheme was and is an act of unlawful monopolization of the CUSIP Use Market in violation of  Section 2 of the Sherman Act, 15 U.S.C. § 2.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek judgment awarding then the following relief:

a.       An order declaring that Defendants have engaged in anticompetitive conduct in

violation of Sections 1 and 2 of the Sherman Act;

b.      An order declaring that this action may proceed as a class action on behalf of a

        class of Financial Institutions;

c.      An order declaring that the CUSIPs are not copyrightable;

d.      An injunction prohibiting Defendants from claiming that CUSIPs are

        copyrightable;

e.      Restitution of fees paid by Financial Institutions, including Plaintiffs;

f.       An order declaring that the SA and USS are unenforceable;

g.      An injunction prohibiting enforcement of the SA and USS;

h.      An order declaring that Defendants may not impose fees on Financial Institutions,

        including Plaintiffs, that obtain their data from a data vendor;

i.      An injunction prohibiting the imposition of fees by Defendants on Financial

        Institutions, including Plaintiffs, for the use of CUSIPs after their initial issuance;

j.      Damages (*i.e.*, three times the amount of the overcharge) for Financial

        Institutions, including Plaintiffs, in an amount to be determined at trial;

k.      Attorneys' fees and costs of suit; and

l.      Such other further relief as allowed by law.

**<u>JURY DEMAND</u>**

Plaintiffs request a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: March 4, 2022                          Respectfully submitted,


                                              */s/ Leiv Blad*
                                              Leiv Blad
                                              Jeffrey Blumenfeld *pro haec vice* to be submitted
                                              COMPETITION LAW PARTNERS PLLC
                                              1101 Pennsylvania Avenue, NW
                                              Washington, DC  20004
                                              Telephone: (202) 742-4300
                                              Email: leiv@competitionlawpartners.com
                                              jeff@competitionlawpartners.com


                                              Robert N. Kaplan
                                              Frederic S. Fox
                                              Gregory K. Arenson
                                              Donald R. Hall
                                              KAPLAN FOX & KILSHEIMER LLP
                                              850 Third Ave., 14th Floor
                                              New York, NY 10022
                                              Telephone: (212) 687-1980
                                              Email: rkaplan@kaplanfox.com
                                              ffox@kaplanfox.com
                                              garenson@kaplanfox.com
                                              dhall@kaplanfox.com


                                              David Nimmer *pro haec vice* to be submitted
                                              Joseph Mantegani *pro haec vice* to be submitted
                                              IRELL & MANELLA LLP
                                              1800 Avenue of the Stars
                                              Suite 900
                                              Los Angeles, CA  90067
                                              Telephone: (310) 277-1010
                                              Email: dnimmer@irell.com
                                              jmantegani@irell.com