# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DINOSAUR FINANCIAL GROUP LLC<br>470 Park Avenue South, Ninth Floor<br>New York, NY  10016 | ) ) ) | |
| | ) | |
| HILDENE CAPITAL MANAGEMENT, LLC<br>333 Ludlow Street, Suite 5<br>Stamford, Connecticut 06903 | ) ) ) ) | |
| SWISS LIFE INVESTMENT<br>MANAGEMENT HOLDING AG<br>General-Guisan-Quai 40<br>P.O. Box. 8022 Zurich, Switzerland | ) ) ) ) ) | Civil Action No.: 1:22-cv-1860-KPF |
| on behalf of themselves and all others<br>similarly situated, | ) ) ) | Civil Action No.: 1:22-cv-1929-KPF |
| Plaintiffs, | ) ) | |
| v. | ) ) | **CONSOLIDATED AND AMENDED** |
| S&P GLOBAL, INC.<br>55 Water Street<br>New York, NY  10041 | ) ) ) ) | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| AMERICAN BANKERS ASSOCIATION<br>1120 Connecticut Ave., NW<br>Washington, DC  20036 | ) ) ) ) | |
| FACTSET RESEARCH SYSTEMS INC.<br>45 Glover Avenue<br>Norwalk, CT  06850 | ) ) ) ) | |
| Defendants. | ) ) ) ) ) ) | |

Plaintiffs Dinosaur Financial Group LLC, Hildene Capital Management, LLC, and Swiss Life Investment Management Holding AG (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by their attorneys, Competition Law Partners PLLC, Kaplan, Fox & Kilsheimer LLP, and Wollmuth Maher & Deutsch LLP, for their Consolidated Amended Complaint ("CAC") in this action hereby state the following:

## I.   INTRODUCTION

1.      Defendants S&P Global, Inc. ("S&P")[1] and the American Bankers Association ("ABA") have conspired for decades to eliminate competition in the market for the use of issued CUSIP numbers—the "CUSIP Use Market." CUSIP is an acronym that stands for Committee on Uniform Securities Identification Procedures. As its name implies, a CUSIP number is a functional "serial number" to identify a particular financial instrument. CUSIP numbers identify financial instruments just as social security numbers identify persons or VIN numbers identify cars.

2.      Each CUSIP number is merely a nine-digit number that identifies a specific United States financial instrument—specifying the issuing entity and the type of instrument—and thereby enables the processing, clearing, and settlement of trades of that instrument. CUSIP numbers are also needed for research and analysis of financial instruments. Therefore, banks, investment funds, public employee pension funds, fund managers, and other financial institutions ("CUSIP Users"), both in the United States and abroad, must have the CUSIP numbers, as well as the full issuer name and the issue description, to operate their businesses. Plaintiffs are CUSIP Users. CUSIP Users include pension funds, fund managers, and other financial institutions that advise and manage investments for public and private pension funds and other retirement accounts such as 401Ks and

---

[1] All references to S&P which describe current and ongoing conduct should be read to include FactSet (defined below), whether or not the inclusion of FactSet is specifically noted.

IRAs.[2] As a result, the unlawful "license fees" imposed by the Defendants (as explained further below) operate as a tax on United States financial and retirement systems, extracting tens of millions of dollars or more each year from current and future retirees and other investors.

3.     Participants in the CUSIP Use Market include: (a) the Defendants, who control the distribution of CUSIP numbers through unlawful agreements imposed by S&P (and now FactSet, as defined below) that restrict competition and that create a boycott of CUSIP Users that do not enter the unlawful agreements; (b) CUSIP Users, such as Plaintiffs and the members of the Class[3], who must pay unlawful and unfair license fees to use CUSIP numbers in their businesses; (c) data vendors, such as Bloomberg L.P. ("Bloomberg"), who distribute CUSIP numbers to the CUSIP Users and could do so without restriction were it not for the unlawful agreements with Defendants ("Data Vendors"); and (d) fintech companies and other potential competitors, such as Xignite as discussed below, who could develop innovative products and services using the CUSIP numbers were they not excluded from the market by Defendants' unlawful agreements and group boycott.

4.     The ABA asserts that it "owns" the CUSIP numbering system. The ABA claims to own a copyright based on a copyright registration it filed for a "compilation" of data that includes data for every financial instrument associated with a CUSIP number as well as the CUSIP number for each such financial instrument. In fact, however, CUSIP numbers are not copyrightable and therefore copyright protection does not extend to CUSIP numbers. The ABA contracted the management of the CUSIP numbering system to S&P (and now to FactSet Research Systems, Inc. ("FactSet")). ABA shares in the revenue and profits derived from the CUSIP numbering system.

---

[2] *See* footnote 6 for a partial listing of CUSIP Users.

[3] "Class" as used herein refers to members of the "CUSIP User Class" defined below.

5.     Within S&P, the CUSIP Global Services ("CGS") division was responsible for managing the CUSIP issuance and licensing business ("CGS Business") on behalf of the ABA until March 1, 2022. On that date, Defendant FactSet purchased the CGS business from S&P for $1.925 billion, assumed its liabilities through an asset purchase agreement, and entered into an agreement with S&P and the ABA by which FactSet took over from S&P the licensing and administration of the CUSIP numbering system on behalf of the ABA.

6.     The CUSIP numbering system is the standard for identifying financial instruments in the United States. The ABA and S&P entrenched the CUSIP numbering system as the standard through their decades of control of the committee that designates the standard for securities identifiers, the ANSI (defined below) Accredited Standards Committee X9 ("X9"). As a result, S&P (and now FactSet) provide new CUSIP numbers to securities issuers to identify their newly issued securities, a function Plaintiffs are not challenging in this Complaint. However, the designation of the CUSIP numbering system as a standard does not confer on Defendants any power or rights in the CUSIP Use Market. Defendants control the CUSIP Use Market only because they have successfully and unlawfully excluded all actual and potential competitors from that market through unlawful agreements and a group boycott.

7.     Historically, CUSIP Users purchased physical books from S&P containing all CUSIP numbers in use and identifying the issuer and the type of financial instrument. However, beginning in the 1980s, Data Vendors, such as Bloomberg, began providing rich sets of value-added data services, which include CUSIP numbers, directly to financial institutions and other customers, disintermediating the prior relationship between S&P and CUSIP Users. As a result, S&P lost its contractual relationships with CUSIP Users and therefore could no longer control

the CUSIP Users' use of the CUSIP numbers they received from their Data Vendors. Such uncontrolled use threatened Defendants' control of the CUSIP Use Market.

8.      To reassert S&P's control of the CUSIP Use Market and prevent competition, Defendants engaged in multiple tactics, all in violation of United States antitrust law and premised on Defendants' false assertion that CUSIP numbers are protected by copyright. As explained in more detail below, the CUSIP numbers are not copyrightable and not protected by the ABA's claimed compilation copyright.

### A.  Unlawful Agreements

9.      S&P's (and now FactSet's) agreements with the Data Vendors that restored S&P's control over the use of CUSIP numbers by the CUSIP Users included a clause prohibiting Data Vendors from distributing CUSIP numbers to any CUSIP User that did not sign a "license agreement" directly with S&P, despite receiving no data from S&P (and now FactSet). This clause in the Data Vendor agreements made the Data Vendors—however unwillingly—the instruments of S&P's (and now FactSet's) strategy to control the CUSIP Use Market by creating a group boycott that excluded from that market, as competitors, all CUSIP Users who did not agree to enter into a "license agreement" with S&P even if they received CUSIP numbers from sources other than S&P.

10.      Defendants extracted and continue to extract these "license fees" by threatening CUSIP Users both with copyright infringement litigation and with the loss of access to the CUSIP numbers if they do not sign the license agreement. Defendants reinforce those threats by contractually prohibiting Data Vendors from supplying CUSIP numbers to the Data Vendors' customers who do not agree to enter into the license agreements. S&P's (and now FactSet's)

agreements with the Data Vendors ensure that any CUSIP User that does not sign the license agreement will face the risk of losing access to the CUSIP numbers.

11.     This is no small threat because without access to CUSIP numbers, CUSIP Users cannot conduct their businesses. In today's computerized financial systems, data relating to each specific individual financial instrument is largely useless unless it is associated with a unique identifier of that specific individual financial instrument. The data become like Social Security numbers not associated with a name or baseball statistics unattached to a specific player. Because CUSIP Users must be able to use the CUSIP numbers to process, clear, and settle trades, as well as to perform research and analysis on financial instruments, and given the costs to the CUSIP Users of defending potential lawsuits if they do not capitulate to Defendants, Defendants' threats give CUSIP Users no choice but to enter the license agreements. And, on information and belief, these were not empty threats: CUSIP Users have lost access to the CUSIP numbers as threatened.

12.     Indeed, the fact that Defendants threaten to cut off CUSIP Users' access to CUSIP numbers demonstrates that Defendants' assertion that CUSIP Users can obtain the CUSIP numbers from other sources is misleading. If it were so easy for CUSIP Users to obtain the CUSIP numbers from sources other than the Data Vendors, the threats would be empty. Defendants can make these threats only because Defendants know, as a practical matter, that CUSIP Users cannot obtain the CUSIP numbers from other sources and therefore the exclusion of CUSIP numbers from CUSIP Users' data feeds would make that data unusable.

13.     Thus, S&P's contracts with the Data Vendors and CUSIP Users gave S&P complete control over the CUSIP Use Market. Defendants could not have imposed these exclusionary agreements, the so-called "licenses," or the "license fees" in a competitive market.

### B.  Group Boycott

14.    Defendants created a group boycott in which S&P (and now FactSet) require the Data Vendors to sign agreements—however unwillingly—committing the Data Vendors to deny access to essential financial data including CUSIP numbers to any CUSIP User that refuses to enter into a "license agreement" with S&P in addition to the CUSIP Users' existing contracts with their Data Vendors. Denying access to the CUSIP numbers from their Data Vendors would make it impossible for CUSIP Users to conduct their businesses. Defendants' group boycott is a *per se* violation of Section 1 of the Sherman Act.

### C.  Defendants' Stated Justification of Their Illegal Conduct on The Basis That CUSIP Numbers Are Copyrighted Is Baseless

15.    Defendants contend, as they must, that an ABA-owned copyright justifies this exclusionary, anticompetitive conduct. A valid claim of an intellectual property right—such as a patent or copyright—is the only basis on which such exclusionary conduct is justified. This is because the heart of the intellectual property right is the lawful power to prevent others from using the intellectual property without the owner's permission. Without a valid and lawful intellectual property right, the Defendants have no such lawful authority, and their exclusionary conduct violates antitrust laws.

16.    The problem for Defendants is that the ABA's copyright protects at most only a compilation of data, not the individual bits of data in the compilation. Copyright protection is not available for individual facts such as numbers. Copyright protection can be available for a collection of facts if that collection qualifies as a "compilation" under 17 U.S.C. § 103, which requires that the organization and format of the compilation show sufficient originality and authorship. But even where a collection of facts or data qualifies for copyright as a "compilation," the copyright protection applies only to the compilation itself, and not to the individual data items.

Thus, the compilation copyright protects against someone copying the entire, or a substantial portion of, the data compilation, where "copying" means literally reproducing the organization and format of the copyrighted compilation. By contrast, any fact or other data item included in the compilation is not protected by the compilation copyright in and of itself; anyone is free to see one or more facts or bits of data in the compilation and use those facts or bits of data for any purpose (short of reproducing substantially all the compilation in its copyrighted format and organization).

17.     Thus, even assuming *arguendo* the validity of the ABA's copyright of a "data compilation," a CUSIP User infringes that copyright only if it copies substantially the entire compilation precisely as it is arranged on S&P's (and now FactSet's) servers. This the CUSIP Users cannot and do not do. CUSIP Users do not receive the entire data compilation from Defendants. In fact, CUSIP Users do not receive any data directly from Defendants, not even the CUSIP numbers. Instead, CUSIP Users receive the CUSIP numbers and other individual items of data—including the full issuer name, and the description of the issue—from their Data Vendors. CUSIP Users do not receive or use anything close to the entire data compilation, and the data they do receive from their Data Vendors are not supplied to them in the form of the ABA's data compilation even where that full compilation may be supplied by S&P (and now FactSet) to the Data Vendors.

18.     Therefore, the ABA's copyright does not and cannot justify Defendants' anticompetitive conduct, even if the CUSIP numbers and some other individual data items supplied to them by their Data Vendors are also included in the Defendants' compilation.

19.     In sum, Defendants have no lawful right to control the use of the CUSIP numbers because they have no valid copyright in the CUSIP numbers and the numbers—as well as the full issuer names and the issue descriptions—are not copyrightable.

20.     But even assuming *arguendo*, and contrary to existing law, that CUSIP numbers are determined to be copyrightable, Defendants have violated the commitment made by the ABA, as the claimed holder of the intellectual property, to X9 to offer licenses to CUSIP numbers and the CUSIP numbering system on fair, reasonable and non-discriminatory ("FRAND")[4] terms, including price. While Defendants were not and are not entitled to require CUSIP Users to pay any "license" fees for accessing CUSIP numbers, the fees they coerce from CUSIP Users, at a minimum, violated the ABA's FRAND commitment.

21.     Upon information and belief, including statements FactSet's managers made during an analyst call shortly after its acquisition of CGS, FactSet has continued and plans to continue S&P's unlawful conduct. FactSet therefore has entered into and is continuing the same conspiracy that S&P participated in for decades, excluding potential competitors from the CUSIP Use Market, continuing the unfair business practices S&P started, and imposing unlawful and anticompetitive license fees on CUSIP Users.

22.     As a result of Defendants' illegal conduct, Plaintiffs, on behalf of themselves and all others similarly situated, bring this action for a declaratory judgment that CUSIP numbers are not copyrightable, and for damages for violation of the United States antitrust laws, for breach of contract, and for violation of New York and Connecticut unfair business practice statutes.

23.     **Declaratory Judgment that CUSIP Numbers Are Not Copyrightable**. Defendants have asserted and continue to assert ABA's claim of copyright on individual CUSIP numbers. However, ABA's only purported copyright is on the entire CUSIP database compilation. The CUSIP numbers stand outside copyright protection because they lack the originality and

---

[4] In some standards setting organizations, particularly in the United States, the commitment is or has been phrased as "reasonable and non-discriminatory" or RAND, and in some organizations, particularly outside the United States, it is defined as "fair, reasonable, and non-discriminatory" or FRAND. The more common usage today is "FRAND" which is the term that will be use throughout this Complaint.

creativity that is a constitutional and statutory requirement for copyright protection. Far from being original and creative, a CUSIP number is fixed by the long-standing convention for how CUSIP numbers are assigned to identify financial instruments. Moreover, the full name of the issuer and the description of the issued instrument—while they are facts that are included in the compilation—are chosen by the issuer, and therefore are entirely outside any claim of copyright by the ABA, S&P, or FactSet. A declaratory judgment that ABA has no valid copyright claim on CUSIP numbers is ripe for review now since, as described below, Defendants have threatened legal action and other business harm to Plaintiffs based on false copyright claims. As part of the necessary and proper relief based on a declaratory judgment that ABA has no valid copyright on CUSIP numbers, Defendants should be ordered to return all fees paid by Plaintiffs and members of the Class pursuant to invalid "license agreements" based on false copyright claims.

24. **Violations of Section 1 of the Sherman Act**. Throughout the relevant class period, Defendants conspired to restrain competition in the CUSIP Use Market in three ways. First, S&P (and now FactSet) and their horizontal competitors, the Data Vendors, created a group boycott of CUSIP Users that refuse to enter into license agreements with S&P (and now FactSet). The group boycott was implemented through written agreements with Data Vendors that prohibit Data Vendors from distributing CUSIP numbers to any CUSIP User that does not sign a "license agreement" directly with S&P and now FactSet. These agreements resulted in the exclusion from the CUSIP Use Market of all CUSIP Users who do not agree to enter into a "license agreement." Second, S&P conspired with the ABA (and now FactSet continues to conspire with the ABA) to prevent competition in the CUSIP Use Market by requiring CUSIP Users to take a license from Defendants that sharply limits CUSIP Users' use of CUSIP numbers despite having no lawful basis to impose such restrictions. Based on a false claim that the ABA's copyright protects CUSIP

numbers, S&P required (and now FactSet continues to require) that financial institutions that use CUSIP numbers enter into written agreements—so-called "license agreements"—that limit the manner in which licensees can use the CUSIP numbers. These agreements prevent innovation and competition that would bring to the market novel services and offerings that involve the use of CUSIP numbers. Third, Defendants have agreed and conspired to use the standard-setting process to prevent competition in the CUSIP Use market to ensure their CUSIP numbering system remains the standard and enabling them to continue receiving monopoly returns. Accordingly, Plaintiffs, individually and on behalf of all persons and entities similarly situated, bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*, seeking actual damages, treble damages, and injunctive relief.

25.     **Violations of Section 2 of the Sherman Act**. During the relevant class period, S&P willfully and unlawfully maintained (and FactSet is maintaining) a monopoly in the CUSIP Use Market through its market power and exclusionary conduct. The ABA and S&P (and now FactSet) conspired to maintain S&P's (and now FactSet's) monopoly power by engaging in exclusionary conduct that prevented competition in the market. As explained above, S&P (and now FactSet) excluded other potential competitors from entry into the CUSIP Use Market through unlawful exclusionary contracts and by means of a group boycott. As a result of this conduct, CUSIP Users, including Plaintiffs, were deprived of a competitive CUSIP Use Market and were forced to enter "license agreements" with S&P (and now FactSet) and pay unlawful and unfair fees. Accordingly, Plaintiffs, individually and on behalf of all persons and entities similarly situated, bring this action under Section 2 of the Sherman Act, 15 U.S.C. § 2 *et seq.*, seeking actual damages, treble damages, and injunctive relief.

26.     **Unfair Deceptive and Threatening Business Practices**. Plaintiffs, individually and on behalf of the New York Unfair Business Practices Sub-Class (defined below), bring this action under Section 349 of the New York General Business Law, and Hildene (defined below), individually and on behalf of the Connecticut Unfair Business Practices Sub-Class, bring this action under Section 42-110b of the Connecticut Unfair Trade Practices Act, seeking compensation for injuries caused by Defendants' use of materially threatening, deceptive, and misleading business practices to force them to enter unlawful and unfair "license agreements." Specifically, Defendants have engaged in (i) purposeful, deceitful, and misleading monopolistic conduct to ensure control over the CUSIP Use Market; (ii) purposeful, deceitful, unfair, and misleading practices by falsely claiming "license agreements" were necessary to use CUSIP numbers; and (iii) threats that CUSIP Users will be unable to access essential data from Data Vendors and be subject to copyright infringement claims unless they enter "license agreements."

27.     **Breach of Contract**. If, contrary to law, CUSIP numbers are found to be copyrightable, then Plaintiffs, individually and on behalf of the Class, bring this action for Defendants' breach of the ABA's commitment that, as a condition to X9 designating the CUSIP numbering system as the standard, the ABA would license use of the CUSIP numbering system on FRAND terms. Plaintiffs and members of the Class are intended third-party beneficiaries of the agreement between ABA and X9. At a minimum, Defendants breached the ABA's FRAND agreement by coercing CUSIP Users to pay fees for the use of CUSIP numbers that do not comply with the FRAND commitment.

28.     **Additional Injunctive Relief**. Plaintiffs, individually and on behalf of the Injunctive Relief Class (as defined below), also seek injunctive relief to enjoin the ABA's and FactSet's continued anticompetitive and unfair conduct alleged herein. This ongoing unlawful

conduct threatens to continue to injure Plaintiffs and members of the Injunctive Relief Class through the continued payment of annual fees for existing "license agreements" and demands to renew or enter new "license agreements." Accordingly, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs seek a permanent injunction prohibiting the ABA and FactSet from continuing their illegal, anticompetitive and unfair practices of seeking to force CUSIP Users to continue to pay fees for existing license agreements and to enter and renew license agreements for the use of CUSIP numbers.

## II.  JURISDICTION AND VENUE

29.     This is an action (i) for declaratory judgment and restitution under 28 U.S.C. §§ 2201, 2202 arising, in part, under the United States Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act"); (ii) for injunctive relief and damages under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 4 of the Clayton Act, 15 U.S.C. § 15(a); (iii) for damages for violations of New York General Business Law § 349(a); (iv) for damages for violations of Connecticut Unfair Trade Practices Act § 42-110b(a); and (v) for damages for breach of contract. As to monetary relief, this action seeks to recover threefold damages, restitution, costs of suit, and reasonable attorneys' fees.

30.     This Court has original jurisdiction of these claims under 28 U.S.C. §§ 1331, 1337, and 1338 and Section 4 of the Clayton Act, 15 U.S.C. § 15.

31.     This Court has subject matter jurisdiction over this matter pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, and the Copyright Act.

32.     The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 because these claims form part of the same case or controversy as the federal claims asserted herein.

33.     Defendants' conduct, as described herein, was within the flow of, and was intended to and did have a substantial effect on, the interstate commerce of the United States, including in this District. During the relevant period, each Defendant used the instrumentalities of interstate commerce to join or effectuate their scheme. The Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

34.     Defendants engaged in conduct in the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

35.     This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, and committed overt acts in furtherance of its illegal scheme throughout the United States, including in this District. The scheme has been directed at, and has had the intended effect of, causing injury to Plaintiffs and persons and entities residing in, located in, or doing business in this District, the United States and its territories, and the District of Columbia.

36.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400 and Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22) because each Defendant resides, transacts business, is found, or has agents within this District, and because a substantial part of the alleged events giving rise to the claims occurred, and a substantial portion of the affected interstate trade and commerce described below was carried out, in this District.

## III.    THE PARTIES

37.     Dinosaur Financial Group LLC ("Dinosaur") is a financial institution based in New York. It provides investment banking, institutional brokerage, and wealth management services.

Dinosaur has entered into a license agreement with S&P and paid license fees directly to S&P in New York.

38.     Hildene Capital Management, LLC ("Hildene") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Connecticut. It is a diversified institutional asset manager specializing in assets based on credit opportunities. Hildene entered into a license agreement with S&P and paid license fees directly to S&P in New York. The negotiations occurred in New York and Connecticut, and the agreement is governed by New York law.

39.     Swiss Life Investment Management Holding AG ("Swiss Life") is a Switzerland-based holding company and through its fund and asset management companies is a provider of portfolio management services for institutional investors. Swiss Life has entered into a license agreement with S&P and paid license fees directly to S&P in New York; that agreement, and the relationship between Swiss Life and S&P established by the license agreement, is governed by New York law.

40.     Defendant ABA is a trade association for the United States banking industry organized under Section 501(c)(6) of the Internal Revenue Code. It is headquartered in Washington, DC.

41.     S&P is a provider of financial information and data analytics. It is headquartered in New York, New York.

42.     FactSet is a financial data analytics company. It is headquartered in Norwalk, Connecticut. Under the Asset Purchase Agreement between S&P and FactSet, FactSet assumed and agreed to pay, discharge, or perform the liabilities of S&P and its affiliates to the extent related to or arising out of the CGS Business. In addition, under a Novation Agreement entered into among

S&P, FactSet, and the ABA, the ABA consented to FactSet's purchase of the CGS Business from S&P, and FactSet agreed to assume all of S&P's obligations to the ABA under the CGS Business' license agreement with the ABA. Thus, upon its acquisition of the CGS Business, FactSet became both the beneficiary of S&P's and the ABA's illegal conduct, responsible for it, and a participant in that illegal conduct. FactSet is continuing this illegal conduct.

43.     CGS was a division of S&P located in New York, New York until March 1, 2022 when FactSet purchased the CGS Business. As of March 1, 2022, CGS is owned by FactSet, which is headquartered in Connecticut and maintains an office in New York, New York. The CGS Business was operated on behalf of the ABA by S&P and its subsidiaries until March 2022 and is now operated on behalf of the ABA by FactSet.

## IV.    NATURE OF THE ACTION

### A.  The Development of the CUSIP Numbering System

44.     Electronic trading systems require a standardized method for identifying financial instruments to facilitate the clearing and settlement of trades and other transactions. The standardized method must ensure that each financial instrument has a unique identifier that electronic trading systems can read and process. CUSIP numbers are unique identifiers, constituting the numbering system for trading in all United States financial instruments.

45.     The CUSIP numbering system was the product of a years-long industry-wide voluntary cooperative effort to develop a standard for identifying United States financial instruments. In the 1960s, government regulators, stock exchanges, and private firms recognized the need for such a standard because the then-new, but already rapidly growing number of, electronic systems managing the clearing and settlement of trades had no efficient way to identify a particular financial instrument. Verbal descriptions could not serve that function because any

variation from one party's expression to another's—such as the use by one of abbreviations rather than whole words, or the use of different abbreviations for the same word—would cause the electronic systems (at least at the time and for many years thereafter) to fail to recognize all such descriptions as identifying the same instrument.

46. To remedy this shortcoming, representatives of the Securities and Exchange Commission ("SEC"), the New York Stock Exchange ("NYSE"), the American Stock Exchange, the National Association of Securities Dealers, the Association of Stock Exchange Firms, the Investment Bankers Association, the ABA, and many financial institutions worked to develop a numbering identification system to speed up the clearing and settlement of securities transactions in a committee formed for that purpose—the Committee on Uniform Security Identification Procedures (the "CUSIP Committee").

47. Beginning in 1964, the CUSIP Committee coordinated the development of a numbering system and the creation of an entity to manage the real-time listing of CUSIP numbers. The CUSIP Committee completed the development of the CUSIP numbering system in 1966. The numbering system was introduced to the financial markets in 1968. Shortly after the ABA announced the development of the CUSIP numbering system, it created the CUSIP Service Bureau ("CSB"), the predecessor to CGS, to administer the CUSIP database. Later that year, the ABA selected S&P to operate and manage CSB/CGS, which became a division of S&P. This setup lasted through March 1, 2022, when S&P sold CGS to FactSet.

48. On March 3, 1971, the SEC began using CUSIP numbers in its electronic data processing systems related to certain reporting forms, securities analyses, and the publication of certain directories.

49.     In 1971, the SEC required the use of CUSIP numbers on Form 3, the Initial Statement of Beneficial Ownership of Securities, and Form N-1R, a form for filing annual reports by management investment companies. In 1972, all clearing corporations begin using CUSIP numbers, making them the mandatory identifier for all brokerage firms. In 1975, The Federal Reserve Bank's automated book entry system began using CUSIP numbers to accelerate the transfer of United States Treasury Securities.

50.     In 1974, several years after granting an exclusive license to S&P's CGS, the ABA established the X9 Standards Committee, the predecessor of X9, which is an Accredited Standards Developer of the American National Standards Institute ("ANSI"). The ABA established the X9 Standards Committee to develop and review standards for the United States financial services industry. In that same year, the X9 Standards Committee obtained approval from ANSI to set the CUSIP numbering system as the market standard for identifying financial instruments traded on the United States financial markets.

51.     In 1976, the ABA-controlled X9 Standards Committee ratified the CUSIP numbering system as the national standard for identifying financial instruments under ANSI X9. However, X9 was and is far from an independent standard-setting committee. The ABA established X9 in the 1970s and X9 remains closely tied to the ABA and CGS to this day.

52.     Both the ABA and S&P's (now FactSet's) CGS division are full voting members of X9. The current Managing Director, and Global Head of CGS is Scott Preiss, who previously chaired X9. Tab Stewart, the Senior Vice President, Financial Services Standards at the American Bankers Association is (i) Chair of X9's Policies and Procedures; (ii) a representative of X9's CUSIP Working Group—the working group responsible for reviewing and approving the CUSIP numbering system as a national standard; and (iii) a member of CGS's Board of Trustees. Karin

Flynn, Chief Financial Officer of the American Bankers Association, is a member of the Board of Trustees of CGS. Nine of the twenty-three members of the CUSIP Working Group were from the ABA and S&P's CGS when CUSIP's X9 accreditation was renewed in December 2020.

53.     Although X9 formally separated from the ABA in 2001 and is now an ANSI Accredited Standards Developer, the ABA has and continues to exert substantial control over it as evidenced by the significant ties and overlap between the ABA, CGS and X9, ensuring the entrenchment of CUSIP numbers as the standard for identifying United States financial instruments and Defendants' continued ability to control the CUSIPS Use Market through the anticompetitive and unlawful conduct described herein. The ABA's and S&P's CGS (now FactSet's) influence over X9 allowed them to agree and conspire to use the standard-setting process—which continually selected CUSIP as the standard even in the face of a free alternative from Bloomberg—to prevent competition in the CUSIP Use market to ensure their CUSIP numbering system remains the standard and enabling them to continue receiving monopoly returns.

54.     Because the CUSIP numbering system is the standard for identification of financial instruments, the CUSIP numbering system enjoys a significant advantage over the development of any competing numbering system for United States financial instruments, such as the FIGI numbering system developed by Bloomberg and offered as a free alternative. Issuers and CUSIP Users that were required to use the CUSIP numbers in their regulatory reporting had an absolute need for the CUSIP numbers and no need for an alternative.

55.     Regardless of any requirements to use CUSIP numbers in regulatory filings or otherwise, no government agency, including the Department of the Treasury and the SEC, regulates

the CUSIP Use Market, nor does any government agency regulate the rates and terms charged by CGS for any of its CUSIP-related activities.

**B. If—Contrary to Current Law—CUSIP Numbers Are Found to Be Protected by Copyright, Defendants Are Violating the ABA's Commitment to X9 to License on FRAND Terms**

56.     The ANSI Intellectual Property Rights ("IPR") policy requires that entities contributing to a standard disclose if they have or may assert proprietary intellectual property rights as to their contribution to the standard and disclose the terms and conditions under which they will license (or refuse to license) to those whose use of the standard would infringe those intellectual property ("IP") rights without a license. As required by the ANSI IPR policy, during the standard setting process the ABA disclosed its intended licensing terms and committed that it would license the CUSIP numbering system on FRAND[5] terms and conditions, including pricing. CUSIP Users as licensees of S&P (now FactSet) are third-party beneficiaries of those commitments.

57.     Having chosen to (unlawfully) force CUSIP Users to take licenses for the use of CUSIP numbers, S&P (now FactSet), which acts on behalf of the ABA, is bound by the ABA's FRAND commitment, which applies to the so-called "licenses" Defendants force CUSIP Users to sign. Underscoring its understanding of its requirement to honor that commitment, S&P (now FactSet) represents on its website that it complies with the ABA's licensing commitment by stating that it "seeks to charge fair, reasonable and non-discriminatory license fees" for CUSIP numbers. A key purpose of the FRAND commitment is to prevent holders of proprietary rights on technologies that are incorporated into standards (SEP patentees) from engaging in "hold up," which is the exercise by SEP patentees of the market power conferred by the standard to charge users of the standard supracompetitive prices and other anticompetitive licensing terms.

---

[5] At the time of the ABA's commitment, the stated standard was "reasonable and non-discriminatory" but FRAND is used throughout this Complaint as indicated in footnote 4.

### C.  The Relationship Among the ABA, S&P, and CGS

58.     As stated above, the ABA asserts that it "owns" the CUSIP numbering system. The ABA claims to own a copyright based on a copyright registration it filed for a "compilation" of data that includes data for every financial instrument associated with a CUSIP number as well as the CUSIP number for each such financial instrument.

59.     But even though the ABA's copyright application has been for a "compilation" of factual data, the ABA's assertions do not stop there. Rather, the ABA also asserts copyright ownership over every individual CUSIP number (as described in detail below)—as well as to other facts in the compilation including the full issuer name and the issue description—as opposed to the particular database "compilation" in which the CUSIP numbers and the other factual data are presented.

60.     The ABA contracted the management of the CUSIP numbering system initially to S&P and now to FactSet. The ABA and S&P (and now FactSet) state that CGS is operated "for" or "on behalf of" the ABA.

61.     CGS performs two functions: it issues new CUSIP numbers for newly issued financial instruments, for which it charges fees to the entity issuing the financial instrument, and it maintains the compilation of factual data over which the ABA claims a copyright. S&P's (and now FactSet's) CGS refers to this compilation as the "CGS Database."

62.     As demanded by Defendants, CUSIP Users have executed so-called "license agreements" with S&P and now with FactSet. All payments of "license fees" by CUSIP Users— including Plaintiffs—were made to S&P in New York and are now made to FactSet which is headquartered in Connecticut and maintains an office in New York. As the owner of the claimed copyright, the ABA is and will continue to be a beneficiary of those contracts, and will continue to

receive a portion of the license fees formerly collected by S&P's CGS division, and now by FactSet. Upon information and belief, the ABA receives 30% of the licensing fees CGS collects.

63.     In October 2021, S&P announced its intent to acquire IHS Markit, Ltd. ("IHS Markit"), a data and analytics provider headquartered in London that "provides pricing and reference data, identifiers, financial indices, valuation and trading services, as well as data feeds and data management solutions." *See* European Commission, Mergers: *Commission approves acquisition of IHS Markit by S&P Global, subject to conditions* (Oct. 22, 2021), https://ec.europa.eu/commission/presscorner/detail/en/IP_21_5461. S&P committed to divest the CGS business and operations to alleviate the European Commission's stated concerns about the proposed acquisition. S&P entered into an asset purchase agreement with FactSet under which FactSet purchased CGS for almost $2 billion.

### D.  The Structure and Utility of CUSIP Numbers

64.     Copyright protection in the United States subsists over creative works—such as sonnets, movies, and paintings—that result from human creativity. It may also extend to other works, such as compilations, evincing creativity purely through subjective selection and arrangement of factual data without any claim, or ability to claim, creativity as to the data items themselves.

65.     Each individual CUSIP number, and each listing of the issuer's full name and the issue description—results not from any artistic, literary, or other aesthetic or subjective consideration or authorship or creativity. Instead, a convention established more than 50 years ago strictly determines the invariable format of each CUSIP number and each digit within it. The issuer's full name and the issue description are set by the issuer, and therefore are entirely outside

any claim of authorship or originality, and therefore of copyright, by the ABA, CGS, or S&P (and now FactSet). The following chart describes the rigid, invariable structure of a CUSIP number:

**Structure of a CUSIP**

**Example: Amazon.com Inc – Common Stock**

| ISSUER | ISSUE | CHECK |
|---|---|---|
| 023135 | 10 | 6 |

**First 6 Characters**

Identifies the unique name of the:

- Company
- Municipality
- Agency

A hierarchical alpha numeric convention linked to alphabetic issuer name

**Next 2 Characters**

Identifies the type of instrument:

- Equity
- Debt

Uniquely identifies the issues within the issuer

A hierarchical alpha numeric convention

CUSIP IDENTIFIER

023135106

**Final Character**

A mathematical formula checks accuracy of the previous 8 characters

Delivers a 1 character check result

**Resulting 9 Characters**

A unique identifier

66. This structure is so rigid and predictable that injecting novelty, creativity, or subjectivity into the CUSIP numbering system would destroy its utility because electronic trading systems could no longer identify financial instruments from its assigned CUSIP number. This consideration, among others, negates Defendants' putative claim of copyright, as discussed below.

67. The CUSIP numbers also are an integral element of International Securities Identification Numbers ("ISINs"), which are 12-character numeric codes that identify securities traded on markets outside the United States. ISINs for United States financial instruments traded

on markets outside the United States incorporate the CUSIP numbers. Any entity outside the United States that trades the stock of a United States company on a foreign exchange must use the CUSIP numbers as an element of the ISIN that identifies that company's stock.

68.     Plaintiffs do not challenge the legality of the CUSIP numbers as the numbering system for financial instruments in the United States, nor do they challenge S&P's or FactSet's right to issue CUSIP numbers for new financial instruments and charge a fee to issuers. Plaintiffs' challenge focuses on Defendants' leveraging S&P's (and now FactSet's) market and monopoly power and their control of the issuance of CUSIP numbers into their unlawful control of the use of CUSIP numbers thereafter and their unlawful collection of "license fees" from CUSIP Users.

### E.   S&P Transformed a Staid, Lawful Business Into a Behemoth By Unlawfully Exploiting CUSIP Users by Engaging in Anticompetitive Practices

69.     After the CUSIP numbering system was formed in 1968, S&P operated a dependable "utility" business. S&P distributed CUSIP numbers in physical books to financial institutions. The books contained a limited amount of information about each financial instrument that was linked to a CUSIP number: the issuer number, issuer name, issue name, and CUSIP number.

70.     S&P sold the books on a subscription model. Each customer bought a new book each year. S&P issued paper updates to the books throughout the year. At the end of the year, S&P required that subscribers return the books and paper updates, after which the subscribers would receive the next year's books. Under this physical distribution model, S&P was able to control the dissemination of the CUSIP numbers after issuance merely by controlling the physical books, and thereafter the CD-ROMs that later replaced the books.

71.     However, in the 1980s sophisticated Data Vendors began to distribute rich sets of financial market data, including CUSIP numbers, directly to CUSIP Users, usually on a

subscription model. This innovation disintermediated the direct contractual relationship S&P had enjoyed with CUSIP Users in the distribution of CUSIP numbers and threatened the comfortable monopoly the Defendants had enjoyed for more than a decade. The Data Vendors' distribution of CUSIP numbers directly to CUSIP Users meant that the CUSIP Users could use the CUSIP numbers without paying a fee to S&P. To reassert control over the use of CUSIP numbers, to ensure that it would face no competition in the CUSIP Use Market, and to reap even higher revenue, S&P changed its business model.

72.     S&P's CGS faced a dilemma because its numbering system was a utility, so dramatic price increases to existing subscribers were not feasible.

73.     S&P's CGS solved this dilemma by scrapping the historical subscription model in favor of a "license" model. Now, because they could not charge subscription fees to CUSIP Users— who received data from Data Vendors, not from S&P—S&P would demand that CUSIP Users sign a so-called "license" and pay so-called "license fees." This demand was based on the false premise that receiving CUSIP numbers from Data Vendors resulted in CUSIP Users collecting—or "databasing"—CUSIP numbers, which allegedly infringed the ABA's compilation copyright. Collecting or "databasing" CUSIP numbers does not infringe the ABA's compilation copyright because CUSIP Users do not receive or copy the compilation and because the CUSIP numbers alone, like the issuer's name and the description of the financial instrument, are not protected by the compilation copyright.

74.     Beginning in the 1980s, S&P demanded that CUSIP Users enter into license agreements with S&P for their use of CUSIP numbers. CUSIP Users understandably saw no need to enter into license agreements with S&P because they were not receiving CUSIP numbers or any other data from S&P but from their Data Vendors.

75.     S&P attempted to break that resistance among CUSIP Users by flexing its market power to force them to enter into license agreements. To that end, S&P inserted into its contracts with Data Vendors clauses that required the Data Vendors to cut off access to the CUSIP numbers for any CUSIP User that did not enter into a license agreement with S&P, thus recruiting Data Vendors, however unwillingly, to form a group boycott of CUSIP Users who refused to sign a license.

76.     S&P also used its market power from its other offerings to coerce CUSIP Users to enter a CUSIP license. S&P is a credit-rating agency that issues ratings for both government debt and company debt (public and private). As one of the largest credit-rating agencies in the United States, S&P is a source of ratings data for CUSIP Users that trade, manage, or research debt offerings. Upon information and belief, S&P used its market power in ratings data to coerce CUSIP Users into accepting a CUSIP license by refusing to provide its ratings data to CUSIP Users unless they entered into license agreements with S&P for use of the CUSIP numbers.

77.     By re-establishing its control over the use of CUSIP numbers in the market after issuance, S&P foreclosed an avenue for potential competitors to enter the CUSIP Use Market and foreclosed the innovation that otherwise would have arisen organically in how CUSIP numbers could be provided and used. As one example of such potential competition, electronic systems, including those the SEC has used for public filings, allowed potential competitors lawfully to accumulate all the CUSIP numbers in use by capturing and storing in their own data systems each CUSIP number as it appeared in a public source such as the website of a federal agency, and thus compete with Defendants in providing all issued CUSIP numbers along with other data including as part of new offerings or services.

78.     To eliminate this competitive threat, S&P worked to identify entities, such as Xignite, that had accumulated inventories of CUSIP numbers. S&P then threatened these entities with the loss of access to CUSIP numbers for the entity's own use if they did not destroy their inventories of CUSIP numbers. These threats prevented innovation in, and prevented potential competitors such as Xignite (which destroyed its inventories of CUSIP numbers) from entering, the CUSIP Use Market as discussed more fully below.

### F.  Defendants Unlawfully Control the Use And Distribution of CUSIP Numbers in The CUSIP Use Market

79.     Although Defendants root their intellectual property claim in the ABA's compilation copyright, they attempt to control the use and distribution of CUSIP numbers that do not remotely infringe the compilation copyright. Indeed, there is no limiting principle to Defendants' assertion of the ABA's intellectual property right. S&P has routinely asserted its right to stop Plaintiffs and Class members from using the CUSIP numbers. Indeed, S&P repeatedly has asserted that the mere use of CUSIP numbers constitutes infringement and must be stopped.

80.     S&P's (and now FactSet's) CGS website asserts that a license is needed whenever a financial institution "receives the benefit of CGS Data for usage within its internal operations or to support its internal business processes." Thus, Defendants assert that an unlicensed use of the "CGS Data" infringes the ABA's compilation copyright, regardless of whether the CUSIP User receives the data from S&P and regardless of whether it only uses CUSIP numbers and does not copy the entire compilation as it is maintained on S&P's (and now FactSet's) servers.

81.     S&P's Use of Service Statement explicitly states that a license is required for the mere storage of CUSIP numbers in a user's database: "A license agreement is required when a user obtains access to an electronic data feed or bulk downward of CUSIP, CINS, and CGS ISINs ('CGS Identifiers') and related descriptive data—either directly from CGS or indirectly through

one of CGS' authorized data vendors/information providers ('Authorized Distributors'), *including when a user's database that contains CUSIP Identifiers and related descriptive data (including any outsourced databases) is updated, maintained and/or operated by an Authorized Distributor*" (emphasis added). This assertion of copyright makes no attempt to limit the right to what is claimed in the ABA's compilation copyright.

82.     The whole point of S&P's Use of Service Statement is to determine how the applicant, to-be CUSIP User *uses* CUSIP numbers. One of the inquiries in the Use of Service Statement asks the CUSIP User to "describe in detail how our firm uses CUSIP Identifiers for its operations, and stores/maintains them (including any outsourced databases)." S&P's own documents could not make the point any clearer that its license fees are based on the CUSIP Users' use of the CUSIP numbers, not on the Users' copying of the database compilation.

83.     S&P has used the compilation copyright as the basis for stopping the mere unlicensed use of the CUSIP numbers. For example, in a January 5, 2021 letter to Hildene, Alison Romeo, a Manager of Licensing at S&P's CGS, referring to CUSIP numbers and ISINs, stated that "[f]irms *using* these identifiers internally (e.g., to support some of the processes described above), and/or that externally redistribute CGS Data must possess a license from CGS" (emphasis added). Ms. Romeo thus asserted that the mere use of the CUSIP numbers, even if internal to the financial institution, required a license from S&P.

84.     In a February 26, 2018 email to Dinosaur, Paul Mertz of S&P claimed that Dinosaur was required to enter into a license agreement because "proprietary CUSIP data is being *utilized* within your firm" (emphasis added). Mr. Mertz could not have been clearer that the mere use of CUSIP data, regardless of whether the CUSIP User was copying the entire data compilation, required a license agreement with S&P.

85.     In a June 5, 2012 letter to Swiss Life, Martin Richter of S&P Capital IQ confirmed that Swiss Life could not use the CUSIP numbers in its business if it failed to execute a license agreement. Mr. Richter stated that S&P would direct Swiss Life's data vendor to cut off access to the CUSIP numbers and ISINs: "I confirm that CUSIP Global Services will cease delivery of the CUSIP numbers and CSB ISINs if we do not have a re-filed 'Statement of Use' by June 15, 2012 and no signed contract by June 22, 2012." Mr. Richter made clear that this would apply "to all vendors, including Bloomberg." Mr. Richter did not attempt to determine whether Swiss Life had copied the entire data compilation claimed in the ABA's copyright.

86.     The ABA has represented to the SEC that its compilation copyright permits it to stop a CUSIP User from posting even a single CUSIP number to its website. In a February 2, 2010 letter to the SEC, the ABA stated that ratings agencies could not use single CUSIP numbers without a license. The SEC was considering a rule requiring ratings agencies to post additional information about the companies paying the agencies for the issuance or maintenance of a credit rating. Each of the agencies' credit ratings would have to be identified by the CUSIP or ISIN number. As the ABA put it: "The purpose of the proposed rule is to provide users of credit ratings with information to assist them in evaluating the potential risk to the integrity of the credit rating that arises from the conflict inherent when an NRSRO is paid to determine a credit rating for a specific obligor, security, or money market instrument."

87.     The ABA falsely represented to the SEC that it held a copyright not just in the compilation of data on the CGS Database, but in the CUSIP numbers themselves: "ABA retains the copyright in the selection and arrangement of data compiled in the data base *as well as in the CUSIP numbers themselves*" (emphasis added). The ABA asserted that these copyrights did not permit the ratings agencies to post a company's CUSIP number to their websites in the way the

SEC contemplated. Nevertheless, the ABA pledged to change the terms of its licenses with the ratings agencies to permit the agencies to comply with the proposed regulation without infringing the ABA's copyright.

88.     Defendants also have controlled the use of CUSIP numbers by companies seeking to distribute them, and eliminated potential competition, even when the distributor obtained the CUSIP numbers from SEC filings, not from the Defendants. For example, Xignite, Inc. is a provider of cloud-based market data distribution and management solutions for financial services and technology companies. Xignite's agreement with S&P's CGS precluded the distribution of "CGS Data": "Customer agrees that Customer shall not publish or distribute in any medium the CUSIP database or any information contained therein or summaries or subsets thereof to any person or entity except in connection with the normal clearing and settlement of security transactions."

89.     The CUSIP numbers Xignite had accumulated from public filings were not subject to the restrictions of its agreement with S&P because the numbers did not originate on the "CUSIP database." Nevertheless, S&P demanded that Xignite destroy its independent inventory of CUSIP numbers and threatened to terminate the parties' agreement if Xignite failed to do so. Xignite ultimately concluded that it had no realistic option but to comply with S&P's demand under economic duress.

90.     Defendants' pricing of the CUSIP license demonstrates that they are using the ABA's compilation copyright to police and unlawfully profit from the mere use of CUSIP numbers, not the copying of the compilation.

91.     S&P calculated (and FactSet now calculates) a CUSIP User's fee based on the number of CUSIP numbers it "databased." The sliding scale starts at "under 500 securities" and

ends at "greater than 40,000 securities," with six gradations in between. This pricing scale bears no resemblance to what is claimed in the ABA's compilation copyright. If S&P were pricing a license based on acts of infringement, it would calculate the number of times a CUSIP User had copied the data compilation.

92.    Instead, S&P priced the license based on the use of only a fraction of data in the database compilation. By definition, a CUSIP User that is databasing 500 CUSIP numbers is not copying the database compilation. It therefore cannot be infringing the compilation copyright. Instead, it is using 500 CUSIP numbers, and S&P's license is imposing an unjustified usage fee on the CUSIP User. Such a usage fee is not an implementation of the ABA's intellectual property rights, but, as others in the industry have noted, a shakedown.

### G. Defendants Unlawfully Enforce Their Non-Existent Copyright Claims By Threatening to File Copyright Infringement Litigation And to Stop Plaintiffs From Using The CUSIP Numbers On Which Their Businesses Depend

#### 1. Defendants' Licensing Program Offers Unlicensed Users Only One Rational Choice

93.    Defendants have no copyright claims to enforce against Plaintiffs. Nevertheless, they devised a scheme that offered unlicensed users a Hobson's choice: accept a license or engage in expensive litigation—likely costing much more than the license fees demanded—to avoid losing access to CUSIP numbers. Faced with this "choice," unlicensed users caved to Defendants' demands for nearly 40 years and continue to cave to Defendants' demands.

94.    A core tactic in Defendants' licensing program is that Defendants set price at a level high enough that it generates huge returns over the entire customer base, but low enough that it does not incentivize a single CUSIP User to challenge the need for a license in court because for any individual CUSIP User it is simply less expensive to pay the unlawful license fee than to litigate its legitimacy. This, combined with the threat to cut off the CUSIP User's access to the

CUSIP numbers, proved sufficient to coerce unlicensed CUSIP Users into accepting unlawful license agreements.

95.     CUSIP Users have been vocal about Defendants' tactics to coerce entry into unlawful license agreements for years. For example, the Bond Dealers of America ("BDA"), the Investment Adviser Association ("IAA"), and the Government Finance Officers Association of the United States ("GFOA"),[6] noted Defendants' "tactics regarding CUSIP fees" and the "rapidly increasing and non-transparent fee for use and redistribution of CUSIP identifiers." The industry groups explained that CUSIP fees "exert a chilling effect on market transparency and the free flow of information for investing, trading, accounting, risk management, and regulatory reporting." The industry groups described "ongoing efforts by [S&P's CGS] to levy a toll on the majority of securities transactions, statements, disclosures, and electronic searches that occur daily in the United States."

96.     In January 2013, the BDA, IAA, and GFOA wrote jointly to the SEC's then Chair, the Honorable Elisse Walter, to "express [their] deep concerns regarding the operation of the CUSIP system and the collection of fees for standard security identifiers." The industry groups wrote that since their last joint correspondence, S&P "continues to impose increasingly burdensome fees on issuers, underwriters, investment advisers, broker dealers, investors, and other bond market participants for the acquisition and use of CUSIP identifiers."

97.     Again in 2014, the same industry groups wrote a joint letter to the SEC's then Chair, the Honorable Mary Jo White, to reiterate their concerns with S&P's operation of the CUSIP

---

[6] These organizations include numerous members, such as McGuireWoods, RBC Capital Markets, Tradeweb, Inc., UBS Wealth Management, U.S. Bank National Association, Wells Fargo Securities, Allianz Global Investors, The Blackstone Group, BNY Mellon Investment Adviser, Inc., Charles Schwab Investment Management, LLC, Fidelity Institutional Asset Management, Franklin Advisers, J.P. Morgan Investment Management, PIMCO, Morgan Stanley Investment Management, Inc., and Vanguard Group.

system and that their previous concerns have continued unabated. The 2014 joint letter repeated the same message from 2013: "S&P continues to impose increasingly burdensome fees on issuers, underwriters, investment advisers, broker/dealers, investors, and others for the acquisition, retention, and use of CUSIP identifiers."

98.     As recently as May 17, 2021, the IAA wrote to current SEC Chair, the Honorable Gary Gensler, concerning the effect of the CUSIP licensing practices on market participants. The IAA wrote, "We understand that S&P's efforts to obtain licensing fees for use of CUSIP have become increasingly aggressive in recent years, with S&P threatening to freeze [the IAA's] ability to maintain CUSIP numbers in their databases unless they not only pay the fee determined by S&P but also allow S&P access to their databases to audit their use of CUSIP [numbers]."

### 2.     Defendants Threaten Unlicensed Users With Prohibitively Expensive Copyright Infringement Litigation

99.     Defendants threaten copyright infringement litigation, the defense of which unlicensed CUSIP Users could not possibly justify. Defendants' process is to send letters to unlicensed CUSIP Users asserting that the CUSIP numbers are copyrighted, and that the CUSIP User's unlicensed use is infringing. Those two statements alone are sufficient to put the unlicensed CUSIP User on notice that it may face copyright infringement litigation and to trigger the unlicensed CUSIP User's right to file a declaratory judgment action seeking a ruling that its use does not infringe the copyright.

100.     S&P then requires that unlicensed CUSIP Users execute an agreement whose purpose, at least in part, is to inform unlicensed CUSIP Users that any unauthorized use of the CUSIP numbers will subject the CUSIP User to copyright infringement litigation. That agreement is the Subscription Agreement, by which the CUSIP User subscribes to the S&P "service." Section

2 of the Subscription Agreement states that the data the CUSIP User receives is protected intellectual property.

101.     After S&P sent Swiss Life a form Subscription Agreement, Swiss Life deleted from Section 2 the language stating that the data was protected intellectual property. When Swiss Life objected to S&P's rejection of those changes, S&P informed Swiss Life of the language's purpose. Martin Richter of S&P forwarded to Swiss Life Mr. Richter's internal email exchange with Richard Dartey, an executive in McGraw Hill's Global Licensing & Contracts department. (McGraw Hill owned S&P Capital IQ at the time). In the June 26, 2012 email, Mr. Dartey asserted that the language in Section 2 regarding intellectual property gave S&P the right to sue infringers for copyright infringement: "The client is failing to acknowledge that CUSIP data is our intellectual property and therefore in the event of misappropriation or misuse *we have the right to seek injunctive relief*" (emphasis added). Mr. Richter forwarded the email to Swiss Life the next day, June 27, 2012.

102.     S&P's demands to the Plaintiffs make clear that it threatened legal action that included the possibility of copyright infringement litigation. For example, S&P asserted that Hildene could receive Defendants' allegedly copyrighted data only if it entered into a license agreement. When Hildene refused, Daphne Shephard, a Director at S&P, informed Hildene on August 31, 2021, that failure to enter a license by September 20, 2021, would cause her "to refer this matter to our legal department for further action which may include the removal of all CGS data from all sources into Hildene Capital." The phrase "further action" was not limited to removal of the data and was a clear threat that S&P would consider all available legal remedies, one of which included copyright infringement litigation.

103.     Ms. Shepard renewed S&P's threat to pursue all available remedies in an email dated September 9, 2021: "If we do not receive the executed agreements by September 30, 2021, our Licensing Compliance and Legal teams will continue the escalation process. At this juncture in the process, if CGS is unable to reach an agreement with Hildene Capital your firm may lose access to CGS data." Ms. Shepard's threat to "continue the escalation process" clearly included a threat to pursue copyright infringement litigation.

### 3. Defendants Also Threaten Unlicensed Users With The Loss of Access to The CUSIP Numbers

104.     To ensure that unlicensed CUSIP Users enter into the license agreements, S&P threatens to cut off access to the CUSIP numbers.

105.     For example, Hildene has an agreement with Bloomberg to obtain financial data, a small fraction of which include CUSIP numbers associated with data concerning financial instruments. Hildene receives data services from Bloomberg, not from Defendants. Nevertheless, in 2020, S&P demanded that Hildene purchase a license from S&P because Hildene's data feed from Bloomberg contained CUSIP numbers. S&P demanded that Hildene pay an annual fee of $10,500 and threatened to strip Hildene's data feed of all CUSIP numbers if it refused to enter the license agreement.

106.     When Hildene balked at paying these licensing fees, S&P sent a series of increasingly hostile letters. On March 19, 2021, Alison Romeo, a CGS Product Manager, sent Hildene's John Scannell a letter warning: "[I]f we do not hear from you or if we do not receive a completed CUSIP Use of Service Statement, we will have no choice but to contact all applicable ISPs [information service providers] that may furnish you with CGS Data in bulk, data feed or downloadable format, and enforce our rights to require such ISPs to discontinue furnishing your

firm with this CGS Data." Ms. Romeo instructed Hildene to have its counsel contact Jeffrey Mitnick, an Associate General Counsel at S&P.

107.    On June 8, 2021, Mr. Mitnick sent a letter to Hildene threatening: "In the event that a satisfactory solution is not reached by June 25, 2021, we will have no choice but to send final notification to all applicable authorized vendors to cease servicing your firm with CGS Data." In plain language, Mr. Mitnick's threat was that S&P would remove the CUSIP numbers from securities data Hildene receives from Bloomberg, rendering that data useless.

108.    Defendants also used their influence over Data Vendors to coerce CUSIP Users to enter the license agreements under the threat of having CUSIP numbers stripped from the Data Vendors' data feeds. For example, Bloomberg informed Swiss Life in 2007 that S&P required that Swiss Life enter into a license agreement with S&P to obtain the CUSIP numbers in Bloomberg's data feed. Bloomberg told Swiss Life that S&P asserted that that data was copyrighted. Bloomberg sent a form agreement to Swiss Life, and Swiss Life deleted the clauses asserting that the CUSIP data was copyrighted and returned a signed copy to Bloomberg. Swiss Life informed Bloomberg that the data at issue was not copyrighted and that Swiss Life would sign an agreement asserting that the data was not copyrighted. Bloomberg informed Swiss Life that S&P would not accept the agreement without the clauses and that Bloomberg would have to remove the CUSIP numbers from the data feed if Swiss Life did not sign the form agreement. Because Swiss Life needs the CUSIP numbers to manage its United States dollar bond portfolio, losing access to the CUSIP numbers was not an option. Reluctantly, Swiss Life signed the form agreement, which was last renewed in 2019.

109.    These coercive and exclusionary tactics were effective. Today, on information and belief, thousands of CUSIP Users have entered into licenses with S&P (and now FactSet) for use of the CUSIP numbers, and Defendants continue to press those who have not yet signed.

**H.  Defendants' Copyright Justifications For Demanding CUSIP Users Enter License Agreements Are Invalid**

110.    S&P (and now FactSet) and CGS based the requirement of license agreements with CUSIP Users for the use of CUSIP numbers on the ABA's claimed copyright. Yet, the CUSIP numbers are not protected as a matter of United States copyright law.

111.    A CUSIP number is a nine-digit number, and each CUSIP number is a number that has been known to humanity literally for millennia. Mathematicians, scientists, teachers, and financial market participants use numbers every day that happen to coincide with CUSIP numbers. Yet, Defendants assert that the ABA has copyrighted those numbers and therefore can control the use of those numbers. That assertion is legally baseless.

112.    Numbers used for identification such as parts numbers or CUSIP numbers stand outside copyright protection because they lack the originality and creativity that is a constitutional and statutory requirement for copyright protection. Indeed, extending copyright protection to such numbers would unduly interfere with the legitimate use of the numbers in question. If such a copyright were allowed, *any* use of the number would potentially infringe the copyright. Moreover, CUSIP numbers lack originality and creativity by design. Each part of the sequence of characters making up a CUSIP number is dictated by the long-standing convention of the numbering system, and the utility of CUSIP numbers depends on Defendants slavishly adhering to that system. CUSIP numbers would lose their utility were Defendants to inject any subjectivity, originality, or creativity into them because electronic systems could not then read and process CUSIP numbers to identify the underlying financial instruments.

113.     ISINs are the equivalent ISO-based numbering standard for international financial transactions, with National Numbering Agencies ("NNA") designated in each participating country. CGS is the designated NNA for the United States. By contrast to Defendants, none of the NNAs in the European Community, for example, claim intellectual property rights over the ISINs they issue and distribute. Nor does any NNA other than CGS (S&P and now FactSet) charge users "license fees" or any other fees for using ISIN numbers.

114.     And, as stated above, the copyright to the database compilation does not protect the individual CUSIP numbers.

115.     Plaintiffs do not access the CGS Database. Instead, they obtain data from their Data Vendors, such as Bloomberg, which provide the data to Plaintiffs in the Data Vendors' proprietary format. Because Plaintiffs do not access the CGS Database and are not provided copies of it by their Data Vendors, they cannot copy the data compilation. Therefore, the ABA's compilation copyright, which protects only the compilation as it is stored on the CGS servers, not the individual bits of data in the compilation, is irrelevant to Plaintiffs' use of data and Plaintiffs have no need for and do not use the ABA's data compilation.

116.     S&P has admitted that financial institutions that obtain data from Data Vendors do not access the CGS Database. For example, when Dinosaur reported to Paul Mertz of S&P that Dinosaur received its data from FactSet, not from S&P, Mr. Mertz informed Dinosaur it needed a license from S&P even if it was getting all of its data from FactSet. Similarly, in a January 5, 2021 letter to Hildene, Alison Romeo of S&P asserted that Hildene required a license because it "receives CGS data from Bloomberg BPipe & Data License."

117.     If, as S&P has admitted, Plaintiffs receive from their Data Vendors bits of data that (a) also exist in the CGS Database; (b) have been selected by the Data Vendor; and (c) have been

put in the Data Vendor's proprietary format, Plaintiffs do not copy the entire CGS Database as it exists on CGS' servers. Therefore, the ABA's copyright to the CGS Database compilation is irrelevant to Plaintiffs' use of data and Defendants cannot lawfully control the use or distribution of the CUSIP numbers in the CUSIP Use Market.

## I. Defendants Coordinated to Unlawfully Exclude Competition And Prevent Innovation Through Non-Negotiable Contractual Provisions

118.    As described above, Defendants excluded competition in the CUSIP Use Market by (a) forcing Data Vendors into written agreements requiring the Data Vendors to require that CUSIP Users enter into license agreements with S&P and now FactSet, and (b) boycotting CUSIP Users that refuse to enter such agreements. This allowed S&P (now FactSet) to maintain its monopoly and to impose illegal "license fees" on CUSIP Users.

### 1.    The Data Vendor Agreements

119.    Defendants prohibited Data Vendors from providing the CUSIP numbers to any CUSIP User that refused to sign a license agreement with S&P. These terms in the Data Vendors' agreements with S&P and CGS were non-negotiable. S&P's CGS recently acknowledged these restrictions in its contracts with Data Vendors in January 2021 correspondence to Hildene stating: "CGS's agreements with its ISPs[7] do not allow such ISPs to distribute CGS Data to firms in bulk or downloadable format unless such firms are properly licensed by CGS" and that "CGS has the contractual right to require applicable ISPs to cease distribution of CGS Data in bulk, datafeed or downloadable format to those firms who refuse to sign an appropriate CGS license agreement." The restriction is not related to copying a compilation, but rather for any access to CUSIP numbers in a data feed or downloadable format.

---

[7] CGS defined ISPs as "information service providers" such as "Bloomberg L.P., SIX Financial Information, Advent and/or Thomson Reuters"—the equivalent of Data Vendors.

120.    The imposition on the Data Vendors of the requirement to cease providing CUSIP

Users CUSIP numbers in data feed or downloadable format posed a very real threat. Defendants

threatened, either directly or through Data Vendors, to cut off access to CUSIP numbers in data

feeds for CUSIP Users, like Hildene for example, that did not immediately cave to Defendants'

demands, and upon information and belief, CUSIP Users that refused to enter a license agreement

have been deprived of access to CUSIP numbers.

121.    Defendants organized a group boycott by forcing the Data Vendors—who are

horizontal competitors of each other and of S&P, itself a Data Vendor—to agree to these

provisions, however unwillingly, through similar threats as Defendants made to CUSIP Users, that

is, by threatening the Data Vendors with the loss of access to the CUSIP numbers and, upon

information and belief, S&P ratings data if they did not comply. CGS's website makes clear that

it seeks to require all Data Vendors to sign a license with these restrictions. It describes how only

an "Authorized Data Vendor" who entered into a license agreement with CGS can provide CUSIP

data to its own customers; the required license agreements include the clause recruiting Data

Vendors into the group boycott. These threats guaranteed that substantially all Data Vendors agreed

to these contract terms, which harmed competition by forcing Data Vendors to be the enforcement

arm of Defendants' unlawful conduct to the detriment of all CUSIP Users. This horizontal group

boycott is a *per se* violation of Section 1 of the Sherman Act.

### 2. The CUSIP User License Agreements

122.    S&P required (and FactSet requires) that each CUSIP User enter into two

agreements that together constitute the "unlawful license agreement": a "Subscription Agreement"

("SA") and a "Use of Services Statement" ("USS"). Between them, the two agreements effectively

prohibited CUSIP Users from using CUSIP numbers in any way not specifically permitted by Defendants.

123.    The SA prohibits CUSIP Users from publishing, distributing, or disseminating the CUSIP numbers, meaning that the agreement on its face purports to bar CUSIP Users from using publicly available information. The SA further requires CUSIP Users to agree to "protect the CUSIP numbers" after the SA expires, meaning that the SA purports to control how CUSIP Users use the CUSIP numbers even after the SA expires.

124.    The USS dictates CUSIP Users' permitted use of CUSIP numbers.  This requires each CUSIP User to report how many CUSIP numbers it maintains in its databases. Defendants used that information to set the level of the fee to the CUSIP User.

125.    The specific language typically is as follows:

> Subscriber agrees and acknowledges that the CUSIP Database and the information contained therein is and shall remain valuable intellectual property owned by, or licensed to, CUSIP Global Services ("CGS") and the American Bankers Association ("ABA"), and that no proprietary rights are being transferred to Subscriber in such materials or in any of the information contained therein. Any use by Subscriber outside of the clearing and settlement of transactions requires a license from CGS, along with an associated fee based on usage. Subscriber agrees that misappropriation or misuse of such materials will cause serious damage to CGS and ABA, and that in such event money damages may not constitute sufficient compensation to CGS and ABA; consequently, Subscriber agrees that in the event of any misappropriation or misuse, CGS and ABA shall have the right to obtain injunctive relief in addition to any other legal or financial remedies to which CGS and ABA may be entitled.

> Subscriber agrees that Subscriber shall not publish or distribute in any medium the CUSIP Database or any information contained therein or summaries or subsets thereof to any person or entity except in connection with the normal clearing and settlement of security transactions. Subscriber further agrees that the use of CUSIP numbers and descriptions is not intended to create or maintain, and does not serve the purpose of the creation or maintenance of, a master file or database of CUSIP descriptions or numbers for itself or any third party recipient of such service and is not intended to create and does not serve in any way as a substitute for the CUSIP

MASTER TAPE, PRINT, DB, INTERNET, ELECTRONIC, CD-ROM
Services and/or any other future services developed by the CGS.

126.   These agreements preclude CUSIP Users from using the CUSIP numbers without signing a license agreement with S&P and prohibit all uses of the CUSIP numbers that are not specifically permitted. The agreements also restrict any publication or distribution of "any information contained" in the CUSIP Database, which would include CUSIP numbers themselves. The agreements preclude CUSIP Users from competing in the CUSIP Use market and further undermine CUSIP Users' potential challenge to Defendants' anticompetitive conduct, including by requiring that CUSIP Users "admit" the validity of Defendants' claims of ownership and protection of intellectual property in the CUSIP numbers. In fact, Defendants even seek to stop CUSIP Users who collect CUSIP numbers from public sources from using that information for any commercial purpose: CGS's website states that CUSIP Users may only collect publicly available CUSIP data "and store such information in their internal database for non-commercial use." In other words, Defendants will use ABA's false copyright claims to stop anyone from competing in the CUSIP Use Market, by using "publicly available CUSIP data" for commercial use, even if the entity compiled such information from public sources.

### J.   The Fees That Defendants Charge CUSIP Users Are Unlawful

#### 1.   The Fees Are Unlawful Because CUSIP Numbers Are Not Copyrightable

127.   As stated above, Defendants collect fees from issuers of financial instruments for issuing the individual CUSIP numbers S&P's (now FactSet's) CGS generates for those new financial instruments. Plaintiffs take no position on whether fees charged to issuers for the assignment of CUSIP numbers is consistent with Defendants' FRAND commitment and do not challenge those fees in this lawsuit.

128.    Nonetheless, S&P was not, and FactSet is not, entitled to charge so-called "license fees" to CUSIP Users for the use of CUSIP numbers. CUSIP numbers are not copyrightable or protected by copyright. Therefore, Defendants have no lawful right to prevent CUSIP Users from using CUSIP numbers without a license, no right to insist that CUSIP Users sign a license, and in turn, no right to charge license fees.

129.    S&P's (now FactSet's) CGS' process of requiring CUSIP Users to sign so-called "licenses" is elaborate and calibrated to the resistance level of the CUSIP User. This is one area where Defendants have been creative. At the first level, Defendants set the license fees to each CUSIP User for use of the CUSIP numbers at a level just below the level that would motivate the CUSIP User to challenge the fees. Because the CUSIP numbers are a critical element of a financial company's business, virtually all CUSIP Users agree to pay the license fees.

130.    Next, as in the case of Hildene, if a target CUSIP User initially refused to pay the fees, the sales employees threatened the CUSIP User that it would be cut off from the CUSIP numbers. This threat usually was sufficient to browbeat virtually all holdouts to sign a license and pay the license fees.

131.    The third tier of escalating threats is particularly interesting: if the sales employees determined that a particular target CUSIP User would challenge the need for a license in court rather than pay, the employees were trained to back off and reengage with that target at a later time. This course of conduct confirms that S&P had no confidence in its claims of copyright protection for CUSIP numbers and is consistent with Defendants' refusal to state clearly—at least in this litigation—whether the CUSIP numbers are copyrightable or copyrighted. It gave S&P time to determine the optimum time and method of re-engaging with the CUSIP User. Finally, in

numerous cases, Defendants threatened to cut off CUSIP Users who refused to sign, and, upon information and belief, did cut off some CUSIP Users' access to the CUSIP numbers.

132.    Nearly every CUSIP User that has a material business that involves research into, analysis of, advisory services on, trading, or managing United States financial instruments was and is paying "license fees" to S&P and now to FactSet. Because Defendants had and have no legal right to demand or collect any money on the basis that they are "licensing" anything to a CUSIP User, the entire amount of the license fees is the measure of overcharge. On information and belief, the estimated amount of the overcharge the Class is paying amounts to more than $100 million dollars per year.

### 2. Even Assuming *Arguendo* That CUSIP Numbers Are Found to Be Copyrightable—Which They Are Not—The Imposition of Non-FRAND License Fees on CUSIP Users Breached The ABA's Commitment to Offer FRAND Terms

133.    The CUSIP numbers are not copyrightable; Defendants therefore may not lawfully prevent CUSIP Users from using them, and therefore may not require "licenses" or impose "license fees" on CUSIP Users for the use of the CUSIP numbers. Even if one were to assume, contrary to current law, that CUSIP numbers are protected by copyright, S&P's (and now FactSet's) obligation to honor the ABA's FRAND commitment constrains it from charging CUSIP Users fees that are not fair and reasonable.

134.    As an ANSI-Accredited Standards Developer, X9 requires each entity that participates in the standard setting and made technical contributions it claimed were proprietary and that were incorporated into the standard to file a statement setting forth its licensing policy. In response, the ABA "filed a statement of willingness to grant a license under these rights on reasonable and nondiscriminatory[8] terms and conditions to applicants desiring to obtain such a

---

[8] *See* footnote 4 and 5.

license." Once the CUSIP numbering system was adopted as a standard and its use became sufficiently widespread, it became financially infeasible to not use the standard, as is the case here. Market participants become "locked in" to the standard, meaning that they cannot make use of an alternative. As such, the standard holder obtains monopoly power over the market of those practicing the standard, in this case, over all CUSIP Users.

135.    The FRAND commitment and obligation, such as the commitment that was voluntarily undertaken by the ABA, are critical tools in preventing monopoly hold up (or providing recourse if monopolists created through the standard setting process, as here, attempt to engage in "hold up") and ensuring that the standard remains accessible on fair, reasonable, and non-discriminatory terms to all who wish to utilize it. Here, however, the FRAND commitment was an empty promise: X9 was influenced and controlled by the ABA, the party making the FRAND commitment, and its co-conspirator S&P (now FactSet), all of which directly benefitted from Defendants' violation of their FRAND obligations. S&P's (now FactSet's) recognition of their obligation to honor that commitment is reflected in CGS's License Fee Policy, found on the CGS website, pledging that S&P's (now FactSet's) CGS seeks to charge "fair, reasonable and non-discriminatory license fees."

136.    Defendants, however, breached that commitment by charging Plaintiffs and members of the Class unfair, unreasonable, and arbitrary fees based on false claims of copyright that it should not have charged at all in the first place because they had no right to prevent Plaintiffs and other Class members from using CUSIP numbers, and thus no right to demand "licenses" or "license fees." The incremental cost of electronic distribution of information to any user is zero. Thus, it is not surprising that, for example, in the case of Swiss Life, every other provider of

identifying numbers for financial instruments made them available at no cost. Bloomberg created FIGI, an alternative to the CUSIP numbering system that it sought to make entirely free.

137.     Defendants incur no incremental cost when a CUSIP User "uses" a CUSIP number it has received from its contracted Data Vendor rather than from Defendants. Therefore, for the Class members there is no basis on which Defendants can argue that any charge other than $0.00 is fair or reasonable. Thus, every dollar of licensing fees that S&P extracted from Plaintiffs and other members of the Class is supracompetitive and in breach of the FRAND commitment.

138.     Therefore, Plaintiffs and members of the Class are entitled to the entirety of their licensing fees as damages.

## V.     RELEVANT MARKET AND DEFENDANTS' MARKET POWER

139.     The relevant product market is the market for using CUSIP numbers after initial issuance (previously defined as the "CUSIP Use Market"). Because identifiers of financial instruments are national in scope, identifiers of non-United States financial instruments are not used to identify United States financial instruments. Thus, only the use of identifiers of United States financial instruments (CUSIP numbers) are included in the relevant product market.

140.     The relevant geographic market is the United States.

141.     S&P had a 100% share in the CUSIP Use Market, as does FactSet today. At all relevant times S&P had and FactSet has monopoly power in the CUSIP Use Market.

142.     Alternative numbering systems are inadequate substitutes for CUSIP numbers because the CUSIP numbering system is and has been the standard for decades.

143.     The existence of other identifiers did not constrain S&P's ability to raise or maintain prices of licenses for use of CUSIP numbers without losing substantial sales and does not constrain

FactSet's ability to do the same now because Defendants successfully excluded other competitors from replacing CUSIP numbers as the standard.

144.     S&P had the power to exclude competition in and maintain supra-competitive prices for licenses for the use of CUSIP numbers paid by CUSIP Users without losing substantial sales to potential rivals. FactSet now has that same power to exclude. S&P's long history of charging supra-competitive prices and excluding competitors demonstrates this monopoly power.

145.     A small but significant, non-transitory price increase in CUSIP licenses would not cause, and has not caused, a significant loss of sales to potential rivals to make such a price increase unprofitable. Thus, the pricing of licenses for the use of CUSIP numbers does not exhibit significant, positive cross-elasticity of demand with respect to prices charged by any other entity.

146.     There are no natural barriers to entry into the CUSIP Use Market. The CGS website acknowledges that collections of CUSIP numbers can be created based on public data. However, Defendants' illegal, exclusionary, and anticompetitive conduct has created substantial unnatural barriers to entry.

## VI.    CLASS ACTION ALLEGATIONS

147.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3), Plaintiffs bring this action for themselves and on behalf of the following classes.

148.     The "CUSIP User Class":

> All persons or entities (other than Data Vendors) that directly paid a so-called "license fee" to S&P or FactSet pursuant to the Subscription Agreement and the Use of Services Statement at any time beginning March 4, 2018 until the anticompetitive acts end (the "Class Period").

149.     The "Injunctive Relief Class" (together with the CUSIP User Class, the "Classes"):

> All persons or entities (other than Data Vendors) that currently have a Subscription Agreement and are paying a so called "license fee" to FactSet (including to CGS).

150.     Plaintiffs also bring this action for themselves and on behalf of the following sub-class (the "New York Unfair Business Practices Sub-Class"):

> All persons or entities (other than Data Vendors) that directly paid a so-called "license fee" to S&P or FactSet in New York pursuant to a Subscription Agreement and Use of Service Statement at any time beginning March 7, 2019 until the unfair and deceptive business practices end (the "New York Subclass Period").

151.     Additionally, Hildene brings this action on behalf of itself and on behalf of the following sub-class (the "Connecticut Unfair Business Practices Sub-Class," and together with the "New York Unfair Business Practices Sub-Class," the "Sub-Classes"):

> All persons or entities (other than Data Vendors) that reside in Connecticut that directly paid a so-called "license fee" to S&P or FactSet pursuant to a Subscription Agreement and Use of Service Statement at any time beginning March 7, 2019 until the unfair and deceptive business practices end (the "Connecticut Sub-Class Period").

152.     Excluded from the Classes and Sub-Classes are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, Defendants' officers, directors, employees, and immediate families thereof, any legal representative, heir, or assign of any Defendant, and any person acting on their behalf, any judicial officer presiding over or assigned to hear any aspect of this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

153.     Plaintiffs and the Classes and Sub-Classes are seeking damages and an injunction for Defendants' violations alleged herein.

154.     The Classes and Sub-Classes are readily ascertainable, and the members of the Classes and Sub-Classes are readily identifiable from information and records maintained by S&P and FactSet.

155.    Members of the Classes and Sub-Classes are so numerous that joinder of all members is impracticable.  The members of the Classes and Sub-Classes are numerous and widely dispersed throughout the United States and around the world.

156.    Plaintiffs' claims are typical of the claims of the members of the Classes and Sub-Classes. Within the Classes and Sub-Classes, Plaintiffs' interests are not antagonistic to the claims of the other members of the Classes and Sub-Classes, and there are no material conflicts with any other members of the Classes and Sub-Classes that would make class certification inappropriate. Plaintiffs and all members of the Classes and Sub-Classes were damaged by the same wrongful conduct of Defendants.

157.    Plaintiffs will fairly and adequately protect and represent the interests of the members of the Classes and Sub-Classes. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the members of the Classes and Sub-Classes.

158.    Plaintiffs are represented by counsel (Competition Law Partners PLLC, Kaplan Fox & Kilsheimer LLP, and Wollmuth Maher & Deutsch LLP) who are experienced and competent in the legal issues involved in this Complaint and in the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law in the financial services industry.

159.    Questions of law and fact common to the members of the Classes and Sub-Classes predominate over questions that may affect only individual Class and Sub-Class members because Defendants have acted on grounds generally applicable to the entirety of the Classes and Sub-Classes, thereby determining damages with respect to the Classes and Sub-Classes as a whole is appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

160.    There are legal and factual questions common to the Classes and Sub-Classes, which do not vary from Class member to Class member and which may be determined without reference to individual circumstances of any Class or Sub-Class member. These include, but are not limited to, the following:

(a)    Whether CUSIP numbers are copyrightable;

(b)    Whether S&P (and now FactSet) has monopoly power in the CUSIP Use Market;

(c)    Whether S&P (and now FactSet) willfully acquired or maintained and enhanced its monopoly power in the CUSIP Use Market;

(d)    Whether the standardized contractual restriction on Data Vendors have constituted an unreasonable restraint of trade;

(e)    Whether S&P and the ABA (and now FactSet and the ABA) conspired for S&P (and now FactSet) to willfully acquire, maintain or enhance its monopoly power in the CUSIP Use Market;

(f)    Whether S&P and the ABA (and now FactSet and the ABA) conspired to monopolize the relevant market by engaging in unlawful exclusionary conduct to acquire, maintain or enhance S&P's (and now FactSet's) monopoly power in the CUSIP Use Market;

(g)    Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and other members of the Classes and Sub-Classes;

(h)    What is the appropriate measure of damages;

(i)    Whether the alleged conspiracies alleged herein violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

(j)    Whether the alleged monopolization violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

(k)    Whether, if the CUSIP numbers are found to be protected by copyright, Defendants violated ABA's FRAND agreement in charging Plaintiffs and members of the Class supracompetitive prices for CUSIP "licenses";

(l)    Whether Defendants' conduct was unfair and had the capacity to and did materially deceive or threaten Plaintiffs and similarly situated members of the New York Unfair Business Practices Sub-Class when transacting business in the State of New York;

(m)    Whether Defendants' conduct was unfair and had the capacity to and did materially deceive or misled Plaintiffs and similarly situated members of the Connecticut Unfair Business Practices Sub-Class when transacting business in the State of Connecticut; and

(n)    Whether the Classes and Sub-Classes are entitled to the injunctive relief sought.

161.    Class action treatment is a superior method to other available methods for the fair and efficient adjudication of the controversy. The prosecution of separate actions by individual members of the Classes and Sub-Classes would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes and Sub-Classes. Class action treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in management of this class action.

162.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VII.   THE ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

163.    Defendants' conduct produces substantial anticompetitive harm. Most obviously, the agreements that exclude competitors from the CUSIP Use Market deny CUSIP Users the benefit of robust competition. Defendants' success in stopping actual and potential competitors, such as the Data Vendors and other data and fintech companies such as Xignite from the

unconditional use of CUSIP numbers (without requiring license agreements)—has prevented potential competitors from using the CUSIP numbers in innovative ways as part of larger data offerings.

164.    Defendants' anticompetitive conduct imposes unnecessary burdens on financial markets, thereby reducing competition, liquidity, and transactional flow. Competitors and other market participants have repeatedly complained about the harmful effects of Defendants' anticompetitive conduct. For example, Bloomberg, a potential competitor in the CUSIP Use market (but for the restrictive Data Vendor agreements) and who even created FIGI as an alternative to CUSIP in an attempt to break S&P's (and now FactSet's) control of the market, wrote to the SEC in October 2017 to voice its concern over the anticompetitive effects of Defendants' conduct: "The process of obtaining a CUSIP, and the restrictive licensing imposed on its use imposes unnecessary burdens on firms by interrupting transactional flow and timing. This is evidenced by the assertion that competition would be reduced, liquidity would be negatively affected, and parties would actively seek ways to avoid processes that would require use of a CUSIP." Bloomberg added that by forcing market participants to pay arbitrary fees to use CUSIP numbers, S&P "imposes a significant and restrictive cost on the industry as a whole," which negatively affects liquidity and reduces competition. Bloomberg also expressed concern that restricting the use of CUSIP numbers would disadvantage "new technology and can instead stifle innovation."

165.    Defendants' licensing policies raise its actual and potential rivals' costs, thereby imposing unnecessary costs on companies seeking to offer innovative services and lower-cost alternatives to CUSIP Users. For example, S&P's (now FactSet's) CGS website makes clear that Defendants will seek licenses from CUSIP Users that compile their own collection of CUSIP

numbers for "commercial" use, even if they compile the data from public sources. Therefore, efforts to compete with Defendants in the CUSIP Use Market would require either signing a license agreement and paying Defendants significant license fees or refusing to take a license and engaging in a costly dispute with Defendants. Either choice raises the costs faced by these rivals, and operates as a "competition tax"—or an "anticompetition tax" imposed by Defendants.

166.    Defendants' restrictive licensing policies, in turn, impede competitors from innovating in the financial markets. Notwithstanding the tremendous advancements in technology over the past decades, Defendants still are charging CUSIP Users unlawful licensing fees whereas there are no charges for the use of financial instrument identifiers in almost every (if not every) other market outside the United States.

167.    Defendants' contracts, which allow S&P (and now FactSet) to audit licensees' use of CUSIP numbers, is anticompetitive and creates anticompetitive harm. The audit function allows S&P (and now FactSet) to disintermediate the relationships between the Data Vendors and their customers by interfering in that relationship and potentially replacing the Data Vendor. The audit function also gives S&P (now FactSet) the opportunity to not only understand, but also to track the status and progress of the businesses of its potential rivals who are collecting CUSIP numbers and compiling their own datasets or otherwise combining CUSIP numbers into their own innovative services but for Defendants' copyright claims. This anticompetitive insight also allows Defendants to market and sell more effectively against these emerging rivals based on access to those rivals' proprietary and competitively sensitive information.

168.    By imposing unnecessary costs on the use of CUSIP numbers, Defendants' conduct reduces transparency in financial markets and thereby creates inefficiencies that impede actual and potential rivals from creating more efficient and attractive data offerings. The municipal bonds

market provides an example of this anticompetitive effect. Marc Joffe, a Senior Policy Analyst at the Reason Foundation, has written that Defendants' restrictive licensing policies reduce transparency in municipal bond markets. M. Joffe, "*Class action lawsuits against CUSIP could improve government transparency*," Reason Foundation (March 18, 2022), available at: https://reason.org/commentary/class-action-lawsuits-against-cusip-could-improve-government-transparency/. The Municipal Securities Rulemaking Board ("MSRB") maintains a public information site for municipal bonds known as Electronic Municipal Market Access ("EMMA"). EMMA theoretically should permit data companies that could compete with Defendants to process information about municipalities' debt practices quickly and efficiently.

169.    Yet Defendants require that the MSRB post the following notice on the EMMA site:

> You agree that you will not use the CUSIP Numbers and Securities Descriptions contained on the Website for any other purpose. You may not download CUSIP Numbers and Securities Descriptions from the Website. Such information obtained from the Website shall not be re-disseminated other than as provided in these Terms and, to the extent such information is re-disseminated by you to other parties, you will take all necessary and reasonable precautions to ensure that recipients who obtain the information directly or indirectly from you do not use CUSIP Numbers or Securities Descriptions for any other purpose.

170.    Mr. Joffe notes that the MSRB implements these restrictions by displaying the CUSIP numbers as images (similar to Defendants' requirement that Data Vendors not provide CUSIP numbers in data feed or downloadable format to unlicensed CUSIP Users), thus "rendering them impossible to copy and paste into spreadsheets." This makes the task of "[c]ompiling lists of all the outstanding bonds issued by any large government entity … tedious and time-consuming." This raises the costs of processing and analyzing the data on the EMMA site for any data company wishing to compete with Defendants. The result is reduced transparency into municipal debt practices, which "undermin[es] government financial transparency" to the detriment of taxpayers.

171.     No legitimate pro-competitive efficiencies justify Defendants' conduct in abusing S&P's and now FactSet's monopoly power and unreasonably restraining trade to extort fees from CUSIP Users.

172.     Absent Defendants' anticompetitive conduct, Plaintiffs and members of the Classes and Sub-Classes would not have had to enter into license agreements and pay Defendants substantial amounts of annual fees.

173.     S&P (and now FactSet) extracted from CUSIP Users, on information and belief, at least an estimated $100 million each year in unlawful charges that they would not have obtained absent Defendants' unlawful scheme.

174.     Defendants' unlawful conduct harmed and continues to harm competition by stifling innovation and competition in the CUSIP Use Market, thereby depriving CUSIP Users of the benefits of greater variety and increased competitive choices at lower prices that would exist in a competitive market, and by diverting financial resources to the Defendants that would otherwise be used by actual and potential rivals, including Data Vendors and CUSIP Users. These anticompetitive effects ultimately result in higher costs and lower returns to CUSIP Users, and therefore to the retirees and future retirees whose pension funds, retirement funds, 401Ks, and IRAs are the customers and clients of the financial institutions that are the CUSIP Users.

175.     There is no cognizable or plausible procompetitive justification for Defendants' unlawful conduct, or one that outweighs its anticompetitive effects. The only purpose for Defendants' conduct is to prevent competition and generate millions of dollars in revenue a year from CUSIP Users' use of already issued CUSIP numbers.

176.     CUSIP Users, including Plaintiffs, will continue to suffer such injury unless the relief sought in this Complaint is granted.

## VIII.   CLAIMS FOR RELIEF

### <u>First Claim for Relief</u>

**(Declaratory Judgment and Restitution Under the Declaratory Judgment Act,
28 U.S.C. § 2201 and the United States Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*)**

**(On Behalf of the CUSIP User Class Against All Defendants)**

177.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

178.    During the relevant period, Defendants have asserted (and continue to assert) a claim of copyright to CUSIP numbers, which are not entitled to copyright under the Copyright Act of 1976, 17 U.S.C. §101 *et seq*.

179.    There is an actual case and controversy concerning whether Defendants have a valid claim of copyright to CUSIP numbers. A judicial determination of the parties' right and duties is necessary and appropriate at this time and under these circumstances to resolve the controversy between the parties and afford relief from the dispute over the copyrightability of CUSIP numbers giving rise to this proceeding.

180.    Declaratory judgment is appropriate under the Declaratory Judgment Act, 28 U.S.C. § 2201, to declare the rights of Plaintiffs by declaring that Defendants had (and have) no valid claim of copyright in and to the CUSIP numbers.

181.    Because 28 U.S.C. § 2202 empowers this Court to grant, "necessary or proper relief based on a declaratory judgment or decree . . . after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment," Plaintiffs are entitled to a declaration that the CUSIP numbers are not copyrightable and are entitled to restitution for all fees paid to Defendants commencing three years before the filing of the Dinosaur complaint on March 4, 2022 pursuant to the invalid "license agreements" that S&P imposed.

## Second Claim for Relief

### (Group Boycott in Violation of Section 1 of the Sherman Act)

### (On Behalf of the CUSIP User Class Against All Defendants)

182.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

183.     S&P, the ABA, and FactSet agreed among themselves and forced Data Vendors to agree to refuse to deal with CUSIP Users, including Plaintiffs, unless CUSIP Users, including Plaintiffs, signed a license agreement with S&P and now FactSet.

184.     This group boycott is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

185.     The purpose and effect of this group boycott was to restrain competition in the United States CUSIP Use Market.

186.     CUSIP Users, including Plaintiffs, were harmed and are being harmed by S&P's, the ABA's, and FactSet's conduct because they were deprived and are being deprived of a competitive market in which to obtain CUSIP numbers for use after their initial issuance, and as a result had to pay license fees that were and are unwarranted and unlawful.

187.     Defendants' conduct was and is a substantial factor in causing Plaintiffs' harm.

## Third Claim for Relief

### (Conspiracy in Violation of Section 1 of the Sherman Act)

### (On Behalf of the CUSIP User Class Against All Defendants)

188.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

189.     During the relevant period, S&P and the ABA conspired and FactSet is now conspiring with the ABA to prevent competition in the CUSIP Use Market by requiring CUSIP Users to take a license from Defendants that sharply limits CUSIP Users' use of CUSIP numbers despite having no lawful basis to impose such restrictions. Defendants' false claim that CUSIP

numbers are protected by copyright provides no lawful basis on which Defendants may restrict the manner in which CUSIP Users use CUSIP numbers, and therefore no lawful basis to (i) require that CUSIP Users take a license, (ii) impose use limitations in that license, and (iii) require that CUSIP Users pay so-called "license fees" for using CUSIP numbers. Defendants' conduct was and is in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

190.    During the relevant period, Defendants leveraged and continue to leverage the ABA's purported copyright to require the execution by CUSIP Users of Subscription Agreements, and Use of Service Statements (collectively, the "Unlawful Agreements"). The Unlawful Agreements constituted and constitute an illegal restraint of trade or commerce in the United States CUSIP Use Market and a continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

191.    Moreover, there is no procompetitive justification for Defendants' use of Unlawful Agreements and related unlawful conduct restraining trade in the CUSIP Use Market. Even if, contrary to fact, there were assumed to be a procompetitive justification, the exclusionary conduct was not necessary to achieve the procompetitive purpose, any such procompetitive purpose could have been obtained by less restrictive alternatives, and the anticompetitive effects of Defendants' conduct far outweigh the procompetitive benefits.

192.    As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, CUSIP Users, including Plaintiffs, were harmed and sustained substantial losses and damage to their businesses and property as set forth above.

193.    Defendants' agreement to impose the Unlawful Agreements was a combination, contract, or conspiracy undertaken to produce adverse anticompetitive effects, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## Fourth Claim for Relief

### (Conspiracy in Violation of Section 1 of the Sherman Act)

### (On Behalf of the CUSIP User Class Against All Defendants)

194.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

195.     Defendants have agreed and conspired to use the standard-setting process to eliminate competitors and unreasonably restrain trade in the CUSIP Use Market to ensure the CUSIP numbering system remains the standard so that Defendants can (i) force CUSIP Users to enter the Unlawful Agreements and charge artificially inflated, arbitrary fees simply because CUSIP numbers are the standard, unrelated to any actual value in the random string of numbers and letters; and (ii) exclude FIGI and other potential competitors from the CUSIP Use Market, thereby further entrenching S&P's (and now FactSet's) monopoly.

196.     The conspiracy harmed CUSIP Users, including Plaintiffs, as set forth above.

197.     Moreover, there is no procompetitive justification for Defendants' unlawful conduct restraining trade in the CUSIP Use Market. Even if, contrary to fact, there were assumed to be a procompetitive justification, the exclusionary conduct was not necessary to achieve the procompetitive purpose, any such procompetitive purpose, could have been obtained by less restrictive alternatives, and the anticompetitive effects of Defendants' conduct far outweigh the procompetitive benefits.

198.     As a direct and proximate result of the S&P's and the ABA's anticompetitive conduct, and now FactSet's anticompetitive conduct, as alleged herein, CUSIP Users, including Plaintiffs, were harmed and sustained substantial losses and damage to their businesses and property as set forth above.

199.     Defendants' agreements were a combination, contract, or conspiracy undertaken to produce adverse anticompetitive effects, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Fifth Claim for Relief**

**(Monopolization in Violation of Section 2 of the Sherman Act,
Unlawful Maintenance of Monopoly Power)**

**(On Behalf of the CUSIP User Class Against S&P and FactSet)**

200.    Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint.

201.    During the relevant period, S&P willfully and unlawfully maintained, and FactSet is unlawfully maintaining, its monopoly power in the United States CUSIP Use Market by engaging in exclusionary conduct that discouraged rather than encouraged competition on the merits. As explained in detail above, S&P (and now FactSet) excluded other potential competitors from entry into the United States CUSIP Use Market.

202.    The goal, purpose, and effect of S&P's and now FactSet's conduct, was and is to maintain and extend S&P's and now FactSet's monopoly power. Defendants' illegal conduct enabled S&P (and now FactSet) to obligate CUSIP Users, including Plaintiffs, to execute the Unlawful Agreements.

203.    The scheme was and is an act of unlawful monopolization of the CUSIP Use Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

204.    There is no procompetitive justification for S&P's and now FactSet's unlawful conduct in maintaining its monopoly over the CUSIP Use Market. Even if, contrary to fact, there were assumed to be a procompetitive justification, the exclusionary conduct was not necessary to achieve the procompetitive purpose, any such procompetitive purpose, could have been obtained by less restrictive alternatives, and the anticompetitive effects of S&P's and now FactSet's conduct far outweigh the procompetitive benefits.

205.     As a direct, material, and proximate result of S&P's and now FactSet's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, Plaintiffs and members of the Class have been injured by being deprived of the benefits of a competitive market for the use of CUSIP numbers and have suffered damages in an amount to be proved at trial and without injunctive relief, Plaintiffs and members of the Class will continue to suffer injury as a result of S&P's and now FactSet's ongoing unlawful conduct.

## Sixth Claim for Relief

### (Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act)

### (On Behalf of the CUSIP User Class Against All Defendants)

206.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

207.     During the relevant period, Defendants have engaged in a conspiracy to monopolize the CUSIP Use Market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, *et seq.*

208.     During the relevant period, Defendants have conspired to willfully and unlawfully maintain S&P's (now FactSet's) monopoly power in the United States CUSIP Use Market by engaging in exclusionary conduct that discouraged rather than encouraged competition on the merits. As explained in detail above, Defendants conspired to exclude other potential competitors from entry into the United States CUSIP Use Market.

209.     The goal, purpose, and effect of Defendants' conspiracy was and is to maintain and extend S&P's and now FactSet's monopoly power.

210.     Defendants' conspiracy to monopolize the CUSIP Use Market had a dangerous probability of success as demonstrated by its success in excluding any meaningful competition in that market and preserving S&P's and now FactSet's monopoly.

211.    There is no procompetitive justification for the Defendants' unlawful conduct in conspiring to maintain S&P's and now FactSet's monopoly over the CUSIP Use Market and charging unlawful licensing fees to CUSIP Users with no connection to the value, if any, of the services provided. Even if, contrary to fact, there were assumed to be a procompetitive justification, the exclusionary conduct was not necessary to achieve the procompetitive purpose, any such procompetitive purpose, could have been obtained by less restrictive alternatives, and the anticompetitive effects of Defendants' conduct far outweigh the procompetitive benefits.

212.    As a direct, material, and proximate result of Defendants' violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, Plaintiffs and members of the Class have been injured and suffered damages in an amount to be proved at trial and without injunctive relief, Plaintiffs and members of the Class will continue to suffer injury as a result of Defendants' ongoing unlawful conduct.

## Seventh Claim for Relief

### (Violations of New York General Business Law § 349(a))

### (On Behalf of the New York Unfair Business Practices Sub-Class Against All Defendants)

213.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs.

214.    At all times relevant herein, the New York General Business Law ("GBL") was in effect. GBL § 349(a) makes unlawful the use of purposeful and threatening, unfair, deceptive, or misleading acts or practices in the conduct of any business in the State of New York that cause injury to consumers and business entities, including Plaintiffs and members of the New York Unfair Business Practices Sub-Class.

215.    Defendants were and are doing business in the State of New York and thus are subject to New York law for their acts, practices, and conduct described in this action. S&P's (now

FactSet's) CGS operated out of New York during the relevant period, the threatening, unfair, deceptive and misleading conduct by Defendants emanated from New York, and Defendants received payment from the "license agreements" in New York.

216.    Defendants' actions complained of herein were and are consumer-orientated and are threatening, unfair, deceptive and misleading acts and practices in the conduct of Defendants' business that have the capacity to and did mislead and deceive Plaintiffs, and members of the New York Unfair Business Practices Sub-Class.

217.    Defendants have engaged in (i) purposeful, deceitful, unfair and misleading monopolistic conduct to ensure control over the CUSIP Use Market; (ii) purposeful, deceitful, unfair, and misleading practices by falsely claiming "license agreements" were necessary to use CUSIP numbers; and (iii) threats that CUSIP Users will be unable to access essential data from Data Vendors and be subject to copyright infringement claims absent entering "license agreements."

218.    As a result of Defendants' materially threatening, unfair, deceptive, and misleading conduct and practices, Plaintiffs and members of the New York Unfair Business Practices Sub-Class have been injured and have incurred damages by Defendants' unlawful acts.

219.    The foregoing acts and practices directly, foreseeably, and proximately caused Plaintiffs and members of the New York Unfair Business Practices Sub-Class to suffer an ascertainable loss in the form of payment of unlawful and unfair licensing fees to access CUSIP numbers, and Plaintiffs and members of the New York Unfair Business Practices Sub-Class are entitled to recover such damages, together with appropriate penalties, including punitive damages, attorneys' fees and costs of suit.

**Eighth Claim for Relief**

**(Violations of Connecticut Unfair Trade Practices Act § 42-110b(a))**

**(On Behalf of the Connecticut Unfair Business Practices Sub-Class Against All Defendants)**

220.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs.

221.    At all times relevant herein, the Connecticut Unfair Trade Practices Act ("CUTPA") was in effect. CUTPA § 42-110b(a) states that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" in Connecticut that cause injury to people or entities doing business or that reside in the State, including Hildene and members of the Connecticut Unfair Business Practices Sub-Class.

222.    Defendants were and are doing business in the State of Connecticut and thus are subject to Connecticut law for their acts, practices, and conduct described in this action.

223.    Defendants' actions complained of herein were and are threatening, unfair, deceptive, and misleading acts and practices in the conduct of Defendants' business that have the capacity to and did mislead and deceive Hildene, and members of the Connecticut Unfair Business Practices Sub-Class of similarly harmed parties that were injured while residing in Connecticut.

224.    Defendants have engaged in (i) purposeful, deceitful, unfair, and misleading monopolistic conduct to ensure control over the CUSIP Use Market; (ii) purposeful, deceitful, unfair, and misleading practices by falsely claiming "license agreements" were necessary to use CUSIP numbers; and (iii) threats that CUSIP Users will be unable to access essential data from Data Vendors and be subject to copyright infringement claims absent entering "license agreements."

225.    As a result of Defendants' unfair methods of competition and materially threatening, unfair, deceptive, and misleading business practices occurring within the State,

Plaintiff Hildene and other members of the Connecticut Unfair Business Practices Sub-Class have suffered ascertainable losses within the meaning of CUTPA § 42-110g(a) and have been damaged by Defendants' unlawful acts.

226.    The foregoing acts and practices directly, foreseeably, and proximately caused Plaintiff Hildene and other members of the Connecticut Unfair Business Practices Sub-Class to suffer an ascertainable loss in the form of payment of unlawful and unfair licensing fees to access CUSIP numbers, and Plaintiff Hildene and other members of the Connecticut Unfair Business Practices Sub-Class are entitled to recover such damages, together with appropriate penalties, including punitive damages, attorneys' fees and costs of suit.

### Ninth Claim for Relief

**(Breach of Contract)**

**(On Behalf of the CUSIP User Class Against All Defendants)**

227.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein. This Cause of Action (and each statement in paragraphs 227 through 234) becomes relevant if and only if, contrary to current law, CUSIP numbers are found to be protected by copyright.

228.    During the standard selection and approval process, the ABA filed a statement of willingness and entered a binding commitment to X9 that it would offer access to the CUSIP numbering system on FRAND terms. That commitment obligates S&P (and now FactSet) to offer access to the CUSIP database, including the CUSIP numbers, on FRAND terms, as CGS acknowledges on its website.

229.    Plaintiffs and other CUSIP Users were and are intended third-party beneficiaries of the ABA's FRAND commitment, which is a contract between X9 and the ABA.

230.    S&P (and now FactSet), acting on behalf of ABA, was bound by the ABA's FRAND commitment. CGS's License Fee Policy recognizes S&P's (and now FactSet's) FRAND obligation by pledging that it seeks to charge "fair, reasonable and non-discriminatory license fees."

231.    Defendants had no lawful right to force CUSIP Users to enter the Unlawful Agreements, but having chosen to require the CUSIP Users to sign license agreements (the Unlawful Agreements) ABA, and S&P (and now FactSet) acting on its behalf, was required by its FRAND commitment to X9 to offer those licenses on FRAND terms.

232.    Defendants, however, breached that commitment by charging Plaintiffs and members of the Class unfair, unreasonable, and arbitrary fees based on false claims of copyright that it should not have charged at all in the first place.

233.    The incremental cost of electronic distribution of existing information including CUSIP numbers to any user is zero. Defendants incur no incremental cost when a CUSIP User "uses" a CUSIP number it has received from their contracted Data Vendor rather than from Defendants.

234.    Therefore, any charge other than $0.00 for the use of issued CUSIP numbers is not fair or reasonable, and every dollar of licensing fees that Defendants extracted from Plaintiffs and other members of the Class is supracompetitive and in breach of the FRAND commitment.

**Tenth Claim for Relief**

**(Injunctive Relief)**

**(On Behalf of the Injunctive Relief Class Against FactSet and the ABA)**

235.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

236.     This is a claim for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. Plaintiffs and Injunctive Relief Class members seek injunctive relief under 15 U.S.C. § 26 to correct the anticompetitive effect caused by Defendants' unlawful conduct. As explained above, Defendants are in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

237.     Defendants' unlawful conduct threatens to continue to injure Plaintiffs and members of the Injunctive Relief Class. Plaintiffs seek a permanent injunction prohibiting Defendants from continuing their illegal conspiracy to force CUSIP Users to enter the Unlawful Agreements and charge license fees, and ordering them to take appropriate remedial action to correct and eliminate any remaining effects of the conspiracy.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

a.     An order declaring that CUSIP numbers are not copyrightable and that Defendants had (and have) no valid claim of copyright in and to the CUSIP numbers;

b.     An injunction prohibiting Defendants from claiming that CUSIP numbers are copyrighted or copyrightable;

c.     Restitution of all so-called "license fees" paid by CUSIP Users, including Plaintiffs;

d.     An order declaring that the SA and USS are unenforceable;

e.     An injunction prohibiting enforcement of the SA and USS;

f.     An order declaring that Defendants may not impose fees on CUSIP Users, including Plaintiffs, that obtain their data from a Data Vendor;

g.     An injunction prohibiting the imposition of fees by Defendants on CUSIP Users, including Plaintiffs, for the use of CUSIP numbers after their initial issuance;

h.      An order declaring that Defendants have engaged in anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act;

i.      An order declaring that this action may proceed as a class action on behalf of the Classes and Sub-Classes;

j.      An injunction permanently enjoining and restraining Defendants from continuing and maintaining S&P's (now FactSet's) abuse of monopoly power alleged in the Complaint under Section 16 of the Clayton Act, 15 U.S.C. § 26;

k.      A judgment awarding actual damages trebled (*i.e.*, three times the amount of the so-called "license fees") for CUSIP Users, including Plaintiffs, in an amount to be determined at trial;

l.      A judgment awarding attorneys' fees and costs of suit;

m.      An order declaring that Defendants' conduct violates Section 349(a) of the New York General Business Law;

n.      An ordering declaring that this action may proceed as a class action on behalf of the New York Unfair Business Practices Sub-Class;

o.      A judgment awarding Plaintiffs and members of the New York Unfair Business Practices Sub-Class damages against Defendants for their violations of New York General Business Law Section 349(a), together with appropriate penalties, including punitive damages, attorneys' fees, and costs of suit;

p.      An order declaring that Defendants' conduct violated Section 42-110b(a) of the Connecticut Unfair Trade Practices Act;

q.      An order declaring that this action may proceed as a class action on behalf of the Connecticut Unfair Business Practices Sub-Class;

r.      A judgment awarding Hildene and the Connecticut Unfair Business Practices Sub-Class damages against Defendants for their violations of the Connecticut Unfair Trade Practices Act Section 42-110b(a), together with appropriate penalties, including punitive damages, attorneys' fees, and costs of suit;

s.      In the event that the CUSIP numbers are held to be protected by copyright, an order setting the FRAND rate for CUSIP numbers if after a hearing the current rates are determined to not be FRAND;

t.      A judgment awarding Plaintiffs and the CUSIP User Class damages for breaches of contract;

u.      A judgment awarding all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity; and

v.      An order or judgment awarding such other further relief as allowed by law.

## **<u>JURY DEMAND</u>**

Plaintiffs request a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: August 8, 2022

Respectfully submitted,

/s/ *David H. Wollmuth*
David H. Wollmuth
R. Scott Thompson
Ronald J. Aranoff
Ryan A. Kane
Grant J. Bercari
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue, 12th Floor
New York, New York 10110
Telephone: (212) 382-3300
Email: dwollmuth@wmd-law.com
sthompson@wmd-law.com
raranoff@wmd-law.com
rkane@wmd-law.com
gbercari@wmd-law.com

/s/ *Leiv Blad*
Leiv Blad
Jeffrey Blumenfeld *pro hac vice*
Meg Slachetka
COMPETITION LAW PARTNERS PLLC
1101 Pennsylvania Avenue NW
Washington, DC  20004
Telephone: (202) 742-4300
Email: leiv@competitionlawpartners.com
jeff@competitionlawpartners.com
meg@competitionlawpartners.com

/s/ *Robert N. Kaplan*
Robert N. Kaplan
Frederic S. Fox
Gregory K. Arenson
Donald R. Hall
KAPLAN FOX & KILSHEIMER LLP
850 Third Ave., 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Email: rkaplan@kaplanfox.com
ffox@kaplanfox.com
garenson@kaplanfox.com
dhall@kaplanfox.com