September 6, 2022

The Honorable Katherine Polk Failla
United States District Court for the Southern District of New York
40 Foley Square, Room 618
New York, NY 10007

Re:   *Dinosaur Financial Group LLC et al. v. S&P Global, Inc. et al.*, Case Nos. 22 Civ. 1860-
      KPF, 22 Civ. 1929-KPF

Dear Judge Failla:

Defendants request a pre-motion conference for their motion to dismiss the Amended Complaint.
Plaintiffs allege antitrust, copyright, breach of contract, and other state-law claims. Plaintiffs
acknowledge that the American Bankers Association ("ABA") developed CUSIP identifiers
more than 50 years ago at the behest of "government regulators, stock exchanges, and private
firms" to devise an "efficient way to identify a particular financial instrument." *Dinosaur*,
No. 22-cv-1860, Dkt. 70 ("Compl.") ¶ 45. Defendants have compiled, maintained, and updated a
database of CUSIP identifiers and related financial information ("CGS Data") and license the
right to access, download, and use that CGS Data to Data Vendors like Bloomberg and to End
Users and other entities. *Id.* ¶ 4. To protect Defendants' investments, these agreements prohibit
the unlicensed commercial redistribution and use of CGS Data. *See id.* ¶ 119. Plaintiffs disavow
challenging the "legality of the CUSIP numbers as the numbering system for financial
instruments" or charging a fee to issue CUSIPs. *Id.* ¶ 68; *see also id.* ¶ 6. Instead, their core
challenge is to Defendants' contractual restriction on redistribution. Plaintiffs' claims fail.

## I.     Plaintiffs Have Not Alleged Anticompetitive Conduct.

*Group Boycott Claim.* Plaintiffs purport to allege a *per se* "group boycott" by Defendants and
Data Vendors "to refuse to deal with CUSIP users" that have not "signed a license agreement
with" CGS[1] to pay to access and use the CGS Data. *See* Compl. ¶¶ 182–187 (Count II). But a
*per se* group boycott claim requires a "horizontal agreement[] among direct competitors."
*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). The agreements between CGS and
Data Vendors are not between direct competitors; rather, they are *vertical agreements* between a
supplier (CGS) and its Data Vendor licensees. And Plaintiffs plead no facts plausibly suggesting
the Data Vendors entered into an agreement with one another to boycott unlicensed Data Users.
*See, e.g., In re Inclusive Access Course Materials Antitrust Litig.*, 2021 WL 2419528, at *11
(S.D.N.Y. June 14, 2021) (series of vertical agreements insufficient to show unlawful
"conspiracy" absent horizontal agreement). Nor is it a cognizable boycott to require a license
from entities that want access to and commercial use of a product.

*Vertical Restraints of Trade.* Plaintiffs allege that vertical agreements between CGS and Data
Vendors are unlawful because they prohibit the Data Vendor from re-distributing CGS Data to
Data Users that do not have a subscription agreement with CGS. Compl. ¶¶ 9, 10, 12, 24, 118–

---

[1]  CGS is the former S&P (now FactSet) business unit that issues CUSIP identifiers and licenses the CGS Data.
Compl. ¶ 5.

20.  But there is nothing unlawful—or unusual—about a data supplier requiring prospective end users to pay for access to and commercial use of its data, regardless of whether they obtain such data directly or through a third-party intermediary.  *See, e.g., FTC v. Qualcomm Inc.*, 969 F.3d 974, 985, 1002 (9th Cir. 2020) (no antitrust violation where Qualcomm required manufacturers to pay for license regardless of whether they purchased chips from Qualcomm or competitor, and required manufacturers to sell devices only to customers who had a license with Qualcomm); *MiniFrame Ltd. v. Microsoft Corp.*, 2013 WL 1385704, at *4 (S.D.N.Y. Mar. 28, 2013) (no antitrust violation where Microsoft "curtailed the ability of third parties to reproduce its software for multiple users"), *aff'd,* 551 F. App'x 1 (2d Cir. 2013).

Plaintiffs also fail to plead how it reduces competition for CGS to require Data Users to pay CGS to access and download CGS Data indirectly through an intermediary.  CGS could charge Data Vendors a fee calculated based on those Data Users' data consumption—so charging fees to Data Users directly has no cognizable effect on competition.  *See, e.g., Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*, 516 F. Supp. 2d 270, 293 (S.D.N.Y. 2007) (an antitrust violation requires "actual adverse effect on competition as a whole in the relevant market").

Plaintiffs similarly do not plead a cognizable harm to competition by claiming that Defendants threatened to terminate Xignite's license with CGS when Xignite was constructing a competing CUSIP database using purportedly "independent" sources.  Compl. ¶¶ 3, 78, 88–89, 163.  First, if Xignite was developing its own database from truly independent sources (*i.e.*, without using CGS's database), then restricting access to CGS's Data would not affect Xignite's ability to offer that competing database.  Second, nothing in the antitrust laws requires CGS to supply its data or database to a potential competitor while the competitor is seeking to construct a competing database containing some of the very same information.  *See, e.g., Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (rejecting antitrust claim brought by rival word processor developer challenging Microsoft's cutting off the developer's access to Microsoft's proprietary APIs).  "Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival."  *Id.*; *see also New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 27 (D.D.C. 2021) ("Facebook's adoption of a policy of not offering API access to competitors did not, standing alone, violate Section 2.").[2]

At bottom, Plaintiffs' theory is that Defendants restrained trade by requiring Data Vendors to agree not to enable end users to download CGS Data for commercial use without a CGS license, which allegedly made it harder for potential competitors to compete against CGS's database.  Compl. ¶ 126 (Defendants' agreements "preclude CUSIP Users from competing in the CUSIP Use market").  Yet nothing in the antitrust laws obligates a company to license its data and decades-long investments on terms that empower potential rivals.  "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Pac. Bell Tel. Co. v. linkLine Comm'ns*, 555 U.S. 438, 448 (2009).

*Threats of copyright litigation*.  Plaintiffs' allegations that Defendants threatened copyright infringement actions similarly fail.  Compl. ¶¶ 10, 99–103.  To the contrary, the only non-conclusory allegations in the Complaint show that Defendants licensed and sought to enforce

---

[2] For these reasons, Plaintiffs' allegations that licenses with CUSIP Users "sharply limited their use of CUSIPs" also fail to allege harm to competition.  Compl. ¶ 189.

their rights in the CGS database, not in a CUSIP identifier alone.  *Infra* at III.  Seeking to enforce one's copyrights is immune from antitrust liability under the *Noerr-Pennington* doctrine, which protects the right to petition the government.  *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993).  *Noerr* protects not only filing litigation, but also "threat letters."  *Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 100 (2d Cir. 2000).  And there are no allegations suggesting Defendants' claim to copyright protection over the CGS Data was a "sham."  *Prof'l Real Estate Investors,* 508 U.S. at 60.

*Standard Setting*.  Plaintiffs also allege that Defendants used the "standard setting process" to exclude competitors.  Compl. ¶ 195.  Plaintiffs disavow any challenge to the adoption of the CUSIP standard, asserting instead that they contest only the alleged restrictions on the use of (and fee for) the CUSIP identifiers.  *Id.* ¶ 68.  That assertion raises the same claim discussed above and fails for the same reasons.  Further, because Plaintiffs do not challenge the adoption of the CUSIP standard, Plaintiffs' allegation that Defendants controlled X9 is a red herring.  And, even if control were relevant, Plaintiffs do not plausibly allege it.  Plaintiffs admit that the CUSIP standard has been periodically renewed after X9 formally separated from ABA, and do not allege that such renewals were improperly achieved.  *Id*. ¶ 52.  Plaintiffs point to the continuing presence of some ABA- or CGS-affiliated members on certain of X9's committees but allege nothing that shows those members controlled the voting even on those committees, let alone the full voting membership that approved the standard.  And Plaintiffs plead no facts to support their allegation that Defendants used the X9 standard-setting process to "exclude FIGI" as a competing identifier.  *Id*. ¶¶ 53–54, 195.[3]

*FRAND Claim*.  Plaintiffs' breach of contract claim is based on ABA's alleged violation of a purported commitment to X9 that it would charge license fees to CUSIP identifiers on a FRAND basis.  *Id.* ¶ 134.  But Plaintiffs allege no facts showing any such promise.  The Complaint quotes ABA as having "filed a statement of willingness" to charge FRAND license fees.  *Id.*  The document containing that quote, however, refers only to "*patent* holder[s]," not copyright holders.  Exhibit 1, ANSI X9.6-2014 at v (emphasis added).  (The document may be considered as incorporated by reference in the Complaint.)  Plaintiffs do not allege that Defendants claim, or are charging them for, any patent rights.  Plaintiffs also assert that breach of a FRAND commitment can be a misuse of market power.  Compl. ¶ 57.  But Plaintiffs fail to allege the necessary predicates for such a claim, *i.e.*, that the defendant made an intentionally false promise and the standard would not have been adopted absent that promise.  *See Rambus Inc. v. F.T.C.*, 522 F.3d 456, 463–64 (D.C. Cir. 2008); *Qualcomm*, 969 F.3d at 996.

Because none of the alleged conduct is anticompetitive, it does not support a claim under either section 1 or section 2 of the Sherman Act.  *Qualcomm*, 969 F.3d at 991 (if, "a court finds that the conduct in question is *not* anticompetitive under § 1, the court need not separately analyze the conduct under § 2.") (emphasis in original).  Plaintiffs' state-law claims fail for the same or related reasons as those described herein.

---

[3] Plaintiffs neglect to mention that, contrary to their allegations of Defendants' "control," X9 approved the FIGI identifier standard more than a year ago.  *See* https://x9.org/wp-content/uploads/2021/08/ANSI-X9.145-2021-Financial-Instrument-Global-Identifier-FIGI.pdf.  The Court can take judicial notice given Plaintiffs' allegations.

## II.      Plaintiffs' Market Definition is Implausible.

Plaintiffs' antitrust claims also fail because Plaintiffs have not defined a plausible relevant market.  Courts "have not hesitated to reject market allegations that make no economic sense under any set of facts."  *Theatre Party Assocs. v. Shubert Org.,* 695 F. Supp. 150, 154 (S.D.N.Y. 1988).  The relevant market must define the "area of effective competition within which the defendant operates."  *Concord Assocs. v. Entm't Props. Trust,* 817 F.3d 46, 52 (2d. Cir. 2016).

Plaintiffs allege a "CUSIP Use" market "for using CUSIP numbers after initial issuance," which makes no economic sense.  Compl. ¶ 139.  Plaintiffs allege S&P, and now FactSet, possesses 100% of this purported market.  *See id.* ¶¶ 2, 3, 141.  But Plaintiffs reveal the gerrymandered nature of their "CUSIP Use Market" when they allege (conclusorily and falsely) that Defendants "exclude[d]" Bloomberg's "FIGI numbering system," which they suggest competes with the CUSIP system—thereby implying the appropriate market is securities identifiers, not a single-brand market limited to CUSIPs.  *Id.* ¶¶ 53–54; *Skyline Travel, Inc. (NJ) v. Emirates*, 476 F. App'x 480, 481 (2d Cir. 2012) (internal citation omitted) (Complaint fails if it limits "'product market to a single brand . . . that competes with potential substitutes' or fails to provide a 'plausible explanation as to why a market should be limited in a particular way.'").  And Plaintiffs' theory that CUSIP numbers by themselves are a market is further revealed as deficient by their admission that customers need more than the CUSIP identifiers; they "must have the CUSIP numbers, as well as the full issuer name and the issue description, to operate their businesses."  Compl. ¶ 2; *id.* ¶ 14 (describing alleged group boycott as forcing Data Vendors "to deny access to *essential financial data including* CUSIP numbers" (emphasis added)).

## III.     Plaintiffs' Copyright-Related Claim Should Be Dismissed.

*Lack of Justiciability.*  Plaintiffs seek a declaration that CUSIP identifiers are not copyrightable.  But courts may issue a declaratory judgment only where an "actual controversy" between the parties gives rise to a justiciable claim.  28 U.S.C. § 2201(a); U.S. Const. art. III § 2.  A claimant must allege facts showing a threat of litigation that is "'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that [is] 'real and substantial.'"  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 131 (2007) (citation omitted) (finding controversy where licensee faced threat of litigation for refusal to pay royalties).

Plaintiffs' allegations do not support their theory that Defendants threatened copyright infringement litigation over use of the CUSIP identifier alone.  The Subscription Agreement and correspondence Plaintiffs rely on concern the "CUSIP Database" or "CGS Data."  Compl. ¶¶ 80–81, 83–84, 101–103, 107, 116, 119, 125.  The Subscription Agreement (which may be considered as incorporated by reference in the Complaint) defines those terms to mean *the database compilation* that Defendants created decades ago and continually update and maintain, in which ABA has registered its copyright.  *Id.* ¶¶ 4, 58, 69–70; ECF 56 (*Dinosaur*), Ex. 1 (CGS Subscription Agreement of Dinosaur Financial Group at 1, first WHEREAS clause).  That Agreement grants Plaintiffs a right to access, download in bulk, and use thousands of data records originating from the "CGS Data" compilation—not just individual CUSIP identifiers.  *See* ECF 56, Ex. 1, §§ 1.1, 2.  Thus, Plaintiffs cannot plausibly allege that their CGS Subscription Agreements are based on a copyright solely over a CUSIP identifier or that that they faced any "definite and concrete" threat of infringement suit based solely on CUSIP

identifiers, which ABA never registered with the Copyright Office.  17 U.S.C. § 411(a); *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 888 (2019) (holding registration a prerequisite to filing infringement suit).

*No Right to Restitution.*  Regardless of whether Plaintiffs' copyright claim survives (which it should not), Plaintiffs' restitution claim must be dismissed.  Plaintiffs have no statutory remedy under the Copyright Act, which affords restitution only to copyright owners and not copyright users.  17 U.S.C. § 504(a)(1), (b).  Nor can Plaintiffs seek restitution under state law which governs intellectual property licenses.  *See Great Minds v. FedEx Office and Print Servs.*, 886 F.3d 91, 94 (2d Cir. 2018) ("Copyright licenses are generally construed according to principles of contract law.").  Even if the Court were to find the Subscription Agreements to be based on an invalid copyright, in the analogous context of patent licenses, courts deny restitution of past royalties paid on invalidated patents.  *See, e.g.*, *Zenith Labs., Inc. v. Carter-Wallace, Inc.,* 530 F.2d 508, 513 (3d Cir. 1976); *Troxel Mfg. Co. v. Schwinn Bicycle Co.*, 465 F.2d 1253, 1255, 1260 (6th Cir. 1972); *accord Warner-Jenkinson Co. v. Allied Chem. Corp.*, 567 F.2d 184, 188 (2d Cir. 1977) (limiting potential recovery to royalties paid *pendente lite*).  *See also, Davis v. Blige*, 505 F.3d 90, 104 (2d Cir. 2007) (courts look to patent law for analogies in copyright cases, given the "historic kinship" between them).

Respectfully submitted,

| | | |
|---|---|---|
| */s/ Eric J. Stock* | */s/ Jeffrey Shinder* | */s/ David Kiernan* |
| Eric J. Stock | Jeffrey I. Shinder | David C. Kiernan |
| GIBSON, DUNN & CRUTCHER LLP | Constantine Cannon LLP | JONES DAY |
| 200 Park Avenue, 47th Fl. | 335 Madison Avenue, Fl. 9 | 555 California Street, 26th Fl. |
| New York, NY 10166 | New York, NY 10017 | San Francisco, CA 94104 |
| Tel.: (212) 351-2301 | Tel.: (212) 350-2700 | Tel.: (415) 626-3939 |
| Fax: (212) 716-0801 | Fax: (212) 350-2701 | Fax: (415) 875-5700 |
| estock@gibsondunn.com | jshinder@constantinecannon.com | dkiernan@jonesday.com |
| | | |
| Attorneys for Defendant S&P Global Inc. | Attorneys for Defendant FactSet Research Sys., Inc. | Attorneys for Defendant American Bankers Association |