**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X

DINOSAUR FINANCIAL GROUP LLC,
HILDENE CAPITAL MANAGEMENT,
LLC and SWISS LIFE INVESTMENT
MANAGEMENT HOLDING AG, on behalf
of themselves and all others similarly
situated,

                 Plaintiffs,

     -against-

S&P GLOBAL, INC., AMERICAN
BANKERS ASSOCIATION, and FACTSET
RESEARCH SYSTEMS INC.,

                Defendants.

: : : : : : : : : : : : : : : : : :

Case Nos. 1:22-cv-1860-KPF,
1:22-cv-1929-KPF

------------------------------------------------------- X

**Memorandum of Law in Support of Defendants' Motion**
**<u>to Dismiss Second Amended Class Action Complaint</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND .............................................................................. 3

    A.   The CUSIP Identifier ......................................................................... 3

    B.   The CGS Database and Related Agreements ..................................... 4

ARGUMENT ...................................................................................................... 8

I.    LEGAL STANDARD ................................................................................. 8

II.   THE COMPLAINT DOES NOT STATE A VALID ANTITRUST CLAIM. ..................... 9

    A.   Plaintiffs Fail to Allege a Valid Monopolization Claim Under Section 2 of the Sherman Act ................................................................. 9

        1.   Defendants' Distribution and Subscription Agreements Are Not Anticompetitive. .................................................................. 10

            (a)   Defendants' Restrictions on Use and Redistribution of CGS Data Are Not Anticompetitive ......................................... 10

            (b)   Charging Data Users Directly for Their Use of CGS Data Is Not Anticompetitive .................................................... 16

        2.   Plaintiffs Have Not Alleged Any Facts Showing that Defendants Improperly Hijacked the Standard-Setting Process. ............................. 19

        3.   Plaintiffs' Allegations that Defendants Threatened Copyright Litigation Do Not State a Claim. ...................................................... 21

    B.   Plaintiffs Have Not Alleged a Valid Claim Under Section 1 of the Sherman Act. .... 22

III.   THE COURT SHOULD DISMISS PLAINTIFFS' COPYRIGHT DECLARATORY JUDGMENT CLAIM. ................................................................. 25

IV.   PLAINTIFFS HAVE NOT STATED VALID CLAIMS UNDER STATE LAW ............. 28

    A.   Plaintiffs' New York General Business Law § 349 Claim Should Be Dismissed ...... 28

    B.   Plaintiffs' Connecticut Unfair Trade Practices Act Claim Should be Dismissed ....... 31

    C.   Plaintiffs' Breach of Contract Claim Must Be Dismissed Because the Alleged FRAND Obligation Imposed by X9 Covers Only Patents, Not Copyrights .............. 33

CONCLUSION.................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Abcor Corp. v. AM Int'l, Inc.*,
  916 F.2d 924 (4th Cir. 1990) ................................................................. 10

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
  948 F.2d 536 (9th Cir. 1991) ................................................................. 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................. 8

*BankUnited, N.A. v. Merritt Env't Consulting Corp.*,
  360 F. Supp. 3d 172 (S.D.N.Y. 2018) .................................................... 3

*Barry Wright Corp. v. ITT Grinnell Corp.*,
  724 F.2d 227 (1st Cir. 1983) ................................................................. 22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................. 8

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ................................................................. 19

*Broder v. Cablevision Sys. Corp.*,
  418 F.3d 187 (2d Cir. 2005) .............................................................. 8, 9

*Bruce Winston Gem Corp. v. Harry Winston, Inc.*,
  2010 WL 3629592 (S.D.N.Y. Sept. 16, 2010) ....................................... 28

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
  485 U.S. 717 (1988) .............................................................................. 23

*Campbell v. Barclays Bank*,
  24 Misc. 3d 1201 (A) (Sup. Ct. N.Y. Cnty. July 2, 2009) ..................... 30

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ................................................................. 8

*City of Groton v. Conn. Light & Power Co.*,
  662 F.2d 921 (2d Cir. 1981) ................................................................. 10

*Continental T.V., Inc. v. GTE Sylvania, Inc.*,
  433 U.S. 36 (1977) ................................................................................ 21

*Cortec Indus., Inc. v. Sum Holding LP*,
  949 F.2d 42 (2d Cir. 1991) .................................................................... 35

*E.I. Dupont de Nemours & Co. v. Invista B.V.*,
  473 F.3d 44 (2d Cir. 2006) .................................................................... 25

*Eatoni Ergonomics, Inc. v. Rsch in Motion Corp.*,
  486 F. App'x 186 (2d Cir. 2012) ........................................................... 10

*Ebomwonyi v. Sea Shipping Line*,
  473 F. Supp. 3d 338 (S.D.N.Y. 2020) ................................................... 33

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
  129 F.3d 240 (2d Cir. 1997) .................................................................. 23

*Fashion Originators Guild of Am. v. FTC*,
  312 U.S. 703 (1941)............................................................................... 24

*Fourth Estate Publ'g. Benefit Corp. v. Wall-Street.com, LLC*,
  139 S. Ct. 881 (2019)............................................................................. 26

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ........................................................... 16, 17

*FTC v. Superior Court Trial Lawyers Ass'n*,
  493 U.S. 411 (1989)............................................................................... 24

*Glob. Network Comm'ns v. City of New York*,
  458 F.3d 150 (2d Cir. 2006) .................................................................. 35

*Goel v. Bunge, Ltd.*,
  820 F.3d 554 (2d Cir. 2016) .................................................................... 8

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991) .................................................................. 35

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) .................................................................... 14

*In re Inclusive Access Course Materials Antitrust Litig.*,
  2021 WL 2419528 (S.D.N.Y. June 14, 2021) ....................................... 25

*In re Livent, Inc. Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................................................... 34

*Island Software & Comput. v. Microsoft*,
  413 F.3d 257 (2d Cir. 2005) .................................................................. 26

*J. Publ'g Co. v. Hartford Courant Co.*,
   804 A.2d 823 (Conn. 2002) ........................................................................ 31, 32

*Kartell v. Blue Shield of Mass., Inc.*,
   749 F.2d 922 (1st Cir. 1984) .............................................................................. 19

*Kaufman v. Time Warner*,
   836 F.3d 137 (2d Cir. 2016) .............................................................................. 22

*Koch v. Acker, Merall & Condit Co.*,
   18 N.E.2d 675 (N.Y. 2012) ............................................................................... 29

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991) .............................................................................. 35

*McCracken v. Verisma Sys., Inc.*,
   131 F. Supp. 3d 38 (W.D.N.Y. 2015) ................................................................ 29

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ........................................................................................... 25

*MetroNet Servs. Corp. v. Qwest Corp.*,
   383 F.3d 1124 (9th Cir. 2004) ........................................................................... 13

*MiniFrame Ltd. v. Microsoft Corp.*,
   2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013) .............................................. 13, 14

*MiniFrame Ltd. v. Microsoft Corp.*,
   551 F. App'x 1 (2d Cir. 2013) ........................................................................... 13

*N. Y. ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) ................................................................................ 9

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*,
   389 F. Supp. 2d 527 (S.D.N.Y. 2005),
   *aff'd,* 497 F.3d 109 (2d Cir. 2007) .................................................................... 13

*N.Y. Transp., Inc. v. Naples Transp., Inc.*,
   116 F. Supp. 2d 382 (E.D.N.Y. 2000) ............................................................... 31

*New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*,
   323 F. Supp. 2d 559 (S.D.N.Y. 2004) .......................................................... 12, 14

*New York v. Facebook, Inc.*,
   549 F. Supp. 3d 6 (D.D.C. 2021) ....................................................................... 12

*Newman v. RCN Telecom Servs., Inc.*,
   238 F.R.D. 57 (S.D.N.Y. 2006) ......................................................................... 30

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ............................................................. 11

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998) ............................................................................... 23

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
797 F.2d 370 (7th Cir. 1986) ................................................................. 11

*Orlander v. Staples, Inc.*,
802 F.3d 289 (2d Cir. 2015) .................................................................. 29

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
647 N.E.2d 741 (N.Y. 1995).................................................................. 29

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)......................................................................... 10, 15

*Pearson v. City of New York*,
2021 WL 2894776 (S.D.N.Y. July 9, 2021) ........................................... 8

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101, 110 (2d Cir. 2002) .......................................................... 25

*Primetime 24 Joint Venture v. Nat'l Broad., Co.*,
219 F.3d 92 (2d Cir. 2000) .................................................................... 22

*Pro Music Rights, LLC v. Apple, Inc.*,
2020 WL 7406062 (D. Conn. Dec. 16, 2020)........................................ 32

*Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993)................................................................................. 22

*Purgess v. Sharrock*,
33 F.3d 134 (2d Cir. 1994) .................................................................... 31

*Redcell Corp. v. A.J. Trucco, Inc.*,
2022 WL 683007 (S.D.N.Y. Mar. 8, 2022) ............................................. 8

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ................................................................. 19

*Shak v. JPMorgan Chase & Co.*,
156 F. Supp. 3d 462 (S.D.N.Y. 2016) ..................................................... 9

*Sky Billiards, Inc., v. WolVol, Inc.*,
2016 WL 7479428 (C.D. Cal. July 11, 2016)........................................ 26

*Small v. Lorillard Tobacco Co.*,
  720 N.E.2d 892 (N.Y. 1999) ........................................................................... 30

*Smith v. Wells Fargo Bank, N.A.*,
  158 F. Supp. 3d 91 (D. Conn.),
  *aff'd,* 666 F. App'x 84 (2d Cir. 2016) ........................................................... 32

*United States v. Aiyer*,
  33 F.4th 97 (2d Cir. 2022) ............................................................................. 23

*Valassis Commc'ns, Inc. v. News Corp.*,
  2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) ................................................. 10

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ................................................................................ passim

*We Shall Overcome Found. v. Richmond Org., Inc. (TRO Inc.)*,
  221 F. Supp. 3d 396 (S.D.N.Y. 2016) ........................................................... 31

*Wellnx Life Sci. Inc. v. Iovate Health Scis. Rsch. Inc.*,
  516 F. Supp. 2d 270 (S.D.N.Y. 2007) ........................................................... 25

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*,
  810 F.2d 243 (D.C. Cir. 1987) ...................................................................... 18

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*,
  513 F. Supp. 1100 (E.D. Pa. 1981) ............................................................... 10

## Statutes

17 U.S.C. § 101 ....................................................................................................... 27

17 U.S.C. § 411(a) .................................................................................................. 26

17 U.S.C. § 502 ....................................................................................................... 26

28 U.S.C. § 2201(a) ................................................................................................ 25

Conn. Gen. Stat. § 42-110b(a) ............................................................................... 31

N.Y. GBL § 349(a) ........................................................................................... 28, 30

## Other Authorities

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (Aug. 2022 update) ...................... 19, 24

## Rules

Fed. R. Civ. P., Rule 12(b)(1) ................................................................................. 25

Fed. R. Civ. P., Rule 12(b)(6) ................................................................................................ 25

Constitutional Provisions

U.S. Const. art. III § 2 ........................................................................................................... 25

## INTRODUCTION

The CUSIP numbering system was created to provide an efficient system for processing, clearing, and settling securities trades and has been the uniform standard for identifying financial instruments for more than fifty years.  Over that time, Defendants have invested in developing and maintaining a database of CUSIP identifiers and related information for tens of millions of individual securities (the "CGS Database") and have licensed and charged for the right to access, download, and use that data.  The license agreements restrict the use and redistribution of CGS Data to protect Defendants' investment and preserve their incentive to continue investing in and offering this valuable database.  Absent the restriction, potential competitors could use the CGS Data to develop a competing product and thereby free ride on Defendants' decades-long investment.

Plaintiffs do not, and cannot, challenge the legality of the CUSIP system as the uniform standard for financial security identifiers or Defendants' role in administering the system. Indeed, Plaintiffs acknowledge that the success of the CUSIP system resulted from the financial industry and governmental agencies adopting it.  *See* Second Amended Class Action Complaint ("SAC") ¶¶ 35–39, 42.  Plaintiffs offer no non-conclusory allegations to show that Defendants have done anything to prevent Plaintiffs or anyone else from developing a competing identifier and convincing industry stakeholders and government agencies to adopt it.

Instead, Plaintiffs seek to force Defendants to help other companies sell Defendants' data in competition with Defendants' own products and services.  Plaintiffs challenge Defendants' license agreements, asserting that, without a copyright over individual CUSIP identifiers, Defendants can neither (1) restrict Plaintiffs and other Data Users from using data from the CGS Database to develop a competing product nor (2) charge for access to and use of the CGS Data when Plaintiffs access that valuable CGS Data through a third-party Data Vendor.  In essence,

Plaintiffs allege that Defendants are required to give away data they spent years collecting and updating to help potential rivals *including Plaintiffs* develop competing products.

These allegations conflict with bedrock antitrust principles.  As the United States Supreme Court has recognized, the antitrust laws permit companies (even dominant ones) that have invested time and resources in creating a valuable good or service, as the American Bankers Association ("ABA") and CUSIP Global Services ("CGS") have done here, to limit access to their products or services and to decline to deal with potential rivals.  Such restrictions, like the license restrictions here, do not impede competition.  Rather, they promote competition by encouraging innovation while preventing others from free riding off that innovation instead of developing their own products and services.  This right to determine the terms of access extends to all companies regardless of size or alleged monopoly power and does not depend on whether the goods or services at issue are protected by copyright.  Instead, the right exists to protect the effort, acumen, time, and money the seller has invested in developing and improving its service.  Plaintiffs' challenge to the license agreements thus fails to state a claim under either Section 2 or Section 1 of the Sherman Act.

Plaintiffs' invocation of the term "group boycott" adds nothing to their claims.  All Plaintiffs allege in support of their "boycott" claim are CGS's vertical agreements with customers that limit redistribution and use of the CGS Data.  Because it is lawful to impose contractual restrictions against free riding, CGS's vertical agreements that implement these restrictions are also lawful.

Plaintiffs' claim that Defendants manipulated the standard-setting process is a red herring.  Plaintiffs do not allege any well-pleaded facts (nor could they) that Defendants either controlled the X9 Standards Committee ("X9"), the independent standard-setting body, or

engaged in any improper conduct at X9 to block competition.  Thus, their Section 2 claims concerning X9 fail.

Plaintiffs' non-antitrust claims are equally groundless.  Plaintiffs' request for a declaration that Defendants have no valid copyright in CUSIP identifiers is not justiciable, as Plaintiffs allege no non-conclusory facts demonstrating that Defendants have asserted a definite and concrete copyright claim or threatened copyright litigation against them.  Their claims under the New York General Business Law and the Connecticut Unfair Trade Practices Act also fail because the alleged conduct does not fall within those statutes.  Finally, their breach-of-contract claim fails because they allege no facts showing that the alleged contractual obligation exists.

Defendants described the deficiencies in Plaintiffs' previous complaints in two rounds of pre-motion letters and hearings before this Court.  Plaintiffs have had ample opportunity, in consolidating their original complaints and then amending the consolidated complaint, to plead valid, legally sufficient claims.  They have twice failed to do so, and the SAC should be dismissed with prejudice.  *See BankUnited, N.A. v. Merritt Env't Consulting Corp.*, 360 F. Supp. 3d 172, 191–92 (S.D.N.Y. 2018) (denying leave to amend where the "[p]laintiff has already amended once, . . . after having the benefit of [defendants'] pre-motion letters . . . , as well as the Court's observations during a pre-motion conference").

## FACTUAL BACKGROUND

### A.     The CUSIP Identifier

The ABA developed the CUSIP identifier in the 1960s as the culmination of a "years-long industry-wide voluntary cooperative effort to develop a standard for identifying United States financial instruments."  SAC ¶ 35.  "[G]overnment regulators, stock exchanges, and private firms" recognized the need for a standard identifier to use in facilitating clearing and settlement of trades.  *Id.*  These organizations approached the ABA, which formed the

Committee on Uniform Securities Identification Procedures ("CUSIP") in 1964 to agree on a design for the identifier.  *Id.* ¶ 36–37.  That Committee in turn decided that the identifier should be a unique nine-digit alphanumeric code for each security, with the first six digits identifying the issuer and the next two digits identifying the type of instrument (the last digit is a mathematical check character).  *Id.* ¶¶ 4, 36.  The ABA contracted with S&P Global, Inc. ("S&P") to administer assigning CUSIP identifiers for individual securities.  *Id.* ¶ 37.  S&P, in turn, formed CGS to perform this function.  *Id.* ¶¶ 32, 37.  S&P recently sold the CGS business unit to FactSet Research Systems Inc. ("FactSet").  *Id.*

Plaintiffs allege that, by 1968, CUSIP identifiers were recognized as the de facto standard in domestic financial markets.  *Id.* ¶ 37.  In the early 1970s, the Securities and Exchange Commission and other financial regulatory agencies began requiring the use of CUSIP identifiers on financial reporting forms and in their systems, and all financial clearing corporations began using them.  *Id.* ¶¶ 38–39.  In 1974, the American National Standards Institute ("ANSI") approved X9 to develop standards for the financial services industry, and, in 1976, X9 adopted the CUSIP identifier as a national standard.  *Id.* ¶ 40.  X9 (now formally known as the Accredited Standards Committee X9, Financial Services, Inc.) became separately incorporated from the ABA in 2001.  *Id.* ¶ 112.  X9 has repeatedly renewed CUSIP identifiers as a standard, most recently in December 2020.  *Id.*  Plaintiffs do not allege that either the initial or subsequent X9 approvals of the CUSIP standard resulted from any anticompetitive conduct or were otherwise unlawful.  Nor do Plaintiffs challenge the decisions of government regulators and industry participants to adopt and continue to use CUSIP identifiers.

### B.    The CGS Database and Related Agreements

In addition to issuing CUSIP identifiers, CGS has created and maintained a large database of additional information about each financial instrument, including the CUSIP

identifier and other identifiers, name of the issuer, type of security, maturity dates, underwriters, frequency of payments, and numerous related data points. *Id.* ¶ 48. This CGS Database, compiled over many decades, includes up to 60 discrete pieces of information for each of more than 26 million financial instruments. *Id.* ¶ 65. The ABA has registered a copyright on this data compilation. *Id.* ¶ 64. Plaintiffs do not challenge this copyright. Plaintiffs do not allege that ABA has registered a copyright in CUSIP identifiers (and no such registered copyright exists).

Plaintiffs refer to themselves as "CUSIP Users," a classification that they allege includes banks, investment funds, public employee pension funds, fund managers, and other financial institutions that use CUSIP identifiers for securities trading and market research. *Id.* ¶ 9. Plaintiffs allege that Defendants initially distributed for a fee to CUSIP Users "physical books" and CD-ROMs that included CUSIP identifiers and related information under subscription agreements that required the CUSIP Users to return the books and CD-ROMs to CGS each year. *Id.* ¶¶ 43–44. Plaintiffs allege that, when technological developments enabled digital distribution of CGS Data, S&P (and now FactSet) entered into agreements granting Data Vendors such as Bloomberg limited rights to re-distribute to end users data they obtained from the CGS Database. *Id.* ¶¶ 46–47, 51.[1] Plaintiffs allege that that they and other CUSIP Users contract with Data Vendors to download CUSIP identifiers and related information that the Data Vendors obtained from the CGS Database. *Id.* ¶¶ 27–29, 47, 68–70.[2] Among other things, Plaintiffs assert that the CGS/Data Vendor agreements restrict Data Vendors from allowing Data Users to download in bulk CGS Data unless those Data Users have a Subscription Agreement with CGS. *Id.* ¶¶ 54, 56.

---

[1] These agreements are actually between CGS (not S&P/FactSet) and the Data Vendors, which is how this motion will describe them.

[2] Plaintiffs limit the class to CUSIP Users that obtain CUSIP identifiers and other CGS Data through a Data Vendor. Plaintiffs acknowledge that Data Users can access the CGS Database directly through CGS, but they exclude such Data Users from the class. *Id.* ¶ 71.

Plaintiffs' Subscription Agreements with CGS, which Plaintiffs refer to and rely on throughout the SAC and which this Court may accordingly consider as incorporated into the SAC, *see infra*, pp. 8–9, grant Data Users the right to access, download in bulk, and use CGS Data originating from the CGS Database to support their business operations, with fees calculated based on the amount of downloaded data that the Data User reports in a Use of Service Statement ("UOSS").  Exs. 1-3.[3]  The UOSS summarizes when a license from CGS is needed:  "A license agreement is required when a user obtains access to an electronic data feed or bulk download of CUSIP, CINS, and CGS ISINs ('CGS Identifiers') and related descriptive data—either directly from CGS or indirectly through one of CGS' authorized data vendors/information providers ('Authorized Distributors') . . . ."  SAC ¶ 84; Exs. 1-3.[4]  The Subscription Agreement permits a Data User to use the downloaded CGS Data for its internal use only but not to redistribute it to other persons or entities.  Exs. 1-3 § 1.3; SAC ¶ 47.

Plaintiffs do not allege that these licensing practices terminated any prior voluntary course of dealing between CGS and its customers.  To the contrary, Plaintiffs acknowledge that CGS has always protected its investment in creating and maintaining the CGS Database— initially by requiring return of physical books and media, and subsequently through restrictions in its agreements against redistributing data originating from the CGS Database.  SAC ¶¶ 43–47.

Plaintiffs allege a "CUSIP Use Market," *i.e.*, "the market for using identifiers for United

---

[3] Unless otherwise stated, all "Ex." references are to the Maugeri Declaration submitted herewith.

[4] CGS does not require a license agreement for users that view and access CGS data on-screen in computer display format from Data Vendors without downloading in bulk or receiving a data feed, or that download fewer than 500 records.  Exs. 1-3, UOSS.  Although Plaintiffs include certain of those users in the definition of "CUSIP User," SAC ¶ 9, they exclude them from the definition of "CUSIP User Class."  SAC ¶ 135.

States financial instruments,"[5] in which "CUSIP Users" use CUSIP identifiers "to process, clear, and settle trades and to conduct research and analysis."  *Id.* ¶¶ 1, 9.  Plaintiffs assert that S&P (and FactSet since March 2022) possessed 100% of this supposed market.  *Id.* ¶¶ 10, 128.  At the same time, Plaintiffs acknowledge that anyone can create a database of "collections of CUSIP numbers . . . based on public data."  *Id.* ¶ 133.  Plaintiffs aver that Defendants have maintained monopoly power in the CUSIP Use Market by restricting redistribution of CGS Data and charging end users to download in bulk and use CGS Data.  According to Plaintiffs, those restrictions prevented them and other CUSIP Users from competing against CGS by using CUSIP identifiers from the CGS Database to create a competing product.  *Id.* ¶¶ 55, 157–58.  Plaintiffs assert that the restrictions "could be justified only if the CUSIP numbers were copyrighted, which they are not."  *Id.* ¶ 82.

Plaintiffs further allege, in conclusory fashion, that Defendants maintained a monopoly over the CUSIP Use Market by purportedly using their alleged "influence" in X9 working groups to block the standardization of FIGI, an alternative identifier developed by Bloomberg.  *Id.* ¶¶ 112–14.  Plaintiffs do not explain when FIGI was under discussion at X9, let alone what actions Defendants' personnel took to "preclude" its standardization.  Plaintiffs do acknowledge, however, that X9 did adopt FIGI as a standard in 2021.  *Id.* ¶ 113.[6]  Plaintiffs also acknowledge

---

[5] This framing of the alleged relevant market is a departure from Plaintiffs' previous complaints, which alleged a relevant market limited to CUSIPs.  See Consolidated and Amended Class Action Complaint, Case No. 1:22-cv-1860-KPF, ECF 70 ¶¶ 1, 139 (defining the "CUSIP Use Market" as "the market for using CUSIP numbers after initial issuance.")

[6] The initial complaints in this action failed to acknowledge that X9 already had adopted the FIGI standard.  *See* Case No. 1:22-cv-01929-KPF, ECF 1 ¶¶ 7, 9, 72–76, 101, 113.  When Defendants argued that the Court could take judicial notice of this fact, Plaintiffs admitted this important fact, but contended that the "belated approval [of FIGI] does not atone for the prior years where FIGI was available (and free) but was prevented from attempting to compete with Defendants."  Case No. 1:22-cv-01860-KPF, ECF 77 at 3.  As discussed more fully below, Plaintiffs have failed to back up this rhetoric with non-conclusory allegations of any kind detailing how Defendants have "prevented" FIGI from competing in the alleged market.

that FIGI has gained little traction in the market "because of the required use of CUSIPs in various regulatory filings and the universal use of CUSIPs throughout the United States financial system," *id*. ¶ 113, features of the industry they do not challenge.

**ARGUMENT**

## I.  LEGAL STANDARD.

A complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Accordingly, a complaint is deficient if it contains only "[t]hreadbare recitals of the elements of a cause of action" and "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original) (quotation marks and citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *id.*, or when "allegations are internally inconsistent or contradictory." *Redcell Corp. v. A.J. Trucco, Inc.*, 2022 WL 683007, at *5 (S.D.N.Y. Mar. 8, 2022).

"Where a plaintiff has reli[ed] on the terms and effect of a document in drafting the complaint, and that document is thus integral to the complaint, we may consider its contents even if it is not formally incorporated by reference." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (alteration in original) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (taking judicial notice of customer agreement alleged in complaint)); *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) ("[a] document is integral to the complaint 'where the complaint relies heavily upon its terms and effect'") (quoting *Chambers,* 282 F.3d at 153). "[T]he Court need not accept as true any allegations that are contradicted by documents deemed to be part of the complaint, or materials amenable to judicial notice." *Pearson v. City of New York*, 2021 WL 2894776, at *3 (S.D.N.Y. July 9, 2021) (quotation marks and citation

omitted).  Thus, where the complaint relies on the terms of an agreement deemed to be part of

the complaint, the court "need not accept its description of those terms, but may look to the

agreement itself."  *Broder,* 418 F.3d at 196.

## II.    THE COMPLAINT DOES NOT STATE A VALID ANTITRUST CLAIM.

### A.    Plaintiffs Fail to Allege a Valid Monopolization Claim Under Section 2 of the Sherman Act.

Plaintiffs do not challenge (nor could they) the adoption of CUSIP identifiers as a

standard or their required use by governmental entities and industry participants.  In fact,

Plaintiffs admit that CUSIPs have been the uniform standard for financial identifiers for over

50 years, because they enabled the market and government regulators to solve an inefficiency

that hindered capital markets.  SAC ¶¶ 35–37.  Instead, Plaintiffs assert that Defendants have

"unlawfully maintained a monopoly" by (1) entering agreements with Data Vendors and Data

Users restricting redistribution of CGS Data and charging Data Users for its use; and

(2) exercising alleged "control" over X9 to foreclose standardization of rival identifiers.  *Id.* ¶¶ 1,

14–15, 55, 112–14, 169.

To state a monopolization claim, Plaintiffs must allege "not only that the defendant

possessed monopoly power in the relevant market, but that it willfully acquired or maintained

that power as distinguished from growth or development as a consequence of a superior product,

business acumen, or historic accident."  *N. Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d

638, 651 (2d Cir. 2015) (quotation marks and citation omitted).  "To safeguard the incentive to

innovate, the possession of monopoly power will not be found unlawful unless it is accompanied

by an element of anticompetitive *conduct.*"  *Id.* (emphasis in original); *see also Shak v.*

*JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 486 (S.D.N.Y. 2016) ("[P]laintiff must

demonstrate exclusionary conduct—as opposed to gloves-off, hard-nosed market competition—

aimed at obtaining or enshrining monopoly power, harm[ing] the competitive *process* and thereby harm[ing] consumers.") (emphasis and alteration in original) (quotation marks and citation omitted).

When "alleged instances of misconduct are not independently anticompetitive . . . they are not cumulatively anti-competitive either." *Eatoni Ergonomics, Inc. v. Rsch in Motion Corp.*, 486 F. App'x 186, 191 (2d Cir. 2012); *see also City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928–29 (2d Cir. 1981) (rejecting aggregation of "fractions" of claims to prove Sherman Act violations). "Two wrong claims do not make one that is right." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009).[7]

Even assuming Plaintiffs have alleged monopoly power or a properly defined antitrust market, which Defendants do not concede, Plaintiffs' Section 2 claims fail because Plaintiffs have not alleged any exclusionary conduct or harm to competition.

> **1.    Defendants' Distribution and Subscription Agreements Are Not Anticompetitive.**
>
> **(a)    Defendants' Restrictions on Use and Redistribution of CGS Data Are Not Anticompetitive.**

Plaintiffs contend that CGS licenses are unlawful because they (1) restrict Plaintiffs' and other potential competitors' ability to use CGS Data to develop competing products in the CUSIP Use Market and (2) require Plaintiffs and other Data Users to pay to access and use CGS Data, including when they access CGS Data through a third-party service provided by a Data Vendor like Bloomberg. *See, e.g.*, SAC ¶¶ 47, 55, 152, 158. Without these restrictions,

---

[7] *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930–31 (4th Cir. 1990) (aggregating a defendant's acts, none of which was anticompetitive individually, did not show injury to competition); *Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *10 (S.D.N.Y. Feb. 21, 2019) (lawful conduct "cannot properly be considered an ingredient of a plaintiff's monopoly broth claim"); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1311 (E.D. Pa. 1981) (rejecting aggregation of claims because "[n]othing plus nothing times nothing still equals nothing").

Plaintiffs contend, they and other Data Users "would be free" to use the CGS Data "to compete with Defendants" and would not be required to pay for access to CGS Data.  *Id.* ¶ 158; *see also id.* ¶ 55.  But there is nothing anticompetitive about an owner of a valuable database service restricting commercial use or redistribution of data it supplies to potential competitors to prevent free riding on the owner's investment.

"As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Pac. Bell*, 555 U.S. at 448.  Antitrust law does not impose a duty on Defendants to sell to Plaintiffs or any other Data User on terms that would enable them to create competing products that free ride on the coattails of Defendants' decades of investments in the CGS Database.  As the Supreme Court explained in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), "[c]ompelling . . . firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law" because it "may lessen the incentive for the monopolist, the rival, or both to invest in . . . economically beneficial facilities"; courts are "ill suited" to act as "central planners" enforcing required dealing; and compelling cooperation between competitors "may facilitate the supreme evil of antitrust: collusion."  *Id.* at 407–08.

Applying these principles, courts have repeatedly held that businesses generally have no duty to extend a helping hand to their current or potential rivals.  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.) ("Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival."); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375–76 (7th Cir. 1986) (Posner, J.) ("Today it is clear that a firm with lawful monopoly power has no general duty to help its competitors" and thus no duty "to extend a helping hand to new entrants . . . [or] help [rivals] . . . survive or

-11-

expand.") (quotation marks omitted); *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 27 (D.D.C. 2021) ("Facebook's adoption of a policy of not offering API access to competitors did not, standing alone, violate Section 2.").

The decision in *New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc.*, 323 F. Supp. 2d 559 (S.D.N.Y. 2004) ("*NYMEX*"), is illustrative and directly applicable here. NYMEX determined and made available on a real-time basis the settlement prices for oil and gas futures contracts traded on NYMEX, but it restricted real-time subscribers to using the prices only for their "internal use" and not in competition with NYMEX. *Id.* at 563. Like Plaintiffs here, ICE challenged this restriction under Section 2 alleging, among other things, that NYMEX was engaged in an unlawful refusal to deal. *Id.* at 565. Citing *Trinko*, the court rejected that claim on the pleadings, holding that the antitrust laws permit firms, even dominant firms, to unilaterally set the terms upon which they will deal and to decline to facilitate competition from rivals. As the court explained, "NYMEX has a legitimate business interest in preventing its competitor, ICE, from free-riding on NYMEX's settlement prices." *Id.* at 571. The same is true here. CGS has the right to set terms that restrict access to and use of the valuable database service it provides to its customers, and to thereby protect its legitimate business interest in not having others free ride on its decades-long investment in collecting and maintaining that data.

Defendants' right to protect against free riding off their decades of investment does not depend on the existence of a copyright. SAC ¶ 82. This is apparent from the fact that the court's decision in *NYMEX* did not rest on whether NYMEX had a valid copyright on the settlement prices it prohibited its customers from re-distributing. To the contrary, in a subsequent decision, Judge Koeltl granted summary judgment against NYMEX on that issue. *See N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 389 F. Supp. 2d 527 (S.D.N.Y. 2005), *aff'd,* 497 F.3d

109, 112 (2d Cir. 2007) (affirming the "actual price at which a futures contract must be settled" is a "real-world fact []" not protectable by copyright). The basis for rejecting the antitrust claim was NYMEX's right to decline to deal with potential competitors who could free ride on NYMEX's investment. Defendants here have that same right.

Similarly, the court in *MiniFrame Ltd. v. Microsoft Corp.*, 2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013), rejected at the pleadings stage an antitrust challenge to a change in Microsoft's licenses for Windows that limited use of the program to one *user* per license. Before that change, Microsoft's licenses had restricted use of Windows to one *computer* per license, and MiniFrame had exploited that policy by selling a software program that enabled multiple users to simultaneously run Windows from a single computer. *Id*. at *1. The court held that Microsoft had no general duty to deal with or accommodate rivals that were exploiting its products to compete against it, and thus, it could re-structure its licenses to proscribe such competition. *Id*. at *4–5. Once again, this ruling did not turn on any Microsoft copyright or patent rights. The court separately concluded that Microsoft's patent on the Windows license gave it the right to limit use of the software. *Id*. at *4. But its ruling that Microsoft had no antitrust duty to enable use of the plaintiffs' product did not depend on that conclusion, and, indeed, the Second Circuit affirmed the dismissal of the case *solely* on the ground that no antitrust duty to deal existed without "endors[ing or] address[ing] the District Court's alternative rationale that Microsoft's conduct is immune from antitrust liability based on intellectual property law." *MiniFrame Ltd. v. Microsoft Corp.,* 551 F. App'x 1, 2 (2d Cir. 2013); *see also MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132, 1135 (9th Cir. 2004) (holding that telecommunications service provider did not violate Section 2 by changing its pricing structure to "increase its short-term profits" and "eliminate . . . resale" of its product, and that its refusal to deal validly protected

investment).

Thus, while Defendants' protection of its CGS Database is justified under copyright law, nothing in *Trinko*, *NYMEX*, *MiniFrame*, or other cases recognizing that businesses are not required to share the sources of their advantage with potential rivals turned on the enforcement of an intellectual property right.  Instead, a business's right to choose the parties with whom it will deal—and to choose the terms of any such dealing—stems from antitrust law's recognition of the procompetitive objectives this principle serves, including protecting incentives to innovate, avoiding collusion among competitors, and keeping courts from acting as central planners.  *Trinko*, 540 U.S. at 407–08.  None of this requires a copyright.

Plaintiffs also do not allege facts that fit within the "sole exception" to the bedrock rule that failure to assist a competitor does not violate the antitrust laws—*i.e.*, the exception when a monopolist "seeks to terminate a prior (voluntary) course of dealing with a competitor."  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 53 (2d Cir. 2007).  Plaintiffs do not allege any termination of a prior voluntary course of dealing in which CGS gave unrestricted access to its database to actual or potential competitors in the relevant market without restrictions to protect against free riding.  They allege instead that CGS always has sought to protect against free riding by restricting subscribers from disseminating CGS Data without permission—initially by requiring return of the physical books and CD-ROMs, now by limiting electronic downloading and redistribution—and has consistently required payment to access that data.  SAC ¶¶ 43–44, 47.  Plaintiffs' allegation that Defendants refused to provide them access to CGS Data on terms that would enable them to compete against Defendants by free riding on Defendants' investment accordingly fails to state a valid antitrust claim.  *See Elevator*, 502 F.3d at 52 (affirming dismissal of Section 2 claim that alleged the defendant refused to supply parts to competitors

"because plaintiffs do not allege that defendants terminated any prior course of dealing—the sole exception to the broad right of a firm to refuse to deal with its competitors").

Nor can Plaintiffs make an end run around Defendants' right to charge for their services and prevent free riding by asserting a right to indirectly obtain CGS Data from a third party without conditions. Just as CGS is not required to deal directly with potential competitors on terms that would allow free riding, they are not required to deal indirectly with potential rivals that intend to free ride on their investments. Either way, Defendants are merely "choos[ing] the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing," *Pac. Bell*, 555 U.S. at 448, and CGS's Data Vendor agreements simply enable Defendants to exercise that right.

These principles also dispose of Plaintiffs' conclusory allegation that Defendants unlawfully restricted Xignite's use of CUSIP identifiers. Plaintiffs assert that Xignite (a Data Vendor and not a member of Plaintiffs' proposed CUSIP User Class) was building a competing commercial database from "independent" sources, which CGS allegedly informed Xignite was "an unauthorized, commercial use under the license agreement." SAC ¶ 62. According to Plaintiffs, Xignite had to choose between continuing to receive CGS Data or creating a competing database of CUSIPs, and it elected to maintain its contractual relationship with CGS and continue to receive access to the CGS Data. *Id.* That pleads no antitrust violation. As discussed, to the extent Xignite was using CGS Data to build a rival database service, the antitrust laws did not obligate CGS to help potential rivals develop competing products. Nor do Plaintiffs allege that CGS changed a prior profitable course of dealing with Xignite. To the contrary, Plaintiffs allege only that CGS invoked the provisions of its existing agreement with Xignite to protect against free riding. That is fatal to Plaintiffs' claims.

Moreover, Plaintiffs' Xignite allegations fail to allege any harm to competition. *Id.* ¶ 62. If Xignite were truly creating its own competing database from *independent* sources, then Xignite had no need to obtain a license from CGS to do so. Accordingly, the SAC pleads no facts that CGS's restrictions on the use of its data by Xignite had any material or cognizable anticompetitive effect.

### (b)   Charging Data Users Directly for Their Use of CGS Data Is Not Anticompetitive.

There is similarly nothing anticompetitive about a business structuring its pricing to charge end users directly for their use, instead of charging distributors. Such a pricing structure excludes no competition—it merely reflects one choice, among many, for pricing one's product, demonstrating the value to each commercial user. There is, accordingly, no merit to Plaintiffs' claim that, because "they were not receiving CUSIP numbers or any other data [directly] from S&P," it was anticompetitive for Defendants to charge them and other Data Users for downloading CGS Data from one or more Data Vendors. SAC ¶ 52; *see also id.* ¶ 55 (alleging it is unlawful for defendants to "collect a toll from the mere use of CUSIP numbers"); *id.* at p. 56 (Prayer for Relief) (requesting a declaration that "Defendants may not impose fees on CUSIP Users" and an injunction "prohibiting the imposition of fees by Defendants on CUSIP Users").

The Ninth Circuit in *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), rejected just such a claim. There, Qualcomm owned patented technology for chips used in mobile telephones. *Id.* at 982. Qualcomm used its technology to manufacture its own chips and also licensed its patents to competing chipmakers. *Id*. at 983. Rather than charging competing chipmakers directly for using the technology, Qualcomm charged the chipmakers' customers—*i.e.*, the telephone manufacturers (indirect purchasers) that bought chips for their phones from the competing chipmakers. *Id*. at 984–85. The Ninth Circuit ruled that this distribution strategy was

not anticompetitive because Qualcomm merely charged for the technology it created that was an input in the purchased chips. *Id.* at 1002–03. The court relied on the fact that Qualcomm's pricing was "supplier neutral," *id*. at 1005, in that telephone manufacturers paid for their use of Qualcomm's technology "regardless of which company they choose to source their chips from," *id.* at 985. The court further found no antitrust issue with the fact that Qualcomm's policy was "designed to maximize Qualcomm's profits" by enabling Qualcomm to charge more for its technology, since "profit-seeking behavior alone is insufficient to establish antitrust liability." *Id*. at 1003 (*citing Trinko,* 540 U.S. at 407).

The situation here is no different. Plaintiffs do not allege that it would be anticompetitive for Defendants to charge Data Users for accessing and downloading the CGS Data directly from CGS. Plaintiffs question only whether Defendants can charge Data Users for accessing CGS Data through data feeds provided to them by Data Vendors. Rather than charging Data Users directly, CGS could have charged Data Vendors a fee that included the value of the Data Users' data consumption, which Data Vendors could then have passed-on to the Data Users. Plaintiffs offer no basis—and none exists—for concluding that charging Data Vendors in that fashion excludes competitors or would be anticompetitive. Charging the Data Users directly likewise does not exclude competitors and is not anticompetitive. Nothing in the antitrust laws forbids firms from choosing a distribution method that they find most efficient, desirable, or profitable.

Plaintiffs argued in an earlier filing that *Qualcomm* is not pertinent because Qualcomm's technology was patented. ECF 77 at 2–3. But the Ninth Circuit's holding that the antitrust laws permitted Qualcomm to charge telephone manufacturers (rather than chipmakers) did not turn on the existence of that patent. Rather, the court relied on the fact that Qualcomm was charging for its own technology and seeking payment on a supplier-neutral basis—*i.e.*, whether the

manufacturer obtained the technology directly or indirectly.  *Qualcomm*, 969 F.3d at 1005.  The same is true here.

Nor is there any basis for concluding that a firm needs a patent or copyright to charge for access or commercial use of its service.  Neither a copyright nor a patent nor any other statutory property right is a prerequisite under antitrust law for a company to decide how to distribute and price what it sells.  Far from excluding competition, choosing how to price one's own products is "an important element of the free-market system" and is "what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth."  *Trinko*, 540 U.S. at 407.

Because Defendants' right to be paid for the use of the data they supply does not depend on the existence of any copyright, Plaintiffs' allegation that they "do not copy all or substantially all of the CUSIP_DB compilation," SAC ¶¶ 64–75, is irrelevant.  Whether Data Vendors or Data Users download the entire data compilation or just specific items within the compilation, Defendants are entitled to charge them to access that valuable information from a database Defendants have compiled and maintained for decades.  Downloading less than the entire database means they may pay less, not that they are entitled to pay nothing at all.

Nor can Plaintiffs state a valid antitrust claim by alleging that the amount of the fee CGS charges is "unfair," *id.* ¶ 14, higher than what other entities charge, *id.* ¶ 152, or not justified by improvements in the product, *id.*  "[A]n excessive price alone does not establish a violation of the antitrust laws, because imposition of a high price is not, in and of itself, an anticompetitive act."  *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 252 (D.C. Cir. 1987); *see also Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 549 (9th Cir. 1991) (while "setting a high price may be a use of monopoly power, . . . it is not in itself anti-

competitive") (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979)). Even "a monopolist is free to exploit whatever market power it may possess when that exploitation takes the form of charging uncompetitive prices." *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 927 (1st Cir. 1984); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶ 1512a (Aug. 2022 update) ("[a]ntitrust makes unilateral pricing per se lawful").

### 2. Plaintiffs Have Not Alleged Any Facts Showing that Defendants Improperly Hijacked the Standard-Setting Process.

Plaintiffs allege in conclusory fashion that Defendants "abused the standard-setting process to preclude even the chance, however remote, that X9 would adopt an alternative standard." SAC ¶ 114. As noted, Plaintiffs do not challenge the adoption and re-adoption of CUSIP identifiers as a standard, or dispute that CUSIP identifiers have been the de facto standard for decades because of market support and governmental reporting requirements. Instead, Plaintiffs claim that Defendants used purported "control" over X9 to prevent it from adopting FIGI as a supposedly competitive standard until recently. *Id.* ¶¶ 112–14. To support this theory, Plaintiffs assert that some ABA and CGS employees were "full voting members" or had positions at X9. *Id.* ¶ 112. These allegations do not come close to plausibly alleging conduct that could violate the antitrust laws.

Imposing antitrust liability for standard-setting activities requires more than alleging mere participation in standard setting. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 436 (4th Cir. 2015) (court will not "infer malfeasance" from the fact that "some of the defendants' representative[s] served on the relevant standard-setting panel"). The defendant must instead have "deliberately distorted" the process through improper means such as "lies, bribes, or other improper forms of influence." *Id.* (quotation marks omitted). Plaintiffs must adequately allege that the organization's "normal procedures were thwarted" or that the

defendant "engaged in some form of external misconduct." *Id.*  Plaintiffs have alleged none of this.

Nothing in the complaint suggests that any Defendant engaged in any misconduct at X9 at all, let alone anything that thwarted X9's normal procedures or hijacked the outcome. Plaintiffs allege that CGS and ABA executives chaired X9 committees at some time, but do not allege they did anything improper, or that they were involved at all in any decision regarding FIGI.  SAC ¶ 112.  Moreover, Plaintiffs' allegation that the ABA's Chief Financial Officer sits on the CGS Board of Trustees, *id.,* is meaningless.  Plaintiffs do not allege she had any role at all at X9, let alone that she did anything improper to undermine the proper functioning of that standard-setting body.

Even if voting control were enough to support a claim, and it is not, Plaintiffs failed to allege that as well.  Plaintiffs do not allege anything about the overall composition of the voting membership of X9, much less show that the voting members from the ABA and CGS could dictate the outcome of any vote.  Plaintiffs allege that 9 of 23 members of the X9 CUSIP Working Group came from the ABA and CGS.  *Id.*  But they do not allege that this Group (as opposed to the full voting membership of X9) had any authority to decide whether X9 should adopt the FIGI standard—or, even if it did, how 9 out of 23 could "control" the outcome.

If more were necessary, Plaintiffs further reveal the baseless nature of their X9 allegations by admitting that FIGI is "not a viable alternative to CUSIP today because of the required use of CUSIPs in various regulatory filings and the universal use of CUSIPs throughout the United States financial system." *Id.* ¶ 113.  Indeed, Plaintiffs allege more generally that "[a]lternative numbering systems have been inadequate substitutes for CUSIP numbers because the CUSIP numbering system is and has been the market standard for decades" *Id.* ¶ 129.

Plaintiffs acknowledge that CUSIP identifiers achieved market success because the market and government regulators recognized that a standardized national identifier would render financial services markets more efficient. *See id.* ¶¶ 35–40. That efficiency explains why FIGI allegedly has only a "remote" chance of marketplace success even after being standardized at X9. *Id.* ¶ 114. Plaintiffs' own allegations, therefore, render their X9 allegations a complete red herring.

Plaintiffs' failure to allege any harm to competition regarding FIGI highlights another reason why their antitrust claims must fail. Contrary to their initial framing of the relevant market (*i.e.,* "market for using CUSIP numbers after initial issuance"), Plaintiffs now allege a relevant market "for using identifying numbers after initial issuance." *Id.* ¶ 126. But, in addition to the fatal flaws discussed above, their allegations of harm to competition pertain to competition only for the distribution of CUSIP identifiers. Plaintiffs plead no facts plausibly suggesting that Defendants' conduct, including CGS' contracting practices, have prevented anyone from inventing and marketing an alternative identifier to the CUSIP system. That further disposes of their claims because it is not competition between distributors of a single supplier's product (like the CGS Database) but rather competition between alternative products—*i.e.*, "[i]nterbrand competition"—that "is the primary concern of antitrust law." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 51 n.19 (1977).

### 3. Plaintiffs' Allegations that Defendants Threatened Copyright Litigation Do Not State a Claim.

Plaintiffs also try to rely on Defendants' purported threats to enforce their copyright to support Plaintiffs' monopoly maintenance theory. SAC ¶¶ 95–110, 158. In fact, Plaintiffs do not allege any facts showing any such threats. *Infra*, pp. 25–28. But even if Defendants had made such threats, seeking to enforce one's copyright is immune from antitrust liability under the *Noerr-Pennington* doctrine, which protects the right to petition the government. *See Pro.*

*Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993).  *Noerr* protects

not only filing litigation, but also "threat letters."  *Primetime 24 Joint Venture v. Nat'l Broad.,

Co.*, 219 F.3d 92, 100 (2d Cir. 2000).  Plaintiffs also fail to allege that Defendants' right to assert

copyright protection over CGS Data would have been objectively baseless—"that no reasonable

litigant could realistically expect to secure favorable relief"—to meet the stringent "sham

litigation" exception to the antitrust immunity provided by *Noerr*.  *Pro. Real Estate Invs.*, 508

U.S. at 62.[8]

### B.     Plaintiffs Have Not Alleged a Valid Claim Under Section 1 of the Sherman Act.

Plaintiffs' Section 1 claim relies on the same conduct as their Section 2 claim and fails

for the same reason:  Plaintiffs fail to plausibly allege conduct that is anticompetitive.  Plaintiffs

try to differentiate their Section 1 claim by characterizing it as a claim for a "group boycott."

SAC ¶ 185.  But the alleged "boycott" consists of nothing more than the same agreements Plain-

tiffs challenge under Section 2—*i.e.*, the Distribution Agreements with Data Vendors that protect

against free riding by restricting re-distribution of CGS Data.  *Id.* ¶ 184.  Those agreements are

not anticompetitive for the reasons discussed above, and conduct that is not anticompetitive for

purposes of Section 2 cannot support a Section 1 claim because both require anticompetitive

conduct.  *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 239 (1st Cir. 1983).

---

[8] Plaintiffs also include a conclusory allegation that S&P supposedly "used its market power in ratings data to coerce financial institutions into accepting a CUSIP license."  SAC ¶ 111.  Plaintiffs do not connect this isolated allegation to any of their claims for relief and thus do not appear to relying on it as a basis for any relief.  But, even if they were, the allegation does not support Plaintiffs' claims.  First, the allegations of market power are wholly conclusory.  Plaintiffs do not allege the requisite "particular facts" showing S&P's market share, that its ratings data are not substitutable with that of other suppliers, or that S&P could plausibly "control prices or exclude competitors from the market" for ratings data.  *Kaufman v. Time Warner*, 836 F.3d 137, 141, 148 (2d Cir. 2016).  The allegation also lacks non-conclusory facts plausibly suggesting S&P actually conditioned the sale of ratings data on a customer entering into CGS Data agreements, let alone that such conduct had a material impact on competition or competitive foreclosure.  *Id.* at 141.  The Court should not permit Plaintiffs to proceed with any claim based this conclusory allegation.

Plaintiffs cannot avoid dismissal by characterizing their group-boycott claim as one for *per se* illegality under which anticompetitive harm is presumed.  Plaintiffs have dropped from the SAC any reference to a *per se* claim.  But even if Plaintiffs did assert such a theory, the allegations could not support a *per se* claim because Plaintiffs have failed to allege the required "horizontal agreement[] among direct competitors."  *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *id.* at 138 ("antitrust law does not permit the application of the *per se* rule in the boycott context in the absence of a horizontal agreement").  The test for whether a restraint of trade under Section 1 is horizontal is whether a "horizontal agreement" exists, not whether it has alleged "horizontal effects."  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.4 (1988).  Restraints "imposed by agreement between firms at different levels of distribution [are] vertical restraints," not horizontal restraints.  *Id.* at 730.

The challenged terms in the Data Vendor agreements are indisputably vertical.  Plaintiffs allege a chain of distribution in which CGS enters agreements with Data Vendors to provide them with CGS Data, and the Data Vendors in turn "distribute" that data to Data Users.  SAC ¶¶ 45–47.  This supplier-distributor relationship is a quintessential vertical relationship.  *See United States v. Aiyer*, 33 F.4th 97, 115 n.15 (2d Cir. 2022) (vertical agreement is one between "persons at different levels of the market structure, *e.g.,* manufacturers and distributors") (quotation marks and citation omitted).

The *per se* rule does not apply to such relationships, which involve distribution of a single product, not competition among firms regarding their separate products.  *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.,* 129 F.3d 240, 244 (2d Cir. 1997) ("The fact remains that the dispute involves one manufacturer's product.").  As the leading antitrust treatise has observed, "the core reason for intense antitrust concern about 'boycotts' is the

aggregation of the power of several competitors—a reason that does not apply to distribution restraints involving a single manufacturer's product." *Antitrust Law* ¶ 1644c.  For this reason, the *per se* rule against group boycotts applies only when horizontal competitors agree to boycott a supplier or customer and thereby restrain competition amongst themselves regarding their separate products.  *See, e.g.*, *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1989) (a group of lawyers in private practice agreed to cease providing services as court-appointed attorneys for indigent defendants); *Fashion Originators Guild of Am. v. FTC*, 312 U.S. 703 (1941) (dress and textile manufacturers who sold original designs agreed with each other to boycott retailers that dealt with manufacturers who sold copies of those original designs).

Plaintiffs' allegation that FactSet and S&P separately compete as Data Vendors that offer "data," "analytics," and other market information directly to end users, *see* SAC ¶ 46, does not turn CGS's vertical distribution agreements regarding CGS Data into horizontal agreements.  To allege a horizontal agreement to boycott CUSIP Users in the alleged CUSIP Use Market, Plaintiffs must allege such an agreement between competitors in that allegedly restrained market. They have not done so.  Plaintiffs instead assert that the market in which competition has been restrained is the purported "CUSIP Use Market," in which they allege CGS had 100% market share.  *Id.* ¶¶ 126–28.  Accepting those allegations as true, no competitors of the CGS business exist in the CUSIP Use Market and thus there could be no horizontal agreement among competitors to harm competition in that market.

Plaintiffs' claim of a horizontal agreement also cannot be salvaged by alleging that the Data Vendors were each aware that CGS required all Data Vendors to limit access to CGS Data to Data Users that signed agreements with CGS.  SAC ¶¶ 56–57.  As an initial matter, Plaintiffs' sole allegations of such knowledge by the Data Vendors pertains to communications between

-24-

CGS and Hildene, a Data User.  *Id.*  As that allegation says nothing about the Data Vendors, Plaintiffs' contention that the Data Vendors had knowledge of similar provisions in their competitors' agreements is conclusory at best.  But even if Plaintiffs have adequately alleged such knowledge, mere knowledge among Data Vendors that CGS's distribution agreements contain the licensing requirement is not enough to show that they entered an agreement with each other.  *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (evidence that "Coca–Cola assured the [distributors] that the loyalty policy would be uniformly enforced and encouraged them to report violations" was insufficient to show agreement); *Wellnx Life Sci. Inc. v. Iovate Health Scis. Rsch. Inc.*, 516 F. Supp. 2d 270, 291 (S.D.N.Y. 2007) (mere awareness not enough to show agreement); *In re Inclusive Access Course Materials Antitrust Litig.*, 2021 WL 2419528, at *11 (S.D.N.Y. June 14, 2021) ("series of vertical agreements" insufficient to show unlawful "conspiracy" absent horizontal agreement).

## III.   THE COURT SHOULD DISMISS PLAINTIFFS' COPYRIGHT DECLARATORY JUDGMENT CLAIM.

Plaintiffs' request for a declaratory judgment that CUSIP identifiers are not copyrightable is not justiciable and therefore should be dismissed under Rules 12(b)(1) and 12(b)(6).  Because courts cannot adjudicate abstract disputes, a complaint seeking a declaratory judgment must satisfy the constitutional and statutory requirement of an "actual controversy."  U.S. Const. art. III § 2; 28 U.S.C. § 2201(a); *E.I. Dupont de Nemours & Co. v. Invista B.V.,* 473 F.3d 44, 46 (2d Cir. 2006).  To meet that requirement here, Plaintiffs must allege non-conclusory facts showing that Defendants have threatened to enforce the specific copyright at issue against them in a manner that is "definite and concrete" and that is "'real and substantial,'" as opposed to a hypothetical state of facts.  *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 127 (2007) (citation omitted).  Plaintiffs have not done so.

First, as a matter of law, Plaintiffs could not have faced any "definite and concrete" threat of copyright liability with respect to CUSIP identifiers.  Registration is a prerequisite to enforcing a copyright claim.  17 U.S.C. §§ 411(a), 502; *Fourth Estate Publ'g. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 888, 891 (2019) (affirming registration required to sue for infringement, including injunctive relief).  But Plaintiffs have not alleged that the ABA has ever registered any copyright in CUSIP identifiers alone—and the Court may take judicial notice that the ABA has not separately registered any copyright in CUSIP identifiers since the U.S. Copyright Office publishes registration information on its website.  *See Island Software & Comput. v. Microsoft*, 413 F.3d 257, 261 (2d Cir. 2005).  Instead, Plaintiffs allege only that the ABA registered a copyright in the database compilation.  SAC ¶ 64.  Thus, Plaintiffs never faced any risk of copyright infringement litigation with respect to CUSIP identifiers alone.  *Sky Billiards, Inc., v. WolVol, Inc.*, 2016 WL 7479428, at *4 (C.D. Cal. July 11, 2016) (dismissing claim for declaratory judgment of non-infringement where defendant had no registered copyright and had threatened litigation based on breach of contract).[9]

Second, even apart from the lack of any registered copyright in CUSIP identifiers, Plaintiffs have not alleged facts showing that Defendants threatened copyright enforcement over CUSIP identifiers.  While Plaintiffs seek to rely on the terms of the Subscription Agreement, SAC ¶¶ 97–102, nothing in that agreement asserts any copyrights in CUSIP identifiers alone, much less threatens copyright litigation over them.  The Agreement gives data users limited rights to access "*the proprietary CGS Service*" and to download in bulk and use in their business "*CGS Data*" from the "*CUSIP Database*" as specified in the Services Attachment(s).  *Id.* ¶¶ 69,

---

[9] Although Defendants raised this registration-as-prerequisite argument in two pre-motion letters to this Court, Plaintiffs failed to address it either in their responsive letters or their amended complaints. Case Nos. 22-cv-1860-KPF, ECF 55 and 74  p.3; and 22-cv-1929-KPF, ECF 60 p. 3.

84; Exs. 1-3 § 1 (emphasis added).  The Agreement defines these terms to mean the database

compilation that CGS has updated and maintained for decades, not CUSIP identifiers alone.  *Id.*

p.1 (first WHEREAS clause defining "CUSIP Database" to mean the database consisting of

"CUSIP standard identifiers, CUSIP standard descriptions, . . . and other information about

financial instruments (the 'CGS Data')"); *see* SAC ¶ 68.  Similarly, Section 2 of the

Agreement—entitled "Copyrights and Other Proprietary Rights"—does not use the word CUSIP

or CUSIP identifiers at all.  Instead, it uses the phrase "*the Data*" referencing the above defined

terms encompassing the database.  *Id.* ¶ 97 (emphasis added).  By referring to "the Data [that]

was *compiled*, prepared, revised, *selected*, *arranged* and published by CGS," *id.* (emphasis

added), Section 2 of the Agreement invokes the definition of a copyrightable compilation in

Section 101 of the Copyright Act.[10]  *See* Exs. 1-3 § 2.  Thus, to the extent the Subscription

Agreement references copyrights at all, that reference is to the "CUSIP Database" and "CGS

Data," not to CUSIP identifiers alone.

Nor does the correspondence on which Plaintiffs rely, SAC ¶¶ 56, 87, 103–11, threaten

copyright litigation over CUSIP identifiers.  That correspondence does not refer to copyright

infringement, but rather to terminating the contract and seeking relief for "misappropriation and

misuse" of CGS's intellectual property—remedies that exist under contract and tort law,

independent of statutory property rights.  *Id.* ¶¶ 99, 104.  But even if the letters could be

construed as threatening *copyright* litigation, they refer to unauthorized use of the CGS Database

as opposed to CUSIP identifiers alone.  *See id.* ¶ 104; *see also id.* ¶ 56 ("CGS Data"), ¶ 86 ("CGS

Data"), ¶¶ 87, 104 ("proprietary CUSIP data"), ¶¶ 107–10 ("CGS Data").

---

[10] "A 'compilation' is a work formed by the collection and assembling of … data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."  17 U.S.C. § 101.

Finally, the February 2012 ABA letter to the SEC does not threaten copyright enforcement with respect to CUSIP identifiers. *Id.* ¶¶ 77–79. The letter (written more than 10 years before the filing of either complaint in the now-consolidated actions) simply states the ABA's position that it retains all copyrights. *Id.* ¶ 79. Mere assertion of an intellectual property right does not create a threat of infringement suit sufficient to support a declaratory judgment. In an analogous case, the court dismissed a trademark infringement complaint for lack of an "actual controversy" where the defendant never threatened the plaintiff with infringement litigation— even where it actively opposed plaintiff's trademark registration application before the Trademark Trial and Appeal Board. *Bruce Winston Gem Corp. v. Harry Winston, Inc.*, 2010 WL 3629592, at *3 (S.D.N.Y. Sept. 16, 2010). As that court concluded, "defendants rightly object to the use of a declaratory judgment action . . . in the absence of a specific dispute about an imminent activity." *Id.*

In sum, Plaintiffs cannot meet their burden to allege facts showing a concrete, definite, and imminent threat that Defendants either could or would sue Plaintiffs based on a copyright in a CUSIP identifier alone. Having failed on their third attempt to state an "actual controversy," their First Claim for declaratory judgment should be dismissed.

## IV.  PLAINTIFFS HAVE NOT STATED VALID CLAIMS UNDER STATE LAW.

### A.  Plaintiffs' New York General Business Law § 349 Claim Should Be Dismissed.

New York General Business Law Section 349(a) prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." To state a claim under Section 349, "a plaintiff must allege that the defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*,

802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merall & Condit Co.*, 18 N.E.2d 675, 675 (N.Y. 2012)).  Accepting for purposes of this motion only that the conduct is consumer oriented, Plaintiffs fail to allege that Defendants' conduct was materially misleading or resulted in injury.

The New York Court of Appeals applies "an objective definition of deceptive acts and practices," by "limit[ing] [them] to those likely to mislead a reasonable consumer acting reasonably under the circumstances." *McCracken v. Verisma Sys., Inc.*, 131 F. Supp. 3d 38, 48 (W.D.N.Y. 2015) (alteration in original) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995)).  Plaintiffs have not satisfied this standard.  They allege that Defendants "falsely claim[ed] 'license agreements' were necessary to use CUSIP numbers."  SAC ¶ 202.  But that alleged statement is not false.  Defendants did require—lawfully—that Data Users sign a Subscription Agreement to access or download in bulk CGS Data, including CUSIP identifiers.  Nor can Plaintiffs assert that any demand for a license agreement is a representation that the data is copyrighted, or necessarily based on copyright in CUSIP identifiers.  As discussed above (at pp. 12–13, 17–18), a supplier of a good or service need not own a copyright (or any other statutory property right) to require a licensing agreement and fees for use of the product.  Furthermore, as also discussed above (at pp. 25–28), Plaintiffs do not allege facts showing that Defendants asserted any copyright over CUSIP identifiers alone, as opposed to the CGS Database.  Plaintiffs thus have failed to plead deception.[11]

Plaintiffs also fail to plead any cognizable injury.  *See Newman v. RCN Telecom Servs.*,

---

[11] Moreover, as noted above (*supra*, pp. 21–22), a party's assertion of intellectual property rights is protected by the *Noerr-Pennington* doctrine absent adequate allegations that its claim was objectively baseless, which Plaintiffs do not plead.

*Inc.*, 238 F.R.D. 57, 74 (S.D.N.Y. 2006) (plaintiff must "show that the defendant's material deceptive act caused the injury") (quotation marks and citation omitted).  Plaintiffs do not allege that, absent the purported assertion of a copyright on the CUSIP identifiers, they or any other Data User would not have entered a license agreement.  To the contrary, Swiss Life alleges that it told Bloomberg that CUSIP identifiers were *not* copyrighted.  SAC ¶ 103.  Plaintiffs further concede that, whether or not CUSIP identifiers were copyrighted, they needed to have "in their data feeds the CUSIP numbers, as well as the associated issuer name and the type of financial instrument, to operate their businesses."  *Id*. ¶ 9.  Thus, Swiss Life entered into the CGS Subscription Agreement not because of any purported deception regarding the copyright, but because "a functioning data feed is a necessary tool for CUSIP Users' business."  *Id*. ¶¶ 58, 105.  These allegations foreclose any claim that Defendants' purported deception caused any harm.

Plaintiffs' purported injury also is not cognizable.  Plaintiffs allege that they suffered "an ascertainable loss in the form of payment of unlawful and unfair licensing fees," *id.* ¶ 204, and they seek an order "prohibiting the imposition of fees by Defendants on CUSIP Users," *id*. at p. 56.  To state a Section 349 claim, however, a plaintiff must allege that the deception caused it an injury beyond merely having paid the purchase price for the product.  *See, e.g.*, *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 898 (N.Y. 1999) (rejecting claim where plaintiff sought only "recoupment of the purchase price of the cigarettes"); *Campbell v. Barclays Bank*, 24 Misc. 3d 1201 (A),  at *6 (Sup. Ct. N.Y. Cnty. July 2, 2009) ("Just because plaintiff purchased goods that he might not have otherwise purchased does not constitute actual harm, since such a theory improperly 'sets forth deception as both act and injury.'") (quoting *Small*, 720 N.E.2d at 898).

Finally, even if Plaintiffs had alleged facts sufficient to show that Defendants made false representations about the existence of a copyright, a Section 349 claim based on such

representations would be preempted by the Copyright Act.  Plaintiffs allege that Defendants

falsely claimed that license agreements were necessary to access CUSIP identifiers and

threatened unlicensed end users with copyright infringement.  SAC ¶ 202.  "Such a claim is not

qualitatively different than the Plaintiffs' request for a declaration that the Defendants have no

valid copyright."  *We Shall Overcome Found. v. Richmond Org., Inc. (TRO Inc.)*, 221 F. Supp.

3d 396, 412 (S.D.N.Y. 2016); *see also* SAC ¶¶ 163–67 (seeking a declaratory judgment that

Defendants have no valid claim of copyright over the CUSIP identifiers).[12]

### B.    Plaintiffs' Connecticut Unfair Trade Practices Act Claim Should be Dismissed.

The Connecticut Unfair Trade Practices Act ("CUTPA") prohibits "unfair" and

"deceptive" conduct.  Conn. Gen. Stat. § 42-110b(a).  Plaintiffs have alleged neither.

In evaluating whether conduct is unfair, courts consider:

> (1)[W]hether the practice, without necessarily having been previously considered
> unlawful, offends public policy as it has been established by statutes, the common
> law, or otherwise-whether, in other words, it is within at least the penumbra of
> some common law, statutory, or other established concept of unfairness;
> (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it
> causes substantial injury to consumers [competitors or other businessmen]. . . .

*J. Publ'g Co. v. Hartford Courant Co.*, 804 A.2d 823, 839 (Conn. 2002) (alteration in original)

(quotation marks omitted).  While conduct need not violate the antitrust laws to be "unfair,"

Plaintiffs' claim of unfairness here rests (aside from alleged deception (discussed below)) on the

same theory of supposed anticompetitive conduct alleged in their antitrust claims—*i.e.*, that

---

[12] If the Court dismisses Plaintiffs' federal claims, it should retain jurisdiction over Plaintiffs' state law claims.
District courts have broad discretion to exercise supplemental jurisdiction over state-law claims even after all the
federal claims have been dismissed.  *See Purgess v. Sharrock*, 33 F.3d 134, 138–39 (2d Cir. 1994).  In this case,
because Plaintiffs' state-law claims arise from the same set of factual circumstances as their antitrust claims and
because the Court and the Parties have already invested time and effort, Defendants respectfully request that the
Court retain supplemental jurisdiction over Plaintiffs' state-law claims.  *See N.Y. Transp., Inc. v. Naples Transp.,
Inc.*, 116 F. Supp. 2d 382, 389–90 (E.D.N.Y. 2000).

Defendants engaged in "monopolistic conduct to ensure control over the CUSIP Use Market," which allegedly resulted in "unlawful and unfair licensing fees."  SAC ¶¶ 16, 209, 211. Plaintiffs do not allege any other basis for finding that Defendants' conduct "offends public policy," is "immoral, unethical, oppressive, or unscrupulous," or caused "substantial injury." This claim fails because, as discussed above, far from being anticompetitive or otherwise against public policy, the conduct Plaintiffs allege is legitimate, procompetitive behavior.  Such conduct does not support a CUTPA claim.  *See Pro Music Rights, LLC v. Apple, Inc.,* 2020 WL 7406062, at *11 (D. Conn. Dec. 16, 2020) (dismissing CUTPA claim where the plaintiff did not advance any theory of unfairness beyond purported anticompetitive conduct under antitrust laws that the court concluded had not been sufficiently alleged); *J. Publ'g*, 804 A.2d at 839 (finding no alleged unfairness where plaintiffs relied on alleged exclusivity agreements that did not violate the antitrust laws because they "are generally procompetitive and, as such, are in furtherance of public policy and presumptively legal").

Nor have Plaintiffs asserted a valid claim for "deceptive" conduct.  Their theory of deception under CUTPA is the same as their theory under the NYGBL, *compare* SAC ¶ 202 *with id.* ¶ 209, and it fails for the same reasons.  As discussed above (at p. 29), Plaintiffs' allegations do not identify any false or misleading statements, and they fail to show that the alleged deception caused a cognizable injury.  *See Smith v. Wells Fargo Bank, N.A.*, 158 F. Supp. 3d 91, 101 (D. Conn.), *aff'd,* 666 F. App'x 84 (2d Cir. 2016) ("a plaintiff cannot make out a CUTPA claim without alleging that the defendant's actions caused her injury").  Moreover, any claim that Defendants falsely asserted the existence of a copyright is preempted.  *See supra*, pp. 30–31.

**C.   Plaintiffs' Breach of Contract Claim Must Be Dismissed Because the Alleged FRAND Obligation Imposed by X9 Covers Only Patents, Not Copyrights.**

A claim for breach of contract must plead non-conclusory facts that establish that a contract exists.  *See, e.g., Ebomwonyi v. Sea Shipping Line*, 473 F. Supp. 3d 338, 347–48 (S.D.N.Y. 2020) (dismissing claim for failure to allege non-conclusory facts supporting existence of contract).  Plaintiffs base their Fifth Claim (Breach of Contract) upon a purported agreement between the ABA and X9 "to offer access to the CUSIP database, including the CUSIP numbers, on FRAND terms."  SAC  ¶ 191.[13]  To support this allegation, Plaintiffs rely on two documents:  a "statement of willingness" (which Plaintiffs call an "Assurance"); and "X9 procedures" that Plaintiffs assert cover "[u]se of trademarks, copyrighted, or patented materials . . . in accordance with the X-9 [sic] approved policies."  *Id*. ¶¶ 115–16.  Because Plaintiffs base their breach of contract claim solely on language from these two documents, the Court may consider these documents on a motion to dismiss as "integral" to the SAC.  *See supra*, pp. 8–9.  Neither document shows any commitment by the ABA with respect to its copyright assets.

As Defendants explained in their pre-motion letter,[14] Plaintiffs' quotation regarding the "statement of willingness"—repeated at SAC ¶ 119—omitted the key opening phrase that limits any X9-required commitment to patent rights:  "*The patent holder* has, however, filed a statement of willingness *to grant a license under these rights* on reasonable and nondiscriminatory terms and conditions to applicants desiring to obtain such a license."[15]  "These

---

[13] Plaintiffs state this claim in the alternative, assuming that CUSIP identifiers can be copyrightable.  SAC ¶ 190. Therefore, Plaintiffs' breach of contract claim should be dismissed along with their declaratory judgment claim.

[14] *Dinosaur Fin. Grp. LLC et al. v. S&P Global, Inc. et al.*, Case Nos. 22-cv-1860-KPF, EFC 74, and 22-cv-1929-KPF, ECF 60, p. 3 (Sept. 6, 2022).

[15] Exhibit 4, Introduction to ANSI X9.6-2020 p. v (emphasis added); Exhibit 5, Introduction to ANSI X9.6-2014 p. v (emphasis added).

rights" means "patent" rights.  The statement of willingness neither requires nor makes any

commitment regarding copyrights, and Plaintiffs make no allegations concerning patent rights in

CUSIP identifiers.

Regarding the second quoted document, "X9's procedures," rather than explaining or

curing their omission of a key phrase from their contract allegations, Plaintiffs again omit

language limiting the alleged FRAND obligation to patent rights.  Bolding the missing portion of

the sentence that Plaintiffs excerpted in SAC ¶ 116:  "Use of trademarks, copyrighted, or

patented material shall be in accordance with the X9-approved policies (*see* **Annex G, Patent**

**Policy)**."[16]  In case the title "Patent Policy" leaves any doubt, the full text of Annex G covers

only patent rights, not copyright.  *Id.* at 38–41.  Annex G Section G.1 further clarifies that the

statement of willingness (referenced in Plaintiffs' first incomplete quotation) is limited to

assurances that "*the patent holder*" will offer "*a license to such essential patent claim(s)*" on

RAND terms with or without compensation.  *Id.* at 38 (emphasis added).

These documents flatly contradict Plaintiffs' claim.  Where a complaint relies on

documents at odds with its allegations, the Court need not accept the truth of the contrary

assertions.  *See*, *e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F. Supp. 2d 371, 405–06

(S.D.N.Y. 2001) (court need not accept as true pleadings "that are contradicted either . . . by

documents upon which its pleadings rely, or by facts of which the court may take judicial

notice").  Plaintiffs cannot avoid dismissal by failing to attach to the SAC the referenced

---

[16] Accredited Standards Committee X9, Incorporated, Procedures, Standing Doc. #SD028 p. 65 (Aug. 15, 2018) https://x9.org/wp-content/uploads/2019/01/X9_Procedures_2017_Approved-by-ANSI-Aug-15-2018-in-the-Audit.doc (emphasis added).  Annex G is entitled, "Annex G, Patent Policy: Commercial Terms and Conditions." *Id.* at 38.  The reference to X9-approved policies relating to "trademarks, copyrighted, or patented material" includes X9's separate policy protecting X9's own intellectual property rights in published standards documents.  *X9 Owned Intellectual Property Policy*, Standing Doc. # SD018 (Oct. 19, 2018), https://x9.org/wp-content/uploads/2018/10/X9-Intellectual-Property-Policy-2018.docx.  *See* Exs. 4 and 5 (including copyright notices in the name of X9).  The X9 procedure and policy documents are publicly available at https://x9.org/x9-procedures-and-policies, and are subject to judicial notice.

documents, "because plaintiff should not so easily be allowed to escape the consequences of its own failure." *Cortec Indus., Inc. v. Sum Holding LP*, 949 F.2d 42, 44, 47–48 (2d Cir. 1991) (finding district court could have considered on motion to dismiss securities documents relied upon but not attached to complaint).[17]

Finally, Plaintiffs' attempt to link CGS's website statements to any purported FRAND commitment is wholly speculative and conclusory, and must be rejected. CGS's statement that it "seeks to charge fair, reasonable and non-discriminatory license fees" shows no nexus to X9 policies or to copyright, and thus does not support even an inference of the alleged contract. SAC ¶ 120. The statement on its face reflects CGS's own licensing ethic, nothing more.

Plaintiffs therefore have failed to demonstrate the most basic element of a breach of contract claim—the existence of a contract. The Court should dismiss Plaintiffs' Fifth Claim.

## CONCLUSION

The Complaint should be dismissed with prejudice.

---

[17] *See also Glob. Network Comm'ns v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint."); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) "[w]ere courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure"); *.I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (examining prospectus as "integral to the complaint" despite plaintiff's "limited quotation" from the document and failure to submit it with the complaint).

Respectfully submitted,

*/s/ Eric J. Stock*
Eric J. Stock
Alexander H. Southwell
Esther Lifshitz
GIBSON, DUNN &
CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel.: (212) 351-2301
Fax: (212) 716-0801
estock@gibsondunn.com
asouthwell@gibsondunn.com
elifshitz@gibsondunn.com

*Attorneys for Defendant S&P*
*Global Inc.*

*/s/ Jeffrey Shinder*
Jeffrey I. Shinder
CONSTANTINE CANNON LLP
335 Madison Avenue, Fl. 9
New York, NY 10017
Tel.: (212) 350-2700
Fax: (212) 350-2701
jshinder@constantinecannon.com

W. Stephen Cannon
Seth D. Greenstein
James J. Kovacs
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., NW
1300N
Washington, D.C. 20004
Tel.: (202) 204-3500
Fax: (202) 204-3501
scannon@constantinecannon.com
sgreenstein@constantinecannon.com
jkovacs@constantinecannon.com

*Attorneys for Defendant FactSet*
*Research Systems, Inc.*

*/s/ David Kiernan*
JONES DAY
David C. Kiernan (*pro hac vice*)
Craig E. Stewart (*pro hac vice forthcoming*)
555 California St., 26th Fl.
San Francisco, CA 94104
Tel.: (415) 626-3939
Fax: (415) 875-5700
dkiernan@jonesday.com
cestewart@jonesday.com

Michelle K. Fischer (*pro hac vice*)
901 Lakeside Avenue
Cleveland, OH 44114
Tel.: (216) 586-3939
Fax: (216) 579-0212
mfischer@jonesday.com

Alexander V. Maugeri
Amanda L. Dollinger
250 Vesey Street
New York, NY 10281
Tel.: (212) 326-3939
Fax: (212) 755-7306
amaugeri@jonesday.com
adollinger@jonesday.com

*Attorneys for Defendant*
*American Bankers*
*Association*