**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

DINOSAUR FINANCIAL GROUP LLC,
HILDENE CAPITAL MANAGEMENT, LLC and
SWISS LIFE INVESTMENT MANAGEMENT
AG, on behalf of themselves and all others
similarly situated,

                Plaintiffs,

                    -v-

S&P GLOBAL, INC., AMERICAN BANKERS
ASSOCIATION, and FACTSET RESEARCH
SYSTEMS INC.,

                Defendants.

----------------------------------------------------------------x

Case No. 1:22-CV-1860 (KPF)

1:22-CV-1929 (KPF)

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO**
**<u>DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................4

I.      LEGAL STANDARD.................................................................................................4

II.     THE SAC ADEQUATELY STATES A SECTION 2 CLAIM..........................................5

        A.     Defendants' Anticompetitive Conduct Violates the Sherman Act ..........................6

        B.     Defendants' Antitrust Defenses Are Irrelevant.......................................................8

             1.     The SAC Does Not Allege a Unilateral Refusal to Deal ............................8

             2.     Even if Refusal to Deal Law Applied, Which It Does Not, Defendants Still Could Not Stop CUSIP Users from Using Preexisting Data in the CUSIP_DB Compilation .......................................9

             3.     Defendants' Defenses Do Not Apply to Collusive Conduct Regarding the Use of Something the Monopolist Does Not Own............11

             4.     Defendants' Assertion that They May Exert Monopoly Control Over the Use of Preexisting Data Contradicts Section 103 and *Feist* ................14

             5.     *Qualcomm* Is Inapplicable Because It Rests on Valid Intellectual Property Rights and Not on Qualcomm's Distribution Strategy..................................................................................15

III.    THE SAC ADEQUATELY STATES A SECTION 1 CLAIM........................................17

IV.    DEFENDANTS' JUSTICIABILITY ARGUMENTS MISSTATE BOTH THE SAC'S ALLEGATIONS AND THE LAW ...................................................................21

        A.     The SAC Adequately Alleges Threats to CUSIP Users' Businesses that Merit Declaratory Relief ......................................................................................21

        B.     Defendants Misread *MedImmune* .......................................................................22

        C.     Defendants' Threats of Copyright Claims Are Not Immune from Antitrust Liability Under *Noerr-Pennington* ......................................................................24

        D.     Defendants Misstate the Need for and the Effect of Filing Copyright Registrations ........................................................................................................25

i

V.    PLAINTIFFS HAVE STATED VALID CLAIMS UNDER GBL § 349 AND
      CUTPA § 42-110b(a)........................................................................................26

      A.    Defendants' Basis for Dismissal of the GBL § 349 Claim is Without Merit ........26

            1.    Defendants Mischaracterize Plaintiffs' Allegations of Deceptive
                  Acts, Ignore Other Deceptive Acts, and at Most Raise Questions of
                  Fact........................................................................................................26

            2.    Plaintiffs Have Sufficiently Pleaded Cognizable Injury ...........................29

      B.    Defendants' Basis for Dismissal of Plaintiffs' CUTPA § 42-110b Claim is
            Without Merit........................................................................................................30

VI.   PLAINTIFF ADEQUATELY ALLEGED, IN THE ALTERNATIVE, THAT
      DEFENDANTS MANIPULATED THE STANDARD-SETTING PROCESS
      AND BREACHED THEIR FRAND COMMITMENTS TO X9....................................31

      A.    Plaintiffs Adequately Allege that Defendants Manipulated the Standard-
            Setting Process ......................................................................................................32

      B.    Plaintiffs Sufficiently Pleaded a Breach of Contract Claim ...................................34

CONCLUSION...........................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*AARP v. 200 Kelsey Assocs., LLC*,
  2009 U.S. Dist. LEXIS 969 (S.D.N.Y. Jan. 6, 2009) ............................................................ 24

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967).................................................................................................................. 23

*Allied Tube & Conduit Corp. v. Indian Head*,
  486 U.S. 492 (1988) .......................................................................................................... 32, 33

*Altvater v. Freeman*,
  319 U.S. 359 (1943) .................................................................................................................. 23

*Anthem Sports v. Under the Weather*,
  320 F. Supp. 3d 399 (D. Conn. 2018) ...................................................................................... 31

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................................... 4

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................................... 4

*Calabrese v. CSC Holdings, Inc.*,
  283 F. Supp. 2d 797 (E.D.N.Y. 2003) ...................................................................................... 28

*Campbell v. Barclays Bank*,
  2009 N.Y. Misc. LEXIS 1731 (Sup. Ct. Kings Cnty. July 2, 2009) ......................................... 30

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps., Inc.*,
  44 F.3d 61 (2d Cir. 1994) .......................................................................................................... 11

*Comput. Assocs. Int'l, Inc. v. Altai, Inc.*,
  982 F.2d 693 (2d Cir. 1992) ...................................................................................................... 27

*Cont'l Ore. Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) .................................................................................................................... 5

*Cox v. Microsoft Corp.*,
  8 A.D. 3d 39 (1st Dep't 2004) ............................................................................................ 28, 30

*Dichello Distribs., Inc. v. Anheuser-Busch LLC*,
  2021 U.S. Dist. LEXIS 174001 (D. Conn. Sept. 14, 2021) ...................................................... 30

*Duran v. Henkel of Am., Inc.*,
  450 F. Supp. 3d 337 (S.D.N.Y. 2020) ...................................................................................... 28

*Fabri v. United Techs. Int'l, Inc.*,
    387 F.3d 109 (2d Cir. 2004) ............................................................ 30

*Famous Horse Inc. v. 5th Ave. Photo Inc.*,
    624 F.3d 106 (2d Cir. 2010) .............................................................. 4

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ........................................................ 2, 3, 14, 15, 17

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ....................................................... 15, 16

*FTC v. Shkreli*,
    581 F. Supp. 3d 579 (S.D.N.Y. 2022) .................................................. 14

*Gelmart Indus., Inc. v. Eveready Battery Co.*,
    120 F. Supp. 3d 327 (S.D.N.Y. 2014) ............................................ 23, 24

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*,
    425 U.S. 738 (1976) ........................................................................... 4

*IHS Dialysis Inc. v Davita, Inc.*,
    2013 U.S. Dist. LEXIS 47532 (S.D.N.Y. Mar. 31, 2013) ......................... 5

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) ................................................................. 4

*In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ..................................... 5, 8, 12, 13

*Info. Superhighway, Inc. v. Talk Am., Inc.*,
    274 F. Supp. 2d 466 (S.D.N.Y. 2003) ................................................. 35

*J. Publ'g Co. v. Hartford Courant Co.*,
    804 A.2d 823 (Conn. 2002) ............................................................... 31

*Javier v. Beck*,
    2014 U.S. Dist. LEXIS 95594 (S.D.N.Y. July 3, 2014) .......................... 35

*Klor's Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959) ........................................................ 17, 18, 19, 20

*Kurtz v. Kimberly-Clark Corp.*,
    321 F.R.D. 482 (E.D.N.Y. 2017) ......................................................... 30

*Laumann v. NHL*,
    56 F. Supp. 3d 280 (S.D.N.Y. 2014) .................................................... 3

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
    2013 U.S. Dist. LEXIS 69407 (S.D.N.Y. May 14, 2013) ..................... 32, 33

iv

*Marriott Int'l, Inc. v. Downtown Ath. Club of N.Y.C., Inc.*,
   2003 U.S. Dist. LEXIS 9570 (S.D.N.Y. June 6, 2003) ........................................ 35

*Maryland Casualty Co. v. Pac. Coal & Oil Co.*,
   312 U.S. 270 (1941)........................................................................................... 22

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ................................................................... 21, 22, 23, 24

*MetroNet Servs. Corp. v. Qwest Corp.*,
   383 F.3d 1124 (9th Cir. 2004) .......................................................................... 12

*MiniFrame Ltd. v. Microsoft Corp.*,
   2013 U.S. Dist. LEXIS 49813 (S.D.N.Y. Mar. 28, 2013) .................................. 12

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) ......................................................................... 5, 8

*N.Y. MedScan LLC v. N.Y. Univ. Sch. of Med.*,
   430 F. Supp. 2d. 140 (S.D.N.Y. 2006) ................................................................ 5

*N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*,
   323 F. Supp. 559 (S.D.N.Y. 2004) .................................................................... 10

*N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*,
   389 F. Supp. 2d 527 (S.D.N.Y. 2005) .......................................................... 10, 11

*N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*,
   497 F.3d 109 (2d Cir. 2007) ............................................................................. 11

*New York v. Facebook, Inc.*,
   549 F. Supp. 3d 6 (D.D.C. 2021) ...................................................................... 12

*Nat'l Ass'n of Realtors v. PLS.com, LLC.*,
   32 F.4th 824 (9th Cir. 2022) ....................................................................... 18, 20

*Nat'l Ass'n of Realtors v. PLS.com, LLC.*,
   143 S. Ct. 567 (2023) ........................................................................................ 18

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ........................................................................ 12

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
   797 F.2d 370 (7th Cir. 1986) ............................................................................ 12

*Orlander v. Staples*,
   802 F.3d 289 (2d Cir. 2015) ....................................................................... 29, 30

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009) .................................................................................. 8, 9, 12

v

*PharmacyChecker.com LLC v. Nat'l Ass'n of Bds. of Pharm.*,
  530 F. Supp. 3d 301 (S.D.N.Y. 2021) ............................................................ 19, 20

*Primetime 24 Joint Venture v. NBC*,
  219 F.3d 92 (2d Cir. 2000) ........................................................................ 24

*Pro Music Rights, LLC v. Apple, Inc.*,
  2020 U.S. Dist. LEXIS 236280 (D. Conn. Dec. 16, 2020) ................................. 31

*Quanta Comput., Inc. v. LG Elecs., Inc.*,
  553 U.S. 617 (2008) ................................................................................ 16

*Reed Elsevier, Inc. v. Muchnick*,
  559 U.S. 154 (2010) ................................................................................ 26

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) ...................................................................... 35

*Sanborn Library LLC v. Eris Info.*,
  2021 U.S. Dist. LEXIS 165496 (S.D.N.Y. Aug. 30, 2021) ...............................5, 6

*Samara Bros. v. Wal-Mart Stores, Inc.*,
  165 F.3d 120 (2d Cir. 1998) .................................................................. 27, 28

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ......................................................................33

*Small v. Lorillard Tobacco Co.*,
  720 N.E.2d 892 (N.Y. 1999) ...................................................................... 30

*Titan Sports, Inc. v. Turner Broad. Sys.*,
  981 F. Supp. 65 (D. Conn. 1997) ................................................................ 27

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ....................................................................... 4

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ........................................................................... 5, 7, 8

*Valassis Commc'ns, Inc. v. News Corp.*,
  2019 U.S. Dist. LEXIS 27770 (S.D.N.Y. Feb. 21, 2019) ..................................... 6

*Verizon Commc'ns, Inc. v. Law Office of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ............................................................................. 8, 12

*We Shall Overcome Found. v. Richmond Org., Inc.*,
  221 F. Supp. 3d 396 (S.D.N.Y. 2016) ......................................................... 28

*Windstream Servs., LLC v. BMG Rights Mgmt. (U.S.) LLC*,
  2017 U.S. Dist. LEXIS 58204 (S.D.N.Y. Apr. 17, 2017) ................................... 24

**Statutes**

15 U.S.C. § 2 ................................................................................................................... 5

17 U.S.C. § 101 ........................................................................................................ 2, 3, 14

17 U.S.C. § 103(b) ........................................................................................................... 15

17 U.S.C. § 411(a) ..................................................................................................... 25, 26

**Rules**

Rule 12(b)(6) ..................................................................................................................... 4

## INTRODUCTION

For four decades Defendants have claimed to the United States government, financial industry regulatory bodies, and financial institutions including the named Plaintiffs that a copyright to a data compilation (the "CUSIP_DB compilation") held by the American Bankers Association ("ABA") allows Defendants to prevent public employee pension funds, banks, investors, and academics ("CUSIP Users") from freely using CUSIP numbers, issuer names, and types of issue. (Second Amended Complaint ("SAC") ¶¶ 77-81, 83-88, 154-56.) But now, faced with the first litigation to challenge that claim, Defendants' Memorandum of Law in Support of their Motion to Dismiss the SAC ("MOL") abandons the compilation copyright defense Defendants asserted as recently as November 17, 2022.[1]

**Antitrust claims**. Without a copyright defense, Defendants now assert that antitrust law allows them to monopolize the use of preexisting data in the compilation, which the copyright law does not protect, and to use that monopoly power to exclude from the market "potential competitors" that could use that data "to develop a competing product." (MOL at 1.) Defendants argue that S&P Global, Inc. ("S&P") (and now FactSet Research Systems, Inc. ("FactSet"))[2] lawfully may prevent CUSIP Users, such as Plaintiffs, from using the CUSIP numbers, issuer names, and types of issue as part of an alleged unilateral "refusal to deal" with its potential horizontal competitors. Defendants note that all CUSIP Users are Defendants' potential competitors. (*Id*. at 1-2.) They also argue that the alleged procompetitive effects arising out of their

---

[1] Defense counsel conceded at the November 17 pre-motion conference that Defendants have insisted to financial institutions and others that "you need to take a license because there are intellectual property rights that inhere in this database." (Hrg. Tr. at 10). Asserting that a party needs to execute a license is an assertion that the party is infringing on an intellectual property right and is tantamount to a threat of infringement litigation.

[2] For ease of reading, all references to "S&P" include "FactSet" unless stated otherwise.

preventing "free riding" on Defendants' alleged substantial investments in the CUSIP_DB compilation outweigh the anticompetitive effects of their conduct. (*Id.* at 2.) Both arguments fail.

First, Defendants attempt to analogize this action to a refusal to deal case is inapposite. The SAC does not assert a unilateral refusal to deal claim. CUSIP Users receive their data from third-party data vendors like Bloomberg ("Third Party Data Vendors" or "TPDVs") and want nothing from Defendants. It is Defendants that are coercing Plaintiffs to deal with them.

Second, Defendants do not act unilaterally. But, even if the SAC did allege a unilateral refusal to deal, which it does not, and assuming *arguendo* that it might be permissible in that circumstance for S&P, acting unilaterally, to decline a request from a direct purchaser, such as the TPDVs, to provide the full CUSIP_DB compilation, that still would not permit S&P to stop a potential competitor—all CUSIP Users according to Defendants—from using the preexisting facts in the compilation. Nor would it permit S&P to agree with other suppliers or distributors that they would refuse to deal with that potential competitor.

Third, refusal to deal law and free riding principles apply only to a monopolist's unilateral conduct in protecting something it owns not to collusive conduct among a monopolist and its distributors to strip away from the distributor's customers something the monopolist does not own, as is alleged in the SAC. This is especially true where something is necessary for the distributor's customers to potentially compete against the monopolist. Courts have held that such collusive conduct is a group boycott that violates Section 1 of the Sherman Act.

Fourth, Defendants' argument that antitrust law allows them to monopolize the use of preexisting data in the CUSIP_DB compilation directly contradicts the Supreme Court's holding in *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 349-51 (1991). In *Feist*, the Supreme Court held that Congress drew a line in Section 103 of the Copyright Act (17 U.S.C.

§ 101, *et seq.*) between the original selection and arrangement of preexisting data—which is protected—and the preexisting data itself—which is not protected—and drew that line specifically for the purpose of injecting more competition into the creation of compilations. 499 U.S. at 349-50. This distinction allows subsequent compilers to use freely the preexisting data to create new compilations, which creates more choice for users. Defendants' argument that antitrust law allows them to stop potential competitors from using the preexisting data in the CUSIP_DB compilation to create competing products would stand antitrust law on its head and effectively overrule *Feist*.

For all these reasons, Defendants have no cognizable justification for their anticompetitive conduct—conduct Defendants admit is intended to prevent potential competitors from developing a competing product or service. (MOL at 1.) This amounts to a defense that "competition itself is unreasonable," which "the Rule of Reason does not support." *Laumann v. NHL*, 56 F. Supp. 3d 280, 299 (S.D.N.Y. 2014) (Scheindlin, J.).[3]

**State law, standard-setting, and FRAND claims**. Defendants' conduct also violates New York General Business Law ("GBL") § 349 and Connecticut Unfair Trade Practices Act ("CUTPA") § 42-110b(a). Defendants argue their actions were not deceptive and that Plaintiffs were not injured. (MOL at 28-32.)  However, as shown below, the SAC alleges myriad deceptive and unfair acts by Defendants—ranging from false assertions of copyright over the mere CUSIP numbers, general threats of litigation, and threats of objectively-baseless copyright litigation, if Plaintiffs did not surrender to Defendants' demands to enter license agreements—and resulting injury. In any event, Defendants at most raise factual issues not resolvable on a motion to dismiss.

If, and only if, the Court finds that CUSIP numbers, issuer names, and types of issue are copyrighted, Plaintiffs also have adequately alleged that Defendants manipulated the standard

---

[3] Internal citations and quotations are omitted in the memorandum unless otherwise noted.

setting process and breached the ABA's contractual FRAND commitment to the X9 Standards Committee ("X9") because if, *arguendo*, Defendants are permitted to force Plaintiffs to enter license agreements, the fees were unfair and unreasonable. While Defendants argue that the scope of the FRAND commitment is supposedly limited to patents, the SAC alleges based on both statements from X9 and Defendants themselves that the commitment covered all purported intellectual property, including copyrights. Finally, Defendants' dispute as to the breadth of the FRAND commitment at best raises disputed issues of fact not resolvable on a motion to dismiss.

Defendants' Motion to Dismiss should be denied in its entirety.

## ARGUMENT

### I.   LEGAL STANDARD

When ruling on a Rule 12(b)(6) motion the court accepts "all factual claims in the complaint as true" and draws "all reasonable inferences in the plaintiff's favor." *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

However, the "flexible plausibility standard" is not a heightened pleading standard. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007). A complaint "does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555, and "in antitrust cases in particular, the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976)).

## II.       THE SAC ADEQUATELY STATES A SECTION 2 CLAIM

Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. A plaintiff must prove that the defendant possesses monopoly power in the relevant market and that it willfully maintained that power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 651 (2d Cir. 2015). "Willfulness" is demonstrated by conduct that "(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *See In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019).

Courts have cautioned that in an antitrust case "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after the scrutiny of each." *IHS Dialysis Inc. v. Davita, Inc.*, 2013 U.S. Dist. LEXIS 47532, at *22-23 (S.D.N.Y. Mar. 31, 2013) (Ramos, J.) (quoting *Cont'l Ore. Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962)); *see N.Y. MedScan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d. 140, 149 (S.D.N.Y. 2006) (denying motion to dismiss Sherman Act claims where defendant "selectively refer[red] to allegations in the complaint, ignoring the complete picture painted by plaintiffs"). Rather, the proper inquiry is to consider "the alleged conduct as a whole in the context of the relevant market and in light of the parties' respective roles therein," *IHS Dialysis Inc.*, 2013 U.S. Dist. LEXIS 47532, at *24, and whether qualitatively, there is a "synergistic effect" among the various acts that in combination cause the anticompetitive effect. *See Sanborn Library LLC v. Eris Info.*, 2021 U.S. Dist. LEXIS 165496, at *25 & n.14 (S.D.N.Y. Aug. 30, 2021)

(analyzing "each category of allegedly anticompetitive conduct keeping in mind the context and possible 'synergistic effect' of the conduct"); *see also Valassis Commc'ns, Inc. v. News Corp.*, 2019 U.S. Dist. LEXIS 27770, at *27 (S.D.N.Y. Feb. 21, 2019).

### A.     Defendants' Anticompetitive Conduct Violates the Sherman Act

The SAC alleges that CUSIP Users do not want, receive, use, or copy the CUSIP_DB compilation. (SAC ¶¶ 11, 47, 51, 55, 67.) And CUSIP Users do not want or need a "license" or any other contractual relationship with Defendants. (*Id.* ¶¶ 69-75.) Rather, it is Defendants that want and impose such a relationship, coercing CUSIP Users to sign so-called "license agreements" directly with S&P. (*Id.* ¶¶ 15, 52-55, 59, 95, 106.)

To achieve that relationship and gain contractual control over CUSIP Users, Defendants and the TPDVs, such as Bloomberg, agreed that the TPDVs would remove CUSIP numbers, issuer names, and types of issue from their data feed to any CUSIP User that refused to sign a license agreement with S&P. (*Id.* ¶¶ 9, 53-59, 105-08.) The "license agreements" exclude potential competition in and entry into the CUSIP Use Market by prohibiting any unauthorized or commercial use of the CUSIP numbers, the issuer names, and the types of issue. (*Id.* ¶¶ 10, 47, 60-63.) Absent these restrictions, any entity with access to those three facts could use them to create innovative new services, such as the management solutions for financial services and technology companies Xignite sought to create before Defendants shut down that effort. (*Id.* ¶¶ 62, 150; MOL at 1.)

Defendants' conduct impedes actual and potential competitors from innovating in financial markets both by direct prohibition and by raising the costs of potential rivals. (SAC ¶ 152.) Defendants charge CUSIP Users unlawful license fees but there are no charges for the use of such identifiers in almost every (if not every) market outside the United States. (*Id.*)

Moreover, by imposing unnecessary costs on the use of CUSIP numbers, Defendants impose unnecessary burdens on financial markets, which in turn reduce competition, liquidity, and transactional flow—harms that the industry has recognized and protested. (*Id.* ¶¶ 151, 154-56.) Defendants' conduct also reduces transparency in financial markets, thereby creating inefficiencies that impede actual and potential rivals from creating more efficient and attractive data offerings that use CUSIP numbers, issuer names, and types of issue. (*Id.* ¶ 154.)

The "license" agreements' enforcement provisions create additional and more daunting risks for any CUSIP User tempted to test the license's restrictions on "commercial" use. By forcing the CUSIP User to "admit" that the Defendants have some proprietary interest in the uncopyrightable CUSIP numbers, issuer names, and types of issue, the "license" gives the Defendants leverage to enforce a non-existent proprietary interest while taking away the User's right to challenge that claim. (*Id.* ¶¶ 99-100.) The enforcement provisions coerce compliance with the agreements' anticompetitive restrictions by creating existential risk for challenging the provisions or engaging in conduct they prohibit. This is accomplished by, first, CUSIP Users being forced to agree that Defendants have the "right to *obtain*[4] injunctive relief" (*id.* ¶ 99) for any unauthorized use of CUSIPs. Second, CUSIP Users are forced to agree that Defendants may terminate the agreement, thereby depriving them of access to CUSIP numbers from their TPDVs even if Defendants have only "reasonable grounds to believe" that the CUSIP Users have used CUSIP numbers, issuer names, and types of issue in any unauthorized way. (*Id.* ¶¶ 100-01.)

The SAC plausibly alleges the anticompetitive effects of Defendants' conduct. That conduct could not be characterized as the creation of "a superior product" or as an "historic

---

[4] Note this formulation has CUSIP Users agreeing to the *grant of* an injunction, not just to Defendants' right to *seek* an injunction.

accident." *Grinnell Corp.*, 384 U.S. at 570-71; *Actavis PLC*, 787 F.3d at 651. Rather, that conduct clearly "tends to impair the opportunities of rivals" and "either does not further competition on the merits or does so in an unnecessarily restrictive way." *In re Keurig*, 383 F. Supp. 3d at 228-29.

### B. Defendants' Antitrust Defenses Are Irrelevant

Defendants' refusal to deal and free riding defenses are inapplicable and irrelevant (MOL at 10-19) because (i) this is not a unilateral refusal to deal case; (ii) even if this were a unilateral refusal to deal case, which it is not, S&P might be permitted to refuse to provide the CUSIP_DB compilation to its competitors, but it could not stop those competitors from using the preexisting facts in the compilation; (iii) refusals to deal and free riding apply only to unilateral conduct by a monopolist to protect something it owns, not collusive conduct with its distributors to protect something it does not own; and (iv) Defendants' defenses would vitiate Congress' intent to allow potential competitors to use the preexisting data in compilations to create new compilations, thereby increasing competition.

### 1. The SAC Does Not Allege a Unilateral Refusal to Deal

Defendants argue that "'[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.'" (MOL at 11 (quoting *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009)).) From this general rule, Defendants contend that they have no duty to deal with the TPDVs' customers—CUSIP Users—their "potential competitors." (*Id.* at 10-16.)

But this is not a unilateral refusal to deal case, meaning one in which a monopolist's horizontal competitor seeks to force the monopolist to provide something that is necessary for the competitor to compete in the relevant market. *See Verizon Commc'ns, Inc. v. Law Office of Curtis V. Trinko, LLP*, 540 U.S. 398, 403, 407-08 (2004) (Verizon allegedly granted its competitors "discriminatory access" to its network); *linkLine*, 555 U.S. at 457 (AT&T allegedly provided

higher prices for its DSL network to its competitors than to its customers). Here, the facts are the opposite of a unilateral refusal to deal: the Plaintiffs want and need nothing from the Defendants. (SAC ¶¶ 11, 67.) Plaintiffs receive everything they need—the CUSIP number, issuer name, and type of instrument—from their TPDVs. (*Id.* ¶¶ 45, 47, 51-52.) CUSIP Users "saw no need to enter into license agreements with S&P because they were not receiving CUSIP numbers or any other data from S&P [and now FactSet]." (*Id.* ¶ 52.)

It was S&P in concert with the TPDVs that broke this resistance and forced CUSIP Users to sign license agreements with Defendants as a condition for receiving the CUSIP numbers, issuer names, and types of issue from the TPDVs. (*Id.* ¶¶ 53-59.) That tactic worked because the TPDVs' data feeds must include the CUSIP number, the issuer name, and the type of issue for each financial instrument in the feed. (*Id.* ¶¶ 9, 45, 49.) Without those three elements, electronic systems cannot match electronic data to a particular financial instrument, and the TPDVs' data feeds would be useless jumbles of unorganized data. (*Id.* ¶ 49.) The lack of CUSIP numbers would have dire consequences for CUSIP Users because CUSIP numbers are essential for many investment functions, such as analyzing financial instruments and settling trades.

Thus, in this case—unlike a unilateral refusal to deal case—it is the Defendants who have forced the Plaintiffs into a business relationship that the Plaintiffs neither need nor want. Unilateral refusal to deal law is irrelevant to this dispute.

2. **Even if Refusal to Deal Law Applied, Which It Does Not, Defendants Still Could Not Stop CUSIP Users from Using Preexisting Data in the CUSIP_DB Compilation**

Refusal to deal law might permit S&P to decline to provide the CUSIP_DB compilation directly to its horizontal competitors, but it would not permit S&P to prevent the competitors from using the preexisting data in the compilation regardless of the source from which competitors

acquired that data, including from the compilation itself. A series of opinions in litigation very much like this one makes this clear.

Judge Koeltl and ultimately the Second Circuit addressed this issue in litigation between New York Mercantile Exchange, Inc. ("NYMEX") and IntercontinentalExchange, Inc. ("ICE"), two futures exchanges that were battling over the use by new entrant ICE of NYMEX's closing prices. In response to NYMEX's complaint alleging that ICE's use of NYMEX's closing prices constituted copyright infringement, ICE filed two antitrust counterclaims, alleging that NYMEX had monopolized the relevant markets by refusing to deal with ICE and that the closing prices were essential facilities, and one copyright counterclaim, alleging that the closing prices were not copyrightable. *N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*, 323 F. Supp. 2d 559, 560 (S.D.N.Y. 2004) ("*NYMEX I*"). NYMEX moved to dismiss the antitrust counterclaims, but not the copyright counterclaim. Judge Koeltl dismissed ICE's monopolization counterclaim on the grounds that NYMEX had no obligation to help its horizontal competitor compete and dismissed the essential facilities counterclaim on the grounds that the Commodity Futures Trading Commission regulated access to the facility. *Id.* at 567-72 (dismissing antitrust claims without deciding the copyright declaratory judgment action counterclaim, thereby assuming the existence of valid copyrights). Thus, as of *NYMEX I*, Judge Koeltl had not adjudicated the copyright issue.

A year later, Judge Koeltl considered the parties' cross-motions for summary judgment. In particular, the court analyzed whether NYMEX lawfully could stop ICE from receiving closing prices from third-party data vendors (rather than from ICE) on the basis that those prices were copyrighted. *N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*, 389 F. Supp. 2d 527, 529 (S.D.N.Y. 2005) ("*NYMEX II*"). NYMEX owned a copyright on its "NYMEX Database," but not on the closing prices themselves. *Id.* at 537-38. ICE received the closing prices not from

NYMEX, but from GlobalView Software, Inc., a data vendor that had entered a contract with NYMEX that, like S&P's contracts with the TPDVs, required GlobalView to provide the closing prices to entities that agreed not to redistribute the prices. *Id.* at 531-32. ICE asserted in its motion that the closing prices were not copyrightable and that ICE lawfully could obtain the prices from GlobalView and use them in its business. Judge Koeltl agreed and dismissed NYMEX's copyright claims. *Id.* at 543-44.

The Second Circuit affirmed Judge Koeltl's decision granting summary judgment on ICE's counterclaim, finding the closing prices were not copyrightable. *N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109, 110 (2d Cir. 2007) ("*NYMEX III*"). The Court of Appeals held that "in using the settlement prices, ICE 'took nothing more than ideas, for which the copyright law affords no protection to the author.'" *Id.* at 118 (quoting *CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps., Inc.*, 44 F.3d 61, 68 (2d Cir. 1994)).

*NYMEX I*, *II*, and *III* therefore establish that a monopolist may not prevent anyone, including its potential competitors, from using the preexisting facts in a copyrighted database. Nor can a monopolist stop its data vendors from providing the preexisting facts to the data vendors' customers. Thus, despite Defendants' representations to the contrary (MOL at 12-13), the *NYMEX* cases do not permit Defendants to prevent CUSIP Users from using CUSIP numbers, issuer names, and types of issue without a license from S&P, but rather squarely support Plaintiffs' position, and based on a very similar chain of distribution.

### 3. Defendants' Defenses Do Not Apply to Collusive Conduct Regarding the Use of Something the Monopolist Does Not Own

Defenses grounded in refusals to deal and free riding depend on two facts that are absent from the SAC: (i) the monopolist's action is unilateral; and (ii) the monopolist takes the action to protect an asset the monopolist owns. Here, Defendants' actions are collusive, not unilateral, and

they do not own or have any other proprietary right in the CUSIP numbers, issuer names, and types of issue.

Every one of the refusal to deal and free riding cases Defendants cite (MOL at 11-14) involves the same fact pattern: a monopolist unilaterally decides not to share with a horizontal competitor an asset it owns. *See linkLine*, 555 U.S. at 443-44 (AT&T leased its wholesale DSL transport service to independent competitors at a statutorily permitted price that was higher than AT&T's wholesale price); *Trinko*, 540 U.S. at 404-05 (Verizon granted its independent competitors access to Verizon's operations support systems on a discriminatory basis); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1067-69 (10th Cir. 2013) (Microsoft refused to share APIs in its copyrighted Windows operating system software with independent software vendors); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 372-73 (7th Cir. 1986) (Western Union sold telex terminals in such volume that it drove an independent seller of competing terminals out of business); *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 19-20 (D.D.C. 2021) (Facebook refused to offer its competitors access to APIs in its copyrighted source code); *NYMEX I*, 323 F. Supp. 2d at 571; *MiniFrame Ltd. v. Microsoft Corp.*, 2013 U.S. Dist. LEXIS 49813, at *2-4 (S.D.N.Y. Mar. 28, 2013) (Microsoft's changes to the terms of its patented software license agreement harmed a rival's business model); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1127-28 (9th Cir. 2004) (changes to incumbent local exchange carrier's discounting policy harmed the business model of an independent carrier).

Where a monopolist does not act unilaterally or lacks an ownership interest, a refusal to deal or free riding defense does not apply. For example, in *In re Keurig Green Mountain Singleserve Coffee Antitrust Litigation*, Judge Broderick rejected Keurig's free riding justification because it was not unilateral and Keurig did not own the cups (or pods) its suppliers manufactured

that were compatible with Keurig's coffee machines, just as Defendants here are not acting unilaterally, but collectively with the TPDVs, and do not own the CUSIP numbers, issuer names, and types of issue. 383 F. Supp. 3d at 211-12, 229, 238-39. Keurig had designed and owned "patents covering the filter technology used in its" cups, but those patents expired in 2012, after which Keurig's distributors could make compatible cups without infringing Keurig's patents. *Id.* at 212. Similar to S&P's contracts with the TPDVs, Keurig's contracts with its suppliers precluded the suppliers from selling to Keurig's competitors cups that contained technology that Keurig had designed or developed, technology that was necessary to compete against Keurig. *Id.* at 215, 238-39. Like the Defendants here, Keurig claimed that the restriction was procompetitive because those competitors had "no right to freeride on Keurig's developments and investments" in designing and developing the cups. *Id.* at 238. Judge Broderick held that while the avoidance of free riding in general could be an appropriate procompetitive argument, "Keurig [could] not unlawfully restrict *other parties* in its manufacturing and distribution chain from contracting with competitors" for the cups that Keurig did not own. *Id.* (emphasis added). Keurig's joint conduct with its suppliers meant that Keurig was "not protecting against free-riding on its own investments, but [was] rather blocking competitors from accessing inputs and distribution networks" that Keurig did not own. *Id.*

Defendants cite no case in which a court accepted a refusal to deal or free riding justification where the monopolist agreed with and acted in concert with a distributor to deny the distributor's customer something that was necessary to compete, but over which the monopolist had no property right. That is because there is no such case. Courts reviewing such collective action by monopolists and their distributors have held that the arrangements are not a valid refusal to deal

or restriction on free riding, but an unlawful group boycott that violates Section 1 of the Sherman Act. (*See infra* pp. 17-21.)

Further, Defendants' free riding justification is procedurally premature as it may be offered by a defendant only after there has been a finding that the defendant's conduct had an anticompetitive effect and a defendant has proved that there are procompetitive effects that outweigh the anticompetitive effects through contemporaneous documents and fact and expert witness testimony and analysis. *See, e.g.*, *FTC v. Shkreli*, 581 F. Supp. 3d 579, 633-36 (S.D.N.Y. 2022) (Cote, J.) (finding that defendant did not bear its burden after bench trial). There is no evidentiary record at this early stage of the case.

### 4. Defendants' Assertion that They May Exert Monopoly Control Over the Use of Preexisting Data Contradicts Section 103 and *Feist*

The Supreme Court has held that Congress drafted Section 103 of the Copyright Act (17 U.S.C. § 101, *et seq*.) with the specific purpose of encouraging competition using the preexisting facts in a data compilation: "a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement." *Feist*, 499 U.S. at 349. Protecting only the original expression—the selection and arrangement of the preexisting data—allows subsequent compilers to use the preexisting data to create competing products and services, a "result [that is] neither unfair nor unfortunate." *Id.* at 350. The Court specifically dismissed the argument Defendants make here, namely that their hard work and investment allows them to override Congress' decision and protect the preexisting facts: "It may seem unfair that much of the fruit of the compiler's labor may be used by others without compensation," but that is the "essence of copyright" and "a constitutional requirement." *Id.* at 349.

Defendants cite no case—antitrust or otherwise—overriding the balance Congress struck in drafting Section 103[5] because any such case would undermine Congress' decision to inject competition into the creation of compilations and would effectively overrule the Supreme Court's decision in *Feist*. Defendants' request that this Court do just that should be rejected.

### 5. *Qualcomm* Is Inapplicable Because It Rests on Valid Intellectual Property Rights and Not on Qualcomm's Distribution Strategy

Defendants contend that the decision in *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), shows that "[t]here is . . . nothing anticompetitive about [S&P or FactSet] structuring its pricing to charge end users directly for their use, instead of charging distributors." (MOL at 16.) Nothing in *Qualcomm* supports that statement.

Defendants misstate several critical facts in *Qualcomm*. First, Qualcomm did not "license[] its patents to competing chipmakers." (MOL at 16.) Indeed, the central issue in *Qualcomm* was the FTC's request that the Ninth Circuit affirm the District Court's ruling that the antitrust law required Qualcomm to offer licenses to its patents to competing chip makers. 969 F.3d at 993. Qualcomm licensed its patents only to the original equipment manufacturers ("OEMs")—the manufacturers of cellular telephones—and did not offer licenses to its rival chip makers. *Id.* at 984. The chip makers' semiconductors practiced many of Qualcomm's standard essential patents ("SEPs") "by necessity," but not pursuant to a license. *Id.* Instead, Qualcomm permitted the chip makers to use its technology not pursuant to a license, but rather "in exchange for the [chip makers] promising not to sell [their] chips" to OEMs that had not signed licenses with Qualcomm. *Id*.

Second, the appeal to the Ninth Circuit did not turn on Qualcomm's "distribution strategy." (MOL at 16-17.) There were no "distributors" in *Qualcomm*. Qualcomm licensed its technology

---

[5] "The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b).

directly to its OEM customers. 969 F.3d at 984-85. Qualcomm did not offer licenses for sublicensing or chips for resale. *Id.* The OEMs were free to purchase semiconductor chips from Qualcomm's competitors so long as the OEM was licensed to use Qualcomm's patented technology in those chips. *Id.* Unlike Defendants here, Qualcomm was not requiring the chip makers' customers to take a license to materials in which Qualcomm did not own a valid intellectual property interest.

Third, contrary to Defendants' claim (MOL at 17), the Ninth Circuit's holding that the antitrust laws permitted Qualcomm to license OEMs and not chip makers *did* turn on the existence of Qualcomm's patents. Unlike here, *Qualcomm* had valid intellectual property—its patents—and the patent exhaustion doctrine provided that "'the initial authorized [or licensed] sale of a patented item terminates all patent rights to that item.'" 969 F.3d at 984 (quoting *Quanta Comput., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008)). Thus, patent law allowed Qualcomm to recover royalties only once on its SEPs; it could earn that royalty either on a license to the chip makers or on a license to the OEMs, but not both. *Id.* Faced with this choice, Qualcomm lawfully decided that receiving royalties from licensing its patents to the OEMs was the profit-maximizing strategy. *Id.*

Fourth, Defendants' claim that the Ninth Circuit's review of Qualcomm's licensing program turned, not on SEPs, but on the fact that Qualcomm "was charging for its own technology and seeking payment on a supplier-neutral basis" (MOL at 17-18) also is incorrect. The portion of the opinion on which Defendants rely related not to the licensing program, but to whether Qualcomm's exclusive chip supply contracts with Apple, Inc. foreclosed a substantial share of the relevant market. *Qualcomm*, 969 F.3d at 1003-05. Thus, Defendants' reliance on that discussion is inapposite.

Finally, Defendants' argument (MOL at 18) that they can lawfully require Plaintiffs to pay for "access" to CUSIP numbers, issuer names, and types of issue regardless of whether those items are copyrighted is wrong. The SAC alleges that Plaintiffs obtain no data from Defendants and do not access the CUSIP_DB compilation. (SAC ¶¶ 11, 47, 51-52, 55, 67.) The argument also is contrary to *Feist*, which held that subsequent compilers are "free to use" the preexisting data in a compilation. 499 U.S. at 349.

## III.    THE SAC ADEQUATELY STATES A SECTION 1 CLAIM

The SAC states a boycott claim like those consistently found by courts to violate Section 1 of the Sherman Act. S&P coerced CUSIP Users to enter license agreements by agreeing with the TPDVs "to a boycott of any CUSIP User that refused to enter a license with S&P." (SAC ¶ 53.) S&P and the TPDVs "agreed to insert into the [TPDVs'] contracts with CUSIP Users clauses that required the [TPDVs] to remove the CUSIP numbers from the [TPDVs'] data feeds to any CUSIP User that did not enter into a license agreement with S&P." (*Id.* ¶ 54.) This was "an agreement to ensure that S&P could impose a license from S&P on CUSIP Users to collect a toll from the mere use of CUSIP numbers and to preclude CUSIP Users from competing in the CUSIP Use Market." (*Id.* ¶ 55.)

Courts analyzing this fact pattern consistently have labeled such arrangements an unlawful group boycott for more than 60 years. For example, the plaintiff in *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, was a small retail store, and Broadway-Hale was a retail chain with a location next door to Klor's in San Francisco. 359 U.S. 207, 208 (1959). Klor's and Broadway-Hale "compete[d] in the sale of radios, television sets, refrigerators, and other household appliances." *Id.* Plaintiff claimed that Broadway-Hale and ten national manufacturers and their distributors conspired either not to sell to Klor's or to sell "only at discriminatory prices and highly unfavorable terms." *Id.* at 208-09. This "concerted refusal to deal with Klor's ha[d] seriously handicapped its ability to

compete, and [had] caused it a great loss of profits, goodwill, reputation, and prestige." *Id*. at 209. The defendants did not dispute these allegations, but "submitted unchallenged affidavits which showed that there were hundreds of other household appliance retailers, some within a few blocks of Klor's, who sold many competing brands of appliances, including those the defendants refused to sell to Klor's." *Id.* at 209-10. The district court granted defendants' summary judgment motion, and the Ninth Circuit affirmed.

The Supreme Court reversed, holding that defendants had formed a group boycott or concerted refusal to deal, which was a *per se* violation of Section 1 of the Sherman Act. *Id.* at 212-13. Unlike in the case of a unilateral refusal to deal, the Court stated that this was "not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship." *Id.* at 212. Rather, this was "a wide combination consisting of manufacturers, distributors, and a retailer" that took "from Klor's its freedom to buy appliances in an open competitive market." *Id.* at 213.

Similarly, in *PLS.com, LLC v. Nat'l Ass'n of Realtors*, the plaintiff was a new entrant in the real estate network services market, which long had been dominated by multiple listing services ("MLSs"), which were "owned and controlled" by members of the National Association of Realtors ("NAR"). 32 F.4th 824, 829 (9th Cir. 2022), *cert. denied sub nom.*, *Nat'l Ass'n of Realtors v. PLS.com, LLC.*, 143 S. Ct. 567 (2023). While most sellers listed their properties on MLSs to reach the widest possible audience, some sellers—most notably public figures—chose not to do so because they wanted to limit the personal information they shared with buyers. *Id*. at 830. These so-called "pocket listings" were shared through inefficient personal communications rather than mass disclosures. *Id.* Plaintiff PLS.com created a database of nationwide pocket listings open to any real estate agent at a lower price than the MLSs charged. *Id.* The pocket listing service ("PLS")

grew rapidly to the point that the defendants became concerned that the PLS service would limit or replace the incumbent MLSs. *Id.* To forestall that competition NAR adopted a rule mandating that any member agent who published a listing on the PLS must publish the same listing on an MLS within one business day. *Id.* Noncompliance could result in the agent losing access to the MLSs. *Id.* The new policy had its intended effect; agents removed listings from the PLS and instead submitted them to MLSs. *Id.* at 831. The district court granted defendants' motion to dismiss, but the Ninth Circuit reversed. *Id.* at 843.

> The Ninth Circuit held that defendants had organized a classic group boycott:
>
> PLS's competitors coerced its suppliers (sellers' agents) not to supply PLS with listings (or to do so only on highly unfavorable terms), and they did so for the express purpose of preventing PLS, a new entrant to the market after decades of little or no competition, from competing with MLSs.

*Id.* at 834-35. Moreover, the Ninth Circuit held that plaintiff had adequately alleged a *per se* violation of Section 1: "a group of competitors coercing a competitor's suppliers to sell to that competitor on 'unfavorable terms' constitutes a group boycott even if the competitors do not completely cut off the competitor's access to inputs it needs." *Id.* at 835 (citing *Klor's*, 359 U.S. at 209). Critically, that the group boycott had both a horizontal and a vertical element was immaterial:

> In *every* group boycott, the dominant firms force their suppliers or customers to choose between assisting the dominant firms in injuring their competitors or working exclusively with those competitors, knowing that because of the dominant firms' market power very few suppliers or customers will be able to rely exclusively on the competitors.

*Id.* at 836 (emphasis in original).

Courts in this District have adopted the same reasoning. In *PharmacyChecker.com LLC v. National Association of Boards of Pharmacy*, Judge Karas held that a plaintiff had adequately pleaded a *per se* group boycott in violation of Section 1. 530 F. Supp. 3d 301, 343 (S.D.N.Y. 2021).

The defendants were a mixture of (i) plaintiff's horizontal competitors in the pharmacy accreditation market, such as the National Association of Boards of Pharmacy ("NABP"), (ii) Alliance for Safe Online Pharmacies ("ASOP"), an organization that analyzed the problem of online pharmaceutical sales, and (iii) Centers for Safe Internet Pharmacies Ltd. ("CSIP"), an organization of internet commerce gatekeepers including Google, Microsoft, and Facebook. *Id.* at 317-18. In December 2018, NABP added plaintiff's website to its "Not Recommended Sites" list. *Id.* at 318. In June and July 2019, CSIP ran targeted ads against plaintiff. *Id.* In July 2019, Microsoft's Bing search engine began displaying warning signs when users clicked on plaintiff's website, which caused plaintiff to lose 76% of its web traffic from Bing. *Id.* Plaintiff alleged that defendants' coordinated attacks caused its site traffic to decline by more than 78%. *Id.*

Judge Karas held that plaintiff had adequately alleged a group boycott that was a *per se* violation of Section 1. Plaintiff "sufficiently alleged that Defendants' actions cut it off from its ability to receive traffic from search engines" and that two of the defendants were dominant in the market for pharmacy accreditation. *Id.* at 344-45. Plaintiff also adequately alleged that the group boycott was producing anticompetitive effects in the relevant market. *Id.* at 346 (citing *Klor's*, 359 U.S. at 208).

The SAC alleges a group boycott based on the same fact pattern as in *Klor's*, *PLS.com*, and *PharmacyChecker.com*. (SAC ¶¶ 52-59.) In those cases, as in the SAC, a monopolist contracted with its suppliers and/or distributors to refuse to sell to a potential competitor or to sell on discriminatory terms inputs from those suppliers and distributors that the potential competitor needed to compete with the monopolist. These group boycotts (or concerted refusals to deal) had both horizontal and vertical elements, and in each case the monopolist claimed its conduct was not anticompetitive, as do Defendants here, on the basis that the potential competitor had other sources

for the necessary inputs. Yet, in each case the court held that the monopolist's collusive conduct with its suppliers and/or distributors was not a lawful vertical distribution arrangement, but a group boycott (or concerted refusal to deal) that violated Section 1. The reasoning in those cases makes clear that the SAC adequately alleges a group boycott.

## IV. DEFENDANTS' JUSTICIABILITY ARGUMENTS MISSTATE BOTH THE SAC'S ALLEGATIONS AND THE LAW

Defendants argue that Plaintiffs' request for declaratory relief is not justiciable because Plaintiffs have not alleged "non-conclusory facts showing that Defendants have threatened to enforce the specific copyright at issue against them in a manner that is 'definite and concrete' and that is 'real and substantial,' as opposed to a hypothetical state of facts." (MOL at 25 (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).) Defendants' argument (i) misstates the SAC's allegations; (ii) misreads *MedImmune* and ignores opinions from judges in this District; (iii) mistakenly relies on *Noerr-Pennington* immunity; and (iv) misstates the law regarding registration of copyright.

### A. The SAC Adequately Alleges Threats to CUSIP Users' Businesses that Merit Declaratory Relief

Defendants' attempts to escape liability for their threats of litigation—including litigation based on false claims of copyright—all fail. (MOL at 21-22.) First, Defendants assert that "Plaintiffs do not allege any facts showing any such threats." (*Id.* at 21.) Not so. The SAC is replete with allegations that Defendants threatened copyright and other litigation over CUSIP numbers if a CUSIP User refuses to execute a license. (SAC ¶¶ 95-110.) Defendants sent letters to Plaintiffs asserting that CUSIP numbers are copyrighted and that the Plaintiffs' unlicensed use of CUSIP numbers would infringe the ABA's copyright to put Plaintiffs on notice that they may face litigation over their use of CUSIP numbers. (*Id.* ¶ 96.) For example, S&P told Swiss Life that if

Swiss Life did not enter into a license agreement for the use of CUSIP numbers, Swiss Life would be misappropriating the ABA's copyright and subject to infringement or injunctive relief litigation. (*Id.* ¶ 104.) S&P threatened Hildene through hostile correspondence that S&P would pursue all available remedies and will "continue the escalation process" with its legal department if Hildene continued to use CUSIP numbers without a license. (*Id.* ¶¶ 106-10.)

### B.    Defendants Misread *MedImmune*

Defendants' argument is based on a reading of *MedImmune* that is wrong. Defendants cite a single sentence of the *MedImmune* decision (MOL at 25) requiring that a dispute be "'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *MedImmune*, 549 U.S. at 127. But Defendants fail to include the next sentence, in which the Court further explained that "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Maryland Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

The Court held that a party facing a coercive threat like those Defendants made to CUSIP Users may accede to the coercion, eliminating the *imminent* threat of harm—for example, by taking a license and paying the demanded royalties—and yet still face a threat that merits declaratory relief:

> The question before us is whether this causes the dispute no longer to be a case or controversy within the meaning of Article III. . . . The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, *but nonetheless does not eliminate Article III jurisdiction*.

*Id.* at 128-29 (emphasis added).

The Court held that the coerced actions the petitioner took to eliminate the threatened harm by giving in to it did not negate its ability to seek declaratory relief: "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *Id*. at 129 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967)).[6]

And finally, the Court noted that the "coercion" at issue is not limited to a threat or filing of a suit for infringement of an intellectual property right, but also includes other risks of harm:

> Moreover, [*Altvater*] cited approvingly a treatise which said that an 'actual or threatened serious injury to business or employment' by a private party can be as coercive as other forms of coercion supporting restitution actions at common law; and that '[t]o imperil a man's livelihood, his business enterprises, or his solvency, [was] ordinarily quite as coercive' as, for example, 'detaining his property.'

*Id.* at 132.

The Court specifically rejected the argument Defendants make here, that a business must wait for the Defendant to make an explicit threat or carry out its threat before seeking declaratory relief: "The rule that a plaintiff must destroy a large building, bet the farm, or (as here) risk treble damages and the loss of 80 percent of its business before seeking a declaration of its actively contested legal rights finds no support in Article III." *Id.* at 134.

Subsequent caselaw in this jurisdiction has held that "*MedImmune* 'lowered the threshold' for establishing the existence of an actual case or controversy in intellectual property-related declaratory judgment cases." *Gelmart Indus., Inc. v. Eveready Battery Co.*, 120 F. Supp. 3d 327,

---

[6] The Court noted that its prior cases consistently had found a "case or controversy" in the context of a threat of adverse *government* action against the petitioner and observed that the lower courts similarly had concluded that there was a case or controversy where the petitioner's actions had avoided a threat of adverse *private* action. *MedImmune*, 549 U.S. at 129. The Court also noted that, like the lower courts, it too had held—in *Altvater v. Freeman*, 319 U.S. 359 (1943)—that where the threats were of private rather than government action steps taken by the threatened party to avoid the potential harm do not deprive the plaintiff of the right to declaratory relief or the district court of equitable jurisdiction. *MedImmune*, 549 U.S. at 130-31.

331 (S.D.N.Y. 2014) (quoting *AARP v. 200 Kelsey Assocs., LLC*, 2009 U.S. Dist. LEXIS 969, at

*17 (S.D.N.Y. Jan. 6, 2009)); *Windstream Servs., LLC v. BMG Rights Mgmt. (US) LLC*, 2017 U.S.

Dist. LEXIS 58204, at *10-11 (S.D.N.Y. Apr. 17, 2017) (Wood, J.) (hereafter "*Windstream*").

> The *Windstream* court described the transformative effect of *MedImmune*:

> Following *MedImmune*, so long as [t]he factual and legal dimensions of the dispute are well defined' and 'nothing about the dispute would render it unfit for judicial resolution, jurisdiction is not defeated by a party's decision to refrain from taking some action and thus make[] what would otherwise be an imminent threat [of suit] at least remote, if not nonexistent. Nonetheless, the threat of future litigation remains relevant in determining whether an actual controversy exists.

*Windstream*, 2017 U.S. Dist. LEXIS 58204, at *11-12.

### C. Defendants' Threats of Copyright Claims Are Not Immune from Antitrust Liability Under *Noerr-Pennington*

Defendants' assertion that their threats of copyright litigation are immune from antitrust

liability under the *Noerr-Pennington* doctrine is incorrect. (MOL at 21-22.) While the *Noerr-

Pennington* doctrine may provide immunity to a party that files or threatens litigation to enforce *a

valid copyright*, the doctrine's "sham exception" affords no immunity to a party that threatens

litigation that is "objectively baseless." *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 100-01

(2d Cir. 2000). Defendants' threats of copyright litigation over the mere use of CUSIP numbers

were objectively baseless and fall into the "sham exception" to *Noerr-Pennington* because

Defendants had no legitimate copyright claim on which they could succeed in such a litigation.

First, the ABA's compilation copyright does not cover any of the individual facts in the

compilation. (*See supra* pp. 2-3, 14-15.) Second, contrary to Defendants' declaration to the Court

that they reserve the right to claim a copyright in the CUSIP numbers (Hrg. Tr. at 6), those numbers

are not copyrightable. (*See supra* pp. 10-11, 14-15.) Third, Defendants cannot obtain copyright

protection for the other two facts Plaintiffs need—the issuer name and the type of issue—because

the issuer "authored" those facts, not the Defendants. (*Id.* at 14 n.5.) And Defendants' claim that asserting copyright over the CUSIP_DB compilation is not objectively baseless (MOL at 22), misses the point because, as shown above, the SAC alleges that Defendants threatened copyright claims over the mere use of CUSIP numbers. (SAC ¶¶ 86-88, 107-10.)

### D.   Defendants Misstate the Need for and the Effect of Filing Copyright Registrations

Defendants argue that "Plaintiffs could not have faced any 'definite and concrete' threat of copyright liability with respect to CUSIP identifiers" because "Plaintiffs have not alleged that the ABA has ever registered any copyright in CUSIP identifiers alone," concluding that "Plaintiffs never faced any risk of copyright infringement litigation with respect to CUSIP identifiers alone." (MOL at 26). Those arguments, likewise, fail.

First, the filing of a copyright registration is not a predicate to the non-litigation remedies available to Defendants, including those set forth in the license. The license allowed Defendants to terminate the license and cut off access to the CUSIP numbers, issuer names, and types of issue against any licensee that refused to accede to Defendants' demands. (SAC ¶¶ 100-10.) Defendants threatened to cut off access to ratings data if the licensee refused to accept their demands. (*Id.* ¶ 111.) None of these threats were predicated on the filing of a copyright registration.

Second, while registration of a copyright is a necessary, but purely procedural predicate to filing copyright infringement litigation, 17 U.S.C. § 411(a), the lack of registration does not mean that S&P could not file or threaten to file such an action. The license permits the Defendants to file non-infringement litigation against CUSIP Users for breach of the license and even permits the Defendants to obtain an injunction where S&P has only "reasonable grounds to believe" that a CUSIP User has used the CUSIP numbers, issuer names, and types of issue in an unauthorized way. (SAC ¶¶ 99-101.) That litigation does not depend on a copyright registration. The absence of

a copyright registration also is not an impediment to copyright infringement litigation because S&P could file the registration at any time, including just before filing infringement litigation. 17 U.S.C. § 411(a). And if Defendants mean to imply that the lack of registration made their threat of litigation an empty one, that would mean the threat was "objectively baseless" and a "sham" that would not be protected speech under *Noerr-Pennington*.

Third, Defendants' copyright registration argument is irrelevant to this Court's jurisdiction to hear a petition for and issue declaratory relief. The Supreme Court has held that while "Section 411(a)'s registration requirement is a precondition to filing a claim that does not restrict a federal court's subject-matter jurisdiction." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010). Therefore, the lack of a copyright registration does not preclude the Court from hearing Plaintiffs' request for declaratory relief.

## V.   PLAINTIFFS HAVE STATED VALID CLAIMS UNDER GBL § 349 AND CUTPA § 42-110b(a)

### A.   Defendants' Basis for Dismissal of the GBL § 349 Claim is Without Merit

#### 1.   Defendants Mischaracterize Plaintiffs' Allegations of Deceptive Acts, Ignore Other Deceptive Acts, and at Most Raise Questions of Fact

Defendants' argument that Plaintiffs fail to allege a deceptive act (MOL at 29), is wrong. Defendants argue that mandating that CUSIP Users execute license agreements for use of *CUSIP numbers* is not materially misleading because license agreements are purportedly lawful for "*bulk CGS Data*." (*Id.* (emphasis added).) But Defendants are rewriting the SAC, which specifically alleges that Defendants deceptively claimed license agreements were necessary to use just CUSIP numbers. For example, the SAC alleges that S&P told Plaintiffs that the mere internal use of CUSIP numbers requires a license from CUSIP Global Services ("CGS"), S&P's division responsible for managing the CUSIP business. (SAC ¶ 86 (S&P: "firms using these identifiers [CUSIPs] internally . . . must possess a license from CGS"); *id.* ¶ 87 (S&P "could not have been

clearer that a license agreement with S&P was required for the mere use of CUSIP data, meaning the CUSIP numbers, issuer names, and types of issue" because the data is purportedly "proprietary"); *id.* ¶ 88 (S&P telling Swiss Life that it "could not use the CUSIP numbers in its business if it failed to execute a license agreement").) The ABA even told the SEC that it could not adopt a proposed rule requiring disclosures by rating agencies without the ABA's consent because of the ABA's purported copyright in the CUSIP database "as well as in the CUSIP numbers themselves." (*Id.* ¶¶ 77-79.)

The license agreements corroborate that Defendants deceptively claimed the licenses were required for the mere use of CUSIP numbers, as that is exactly what the license agreements covered. For example, Hildene's agreement is limited to: "CUSIP License to 2,500 Identifiers." (*Id.* ¶ 107.) Indeed, the license agreements' fees are not calculated based on the use of a database, but rather on the number of CUSIP numbers that the CUSIP User "databases." (*Id.* ¶¶ 89-91.)

The Copyright Act provides no refuge for Defendants. (MOL at 30-31.) Even if Plaintiffs' GBL claim involved copyright issues, which it does not, it is not preempted by the Copyright Act because the focus of the claim here is on the "actual deceptive effect on consumers." *Samara Bros. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 131 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 205 (2000). Therefore, the GBL claim is qualitatively different from a request for a declaratory judgment that Defendants have no valid copyright because the GBL claim involves the extra elements of deception and harm caused to consumers (*i.e.*, CUSIP Users). (SAC ¶¶ 137, 202-03; *see Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992); *Titan Sports, Inc. v. Turner Broad. Sys.*, 981 F. Supp. 65, 70-71 (D. Conn. 1997) ("[S]tate law claims based on deceptive trade practices involve the element of misrepresentation or deception, which is not part of a cause of action for copyright infringement, and are not preempted.").)

27

The case on which Defendants rely, *We Shall Overcome Foundation v. Richmond Organization, Inc.*, 221 F. Supp. 3d 396, 412 (S.D.N.Y. 2016), confirms that where, as here, the focus of the state law claim is on "the actual deceptive effect on consumers," "the claim is not preempted" (citing *Samara Bros.*, 165 F.3d at 131). (MOL at 31.) *We Shall Overcome* is otherwise inapposite because there the challenged right was "the very right protected by the Copyright Act," 221 F. Supp. 3d at 412; here, Defendants admit that individual CUSIP numbers are not protected by copyright. (MOL at 26.)

Moreover, Defendants ignore other allegations of their deceptive acts, including that Defendants' threats that unlicensed CUSIP Users will face copyright litigation over their mere use of CUSIP numbers if they do not sign a "license agreement" was deceptive because Defendants' copyright does not apply to CUSIP numbers. (*See, e.g.*, SAC ¶¶ 107-10 (threatening Hildene that S&P would pursue all available remedies and will "continue the escalation process" with its legal department if Hildene used CUSIP numbers without a license).) Similar conduct has been found to state a GBL claim. *See, e.g.*, *Calabrese v. CSC Holdings, Inc.*, 283 F. Supp. 2d 797, 815 (E.D.N.Y. 2003) (deceptively accusing plaintiff of stealing cable programming and threatening litigation states GBL claim). Moreover, Defendants' "purposeful, deceptive monopolistic practices" set forth above (s*ee supra* pp. 6-8, 17-21), alone are sufficient to state a GBL claim. *Cox v. Microsoft Corp.*, 8 A.D. 3d 39, 40 (1st Dep't 2004) (GBL claim adequately pled based on "purposeful, deceptive monopolistic practices").

Finally, whether a deceptive practice was likely to mislead a reasonable consumer "is generally a question of fact not suited for resolution at the motion to dismiss stage." *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020). Here, Defendants at most raise

issues of fact with respect to the deceptiveness of their acts, which should not be resolved at this stage of the case.

### 2. Plaintiffs Have Sufficiently Pleaded Cognizable Injury

Defendants' "lack of injury" arguments again ignore the allegations in the well-pled SAC. (MOL at 29-30.) Defendants first argue that Plaintiffs do not allege that they or any other CUSIP User would not have entered a license agreement absent Defendants' deceptive acts. (*Id.* at 30.) Not so. The SAC alleges that Defendants used a plethora of deceptive practices to cause Plaintiffs to enter "license agreements." (*See supra* pp. 26-28 (providing examples of Defendants' deceptive practices causing Plaintiffs to execute "license agreements").) The fact that Swiss Life protested Defendants' false assertions of copyright is irrelevant (MOL at 30) because Defendants employed many deceptive acts as set forth above.

Further, Defendants' claim that CUSIP Users entered license agreements because "a functioning data feed is a necessary tool for CUSIP Users' business" (*id.*), misses the point. CUSIP Users obtained functioning data feeds from TPDVs like Bloomberg. Plaintiffs receive *nothing* from Defendants. (SAC ¶ 52.) They were forced to pay Defendants because Defendants employed deceptive, monopolistic business practices and threatened unfounded litigation if CUSIP Users did not execute a license with CGS. (*Id.* ¶¶ 60-63, 95, 105, 202.) Defendants received fees not because of anything they provided to Plaintiffs, but rather because of Defendants' unfair and deceptive practices. The fees Plaintiffs paid Defendants clearly were unjustified—the fee should have been zero.[7] These allegations sufficiently plead a cognizable injury under GBL. *Orlander v. Staples*, 802 F.3d 289, 302 (2d Cir. 2015) (holding plaintiff pled GBL injury when plaintiff purchased a

---

[7] In the alternative, if the license agreements are not found to be all together impermissible, the complaint also alleges that the fees were unreasonable and in violation of the FRAND commitment. (*Id.* ¶¶ 115, 122.)

plan but did not receive services bargained for); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 551 (E.D.N.Y. 2017) (actionable GBL injury when plaintiffs "paid for something they did not get" and noting that pecuniary harm is not necessary); *Cox*, 8 A.D.3d at 40 (finding GBL injury when plaintiff paid artificially inflated fees and was denied access to competitors' products and services based on Defendants' monopolistic conduct).

Defendants' cited cases are inapposite. (MOL at 30.) In *Small v. Lorillard Tobacco Co.*, unlike here, there was no allegation that the cost of cigarettes was affected by the alleged deception. 720 N.E.2d 892, 898 (N.Y. 1999). Defendants' reliance on *Campbell v. Barclays Bank* is also unavailing because that plaintiff similarly did not allege how the price of a CD it purchased was affected by an omission and otherwise lacked standing due to a lack of any relationship whatsoever with defendant. 2009 N.Y. Misc. LEXIS 1731, at *16 (Sup. Ct. Kings Cnty. July 2, 2009).

## B.   Defendants' Basis for Dismissal of Plaintiffs' CUTPA § 42-110b Claim is Without Merit

CUTPA § 42-110b provides a remedy for unfair conduct in addition to deceptive conduct. "Courts consider three factors to determine whether an act or practice is unfair: 1) whether it is in violation of public policy as established by common law or statute, 2) whether it is otherwise immoral, and 3) whether it causes substantial harm to consumers." *Dichello Distribs., Inc. v. Anheuser-Busch LLC*, 2021 U.S. Dist. LEXIS 174001, at *37 (D. Conn. Sept. 14, 2021). "A CUTPA plaintiff need not establish all three criteria to demonstrate unfairness." *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 120 (2d Cir. 2004). In addition to Defendants' deceptive conduct discussed above (*see supra* pp. 26-28), Plaintiffs also allege unfair conduct sufficient to state a claim under CUPTA. Defendants claim that Plaintiffs' theory of unfairness rests solely on the anticompetitive conduct alleged in the antitrust claims. (MOL at 31.) This is true in part, and those well-pleaded allegations alone are sufficient to state unfair conduct. *See supra* pp. 6-8, 17-21.

However, Defendants are incorrect that Plaintiffs do not allege "immoral, unethical, oppressive, or unscrupulous" conduct. (MOL at 32.) Allegations that Defendants forced Plaintiffs to enter license agreements under threats of disrupting their businesses and unfounded lawsuits premised on non-existent copyright protection, (SAC ¶ 106 (S&P "threatened to have Bloomberg strip all CUSIP numbers from Hildene's data feed if Hildene refused to sign the license agreement"); *id.* ¶¶ 107-10 (S&P threatened to disrupt Hildene's business and an unfounded lawsuit)), qualifies as immoral, unethical, oppressive, and unscrupulous. *See, e.g.*, *Anthem Sports v. Under the Weather*, 320 F. Supp. 3d 399, 420 (D. Conn. 2018) (actionable conduct alleged by defendant's infringement threats when plaintiff attempted to compete). Defendants' citations to *Pro Music Rights, LLC v. Apple, Inc.*, 2020 U.S. Dist. LEXIS 236280, at *35 (D. Conn. Dec. 16, 2020) and *J. Publishing Co. v. Hartford Courant Co.*, 804 A.2d 823, 839 (Conn. 2002) are distinguishable. (MOL at 32.) In *Pro Music Rights*, the plaintiff did not allege any non-conclusory facts that defendants acted unfairly, immorally, or in a way that caused substantial injury to others. 2020 U.S. Dist. LEXIS 236280, at *35. Similarly, in *J. Publishing*, plaintiff did not allege any deceptive or oppressive conduct and relied solely on exclusivity agreements that were customary in the newspaper industry to show unfairness. 804 A.2d at 839.

## VI.   PLAINTIFF ADEQUATELY ALLEGED, IN THE ALTERNATIVE, THAT DEFENDANTS MANIPULATED THE STANDARD-SETTING PROCESS AND BREACHED THEIR FRAND COMMITMENT TO X9

The SAC more than adequately alleges that in connection with the standard-setting process: (1) Defendants abused the process to maintain CUSIP numbers as the standard to ensure the profitability of their anticompetitive conduct in the CUSIP Use market; and (2) Defendants made an empty promise to X9 to offer licenses on FRAND terms and breached that promise.

A.      **Plaintiffs Adequately Allege that Defendants Manipulated the Standard-Setting Process**

Contrary to Defendants' contentions, Plaintiffs' allegations concerning Defendants' manipulation of the standard-setting process are neither conclusory nor limited to the fact that Defendants participated in the standard-setting process. (MOL at 19.) Defendants argue that the SAC only alleges "mere participation in standard setting" and no "misconduct" or ability for Defendants to control the vote. (*Id.* at 19-20.) Defendants are wrong. The SAC alleges that ABA and S&P exert "substantial control" over X9 evidenced by the significant ties and substantial overlap between the ABA (which owned X9 for years), CGS, and X9. (SAC ¶ 112.) For example, the SAC alleges that the ABA and S&P are full voting members of X9, controlled nearly 40% of the vote, and that their officers and high-ranking officials *influenced the CUSIP Working Group* (the working group responsible for reviewing and approving CUSIP as the national standard). (*Id.*) The SAC also alleges that despite their financial interests, the ABA and S&P participated in and did not abstain from approving CUSIP as the standard. (*Id.* ¶ 114.) The complaint alleges that the ABA and S&P were financially motivated to exploit CUSIP's position as the standard to exploit the CUSIP Use market. (*Id.*) Further, the complaint alleges that the ABA's FRAND commitment to X9 was an empty promise: X9 was influenced and controlled by the ABA, the party making the FRAND commitment, and its co-conspirator S&P (now FactSet)—all of which benefitted from the ABA's false promise. (*Id.* ¶ 121.)

These allegations taken in the aggregate are more than sufficient to plead that Defendants abused the standard-setting process. *Allied Tube & Conduit Corp. v. Indian Head* is instructive. In *Allied Tube*, the Supreme Court affirmed the trial court's finding that petitioner abused the standard-setting process by "packing" the board with loosely affiliated members comprising 30% of the standard body to vote against a proposal. 486 U.S. 492, 496-97, 511 (1988). In *Lotes Co. v.*

*Hon Hai Precision Industry Co.*, the court held that the complaint adequately alleged anticompetitive conduct by alleging that defendant falsely promised the standard-setting body that it would license its intellectual property on FRAND terms, the body relied on that promise, and defendant subsequently breached the FRAND commitment. 2013 U.S. Dist. LEXIS 69407, at *17-18 (S.D.N.Y. May 14, 2013). Here, the SAC similarly alleges that (1) the ABA and S&P packed the CUSIP Working Group with nearly 40% of the vote (as opposed to 30% in *Allied Tube*) to ensure that CUSIP remained the standard (SAC ¶¶ 112-14); and (2) the ABA falsely made a FRAND commitment to X9 as part of the standard-setting process, X9 relied upon that promise when it affirmed CUSIP as the standard, and the ABA breached its commitment. (*Id.* ¶ 121.) Defendants' citation to *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 436 (4th Cir. 2015), (MOL at 19-20), is off point because the plaintiff there merely alleged that "some of the defendants' representatives served on the relevant standard-setting panel" and, unlike here, made no allegation that defendants engaged in any misconduct to thwart the standard-setting process. *SD3, LLC*, 801 F.3d at 436.

Defendants' assertion that Plaintiffs conceded that FIGI is "not a viable alternative to CUSIP today" ignores why FIGI is not a viable alternative. (MOL at 20-21.) The SAC specifically alleges that FIGI is not a viable alternative, at least in part, *because Defendants controlled the standard setting process to ensure CUSIP remains the embedded standard*. (SAC ¶¶ 112-13 ("the ABA and S&P agreed and conspired to use their influence over X9 to help ensure that X9 would not choose FIGI as an alternative standard").) And far from being a "red herring" (MOL at 21), Defendants' manipulation of the standard setting process demonstrates the anticompetitive measures Defendants undertook to ensure CUSIP remained the standard and a profitable product.

Finally, Defendants' argument that Plaintiffs do not plead that Defendants prevented an alternative identifier to the CUSIP system is a strawman. (*Id.*) While FIGI may very well have been victim of Defendants' abuse of the standard-setting process in order to preserve their profit center in CUSIP (SAC ¶¶ 112-14), Plaintiffs' claims do not depend on proving FIGI was harmed. Rather, Plaintiffs' claims center on damages suffered by Plaintiffs and other class members resulting from Defendants' anticompetitive conduct in the CUSIP Use market, or, in the alternative, the breach of the FRAND commitment as discussed below.

### B.      Plaintiffs Sufficiently Pleaded a Breach of Contract Claim

Defendants only challenge a single element of Plaintiffs' breach of contract claim— whether the scope of the FRAND commitment applies to ABA's purported copyright or just to patents. (MOL at 33-35.) Defendants' challenge is without merit. Plaintiffs allege that the ABA filed a statement of willingness (the "Assurance") and entered a binding commitment to X9 to offer any license to the CUSIP database, or CUSIP numbers (if, *arguendo*, the Court finds they are protected by copyright and therefore that Defendants have a lawful right to demand a license), on FRAND terms. (SAC ¶¶ 115-20, 191.) Plaintiffs adequately allege that the Assurance applied as well to any copyright based on the description of the Assurance in the 2014 and 2020 CUSIP standard documents, the X9 procedures' description of the scope of Assurances, and CGS's confirmation that it will issue licenses on FRAND terms on its website. (*Id.* ¶¶ 116-120.)

Defendants' submission of evidence with its motion does not prove that the Assurance is limited to patents.[8] (MOL at 34.) The X9 procedures submitted with Defendants' motion do not prove that the FRAND commitment covers only patents because, as alleged in the SAC, X9's Assurance requirement applies to the use of *all* intellectual property ("IP"), including "trademarks,

---

[8] Tellingly, Defendants never identify what patents are supposedly covered by the Assurance.

copyrighted, or patented material." (SAC ¶ 116.) Defendants' footnoted argument (MOL at n.16) that this reference to trademarks and copyrighted material refers to *X9's* IP rights has no factual support and makes no sense; X9 *selects* the standard—it does not *contribute IP* to the standard.

Nothing in X9's procedures submitted by Defendants contradicts Plaintiffs' allegations that the ABA's Assurance applies to copyrighted material. As a result, there is no factual basis to reject on a motion to dismiss Plaintiffs' well-pled allegations on the scope of the ABA's FRAND commitment, which should be accepted as true. *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (court must accept "any set of facts consistent with the allegations"); *Javier v. Beck*, 2014 U.S. Dist. LEXIS 95594, at *9 (S.D.N.Y. July 3, 2014) (factual disputes are improper on a motion to dismiss); *Marriott Int'l, Inc. v. Downtown Ath. Club of N.Y.C., Inc.*, 2003 U.S. Dist. LEXIS 9570, at *13-15 (S.D.N.Y. June 6, 2003) (denying motion to dismiss after considering documents attached to complaint and finding documents do not contradict the allegations and raise fact issues). At most, Defendants raise a competing interpretation of the scope of the ABA's FRAND commitment. But when parties advance reasonable interpretations regarding the scope of a contract, "these interpretations cannot be resolved on a motion to dismiss." *Info. Superhighway, Inc. v. Talk Am., Inc.*, 274 F. Supp. 2d 466, 471 (S.D.N.Y. 2003).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss the SAC in its entirety.

Dated: April 3, 2023                                   Respectfully submitted,

/s/ *Ronald J. Aranoff*                                 /s/ *Leiv Blad*
David H. Wollmuth                                      Leiv Blad
R. Scott Thompson                                     Jeffrey Blumenfeld *pro hac vice*
Ronald J. Aranoff                                      Meg Slachetka
Ryan A. Kane                                          COMPETITION LAW PARTNERS PLLC
Grant J. Bercari                                       1101 Pennsylvania Avenue NW
Katherine E. McQuillen                               Washington, DC  20004
WOLLMUTH MAHER & DEUTSCH LLP           Telephone: (202) 742-4300
500 Fifth Avenue, 12th Floor                          Email: leiv@competitionlawpartners.com
New York, New York 10110                          jeff@competitionlawpartners.com
Telephone: (212) 382-3300                           meg@competitionlawpartners.com
dwollmuth@wmd-law.com
sthompson@wmd-law.com
raranoff@wmd-law.com                               /s/  *Robert N. Kaplan*
rkane@wmd-law.com                                  Robert N. Kaplan
gbercari@wmd-law.com                               Gregory K. Arenson
kmcquillen@wmd-law.com                            Elana Katcher
                                                      KAPLAN FOX & KILSHEIMER LLP
                                                      850 Third Ave., 14th Floor
                                                      New York, NY 10022
                                                      Telephone: (212) 687-1980
                                                      Email: rkaplan@kaplanfox.com
                                                      garenson@kaplanfox.com
                                                      ekatcher@kaplanfox.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 3rd day of April 2023, a true and correct copy of the foregoing was

filed electronically and is available for viewing and downloading from the Court's ECF System.

Notice of this filing will be sent to all counsel of record by operation of the ECF System.

*/s/ Grant J. Bercari*
Grant J. Bercari
