**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
DINOSAUR FINANCIAL GROUP LLC,          :
HILDENE CAPITAL MANAGEMENT,            :          Case Nos.  1:22-cv-1860-KPF,
LLC and SWISS LIFE INVESTMENT          :                         1:22-cv-1929-KPF
MANAGEMENT HOLDING AG, on behalf       :
of themselves and all others similarly :
situated,                              :
                                       :
                    Plaintiffs,        :
                                       :
          -against-                    :
                                       :
S&P GLOBAL, INC., AMERICAN             :
BANKERS ASSOCIATION, and FACTSET       :
RESEARCH SYSTEMS INC.,                 :
                                       :
                    Defendants.        :
                                       :
------------------------------------------------------------------X

 

**Defendants' Reply Brief in Further Support of Defendants'**
**<u>Motion to Dismiss Second Amended Class Action Complaint</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..............................................................................................................1

ARGUMENT ....................................................................................................................2

I.     PLAINTIFFS FAIL TO PLEAD A VALID ANTITRUST CLAIM. ...................................2

       A.     Plaintiffs' Allegations Cannot Support a Monopolization Claim. ..........................2

              1.     Plaintiffs Seek to Impose a Duty on Defendants to Help Rivals. ...............2

              2.     Plaintiffs Do Not Allege That CGS Licenses Harm Competition. .............7

       B.     Plaintiffs Do Not State a Cognizable Section 1 Group Boycott Claim. .................9

       C.     Plaintiffs Allege No Standard-Setting Misconduct by Defendants. .....................11

II.    PLAINTIFFS FAIL TO ALLEGE AN "ACTUAL CONTROVERSY"
       CONCERNING COPYRIGHT IN A CUSIP IDENTIFIER ALONE. ............................13

III.   PLAINTIFFS HAVE NOT ALLEGED A CONTRACT WITH X9 REGARDING
       COPYRIGHT IN A CUSIP IDENTIFIER. ......................................................................15

IV.    PLAINTIFFS HAVE NOT STATED VALID STATE LAW CLAIMS...........................15

       A.     Plaintiffs' N.Y. General Business Law § 349 Claim Should Be Dismissed..........15

       B.     The Connecticut Unfair Trade Practices Act Claim Should Be Dismissed..........17

CONCLUSION.................................................................................................................17

# TABLE OF AUTHORITIES

**CASES**                                                **Page(s)**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988) ...................................................................................................... 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................... 16

*Calabrese v. CSC Holdings, Inc.*,
283 F. Supp. 2d 797 (E.D.N.Y. 2003) ......................................................................... 16

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
851 F.2d 478 (1st Cir. 1988) ........................................................................................ 12

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*,
433 U.S. 36 (1977) .......................................................................................................... 7

*Cox v. Microsoft Corp.*,
2003 WL 25519800 (Sup. Ct. N.Y. Cnty. July 02, 2003)
*aff'd in relevant part*, 8 A.D.3d (1st Dep't 2004) ....................................................... 16

*Duran v. Henkel of Am., Inc.*,
450 F. Supp. 3d 337 (S.D.N.Y. 2020) .......................................................................... 16

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*,
129 F.3d 240 (2d Cir. 1997) ........................................................................................... 9

*Feist Publications., Inc. v. Rural Telephone Service Co.*,
499 U.S. 340 (1991) ........................................................................................................ 6

*Fourth Estate Publ'g Benefit Corp. v. Wall-Street.com, LLC*,
139 S. Ct. 881 (2019) ................................................................................................... 14

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) .......................................................................................... 8

*In re Adderall XR Antitrust Litig.*,
754 F.3d 128 (2d Cir. 2014) ........................................................................................... 7

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005) .......................................................................... 11

ii

*In re Inclusive Access Course Materials Antitrust Litig.*,
   2021 WL 2419528 (S.D.N.Y. June 14, 2021) ........................................................... 10

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................................... 6, 7

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959) ................................................................................................ 9

*Liveuniverse, Inc. v. Myspace, Inc.*,
   2007 WL 6865852 (C.D. Cal. June 4, 2007)
   *aff'd*, 304 F. App'x 554 (9th Cir. 2008) ................................................................... 7

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) .............................................................................................. 13

*MiniFrame Ltd. v. Microsoft Corp.*,
   2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013) ........................................................... 4

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
   364 F.3d 1288 (11th Cir. 2004) ............................................................................... 6

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*,
   323 F. Supp. 2d 559 (S.D.N.Y. 2004) ............................................................... 4, 5, 7

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*,
   389 F. Supp. 2d 527 (S.D.N.Y. 2005)
   *aff'd in relevant part*, 497 F.3d 109 (2d Cir. 2007) ................................................ 5, 6

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998) ................................................................................................ 9

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009) ................................................................................................ 3

*PharmacyChecker.com LLC v. National Ass'n of Boards of Pharmacy*,
   530 F. Supp. 3d 301 (S.D.N.Y. 2021) ..................................................................... 10

*PLS.com LLC v. National Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) .................................................................................. 10

*Reed Elsevier, Inc. v. Muchnick*,
   559 U.S. 154 (2010) .............................................................................................. 14

*Rural Tel. Serv. Co. v. Feist Pub'ns, Inc.*,
   957 F.2d 765 (10th Cir. 1992) ................................................................................. 6

iii

*Samara Bros., Inc. v. Wal-Mart Stores, Inc.*,
   165 F.3d 120 (2d Cir. 1998)
   *rev'd on other grounds by* 529 U.S. 2005 (2000) ....................................................................... 17

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) .......................................................................................................... 12

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ............................................................................................................................ 4

*Windstream Servs., LLC v. BMG Rights Mgmt.*,
   2017 U.S. Dist. LEXIS 58204 (S.D.N.Y. Apr. 17, 2017) ....................................................... 14

*We Shall Overcome Found. v. Richmond Org., Inc. (TRO Inc.)*,
   221 F. Supp. 3d 396 (S.D.N.Y. 2016) ........................................................................................ 17

## STATUTES

17 U.S.C. § 411 .............................................................................................................................. 14

## OTHER AUTHORITIES

Introduction, ANSI X9.145-2021, Financial Instrument Global Identifier (2021) ...................... 15

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (Aug. 2022 update) .............................. 9

X9 Owned Intellectual Property Policy, Standing Doc. # SD018 (October 19, 2018) ................. 15

iv

## INTRODUCTION

More than fifty years ago, the financial industry created the CUSIP standard to fill the need for a common identifier for securities in the United States.  Since then, CGS has issued CUSIP identifiers and, separately and at its own expense, created and maintained the CGS Database, which integrates valuable information about every CUSIP-identified security. Plaintiffs do not allege the CUSIP identifier became a de facto industry standard or was adopted for use in government regulatory filings via anticompetitive means.  Instead, Plaintiffs contend that CGS's model for licensing access to its CGS Data, which limits licensees' ability to free ride off CGS's decades of investment and effort, constitutes unlawful monopolization and/or a *per se* unlawful group boycott in violation of Section 1 or 2 of the Sherman Act.  Plaintiffs further assert that Defendants have manipulated the X9 standard setting body to block the emergence of competing identifiers, even while belatedly conceding that X9 accepted Bloomberg's competing identifier, FIGI, as a proper standard.

None of Plaintiffs' allegations states a legally cognizable claim, and their opposition reinforces that conclusion.  To Defendants' argument that CGS's licenses merely protect its investment in the CGS Database, Plaintiffs respond with contentions that are either contradicted by their own allegations or misleadingly link the antitrust questions before the Court to copyright law.  To Defendants' argument that Plaintiffs have not alleged that CGS's licensing model harms competition—which is unsurprising given that this case is really about Plaintiffs' desire to gain access to CGS Data for free—Plaintiffs offer only conclusory assertions.  Plaintiffs also have no response to Defendants' argument that Plaintiffs have failed to allege a horizontal agreement among the Data Vendors to boycott downstream users.  As for their X9 claims, Plaintiffs effectively jettison them by contending, for the first time, that these claims apply "if and only if"

the Court finds that the CUSIP identifier is copyrightable.  Since that issue is non-justiciable,

Plaintiffs' X9 allegations must fail.  Plaintiffs cannot salvage them with new contentions found

nowhere in the Second Amended Complaint (the "SAC") that do not, in any event, suggest

manipulation of standard setting.

Plaintiffs' remaining claims are equally specious.  Plaintiffs' copyright claim fails as they

allege no actual controversy concerning copyright in a CUSIP identifier.  Plaintiffs' breach of

contract claim fails because the X9 "assurance" they cite concerns patents, not copyright and

thus, there is no contract.  Finally, Plaintiffs' state law claims fail because they do not allege a

deceptive statement and are derivative of the failed antitrust and copyright claims.  Plaintiffs

have now had three bites at the apple, and the Court should dismiss all claims with prejudice.

## ARGUMENT

### I. PLAINTIFFS FAIL TO PLEAD A VALID ANTITRUST CLAIM.

#### A. Plaintiffs' Allegations Cannot Support a Monopolization Claim.

##### 1. Plaintiffs Seek to Impose a Duty on Defendants to Help Rivals.

While Section 2 of the Sherman Act requires anticompetitive exclusionary conduct, the

SAC alleges none.  Antitrust law imposes no duty on dominant firms to help their competitors.

*See* Defs.' Mem. of Law in Support of Defs.' Mot. to Dismiss the SAC (ECF 91) ("Mot.") at 11-

12.  Yet, Plaintiffs' Opposition, like the SAC, makes clear that Plaintiffs are seeking to compel

Defendants to provide precisely such assistance to potential rivals.  *See* Pls.' Mem. of Law in

Opposition to Defs.' Mot. to Dismiss the SAC (ECF 102) ("Opp.") at 3 (arguing that, by

restricting use of their data, Defendants are "prevent[ing] potential competitors from developing

a competing product or service"); SAC ¶ 158 (CUSIP Users "would [have been] free to compete with Defendants and innovate in the use of CUSIPs" absent CGS's licenses).[1]

Plaintiffs respond by contending: (i) Plaintiffs "want and need nothing from Defendants" (Opp. at 9); (ii) CGS supposedly colluded with Data Vendors to create its licensing model (*id.*); (iii) Defendants do not own the data in question, so have no right to control its downstream use (*id.* at 11–12); and, (iv) even if Defendants have the right to control use of their data, that right does not extend to "preexisting facts" (*id.* at 8, 11).  All these arguments fail because they are contradicted by Plaintiffs' own allegations or are based on a misreading of the law.

First, Plaintiffs' disingenuous claim that because they get what they need from Data Vendors, they "want and need nothing from Defendants" is contradicted by their own allegations. *Id*. at 9.  Plaintiffs allege Data Users "must have," at a minimum, the CUSIP identifier, the name of the issuer, and the security type.  SAC ¶¶ 9, 49.  As Plaintiffs acknowledge, Data Vendors do not originate this information; they receive it under a license from CGS.  *See id.* ¶ 58.  Plaintiffs are merely downstream recipients of CGS's data within the scope of those Data Vendors' license terms.  *Id.* ¶ 47.  CGS has the right to set "the prices, terms, and conditions" upon which Data Vendors can redistribute CGS Data and under which CUSIP Users, including Plaintiffs, access and use its data, whether received directly from CGS (which Plaintiffs tellingly do not challenge) or indirectly through Data Vendors.[2]  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

---

[1] Plaintiffs misleadingly suggest that Defendants admit that all CUSIP Users are potential competitors.  Opp. at 1.  Defendants' motion merely described Plaintiffs' allegations.

[2] Plaintiffs' class definition excludes CUSIP Users that access CGS Data through direct agreements with CGS as opposed to through the data feeds provided to them by Data Vendors.  *See* SAC ¶ 135.  That is damning because CUSIP Users that get CGS Data directly from CGS are required to abide by the same restrictions on use—internal use only—as those that access the data indirectly through Data Vendors.  *See id.* ¶ 84.

Second, the SAC alleges no facts that show CGS adopted its licensing model in conspiracy with Data Vendors.  To the contrary, the SAC acknowledges the CGS Database has been compiled and maintained by S&P (and now FactSet) over decades, and that S&P has continuously protected its investment—including when it "scrapped the historical subscription model in favor of a 'license' model."  SAC ¶ 47.  That allegation shows unilateral conduct.  This unilaterally determined license model does not become unlawfully collusive simply because it limits the rights of, and imposes obligations on, Data Vendors.  That would turn every distribution model into a concerted refusal to deal, but that is not the law.  *See* Mot. at 11–13.  As Defendants' motion showed, lawful business strategies intended to protect a company's investment are frequently implemented through licensing agreements.  *See e.g., N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559 (S.D.N.Y. 2004) ("*NYMEX I*") (rejecting antitrust challenge to user restriction in license).  Indeed, *NYMEX I* and *Miniframe* confirm that *Trinko* and unilateral duty to deal principles preclude antitrust liability, even when a refusal to deal is implemented through an agreement that limits the customer's ability to re-sell the defendant's product to customers who intend to use it to compete with the defendant.  *See NYMEX I*, 323 F. Supp. 2d at 571; *MiniFrame Ltd. v. Microsoft Corp.*, 2013 WL 1385704, at *4–5 (S.D.N.Y. Mar. 28, 2013); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).

Third, Plaintiffs' contention that CGS does not own the data it seeks to protect is belied by their own allegations.  Plaintiffs admit that the "data elements" they purportedly seek—the CUSIP identifier, issuer name, and type of issue—are part of the CGS Database, which CGS created, owns, and has maintained for decades.  SAC ¶¶ 6, 37.

Fourth, Plaintiffs obfuscate straightforward antitrust principles by incorrectly conflating them with copyright law.  Plaintiffs suggest that, even if Defendants were "permitted to refuse to provide the CUSIP_DB compilation to its competitors, [they] could not stop those competitors from using the preexisting facts in the compilation."  Opp. at 8.  This just restates Plaintiffs' false premise that CGS's right under the antitrust laws to set the terms upon which it will deal must rely upon copyright protection for the CGS Database compilation.  That is not the law.  Database owners are entitled to protect their business interests even in non-copyrightable databases.  Mot. at 12–14, 18; *see infra*, Section II.

Plaintiffs attempt a similar sleight of hand with their contention that "*NYMEX I, II* and *III* therefore establish that a monopolist may not prevent anyone, including its potential competitors, from using the preexisting facts in a copyrighted database."  Opp. at 11.  This is tantamount to arguing a database "facts" exception to the bedrock principle that firms have no duty to lend a helping hand to their competitors.  Plaintiffs offer no authority for that argument, and the *NYMEX* cases, properly construed, refute it.  *See* Mot. at 12.  *NYMEX I* confirms that a dominant firm's ability to restrict the use of its property does not depend on whether it is protected by copyright.  323 F. Supp. 2d at 572, n.2.  Had the court viewed copyrightability as the predicate to NYMEX's right to set the terms upon which it would license its property interests, it would have reserved judgment on the antitrust claims until the copyright questions were adjudicated on summary judgment.  That it did not do so disposes of Plaintiffs' argument, and the fact that *NYMEX II* ultimately rejected the copyright claim, while not revisiting its previous antitrust ruling, does nothing to support Plaintiffs' argument.  *N.Y. Mercantile Exch., Inc. v.*

*Intercontinental Exch., Inc.*, 389 F. Supp. 2d 527, 537–38 (S.D.N.Y. 2005) ("*NYMEX II*"), *aff'd in relevant part*, 497 F.3d 109 (2d Cir. 2007) ("*NYMEX III*").[3]

Plaintiffs cannot salvage their claims by directing the Court to *Feist Publications., Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991), a decision that addressed only copyright issues, not antitrust. *See, e.g.*, *Morris Commc'ns Corp. v. PGA Tour, Inc.,* 364 F.3d 1288, 1297 (11th Cir. 2004) (holding *Feist* irrelevant in an antitrust case). Indeed, in *Feist* on remand, the Tenth Circuit *rejected* the argument that antitrust law precludes the owner of a *non*-copyrightable white pages database from setting terms or refusing to license its property. *Rural Tel. Serv. Co. v. Feist Pub'ns., Inc.*, 957 F.2d 765 (10th Cir. 1992) (finding no Section 2 violation where claimant failed to prove the licensing conduct had anticompetitive effects). If that is true for access to the *non*-copyrightable data compilation at issue in *Feist*, it is certainly true for the CGS Database.

Lastly, Plaintiffs' reliance on *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019), is misplaced. *In re Keurig* did not concern a firm seeking to restrict the use of its own product. To the contrary, Keurig's agreements sought to block its rivals' access to *independent* sources of supply and distribution for their products. *Id.* at 238 (noting that Keurig entered into agreements that restricted companies from "sell[ing] machinery to Keurig competitors who intend to use it to make" competing products). Plaintiffs do not allege any such conduct here. To the contrary, Plaintiffs acknowledge that, regardless of Defendants' alleged restrictions, any entity can build its own competing database from publicly available sources. Mot. at 7 (citing SAC ¶ 133). CGS only requires Data Users to take a license

---

[3] Although the *NYMEX II* copyright decision is substantively irrelevant to the antitrust issues here, the non-copyrightability of the NYMEX settlement prices also is distinguishable because that case involved NYMEX's post-litigation attempt to register copyright in its settlement prices alone, which was rejected by the Copyright Office, followed by a belated registration of a broader compilation including the settlement prices.

to download bulk data originating from CGS—thereby preventing free riders from using CGS

Data to create a rival database product for the mere cost of a subscription.[4]  *See* Mot. at 10–

11.  *In re Keurig* provides no support for Plaintiffs' argument.

### 2.  Plaintiffs Do Not Allege That CGS Licenses Harm Competition.

Plaintiffs speculate, without supporting factual allegations, that CGS licenses that charge

licensing fees and limit licensees' redistribution of CGS Data "exclude potential competition"

because otherwise Data Users could create "innovative new services," such as "management

solutions."  Opp. at 6.  But Plaintiffs concede that CUSIP Users can use independent, non-CGS

sources of data, including publicly-available CUSIP identifiers, if they wish to compete with

CGS.  Mot. at 7; *see also* SAC ¶ 133 ("CUSIP numbers can be created based on public data").[5]

Plaintiffs offer no allegations to show that CGS's licenses restrict the use of alternative identifier

systems that could compete against the CUSIP system.  *See* Mot. at 15–16.

As a result, CGS's licenses do not result in any harm to "[i]nterbrand competition,"

which "is the primary concern of antitrust law."  *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S.

36, 51 n.19 (1977).  Additionally, Plaintiffs fail to explain how contractual provisions preventing

Data Vendors from re-distributing CGS's proprietary data to Data Users who have not contracted

with CGS directly excludes *any* otherwise viable competitor from the "market for using

---

[4] Plaintiffs mischaracterize Defendants' argument as a "defense" that is improper at this stage of the case.  As the cases dismissing similar claims on the pleadings show, it is procedurally proper to address on a motion to dismiss claims that seek to impinge on the principle that a firm need not assist its rivals by allowing unrestricted use of the firm's property.  *See NYMEX I*, 323 F. Supp. at 571 (NYMEX's "legitimate interest in preventing rivals from free-riding" on its reputation constitutes a legitimate business justification for refusal to deal); *Liveuniverse, Inc. v. Myspace, Inc.*, 2007 WL 6865852, at *11–12 (C.D. Cal. June 4, 2007), *aff'd*, 304 F. App'x 554 (9th Cir. 2008) (dismissing refusal to deal claim and noting that free-riding argument is "appropriate for determination on a motion to dismiss").

[5] Plaintiffs appear to abandon their claims regarding Xignite, making only a passing reference to those allegations.  Opp. at 6.  But, as noted in Defendants' motion, the Xignite allegations do not plead harm to competition because Plaintiffs do not explain why Xignite would need access to CGS Data if it were able to create its competing CUSIP product from independent sources.  Mot. at 15–16.

identifying numbers after initial issuance." *See* Mot. at 21 (quoting SAC ¶ 126); *see also In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (conduct is anticompetitive where it "eliminates competition"). Requiring Data Users to pay CGS directly—rather than, *e.g.,* CGS charging Data Vendors a fee based on resale volume—excludes no one. Mot. at 10, 17. Moreover, Plaintiffs' claim that CGS's vertical licensing agreements raise rivals' costs (Opp. at 6, citing SAC ¶ 152) is conclusory because the SAC fails to explain how CGS licensing fees burden potential rivals' ability to compete.

For these reasons, among others, dismissal is also warranted under the Ninth Circuit's decision in *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020). Like the Data Users here, Qualcomm's customers (mobile phone manufacturers or "OEMs") allegedly preferred to pay other companies (chipmakers) for Qualcomm's technology. *Id.* at 982-86. Qualcomm's pricing agreements required that the OEMs pay Qualcomm directly for its technology even if they acquired that technology from a rival chipmaker. The court held the pricing policy was lawful not because of patent rights, as Plaintiffs claim (Opp. at 16), but because the pricing was "'chip-supplier neutral' and [thus did] not undermine competition in the relevant antitrust markets." 969 F.3d at 1005;[6] *see also id.* at 1002 ("[I]f the condition imposed on gaining access to Qualcomm's chip supply applies regardless of whether the OEM chooses Qualcomm or a competitor . . . then the condition by definition does not distort the 'area of effective competition' or impact competitors."). CGS's licensing model is similarly Data Vendor neutral, SAC ¶¶ 47, 54, thus excluding no competition.

---

[6] Plaintiffs wrongly claim this citation refers to the section on substantial foreclosure, *id.* at 1003-05. *See* Opp. at 16. The cite points to Section IV, the conclusion, which explains the fundamental basis for the holding that the pricing strategy was not anticompetitive.

**B.     Plaintiffs Do Not State a Cognizable Section 1 Group Boycott Claim.**

Plaintiffs do not dispute that agreements that are not anticompetitive for purposes of Section 2 cannot support a claim under Section 1, given that both sections require anticompetitive conduct.  *See* Mot. at 22.  Nor can they circumvent that principle by attempting to reassert a *per se* group boycott claim, which they dropped from the SAC.  As Defendants' motion showed, a *per se* group boycott claim requires a horizontal agreement, and Plaintiffs allege only vertical agreements between CGS, Data Vendors, and Data Users.  Mot. at 23; *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135, 138 (1998) ("[A]ntitrust law does not permit the application of the *per se* rule in the boycott context in the absence of a horizontal agreement").  Plaintiffs neither contest that point of law nor respond to Defendants' showing that their own allegations demonstrate the agreements between CGS and Data Vendors that supposedly constitute a group boycott are vertical.  If, as Plaintiffs allege, CGS controls 100% of the alleged "CUSIP Use Market" (SAC ¶ 126), CGS faces no rivals in the relevant market and the Data Vendors that distribute CGS Data cannot be horizontal competitors of CGS.[7]  They instead must be vertical distributors of CGS Data.

Nonetheless, Plaintiffs propose that CGS's vertical distribution arrangements supposedly fit the "fact pattern" of cases where courts have found a *per se* boycott.  That is wrong.[8]  Each case Plaintiffs cite involves *horizontal agreements among competitors*, which Plaintiffs do not allege.  In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, plaintiff alleged that "manufacturers and

---

[7] Moreover, it is well established that so-called dual distribution agreements between a manufacturer and a distributor are *vertical* restraints to which the *per se* rule is inapplicable, "even if the distributor and manufacturer also compete at the distribution level."  *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.,* 129 F.3d 240, 243 (2d Cir. 1997).

[8] Section 1 group boycott claims also are not intended to cover a single manufacturer's product.  Plaintiffs ignore the principles expressed in cases like *Elecs. Commc'ns.*, 129 F.3d at 244 and in the leading antitrust treatise, that "the core reason for intense antitrust concern about 'boycotts' is the aggregation of the power of several competitors—a reason that does not apply to distribution restraints involving a single manufacturer's product."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law Antitrust Law ¶ 1644c (Aug. 2022 update); *see* Mot. at 23–24.

distributors of . . . well-known brands . . . conspired *among themselves* and with" plaintiff's competitor.  359 U.S. 207, 209 (1959) (emphasis added).  Similarly, in *PLS.com, LLC v. National Ass'n of Realtors*, the plaintiff alleged that several competing multiple listing services conspired to prevent it from gaining a foothold in the market.  32 F.4th 824, 829 (9th Cir. 2022).  The plaintiff in *PharmacyChecker.com, LLC v. National Ass'n of Boards of Pharmacy* asserted various "plus factors," which tend to show an agreement among rivals, and therefore sufficiently alleged that multiple horizontal competitors in the pharmaceutical industry executed a coordinated boycott.  530 F. Supp. 3d 301, 334–37 (S.D.N.Y. 2021) (*per se* group boycott where allegations included a "common motive to conspire," various "parallel acts against self-interest" and "a high-level of interfirm communications") (internal quotation marks and quotations omitted).  No such facts have been alleged here.

Plaintiffs cannot remedy their failure to allege a horizontal agreement by asserting that the Data Vendors knew that rival Data Vendors had also agreed to the CGS license terms that Plaintiffs claim constituted a boycott.  *See* Opp. at 17 ("TPDVs 'agreed to insert into the [TPDVs'] contracts with CUSIP Users clauses . . . .'").  As Defendants note in their motion, the sole basis for this purported industry-wide *knowledge* across Data Vendors was correspondence between S&P and Hildene, which is a downstream user, not a Data Vendor.  *See* SAC ¶¶ 56-57.  This isolated allegation fails to show industry-wide knowledge across Data Vendors.  Nor do Plaintiffs respond to Defendants' argument that, even if they had alleged such industry-wide knowledge, their allegations of horizontal conspiracy would still fail.  Alleged *awareness* among Data Vendors regarding CGS's licensing requirements does not turn multiple vertical agreements into a horizontal conspiracy.  *See* Mot. at 24-25 (citing cases)*; see also, In re Inclusive Access Course Materials Antitrust Litig.*, 2021 WL 2419528, at *11 (S.D.N.Y. June 14, 2021) (in a

"hub-and-spoke conspiracy," mere awareness is not enough; and, a failure to plead actual horizontal *agreements* among downstream competitors is "fatal" to an alleged group boycott claim).

### C.     Plaintiffs Allege No Standard-Setting Misconduct by Defendants.

As Defendants' motion explained, Plaintiffs admit that, due to industry demand for a common identifier and governmental reporting requirements, CUSIPs have been the de facto standard for financial identifiers for over 50 years.  Mot. at 9 (citing SAC ¶¶ 35-37).  It is therefore unsurprising that Plaintiffs allege no facts demonstrating that either the adoption or re-adoption of CUSIP as a national standard violates the antitrust laws.  *Id.* at 19.  Moreover, Defendants' mere participation in the standard setting organization, X9, is wholly insufficient to support any of Plaintiffs' claims.  *Id.* at 19–20.

Plaintiffs respond by conceding they are pressing their X9 manipulation claims "in the alternative" *only* if the Court first finds that CUSIP identifiers are copyrighted.  *Id.* at 3–4, 31. Because Plaintiffs' copyright claim must be dismissed for lack of a justiciable controversy, the Court should dismiss the manipulation claim as well.  *See infra*, Section II.  Beyond this, Plaintiffs offer two new assertions of claimed impropriety concerning the re-adoption of the CUSIP standard, neither of which was alleged in the SAC.  First, Plaintiffs improperly supplement their allegations by claiming the ABA and S&P "did not abstain from approving CUSIP as the standard."  Opp. at 32 (citing SAC ¶ 114).  Even if that were sufficient to show anticompetitive conduct, and it is not, it is nowhere in the SAC and is improper.  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 449, n.102 (S.D.N.Y. 2005) (dismissing claim and noting that plaintiffs' "reference to facts not alleged in the complaint is clearly improper").  The same is true of Plaintiffs' second improper attempt to insert a new allegation through their opposition—that

CUSIP was renewed based on a supposedly false FRAND commitment by the ABA.  Opp. at 33 (citing SAC ¶ 121).

Plaintiffs' remaining arguments concerning X9 are easily dispensed with.  Plaintiffs assert that X9 standard-setting was thwarted because Defendants had a financial interest in the outcome, controlled 40% of the vote, and "influenced" the CUSIP working group.  *Id.* at 32–33. Those allegations are insufficient.  In *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 487-89 (1st Cir. 1988) (Breyer, J.), the court rejected a manipulation claim even though the defendants' members (all of which had a financial interest in the outcome) comprised 6 of the 16 voting members of the subcommittee recommending the standard.  The court distinguished *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988), on the ground that the defendant there engaged in "improper practices" by "paying for and packing a meeting with voters who had little to no professional interest in the subject matter."  *Clamp-All*, 851 F.2d at 488.  Just as in *Clamp-All*, Plaintiffs allege no such "improper practices" here.  "It is not problematic, standing alone, for market participants *to try to influence* the standard-setting process through the organization's ordinary procedures."  *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 436 (4th Cir. 2015) (emphasis added).[9]

Finally, in arguing that FIGI was not a viable alternative due to Defendants' purported manipulation of X9 to prevent FIGI's adoption as a standard, *see* Opp. at 33, Plaintiffs ignore their own allegations.  The SAC alleges that FIGI "is not a viable alternative to CUSIP today because of the required use of CUSIPs in various regulatory filings and the universal use of CUSIPs throughout the United States financial system."  SAC ¶ 113.  Plaintiffs allege no facts

---

[9] Plaintiffs assert the CUSIP Working Group is responsible for "approving CUSIP as the national standard."  Opp. at 32.  But the SAC alleges no facts showing the CUSIP Working Group (not X9's full voting membership) had authority to approve standards, much less that it had any authority regarding FIGI's adoption as an X9 standard.

showing that either the required use of CUSIPs in regulatory filings or the "universal use" of CUSIPs resulted from anticompetitive conduct.

## II.     PLAINTIFFS FAIL TO ALLEGE AN "ACTUAL CONTROVERSY" CONCERNING COPYRIGHT IN A CUSIP IDENTIFIER ALONE.

Defendants' motion explained that the SAC fails to allege any non-conclusory facts showing Plaintiffs were ever threatened with enforcement based on copyright in a CUSIP identifier.  *See* Mot. at 26–28.  Plaintiffs have no response to Defendants' showing that the "Copyright and Proprietary Rights" covered by the CGS Subscription Agreement do not even mention copyright in a CUSIP identifier.  *See* Mot. Exs. 1–3 §§ 1–2.  The cited contemporaneous correspondence confirms that Plaintiffs knew the licenses were based on the CGS Database, not on copyright in CUSIP identifiers.  The SAC states that, when S&P wrote to Swiss Life that "CUSIP data is our intellectual property," Swiss Life understood that the "reference to 'CUSIP data'" meant "CUSIP numbers, issuer names, and types of issue, *which is what S&P proposed Swiss Life 'license'*"—not CUSIP identifiers alone.  SAC ¶ 104 (emphasis added); *see* Opp. at 20–22.  Hildene likewise understood S&P's references to "CGS Data" to mean not just CUSIP identifiers but "the CUSIP numbers, issuer names, and types of issue"—which was "the only data that Hildene sought to license."  SAC ¶¶ 106–07, 109–10.  *See* Mot. at 27 (citing references in correspondence to "CGS Data" or "proprietary CUSIP data"); *see also* SAC ¶ 87 (alleging S&P proposed Dinosaur enter into a license agreement for "proprietary CUSIP data").  Thus, Plaintiffs' factual allegations refute their conclusory suggestions that Defendants ever asserted against Plaintiffs copyright in "CUSIP identifiers"—which is the sole basis of Plaintiffs' declaratory judgment claim.  SAC ¶¶ 164–67.

For this same reason, Plaintiffs cannot bring the SAC within the penumbra of *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), where those who refused to pay

royalties would be subject to suit for infringement of specific licensed patents.  In contrast, Plaintiffs here faced no threat by Defendants relating to copyright in a CUSIP alone, regardless of whether Plaintiffs refused to sign or later breached the CGS Subscription Agreement. Plaintiffs' citation to *Windstream Servs., LLC v. BMG Rights Mgmt. (US) LLC*, 2017 U.S.  Dist. LEXIS 58204 (S.D.N.Y. Apr. 17, 2017), further confirms why Plaintiffs' declaratory judgment claim should be dismissed.  That court dismissed Windstream's declaratory judgment claim because Windstream had not been threatened with enforcement as to any specific BMG copyrights.  Plaintiffs similarly fail to allege an "actual controversy" because they have not alleged any threatened assertion of rights based on copyright in a CUSIP identifier alone.

Further, Plaintiffs still cannot explain how they could have faced a sufficiently definite and concrete threat of enforcement where Defendants never registered copyright in a CUSIP identifier alone.  Mot. at 26.  Plaintiffs admit as much by conceding Defendants only threatened *non*-copyright enforcement against them:  "The license permits the Defendants to file *non-infringement* litigation . . . for breach of the license," or "to obtain an injunction [against use of] CUSIP numbers, issuer names, and types of issue"—which, Plaintiffs understood, means "CUSIP data," not CUSIP identifiers.  Opp. at 25 (emphasis added).  Plaintiffs' professed concern that, more than 50 years after registering copyright in the CGS Database, the ABA "could" register copyright in a CUSIP identifier "at any time," merely proves any threat of litigation based on a CUSIP identifier alone was purely hypothetical and not an "actual controversy." *Id.* at 25-26.[10]

---

[10] Plaintiffs' reliance on *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010), is misplaced.  Although the Supreme Court there held federal court jurisdiction does not hinge on copyright registration, it later affirmed that registration remains a mandatory precondition to filing an infringement suit. *Id.* at 171; *Fourth Estate Publ'g Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881 (2019); *see* 17 U.S.C. § 411.  Thus, the relevant question for this case is whether these Plaintiffs faced a definite and concrete threat of suit based on copyright in a CUSIP identifier alone, so as to demonstrate the existence of an "actual controversy"—a question to which *Fourth Estate* answers "no."

### III.   PLAINTIFFS HAVE NOT ALLEGED A CONTRACT WITH X9 REGARDING COPYRIGHT IN A CUSIP IDENTIFIER.

Defendants' motion demonstrated that Plaintiffs have failed to allege that the ABA's "statement of willingness" created a contract with X9 concerning copyright in a CUSIP identifier because X9's Patent Policy and procedures require only representations by a "patent holder" concerning patent rights and patent applications.[11]  *See* Mot. at 33–35 & n.16; *id.* Exs. 4–5.  As Defendants further showed, the only policy document adopted by X9 that explicitly covers copyrights applies only to copyrighted documents owned by X9 itself, and by its express terms does not apply to third parties.  *See X9 Owned Intellectual Property Policy*, Standing Doc. # SD018 (Oct. 19, 2018), https://x9.org/wp-content/uploads/2018/10/X9-Intellectual-Property-Policy-2018.docx (declaring that "intellectual property not owned by X9 are outside the scope of this policy.").  Plaintiffs' suggestion that it "makes no sense" for X9 to apply its "X9 Owned Intellectual Property Policy" to itself, Opp. at 34–35, is thus facially refuted by the document's title and substantively refuted by its content.  Indeed, the standards documents for the CUSIP and FIGI identifiers referenced in the SAC each include an X9 copyright notice, with "All rights reserved."  *See* Mot. Exs. 4–5.  Thus, X9's only copyright policy imposed no FRAND obligation, and created no contract, with respect to any copyrighted property held by Defendants.

### IV.   PLAINTIFFS HAVE NOT STATED VALID STATE LAW CLAIMS.

#### A.   Plaintiffs' N.Y. General Business Law § 349 Claim Should Be Dismissed.

Plaintiffs' Opposition merely rehashes the same unsubstantiated legal conclusions that litter their SAC.  *See* Opp. at 26–27.  The "deceptive acts" alleged are that Defendants told them

---

[11] The same boilerplate "statement of assurance" of patent rights also appears in the X9 FIGI standard.  *See* Introduction, ANSI X9.145-2021, Financial Instrument Global Identifier, vii (2021) ("FIGI Standard"), https://x9.org/wp-content/uploads/2021/08/ANSI-X9.145-2021-Financial-Instrument-Global-Identifier-FIGI.pdf at vii.

15

"license agreements were necessary to use just CUSIP numbers." *Id.* at 26 (citing SAC ¶¶ 86–88). Defendants do require licenses for Plaintiffs to download in bulk the CGS Data Plaintiffs seek, which the SAC repeatedly alleges as including the CUSIP identifier, the issuer name, and type of security. *See* SAC ¶¶ 48-49, 83, 87, 104. Despite Plaintiffs' mischaracterizations of the letters cited in the SAC, Opp. at 26–27; *see also* SAC ¶¶ 107–10, the SAC does not allege that Defendants told Plaintiffs they needed a license because CUSIP identifiers are copyrighted. Describing CGS Data (including CUSIP identifiers) as "proprietary" (*id.* ¶ 87) is not an assertion of copyright; it is proprietary to CGS because of the time, expense, and effort involved in creating and maintaining this data. Nor is a threat to "pursue 'all available remedies,'" *id.* ¶ 109, for unauthorized use of CGS Data a threat to pursue "copyright litigation." Opp. at 28. At bottom, Plaintiffs' state law claims rely on the same flawed theory as their antitrust claims, *i.e.*, that Defendants must possess a copyright in discrete elements of the CGS Data they provide to license access to that data. That is not the law. *See* Mot. at 26–27.

The cases Plaintiffs cite are inapposite because they involved actual deceptive statements, which the SAC fails to allege. *See Calabrese v. CSC Holdings, Inc.*, 283 F. Supp. 2d 797, 814–15 (E.D.N.Y. 2003) ("defendants falsely stated that merely possessing a cable television decoder is illegal"); *Cox v. Microsoft Corp.*, 2003 WL 25519800 (Sup. Ct. N.Y. Cnty. July 02, 2003), *aff'd in relevant part*, 8 A.D.3d 39 (1st Dep't 2004) (Microsoft misled consumers regarding reasons competing software applications would not work with Windows).[12]

---

[12] *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020), does not help Plaintiffs. Inquiring whether a deceptive practice is likely to mislead a reasonable consumer requires a deceptive practice as a threshold matter. Failure to adequately plead deception warrants dismissal of Plaintiffs' NY GBL claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (dismissal permissible where complaint fails to contain sufficient factual matter to state a claim for "relief that is plausible on its face") (internal quotation marks and citation omitted).

Further, Plaintiffs allege no cognizable harm under the GBL.  They contend they suffered injury because the fees they paid "should have been zero" (Opp. at 29), thereby conceding their alleged harm is just the product's purchase price, which is legally insufficient.  *See* Mot. at 30.

Finally, Plaintiffs' attempt to resist federal preemption of their Section 349 claim is unpersuasive.  Plaintiffs' only alleged deception is that Defendants asserted a license over uncopyrighted material.  That is materially indistinguishable from the deception alleged in *We Shall Overcome Found. v. Richmond Org., Inc. (TRO Inc.)*, 221 F. Supp. 3d 396, 412 (S.D.N.Y. 2016), which the court found "not qualitatively different than the plaintiffs' request for a declaration that the defendants have no valid copyright."  *Id.*  Moreover, *Samara Bros., Inc. v. Wal-Mart Stores, Inc.*, 165 F.3d 120 (2d Cir. 1998), *rev'd on other grounds by* 529 U.S. 2005 (2000), is irrelevant because that case was a "passing off" case, not a claim based on copyright. *See We Shall Overcome*, 221 F. Supp. 3d at 412.

### B.    The Connecticut Unfair Trade Practices Act Claim Should Be Dismissed.

Because Plaintiffs rely on the same alleged "deceptive" conduct for their CUTPA claim as for their GBL claim (Opp. at 30), it should fail for the reasons stated above.  Plaintiffs also argue their CUTPA "unfair" conduct claim survives even if their antitrust claims fail.  *Id.* at 31. But they point to no conduct beyond Defendants' purported assertion of a "non-existent" copyright and Defendants' exercise of their right—protected under the antitrust laws—to prevent free riding by requiring a license for use of their data.  *Id.*  The unfair conduct claim thus fails along with the rest of Plaintiffs' claims.

### CONCLUSION

For the reasons set forth in Defendants' motion and above, the SAC should be dismissed with prejudice.

17

Respectfully submitted,

/s/ Eric S. Stock
Eric J. Stock
Alexander H. Southwell
Esther Lifshitz
GIBSON, DUNN &
CRUTCHER LLP
200 Park Avenue
New York, NY  10166
Tel.: (212) 351-2301
Fax: (212) 716-0801
estock@gibsondunn.com
asouthwell@gibsondunn.com
elifshitz@gibsondunn.com
*Attorneys for Defendant S&P
Global Inc.*

/s/ Jeffrey Shinder
Jeffrey I. Shinder
CONSTANTINE CANNON LLP
335 Madison Avenue, Fl. 9
New York, NY 10017
Tel.: (212) 350-2700
Fax: (212) 350-2701
jshinder@constantinecannon.com

W. Stephen Cannon
Seth D. Greenstein
James J. Kovacs (*pro hac vice
forthcoming*)
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., NW
1300 N
Washington, D.C.  20004
Tel.: (202) 204-3500
Fax: (202) 204-3501
scannon@constantinecannon.com
sgreenstein@constantinecannon.com
jkovacs@constantinecannon.com
*Attorneys for Defendant FactSet
Research Systems, Inc.*

/s/ David Kiernan
David C. Kiernan (*pro hac
vice*)
Craig E. Stewart (*pro hac
vice forthcoming*)
JONES DAY
555 California St., 26th Fl.
San Francisco, CA 94104
Tel.: (415) 626-3939
Fax: (415) 875-5700
dkiernan@jonesday.com
cestewart@jonesday.com

Michelle K. Fischer (*pro
hac vice*)
901 Lakeside Avenue
Cleveland, OH  44114
Tel.: (216) 586-3939
Fax: (216) 579-0212
mfischer@jonesday.com

Alexander V. Maugeri
Amanda L. Dollinger
250 Vesey Street
New York, NY  10281
Tel.: (212)326-3939
Fax: (212) 755-7306
amaugeri@jonesday.com
adollinger@jonesday.com
*Attorneys for Defendant
American Bankers
Association*