UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DINOSAUR FINANCIAL GROUP LLC, SWISS LIFE
INVESTMENT MANAGEMENT HOLDING AG, and
HILDENE CAPITAL MANAGEMENT, LLC, *on behalf
of themselves and all others similarly situated*,

                Plaintiffs,

                -v.-

S&P GLOBAL, INC., AMERICAN BANKERS
ASSOCIATION, and FACTSET RESEARCH
SYSTEMS INC.,

                Defendants.

22 Civ. 1860 (KPF)
22 Civ. 1929 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

      Is this an antitrust case masquerading as a copyright case? Or is it in fact the inverse? Perhaps, as Plaintiffs claim, this case is both an antitrust case and a copyright case. Plaintiffs Dinosaur Financial Group LLC ("Dinosaur"), Hildene Capital Management, LLC ("Hildene"), and Swiss Life Investment Management Holding AG ("Swiss Life," and collectively, "Plaintiffs") brought this double-pronged antitrust and copyright action against Defendants American Bankers Association ("ABA"), S&P Global, Inc. ("S&P"), and S&P's successor-in-interest for the relevant division, FactSet Research Systems Inc. ("FactSet," and collectively, "Defendants"). Defendants now move to dismiss the case in its entirety, arguing, *inter alia*, that Plaintiffs have failed to allege a viable antitrust claim and that their putative copyright claim is non-justiciable. For the reasons that follow, the Court grants in part and denies in part Defendants' motion.

## BACKGROUND[1]

### A.   Factual Background

### 1.   The CUSIP Identifier and the Relevant Market

The advent of electronic systems for securities trading revolutionized the financial industry, but also introduced a problem:  The systems "require[d] a standardized method for identifying financial instruments to facilitate the clearing and settlement of trades and other transactions."  (SAC ¶ 34). Accordingly, participants in the industry sought to create a method of assigning each financial instrument a unique identifier that electronic systems could uniformly read and process.  (*Id.*).

Enter the CUSIP identifier.[2]  Beginning in the 1960s, government regulators and industry participants, including the ABA, began working toward

---

[1]   Unless otherwise noted, citations to the record and briefing in this Opinion are from the docket in *Dinosaur Financial Group LLC* v. *S&P Global, Inc.*, No. 22 Civ. 1860 (KPF). This Opinion draws its facts primarily from the Second Amended Class Action Complaint (Dkt. #87 ("SAC")), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  The Court sources additional factual material from the Declaration of Alexander V. Maugeri and its attached exhibits.  (Dkt. #93 ("Maugeri Decl.")).  Defendants assert, and Plaintiffs do not contest, that the exhibits attached to the Maugeri Declaration are integral to the SAC, such that the Court may consider the contents of those exhibits in connection with this motion.  (Def. Br. 8).  *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (internal quotation marks and citation omitted)).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #91); to Plaintiffs' memorandum of law in opposition as "Pl. Opp." (Dkt. #102); and to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #103).

[2]   "CUSIP" is short for Committee on Uniform Securities Identification Procedures, the group of industry regulators and participants — including the Securities and Exchange Commission (the "SEC"), the New York Stock Exchange, and the ABA, among others — that developed the numbering system.  (SAC ¶¶ 3, 36).  The parties use the phrases "CUSIP identifier" and "CUSIP number" interchangeably in their papers, and the Court does the same in this Opinion.

developing a uniform numbering system to facilitate the use of electronic trading systems.  (SAC ¶¶ 35-36).  Their efforts resulted in the CUSIP identifier — a "functional 'serial number' to identify a particular financial instrument" in much the same way that "social security numbers identify persons or Vehicle Identification (VIN) numbers identify cars."  (*Id.* ¶ 3).  The CUSIP identifier is a simple solution to a complex problem: a nine-digit number comprised of three parts that identifies a specific U.S. security.  (*Id.* ¶ 4).  The first six digits of a CUSIP number identify the issuer of the security; the next two identify the issue (*i.e.*, the type of instrument); and the final is a "check" to ensure the accuracy of the first eight numbers.  (*Id.*).

CUSIP identifiers quickly soared in use and popularity.  (SAC ¶ 37).  Once development was completed in 1966, CUSIP identifiers were rolled out to financial markets as the "*de facto* standard."  (*Id.*).  The ABA then created the CUSIP Service Bureau ("CSB") to administer the numbering system, and selected S&P to operate CSB.  (*Id.*).[3]  S&P then subsumed CSB as a division within its corporate structure.  (*Id.*).  By 1971, the SEC began using CUSIP identifiers in electronic data processing systems and requiring their use in certain regulatory filings.  (*Id.* ¶¶ 38-39).  A year later, all clearing corporations were using CUSIP identifiers, making them the standard across brokerage firms.  (*Id.*).  Following the SEC's lead, the Federal Reserve began using CUSIP identifiers to "accelerate the transfer of United States Treasury Securities."  (*Id.*

---

[3]     CSB was a predecessor to CUSIP Global Services ("CGS"), discussed later in this Opinion.  (SAC ¶ 37).

¶ 39).  Though government agencies have adopted the use of CUSIP identifiers, no agencies regulate their use or the rates charged by Defendants.  (*Id.* ¶ 42).

On a parallel track, in 1974 the ABA established X9, an Accredited Standards Developer of the American National Standards Institute ("ANSI"). (SAC ¶ 40).  Although X9 is not a government agency, it was established to review standards for the financial services industry.  (*Id.*).  To that end, X9 obtained approval from ANSI to adopt CUSIP identifiers as the "market standard for identifying financial instruments traded on United States financial markets."  (*Id.*).  In 1976, X9 ratified its 1974 adoption of CUSIP identifiers. (*Id.*).

Separately, S&P assumed management of CUSIP identifiers.  Beginning in 1968, S&P distributed CUSIP identifiers in physical books to financial institutions.  (SAC ¶ 43).  Beyond the identifiers themselves, these books also contained information about each financial instrument tied to an identifier, including the issuer number, the issuer name, and the issue name.  (*Id.*).  The books were distributed as a subscription service; customers paid for a subscription to receive the books (and later, CD-ROMs), and S&P required that the books be returned each year.  (*Id.* ¶ 44).  Once old books were returned, S&P issued updated books on an annual basis as well as periodic paper updates.  (*Id.*).

Just like the innovation that led to the CUSIP identifier, new technology disrupted this subscription model.  Specifically, in the late 1980s, Bloomberg LP began distributing "electronically rich sets of financial market data,

including CUSIP numbers, directly to CUSIP Users, on a subscription model."
(SAC ¶ 45).[4]  What this meant was that S&P no longer had absolute control of
the distribution of CUSIP identifiers; rather, "CUSIP Users obtained and could
use the CUSIP numbers, the issuers' names, and the types of issues without
paying a fee to S&P."  (*Id.*).  Other companies like Reuters, S&P itself, and
FactSet followed suit, and began distributing similar data electronically
through data feeds.  (*Id.*).  Though S&P (and now FactSet, after buying S&P's
relevant division) manages distribution of CUSIP numbers to the industry
through the successor to CSB, known as CUSIP Global Services ("CGS"), it also
competes with entities like Reuters and Bloomberg, known colloquially as
"Third-Party Data Vendors."  (*Id.* ¶ 46).[5]

Importantly, in its role managing CGS, S&P does more than simply issue
CUSIP identifiers.  To review, the ABA delegated management of the CUSIP
numbering system to S&P, which runs this function through the CGS division.
(SAC ¶¶ 5-7).  But the ABA also owns a compilation copyright in a database
("CUSIP_DB"), which includes all CUSIP numbers as well as additional
information about each financial instrument associated with an identifier.  (*Id.*
¶ 5).  The CUSIP_DB contains more than 60 data elements for each of the
26 million financial instruments contained in the database.  (*Id.*).  Three of
these elements are (i) the CUSIP identifier; (ii) the issuer's full name; and

---

[4]     The relevant class of "CUSIP Users" is discussed *infra*.

[5]     For purposes of this Opinion, the Court will refer only to S&P.  FactSet succeeded to
       S&P's ownership of CGS on March 1, 2022.  (SAC ¶ 7).

(iii) the type of issue.  (*Id.* ¶ 6).  CUSIP Users do not receive the full CUSIP_DB compilation in their data feeds from Third-Party Data Vendors.  (*Id.* ¶ 50). Rather, "[t]he Third-Party Data Vendors include only some of the data that is also in the CUSIP_DB compilation in the customized set of data items they provide to CUSIP Users based on each CUSIP User's idiosyncratic data needs, due to each CUSIP User's investment strategy, risk profile, and investor client base." (*Id.* ¶ 51).

With this backdrop in mind, "CUSIP Users" — a group that includes banks, investment funds, public employee pension funds, fund managers, and other financial institutions — "must have in their data feeds the CUSIP numbers, as well as the associated issuer name and the type of financial instrument to operate their businesses." (SAC ¶ 9).  This group includes Plaintiffs.  (*Id.*).  Plaintiffs aver that a relevant product market exists for "using identifying numbers after initial issuance" — *i.e.*, the "CUSIP Use Market." (*Id.* ¶ 126).  Because no alternative numbering system has proven to be an adequate substitute for the CUSIP identifier, Plaintiffs allege that S&P has a one hundred percent market share in this product market.  (*Id.* ¶¶ 128-129).

### 2.    The Licensing Regime

Eventually, S&P replaced its subscription model for distribution of data with a license model.  (SAC ¶ 47).  Some background is necessary to understand the license model.  Recall that CUSIP Users receive CUSIP identifiers, in addition to other financial data, from Third-Party Data Vendors or S&P itself.  (*Id.* ¶¶ 46-47).  In other words, although CUSIP Users may

purchase access to identifiers from S&P, many entities, like Plaintiffs, receive them indirectly from Third-Party Data Vendors via data feeds. (*Id.*). Still, S&P is involved at every step of both the direct and indirect methods of accessing identifiers.

S&P maintains contractual relationships with Third-Party Data Vendors through which the latter obtain access to part or all of the CUSIP_DB. (SAC ¶¶ 56-57). But these agreements also contain a unique provision, one that prohibits the Third-Party Data Vendors from providing data in bulk from CGS to CUSIP Users that have not entered into licenses with S&P. (*Id.*). Plaintiffs aver that this "restriction is not related to copying all or substantially all of a compilation, but rather applies to any access to CUSIP numbers in a data feed or downloadable format from the Third-Party Data Vendors." (*Id.* ¶ 56). And Plaintiffs further claim that S&P and the Third-Party Data Vendors engaged in collusive conduct in entering into these initial agreements: "Third-Party Data Vendors knew that S&P, itself a data vendor, was requiring the other Third-Party Data Vendors, which competed with S&P and with each other, to enter into an agreement containing these restrictions." (*Id.* ¶ 57). Put differently, "the agreement among S&P (and now FactSet) and the Third-Party Data Vendors to require CUSIP Users to enter into license agreements with, and pay so-called 'license fees' to, S&P (and now FactSet) under the threat of losing access to CUSIP numbers, issuer names, and types of issues is a group boycott." (*Id.* ¶ 59).

Flowing from this arrangement between S&P and the Third-Party Data Vendors is the license between CUSIP Users and S&P.  Again, CUSIP Users do not receive the full CUSIP_DB compilation from their data feeds from Third-Party Data Vendors.  (SAC ¶ 55).  Given this fact, "CUSIP Users who received their data feed from Third-Party Vendors understandably saw no need to enter into license agreements with S&P because they were not receiving CUSIP numbers or any other data from S&P."  (*Id.* ¶ 52).  But because of the arrangements between S&P and Third-Party Data Vendors, "CUSIP Users must pay a license fee to S&P (and now FactSet) even if they do not receive the CUSIP_DB compilation, or they run the risk of having essential CUSIP numbers stripped from their data feeds from Third-Party Data Vendors."  (*Id.* ¶ 55).  Such is the case for Plaintiffs.  All three signed licensing agreements with S&P, despite receiving data feeds from Third-Party Data Vendors.  (*Id.* ¶¶ 27-29).

Licenses between S&P and CUSIP Users are contained in a CUSIP Global Services Subscription Agreement (the "Subscription Agreement").  (SAC ¶ 68). The Subscription Agreement states that "pursuant to an exclusive agreement with the [ABA], [S&P/FactSet] owns or has the right to license all proprietary rights to the [CUSIP_DB], which contains CUSIP* standard number, CUSIP* standard descriptions and other information about financial instruments ('Data')."  (*Id.*).  By entering into a Subscription Agreement, CUSIP Users are granted "a non-exclusive, non-transferable, limited license to access and use of the proprietary CGS Service ('the Service') described in the applicable Service

Attachment(s) attached hereto and incorporated herein in accordance with this Agreement." (*Id.* ¶ 69). The scope of the license depends on the option the consumer purchases; some may opt to receive full access to the CUSIP_DB compilation, while others may choose to receive only a subset of such information. (*Id.* ¶ 70).[6] Each of the named Plaintiffs opted for lesser options. As a result, they "do not receive, and therefore cannot copy, all or substantially all of the CUSIP_DB compilation." (*Id.* ¶¶ 72-73). Plaintiffs claim that S&P has no right to make CUSIP Users sign licenses when such Users do not receive the full CUSIP_DB, nor can S&P make Third-Party Data Vendors remove CUSIP numbers from their data feeds if a User refuses to sign a license, because "the ABA's compilation copyright gives Defendants no intellectual property right in the data CUSIP Users receive from Third-Party Data Vendors." (*Id.* ¶ 74).

The Subscription Agreement incorporates by reference several relevant provisions and forms. For example, the Use of Service Statement requires CUSIP Users to "describe in detail how [the] firm uses CUSIP Identifiers for its operations, and stores/maintains them (including any outsourced databases)." (SAC ¶ 85 (emphasis omitted)). License fees are based on use of CUSIP identifiers, not on CUSIP Users' copying of the CUSIP_DB compilation. (*Id.*; *see also id.* ¶ 90 (describing pricing based on a sliding scale between 500 and 40,000 identifiers)). Section 2 of the Subscription Agreement states:

> Subscriber expressly acknowledges that the Data was compiled, prepared, selected, arranged and published

---

[6]     CUSIP Users who opt to receive a license to the entire CUSIP_DB are not members of the class. (SAC ¶ 71).

> by [CGS] under authority from the ABA through the
> application of methods and standards of judgment
> developed and applied through the expenditure of
> substantial time, effort and money, and that the Data
> constitutes valuable intellectual property of [CGS] and
> the ABA and that no proprietary rights are being
> transferred to the Subscriber in such materials or in
> any of the information contained therein.

(*Id.* ¶ 97).  Other provisions recite that "misappropriation or misuse of such materials will cause serious damage to CGS and ABA; consequently, Subscriber agrees that in the event of any misappropriation or misuse, CGS and the ABA shall have the right to obtain injunctive relief" and the ability to terminate the Agreement.  (*Id.* ¶¶ 99, 101 (emphasis omitted)).

### 3. Defendants' Representations to the Public and Enforcement Efforts

Plaintiffs contend that Defendants sell licenses to CUSIP Users who do not receive data feeds by means of "a false narrative that the license[s] [were] necessary because the CUSIP numbers are copyrighted." (SAC ¶ 76).  For example, the ABA has represented to regulators, including the SEC, that CUSIP numbers themselves are copyrighted, not just the CUSIP_DB.  (*Id.* ¶¶ 76-80). Separately, the Financial Industry Regulatory Authority ("FINRA"), a self-regulatory organization, maintains a trade reporting system that requires broker-dealers to report transactions for certain securities.  (*Id.* ¶ 80).  The only information about such securities on this system is the CUSIP number and symbol.  (*Id.*).  It follows logically that software developers *could* develop programs using API files containing this FINRA information.  (*Id.* ¶ 81). However, because FINRA will not release the API files unless the developer has

a CUSIP license with S&P, no such developer has done so.  (*Id.*).  Plaintiffs posit

that "Defendants' restriction demonstrates conclusively that they require a

license for the mere use of the CUSIP numbers, which could be justified only if

the CUSIP numbers were copyrighted, which they are not."  (*Id.* ¶ 82; *see also*

*id.* ¶ 84 (discussing S&P's use of service statement, which provides: "A license

agreement is required when a user obtains access to an electronic data feed or

bulk download ... including when a user's database that contains CUSIP

Identifiers and related descriptive data ... is updated, maintained and/or

operated by an Authorized Distributor." (emphasis omitted))).

S&P has policed compliance with this regime.  At times, this has come in

the form of "gentle" reminders to CUSIP Users.  For instance, in January 2021,

S&P corresponded with Hildene that "CGS's agreements with its [Third-Party

Data Vendors] do not allow [them] to distribute CGS Data to firms in bulk or

downloadable format unless such firms are properly licensed by CGS."  (SAC

¶ 56; *see also id.* ¶ 86 (S&P email to Hildene stating "[f]irms using these

identifiers internally ... and/or that externally redistribute CGS Data must

possess a license from CGS" (emphasis omitted))).  S&P further noted that it

could require Third-Party Data Vendors to cease distribution of such data to

unlicensed firms.  (*Id.* ¶ 56).  Dinosaur and Swiss Life have been similarly

contacted by S&P.  (*See id.* ¶ 87 ("S&P claimed that Dinosaur was required to

enter into a license agreement because 'proprietary CUSIP data is being utilized

within your firm.'" (emphasis omitted)); *id.* ¶ 88 (letter to Swiss Life stating "I

confirm that CUSIP Global Services will cease delivery of the CUSIP numbers ...

11

and CSB ISINs if we do not have a re-filed 'Statement of Use' by June 15, 2012
and no signed contract by June 22, 2012.")).[7]  According to Plaintiffs, these
communications were not one-offs; instead, S&P frequently escalated the
rhetoric when Plaintiffs pushed back on the requirement that they purchase
licenses.  (*See id.* ¶¶ 103-110 (cataloging communications from S&P to
Plaintiffs after the latter refused to sign or otherwise modified Subscription
Agreements, including that Plaintiffs would lose access to data feeds containing
CUSIP identifiers and that "if CGS is unable to reach an agreement … your firm
may lose access to CGS data")).

Plaintiffs claim that Defendants' licensing requirement is essentially a
Hobson's choice: lose access to data critical to Plaintiffs' operations — namely,
CUSIP numbers — or agree to a license with S&P for use of CUSIP numbers
despite receiving the numbers through Third-Party Data Vendors' feeds and
despite the numbers themselves not being copyrighted.  (*See* SAC ¶¶ 103-110).
What is more, Plaintiffs contend that by enforcing the licensing regime and
representing to government agencies and the investing public that CUSIP
numbers are copyrighted, Defendants have misused their compilation
copyright.  (*See, e.g., id.* ¶¶ 76-94 (discussing Defendants' representations to
agencies and institutions, including Plaintiffs); *see also id.* ¶ 76 ("Defendants
could not plausibly claim that a license from S&P was necessary based on an

---

[7]     Per Plaintiffs, ISINs "are the equivalent standard for international financial transactions
involving United States financial instruments.  The CUSIP number is an element of the
ISINs, along with additional digits added by the European numbering agency.
Defendants require a license for the use of CUSIP numbers in the ISINs."  (SAC ¶ 94).

assertion that the Third-Party Data Vendors distributed the CUSIP_DB
compilation to CUSIP Users because the Third-Party Data Vendors do not
distribute the compilation to CUSIP Users.  So, the Defendants adopted a false
narrative that the license was necessary because the CUSIP numbers are
copyrighted.")).

### 4. Defendants' Influence over X9

Separate from taking issue with Defendants' licensing and copyright
conduct, Plaintiffs also raise certain concerns over X9 — the standards-setting
committee for securities identifiers.  X9 formally separated from the ABA in
2001.  (SAC ¶ 112).  Still, Plaintiffs claim that "the ABA has exerted and
continues to exert substantial control over the ostensibly independent X9 as
evidenced by the significant ties and overlap between the ABA, CGS and X9."
(*Id.*).  By way of examples, S&P and the ABA are both full voting members of
X9; various ABA and CGS executives hold leadership positions in X9; and nine
of the twenty-three voting members of the CUSIP Working Group, a
subcommittee within X9, were ABA or S&P employees when X9 last renewed
the CUSIP accreditation in December 2020.  (*Id.*).

Most concretely, Plaintiffs claim that this overlap between Defendants
and X9 has precluded the adoption of alternative numbering systems.
Bloomberg — in this context, a Third-Party Data Vendor — sought
accreditation of its free alternative numbering system, known as the Financial
Instrument Global Identifier ("FIGI").  (SAC ¶ 113).  However, X9 did not
approve FIGI until 2021.  (*Id.*).  Because of the required use of CUSIP numbers

in U.S. regulatory filings, not to mention their ubiquity, FIGI remains a non-viable alternative to the CUSIP number.  (*Id.*).  Moreover, "the ABA and S&P agreed and conspired to use their influence over X9 to help ensure that X9 would not choose FIGIs as an alternative standard."  (*Id.*).

Moving away from issues of control over X9, Plaintiffs claim in the alternative that Defendants have violated certain commitments they made to X9 in their accreditation application.  Specifically, Plaintiffs assert that the ABA committed to license CUSIP numbers on fair, reasonable, and non-discriminatory ("FRAND") terms.  (SAC ¶ 115).[8]  This is so because X9 requires holders of essential intellectual property to either disclaim proprietary IP or offer licenses on FRAND terms.  (*Id.* ¶ 116).  During the standard-setting process, the ABA committed to licensing the CUSIP numbering system on FRAND terms; indeed, the ABA filed a statement of willingness with X9 pertaining to "trademarks, copyrighted, or patented materials." (*Id.*; *see also id.* ¶¶ 119-121 (further discussing FRAND commitment, including statement of willingness and CGS's representations on its website)).  But Plaintiffs claim that this commitment to third-party beneficiaries like Plaintiffs was "an empty promise":

> Defendants … breached [the] commitment by charging Plaintiffs and members of the Class unfair, unreasonable, and arbitrary fees based on false claims of copyright, which Defendants should not have

---

[8]    The FRAND claim is an alternative claim brought in the case that CUSIP numbers are found to be copyrightable.  (SAC ¶ 115).  Based on the Court's resolution of the copyright claim, discussed *infra*, the Court only discusses the facts alleged in the SAC, although the Court is aware that Defendants' proffered documents suggest a different set of facts.

> charged because they had no right to prevent Plaintiffs
> and other Class members from using CUSIP numbers
> and thus no right to demand "licenses" or "license fees."

(*Id.* ¶¶ 121-122). In essence, because Defendants incur no costs when a CUSIP

User uses a CUSIP number received from sources other than Defendants (like

Third-Party Data Vendors), the license fees are *de facto* supracompetitive rates.

(*Id.* ¶ 123).

### 5.    The Effects of Defendants' Licensing Regime

At a high level, Plaintiffs claim that Defendants' licensing regime has

both (i) allowed Defendants to extract "monopoly rents disguised as 'license

fees'"; and (ii) suppressed potential competition in the CUSIP Use Market,

despite Defendants having no copyright in the numbers themselves. (SAC

¶¶ 60-61). From this, Plaintiffs discern a number of anticompetitive harms:

- "[Defendants'] agreements — both the Subscription Agreement with CUSIP [U]sers and their agreements with Third-Party Data Vendors — exclude competition in, and competitors from, the CUSIP Use Market and deny CUSIP Users the benefit of robust competition, including the benefit of innovation that results from and creates robust competition." (*Id.* ¶ 150).

- "Defendants' anticompetitive conduct imposes unnecessary burdens on financial markets, thereby reducing competition, liquidity, and transactional flow." (*Id.* ¶ 151; *see also id.* (Bloomberg letter to SEC stating that "[t]he process of obtaining a CUSIP, and the restrictive licensing imposed on its use imposes unnecessary burdens on firms")).

- "Defendants' restrictive licensing practices impede actual and potential competitors from innovating in the financial markets including by raising the costs of potential rivals." (*Id.* ¶ 152).

15

▪ Defendants' practices reduce transparency in markets and grant Defendants insight into emerging rivals' businesses, because, for example, the licenses grant Defendants the right to audit firms' use of CUSIP numbers. (*Id.* ¶¶ 153-158).

One concrete example provided by Plaintiffs of Defendants' anticompetitive conduct concerns Xignite, Inc., a provider of cloud-based market data and management solutions to financial technology (or "fintech") companies. (SAC ¶ 62). Xignite "gathered CUSIP numbers from sources independent from S&P, but because it had signed a license agreement, S&P forced Xignite to destroy its inventory of CUSIP numbers because Xignite's intended use was an unauthorized, commercial use under the license agreement." (*Id.*). According to Plaintiffs, S&P's enforcement of the license's terms and conditions "eliminated Xignite as a competitor in the CUSIP Use Market and denied CUSIP Users of the benefit of a new service." (*Id.*; *see also id.* ¶ 61 ("As one example of such potential competition, an unlicensed financial institution or fintech company could offer CUSIP Users a value-added service by gathering CUSIP numbers from numerous sources and using the CUSIP numbers to link data and information about financial instruments.")).

Without the licensing regime, Plaintiffs claim that they would not have entered into licenses with S&P. Indeed, "CUSIP Users do not want, receive, use, or copy the CUSIP_DB compilation, which is the only asset the ABA has the right to protect by requiring a license." (SAC ¶ 67; *see also id.* ¶¶ 64-66 (discussing Copyright #TX-614-6660, the ABA's copyright in the CUSIP_DB compilation)). Instead, CUSIP Users would forgo paying the license fees and

"would be free to compete with Defendants and innovate in the use of CUSIP numbers without fear of threatened litigation and the imposition of injunctions that would threaten the viability of their businesses." (*Id.* ¶ 158).  All told, Plaintiffs claim that Defendants' conduct has allowed them to reap an estimated $100 million in fees each year.  (*Id.* ¶ 159).

**B.  Procedural Background**

Plaintiffs commenced the *Dinosaur* action by filing a complaint on March 4, 2022 (Dkt. #1), and the *Hildene* action on March 7, 2022 (22 Civ. 1929, Dkt. #1).  On March 11, 2022, the *Hildene* action was assigned to this Court as related to the *Dinosaur* action.  On April 20, 2022, the *Dinosaur* Plaintiffs filed a pre-motion letter, contemplating a motion for partial summary judgment.  (Dkt. #36).  Specifically, the *Dinosaur* Plaintiffs sought leave to file a motion for partial summary judgment seeking declaratory relief that CUSIP numbers are not copyrightable.  (*Id.*).  Two days later, Defendants filed a letter, proposing a different sequencing of deadlines in both cases.  (Dkt. #40).  Rather than proceed to summary judgment practice, Defendants suggested that the *Dinosaur* and *Hildene* actions be consolidated; that the Court designate interim class counsel; and that the Court set a date for a pre-motion conference for Defendants' anticipated motion to dismiss.  (*Id.*).  The Court then set a pre-motion conference for June 1, 2022, at which conference the parties were directed to discuss the issues raised by Defendants in their letter.  (Dkt. #42). This conference was then adjourned to June 28, 2022.  (Dkt. #51; 22 Civ. 1929, Dkt. #41).

17

On May 6, 2022, Defendants filed a pre-motion letter, seeking consolidation of the *Dinosaur* and *Hildene* actions, and seeking appointment of interim class counsel. (Dkt. #53; 22 Civ. 1929, Dkt. #43). On May 18, 2022, Defendants filed a response to the *Dinosaur* Plaintiffs' pre-motion letter regarding an anticipated motion for partial summary judgment. (Dkt. #55). Defendants opposed the motion as (i) procedurally improper; (ii) against the interests of judicial economy; and (iii) an improper request for an advisory opinion. (*Id.*). On May 27, 2022, the *Dinosaur* Plaintiffs filed a letter response to Defendants' pre-motion letter concerning consolidation, opposing Defendants' request. (Dkt. #58). The *Dinosaur* Plaintiffs contended that consolidation would be inappropriate because "the two cases differ on the core legal issue: whether CUSIP numbers are copyrightable or protected by copyright." (*Id.*). Hildene, on the other hand, agreed with Defendants that consolidation and the appointment of interim class counsel were warranted. (22 Civ. 1929, Dkt. #45).

Following the June 28, 2022 pre-motion conference, the Court rendered its decision on how to proceed in the two cases. (Dkt. #61). As relevant here, the Court (i) consolidated the *Dinosaur* and *Hildene* actions; and (ii) denied the *Dinosaur* Plaintiffs' request to move forward with a motion for partial summary judgment. (*Id.*). The Court directed the parties to discuss the submission of a consolidated pleading as well as the appointment of interim class counsel. (*Id.*). In line with this Order, Plaintiffs submitted a letter on July 25, 2022, proposing the appointment of three firms to serve as interim class counsel.

(Dkt. #67).  On August 1, 2022, the Court held a conference with the parties to discuss Plaintiffs' proposal; thereafter, the Court endorsed interim class counsel's proposal for appointment on August 10, 2022.  (Dkt. #71).  That same day, Plaintiffs filed a consolidated and amended class action complaint. (Dkt. #70).

On September 6, 2022, Defendants filed a pre-motion letter, contemplating a motion to dismiss the consolidated and amended class action complaint.  (Dkt. #74).  Thereafter, Plaintiffs filed a responsive letter on September 23, 2022, opposing each of Defendants' arguments.  (Dkt. #77). The Court held a pre-motion conference with the parties on November 17, 2022.  (*See* November 17, 2022 Minute Entry).  In line with this conference as well as subsequent endorsements, Plaintiffs filed the Second Amended Class Action Complaint (the "SAC") on December 21, 2022.  (Dkt. #87).  On February 14, 2023, Defendants filed their motion to dismiss and supporting papers.  (Dkt. #90-93).  On April 3, 2023, Plaintiffs filed their memorandum of law in opposition to Defendants' motion.  (Dkt. #102).  Finally, on April 27, 2023, Defendants filed their reply memorandum of law.  (Dkt. #103).

## DISCUSSION

As suggested by their wide-ranging SAC, Plaintiffs bring a variety of claims premised on both antitrust and copyright law, as well as contract and state law claims.  As it relates to copyright, Plaintiffs seek a declaration that CUSIP numbers are not copyrightable as a matter of law.  (SAC ¶¶ 163-167). Plaintiffs' antitrust claims are more diverse: Plaintiffs bring claims under

Section 2 of the Sherman Act, 15 U.S.C. § 2, premised on Defendants' alleged maintenance of monopoly power and conspiracy to monopolize (*id.* ¶¶ 168-182), as well as a Section 1 claim, 15 U.S.C. § 1, premised on Defendants' alleged group boycott with Third-Party Data Vendors (*id.* ¶¶ 183-189).  Finally, Plaintiffs allege that Defendants violated New York General Business Law ("GBL") Section 349(a) and Connecticut Unfair Trade Practice Act ("CUTPA") Section 42-110b(a) by engaging in deceitful and monopolistic conduct.  (*Id.* ¶¶ 198-211).  As an alternative claim for relief in the case that CUSIP numbers are found to be copyrightable, Plaintiffs bring a breach of contract claim premised on the ABA's FRAND commitment.  (*Id.* ¶¶ 190-197).  In addition to money damages, Plaintiffs seek injunctive relief for the alleged violations of Sections 1 and 2 of the Sherman Act pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  (*Id.* ¶¶ 212-214).  Defendants have moved to dismiss the entirety of the SAC.

## A.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [a] [p]laintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  While the plausibility requirement "is not akin to a 'probability requirement' ... it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* Toward that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

**B.**    **The Court Grants in Part and Denies in Part Defendants' Motion to Dismiss Plaintiffs' Antitrust Claims**

       **1.**    **Applicable Antitrust Law**

            **a.**    **Claims Under Sherman Act Section 2**

There are two elements to making out a Sherman Act Section 2 claim for monopolization: (i) "the possession of monopoly power in the relevant market" and (ii) "'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United States* v. *Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).  Defendants do not, at this time, challenge Plaintiffs' allegation of monopoly power or market definition; instead, they focus solely on the element of anticompetitive conduct.

The second element of a monopolization claim focuses on the monopolist's conduct.  *See, e.g.*, *Trinko*, 540 U.S. at 407 ("[T]he possession of monopoly power will not be found unlawful unless it is accompanied by an

element of anticompetitive conduct." (emphasis omitted)); *Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*, 555 U.S. 438, 447-48 (2009) ("Simply possessing monopoly power and charging monopoly prices does not violate [Section] 2."). In other words, a plaintiff must not only show that the monopolist indeed has the power to monopolize a market, but also that "it willfully acquired or maintained its power, thereby causing unreasonable exclusionary or anticompetitive effects." *Trans Sport, Inc.* v. *Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992) (internal citations and quotation marks omitted). "The plaintiff must demonstrate exclusionary conduct — as opposed to gloves-off, hard-nosed market competition — aimed at obtaining or enshrining monopoly power, harming the competitive process and thereby harming consumers." *Shak* v. *JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 486 (S.D.N.Y. 2016) (internal quotation marks, citation, and emphasis omitted and alterations adopted); *see also In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 94 (S.D.N.Y. 2021) (collecting cases).

To prove a conspiracy to monopolize under Section 2 of the Sherman Act, a plaintiff must show "[i] proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and [ii] the commission of an overt act in furtherance of the conspiracy." *AD/SAT, Div. of Skylight, Inc.* v. *Assoc. Press*, 181 F.3d 216, 233 (2d Cir. 1999) (internal quotation marks and citation omitted). Similar to a monopolization claim, a plaintiff must also show a specific intent to monopolize. *See, e.g., In re Tether*,

576 F. Supp. 3d at 100 (citing, *inter alia*, *Elecs. Commc'ns Corp.* v. *Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997)).

> ### b.     Claims Under Sherman Act Section 1

For its part, Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. "A group boycott is one such conspiracy in restraint of trade or commerce." *PharmacyChecker.com, LLC* v. *Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 332 (S.D.N.Y. 2021) (citing *St. Paul Fire & Marine Ins. Co.* v. *Barry*, 438 U.S. 531, 541 (1978)). To state a claim under Section 1, a plaintiff must show "[i] a combination or some form of concerted action between at least two legally distinct economic entities that [ii] unreasonably restrains trade." *United States* v. *Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016) (internal quotation marks and citation omitted). "[I]n deciding whether there is concerted action, courts routinely apply the same analysis under both Sections 1 and 2." *In re Inclusive Access Course Materials Antitrust Litig.*, 544 F. Supp. 3d 420, 439 (S.D.N.Y. 2021) (internal quotation marks and citation omitted).

As it relates to the first element, "[t]he crucial question … is therefore whether the challenged conduct 'stems from independent decision or from an agreement, tacit or express.'" *Starr* v. *Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Theatre Enters., Inc.* v. *Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)) (alteration adopted). To prove such

agreement, it is not sufficient to merely allege "parallel conduct."  *Mayor & City Council of Baltimore, Md.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). Instead, if an agreement is not obvious, a plaintiff must allege "additional facts or circumstances" referred to as "plus factors," that support an inference of conspiracy.  *Id.* (quoting *Starr* v. *Sony BMG Music Ent.*, 592 F.3d 314, 322 (2d Cir. 2010)); *see also PharmacyChecker.com, LLC*, 530 F. Supp. at 335 (analyzing plus factors); *Iowa Pub. Employees' Ret. Sys.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 319 (S.D.N.Y. 2018) (same); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 373 (S.D.N.Y. 2016) (same).

### 2.    Analysis

#### a.    The Nature of Defendants' Copyright Is Not Dispositive of the Antitrust Claims

Before proceeding to the Court's analysis, it is important to step back and consider, as a threshold matter, whether Plaintiffs present an analytically honest picture of what is at issue in this case.  Interspersed throughout the SAC are suggestions that the copyright elements of this case cannot be separated from the antitrust elements, and vice versa.  (*See, e.g.*, SAC ¶ 74 ("Because CUSIP Users do not license the CUSIP_DB compilation, the ABA's compilation copyright gives Defendants no intellectual property right in the data CUSIP Users receive from Third-Party Data Vendors."); *id.* ¶ 157 ("No legitimate pro-competitive efficiencies or other pro-competitive arguments justify Defendants' conduct in misusing their copyright, and in abusing S&P's and now FactSet's monopoly power to continue willfully and unreasonably restraining trade to extort fees from CUSIP Users.")).

24

Likewise, Plaintiffs' briefing blends antitrust and copyright law.  (*See, e.g.*, Pl. Opp. 14-15).  For example, in support of their arguments that Defendants' conduct is anticompetitive, Plaintiffs contend that "Defendants' assertion that they may exert monopoly control over the use of preexisting data contradicts" Section 103 of the Copyright Act and the Supreme Court's decision in *Feist Publications, Inc.* v. *Rural Telephone Service Co.*, 499 U.S. 340 (1991). (Pl. Opp. 14).  In *Feist*, the Supreme Court considered whether telephone directory white pages were copyrightable.  499 U.S. at 342.  Of course, *Feist* has nothing to do with antitrust law; the case simply stands for the hornbook law proposition "that facts are not copyrightable [while] compilations of facts generally are."  *Id.* at 344; *see also id.* at 364 (holding that "[b]ecause [counterclaim defendant's] white pages lack the requisite originality, [counterclaimant's] use of the listings cannot constitute infringement").  And as Defendants are quick to point out, the copyright and antitrust elements of *Feist* were analyzed separately; the Supreme Court only considered copyright issues. (Def. Reply 6).  Following the Supreme Court's decision finding white page listings non-copyrightable, the Tenth Circuit reversed the district court's decision that the defendant's refusal to license the listings to a competitor was anticompetitive.  *See Rural Tel. Serv. Co.* v. *Feist Publications, Inc.*, 957 F.2d 765, 769 (10th Cir. 1992) ("Assuming [counterclaim defendant's] refusal to deal was motivated by an intent to exclude [counterclaimant] from the yellow pages advertising market, anti-competitive intent alone is insufficient to establish a violation of § 2.").

Similarly, Plaintiffs offer no support for the proposition that Defendants violated the antitrust laws by charging fees for use of CGS data, even if CUSIP numbers are not copyrighted. Again, the caselaw shows the opposite. By way of example, in *New York Mercantile Exchange, Inc.* v. *Intercontinental Exchange, Inc.*, Judge Koeltl addressed both antitrust and copyright issues stemming from a copyright infringement action concerned with the plaintiff's settlement prices. *See N.Y. Mercantile Exch., Inc.* v. *Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559 (S.D.N.Y. 2004) ("*NYMEX I*"); *N.Y. Mercantile Exch., Inc.* v. *IntercontinentalExchange, Inc.*, 389 F. Supp. 2d 527 (S.D.N.Y. 2005) ("*NYMEX II*"), *aff'd*, 497 F.3d 109 (2d Cir. 2007). In *NYMEX I*, Judge Koeltl solely addressed the defendant's counterclaim that the plaintiff violated the Sherman Act through alleged anticompetitive conduct, including, *inter alia*, by refusing to grant access to settlement prices to the counterclaim plaintiff. *NYMEX I*, 323 F. Supp. 2d at 560-61, 571. Judge Koeltl found that the counterclaim defendant was under no duty to aid its competitor, and thus did not run afoul of the antitrust laws when it refused to cooperate with the counterclaim plaintiff. *Id.* at 572. By contrast, *NYMEX II* concerned the plaintiff's copyright infringement claim regarding the settlement prices. *NYMEX II*, 389 F. Supp. 2d at 529-30.

Taken together, the *NYMEX* decisions demonstrate that a party does not necessarily run afoul of the antitrust laws by refusing to deal with a competitor, even where there is no copyright in the underlying data. *NYMEX I*, 323 F. Supp. 2d at 573 (dismissing defendant's antitrust counterclaim on the

grounds that the defendant had access to the regulated essential facility and plaintiff otherwise owed no duty to aid defendant); *NYMEX II*, 389 F. Supp. 2d at 544 (finding settlement prices noncopyrightable).  More basically, as Defendants point out, the *NYMEX* decisions demonstrate that there is no "database 'facts' exception to the bedrock principle that firms have no duty to lend a helping hand to their competitors."  (Def. Reply 5).  Were it otherwise, Judge Koeltl "would have reserved judgment on the antitrust claims [in *NYMEX*] until the copyright questions were adjudicated on summary judgment."  (*Id.*).

### b. The Court Denies Defendants' Motion to Dismiss Plaintiffs' Section 2 Claims

At the core of the antitrust claims in this case is whether Defendants are allowed — despite not claiming to hold a copyright in CUSIP numbers themselves — to require Plaintiffs and members of the class to obtain a license to obtain access to this information.[9]  This issue distills, in turn, to whether Defendants can require Plaintiffs to obtain these licenses despite Plaintiffs receiving CUSIP numbers and related data from Third-Party Data Vendors. Defendants have not sought dismissal of Plaintiffs' antitrust claims on an incremental or accretive basis.  Rather, Defendants have moved in one fell swoop, arguing that Plaintiffs' antitrust claims fail because they plead a quintessential unilateral refusal to deal case.  (Def. Br. 10-19).  Plaintiffs reject

---

[9]     Whether Defendants' communications with customers suggest that Defendants assert a copyright in CUSIP numbers is discussed *infra*, in the Court's analysis of Plaintiffs' copyright claim.  Defendants do not purport to own a copyright in CUSIP numbers in their briefing, and appear to argue, for purposes of the present motion, that they do not.

that characterization, and argue that "it is the Defendants who have forced the

Plaintiffs into a business relationship that the Plaintiffs neither need nor want,"

by requiring them to obtain licenses from Defendant on pain of losing access to

CUSIP numbers through Third-Party Data Vendors' data feeds.  (Pl. Opp. 9).

It is well-accepted that the antitrust laws do not prevent a private

business, or even a monopolist, from deciding with which parties it will deal,

save for rare circumstances.  *Trinko*, 540 U.S. at 408 ("[A]s a general matter,

the Sherman Act 'does not restrict the long recognized right of [a] trader or

manufacturer engaged in an entirely private business, freely to exercise his

own independent discretion as to parties with whom he will deal.'" (quoting

*United States* v. *Colgate & Co.*, 250 U.S. 300, 307 (1919))).  As such, courts

across the country have dismissed antitrust claims brought by competitors

against a purported monopolist where the competitor's claim essentially boiled

down to the monopolist's unilateral refusal to deal with that competitor.  *See,

e.g.*, *NYMEX I*, 323 F. Supp. 2d at 571 ("[Counterclaim defendant] has a

legitimate business interest in preventing its competitor, [counterclaim

plaintiff], from free-riding on [its] settlement prices.  [Counterclaim defendant's]

settlement prices have value because they are viewed as proxies for market

prices, and [it] has a legitimate interest in preventing rivals from free-riding on

this reputation."); *MiniFrame Ltd.* v. *Microsoft Corp.*, No. 11 Civ. 7419 (RJS),

2013 WL 1385704, at *4 (S.D.N.Y. Mar. 28, 2013) ("Even assuming *arguendo*

that intellectual property law provides no defense for [defendant's] actions,

[plaintiff's] Sherman Act claim concerning the single-user restriction would still

fail because [defendant] had no duty to deal with [plaintiff].") ("*MiniFrame*"), *aff'd*, 551 F. App'x 1 (2d Cir. 2013) (summary order); *see also, e.g.*, *Fed. Trade Comm'n* v. *Qualcomm Inc.*, 969 F.3d 974, 995 (9th Cir. 2020) (finding that technology firm had no duty to license patents to rival chip suppliers as opposed to licensing technology to phone manufacturers).  Stated differently, there "is no duty to aid competitors."  *Trinko*, 540 U.S. at 411.

Before delving into the relevant legal issues, the Court pauses to note the uniqueness of Defendants' licensing arrangement.  At step one, Defendants grant access to the CUSIP_DB or parts of it to Third-Party Data Vendors.  (SAC ¶¶ 56-57).  That licensing arrangement dictates with whom Third-Party Data Vendors may share any CGS data, *i.e.*, only those firms that have been licensed by Defendants.  (*Id.*).  Thus, the further-downstream CUSIP User must obtain a license — in the form of a Subscription Agreement — from Defendants, despite Defendants not directly providing any service to the CUSIP User.  (*Id.* ¶ 55). The Subscription Agreements require CUSIP Users to pay fees to Defendants. (*Id.*).  But they also restrict CUSIP Users' use of *any* CGS data, not just wholesale reproduction of the CUSIP_DB (to which they are not given full access in any event), including unauthorized commercial uses of CUSIP numbers.  (*See, e.g., id.* ¶¶ 55, 62).  In light of the complexity of these arrangements, it is not surprising that neither party has identified cases directly on point.

The thrust of Defendants' motion is that the Court may, based on the above-discussed principle that competitors have no duty to aid their

counterparts, dismiss Plaintiffs' antitrust claims as a matter of law.  In

essence, Defendants contend that "there is nothing anticompetitive about an

owner of a valuable database service restricting commercial use or

redistribution of data it supplies to potential competitors to prevent free riding

on the owner's investment."  (Def. Br. 11).  Maybe so.  But as Plaintiffs point

out, this is not a run-of-the-mill unilateral refusal to deal case.  (Pl. Opp. 8-9).

In other words, while the Court is guided by cases applying straightforward

Sherman Act jurisprudence that firms should not be forced to share the source

of their competitive advantage, Defendants' proffered cases are largely

inapposite.  *See, e.g.*, *Trinko*, 540 U.S. at 407-08 (holding that

telecommunications carrier had no duty to provide rival carriers with

interconnection services on favorable terms); *Novell, Inc.* v. *Microsoft Corp.*, 731

F.3d 1064, 1074, 1080 (10th Cir. 2013) (holding that technology firm was

under no duty to share intellectual property with rival software vendor where

such property would have facilitated rival company's entrance); *Olympia Equip.*

*Leasing Co.* v. *W. Union Tel. Co.*, 797 F.2d 370, 376 (7th Cir. 1986) ("Since

[defendant] had no duty to encourage the entry of new firms into the

equipment market, the law would be perverse if it made [defendant's]

encouraging gestures the fulcrum of an antitrust violation.").

The same is true of the two antitrust cases on which Defendants

principally rely, *NYMEX I* and *MiniFrame*.  In *NYMEX I*, the court simply found

that the incumbent monopolist futures exchange was not required to cooperate

with a rival exchange by, for example, sharing its dominant settlement prices

with the upstart rival exchange.  *NYMEX I*, 323 F. Supp. 2d at 571-72.[10]
Likewise, in *MiniFrame*, the defendant made a unilateral change in its licensing
agreements with its rivals, thereby harming the plaintiff's ability to compete on
price-favorable terms.  *MiniFrame*, 2013 WL 1385704, at *3 (describing
Microsoft's shift from a number-of-computers to number-of-users license,
which shift harmed plaintiff's business model that relied on PC-sharing
software).  Again, because the defendant was free to license its software as it
saw fit and to engage with only certain customers, the plaintiff failed to state a
claim.  *Id.* at *4 ("[Plaintiff's] Sherman Act claim concerning the single-user
restriction would still fail because [defendant] had no duty to deal with
[plaintiff].").

By contrast here, Plaintiffs do not allege that a monopolist firm is being
forced to deal with a rival.  Defendants paint a simplified picture of the SAC to
make it fit this line of cases.  It is *Plaintiffs*, regardless of from whom they
receive CGS data, who are forced to deal with Defendants.  Plaintiffs do not
suggest that Defendants cannot protect the copyrighted CUSIP_DB.  (Def.
Reply 6-7 (arguing that "CGS only requires Data Users to take a license to
download bulk data originating from CGS — thereby preventing free riders
from using CGS Data to create a rival database product for the mere cost of a

---

[10]    Moreover, *NYMEX I* involved settlement prices that were regulated by the CFTC,
whereas here Plaintiffs claim that the government is not involved in regulation of CUSIP
numbers.  (SAC ¶ 42).  *NYMEX I*, 323 F. Supp. 2d at 568 ("So, too, in this case, where
access to the alleged 'essential facility' is regulated by the CFTC, a federal agency with
effective power to compel sharing of NYMEX's settlement prices and regulate the scope
and terms of such sharing.").

subscription")).  The Court is not concerned, from an antitrust perspective, that Plaintiffs must pay for access to CGS data.  *See infra*.  Rather, the issue is that Defendants arguably have no legitimate purpose in forcing Plaintiffs to sign Subscription Agreements when (i) Plaintiffs receive bulk CGS data from Third-Party Data Vendors, not Defendants;[11] and (ii) Plaintiffs do not receive access to the copyrighted CUSIP_DB from Third-Party Data Vendors, but instead data feeds that include CUSIP numbers that are otherwise non-protectable.  (Pl. Opp. 9 ("It was S&P in concert with the [Third-Party Data Vendors] that broke this resistance and forced CUSIP Users to sign license agreements with Defendants as a condition for receiving the CUSIP numbers, issue names, and types of issue from the [Third-Party Data Vendors]."); *id.* at 6 (noting that "[a]bsent [the restrictions imposed by the Subscription Agreements], any entity with access to [CUSIP numbers, issue names, and types of issue] could use them to create innovative new services, such as the management solutions for financial services and technology companies")).

Thus, Defendants dictate the terms on which distributors — here, Third-Party Data Vendors — can engage with CUSIP Users.  (SAC ¶¶ 56-57).  And those terms, enshrined upstream, in turn mandate that CUSIP Users sign restrictive Subscription Agreements with Defendants downstream.  (*Id.*).  As discussed, the terms of the Subscription Agreements circumscribe how CUSIP

---

[11]     Of course, bulk CGS data comes from Defendants by way of their ownership of the CUSIP_DB.  But whether that mere fact allows Defendants to dictate how Plaintiffs engage with their respective Third-Party Data Vendors and how they use the data is another story.

Users can use *any* CGS data, including mere CUSIP numbers; give Defendants detailed competitive insights into potential rivals' internal use of CUSIP numbers; and grant Defendants the ability to obtain injunctive relief in event of "any misappropriation or misuse" of any CGS data.  (*See id.* ¶¶ 85-97). Although Defendants suggest that the Subscription Agreements are necessary to protect their investment in the CUSIP_DB and to prevent free-riding, this argument should be taken with some skepticism.  Indeed, nothing prevents Defendants from bringing copyright infringement actions against any party wrongly copying the CUSIP_DB.  Nor does the law require that Defendants give away access to even non-protectable data for free.  (*See* Def. Br. 12 ("CGS has the right to set terms that restrict access to and use of the valuable database service it provides to its customers, and to thereby protect its legitimate business interest in not having others free ride on its decades-long investment in collecting and maintaining that data.")).  But Defendants overstate the case that "[d]atabase owners are entitled to protect their business interests even in non-copyrightable databases" by citing unilateral refusal-to-deal cases, like *NYMEX I* and *MiniFrame*, which this case is not.  (Def. Reply 5).

On Defendants' telling, they are simply executing a refusal to deal indirectly.  (Def. Br. 15 ("Just as CGS is not required to deal directly with potential competitors on terms that allow free riding, they are not required to deal indirectly with potential rivals that intend to free ride on their investments.")).  But it is clear that this is *not* a unilateral scheme.  Instead, Defendants have organized a multilateral arrangement by requiring that Third-

Party Data Vendors enforce the terms of Subscription Agreements containing suspect terms.  (SAC ¶ 56 ("CGS's agreements with its [Third-Party Data Vendors] do not allow [them] to distribute CGS Data to firms in bulk or downloadable format unless such firms are properly licensed by CGS.")). Defendants have offered no compelling reason why CUSIP Users should be required to take licenses dictating how they may use non-protected data from parties from whom CUSIP Users do not receive the data.  *Cf. In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 234 (S.D.N.Y. 2019) ("The key inquiry under [the] fact-intensive [patent misuse] doctrine is whether, by imposing an express condition on the post-sale use of a patented product, the patentee has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect." (internal quotation marks and citation omitted and alteration adopted)).  The economic reality in the CUSIP Use Market is the result of Defendants' restrictive distributorship model, which vastly expands Defendants' control over the entire market, regardless of with whom Plaintiffs deal.[12]

---

[12]     Defendants half-heartedly raise the specter of *Noerr-Pennington* immunity with respect to the intersection of copyright and antitrust issues in this case. (Def. Br. 21-22).  Such an argument is peculiar in light of Defendants' later contention that they in fact never threatened copyright infringement litigation.  (*Id.* at 25-28).  Still, Plaintiffs would be correct that such threats pertaining to CUSIP numbers alone would not be immune because they would be a sham.  (Pl. Opp. 24-25).  In any event, though the SAC at times appears to rely on a theory concerning threats about litigation pertaining to CUSIP numbers, the document as a whole presents the narrative of Defendants' expanding control over the CUSIP Use market through an appeal to proprietary interests they may not otherwise have.  Per the SAC, Defendants were able to accomplish this through agreements with Third-Party Data Vendors, despite those vendors not transmitting copyrighted data to CUSIP Users.  Defendants do not suggest that *Noerr-Pennington* would be implicated on these grounds.

The law instructs courts to be wary of prejudging these types of arrangements on a motion to dismiss before engaging in a rule of reason analysis.  For example, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, discussed by both parties, explains that "[t]he metes and bounds of when such behavior impermissibly crosses the line from competitive to violative of the Sherman Act is a highly contextual analysis."  383 F. Supp. at 239; *see also id.* at 238 (finding that defendant could "seek to limit how competitors or potential competitors might free-ride on its investments," but could not "unlawfully restrict other parties in its manufacturing and distribution chain from contracting with competitors").  Defendants' arguments pertaining to *Keurig* rest on a misreading of the SAC.  (*See* Def. Reply 6). Though a case involving intangible property, like this one, differs from *Keurig* on that basis, the setup is basically the same.  In *Keurig*, plaintiffs successfully pleaded a Section 2 claim by alleging that the defendant locked up the supply of inputs for competitors through use of exclusive supply and distribution contracts.  *Id.* at 238.  Though CGS Data originates from Defendants, making it distinguishable to a degree, Defendants have locked up distributors of CUSIP numbers and have guaranteed that competition cannot exist through restrictive license agreements pertaining to how CUSIP Users may use non-protectable data.  This is the case, even as Defendants have no ostensible right to control how CUSIP Users in fact use CUSIP numbers.  *Cf. Eastman Kodak Co.* v. *Image Tech. Servs.*, 504 U.S. 451, 479 n.29 (1992) (noting, in a type of claim not at issue here, that "[t]he Court has held many times that power

35

gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if a seller exploits his dominant position in one market to expand his empire into the next" (internal quotation marks and citation omitted)).

Contrary to the bulk of Defendants' arguments on this point, Plaintiffs' antitrust allegations do not fit the mold of a unilateral refusal to deal. Instead, Plaintiffs allege that Defendants act as a monopolist foreclosing potential competitors through the control of upstream data distributors/suppliers on the one hand in order to expand control over customers and potential competitors on the other. Given the actual allegations in the SAC, Defendants cannot take refuge by simply claiming that CGS data originates from the copyrighted CUSIP_DB. In *Federal Trade Commission* v. *Vyera Pharmaceuticals, LLC*, the defendant pharmaceutical company owned the brand name drug in the relevant product market. 479 F. Supp. 3d 31, 47 (S.D.N.Y. 2020). To block generic pharmaceutical companies' entrance into the relevant market, the defendant (i) restricted sales of the brand name via its distribution contracts which, among other things, prevented sales to generic pharmaceutical manufacturers; (ii) entered into exclusive supply contracts for the active pharmaceutical ingredient; and (iii) entered into data-blocking agreements with its distributors. *Id.* at 40-41.

The *Vyera* defendant invoked the same argument as Defendants here: that it need not share its drug monopoly with potential generic competitors. 479 F. Supp. 3d at 49. While this Court recognizes the obvious point that the

pharmaceuticals market differs from the fintech market, Judge Cote's rejection

of the *Vyera* defendant's argument also has force in this setting.  *Id.* at 49-50.

She reasoned that by entirely cutting off potential competitors' access to the

relevant drug through a constellation of anticompetitive actions, including

restrictive distribution arrangements, the *Vyera* defendant ran afoul of the

Sherman Act:

> The Amended Complaint alleges that Vyera, while
> holding a monopoly, prohibited any sales of Daraprim,
> directly or indirectly, to generic pharmaceutical
> competitors and even re-purchased Daraprim at above-
> retail prices to stymie competitors' access to Daraprim.
> The Amended Complaint further alleges that Vyera did
> so because access to Daraprim was, by regulation,
> necessary for potential competitors to enter the market.
> These allegations plausibly plead that the defendants
> blocked competitors from accessing Daraprim for the
> purpose of maintaining their monopoly.

*Id.* Defendants have prohibited distribution of CUSIP numbers from their

distributors to unlicensed users.  The required Subscription Agreements, in

turn, allow Defendant to exert vast control over the use of CUSIP numbers, not

just the copyrighted CUSIP_DB.  By allowing Third-Party Data Vendors to

distribute data only to users who have signed Subscription Agreements, the

message is clear: if one tries to compete, they lose access.  At this early stage in

the litigation, these allegations are sufficient to distinguish this case from the

no-duty-to-aid-competitors line of caselaw, and to state a claim under Section

2 of the Sherman Act.

Consumers' access (or not) to alternative sources of CUSIP numbers will

ultimately lie at the heart of this case.  So will other hallmarks of an antitrust

action, including market definition.  The Court agrees with Defendants that
Plaintiffs' allegations pertaining to Xignite do not aid their cause, because the
allegations indicate that consumers can in fact access alternative sources of
CUSIP identifiers.  (Def. Reply 15 (summarizing Plaintiffs' allegations regarding
Xignite, including that Xignite was building a competing commercial database
through "independent" sources (quoting SAC ¶ 62))).  But these issues cannot
be resolved on a motion to dismiss concerned solely with Defendants' conduct.
They focus on *effects*, which the Court cannot determine at this juncture.
(*Compare id.* ¶ 133 ("There are no natural barriers to entry into the CUSIP Use
Market.  The CGS website acknowledges that collections of CUSIP numbers can
be created based on public data."), *with id.* ¶¶ 150-58 (cataloging the
anticompetitive effects of the licensing regime)).

For the avoidance of doubt, the mere fact that Plaintiffs and other CUSIP
Users are required to pay a fee to Defendants does not necessarily present an
antitrust problem.  This is true regardless of the existence, or not, of a
copyright in CUSIP numbers.  *See, e.g.*, *Qualcomm*, 969 F.3d at 990
("Allegations that conduct 'has the effect of reducing consumers' choices or
increasing prices to consumers do[ ] not sufficiently allege an injury to
competition … [because] [b]oth effects are fully consistent with a free,
competitive market.'" (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192,
1202 (9th Cir. 2012) (citations omitted)).[13]  Plaintiffs have not cited to any

---

[13]    *Qualcomm* is the subject of much disagreement between the parties, perhaps because it
is at once both analogous to and distinguishable from the case at hand.  As Defendants
point out, *Qualcomm* did not rely on patent law in any dispositive sense.  That said,

authority to suggest that Defendants are not allowed to charge them fees for use of CGS data, even if the elements of the data that Plaintiffs receive are not protected intellectual property.  And *NYMEX I* and *II* easily dispose of any such argument.  *NYMEX I*, 323 F. Supp. 2d at 571 ("NYMEX has a legitimate business interest in preventing its competitor, ICE, from free-riding on NYMEX's settlement prices.  NYMEX's settlement prices have value because they are viewed as proxies for market prices, and NYMEX has a legitimate interest in preventing rivals from free-riding on this reputation."); *NYMEX II*, 389 F. Supp. 2d at 544 ("If a NYMEX settlement price in dollars constituted copyrightable subject matter, public conduct would be limited, regardless of the use of the price and regardless of the context.").

The antitrust concerns of this case instead arise because Defendants, through their restrictive agreements with Third-Party Data Vendors, have created a system designed to prevent any competitive uses of CUSIP numbers. This is far from suggesting that certain of Plaintiffs' contentions "would turn

---

Defendants understate the importance of the *Qualcomm* defendant's intellectual property in enabling it to engage in the at-issue conduct.  *Fed. Trade Comm'n* v. *Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020) ("The [no license, no chips] policy only insists that, whatever chip source an OEM chooses, the OEM pay Qualcomm *for the right to practice the patented technologies embodied in the chip*, as well as in other parts of the phone or other cellular device." (emphasis added)).  More basically, the antitrust concern in *Qualcomm* concerned the upstream chips market (akin to the level at which Third-Party Data Vendors exist in this case), not the downstream OEM market.  *Id.* at 993 ("Moreover, throughout its analysis, the district court failed to distinguish between Qualcomm's *licensing practices* (which primarily impacted OEMs) and its practices relating to *modem chip sales* (the relevant antitrust market).").  Yet here, Plaintiffs contend that Defendants' practices have monopolized the CUSIP Use Market.  *Qualcomm* would have been a different case had the defendant instead licensed its patents to chip makers and still required OEMs receive a license from the defendant. Finally, Plaintiffs are correct to note that *Qualcomm* was not concerned with distribution arrangements, but strictly the defendant's licensing practice of only licensing downstream users.  (Pl. Opp. 15-16).

every distribution model into a concerted refusal to deal." (Def. Reply 4). And
Defendants' contention that "Plaintiffs fail to explain how contractual
provisions preventing Data Vendors from re-distributing CGS's proprietary data
to Data Users who have not contracted with CGS directly excludes *any*
otherwise viable competitor from the 'market for using identifying numbers
after initial issuance'" is preposterous. (Def. Reply 7-8).[14] The SAC is replete
with such allegations. (*See, e.g.*, SAC ¶¶ 80-82 ("[N]o developer [can create a
value-added software product utilizing CUSIP numbers] because the API files
contain CUSIP numbers, and Defendants require a license agreement with S&P
and FactSet as a condition to accessing the CUSIP numbers in the API files");
*id.* ¶ 151 ("The process of obtaining a CUSIP, and the restrictive licensing
imposed on its use imposes unnecessary burdens on firms by interrupting
transactional flow and timing.... [R]estricting the use of CUSIP numbers would
disadvantage new technology and can instead stifle innovation." (internal
quotation marks omitted)). Because Defendants have not moved to dismiss
Plaintiffs' Section 2 claims on any other grounds, the Court denies Defendants'
motion to dismiss these counts.[15]

---

[14]   Again, this is Defendants' rhetorical sleight of hand with regard to the SAC, which
       repeatedly alleges that Defendants have no "proprietary" claim to CUSIP numbers
       disaggregated from the CUSIP_DB.

[15]   The Court understands Plaintiffs' allegations pertaining to Defendants' purported
       manipulation of X9 to bolster their antitrust claims. (*See, e.g.*, Pl. Opp. 33
       ("Defendants' manipulation of the standard setting process demonstrates the
       anticompetitive measures Defendants undertook to ensure CUSIP remained the
       standard and a profitable product.")). Curiously, however, Plaintiffs clarify in their
       opposition that these allegations are pleaded in the alternative, apparently in the event
       that the Court determines that CUSIP numbers are copyrightable. (*Id.* at 31).
       "[C]onduct that undermines the procompetitive benefits of private standard setting may,
       at least in some circumstances, be deemed anticompetitive under antitrust law." *Lotes*

### c.   The Court Grants Defendants' Motion to Dismiss Plaintiffs' Section 1 Claim

Defendants seek dismissal of Plaintiffs' Section 1 group boycott claim on

two grounds: (i) Plaintiffs fail to allege any anticompetitive conduct; and

(ii) Plaintiffs indisputably allege *vertical*, not horizontal, restraints, such that

---

*Co.* v. *Hon Hai Precision Indus. Co.*, No. 12 Civ. 7465 (SAS), 2013 WL 2099227, at *5 (S.D.N.Y. May 14, 2013) (quoting *Broadcom Corp.* v. *Qualcomm Inc.*, 501 F.3d 297, 310 (3d Cir. 2007)), *aff'd on other grounds sub nom. Lotes Co.* v. *Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2d Cir. 2014); 54 AM. JUR. 2D MONOPOLIES AND RESTRAINTS OF TRADE § 139 ("The immunity doctrine applicable to efforts to influence governmental action is not generally applicable to efforts to influence the standard-setting activities of private associations."); *see also, e.g., In re Int. Rate Swaps Antitrust Litig.*, No. 16 MD 2704 (PAE), 2019 WL 1147149, at *13 (S.D.N.Y. Mar. 13, 2019) (noting that antitrust claims concerning standard setting are ordinarily subject to rule of reason analysis).

As discussed in this Opinion, Plaintiffs have stated claims under Section 2 of the Sherman Act. Plaintiffs' allegations concerning manipulation of X9 do not appear to be pleaded as a freestanding claim, but instead are designed to support antitrust liability. Still, both parties have addressed standard-setting issues in separate discussions. Because the Court is not dismissing all of Plaintiffs' antitrust claims, arguments pertaining to standard-setting manipulation are largely beside the point. Still, the Court agrees with Defendants' basic point that Plaintiffs' allegations concerning X9 and Defendants' relation to it are conclusory. *See, e.g., SD3, LLC* v. *Black & Decker (U.S.) Inc.*, 801 F.3d 412, 436 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) ("The common thread in the few cases finding liability in the private standard-setting context is unique, external pressure applied to achieve an anti-competitive end.") (collecting cases). The SAC contains only three paragraphs of allegations concerning standard-setting manipulation. (SAC ¶¶ 112-114). The first paragraph states in conclusory fashion that "the ABA has exerted and continues to exert substantial control over the ostensibly independent X9 as evidenced by the significant ties and overlap between the ABA, CGS, and X9." (*Id.* ¶ 112). The second asserts that "the ABA and S&P agreed and conspired to use their influence over X9 to help ensure that X9 would not choose FIGIs as an alternative standard." (*Id.* ¶ 113). And the third paragraph merely reiterates the conclusory allegations of the second. (*Id.* ¶ 114). Plaintiffs attempt to buttress these allegations in their opposition. (*See, e.g.*, Pl. Opp. 33 ("[T]he ABA falsely made a FRAND commitment to X9 as part of the standard-setting process, X9 relied upon that promise when it affirmed CUSIP as the standard, and the ABA breached its commitment." (citing SAC ¶ 121)). But that is not what paragraph 121 pleads. (*Id.* ("Here, however, the FRAND commitment was an empty promise: X9 was influenced and controlled by the ABA, the party making the FRAND commitment, and its co-conspirator S&P (now FactSet), all of which directly benefitted from Defendants' violation of their FRAND obligations.")). At bottom, Defendants are correct that Plaintiffs seek to establish antitrust liability based on "infer[ring] malfeasance because some of the defendants' representative[s] served on the relevant standard-setting panel." *SD3, LLC*, 801 F.3d at 436. (*See also* Def. Br. 19-20). Plaintiffs' opposition cites to "no authority drawing that sort of naked inference." *SD3, LLC*, 801 F.3d at 436.

any argument for *per se* illegality fails.  (Def. Opp. 22-25).  Plaintiffs contend
that the allegations in the SAC pertaining to Defendants' agreements with
Third-Party Data Vendors depict a classic group boycott that is *per se* illegal.
(Pl. Opp. 17).

 A foray into the two standards governing assessment of anticompetitive
conduct is needed before proceeding with the parties' contentions.  Those
standards are the rule of reason and *per se* illegality.  *See* PHILLIP E. AREEDA AND
HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND
THEIR APPLICATION 1500 (2023) ("A monopolist acting reasonably does not violate
Sherman Act § 2.  Reasonable collaboration among competitors does not violate
Sherman Act § 1.  Although reasonableness is usually judged case by case, it is
sometimes made for a class of conduct, such as price fixing, which is then said
to be intrinsically or 'per se' unlawful.").  Section 1 claims can fall at the motion
to dismiss stage under either standard.  *See, e.g.*, *Cont'l T.V.* v. *GTE Sylvania*,
433 U.S. 36, 59 (1977) ("When anticompetitive effects are shown to result from
particular vertical restrictions they can be adequately policed under the rule of
reason, the standard traditionally applied for the majority of anticompetitive
practices challenged under [Section] 1 of the Act."); *Copy-Data Sys., Inc.* v.
*Toshiba Am., Inc.*, 663 F.2d 405, 408 (2d Cir. 1981) ("While restrictive
agreements among independent business entities at the same level of the
market, so-called 'horizontal' agreements, are illegal *per se*, restraints imposed
by a manufacturer or supplier upon its distributor retailer-customers, so-called

'vertical' restraints, can significantly benefit competition and are permissible unless they violate the rule of reason." (internal citations omitted)).

The SAC is perhaps deliberately cagey with respect to the type of violation it presses. Yet in their opposition, Plaintiffs appear to clarify that they are asserting a *per se* Section 1 claim. (Pl. Opp. 17-21 (analyzing cases discussing *per se* group boycotts, and contending that "[t]he reasoning in those cases make clear that the SAC adequately alleges a group boycott")). Thus, the Court understands from both the SAC and Plaintiffs' opposition that Plaintiffs are not proceeding with a violation assessed under the rule of reason.

Now properly understood, the Court finds that Plaintiffs' Section 1 claim fails as a matter of law. As an initial matter, Plaintiffs' allegations address *vertical*, not horizontal, restraints. For example, Plaintiffs claim that Defendants have a one hundred percent market share in the relevant CUSIP Use Market; in other words, there are no other competitors in the market. But antitrust law has undergone a sea change since cases like *Klor's Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959), cited by Plaintiffs in support of their group boycott theory. (*See* Pl. Opp. 20). *See also, e.g.*, *O.E.M. Glass Network, Inc.* v. *Mygrant Glass Co., Inc.*, No. 19 Civ. 742 (NGG) (LB), 2023 WL 2563689, at *7 (E.D.N.Y. Mar. 17, 2023) ("The *per se* treatment prescribed in *Klor's* has since been cabined to group boycotts that have a horizontal component.") (collecting cases). As relevant here, a group boycott meriting *per se* treatment requires horizontal agreement among direct competitors. *See, e.g.*, *NYNEX Corp.* v. *Discon, Inc.*, 525 U.S. 128, 135 (1998) ("[P]recedent limits

the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors.").

Although, per the SAC, Third-Party Data Vendors could be seen as horizontal competitors to Defendants in the distribution of CUSIP numbers, Plaintiffs' concerns do not home in on such horizontal relationships.  Rather, Plaintiffs take issue with the vertical relationship between Defendants and each Third-Party Data Vendor — a supplier/distributor relationship — and with the further-downstream vertical relationship between Defendants and CUSIP Users.  Even if Defendants and Third-Party Data Vendors compete on one dimension, the at-issue relationships are indisputably vertical.  *See, e.g.*, *Elecs. Commc'ns Corp.*, 129 F.3d at 243 (holding that the *per se* rule is inapplicable "even if the distributor and manufacturer also compete at the distribution level, where, as here, the manufacturer distributes its products through a distributor and independently") (collecting cases).

A quick review of Plaintiffs' cited authority underscores the point that the rule of *Klor's* has been clarified to require *horizontal* restraints of trade in order for the *per se* rule to be applicable.  *See supra.*  In any event, in *Klor's*, a group of horizontal competitors — manufacturers and distributors of various electronics goods and appliances — conspired among each other to boycott the retail plaintiff through either a concerted refusal to deal or horizontal price-fixing.  *Klor's, Inc.*, 359 U.S. at 209.  Likewise, in *PLS.Com, LLC* v. *National Association of Realtors*, the plaintiff alleged that *horizontal* competitors in the market for sellers' listings — known as "MLSs" — agreed among themselves to

restrain competition in the relevant market.  32 F.4th 824, 836 (9th Cir. 2022), *cert. denied sub nom. The Nat'l Ass'n of Realtors* v. *The PLS.com, LLC.*, 143 S. Ct. 567 (2023).  These competitors agreed to sanction real estate agents who posted listings on the plaintiff's upstart website without also posting listings on MLSs.  *Id.*  In sum, "[r]egardless of what [plaintiff] does — whether it charges less to list properties, provides a nationwide network, or develops a better interface — agents who belong to a NAR-affiliated MLS may not list on [plaintiff's service] without also listing on an MLS.  Thus, the [boycott] essentially eliminates competition for most sellers' agents' listings between NAR-affiliated MLSs and rival services."  *Id.* (emphasis omitted).  The requisite horizontal agreement among direct competitors is also present in *PharmacyChecker.com, LLC* v. *National Association of Boards of Pharmacy*, 530 F. Supp. 3d 301, 318 (S.D.N.Y. 2021) (alleging agreements between direct competitors in online pharmacy verification and comparative drug-pricing information); *see also id.* at 332-37 (examining plus factors showing conspiracy).

Plaintiffs contend that these cases stand for the principle that group boycotts may have both horizontal and vertical elements.  (Pl. Opp. 19).  So stipulated:  Group boycotts may be executed by *horizontal* competitors collectively working to deny a competitor an input, which of course involves a vertical component, and they may also involve a vertical player.  But in all cases a *horizontal* agreement is present, and that is lacking here.  Again, Plaintiffs' allegations focus solely on the agreements between Defendants and

their distributors, the Third-Party Data Vendors.  (*See, e.g.*, Def. Br. 23

("Plaintiffs allege a chain of distribution in which CGS enters agreements with

Data Vendors to provide them with CGS Data, and the Data Vendors in turn

'distribute' that data to Data Users." (quoting SAC ¶¶ 45-47))).  Plaintiffs

entirely fail to respond to this argument, other than to suggest in conclusory

fashion that group boycotts may have both vertical and horizontal aspects.

(*See* Pl. Opp. 19).  But as the preceding analysis makes clear, such an

argument does not address the fact that regardless of the existence of a vertical

component, the putative boycott *must* have a horizontal component, which is

lacking here.

Perhaps recognizing this deficiency, Plaintiffs try to confuse the issue by

transforming, in conclusory fashion, the series of vertical agreements between

Defendants and Third-Party Data Vendors into horizontal collusion.  The SAC

avers that

> the Third-Party Data Vendors knew that all other Third-
> Party Data Vendors were also agreeing to the group
> boycott orchestrated by Defendants.  Specifically,
> Third-Party Data Vendors knew that S&P, itself a data
> vendor, was requiring the other Third-Party Data
> Vendors, which competed with S&P and with each
> other, to enter into an agreement containing these
> restrictions.

(SAC ¶ 57).  In essence, then, Plaintiffs would be alleging a hub-and-spoke

conspiracy.[16]  Still, Plaintiffs allege no horizontal agreement between and

among the spokes of such arrangement, *i.e.*, the Third-Party Data Vendors.

---

[16]    Plaintiffs do not actually invoke the hub-and-spoke theory in their opposition.

*See, e.g.*, *In re Inclusive Access Course Materials Antitrust Litig.*, 544 F. Supp. 3d 420, 437 (S.D.N.Y. 2021) ("The SAC fails to plead that the Retailer Defendants and the Institutions, the 'spokes' in the alleged hub-and-spoke conspiracy, entered into a horizontal agreement with each other.  This alone is fatal to the plaintiffs' claim."); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016) ("Existing case law makes clear that a hub-and-spoke theory is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other.").

Instead, Plaintiffs suggest that because each of the Third-Party Data Vendors knew that their colleagues had also signed vertical agreements with Defendants, a horizontal agreement exists.  (*See* Pl. Opp. 20-21).  For starters, Plaintiffs' allegations of such knowledge are entirely conclusory; for example, Plaintiffs plead that S&P told Hildene that S&P maintains vertical agreements with all Third-Party Data Vendors, which does not show that *Third-Party Data Vendors* knew that contracts were the same among each other.  *See, e.g.*, *Howard Hess Dental Lab'ys Inc.* v. *Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) ("Instead of underscoring factual allegations plausibly suggesting the existence of an agreement, the Plaintiffs invite us to infer that the Dealers were aware of each other's involvement in the conspiracy because, as market participants, they all knew that Dentsply was the dominant player in the artificial tooth market and because they all had an economic incentive to create and maintain a regime in which Dentsply reigned and the Dealers did its

47

bidding."); *cf. Laumann* v. *Nat'l Hockey League*, 907 F. Supp. 2d 465, 486-87
(S.D.N.Y. 2012) ("Moreover, where parties to vertical agreements have
knowledge that other market participants are bound by identical agreements,
and *their participation is contingent upon that knowledge*, they may be
considered participants in a horizontal agreement in restraint of trade."
(emphasis added)).

        More to the point, Plaintiffs do not suggest that the Third-Party Data
Vendors agreed to enter into the alleged group boycott *because of* any
knowledge that other vendors signed similar agreements, nor any of the
requisite plus factors to infer a horizontal agreement.  Knowledge alone is
insufficient to infer horizontal agreements between competitors, a point to
which Plaintiffs never respond.  *See, e.g.*, *PepsiCo, Inc.* v. *Coca-Cola Co.*, 315
F.3d 101, 110 (2d Cir. 2002) ("The district court correctly rejected PepsiCo's
Section 1 claim on the ground that it failed to proffer sufficient evidence of a
horizontal agreement among the IFDs.  PepsiCo offered no evidence of direct
communications among the IFDs; its 'offer of proof' of an agreement was simply
that Coca-Cola assured the IFDs that the loyalty policy would be uniformly
enforced and encouraged them to report violations."); *O.E.M. Glass Network,
Inc.* v. *Mygrant Glass Co., Inc.*, 436 F. Supp. 3d 576, 593-94 (E.D.N.Y. 2020)
("Plaintiffs have alleged such circumstantial evidence and plus factors here,
including a high level of interfirm communication and that the [m]anufacturer
[d]efendants each acted against their apparent economic self-interest by
refusing to deal with [plaintiff]." (internal quotation marks and citations

48

omitted)).  Plaintiffs do not suggest that any Third-Party Data Vendor's decision to execute the agreement was contingent on another vendor's execution of the same agreement; instead, the most logical conclusion is that Third-Party Data Vendors simply wanted to distribute CGS data.  *See Nastasi & Assocs., Inc.* v. *Bloomberg, L.P.*, No. 20 Civ. 5428 (JMF), 2022 WL 4448621, at *12 (S.D.N.Y. Sept. 23, 2022) ("The alleged bid-rigging scheme here depended on each subcontractor knowing that the others would be participating.").  For all of these reasons, because Plaintiffs fail to allege a *per se* Section 1 claim and have not suggested that this claim should be analyzed under the rule of reason, this count is dismissed.

## C.    The Court Grants Defendants' Motion to Dismiss Plaintiffs' Copyright Claim

As alluded to, a core component of Plaintiffs' case also concerns copyright law.  Specifically, Plaintiffs seek a declaratory judgment that CUSIP numbers are neither copyrighted nor copyrightable.  (SAC ¶ 167).  But Defendants counter that the Court cannot reach this issue because Plaintiffs lack Article III standing to bring it.  (Def. Opp. 25).  On this issue, the Court agrees with Defendants.

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  Of course, as in any case, the Declaratory Judgment Act requires "a case of actual controversy"; in

49

other words, the plaintiff must have Article III standing.  *See MedImmune, Inc.*
v. *Genentech, Inc.*, 549 U.S. 118, 126-27 (2007) ("Our [prior] opinion explained
that the phrase 'case of actual controversy' in the Act refers to the type of
'Cases' and 'Controversies' that are justiciable under Article III." (internal
citation and quotation marks omitted)).  Thus, a threshold requirement for
declaratory relief is that a plaintiff show "[i] that he suffered an injury in fact
that is concrete, particularized, and actual or imminent; [ii] that the injury was
likely caused by the defendant; and [iii] that the injury would likely be
redressed by judicial relief."  *TransUnion LLC* v. *Ramirez*, 141 S. Ct. 2190, 2203
(2021) (citing *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  "As
with any federal action, courts may not entertain actions for declaratory
judgment 'when the parties are asking for an advisory opinion, when the
question sought to be adjudicated has been mooted by subsequent
developments, and when there is not standing to maintain the action.'"  *Velvet
Underground* v. *Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d
398, 403 (S.D.N.Y. 2012) (quoting *Flast* v. *Cohen*, 392 U.S. 83, 95 (1968)).  "[A]
plaintiff must demonstrate standing for each claim and form of relief sought."
*Carver* v. *City of New York*, 621 F.3d 221, 225 (2d Cir. 2010) (quoting *Baur* v.
*Veneman*, 352 F.3d 625, 642 n.15 (2d Cir. 2003)).

The first element — injury in fact — is missing here.  Defendants do not
own a copyright in CUSIP numbers.  And Plaintiffs never suggest the contrary.
(Def. Br. 26).  Though Defendants' alleged attempt to expand their intellectual
property holdings through potentially anticompetitive agreements may be

50

relevant to the antitrust issues discussed above, their lack of a copyright in CUSIP numbers vitiates Plaintiffs' effort to drum up standing for the copyright claim.  Plaintiffs suggest that the lack of a copyright is irrelevant because (i) the Subscription Agreement gives Defendants a variety of remedies for misuse of CGS data; and (ii) Defendants could move to register a copyright immediately before filing a litigation.  (Pl. Opp. 25-26).  As to the former contention, Plaintiffs' argument is self-defeating.  Rather than bolster any purported threat of copyright litigation concerned with CUSIP numbers, it reveals that Defendants' remedies would be based on contract and tort law premised on the Subscription Agreements, and not on a statutory copyright claim.  (Def. Br. 27).

As to the latter argument, Plaintiffs offer no authority that such a contingent scenario would present an adequately imminent and concrete threat to confer Article III standing.  Plaintiffs do suggest that lack of copyright registration is not a jurisdictional bar.  (Pl. Opp. 26 (citing *Reed Elsevier, Inc.,* v. *Muchnick,* 559 U.S. 154, 157 (2010))).  But this suggestion is irrelevant to the question at hand.  Indeed, *Muchnick* says nothing about standing, and only holds that Section 411's registration requirement is a claims-processing rule, not a jurisdictional rule.  *Muchnick,* 559 U.S. at 169.  *Muchnick* does not suggest that when a question of copyrightability is presented, a plaintiff automatically has standing.  To so hold would run contrary to the basic principle that "a plaintiff must demonstrate standing for each claim [s]he seeks to press."  *Mahon* v. *Ticor Title Ins. Co.,* 683 F.3d 59, 64 (2d Cir. 2012) (quoting *DaimlerChrysler Corp.* v. *Cuno,* 547 U.S. 332, 335 (2006)).

Federal courts across the country have recognized that plaintiffs lack Article III standing to seek declaratory relief for noninfringement or invalidation of copyrights on similar facts to those presented here. *See, e.g.*, *John Wiley & Sons, Inc.* v. *DRK Photo*, 998 F. Supp. 2d 262, 291 (S.D.N.Y. 2014) ("The Court's determination that [defendant] lacks standing effectively moots the controversy between the parties.  In light of the Court's holding, [plaintiff] is no longer confronted with a reasonable apprehension that it will be subject to liability to [defendant] for the alleged infringement, if it continues to engage in the allegedly infringing conduct."), *aff'd*, 882 F.3d 394 (2d Cir. 2018); *Velvet Underground*, 890 F. Supp. 2d at 404 ("Accordingly, in intellectual property cases, when a declaratory judgment plaintiff seeks a declaration that an asserted right is invalid or otherwise unenforceable and the declaratory defendant provides the plaintiff with a covenant not to sue for infringement of that right, that covenant can extinguish[ ] any current or future case or controversy between the parties, and divest[ ] the district court of subject matter jurisdiction." (internal quotation marks and citation omitted)); *Softketeers, Inc.* v. *Regal W. Corp.*, No. 19 Civ. 519 (JWH), 2022 WL 17968835, at *4 (C.D. Cal. Dec. 22, 2022) ("[Counterclaim defendant] cannot maintain a copyright infringement action with respect to those works unless and until it obtains new registrations pertaining to them from the Copyright Office.  That necessity suggests that there is no longer 'sufficient immediacy' to warrant declaratory relief [that counterclaim plaintiff owns the relevant copyright]." (quoting *MedImmune*, 549 U.S. at 127 (internal citation omitted))); *cf. Lumetrics,*

*Inc.* v. *Blalock*, 23 F. Supp. 3d 138, 144 (W.D.N.Y. 2014) ("[Plaintiff] fails to state a copyright infringement claim based upon software that is not registered. Because it is impossible to separate [plaintiff's] claims based upon software with registered copyrights from its claims based upon unregistered copyrights, and because no application was made by [plaintiff] to amend its complaint to properly limit its claims to the registered copyrights, the complaint's one-count cause of action for copyright infringement necessarily fails to state a claim.").

Simply put, Plaintiffs' declaratory judgment claim premised on CUSIP numbers being non-copyrightable relies on too many contingencies to present an actual case or controversy. This is so even if, as Plaintiffs claim, *MedImmune* "lowered the threshold for establishing the existence of an actual case or controversy in intellectual property-related declaratory judgment cases." (Pl. Opp. 23 (internal citations and quotation marks omitted)). Regardless, *MedImmune* itself is inapposite. In that case, the Supreme Court was confronted with a situation in which the patent-holder threatened patent infringement litigation and demanded royalty payments owing under a license agreement with the plaintiff. *MedImmune*, 549 U.S. at 121-22. By contrast here, Plaintiffs do *not* point to instances of Defendants threatening copyright infringement litigation if Plaintiffs refused to sign a Subscription Agreement. Instead, they identify (i) instances where Defendants noted that CGS data would be stripped from data feeds absent a valid Subscription Agreement; or (ii) references to *contractual* remedies based on the Subscription Agreements. (*See, e.g.*, SAC ¶¶ 106-110 (discussing the correspondence between S&P and

Hildene, in which S&P stated that "if CGS is unable to reach an agreement with Hildene Capital, your firm may lose access to CGS data")).  Plaintiffs make the conclusory assertion that these threatened actions meant that Defendants threatened copyright infringement litigation.  (Pl. Opp. 22).  But Plaintiffs point to no instance of Defendants in fact threatening such litigation, even if Defendants' conduct could be seen as anticompetitive.  As such, Plaintiffs lack standing to press their claim for declaratory relief concerning the copyrightability *vel non* of CUSIP numbers, and that claim is dismissed.[17]

### D.    The Court Denies Defendants' Motion to Dismiss Plaintiffs' State Law Claims

#### 1.    Plaintiffs State a Claim Under GBL Section 349

Finally, the Court considers Plaintiffs' claims under New York and Connecticut state law.  To make out a claim under New York's GBL Section 349, a plaintiff must show that "a defendant has engaged in [i] consumer-oriented conduct that is [ii] materially misleading and that [iii] [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Orlander* v. *Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (citation omitted).  Although a plaintiff may state a Section 349 claim premised on monopolistic conduct, *see, e.g.*, *Cox* v. *Microsoft Corp.*, 778 N.Y.S.2d 147, 148 (1st Dep't 2004) ("A cause of action under General Business Law § 349 is stated by plaintiffs' allegations

---

[17]    Plaintiffs raise their FRAND breach of contract claim in the alternative.  (SAC ¶ 190). Specifically, Plaintiffs state that "[t]his Claim is relevant if any only if CUSIP numbers were found to be protected by copyright."  (*Id.*).  However, the Court has found that Plaintiffs lack standing to bring a declaratory judgment copyright claim.  Thus, it agrees with Defendants that "Plaintiffs' breach of contract claim should be dismissed along with their declaratory judgment claim."  (Def. Br. 33 n.13).  Plaintiffs do not meaningfully respond to this point in Defendants' brief.

that [defendant] engaged in purposeful, deceptive monopolistic business practices, including entering into secret agreements with computer manufacturers and distributors to inhibit competition and technological development."), a plaintiff must still plead that the alleged monopolist engaged in deceptive conduct, *see, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1128 (N.D. Cal. 2008).

Defendants raise several challenges to Plaintiffs' GBL claim, including that Plaintiffs: (i) fail to plead deceptive conduct; (ii) fail to plead a cognizable injury; and (iii) posit a theory that is preempted by the Copyright Act. (Def. Br. 29-31). Defendants' arguments on the first and third issues overlap to some extent. In essence, Defendants suggest that allegations in the SAC pertaining to the proprietary interest Defendants have in CUSIP numbers were not false, and in any event such assertions would be preempted by the Copyright Act. (*Id.*). But these arguments are misplaced, insofar as they rely on re-characterizing the SAC's allegations. Although GBL claims that are "not qualitatively different than the [p]laintiffs' request for a declaration that the [d]efendants have no valid copyright" are indeed preempted by the Copyright Act, *We Shall Overcome Found.* v. *Richmond Org., Inc. (TRO Inc.)*, 221 F. Supp. 3d 396, 412 (S.D.N.Y. 2016), allegations of "'intentional deception' constitute[] an extra element not required in a copyright infringement claim," *Samara Bros.* v. *Wal-Mart Stores, Inc.*, 165 F.3d 120, 131 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 205 (2000).

Plaintiffs at a minimum raise fact issues concerning the alleged anticompetitive scheme and deceptive conduct, based on Defendants' representations concerning their interest in CUSIP numbers. This is quite a different issue than whether Defendants have in fact threatened infringement litigation over use of CUSIP numbers. *See supra.* Instead, the SAC's allegations suggest that Defendants have been intentionally cagey with respect to what proprietary interests they have in CUSIP numbers, and why Plaintiffs must obtain a license. (*See, e.g.*, SAC ¶ 87 (email to Dinosaur, which received CUSIP numbers from Third-Party Data Vendor, claiming that a Subscription Agreement was required because "proprietary CUSIP data is being utilized within your firm" (emphasis omitted)); *id.* ¶ 88 (email to Swiss Life that suggested that "Swiss Life could not use the CUSIP numbers in its business if it failed to execute a license agreement"); *id.* ¶¶ 103-104 (contract negotiations with Swiss Life in which S&P appeared to suggest that CUSIP numbers in ISINs were S&P's intellectual property)). As discussed, Defendants' actions may present a case of antitrust liability, insofar as they are found to have utilized a copyright over the CUSIP_DB and contractual relationships with Third-Party Data Vendors to suppress competition in the CUSIP Use market. So too do Plaintiffs plead deceptive conduct going above and beyond a mere copyright claim, as Defendants could be seen as misrepresenting their interests in CUSIP numbers.

Defendants' argument about a lack of cognizable injury is likewise misplaced. As a first line of attack, Defendants state that "Plaintiffs do not

allege that, absent the purported assertion of a copyright on the CUSIP identifiers, they or any other Data User would not have entered a license agreement." (Def. Br. 30). But the SAC plainly pleads as much, particularly as it relates to suppression of competition as a result of the licensing regime. (*See, e.g.*, SAC ¶¶ 60-63, 74, 86-91). And Defendants' contention that Plaintiffs do not "allege that the deception caused [them] an injury beyond merely having paid the purchase price for the product" is not serious. (Def. Br. 30). The SAC teems with allegations concerning supracompetitive fees for use of CUSIP numbers due to Defendants' conduct and that Plaintiffs would not have paid license fees to Defendants in the absence of their representations, as well as anticompetitive market effects of such conduct. This is sufficient. *See, e.g.*, *Fishon* v. *Peloton Interactive, Inc.*, 620 F. Supp. 3d 80, 99-100 (S.D.N.Y. 2022) (explaining two theories of injury under GBL Section 349, including where a plaintiff relies on deception to her detriment or pays a price premium). In other words, Defendants' proffered cases do not control. *See, e.g.*, *Small* v. *Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56 (1999) (holding that plaintiffs failed to plead a cognizable injury because plaintiffs did not plead "that the cost of cigarettes was affected by the alleged misrepresentation, nor [did] they seek recovery for injury to their health as a result of their ensuing addiction").

### 2. Plaintiffs State a Claim Under CUTPA

CUTPA broadly prohibits any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a). To state a claim under CUTPA, courts consider

> [i] whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; [ii] whether it is immoral, unethical, oppressive, or unscrupulous; [and] [iii] whether it causes substantial injury to consumers, competitors or other businesspersons.

*Pro Music Rts., LLC* v. *Apple, Inc.*, No. 20 Civ. 309 (JAM), 2020 WL 7406062, at *11 (D. Conn. Dec. 16, 2020) (quoting *Cenatiempo* v. *Bank of Am., N.A.*, 333 Conn. 769, 790 (2019) (brackets omitted)).  Importantly, "[a]ll three criteria do not need to be satisfied to support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three."  *Ulbrich* v. *Groth*, 310 Conn. 375, 409 (2013) (internal quotation marks and citation omitted).  And as relevant here, "the standards governing an antitrust plaintiff's CUTPA claim alleging unfair competition largely mirror the standards governing federal claims arising under the Sherman and Clayton Acts and state claims arising under the Connecticut Antitrust Act."  *St. Francis Hosp. & Med. Ctr., Inc.* v. *Hartford Healthcare Corp.*, No. 22 Civ. 50 (SVN), 2023 WL 1967133, at *7 n.5 (D. Conn. Feb. 13, 2023) (citing, *inter alia*, *1-800 Contacts, Inc.* v. *Fed. Trade Comm'n*, 1 F.4th 102, 114 (2d Cir. 2021)).

As with Plaintiffs' New York GBL claim, Defendants have moved to dismiss the CUTPA claim.  (Def. Br. 31-32).  However, unlike the GBL claim, both parties recognize that this claim may survive if Plaintiffs state a valid Sherman Act claim.  (*See id.* at 32 ("This claim fails because, as discussed

above, far from being anticompetitive or otherwise against public policy, the conduct Plaintiffs allege is legitimate, procompetitive behavior."); Pl. Opp. 30 (arguing that allegations overlapping with federal antitrust claims "alone are sufficient to state unfair conduct")).  As such, Plaintiffs' CUTPA claim survives, and the Court need not address the parties' contentions pertaining to "immoral, unethical, oppressive, or unscrupulous" or deceptive conduct.  (Def. Br. 32; Pl. Opp. 30-31).  Likewise, as the Court has rejected Defendants' arguments pertaining to injury and preemption, it does the same with respect to the CUTPA claim.  (Def. Br. 32).

## CONCLUSION

For the reasons discussed in this Opinion, Defendants' motion to dismiss the SAC is GRANTED IN PART and DENIED IN PART.  The Court grants the motion with respect to Plaintiffs' Sherman Act Section 1, copyright, and breach of contract claims.  The Court denies the motion as to the remainder of Plaintiffs' claims.

Defendants are directed to file an answer to the remaining claims on or before **August 7, 2023**.  The parties are directed to submit a proposed case management plan on or before **August 14, 2023**.

The Clerk of Court is directed to terminate the pending motion at docket entry 90 in Case No. 22 Civ. 1860, and to terminate the pending motion at docket entry 74 in Case No. 22 Civ. 1929.  The Clerk of Court is also directed to close Case No. 22 Civ. 1929.  The parties shall proceed in this consolidated action in the 22 Civ. 1860 docket.

SO ORDERED.

Dated:      July 14, 2023
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge