# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

DINOSAUR FINANCIAL GROUP LLC, SWISS
LIFE INVESTMENT MANAGEMENT
HOLDING AG, and HILDENE CAPITAL
MANAGEMENT, LLC, on behalf of themselves
and all others similarly situated,

              Plaintiffs,

              -v.-

S&P GLOBAL, INC., AMERICAN BANKERS
ASSOCIATION, and FACTSET RESEARCH
SYSTEMS INC.,

              Defendants.

1:22-cv-1860

# Expert Report of

# Professor Einer Elhauge

8/29/2025

I.    Qualifications ........................................................................................4

II.    Introduction and Assignment .............................................................5

III.    Summary of Opinions ........................................................................8

IV.    Background ........................................................................................16

   A.    The History of CUSIPs ...................................................................16

   B.    CUSIPs and Other Identifiers Today ..............................................18

V.    Market Definition...............................................................................23

   A.    An Economic Methodology for Market Definition .......................24

   B.    There Is a Relevant Product Market for CUSIP Identifier Use and a Relevant Submarket for US CUSIP Use .........................................................26

     1.    Qualitative Evidence that Neither CUSIP Identifiers Nor US CUSIPs Have Reasonable Economic Substitutes ........................................27

       a.    Statutory, Regulatory, and Operational Mandates That Effectively Require the Use of US CUSIPs and Other CUSIP Identifiers ...................28

       b.    Network Effects and the Infrastructure of Financial Markets ...........32

       c.    The Widespread Perception That CUSIP Identifiers Are Indispensable for Participation in the Financial System.....................................34

       d.    Conclusion Based on the Lack of Economically Reasonable Substitutes 36

     2.    Quantitative Evidence that the Posited Markets for the Use of CUSIP Identifiers or US CUSIPs Satisfy the Hypothetical Monopolist Test .............38

     3.    The Markets for CUSIP Identifiers and US CUSIPs Each Include Their Derivative CUSIP-Based ISINs.................................................................39

     4.    Defining a Market for All CUSIP Identifiers Is Preferable to Defining a Market for US CUSIPs ...................................................................41

   C.    The Relevant Geographic Market Is the United States, But the Analysis Would Be the Same if It Were a Global Market.................................................41

VI.    Market Power and Monopoly Power .........................................................43

   A.    High Market Share Coupled with High Barriers to Entry ...........................44

     1.    High Market Share.................................................................................44

     2.    High Barriers to Entry ........................................................................46

B.    Direct Evidence that CGS Had and Has the Power to Raise Prices Above Competitive Levels, as Well as to Price Discriminate ........................................52

C.    Direct Evidence that CGS had the Power to Exclude Rivals .....................56

VII.    Anticompetitive Exclusionary Conduct....................................................56

VIII.    Anticompetitive Effects ..........................................................................58

IX.    Procompetitive Effects..............................................................................60

X.    Class Member Identification and Damages Methodology .............................62

**XI.    DAMAGES TO THE CLASSES AND TO INDIVIDUAL MEMBERS** ....................65

A.    Overcharge Injury and Damages If the Relevant Market Is All CUSIP Identifiers .............................................................................................66

B.    Overcharge Injury and Damages If the Relevant Market Is Limited to US CUSIP Use .............................................................................................68

1.    Class-Wide Method 1 ..............................................................68

2.    Class-Wide Method 2 ..............................................................69

**EXHIBIT A** ...............................................................................................72

**EXHIBIT B** ...............................................................................................87

# I.    QUALIFICATIONS

1.    I am the Petrie Professor of Law at Harvard University, where I teach and write about the economic analysis of antitrust law, health policy, and various other subjects.  I am the author of various books, including *U.S. Antitrust Law & Economics*; co-author of *Global Antitrust Law & Economics*, *Global Competition Law & Economics*, and *Areeda, Elhauge & Hovenkamp, Vol X, Antitrust Law*; and editor of *The Research Handbook on the Economics of Antitrust Law* and *The Fragmentation of U.S. Health Care*.  I am also the author of numerous articles on various topics involving the economic analysis of antitrust and other legal issues, including articles on monopolization and exclusionary agreements.  My CV (attached as Exhibit A) lists all my publications, including all those in the past ten years.  Exhibit B to this report describes my compensation and the cases in which I have testified as an expert in a trial or deposition in the past four years.  I am being compensated at a rate of $1900 per hour for my work on this case, and my consulting firm, Legal Economics LLC, is being compensated at $245-$945 per hour for the work of my staff on this report.  None of my compensation in this case is contingent upon the outcome of the case or any aspect of the case.

2.    I am also President of Legal Economics, LLC, which provides expert witnesses and support work on legal cases.  I have testified as an expert witness on antitrust economics in dozens of federal cases.  I have been qualified as an expert in antitrust economics in all twenty-five court opinions that addressed that question, and my economic and econometric methodologies have been repeatedly sustained and found reliable.  I also have served as an expert witness on antitrust economics before Congress, arbitration panels, and competition agencies in the U.S., the EC, Korea, and Brazil.  My testimony as an economics expert has spanned a wide range of topics, including reverse-payment settlements, other horizontal agreements, vertical agreements, mergers, monopolization and exclusionary conduct, price discrimination, health economics, patent economics, and contract economics.  My clients have included leading corporations, law firms, and the United States government.  I have been named one of the world's leading competition economists in the *International Who's Who of Competition Lawyers and Economists*.

3.    I am a Member of Advisory Boards for the Journal of Competition Law & Economics, the Social Sciences Research Network on Antitrust Law & Policy, and the Social Sciences Research Network on Telecommunications & Regulated Industries.  I have taken courses in economics, statistics, antitrust, and economic analysis of law, and I regularly read and use economic literature on antitrust economics, including books on industrial organization.  I also regularly attend

workshops on those and other topics regarding the economic analysis of law. I routinely use and teach economic analysis in my classes, including those that I regularly offer on antitrust law and economics.

## II.    INTRODUCTION AND ASSIGNMENT

4.      I have been retained by counsel for Plaintiffs and the proposed Classes, Competition Law Partners PLLC, Kaplan, Fox & Kilsheimer LLP, and Wollmuth Maher & Deutsch LLP ("Counsel"), to provide independent economic opinions in the matter of *Dinosaur Financial Group LLC, et al. v. CUSIP Global Services, et al.* 1:22-cv-01860, (S.D.N.Y.). I will refer to defendant CUSIP Global Services as "CGS" throughout this report.[1] This matter concerns the licensing and use of financial instrument identifiers, which are used to enable participants in financial markets to communicate clearly and efficiently about the identity of financial instruments.

5.      Plaintiffs allege that Defendants unlawfully (1) maintained a monopoly in the CUSIP Use Market through exclusionary conduct, including imposing exclusionary agreements that restrained the distribution and use of CUSIP Identifiers; and (2) conspired to monopolize that market by engaging in exclusionary conduct.[2]   Plaintiffs further alleged that this anticompetitive conduct resulted in anticompetitive effects throughout the Class Period, which included: (a) excluding potential competitors from entering or expanding in the relevant market; (b) inflating the prices paid by market participants; and (c) stifling innovation in financial instrument identification and related services.[3]

6.      I understand that pursuant to a Stipulation and Order Regarding Class Discovery and Amended Schedule entered March 21, 2025 (ECF No. 198), Plaintiffs on April 25, 2025, notified Defendants' counsel of the following amended class

---

[1] I treat CGS as interchangeable with FactSet or S&P for purposes of my economic analysis because CGS is a business division of FactSet and was formerly a business division of S&P. FactSet press release, 3/1/22, FactSet Completes Acquisition of CUSIP Global Services. ("FactSet (NYSE:FDS) (NASDAQ:FDS), a global provider of integrated financial information, analytical applications and industry-leading services, today announced the successful completion of its acquisition of CUSIP Global Services (CGS) from S&P Global Inc. for approximately $1.925 billion.").

[2] Plaintiff's Second Amended Class Action Complaint, *Dinosaur Fin. Grp. LLC et al. v. S&P Glob., Inc et al.*., C.A. No. 22 Civ. 1860 (KPF) (S.D.N.Y. Dec. 21, 2022) (ECF No. 87) (hereinafter "SACAC").

[3] Second Amended Class Action Complaint ¶¶14, 15-160.

definition for damages purposes:

> "All persons or entities that paid a license fee to S&P or FactSet for the use of CGS identifiers pursuant to a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement at any time from March 4, 2018, until March 14, 2025 (the 'Class Period'), and did not license a database product or database service from CGS offered under such agreement, other than web-based products or services offered without further charge."

I am informed that, with the exception of the change of the term "CGS identifiers" to "CUSIP Identifiers" (which is a change in name only and not in the substance of the identifiers being referenced) this is the same definition that is being proposed in connection with the class certification motion papers that accompany this Report, and I refer to it herein as the Antitrust Damages Class.

7.     I understand that the proposed Injunctive Relief Class is similar to that of the Antitrust Damages Class, with the exception that the Injunctive Relief Class is defined as those people and entities paying a license fee to the current owner of CGS, FactSet, at the time of certification.  I understand the proposed Injunctive Relief Class is defined as:

> "All persons or entities that currently are paying a license fee to FactSet for the use of CUSIP Identifiers pursuant to a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement and did not license a database product or database service from CGS offered under such agreement, other than web-based products or services offered without further charge."

8.     I understand the proposed New York Unfair Business Practices Sub-Class to be defined as:

> "All persons or entities that paid a license fee to S&P or FactSet for the use of CUSIP Identifiers pursuant to a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement at any time from March 7, 2019, until March 14, 2025 (the 'New York Sub-Class Period'), and did not license a database product or database service from CGS offered under such agreement, other than web-based products or services offered without further charge."

9.     I understand the proposed Connecticut Unfair Business Practices Sub-Class to be defined as:

> "All persons or entities that reside in Connecticut and paid a license fee to S&P or FactSet for the use of CUSIP Identifiers pursuant to a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution

Agreement at any time from March 7, 2019, until March 14, 2025 (the 'Connecticut Sub-Class Period'), and did not license a database product or database service from CGS offered under such agreement, other than web-based products or services offered without further charge."

10.    Plaintiffs' Counsel asked me to offer expert economic opinions on the following issues:

A. Can economic analysis and evidence common to each of the proposed Classes and Subclasses be used to define the relevant product and geographic markets for each such Class during the Class Period?

B. Can economic analysis and evidence common to each of the proposed Classes and Subclasses be used to establish that Defendants possessed market power and monopoly power in the relevant markets during the Class Periods?

C. Can economic analysis and evidence common to each of the proposed Classes and Subclasses be used to establish that Defendants' conduct had the effect of excluding actual or potential rivals from entering or expanding in the relevant markets during the Class Periods?

D. Can economic analysis and evidence common to each of the proposed Classes and Subclasses be used to establish that, during the Class Periods, Defendants' conduct inflated prices above competitive levels?

E. Can economic analysis and evidence common to each of the proposed Classes and Subclasses be used to establish that, during the Class Periods, Defendants' conduct stifled innovation in the use of financial instrument identification and related services?

F. Can economic analysis and evidence common to each of the proposed Classes and Subclasses be used to assess whether (a) the challenged anticompetitive conduct had any procompetitive benefits that could not have been achieved through less restrictive means, and (b) whether any such benefits were sufficiently large—and passed through to users to a sufficient extent—to offset the anticompetitive harms experienced by users?

G. Can economic analysis and evidence common to each of the proposed

Classes and Subclasses be used to prove that all or virtually all members of the proposed Classes were injured by Defendants' challenged anticompetitive conduct?

H. Can economic analysis and evidence common to each of the proposed Classes and Subclasses be used to estimate aggregate damages to the Class and to provide a methodology for determining the damages individual class members suffered as a result of the alleged anticompetitive conduct?

## III.    SUMMARY OF OPINIONS

11.    The opinions I express herein are based upon my personal knowledge, experience, and expertise, as well as on information I have reviewed to date.  This information consists of produced and publicly available documents collected by me and staff working under my direction, who had access to the full production of documents in this case and were able to search the full production and to review those documents, as well as information that I or my staff requested that was provided to me by attorneys for the Plaintiffs, including documents produced by the parties, transcripts of depositions taken  in this case, and certain other case filings. In addition, my opinions rely in part on Plaintiffs' expert analyses performed by Alan Schachter, Arthur Miller, Bettina Bergmann, Frank Lenz, and James Powell. The specific information upon which I have relied in reaching the opinions expressed in this expert report is identified in the footnotes of this report.  I reserve the right to amend and supplement the analysis and opinions expressed herein based on further information I may receive after the date of the report.

12.    **Commonality.**  In summary, my analysis leads to the opinion that each of the issues I have been asked to consider can be effectively resolved using methodologies and evidence that are common to each of the proposed Classes, Subclasses, and their respective Members.

13.    **Market Definition.**  I find that market definition can be established using methodologies and evidence common to each of the proposed Classes and Subclasses.   Specifically, I conclude that there is a relevant product market for the use of CUSIP Identifiers, which includes any CUSIP (US or Canadian) and any CUSIP International Number (CIN), as well as their corresponding CUSIP-derived International Securities Identification Numbers (ISINs), if any.  All those types of identifiers were and continue to be: (1) used to identify financial instruments that were issued by US firms and/or trade in the US; (2) required to engage in certain activities involving US-issued or US-traded financial instruments; (3) bundled

together into use licenses by CGS that were purchased by all class members; and (4) restrained by the same anticompetitive restraints on identifier usage. I conclude there is also a relevant product submarket to use US CUSIPs, which consists of CUSIPs for any financial instruments issued by US companies, along with the ISINs derived from those US CUSIPs. For either the product market to use CUSIP Identifiers or the submarket to use US CUSIPs, the relevant geographic market is the United States because, even though both US and foreign firms purchase licenses to use CUSIP Identifiers and to use US CUSIPs, they all purchase those licenses from a firm located in the US for the use of identifiers for financial instruments that are issued by US companies and/or tradeable in the US. But nothing in my analysis would change if the relevant geographic market were instead defined to be global.

A. *Relevant Product Market.* My conclusion that the markets to use CUSIP Identifiers and US CUSIPs are both relevant markets is based on applying an economic method that is common to each of the proposed Classes or Subclasses. Under this method, called the "hypothetical monopolist test," a relevant market exists if a hypothetical 100% monopolist in a posited market would likely find it profit-maximizing to charge prices that were at least 5% higher than the prices that would prevail if the market were competitive. Using evidence common to the proposed Class, my analysis shows that a hypothetical 100% monopolist in the use of either CUSIP Identifiers or US CUSIPs could profitably impose prices for licenses to use them that were at least 5% above competitive levels, confirming that either set of identifiers constitutes a relevant product market. This conclusion is supported by both qualitative and quantitative evidence.

i. The conclusion that the hypothetical monopolist test is met is satisfied by qualitative evidence that there are no economically reasonable substitutes, given (a) the extensive array of statutory, regulatory, and operational mandates that require, or effectively compel, the use of CUSIPs or CINS, (b) entrenched network effects that have embedded CUSIPs and CINS into the infrastructure of financial markets in a way that makes them functionally indispensable, and (c) the widespread market perception that CUSIPs and CINS are indispensable for participation in the financial system. All that evidence is common to the class. Accordingly, alternative identifiers for financial instruments, such as Financial Instrument Global Identifiers ("FIGIs"), are not in the relevant market.

ii. The conclusion that the hypothetical monopolist test is met is also satisfied by quantitative evidence that CGS was a

monopolist in the posited markets to use CUSIP Identifiers or to use US CUSIPs, and CGS was able to impose prices that were far more than 5% above competitive levels in both. Indeed, given that competitive benchmarks in more than 120 other nations charged a price of zero for financial instrument identifiers and that the marginal cost to CGS of providing the use of CUSIP Identifiers or US CUSIPs was zero, the competitive price level was $0. Thus, the evidence shows that CGS was able to raise prices by an infinite percentage above the competitive level.

B. *Geographic Market.* Even though both US and foreign firms purchase licenses to use CUSIP Identifiers or US CUSIPs from CGS, they all purchase those licenses from a firm located in the US for the use of identifiers for financial instruments that are issued by US companies and/or tradeable in the US. Thus, a relevant geographic market is the United States. However, my analysis would remain the same if the market were instead defined to be global because CGS is the sole actual and perceived provider of licenses to use CUSIP Identifiers or US CUSIPs worldwide. Because market participants understand that CUSIP Identifiers and US CUSIPs are required for participation in financial activities related to financial instruments traded in the US and/or issued by US firms, they would not shift to alternative identifiers for such US financial instruments regardless of where those alternatives were located. As a result, whether the relevant geographic market is defined as the United States or globally, market shares and other market analyses would remain the same.

14. **Market Power and Monopoly Power.** I find that CGS's market power and monopoly power can be established using methodologies and evidence that are common to each proposed Class and Subclass. Three independently sufficient bases, each of which can be established using methodologies and evidence common to the Class, confirm CGS's market power and monopoly power in both the CUSIP identifier use market and the US CUSIP use market: (1) high market share coupled with high barriers to entry; (2) direct evidence that CGS had the power to raise prices above competitive levels, as well as to price discriminate; and (3) direct evidence that CGS had the power to exclude rivals.

A. *High Market Share Coupled with High Barriers to Entry.* CGS has maintained a high monopoly share of the CUSIP identifier use market and

the US CUSIP use market throughout the Class Periods. CGS's monopoly share has been preserved by a combination of structural and strategic barriers to rival entry and expansion, including regulatory mandates, network effects, and CGS's anticompetitive exclusionary restraints on the use of CUSIP Identifiers or US CUSIPs without a license from CGS.

B. *Direct Evidence that CGS Had the Power to Raise Prices Above Competitive Levels, as Well as to Price Discriminate.* CGS's conduct demonstrates that it had the ability to raise prices above competitive levels and to engage in discriminatory pricing. The marginal cost of permitting additional usage of an existing CUSIP identifier or US CUSIP is effectively zero, yet CGS imposes substantial usage-based fees through a tiered pricing structure, resulting in materially higher fees for large or frequent users without cost justification. CGS's power to charge such high fees depends on CGS restraints that have prevented using CUSIP Identifiers or US CUSIPs without a license and reflect the firm's power to extract surplus from users with inelastic demand. In over 120 nations without similar restraints, identifiers for financial instruments from those nations can be used free of charge, indicating that the competitive price level is zero. The evidence thus supports the conclusion that CGS's prices for CUSIP Identifiers and US CUSIPs are not determined by marginal costs or market competition, but rather instead reflect CGS's monopoly power over prices.

C. *Direct Evidence that CGS Had the Power to Exclude Rivals.* CGS has used its anticompetitive exclusionary conduct to exclude actual and potential rivals from the market for CUSIP identifier use and the market for US CUSIP use. Through actual and perceived exclusive licensing terms, intellectual property assertions, and contractual restrictions on re-use, redistribution, public display, and sublicensing, enforced by CGS's claimed right to instruct data vendors to terminate service to non-licensees and licensees, CGS has prevented potential competitors—such as data vendors, financial platforms, and institutional users—from offering or obtaining alternative sources of CUSIP Identifiers or US CUSIPs free of the restraints imposed by CGS and from offering related services that use US CUSIPs or other CUSIP Identifiers to specify the relevant financial instruments. These exclusionary practices have directly impaired the competitive process, ensuring that users must license US CUSIPs and other CUSIP Identifiers and must go to CGS for such a license, which entrenched CGS's monopoly position and stifled the ability of rivals to

11

offer related services that use US CUSIPs or other CUSIP Identifiers to specify the relevant financial instruments.

15.    **Anticompetitive Exclusionary Conduct.**  Using methodologies and evidence common to each proposed Class and Subclass, I find that Defendants engaged in anticompetitive exclusionary conduct throughout the Class Periods. Specifically, this anticompetitive exclusionary conduct included: (1) imposing contracts that prohibited redistribution and limited downstream use of all CUSIP Identifiers (including US CUSIPs), enforced by CGS's right to instruct data vendors to terminate service to non-licensees and licensees; and (2) imposing other technical and contractual restraints—such as rendering CUSIP Identifiers (including US CUSIPs) in non-machine-readable formats—that prevented meaningful reuse and made it more costly for rivals to compile and provide CUSIP Identifiers or US CUSIPs for customer use or to offer related services that use CUSIP Identifiers to specify the relevant financial instruments.  In the absence of such anticompetitive restraints on unlicensed use of CUSIP Identifiers and US CUSIPs, market observations regarding similar identifiers in other countries indicate there would be no charge for the use of CUSIP Identifiers and US CUSIPs.

16.    **Anticompetitive Effects.**  Using methodologies and evidence common to each proposed Class and Subclass, I find that throughout the Class Periods, Defendants' anticompetitive exclusionary conduct caused harm to all proposed Class Members, as well as harm to the competitive process itself.  All proposed class members were directly harmed because the anticompetitive exclusionary conduct inflated fees for licenses to use CUSIP Identifiers and US CUSIPs.  The anticompetitive exclusionary conduct also denied users the benefits of innovation, improved services, and operational flexibility that would typically arise under competitive conditions — including the ability to integrate identifiers across platforms, redistribute or repurpose them for internal or client-facing use, choose among alternative providers to suit their specific needs, and offer related services that use CUSIP Identifiers to specify the relevant financial instruments.

17.    **Procompetitive Effects.**  Using methodologies and evidence common to each proposed Class and Subclass, I find that (a) the anticompetitive exclusionary conduct had no procompetitive benefits that could not have been achieved through less restrictive means, and (b) even if there were, any such procompetitive benefits were not sufficiently large—or passed through to licensees to a sufficient extent—to offset the anticompetitive harms experienced by licensees.  Specifically, I find that the benefits of having the right to use CUSIP Identifiers for various financial instruments are not procompetitive benefits that were created by the challenged

restraints on competition and thus cannot justify those restraints. To begin with, CUSIP Identifiers (including US CUSIPs) would still be issued even without restraints and fees on their *use* because in the ***issuance*** markets CGS would still be able to charge fees to issuers for the issuance of CUSIP Identifiers (including US CUSIPs) and those issuance fees more than cover the costs of issuance. Further, the fact that identifiers for foreign financial instruments are efficiently issued and used in markets without similar anticompetitive restraints indicates that the challenged restraints do not provide procompetitive benefits to the issuance or use of CUSIP Identifiers or US CUSIPs.

18.    Also, any such benefits could have been achieved through less restrictive means—and at lower cost to users—than the anticompetitive exclusionary conduct. As shown below, I find that in a but-for world without the challenged conduct, the use of machine-readable CUSIP Identifiers and US CUSIPs would be available to all market participants without charge and without executing any license agreement. This finding is based on analysis and evidence common to the Classes that: (i) the marginal cost to CGS for the use of its CUSIP Identifiers and US CUSIPs is zero; and (ii) competitive yardsticks (including the identifiers for foreign financial instruments in over 120 nations) indicate that without similar restraints on competition, identifiers are widely used without charge.

19.    **Classwide Injury and Damages.** Using methodologies and evidence common to each proposed Class and Subclass, I reach three principal conclusions. First, all members of the Antitrust Damages Class, the Connecticut Unfair Business Practices Sub-Class, and the Injunctive Relief Class were injured by the challenged exclusionary conduct (or, in the case of the Injunctive Relief Class, threatened to be injured by it). Second, aggregate damages from the challenged restraints can be calculated for each of those Classes. Third, individual damages from the challenged restraints for all members of those Classes can be estimated using a common economic model, supported by class-wide evidence and a limited set of individualized data to be collected during the claims administration process. For the New York Sub-Class, all those principal conclusions apply if the factfinder accepts plaintiff's contention that, but for the challenged deception, there would have been no license agreements or fees for use paid by the New York Sub-Class members at all. All my measures of injury and damages include only overcharges to class members, so they conservatively ignore the additional harm that class members suffered by being denied the benefits of more innovation and better product quality. All my measures also exclude any possible additional damages from trebling, punitive damages, or fixed statutory damages.

A. The anticompetitive overcharge to members of the Antitrust Damages Class, the Connecticut Unfair Business Practices Sub-Class, and the Injunctive Relief Class equals the difference between: (1) the use license fees the Class members paid with the challenged restraints; and (2) the fees they would have paid "but for" those challenged restraints. Likewise, the threatened anticompetitive overcharge that would occur to the Injunctive Relief Class without an injunction against CGS's anticompetitive restraints equals the difference between: (1) the actual fees that Class members would continue paying if the anticompetitive restraints continued; and (2) the but-for fees that they would pay without those anticompetitive restraints. The anticompetitive overcharge to members of the New York Unfair Business Practices Sub-Class equals the difference between: (1) the actual fees Sub-Class members in fact paid to use CUSIP Identifiers with the challenged deceptive business practices; and (2) the fees Sub-Class members would have paid but for the challenged deceptive business practices. In short, for all Classes, the overcharge injury equals the difference between actual fees and but-for fees.

B. CGS licenses use of its CUSIP Identifiers only as part of a bundled license that also covers all CUSIP Identifiers, thus including US CUSIPs, Canadian CUSIPs, CUSIP International Numbers, and their derivative CUSIP-based ISINs. Accordingly, regardless of the market definition, the actual use fees charged to Class members in each proposed Class or Subclass equal the fees charged for these bundled licenses. The but-for use fees that CGS would have charged Class members without the challenged restraints can be estimated using methodologies and evidence common to the Classes. Without the challenged exclusionary conduct, the but-for fee to use CUSIP Identifiers or the use of US CUSIPs would be zero, for reasons summarized above.

C. In the case where the market is defined to include the use of all CUSIP Identifiers, the but-for fee to license the use of CUSIP Identifiers would necessarily be zero without the challenged restraints, for reasons summarized above. Under this market definition, the overcharge injury and damages to class members from the challenged restraints would be determined by what I will call the Class-wide Method 1. Under this method, the overcharge injury and damages suffered by each member of each proposed Class or Subclass because of the challenged restraints would equal the full amount of actual use license fees paid by them while they were members of that Class or Subclass during their respective Class

14

Periods.  Likewise, if the factfinder accepts plaintiff's contention that, but for the challenged deception, there would have been no license agreements or fees for use paid by the New York Sub-Class members at all, then damages to members of the New York Sub-Class could also be determined using Class-wide Method 1.  Since each Class and Subclass is limited to class members who paid (or are paying) such use license fees, this common method indicates that all class members all suffered (or currently suffer) injury.

D. If the market definition were limited to US CUSIPs, there are two alternative class-wide methods one can use to calculate what but-for fees without the challenged restraints would be to use the CUSIP Identifiers for the foreign-issued financial instruments (such as Canadian CUSIPs and CUSIP International Numbers) that were included in the bundle.  I will call those identifiers for foreign-issued financial instruments the "non-US CUSIP Identifiers", with the understanding that this just means they identify financial instruments that were not issued in the US, not that those financial instruments were not traded in the US.  The two class-wide methods that I use reflect two distinct assumptions about the nature of the but-for world.  The first class-wide method rests on the premise that, in the but-for world, the challenged exclusionary conduct would not restrain usage of the non-US CUSIP Identifiers that were included in the bundled licenses.  Under this premise, the but-for fees for the use of non-US CUSIP Identifiers would have been zero for the same reasons why the but-for fees for the use of US CUSIPs would have been zero, and thus the but-for fee for CGS's bundled licenses for all CUSIP Identifiers would have been zero.  Thus, under this premise about the but-for world, injury and damages would be the same as under Class-wide Method 1.

E. If the market definition were limited to US CUSIPs, the second class-wide method rests on the alternative premise that, in the but-for world, the challenged exclusionary restraints could and would have still restrained the use of non-US CUSIP Identifiers that are in CGS's bundled licenses.  This method, which I will call Class-wide Method 2, requires calculating what the but-for fees would have been for the non-US CUSIP Identifiers that were included in the bundled license.  The overcharge injury and damages under Class-wide Method 2 would be less than they are under Class-wide Method 1, but using a common method and common evidence I estimate they would equal 83.5% of the license fees paid by each Class member while they were a member of the Class during the Class Period.  Because

each Class and Subclass is limited to class members who paid (or currently pay) such license fees, they all suffered (or currently suffer) injury equal to at least 83.5% of those fees under this method.

F. Under Class-Wide Method 1, aggregate damages to each Class and Subclass would equal the total actual use license fees paid by members of that Class or Subclass while they were members of that Class or Subclass during their respective Class Periods. I estimate that, under Class-Wide Method 1, aggregate damages to the proposed Antitrust Damages Class are ███████████, aggregate damages to the proposed New York Unfair Business Practices Sub-Class are ███████████, and aggregate damages to the proposed Connecticut Unfair Business Practices Sub-Class are ███████████ Individualized damages for each proposed Class Member under Class-Wide Method 1 can be computed by confirming Class Member status and the license fees paid by that member while it was a member of the Class during the Class Period.

G. Under Class-Wide Method 2, aggregate damages to the Antitrust Damages Class and the Connecticut Unfair Business Practices Sub-Class equal 83.5% of the total actual use license fees paid by members of that Class or Subclass while they were members of that Class or Subclass during their respective Class Periods. I estimate that, under Class-Wide Method 2, aggregate damages to the proposed Antitrust Damages Class were ███████████ and aggregate damages to the proposed Connecticut Unfair Business Practices Sub-Class were ███████████ Individualized damages for each member of these Classes under Class-Wide Method 2 can be computed by confirming Class Member status and license fees paid while a Member of the Class during the Class Period and subtracting the estimated but-for prices.

## IV.    BACKGROUND

### A.    *The History of CUSIPs*

20.    In the late 1960s, trading activity in U.S. securities markets skyrocketed, triggering what became known as the "paperwork crisis" and prompting a congressional investigation into the functioning of the securities industry.[4] This section briefly outlines the nature of the crisis, describes the

---

[4] https://www.sechistorical.org/collection/papers/1970/1971_0730_NYSECrisis.pdf

emergence of the CUSIP identifier as the industry's solution, and explains how CUSIP met the mandate for uniqueness, standardization, and machine-readability to enable fully automated processing across the marketplace.

21.  **Paperwork Crisis.**  Between 1965 and 1968, trading volumes more than doubled, overwhelming the back-office operations responsible for manually processing transactions.[5]  Manual handling of clearance and settlement was onerous; an ordinary stock certificate changed hands an average of nine times—and accumulated roughly 3.5 errors that needed to be resolved – before settlement could be completed.[6]  These "serious operational problems"[7] brought the securities market to a halt in June of 1969 when the New York Stock Exchange shut down trading on Wednesdays in response to the mounting backlog and the risk of systemic failures. The need for innovation was clear: SEC Chairman Budge remarked, "Projections of anticipated securities volume for the next decade make it crystal clear that the financial community must move aggressively and quickly to develop and install improved securities systems programs."[8]

22.  **Industry Response.**  The industry met this challenge by convening the Committee on Uniform Securities Identification Procedures ("CUSIP Committee"), whose members represented entities from throughout the financial community including the American Bankers Association ("ABA"), the New York Stock Exchange, the National Association of Securities Dealers, the Association of Stock Exchange Firms, and the Investment Bankers Association. The Committee's mandate, as Chairman Budge described it, was to "provide the securities industry with a common language for identifying securities in communications between brokers, transfer agents, and other organizations involved in the transaction process" and further to "eliminat[e] the need for each organization to develop and use individual coding systems…[and] enable the financial community to have access to

---

[5] Wells W. Certificates and Computers: The Remaking of Wall Street, 1967 to 1971, *Business History Review*, 74(2):193-235 (2000) ("Events in the late 1960's reshaped the securities industry…the number of shares changing hands on the New York Exchange growing from 5 million a day in 1965 to 12 million a day in 1968…overwhelmed the mechanisms brokers used to transfer securities and keep records on, which relied heavily on paper and pen." p. 193); Robert Metz, *Key to the Back Office*, N.Y. Times, Jan. 17, 1971, at F1 (presenting a graphic representation of the "intricate jumble of men and machines dedicated one purpose, moving paper.").

[6] Miller Report ¶ 25.

[7] Hamer H. Budge, Chairman, SEC, Remarks Upon Receiving First Copy of the CUSIP Directory (June 20, 1969), https://www.sec.gov/news/speech/1969/062069budge.pdf.

[8] *Id.*

relevant data without the time-consuming conversion of many different security codes."[9]  Chairman Budge also highlighted the importance of designing financial instrument identifiers to be machine readable, so as to be "useful to all organizations, whether they operate manual or automated systems."[10]

23.    Currently, the ABA assigns and licenses CUSIP Identifiers through CGS ████████████████████████████████████████████.[11]  CGS has been managed on behalf of the American Bankers Association by FactSet Research Systems Inc. since March 2022.[12]  Prior to March 2022, CGS was a division of S&P Global Inc.[13]

### B.    CUSIPs and Other Identifiers Today

24.    CUSIPs are unique nine-character alphanumeric identifiers of financial instruments issued by US or Canadian firms.[14]  The first six characters signify the identity of the issuer, the next two signify the type of instrument issued, and the last is a mathematically computed error check.[15]  CUSIPs are used for many types of financial instruments, including equity and debt issues, derivatives, private

---

[9] *Id.*

[10] *Id.*

[11] FRSI01464347 ████████████████████████████████████████ ABA-0000000599 ████████████████████████████████████

[12] See  https://www.cusip.com/index.html  and  https://www.aba.com/about-us/our-story/cusip-securities-identification.

[13] FactSet press release, 3/1/22, FactSet Completes Acquisition of CUSIP Global Services. ("FactSet (NYSE:FDS) (NASDAQ:FDS), a global provider of integrated financial information, analytical applications and industry-leading services, today announced the successful completion of its acquisition of CUSIP Global Services (CGS) from S&P Global Inc. for approximately $1.925 billion.").

[14] CUSIP ("Derived from the Committee on Uniform Security Identification Procedures, CUSIPs are 9-character identifiers that capture an issue's important differentiating characteristics for issuers and their financial instruments in the U.S. and Canada.") https://www.cusip.com/identifiers.html, last accessed 7/31/2025.

[15] For a detailed description of how the six-character issuer, two-character issue, and one-character check digit are assigned, see CUSIP Global Services, *Inside the CGS Identification System,* supra at 5-15; Cusip Global Services, *CUSIP: A Common Language for Efficient Markets* 13 (2025), https://experience.cusip.com/brochure/cusip-a-common-language-for-efficient-markets.

offerings, hedge funds, listed options, and syndicated loans.[16]

25.    International Securities Identification Numbers ("ISINs") are unique twelve-character alphanumeric identifiers of financial instruments issued by firms anywhere in the world.[17]   The ISIN for any United States financial instrument consists of the CUSIP for that instrument (used to define characters 3 to 11 of the 12-character ISIN), adding "US" as the first two characters, signifying that the instrument is issued by a US firm, and adding a twelfth character as a check digit.[18] Similarly, the ISIN for any Canadian financial instrument consists of the CUSIP for that instrument (used to define characters 3 to 11 of the 12-character ISIN), adding "CA" as the first two characters, signifying that the issuer is Canadian, and adding a twelfth character as a check digit.[19]   Accordingly, each CUSIP has a corresponding CUSIP-based ISIN that is derived from the CUSIP, and every CUSIP-based ISIN has a corresponding CUSIP, which is simply the third-through-eleventh characters.

26.    The Association of National Numbering Agencies (ANNA) is a global association of National Numbering Agencies (NNAs).[20]   Generally, each country has an NNA; if it does not, then the ANNA Service Bureau will assign a Substitute

---

[16]    See    https://www.aba.com/about-us/our-story/cusip-securities-identification    and experience.cusip.com/inside-the-cusip-system

[17] ISIN ("The ISIN standard is used worldwide to identify specific securities such as bonds, stocks (common and preferred), futures, warrant, rights, trusts, commercial paper and options. ISINs are assigned to securities to facilitate unambiguous clearing and settlement procedures. They are composed of a 12-digit alphanumeric code and act to unify different ticker symbols which can vary by exchange and currency -- for the same security.") https://www.isin.org/about/, last accessed 8/1/2025.

[18]    ANNA ("In the case of securities, other than debt securities, in jurisdictions where a NNA recognised by ANNA operates, this organisation issues the ISIN for securities if the issuer is registered or domiciled in the country where the NNA operates.  For debt securities, the NNA that issues the ISIN is either one of the international securities clearing organisations or the responsible NNA in accordance with ISO 6166.") https://anna-web.org/identifiers/, accessed 8/4/25); CUSIP ("ISO rules govern designation of the ISO Country Code: For Equity Issues: the country where the entity is incorporated. For Domestic Debt Issues: the country where the lead manager is located. For International Debt Issues: the country where the Central Securities Depository is located.") https://www.cusip.com/identifiers.html#/ISIN, last accessed 7/16/25.

[19] See https://www.cusip.com/identifiers.html#/ISIN, last accessed 7/16/25.

[20] ANNA ("The Association of National Numbering Agencies (ANNA) is a global member association of National Numbering Agencies (NNAs) seeking to foster standardisation within the financial industry by upholding the International Organization for Standardization (ISO) principles and by promoting ISIN, FISN and CFI codes for financial instruments."), https://anna-web.org/about-anna-2/, accessed 8/1/2025.

Numbering Agency ("SNA") to that country.[21]  Each NNA or SNA is responsible for issuing National Securities Identifying Numbers (NSINs) within its jurisdiction (local identifiers) and for issuing ISINs based on the NSINs (global identifiers).[22] The ISIN contains the nine-digit NSIN[23] with two more characters added to the front to identify the country and a single check digit appended to the end.  Thus, each ISIN derives from its corresponding NSIN.

27.    CGS is the designated NNA for the United States and the sole issuer of CUSIPs, which are the NSINs for the US and Canada.[24]  Further, CGS has been appointed as the SNA for various small countries;[25]  in these nations, CGS is the sole official identifier of NSINs, and the corresponding ISINs for the financial instruments of those nations.

28.    For some nations, CGS issues identifiers for financial instruments issued from or sold in those nations under the CUSIP International Numbering

---

[21] ANNA ("To assist countries where no National Numbering Agency (NNA) exists, three numbering agencies (CUSIP Global Services in the US, WM Datenservice from Germany, and SIX Financial Information have been designated as Substitute Numbering Agencies (SNAs)."), https://anna-web.org/anna-members/, accessed 8/1/2025.

[22] CGS ("There are currently over 120 recognized National Numbering Agencies (NNAs) throughout the world which are responsible for the assignment of ISINs in their respective countries.") https://www.cusip.com/identifiers.html#/ISIN, accessed 8/4/2025; ISIN ("There are three parts to an ISIN...[including] A nine-digit numeric identifier, called the National Securities Identifying Number (NSIN), and assigned by each country's or region's National Numbering Agency (NNA).") https://www.isin.org/about/, accessed 8/4/2025.

[23] ANNA ("Where the national number consists of fewer than nine characters, zeros are inserted in front of the number so that the full nine spaces are used"), https://anna-web.org/identifiers/, accessed 8/1/2025.

[24] CUSIP ("CGS provides a 9-character standard CUSIP identifier for issuers and their financial instruments offered in the U.S. and Canada") https://www.cusip.com/index.html, accessed 8/4/2025. CDS Clearing and Depository Services Inc. (CDS Clearing) is the NNA for Canada (https://anna-web.org/anna-members/), but CGS is the sole CUSIP/ISIN issuer. See https://anna-web.org/anna-members/, last accessed 8/7/25.   Accordingly, CDS Clearing "coordinates" the assignment of ISINs with CGS.  *See* https://www.cds.ca/issuers/issuer-services/isin-issuance-and-isin-eligibility-services.

[25] ISIN (CGS issues NSINs for various countries as SNA, including "American Samoa, Anguilla, Antigua & Barbuda, Aruba, Bahamas, Belize, Bermuda, Cayman Islands, Dominica, Grenada, Guam, Guyana, Haiti, Marshall Islands, Mayotte, Micronesia, Northern Mariana Islands, Palau, Puerto Rico, Saint Barthelemy, Saint Kitts-Nevis, Saint Lucia, Saint Martin, Saint Vincent-Grenadines, Saint Maarten, South Georgia, Suriname, Trinidad & Tobago, US Minor Outlying, Virgin Islands - US, Virgin Islands – British") https://www.isin.cusip.com/isin/login.html, last accessed 7/12/25.

System ("CINS").[26]  CINS can be issued not only for foreign-issued financial instruments that trade in the United States, but also for US-issued financial instruments that trade only in the foreign nations.[27]  CUSIP International Numbers are similar to CUSIPs in that both are unique nine-character alphanumeric identifiers of financial instruments with the first six characters signifying the identity of the issuer, the next two signifying the type of instrument issued, and the last representing a mathematically computed error check.[28]  The difference is that the first character of a CUSIP International Number is always an alphabetical character representing the relevant nation.[29]  Further, as with all NSINs, each CUSIP International Number has a corresponding derivative ISIN—the sole official standardized twelve-digit international identifier.

29.    When CGS is the NNA or SNA for a relevant foreign nation (other than Canada), these CUSIP International Numbers are NSINs—the sole official local identifiers of the financial instruments of foreign nations for which CGS is the NNA or the SNA.  For some financial instruments in other nations, CGS issues CUSIP International Numbers even though the NNAs from those nations are issuing the official NSINs and ISINs.

30.    Whether CUSIP International Numbers are NSINs or not, they are as practical matter required when a foreign security interacts with the infrastructure of the US regulatory system because that system requires CUSIP-based identifiers.  For example, the Depository Trust & Clearing Corporation (DTC), which "provides

---

[26] ANNA (These nations include "Argentina, American Samoa, Aruba, Barbados, Saint Barthélemy, Bermuda, Bolivia (Plurinational State of), Brazil, Bahamas, Belize, Canada, Chile, Colombia, Costa Rica, Curacao, Dominica, Dominican Republic (the), Ecuador, Micronesia, Federated States of, Grenada, South Georgia and the South Sandwich Islands, Guyana, Honduras, Haiti, Jamaica, Saint Kitts and Nevis, Cayman Islands (the), Saint Lucia, Saint Martin (French part), Marshall Islands (the), Northern Mariana Islands (the), Mexico, Nicaragua, Panama, Peru, Philippines (the), Puerto Rico, Palau, Paraguay, Suriname, El Salvador, Saint Maarten (Dutch part), Trinidad and Tobago, United States Minor Outlying Islands (the), United States of America (the), Uruguay, Saint Vincent and the Grenadines, Venezuela (Bolivarian Republic of)") https://anna-web.org/anna-members/, last accessed 8/5/2025.  For description of CUSIP-based identifiers, see CUSIP Global Services, *Inside the CGS Identification System* (2024), experience.cusip.com/inside-the-cusip-system; see also Miller Report ¶ 43; https://www.aba.com/about-us/our-story/cusip-securities-identification.

[27] Miller Report ¶ 43, n.44.

[28] *Inside the CGS Identification System*, *supra* note 15, at 24 (the "[CINS] identifier was developed in 1988 by CGS and SIX Telekurs (USA) in response to the North American securities industry's need for a 9-character identifier of international securities.")

[29] *Inside the CGS Identification System*, *supra* note 15, at 24.

settlement services for virtually all broker-to-broker equity and listed corporate and municipal debt securities transactions in the U.S., as well as institutional trades, money market instruments and other financial obligations,"[30] requires either a CUSIP or a CINS for financial instruments sold in the United States.[31]  Similarly, FINRA TRACE reporting, which facilitates the federally mandatory reporting of over-the-counter transactions in eligible fixed income securities,[32] only provides a Trace symbol if no CUSIP or CINS is available,[33] and CGS itself has indicated that either a CUSIP or CINS is available for "virtually all US dollar-denominated debt

---

[30] DTC, https://www.dtcc.com/clearing-and-settlement-services, last accessed 8/5/2025.

[31] Miller Report ¶ 54 (DTC's Operational Arrangements Manual requires an issuer or its agent "to obtain a CUSIP Number (or in the case of certain foreign securities, a CIN) for each security to be included in DTC's book-entry system,"); *id.* ¶43 n. 44 ("DTC's rules require either CINS or CUSIP Numbers for DTC to process trades in securities that are subject to restrictions on trading and investors under the SEC's Regulation S (17 CFR §§ 230.901-905) or Rule 144A of the Securities Act of 1933 (17 CFR § 230.144A)."); The Depository Trust Company, Operational Arrangements — Necessary for Securities to Become and Remain Eligible for DTC Services (April 2025), at § II.A.1(b), p 24 ("issuer shall ensure that a CUSIP or CINS identification number is obtained for all unrestricted securities of the same class").

[32] FINRA Trade Reporting and Compliance Engine (TRACE), ("The Trade Reporting and Compliance Engine is the FINRA-developed vehicle that facilitates the mandatory reporting of over-the-counter transactions in eligible fixed income securities.") https://www.finra.org/filing-reporting/trace, last accessed 8/9/2025; Financial Industry Regulatory Authority (FINRA) ("FINRA is a self-regulatory organization for member broker-dealers that is responsible under federal law for supervising our member firms.") https://www.finra.org/about, last accessed 8/9/2025.

[33] FINRA, *TRACE Reporting of Foreign Sovereign Debt Securities*, Regulatory Notice 22-28 (Dec. 13, 2022), available at https://www.finra.org/rules-guidance/notices/22-28 (last accessed 8/29/25), indicating that only if the CUSIP or CINS is not available will FINRA assign its own symbol to the security using another identifier such as an ISIN or FIGI, "Question 1: Can firms add a U.S. dollar-denominated foreign sovereign debt security to TRACE where a CUSIP or CINS is unavailable? Yes. Firms may submit through the FINRA Gateway a TRACE New Issue Form requesting a symbol for a U.S. dollar-denominated foreign sovereign debt security where only an ISIN or a FIGI is available for the security."); see also, Federal Register, File No. SR-FINRA-2022-011 at https://www.federalregister.gov/documents/2022/08/16/2022-17532/self-regulatory-organizations-financial-industry-regulatory-authority-inc-order-approving-proposed (last accessed 8/29/25) reflecting SEC Order approving FINRA proposed Rule for TRACE reporting of transactions in U.S. dollar-denominated foreign sovereign debt based on CUSIP or CINS); see FINRA Frequently Asked Questions at https://www.finra.org/filing-reporting/trace/faq (last accessed 8/29/25) "If all I want is the API file for Treasury Securities, Securitized Products or Corporate and Agency Debt, what agreements do I have to sign…[f]or access to the files with CUSIP/CINS numbers, firms must have the proper licenses in place with CUSIP Global Services[.]"

securities for foreign issuers."[34]  SEC Form 13F similarly requires inclusion of the CUSIP or CINS number for reportable equities.[35]  Indeed, CGS offers a product called "SEC 13(f) Securities Identification" that identifies "all CUSIPs and CINS that are deemed Section 13(f) securities by the Securities and Exchange Commission."[36]

## V.    MARKET DEFINITION

31.    I find that market definition can be established using methodologies and evidence common to each proposed Class or Subclass.  Specifically, I conclude that there is a relevant product market for the use of CUSIP Identifiers, which includes any CUSIP (US or Canadian) and any CUSIP International Number (CIN), as well as their corresponding CUSIP-derived ISINs.  All those types of identifiers were and continue to be: (1) used to identify financial instruments that were issued by US firms and/or trade in the US; (2) required to engage in certain activities involving US-issued or US-traded financial instruments; (3) bundled together into use licenses by CGS that were purchased by all class members; and (4) restrained by the same anticompetitive restraints on identifier usage.  I conclude there is also a relevant product submarket to use US CUSIPs, which consists of CUSIPs for any financial instruments issued by US companies, along with the corresponding ISINs derived from those US CUSIPs.  For either the product market to use CUSIP Identifiers or the submarket to use US CUSIPs, I conclude that a relevant geographic market is the United States.  To be sure, both US and foreign firms purchase licenses to use CUSIP Identifiers (including US CUSIPs) from CGS.  However, they all purchase those licenses from a firm located in the United States (i.e., CGS) for the use of identifiers for financial instruments that are issued by US companies and/or tradeable in the US.  In any event, nothing in my analysis would change if the relevant geographic market were instead defined to be global.

---

[34] CGS, File No. SR-FINRA-2022-11 ("CGS respectfully submits that a CUSIP or CINS, the 9-character international component of the CUSIP system, is available for virtually all US dollar-denominated debt securities for foreign issuers, both private and sovereign.") https://www.sec.gov/comments/sr-finra-2022-011/srfinra2022011-20130359-297406.pdf.

[35] Institutional investment managers who have short positions on listed 13(f) securities must also file a SEC Form SHO that includes the applicable CUSIP or CINS number.  SEC, Filer Manual – Volume II EDGAR Filing VERSION 75 June 2025, Section 8.2.40 (Completing Form SHO) at p 8-308 ("Column 5. CUSIP Number. Enter the nine (9) digit Committee of Uniform Securities Identification Procedures ("CUSIP") number (or the 9-digit CUSIP International Numbering System ("CINS") number) of the security for which information is being reported") https://www.sec.gov/files/edgar/filermanual/archive/edgarfm-vol2-v75.pdf; Miller Report ¶ 60.

[36] https://experience.cusip.com/resource/fact-sheet/cusip-sec-13f (italics added).

## A.  An Economic Methodology for Market Definition

32.    When analyzing whether alleged conduct has created anticompetitive harm, economists regularly define a relevant market to determine which products and participants are relevant to assessing those allegations of harm.[37]  An economic methodology commonly used to define markets is outlined in the U.S. Department of Justice and U.S. Federal Trade Commission's Merger Guidelines.[38]  Under this method, called the "hypothetical monopolist test," a relevant market exists if a hypothetical 100% monopolist in a posited market would likely find it profit-maximizing to charge prices that were at least 5% higher than the prices that would prevail if the market were competitive.[39]  Whether this test is met turns on the extent to which buyers would substitute to other products in response to such a price elevation over competitive levels and on whether the lost profits from such induced buyer substitution would exceed the profits gained from the increased prices charged to buyers who would not substitute.  The hypothetical monopolist test can be satisfied by either quantitative *or* qualitative evidence.[40]

---

[37] This applies to both product and services.  For ease of exposition, I will just refer to products.  ABA SECTION OF ANTITRUST LAW, MARKET DEFINITION IN ANTITRUST: THEORY AND CASE STUDIES, I.A. (2012), at 1 ("The purpose of market definition is to provide a context within which competitive effects can be analyzed").

[38] *See* DOJ/FTC, Merger Guidelines §4.3 (2023); DOJ/FTC, Horizontal Merger Guidelines §4.1 (2010).  Although the government enforcement agencies most often apply this methodology to merger analysis, it is also applicable to exclusionary conduct cases.  *See* DOJ/FTC, Merger Guidelines n.81 (2023) ("While these guidelines focus on applying the hypothetical monopolist test in analyzing mergers, the test can be adapted for similar purposes in cases involving alleged monopolization or other conduct."); DOJ/FTC, Horizontal Merger Guidelines n.5 (2010) (noting that market definition is similar for non-merger conduct, such as monopolization, except that one cannot assume that the prices that exist in the market are at competitive levels, because the alleged anticompetitive conduct may have in fact already elevated them above competitive levels).

[39] *See* DOJ/FTC, Merger Guidelines §4.3 (2023); DOJ/FTC, Horizontal Merger Guidelines §4.1 (2010).  Although sometimes the test is often loosely described as whether a price increase of 5% would be "profitable," that is not technically accurate because the test is instead whether it is "profit-maximizing" to impose a price increase of at least 5%.  For example, suppose a price increase of 5% would be unprofitable, but a price increase of 20% would be profit-maximizing (which could be so if the demand elasticity of marginal customers who would only buy at prices within 5% of competitive prices is higher than the demand elasticity of inframarginal customers who would continue to buy even at a price increase above 5%).  In that case, the test is satisfied, and the posited market is valid, given that a profit-maximizing hypothetical monopolist would impose a price increase of 20% above competitive levels.  *See* EINER ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 283-84 (4th ed. 2022).

[40] DOJ/FTC, Merger Guidelines §4.3.C (2023) (describing how qualitative *or* quantitative evidence can be used to evaluate the extent of competition among firms and noting that one "can

33.    In a non-merger case like this one, it is important to specify that the price elevation used in the hypothetical monopolist test is measured relative to *competitive* price levels, not as an increase from prices over *current* levels.  Even if the rate of buyer substitution at current prices is high enough to make a price increase above current levels unprofitable, that does not justify broadening the market definition if firms in the market are *already* exercising market power, because those firms will have already raised prices above competitive levels.[41]  "The problem is that current prices may already be at monopoly levels, which are where the monopolist maximizes profits and thus by definition mean a monopolist could not profitably raise prices any further....  [A] monopolist would predictably keep increasing prices until its prices did create significant substitution to other products...  What we really want to know is what buyer substitution rates would be if prices were elevated from competitive levels, which will differ from current levels if monopoly power actually exists."[42]  Thus, "the existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power."[43]  Indeed, it is regarded as a well-known

use similar evidence and analogous tools to apply the HMT [Horizontal Monopolist Test].");  *id.* at §4.2.C (when terms are set through bargaining or auctions, "qualitative *or* quantitative evidence about the leverage provided to buyers by competing suppliers may be used to assess the extent of competition among firms in this setting") (emphasis added);  *id.* at §4.2.D ("Qualitative *or* quantitative evidence may be used to evaluate and weigh each of these factors" regarding competition between merging firms); (emphasis added); DOJ/FTC, Horizontal Merger Guidelines §4.1.3 (2010) ("Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition."); American Bar Association, Market Definition in Antitrust: Theory and Case Studies, § I.C.1.a. (2012) ("qualitative information or experience can be used to argue that the price elasticity of a particular product is unlikely to be beyond the critical threshold or that a loss is unlikely to be larger or smaller than the critical level");  *id.* at III.B.1.a. ("As in all merger cases, market definition in consumer products cases generally begins with reviewing qualitative information");  *id.* at VIII.B.2.d.(1) ("To test whether two Pharmaceuticals are reasonably interchangeable, economists do not focus solely on whether the products treat the same illness. They also measure (either quantitatively or qualitatively) the own price-elasticity of demand for one or both products and/or the cross-elasticity of demand between the products at issue to assess whether the products are sufficiently close substitutes that one product constrains the pricing of the other product.").

[41] DOJ/FTC Merger Guidelines § 4.3.B, fn. 83, and pp. 42-43. (2023); DOJ/FTC, Horizontal Merger Guidelines §4.1.2 & n.5 (2010).

[42] Einer Elhauge, U.S. Antitrust Law & Economics 265 (4th ed. 2022).

[43] Areeda & Kaplow, Antitrust Analysis ¶ 340(b) (4th ed. 1988) (emphasis in original), cited in Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 471 (1992).

economic error (called the "Cellophane fallacy") to broaden a market definition based on evidence of high substitution rates at current prices when those current prices have already been anticompetitively inflated.[44]

34.    The process of defining markets "does not always lead to a single relevant market." [45]   Instead, antitrust analysis can use "any relevant market satisfying the test, guided by the overarching principle that the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects."[46]  Consistent with the approach outlined above, "[t]here is no single, inherently correct, market definition; it all depends on the anticompetitive effects theory that the market definition is trying to illuminate." [47]   Thus, the appropriate approach to market definition should be shaped by the relevant economic question being asked.[48]

35.    "[W]hen the competitive conditions for multiple relevant markets are reasonably similar, it may be appropriate to aggregate the products in these markets into a 'cluster market' for analytic convenience, even though not all products in the cluster are substitutes for each other."[49]  Alternatively, a cluster of distinct products or services that are complements rather than substitutes may be combined into a single relevant market based upon consumer preference for purchasing the products in a group or upon cost savings or convenience attributable to joint sale of the products.[50]  Classic examples are hospital services and supermarkets.  Meeting either test suffices because satisfying either test provides a rationale for clustering markets.

### B.    There Is a Relevant Product Market for CUSIP Identifier Use and a Relevant Submarket for US CUSIP Use

36.    Using the common methodology for market definition summarized in

---

[44] George W. Stocking & Willard F. Mueller, *The Cellophane Case and New Competition*, 45 AMERICAN ECONOMIC REVIEW 29 (1955); Luke M. Froeb & Gregory J. Werden, *The Reverse Cellophane Fallacy in Market Delineation*, 7 REVIEW OF INDUSTRIAL ORGANIZATION 241 (1992).

[45] DOJ/FTC, Merger Guidelines §4.3 (2023); DOJ/FTC, Horizontal Merger Guidelines §4.1.1 (2010) ("[t]he hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market.").

[46] DOJ/FTC, Horizontal Merger Guidelines §4.1.1 (2010).

[47] EINER ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 273 (4th ed. 2022).

[48] See IIB AREEDA, HOVENKAMP & SOLOW, ANTITRUST LAW ¶531a (3rd ed. 2007) ("Finding the relevant market and its structure is typically not a goal in itself but a mechanism for considering the plausibility of antitrust claims that the defendants' business conduct will create, enlarge, or prolong market power").

[49] 2023 Merger Guidelines at § 4.3.D.4.

[50] ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS (6th ed. 2007).

the preceding section, I conclude that both qualitative and quantitative evidence satisfy the hypothetical monopolist test for a posited product market for CUSIP identifier use, as well as for a submarket for US CUSIP use. As detailed in the following sections, this methodology and all the qualitative and quantitative evidence that it uses are common to each proposed Class or Subclass.

### 1.   Qualitative Evidence that Neither CUSIP Identifiers Nor US CUSIPs Have Reasonable Economic Substitutes

37.    Based on analysis and evidence common to each proposed Class or Subclass, I conclude that there are no economically reasonable substitutes for CUSIP Identifiers or US CUSIPs, so that a hypothetical monopolist who imposed prices for the use of either that were 5% above competitive levels would lose no or few buyers of licenses to use either. This is because a lack of economically viable substitutes makes access to US CUSIPs and other CUSIP Identifiers a prerequisite for participating in the financial system, and market participants find it worthwhile to remain active in that system. The lack of economically viable substitutes is supported by common evidence regarding at least three factors that are detailed in the following subsections:

  a. The use of US CUSIPs or other CUSIP Identifiers is required by a wide range of statutory, regulatory, and operational mandates—including those governing trading, clearance, settlement, research, and disclosure reporting. Because no alternative identifier satisfies the full scope of these requirements, users cannot substitute alternative identifiers for US CUSIPs or other CUSIP Identifiers without forgoing a broad range of financial activities.

  b. Even in contexts where use of US CUSIPs or other CUSIP Identifiers is not explicitly mandated, network effects have rendered them functionally indispensable. Since their introduction in the 1960s, US CUSIPs and other CUSIP Identifiers have become deeply embedded in financial market infrastructure, including trading platforms, data feeds, compliance systems, and internal workflows. This creates powerful incentives to use US CUSIPs and other CUSIP Identifiers even when not strictly required.

  c. The conduct of market participants reflects the shared perception that US CUSIPs and other CUSIP Identifiers have no reasonable substitutes. US CUSIPs and other CUSIP Identifiers are widely understood to be essential for effective participation in the modern financial system.

The following paragraphs detail common evidence on each of those factors.

a.    Statutory, Regulatory, and Operational Mandates That Effectively Require
the Use of US CUSIPs and Other CUSIP Identifiers

38.    The Miller, Powell, and Bergmann Reports highlight statutory, regulatory, and operational mandates leading to the use of CUSIPs.  Mr. Miller states:

"CUSIP Numbers (and in certain instances, CINs) are required to comply with regulatory reporting requirements or as a matter of market practice for the trade processing in the United States of: i. All marketable U.S. Treasuries; ii. All exchange-traded equity and debt securities (whether registered with the SEC or exempt under Rule 144A or Regulation S) and ETFs; iii. All marketable securities of governmental agencies; iv. Corporate bonds that are registered with the SEC or exempt under Rule 144A; v. Corporate and asset-backed commercial paper; and vi. Virtually all municipal notes and bonds. Based upon my experience, these six categories represent the substantial majority of the overall securities publicly traded in the United States."[51]

39.    Mr. Powell states:

"CUSIPs are integral to critical market functions, including pre-trade research and analytics, position management, performance measurement, attribution, accounting, reconciliation, pricing, risk management, trade confirmation and settlements, corporate action processing, collateral management, pre- and post-trade compliance, and maintaining security master files.    CUSIP Identifiers are also the designated and required means of identifying financial instruments for financial reporting to United States regulatory agencies and are the identifiers for many Agency operations like Treasury issuances and auctions[.]"[52]

40.    For example, the SEC has many required uses for CUSIPs.  The Powell report provides a table listing several such requirements, the substance of which is shown below:

SEC Form S-1, registration of securities (initial offering);
SEC Form S-3 / F-3, shelf registration for seasoned issuers;
SEC Form S-4, securities in mergers or exchange offers;
SEC Form S-11, REIT and real estate company offerings;
SEC Form F-1 / F-10, foreign issuer registration;
SEC Form N-1A/N-2/N-3, investment co. and mutual fund filings;

---

[51] Miller Report ¶¶ 47-48.
[52] Powell Report p. 31.

SEC Form 8-A / 10-12B, registering securities for exchange listing;
SEC Schedule TO, tender offer statement;
SEC Schedule 13E-3, going-private transactions;
SEC Form 424(b), prospectus filings.[53]

41.    Mr. Miller further explains that the "[m]andated [u]se of CUSIP Numbers in Trade Processing" is supported by the facts that:

"DTC has required the use of CUSIP Numbers (or, in certain instances, CINs) for any trades that it processes…[and with] limited exceptions…the MSRB has required their use for the entire municipal securities bond market.  CUSIP Numbers (and only CUSIP Numbers) are used by the U.S. Treasury as part of the auctions of its marketable securities and its STRIPS program."[54]

The Miller Report also observes that "Given DTC's position as the only SEC-recognized clearing and settlement platform for stocks, corporate bonds, and municipal bonds, and its extensive role in clearing Treasury trades,  its operational rules create a *de facto* requirement for the use of CUSIP Numbers for publicly traded securities of these types."[55]  Being able to trade via DTC is practically necessary because "DTC . . .  provides settlement services for virtually all broker-to-broker equity and listed corporate and municipal debt securities transactions in the U.S., as well as institutional trades, money market instruments and other financial obligations."[56]

42.    Mr. Miller adds that:

"Beyond trade processing, the rules of FINRA and the MSRB governing trade reporting and customer confirmations by broker-dealers, as well as the reporting requirements of the SEC by investment managers of portfolio holdings, effectively require that a CUSIP be obtained for any "CUSIP-eligible" publicly traded security and, as a result, any trade execution with respect to the security would utilize its CUSIP Number… Because of this long-standing use of CUSIPs, currently any platform that processes trades in public securities (whether it be on the investor side, the broker-dealer side, exchanges, or clearing entities) must be able to process trades on the basis of CUSIP Numbers."[57]

---

[53] Powell Report pp. 31-32.
[54] Miller Report ¶ 49.
[55] Miller Report ¶ 54.
[56] See https://www.dtcc.com/clearing-and-settlement-services, last accessed 8/5/2025.
[57] Miller Report ¶ 49.

43.     As Mr. Miller elaborates, under DTC's Operational Arrangements, issuers or their agents must obtain "a CUSIP Number (or in the case of certain foreign securities, a CINS) for each security to be included in DTC's book-entry system."[58] Because DTC is the sole SEC-recognized clearing and settlement platform for stocks, corporate bonds, and municipal bonds, this requirement — reinforced by FINRA's TRACE trade reporting rules (Rule 6730), the MSRB's transaction and confirmation rules (e.g., Rules G-14 and G-15), and SEC reporting forms that require identification by CUSIP "if available"[59]—compels the use of CINS when certain foreign-issued instruments are sold in the U.S. or held by a firm with SEC Rule 13(f) U.S. reporting obligations.

44.     Further, major stock exchanges, including NYSE and NASDAQ, will not list securities that lack DTC eligibility.[60] The Miller Report notes DTC eligibility rules require that each security be assigned a CUSIP or CINS.[61] This means that all the stocks listed on NYSE and NASDAQ must have a CUSIP or CINS to trade on those exchanges.[62]

45.     As Mr. Miller describes, "the extensive use of CUSIP numbers to identify publicly traded securities is reflected in the specific references to CUSIP Numbers in the rules and regulations that govern securities transactions and their ownership[,]"[63] explaining that, "[a]lmost all the SEC FINRA and MSRB rules and regulations that [he is] aware of that have called for the use of a specific securities

---

[58] Miller Report ¶ 54.

[59] *See supra* ¶ 30.

[60] NYSE ("Issuers are reminded that all securities must meet Direct Registration System ("DRS") and DTC eligibility requirements prior to listing on the Exchange."), https://www.nyse.com/publicdocs/nyse/markets/nyse/NYSE_2024_Annual_Guidance_Letter.pdf, last accessed 8/7/2025; NASDAQ ("On August 8, 2006, the Securities and Exchange Commission approved amendments to NASDAQ Rule 4350(l), which requires securities listed on NASDAQ to be eligible for a Direct Registration Program operated by a clearing agency registered under Section 17A of the Exchange Act, such as the one offered by The Depository Trust Corporation ("DTC")."), https://listingcenter.nasdaq.com/assets/rulebook/nasdaq/rules/Issuer_Alert_2007-001.pdf, last accessed 8/6/2025.

[61] Miller Report ¶ 49(i), ¶ 54.

[62] Order Granting Approval of a Proposed Rule Change Relating to a Policy Statement on the Eligibility of Foreign Securities at p.10 & n. 18, p. 12 (referring to DTC's determination that certain Foreign Securities will be eligible for deposit and book entry transfer through its facilities if they have a CUSIP or CINS identification number), https://www.sec.gov/files/rules/sro/dtc/2007/34-56277.pdf.

[63] Miller Report ¶ 50.

identifier, have specified that CUSIP Numbers be used or provided if available…
[T]he use of CUSIP Numbers permeates the rules and regulations of these entities.
These rules cover a wide range of issues: the transaction processes and operations
themselves; information reporting by issuers, regulated investors and broker-dealers;
and required books and records..."[64] Mr. Miller goes on to detail dozens of specific
rules and regulations of the "major operational and regulatory entities that reference
CUSIP Numbers,"[65] specifically considering the DTC, SEC, FINRA, the Municipal
Securities Rulemaking Board (MSRB), the US Treasury, the Intercontinental
Exchange, Inc. (the NYSE Group), NASDAQ, and the National Association of
Insurance Commissioners (NAIC).[66]

46.    Further, CUSIP-based ISINs are required for US-issued financial
instruments to trade in certain international markets.  Dr. Bergmann states:

"ISINs are also necessary for financial market business operations in
Germany and the European Union because CUSIP-based ISINs are necessary
for the clearing and settlement of transactions involving U.S. financial
instruments.  Every significant clearing and settlement company in the
European Union, including the two largest such companies—Euroclear Group
and Clearstream International S.A.—require that ISINs be used to settle and
clear transactions."[67]

47.    To be sure, alternative identifiers could theoretically be used for certain
financial activities not covered by the above regulatory or operational mandates.  But
the fact that only CUSIPs and CINS can be used for the broad range of financial
activities covered by those mandates means that firms have to license CUSIPs and
CINS, rather than alternative identifiers, if they want to participate in any of those
broad ranges of financial activities.  CGS appears to be well aware of the ubiquity
of CUSIPs and CINS, ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████[8]

---

[64] Miller Report ¶ 50.
[65] Miller Report ¶ 50-90.
[66] Miller Report ¶ 50-90.
[67] Bergmann Report p. 15.
[68] FRSI00565701, S&P Global, *Management Presentation: CUSIP Global Services* 31
(Nov. 2021); FRSI00229831 (Email chain attaching a list of Industry Regulations/Rules requiring
CGS Identifiers and ISIN Codes); FRSI01146693 (Email chain attaching FactSet slide deck stating

███████████████████████████████████████████████████████████████████████████

b.    <u>Network Effects and the Infrastructure of Financial Markets</u>

48.    Even when CUSIP identifier use is not explicitly mandated, network effects have created incentives to use CUSIP Identifiers that make them functionally indispensable.  Since their introduction in the 1960s, CUSIP Identifiers have become deeply embedded in financial market infrastructure, including trading platforms, data feeds, compliance systems, and internal workflows.  The entrenched role of CUSIP Identifiers as an industry standard has created significant network effects in which the value of using CUSIP Identifiers increases as the number of users increase.[69]  As Mr. Powell explains, "a network externality (often referred to as a network effect) occurs when the value of a product or service increases for each user as the number of other users … also increases.  In the context of Financial Identifiers, this means that the utility and efficiency of a system for identifying financial instruments grow significantly as more financial institutions adopt and consistently use it.  The more widespread the adoption, the more valuable the standard becomes to all participants in the network.  CUSIP Identifiers exemplify strong positive network externalities through their design, history, and widespread adoption in financial markets[.]"[70]  Mr. Miller also describes how the history and ubiquity of CUSIP identifier use has them "part of the *lingua franca* for the electronic processing of publicly traded securities."[71]

49.    CUSIPs Identifiers are standardized.  They are uniquely designed to play a role in the US and global financial system that no other identifiers can play.  As Mr. Powell describes, "A Standardized Identifier is a Financial Identifier whose design, use, and format are approved by a standards-setting organization.  Because these identifiers are standardized, they are 'interoperable between vendors,' meaning that regardless of 'language or software or infrastructure the vendors use,

---

[69] Gandal, N., Compatibility, Standardization, and Network Effects: Some Policy Implications. Oxford Review of Economic Policy, 18(1), 80–91 (2002) ("A network effect exists if consumption benefits depend positively on the total number of consumers who purchase compatible products. ... In other words, the long-term co-existence of competing incompatible standards is unlikely. This is because a small initial advantage will likely influence consumer expectations about the adoption of a particular standard. This in turn will lead to more consumers adopting the standard. Because the value of the product increases in the number of adopters, the value of the network increases to future adopters. Often, consumer expectations are self-fulfilling and an early lead can be transformed into an advantage that is difficult to overcome.").

[70] Powell Report pp. 29-30.

[71] Miller Report ¶ 20.

they would be able to consume and receive access to [them].'"[72]  Even if there were another identifier that had the technical features to be interoperable in the same way that the CUSIPs are, it would face the challenge of overcoming the network effects and high switching costs.[73]  This reduces the incentives potential entrants have to develop such an identifier.

50.    Non-standardized financial identifiers cannot be meaningful substitutes for CUSIP Identifiers due to the limited range of functions for which they can be used.  As Mr. Powell describes:

"Non-Standardized Financial Identifiers may be divided into three categories. Proprietary Identifiers are Financial Identifiers created by a company to identify financial instruments used by that company on its Technology Platform.  These identifiers identify financial instruments the company that created the Proprietary Identifiers uses. … Venue-Specific Identifiers identify financial instruments on a particular exchange.  For example, NASDAQ issues ticker symbols to identify stocks traded on its exchange.  Venue-Specific Identifiers do not identify financial instruments that are not traded on that exchange.  Instrument-specific identifiers identify financial instruments in a particular asset class, such as credit default swaps.  Instrument-specific identifiers do not identify financial instruments outside that particular asset class."[74]

Each of these types of identifiers has some useful function, yet none could be a credible substitute for CUSIP Identifiers given the range of uses for the latter.

51.    As CGS itself puts it, the ███████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

---

[72] Powell Report pp. 1-2.

[73] FRSI01130559 (Article by CGS CEO Preiss calling CUSIPS "the single interoperable common language in the US, Canada and 30 other territories"); SPGI-0000005742 ███



[74] Powell Report pp. 2-3.

████████████████████████████████████████████[75]  Because these
mandates and network effects require, or effectively compel, the use of CUSIP
Identifiers, the relevant market is limited to CUSIP Identifiers.

### c.    The Widespread Perception That CUSIP Identifiers Are Indispensable for Participation in the Financial System

52.    Even if one were to dispute the conclusion that the use of CUSIP
Identifiers were in fact legally or functionally required for some types of financial
activities, the extent of buyer substitution in response to price increases would turn
on whether users of CUSIP Identifiers *perceive* that they lack any economically
reasonable substitute.  The evidence shows that CUSIP Identifiers were widely
understood to be essential for effective participation in the modern financial system.

53.    For example, CGS maintains a document entitled "Industry
Regulations/Rules requiring CGS Identifier and ISIN Codes" that identifies many
rules and regulations that require the use of CUSIP Identifiers, indicating that CGS's
business understanding is that those rules and regulations require using CUSIP
Identifiers and are important to its businesses of licensing their use.[76]  Other market

---

[75] FRSI00565701 at p. 18; Ritter, Jay R. and Wool, Phillip, Anatomy of a World-Class
Standards Body: The Origins and Future of the CUSIP System (January 26, 2021) (Paper
references the 2020 CUSIP Global Services Survey conducted on behalf of the American Bankers
Association (ABA) ("Market participants reinforce the seriousness of the fragmentation dilemma
with 78 percent of ABA survey respondents indicating serious disruption if there was a change
away from using the CUSIP identifier as the foundation for clearing and settlement. The problem
for most is not the lack of a common key for identification, but rather the costs and complexities
associated with the mapping of legacy infrastructures that use a combination of internal and
external identifiers.").

[76] FRSI00229838 (June 2020 document titled "Industry Regulations /Rules requiring CGS
Identifiers and ISIN Codes" highlights the need for CUSIP use in SEC Rule 6c-11, which requires
"requires ETFs to disclose [CUSIPs] for each portfolio holding on a daily basis"); SEC Form 13F
(quarterly reporting requirement for institutional investment managers that exercises investment
discretion over $100 million, in which they must disclose each section 13(f) security over which
it exercises investment discretion); SEC Rule 17g-2(d) (requiring National Recognized Statistical
Ratings Organizations ("NRSROs") to make and retain a record that, "for each outstanding credit
rating, shows all rating actions and the date of such actions from the initial credit rating to the
current credit rating identified by the name of the rated security or obligor and, if applicable, the
CUSIP of the rated security or the Central Index Key ("CIK") number of the rated obligor.");
FRSI01171986 (email chain attaching ████████████████
████████████████████████████████████████████

participants likewise indicate that they view CUSIP Identifiers as required or essential.[77]  Given that the widespread view of market participants that the use of CUSIP Identifiers is required by rules and regulations, market participants clearly would not switch to other identifiers in response to prices for the use of CUSIP Identifiers that were 5% above competitive levels.

54.     The deep-rooted history of CUSIP Identifiers as the key financial identifier has led market participants to believe it is embedded into systems and processes and therefore essential to the "process of combining data from different sources into a unified view for business consumption."[78]



[80]  Other market participants, such as retirement plan advisors, believe CUSIP Identifiers are essential for timely and cost-effective access to accurate data.[81]

55.     The market perception that CUSIP Identifiers are required also extends to CUSIP International Numbers (CINS).  For example, CGS states that a U.S. issuer



FRSI00229831

---

[77] *See infra* ¶ 54.

[78] Ritter, Jay R. and Wool, Phillip, Anatomy of a World-Class Standards Body: The Origins and Future of the CUSIP System (January 26, 2021) ("The reality described above leads to confusion among some industry participants on the differences between instrument identification (which is addressed by CUSIP) and data integration – which is the process of combining data from different sources into a unified view for business consumption. … There are scores of source systems, data warehouses, risk analytics systems, and reference data management repositories that would all need to be updated and kept synchronized with each other if CUSIP numbers were replaced.") https://ssrn.com/abstract=3773858, last accessed 8/12/2025.

[79] FRSI00198784.

[80] FRSI00538813; FRSI01476139.

[81] Advocacy for Replacing CUSIP with FIGI for Filings under the Financial Data Transparency Act (FDTA) - Proposed Rules: S7-2024-05 ("While CITs [Collective Investment Trusts] offer cost advantages and are rapidly becoming a popular choice in retirement plan lineups due to their potential for lower expenses, accurately identifying them poses challenges, particularly for those without access to the CUSIP system.").

should get a CINS (rather than a CUSIP) for its equity securities offered solely outside the U.S. and Canada.[82] Likewise, CGS says a "non-US/non-Canadian issuer" should get a CINS rather than a CUSIP for "public offering" of equity in the U.S that is not an American Depository Receipt, such as "Companies domiciled in Cayman Islands, Bermuda, or British Virgin Islands listed on NYSE or Nasdaq."[83]

### d. Conclusion Based on the Lack of Economically Reasonable Substitutes

56.     Given the above common evidence that CUSIP Identifiers are required or functionally needed for many financial activities, a hypothetical 100% monopolist in the market for using CUSIP Identifiers would not induce any significant buyer substitution to alternative identifiers if it raised prices for use licenses by 5% over competitive levels. The above analysis thus means that alternative identifiers for financial instruments issued by US firms or tradeable in the US, such as FIGIs, are not in the relevant market.[84]

57.     The requirements and functional needs detailed above likewise mean that ticker symbols are not a reasonable substitute for CUSIP Identifiers.[85] Not only do ticker symbols fail to satisfy the legal and market requirements to use CUSIP Identifiers,[86] but also market participants regard ticker symbols as less useful

---

[82] Miller Report ¶ 43; CUSIP Processes, p. 3 ("Processes: Assigning CINS (International) … Equity offered solely outside U.S. and Canada … Debt offered solely outside U.S. and Canada") https://www.cusip.com/pdf/Processes%20-%20CUSIP_Template_2019.pdf, last accessed 8/13/2025.

[83] CUSIP Global Services, Processes & Procedures, Criteria for Assigning a CINS (CUSIP International Number) at p. 3, https://experience.cusip.com/resource/online-learning-module/process-and-procedures; see also Miller Report ¶ 43, note 44;

[84] PX513 (ABA Comment Letter to the SEC stating "No other financial instrument identifier compares to CUSIP and its closely related ISIN in coverage and utility"); https://www.sec.gov/comments/s7-2024-05/s7202405-515015-1487362.pdf, last accessed 8/14/2025; SPGI-0000033988 ▮▮▮▮▮▮▮
FRSI01666235 ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[85] Bergmann Report p. 17 ("Because financial market participants with diversified portfolios include U.S. financial instruments in their investment portfolios (see previous paragraph and footnote 37) and because CUSIP-based ISINs are the only standardized identifier that regulators and clearing companies accept, financial market participants must be able to use CUSIP-based ISINs.").

[86] Bergmann Report p. 15 ("Other numbering systems such as the Refinitiv RIC and the Bloomberg FIGI can refer to financial instruments and can also be used internally by financial

identifiers of financial instruments than CUSIP Identifiers because they are exchange specific and therefore cannot be used in a global marketplace.[87] Market participants also deem tickers to be less reliable identifiers of financial instruments than CUSIP Identifiers. Wharton Research Data Services notes, "In comparison to the ticker, the CUSIP is a more reliable identifier. While tickers can be reused over time, CUSIPs cannot be reused."[88] Further, ticker symbols can change over time—for example, on August 22, 2024, GAP Inc. changed is ticker on the New York Stock Exchange from GPS to GAP, while its CUSIP remained the same.[89] Whereas tickers can change without any change in corporate action, CUSIPs may change only with corporate actions like mergers and stock splits.[90] In addition, exchange ticker symbols may not be consistent across exchanges,[91] and they do not cover as broad a range of financial instruments as CUSIP Identifiers.[92] As Powell explains, ticker

institutions. However, it is my opinion that such identifiers can never replace the ISIN, and one reason is because the use of the ISIN is mandatory for regulatory reporting in the European Union.").

[87] Viginia Morris and Kenneth Morris, CGS, *CUSIP: A Common Language for Efficient Markets* ("But stock symbols don't translate well from market to market because they're exchange-specific. That limits their use in a global marketplace.") https://www.cusip.com/pdf/news/CUSIP-ACommonLanguageForEfficientMarkets_2022.pdf, last accessed 8/4/2025.

[88] https://wrds-www.wharton.upenn.edu/pages/wrds-research/database-linking-matrix/linking-taq-with-thomson-refinitiv/.

[89] https://www.gapinc.com/en-gb/articles/2024/08/gap-inc-to-change-ticker-symbol-to-gap%E2%80%9D-on-august-.

[90] Srinivasan, R., Umashankar, N., *There's Something in a Name: Value Relevance of Congruent Ticker Symbols,* Customers Needs and Solutions, 1, 241–252 (2014) (noting that firms may change their ticker symbol for many reasons, such as making it similar to its corporate name. "For example, 480 firms, listed in US stock exchanges, changed their ticker symbol between January 2005 and August 2008. … 127 (25%) of the new ticker symbols were congruent after the change..."); CUSIP Global Services Permanance – FAQ ("Under Permanence, CUSIPs for equity securities … will no longer change for an entity name change. However, a new CUSIP will continue to be assigned for reverse stock splits and forward stock splits with a mandatory exchange of shares.") https://www.cusip.com/pdf/news/CUSIPGlobalServices-Permanence-FAQ.pdf, last accessed 8/13/2025.

[91] https://www.morningstar.com/investing-definitions/ticker.

[92] European Commission, Case COMP/39.592-Standard & Poor's, 11/15/2011, Fn. 11 ("[T]here are a number of operations in which ISINs cannot be replaced by alternative identifiers. These are inter-bank communications, asset and portfolio valuation, clearing and settlement, front office operations in relation to bonds, custody issues, internal reporting or reporting to authorities, reference data management, and all other legally and economically sensitive operations which require the highest degree of security and accuracy. … For instance, in the equities field, private securities can only be identified by ISINs, since no Bloomberg tickers or RICs are allocated to such securities. Also, ISINs cover all fixed income instruments whereas proprietary identifiers are

symbols are venue-specific identifiers that are "limited to financial instruments traded on a specific venue" and "may [even] transfer … from one … equity investment [to another],"[93] meaning they are only locally unique, depend on the issuing exchange, and lack the permanence and interoperability of standardized identifiers like CUSIP Identifiers.

58.    Nor is it likely that users of CUSIP Identifiers would simply do without any CUSIP Identifiers because that would require them to forgo profits on financial activities that are far higher than the fees they have to pay for the use of CUSIP Identifiers.   Indeed,

[4]  This combination of need and fees that are negligible relative to holdings supports the conclusion that elevating prices by 5% above competitive levels would not trigger meaningful demand loss.  This is especially true since current prices are far above competitive levels, as is confirmed by the next section.

2.    *Quantitative Evidence that the Posited Markets for the Use of CUSIP Identifiers or US CUSIPs Satisfy the Hypothetical Monopolist Test*

59.    Quantitative evidence confirms the conclusion from the qualitative evidence that the posited markets for the use of CUSIP Identifiers or US CUSIPs satisfy the hypothetical monopolist test.  As detailed in the market power section, common evidence shows that CGS was a 100% or near-100% monopolist in the posited markets for the use of CUSIP Identifiers or US CUSIPs.[95]  As that section further details, common evidence shows that CGS was able to impose prices that were far more than 5% above competitive levels.[96]  This common evidence includes evidence that the marginal cost for using CUSIP Identifiers or US CUSIPs was zero and that competitive benchmarks for similar identifiers in more than 120 other

---

typically limited to debt instruments issued by companies listed at a stock exchange."); Powell Report p. 15 ("As an example, NASDAQ codes can be used only to identify financial instruments traded on that exchange. They are not used to identify financial instruments other than equity instruments traded on the NASDAQ exchange.").

[93] Powell Report p. 15.
[94] ABA-0000003429.
[95] *See infra* Section VI.A.1.
[96] *See infra* Section VI.B.

nations were provided at zero price.[97]  Given that common evidence, the competitive price level was $0.[98]  Accordingly, the fact that ███████████████████████████ ████████████████████████████████████████████████ shows that CGS found it profit-maximizing to raise prices by an infinite percentage above competitive levels.[99]  If an actual or near-100% monopolist in the posited market found such a price elevation profit-maximizing, obviously a hypothetical 100% monopolist in that posited market would as well.  Accordingly, this evidence confirms that CUSIP Identifiers and US CUSIPs are both relevant product markets.

60.    Further, confirming this same conclusion, ████████████████████████ ████████████████████████████████████████████████ ██████[100]  If a near-100% monopolist can ████████████████████████ ████████████████████████████████ then clearly a hypothetical 100% monopolist could raise prices by more than 5% above competitive levels.

3.    *The Markets for CUSIP Identifiers and US CUSIPs Each Include Their Derivative CUSIP-Based ISINs*

61.    The markets for CUSIP Identifiers and US CUSIPs each include their derivative CUSIP-based ISINs.  As noted above, for each CUSIP or CINS identifier, the corresponding ISIN is derived by using that CUSIP or CINS identifier and adding characters to identify the nation and provide an additional error check.[101]

---

[97] *See infra* Section VI.A & VI.B; FRSI01518828 at ¶38 (European Commission, Case COMP/39.592-Standard & Poor's, 11/15/2011. "[N]one of the NNAs in the [European] Union charge customers simply for using ISIN records in their own databases, independently of the source of the data, as S&P does."); Bergmann Report at p. 2 ("[U]sage restrictions and usage fees are not necessary to enable an entity to operate a business in issuing financial market identifiers. No entity in Germany or the European Union that issues financial market identifiers imposes restrictions on use by, or demands usage fees from, financial market participants that use those identifiers."); FRSI00145370 (9/16/2020 email chain between David Hunter of CGS and Elaine Eggers of FINRA stating, "There are somewhere between 120–130 NNAs globally. Each of them has an issuance model and some sort of commercial model. The commercial models vary depending on their role on the industry. For example, stock exchanges charge transaction fees, clearing houses charge clearing fees, and depositories have their own set of fees. To my knowledge, the other NNAs have decided not to charge separately for the use of their ISINs, because they have substantial revenue streams via their primary roles.  Putting aside the ISINs for a second, the London Stock Exchange does license its local code called a SEDOL and this is similar to the CUSIP model.").

[98] *See infra* Section VI.B.

[99] FRSI01456290 (CGS 2024 Price Book).

[100] ABA-000002343 (2023); FRSI01062993 (2019).

[101] *See supra* Section IV.B.

Thus, these ISINs are derived from their corresponding CUSIP Identifiers, and likewise knowing these ISINs necessarily provides the corresponding CUSIP identifier numbers. Even to the extent that they might not be useable as substitutes for each other, both of the potential grounds for defining a cluster market apply to the combination of CUSIP Identifiers and their corresponding CUSIP-based ISINs. First, CGS is the sole issuer of both CUSIP Identifiers and their derivative ISINs,[102] and engages in the same anticompetitive exclusionary conduct to prevent competition in the use market for both.[103]  Because this makes competitive conditions for CUSIP Identifiers and their corresponding CUSIP-based ISINs similar, it is reasonable to group them into a cluster market for analytical convenience even to the extent they are not substitutes.[104]  Second, to the extent that CUSIP Identifiers and their derivative CUSIP-based ISINs are not substitutes, they are complements that customers would prefer to purchase jointly because investors who trade the same financial instrument through U.S. and foreign central securities depositories need  both CUSIPs and ISINs and, when a company or fund is issuing stocks or bonds that are intended for both domestic and international investors, both CUSIPs and ISINs are required.[105]  This provides a second sufficient reason to treat CUSIP Identifiers and their derivative CUSIP-based ISINs as a cluster market.[106]

62.    Accordingly, I will treat CUSIP Identifiers and their derivative CUSIP-based ISINs as a single product market, and I will treat US CUSIPs and their derivative CUSIP-based ISINs as a single product submarket.  However, none of my conclusions would change if one instead treated CUSIP Identifiers and their derivative ISINs as two separate markets or treated US CUSIPs and their derivative ISINs as two separate markets.  It would simply mean that in both markets CGS had monopoly power and engaged in anticompetitive exclusionary conduct that prevented but-for prices of zero in both markets.

---

[102] *See supra* Section IV.B.

[103] *See infra* Sections VI.A,2 & VII.

[104] *See supra* Section V.A; 2023 Merger Guidelines at § 4.3.D.4.

[105] ISIN ("ISIN is being used to identify securities that are traded and settled internationally while CUSIP is used in securities that are traded, cleared, and settled in North America particularly in the United States."), https://www.isin.net/difference-between-isin-and-cusip/, last accessed 8/10/2025.

[106] *See supra* Section V.A; ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS (6th ed. 2007).

4. *Defining a Market for All CUSIP Identifiers Is Preferable to Defining a Market for US CUSIPs*

63. Although the above shows that one can define economic markets for either the use of all CUSIP Identifiers or the use of all US CUSIPs, one can imagine the argument that is better to define separate markets for US CUSIP use, Canadian CUSIP use, and CINS use for each other nation because they are not substitutes for each other. But that argument fails because it is appropriate to group them into a cluster market.

64. Consider the reality that US CUSIPs for different firms are also not substitutes for each other. After all, a customer who wanted to use one US CUSIP could not substitute another US CUSIP for it. But it would not make sense to define each individual US CUSIP to be a separate market. Instead, it makes more sense to define at least the full set of US CUSIPs as a relevant market because they meet the criteria for a cluster market. After all, "when the competitive conditions for multiple relevant markets [i.e., the different US CUSIPs] are reasonably similar, it may be appropriate to aggregate the products in these markets into a "cluster market".[107] Here, CGS has a monopoly as to every US CUSIP, and imposes the same anticompetitive restraints on each of them, so the competitive conditions are not only reasonably similar, but practically identical as to each US CUSIP.

65. Likewise, even though US CUSIPs, Canadian CUSIPs, and CUSIP International Numbers are not substitutes for each other, it makes economic sense to treat them all as in one cluster market because CGS has a monopoly as to the use of all of them (with respect to their usage to trade in securities issued by US companies or traded in the US) and imposes the same anticompetitive constraints on all of them. Thus, competitive conditions for US CUSIPs, Canadian CUSIPs, and CUSIP International Numbers easily exceed the "reasonably similar" standard that justifies aggregating markets into a cluster market for analytic convenience.[108]

C. **The Relevant Geographic Market Is the United States, But the Analysis Would Be the Same if It Were a Global Market**

66. Licenses to use CUSIP Identifiers (including US CUSIPs) are sold to both domestic and foreign customers.[109] Nonetheless, all those licenses are sold by

---

[107] 2023 Merger Guidelines at § 4.3.D.4; *supra* Section V.A.

[108] 2023 Merger Guidelines at § 4.3.D.4; *supra* Section V.A.

[109] FRSI01807326 (January 2025 Master Book of Business listing the shipping and billing addresses of CGS's customers includes both domestic and foreign customers).

a firm located in the United States, CGS,[110] to use the CUSIP Identifiers (including US CUSIPs) of financial instruments that were issued by US firms or tradeable in the US. It is thus appropriate to treat the foreign firms as buying their licenses to use CUSIP Identifiers (including US CUSIPs) in a U.S. market. This conclusion is supported by antitrust agency guidelines. They provide, "In the absence of price discrimination based on customer location, the Agencies normally define geographic markets based on the locations of suppliers, as explained in subsection 4.2.1."[111] Although CGS price discriminates on some buyer characteristics,[112] I have not found any evidence that it price discriminates based on buyer location.[113] Even if CGS did

---

[110] CGS is a business division of FactSet and, formerly, of S&P. *See supra* note 1. FactSet is headquartered in Norwalk, Connecticut. See https://www.factset.com/our-company/locations, accessed 8/13/2025. S&P is incorporated and headquartered in New York, New York. *See* S&P Global, 2025, 10K, ("State or other jurisdiction of incorporation or organization … New York, New York"); Deposition of Warren Breakstone at 8:3-8. CGS's principal offices are currently at 45 Glover Avenue, Norwalk CT. *See* FRSI00000095, FRSI00000073. They were previously at 55 Water Street, New York, New York. *See* FRSI00087277, FRSI00125445, FRSI00002039. CGS was a part of the Global Market Intelligence Division of S&P which is located in New York, New York. *See* https://wrds-www.wharton.upenn.edu/pages/about/data-vendors/sp-global-market-intelligence/#:~:text=Address:,Settings%20Picture%2Din%2DPicture%20Fullscreen.

[111] See DOJ/FTC Horizontal Merger Guidelines §4.2 (2010).

[112] *See infra* Section VI.B.

[113] Defendants have stated the grounds for varying user license fees, and none of those grounds are based on the national location of the user. See Defendant FactSet Research Systems Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories to Factset, p. 7-9 ("[N]o end user has an unfair advantage over its competitors. … The CGS website provides potential and current subscribers with a fee estimator (https://www.cusip.com/services/license-fees.html#/endUserFeeCalculator) that end users may use to estimate their cost of CGS licensing fees. No license fee is required where the number of unique CGS Identifiers accessed, stored, maintained, processed or otherwise used by or for the benefit of an end user customer is fewer than 500 securities, or where the data is used for certain purposes (e.g., only for academic research and teaching, regulatory reporting, or U.S. wealth managers with <$5B AUM).").

To be sure, a European Commission 2011 decision provides that in Europe CGS cannot charge anything to indirect users of US ISINs or charge more than $15,000 per year to direct users of US ISIN records. *See* European Commission, Case COMP/39.592-Standard & Poor's, 11/15/2011, ¶45-46: ("S&P committed to abolish all charges to indirect users for the use of US ISINs within the EEA. … In respect of direct users and ISPs or Service Bureaus (that is to say, outsourced data management service providers) that decide to obtain US ISINs from S&P and not from ISPs, S&P commits to distribute US ISIN records separately from other added value information, via an FTP delivery on a daily basis. Having regard to S&P's cost data, the initial price of that service will be set at USD 15,000 per annum.") However, that does not reflect price discrimination based on location *by CG*S. Nor does it apply to the licensing of CUSIPs or CINs, especially because the European decision does not allow free use of the CUSIPs embedded within an ISIN. *See* EC Press Release, 11/14/2011 ("However, users will not be allowed to extract the

price discriminate based on buyer location, the agencies only say they "may" define geographic markets by buyer location in such a case.[114] They do so when the relevant anticompetitive theory is that the challenged conduct enables defendants to target customers in certain locations with higher prices in a way that justifies defining a separate price discrimination market for them even if market power is absent in other locations.[115] That is not the relevant anticompetitive theory in this case. Accordingly, the relevant geographic market should be defined by supplier location, which is in the United States, and any foreign firm that buys from CGS thus buys in that US market.

67.    In any event, even if the market were instead defined to be global, it would not alter my analysis. Either way, CGS would remain the sole actual and perceived provider of licenses for the use of CUSIP Identifiers (including US CUSIPs) worldwide. Because market participants understand that CUSIP Identifiers (including US CUSIPs) are required to participate in financial activities involving financial instruments issued by US firms or tradeable in US markets, they would not shift to alternative identifiers regardless of where those alternatives are located. As a result, whether the relevant geographic market is defined as the United States or the entire world, market shares and other relevant market calculations would remain the same. Likewise, the effects of the challenged conduct on competition in the markets for using CUSIP Identifiers or using US CUSIPs would be the same whether one deemed the geographic scope of those product markets to be the United States or the world.

## VI.    MARKET POWER AND MONOPOLY POWER

68.    CGS's market power and monopoly power can be established using methodologies and evidence that are common to each proposed Class or Subclass. Three independently sufficient bases confirm CGS's market power and monopoly power in the market for using CUSIP Identifiers and the submarket for using US CUSIPs: (1) high market share coupled with high barriers to entry; (2) direct evidence that CGS had the power to raise prices above competitive levels, as well as to price discriminate; and (3) direct evidence that CGS had the power to exclude rivals. I address each of these bases in the first three sections below. Each of those

---

numerically similar CUSIPs, on which US ISINs are based, from the US ISIN data nor to redistribute in bulk US ISINs to companies other than affiliates located within the EEA.") https://ec.europa.eu/commission/presscorner/detail/en/ip_11_1354.

[114] See DOJ/FTC Horizontal Merger Guidelines §4.2 (2010).

[115] *Id*. §4.2.2; *see also id*. §4.1.4.

bases are common to the proposed Classes, as is the evidence and the method used to assess each basis, and the resulting conclusions about whether CGS has had market and monopoly power over CUSIP identifier use and US CUSIP use are also common to the proposed Classes.

### A. High Market Share Coupled with High Barriers to Entry

#### 1. High Market Share

69.    Throughout the Class Periods, CGS has maintained a high market share of 100% or close to it in the market for using CUSIP Identifiers and the submarket for using US CUSIPs. CGS has been the only entity authorized to issue NSINs for the US, Canada, and over 30 other countries in the form of CUSIPs and CINS and their respective ISINs.[116]    CGS's restraints have prevented other firms from compiling and using CUSIP Identifiers and CUSIPs without a license.    CGS documents and witnesses indicate that the sole exception during the class period is Exchange Data International (EDI).[117] ███████████████████████████████████

███████████████████████████████████    [118]   Although EDI uses CUSIPs in

---

[116] See supra Section IV.B.
[117] See FRSI01776754

effrey Mitnick Depo at 128:5-2

Scott J. Preiss Depo at 39:9-41:18

[118] FRSI00171923

FRSI01424533

FRSI00161427

ABA-0000001229 (3/9/2021)    CUSIP

44

some of their data services, they are not a supplier of financial instrument identifiers and thus not a full-fledged competitor to CGS.[119]

70.    Some CUSIPs are available in government filings.[120]  However, CGS has imposed restrictions that make it more difficult to gather CUSIPs in bulk.[121] In any event, the government filings only contain discrete categories of CUSIPs, for instance 23,239 CUSIPs on the latest SEC 13F list.[122]  As of May 2023, the universe of active CUSIPs was almost 17 million.[123]  CGS has attempted to prevent—and has been successful in preventing—firms from gathering and then publicly displaying CUSIPs from individual filings.[124]

---

Global Services Data Termination" letter send to data vendors stating "Please be advised that ███████████████████ and all of its subsidiaries and affiliates do not have the required CGS License Agreement in place with CUSIP Global Services ("CGS"). Therefore, in accordance with CGS's agreement with your firm, please cease delivering or otherwise making available any CGS Data (which includes CUSIPs, CINS, & CGS-based ISINs and related descriptive data) via your firm's direct feed (bulk or file download) products/services as soon as possible"); ABA-0000016244

███████████████████████████████████

ABA-0000021005

███████████████████████████████████

[119] For a description of EDI's business, *see* https://www.exchange-data.com/about-us-edi/https://www.exchange-data.com/about-us-edi/, last accessed 8/14/2025.

[120] Robert Nagle Depo at 117:5-15 ("Q. Sitting here today, can you think of any source of CGS data that is not under a contract with CGS that somebody could go to to receive CUSIP identifiers? … A. I would think the SEC and other regulator. Q. Okay. Anybody else that you can think of?  A.  Not  at  this  time.");  see  e.g.,  SEF  13F  list https://www.sec.gov/files/investment/13flist2025q2.pdf.

[121]  https://www.sec.gov/files/investment/13flist2025q2.pdf  (13F list asserting CGS copyright).

[122] https://www.sec.gov/files/investment/13flist2025q2.pdf.

[123] FRSI01146725.

[124] FRSI00170852 ███████████████████████████████

## 2. High Barriers to Entry

71.    CGS's monopoly is preserved by a combination of structural and strategic barriers to rival entry and expansion, including regulatory mandates, network effects, and CGS's anticompetitive exclusionary restraints on the use of CUSIP Identifiers (including US CUSIPs) without a license from CGS.

72.    As discussed above, [125] due to regulatory mandates and deeply entrenched network effects, the use of CUSIP Identifiers (including US CUSIPs) is functionally indispensable for market participants in US financial markets. Because these mandates and network effects require, or effectively compel, the use of CUSIP Identifiers (including US CUSIPs), the relevant market is limited to CUSIP Identifiers (including US CUSIPs).    Thus, any firms offering an alternative numbering scheme would not be entrants into the relevant market.

73.    CGS's exclusionary contracts and conduct restrain the use of CUSIP Identifiers (including US CUSIPs) without a license from CGS and prevent firms from entering the relevant market with an alternate service offering the use of CUSIP Identifiers or US CUSIPs. In particular, CGS has imposed contractual restraints on third-party data vendors that require them to inform their end-user customers that they must obtain a license from CGS in order to use the CUSIP Identifiers embedded in the vendor's data offering.[126] Further, should any end-user customer not maintain or comply with the licensing requirement, CGS requires the data vendor to halt distribution of CUSIP Identifiers (including US CUSIPs) to that customer.[127] CGS took additional measures to prevent users from accessing CUSIP Identifiers by rendering them in non-machine-readable formats.[128] Because data vendors provide

---

XIG_000123, XIG_000178 (Xignite ultimately shut down those offerings after CGS threatened to cut off its access to CUSIPs unless Xignite complied with the terms of its Distribution Agreement and executed a new UOSS.); FRSI01596435

FRSI01053148

[125] See supra Section V.B.1.
[126] See infra Section VII.
[127] See infra Section VII.
[128] FRSI01013337 (Web Display Addendum stating

46

their customers with real-time data necessary for daily business,[129] users of CUSIP Identifiers or US CUSIPs have overwhelming agreed to such licenses.[130]

74.    In this litigation, defendants have not asserted that copyright law restricts the use of individual US CUSIPs.[131]    Nonetheless, CGS's contractual restraints have restricted the ability of users to use CUSIP Identifiers (including US CUSIPs) without obtaining a license, thus giving CGS at least the power equivalent to a copyright to restrict the use of CUSIP Identifiers, even if one is not warranted by copyright law.  Further, defendants' contract language and marketing materials have long claimed, and continue to claim, that using CUSIP Identifiers without a license from them violates its intellectual property rights.[132]    These contractual

---

[129] Powell Report p. 3 ("Standardized identifiers are crucial for accurate trading, clearing, settlement, regulatory compliance, and data management.").

[130] FRSI00074682

FRSI00254078

[131] Opinion and Order re Motion to Dismiss the Second Amended Class Action Complaint (ECF 107) at 50-51 ("Defendants do not own a copyright in CUSIP numbers."); *id.* note 9 ("Defendants do not purport to own a copyright in CUSIP numbers in their briefing, and appear to argue, for purposes of the present motion, that they do not."); Deposition of Jeffrey Mitnick at 292:22 – 293:9

[132] FRSI00000095 (CUSIP Global Services Subscription Agreement requiring the subscriber to acknowledge that "the CGS Data was compiled, prepared, revised, selected, arranged and published by CGS under authority from the ABA through the application of methods and standards of judgment developed and applied through the expenditure of substantial time, effort and money, and that the CGS Data constitutes valuable intellectual property of CGS and the ABA"); FRSI00000073

FRSI00529130

restraints and assertions of copyright protection have created large entry barriers to firms that might seek to compile and offer the use of their own list of CUSIP Identifiers, whether standalone or in combination with other innovative services. With its exclusionary restraints, CGS has prevented rivals from entering the market by: (i) increasing the costs of entry with assertions that compiling and/or licensing such lists would be in contravention of copyrights, thus imposing the risk of costly litigation on any potential entrants;[133] and (ii) suppressing any demand that any potential entrant could expect through executing and enforcing contracts that restrained users of CUSIP Identifiers from doing business with any such potential entrant. Thus, the challenged restraints themselves are the foundational cause of high barriers to entry in both the market to use CUSIP Identifiers and the submarket to use US CUSIPs.

75.    In the absence of the challenged restraints, there would be low barriers to entry in both the market to use CUSIP Identifiers and the submarket to use US CUSIPs. I am instructed by plaintiff counsel that although copyright law protects a particular compilation of CUSIP identifier data from being copied, copyright law does not protect the CUSIP Identifiers themselves from being collected and disseminated. CGS's compilation of CUSIP identifier data includes over 60 data fields in addition to the CUSIP Identifiers themselves.[134] I am instructed by plaintiff counsel that although copyright law would ban copying all of the 60-plus data fields in the same arrangement as they are stored by CGS, it would not bar a potential entrant from collecting and providing the CUSIP Identifiers themselves.

76.    Without the challenged restraints, the entry barriers to rivals collecting



FRSI00529131

---

[133] These actions on CGS's part serve to increase the costs of entry regardless of the factual basis for their copyright infringement claims.

[134] CGS ("CGS databases contain 65+ different data elements related to tens of millions of financial instruments (depending on asset class), as well as event-driven corporate actions such as name changes, mergers, acquisitions and reverse splits.") https://www.cusip.com/services/index.html, last accessed 8/9/2025.

and offering the use of CUSIP Identifiers or US CUSIPs would be small because the costs of doing so would be low. Users who access CUSIP Identifiers through third-party data vendors would have no extra costs (beyond what they are already paying the vendors) to assemble, store and re-disseminate CUSIP Identifiers themselves (i.e. without any enhanced data that the vendor itself provides). Users who access CUSIP Identifiers through publicly available sources could also compile lists of any CUSIP Identifiers they wanted through automated processes like web scraping, and then offer those lists (standalone or enhanced by other data) for use by customers.[135] In Germany, once an ISIN is issued, information including but not limited to issuer name, instrument type, interest rate, country code, maturity, marketplace and status (Basic Securities Data), becomes available without any fee  and without any restrictions on use to data providers, data vendors, investors, exchanges, custodians, and any other end user that wishes to use this data for their own purpose.[136] WM Daten allows users to obtain and download Basic Securities Data on a security identification number free of charge via any number of individual queries or search for the identification numbers via a database query.[137] As explained in the Lenz Report, the absence of any licensing agreements to access WKNs (German securities identifiers) and ISINs information, together with the lack of restrictions on their use, has allowed a very low entry barrier for new market participants (data vendors) requiring less investment (i.e. no upfront or recurring licensing fees) and allowing a larger degree of freedom when it comes to the use of WKNs and Basic Securities Data provided by WM Daten.[138] Further, Dr. Bergmann notes that, although CGS issues CFI identifiers, it does not charge fees for the issuance or use of CFIs, "even though CGS bears costs for issuing CFIs similar to the costs it bears for issuing

---

[135] ███████████████████████████████████████████████████████████
██████ FRSI01400549. ██████ Deposition of David Hunter at 379:2-18. If Plaintiffs prevail in this case, business based on public access to CUSIP Identifiers would presumably return.

[136] Lenz Report ¶35.

[137] Lenz Report ¶35; *id.* ¶29 (Mr. Lenz reports that WM Daten not only makes available for free the security identifiers that it issues (i.e., WKNs and WKN-based ISINs), but also the Basic Securities Data which includes basic but important security attributes such as the issuer name, country of origin, security description, maturity, currency, interest rate, etc. depending on whether dealing with a stock, bond, or a fund.)

[138] Lenz Report ¶45. Although a CGS board member stated that the costs of recreating a CGS feed would exceed the license fee, *see* FRSI01776756, the costs of scraping would be lower without CGS's restraints, and if a firm incurred those scraping costs it would (without the restraints) be able to provide databases of CUSIP Identifiers to end users, unlike with a license under the current restraints.

CUSIP-based ISINs, including maintaining a database of such numbers."[139]

77.     These low but-for entry barriers indicate that, in a but-for world without the challenged restraints, prices for the use of CUSIP Identifiers would be zero.  Not only are the entry costs of collecting CUSIP Identifiers very low, but once collected the marginal costs of allowing them to be used are zero.  Given the low collection costs and nonexistent marginal costs, if firms could offer their own collections of CUSIP Identifiers without the challenged restraints, they would offer them for free in order to encourage clients to use their broader data offerings.  Consistent with this inference, when Bloomberg incurred the more significant cost of generating its FIGI identifiers, the zero marginal cost of using them led Bloomberg to offer FIGI identifiers for free in order to encourage customers to use their broader data offerings.[140]

78.     CGS itself would also have incentives to charge a zero price for CUSIP identifier use in the but-for world.  Its marginal cost of allowing CUSIP identifier usage would be zero.  Indeed, absent its audits and self-reporting by data vendors, CGS generally would not even know when one of its CUSIP Identifiers was being used.[141]  Further, in the but-for world, anyone could compile and circulate lists of issued CUSIP Identifiers for free use, so low entry barriers would constrain CGS pricing because any positive charge for use would trigger the entry of free lists.  In addition, in the but-for world, CGS and others would not incur any of the costs of licensing usage, monitoring usage, and enforcing usage licenses because the restraints on usage that allow CGS to impose such usage licenses would not exist. As Mr. Lenz reports, dealing with data provided in connection with a licensing agreement that not only imposes the payment of fees, but that also restricts the use and distribution of such data, results in additional costs and burdens to data vendors and other end users, since compliance and enforcement of licensing agreement

---

[139] Bergmann Report p. 28.

[140] Openfigi.com ("Flexible manual and API tools allow you to access FIGI and it's associated metadata - all provided under the MIT Open Source license at no cost and as a public good."), https://www.openfigi.com/, last accessed 8/1/2025.

[141] FRSI00163032 at '154

FRSI00254078 at '079

provisions demand implementation by data vendors of monitoring processes and policies to make sure no contract provisions get breached or violated.[142]  Because such licensing, monitoring, and enforcement costs would not exist in the but-for competitive world, they would not affect the but-for competitive price level.  Indeed, even in the actual world with such costs, CGS charges a license fee of zero to certain types users, indicating that the marginal costs of licensing usage do not require positive pricing.[143]  Given the zero marginal costs of allowing usage and the inability to require users to pay any license fee in a but-for world without the restraints, CGS would have incentives to offer CUSIP identifier usage free of charge in the but-for world, especially since other firms would also be able to offer CUSIP Identifiers for use free of charge in the but-for world.

79.    This economic inference that the but-for price for CUSIP identifier use would be zero is confirmed by the evidence that, in over 120 nations without similar restraints, identifiers for financial instruments from those nations can be used free of charge.[144]  For example, "[i]n Germany, one of the largest financial markets in the European Union, the NNA—WM Daten—does not charge any fees for the issuance or use of financial instrument identifiers, and does not impose any license restrictions on users of the ISINs.  Yet, that NNA continues to offer its issuance business to issuers of financial instruments without interruption and without any hint of inefficiency."[145]  The only partial foreign exception appears to be the United

---

[142] Lenz Report ¶46.

[143] CGS License Fees (examples of fee waivers (zero license fees) include the following: (a) institutions that obtain data originating from a CGS Database via an electronic data feed or bulk download, solely to fulfill governmental regulatory reporting requirements, are eligible for a no-fee license; (b) no fees for Academic institutions; (c) no fees for end users that store less than 500 CUSIPs; (d) no fees for wealth managers with less than $5B AUM; and (e) consequent to the European Commission Ruling on 11/15/2011, 39592_2152_5.pdf, no license is required and no fees are incurred in the European Economic Area for EEA end users that only need access to the ISIN Record), https://www.cusip.com/services/license-fees.html#/licenseStructure, last accessed 8/14/2025.

[144] *See* Bergmann Report p. 26 ("Of the more than 120 NNAs in the world, only CGS and LSEG impose usage fees or use restrictions on users."); *id.* p. 27 ("CGS is the only NNA worldwide that charges users for the use of ISINs once issued.  I have reviewed the policies of each of the NNAs in the European Union and Asia.  All of them use ISINs as the default identifier, and no NNA in the European Union or in Asia charges a fee for issuing or using ISINs.").

[145] Bergmann Report p. 24; Lenz Report ¶38 (Mr. Lenz reports that WM Daten, although responsible to issue and manage the German securities identifiers WKN and WKN-based ISINs, does not charge any fees for the issuance or use of such identifiers, including its own competitors (German data vendors). WM Daten only charges fees for its enhanced data products, data feeds and services, but not for the use of WKNs and ISINs downstream by end users, and

Kingdom, in which the London Stock Exchange Group (LSEG) is the NNA and is able to charge a price to use its SEDOLs because it imposes exclusionary restraints that are similar to CGS's.[146]  However, LSEG does not charge for using UK ISIN codes, even though the SEDOL code can be found in the middle characters.[147]

### B.    Direct Evidence that CGS Had and Has the Power to Raise Prices Above Competitive Levels, as Well as to Price Discriminate

80.    CGS's conduct demonstrates it has had the ability to raise prices above competitive levels and to engage in discriminatory pricing.  Zero marginal costs combined with substantial usage-based fees through a tiered pricing structure, requirements that licensees self-report their usage annually, onerous audit rights in its license agreements, and the power to terminate access to CUSIP Identifiers through their data vendors to any licensee who does not obey the license constraints, show that CGS's pricing power depended on its restraints that prevent the use of CUSIP Identifiers without a license and reflected the firm's power to extract surplus from users with inelastic demand.  This evidence supports the conclusion that CGS's prices for CUSIP Identifiers were not determined by marginal cost or market competition, but instead reflected CGS's power over pricing.

81.    *First,* the evidence directly shows that CGS has had and exercised the power to raise prices significantly above competitive levels.  As discussed above, in the markets to use CUSIP Identifiers or US CUSIPs, the competitive level of prices

---

does not demand any kind of license agreement to be in place with other data vendors and their end users.).

[146] LSEG, SEDOL Data file and Corporate Actions price list, pg. 3 ("Data file license charges are only paid by customers who take the SEDOL Masterfile data directly from the Exchange.") https://www.lseg.com/content/dam/lseg/en_us/documents/sedol/sedol-data-file-and-corporate-actions-price-list-2025.pdf, last accessed 8/9/2025.

[147] Wolters Kluwer ("There is a licence charge payable to the London Stock Exchange for using SEDOL codes, but there is no charge for using UK ISIN codes like GB0008847096, even though the SEDOL code can be found in the middle characters. However CGS's licensing charges are different. It raises a licence charge on the use of either a CUSIP code or an ISIN code that contains        the        CUSIP        code        in        the        middle        characters.") https://userdocs.wolterskluwer.co.uk/Product_Information/Product_Help/CCH_Trust_Accounts/Advanced_reference/Securities/US_ISIN_Codes, last accessed 8/9/2025; LSEG ("We do not charge a fee for ISIN allocation and neither do we charge a fee for maintenance of the issued ISIN. … The majority of NNAs do not charge for ISIN allocation and fees do not apply for maintenance/renewal of allocated ISINs. In the few instances where fees are charged for ISIN allocation, this is on a cost-recovery basis only, in accordance with ISO 6166 ISIN Registration Authority    obligations.")    https://www.lseg.com/en/data-analytics/market-data/data-analytics-pricing/data-symbology/isin-services, last accessed 8/9/2025.

would be zero because providing CUSIP identifier use has zero marginal costs, customer use can confer benefits on the provider of CUSIP identifier use, and zero is the usage price charged for identifiers for foreign instruments in 120 nations without similar contractual restraints that require licenses for usage.[148]

[149]

82.    **Second,** to impose its usage-based fees, CGS requires its licensees to self-report their usage annually and includes audit rights in its license agreements to verify those reports.[150]  CGS regularly exercises its rights to conduct such audits and

[151]  These audits can be time consuming and costly for both CGS and its target, suggesting that both parties agree to the license in spite of the potential added cost.[152]  As part of the compliance review,

---

[148] *See supra* Section VI.A.2.

[149] FRSI00200179 .

[150] CGS ("To ensure compliance, all end-user customers undergo annual affirmations of use or usage reviews to validate their usage, fees and any applied discounts, ensuring they are appropriate."),  https://www.cusip.com/services/license-fees.html#/endUserFeeCalculator,  last accessed 7/21/25.

[151] FRSI00149384

[152] *See*  FRSI00163032-FRSI00163154



[153]

These extensive compliance reviews can result in additional fees being paid by licensees.[154]   CGS's contracts also required distributors to cooperate with CGS in revoking access to the distributors' services from any user that CGS terminated for noncompliance with its use license contracts.[155]

83.    In short, CGS's pricing power depends on CGS restraints that prevent using CUSIP Identifiers without a license and that reflect the firm's power to extract surplus from users with inelastic demand.   In over 120 nations without similar restraints, identifiers for financial instruments from those nations can be used free of

---

[153] [redacted]

[154] FRSI00074682 at '686

[155] RUS000001 "CUSIP Electronic Distribution Agreement" between CGS and Reuters.

charge, indicating that the competitive price level is zero.[156]

84.  CGS's non-issuance profits also far exceed its costs of licensing and license enforcement. ███████████████████████████████████████
███████████████████████████████████████████████[157] This calculation does not treat the royalty paid by CGS to the ABA as a cost because as a matter of economics it reflects a split of licensing revenues between two co-defendants, CGS and ABA.  This calculation also does not include the amortization of FactSet's purchase price of CGS, which FactSet treats as a cost on CGS's balance sheet, because that is an accounting convention rather than a true cost of operating the CGS licensing business.  Moreover, this calculation understates the degree to which CGS's current prices indicate its power over price because in a but-for competitive world CGS would not be able to restrain the use of CUSIP Identifiers and thus would not incur the costs of licensing or enforcement that are included in this profit margin measure.

85.  **Third,** CGS's ability to price discriminate also indicates that it possesses market power.  Standard economics textbooks observe that the ability to price discriminate requires market power.[158]  CGS charges users of CUSIP Identifiers different prices depending on user characteristics described as "Number of identifiers," "Number of lines of business," "Number of regions," and "Firm/Discount Type."[159]  These prices vary significantly for the exact same product.  For example, a license for up to 30,000 CUSIPs, with 2 lines of business in one region, is (a) $15,373 for a U.S.-only small bank (less than $1 billion in assets) and (b) $107,613 for a U.S.-only regional broker-dealer (approximately seven times larger).[160]  Nor are these price differences justified by cost differences because allowing customers to use CUSIP Identifiers does not inflict any cost to CGS, so the costs of allowing CUSIP identifier usage do not vary with the number of CUSIP Identifiers that a customer uses.  Nor do CGS's costs vary depending on the industry

---

[156] See Bergmann Report p.26 ("Of the more than 120 NNAs in the world, only CGS and LSEG impose usage fees or use restrictions on users."); *id.* p. 27 ("CGS is the only NNA worldwide that charges users for the use of ISINs once issued.  I have reviewed the policies of each of the NNAs in the European Union and Asia.  All of them use ISINs as the default identifier, and no NNA in the European Union or in Asia charges a fee for issuing or using ISINs.").

[157] See Royalty - Annual P&L.xlsx, Annual Adjusted tab.

[158] F.M. SCHERER & DAVID ROSS, INDUSTRIAL MARKET STRUCTURE AND ECONOMIC PERFORMANCE 488 (1990); DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION 294 (4th ed. 2005).

[159] FRSI00565701; https://www.cusip.com/services/license-fees.html.

[160] https://www.cusip.com/services/license-fees.html#/endUserFeeCalculator.

the customer is in. And these large positive prices are far above the price of zero that CGS charges to other types of users.[161] Accordingly, this evidence indicates a power to price discriminate, which provides direct evidence that CGS possessed and exercised a market power to charge well above competitive levels.

### C.    *Direct Evidence that CGS had the Power to Exclude Rivals*

86.    CGS has used its anticompetitive exclusionary conduct to exclude actual and potential rivals from the market for using US CUSIPs or other CUSIP Identifiers. As shown above, through actual and perceived exclusive licensing terms, intellectual property assertions, contractual restrictions on re-use, redistribution, public display, and sublicensing, and rendering CUSIP Identifiers non-machine-readable, CGS has prevented potential competitors—such as data vendors, financial platforms, institutional users, and subscribers—from offering or obtaining alternative sources of US CUSIPs or other CUSIP Identifiers free of the restraints imposed by CGS or from offering related services that use CUSIP Identifiers to specify relevant financial instruments.[162] These exclusionary practices have directly impaired the competitive process, ensuring that users must license US CUSIPs and other CUSIP Identifiers and must go to CGS for such a license, entrenching CGS's monopoly position and restricting innovation in the offering of related services that use CUSIP Identifiers to specify relevant financial instruments.

### VII.    ANTICOMPETITIVE EXCLUSIONARY CONDUCT

87.    Using methodologies and evidence common to each proposed Class or Subclass, I find that Defendants engaged in economically anticompetitive exclusionary conduct throughout the Class Periods. Specifically, this economically anticompetitive exclusionary conduct included: (1) imposing contracts that prohibited redistribution and limited downstream use of US CUSIPs and all other CUSIP Identifiers; and (2) imposing other technical and contractual restraints—such as rendering CUSIP Identifiers in non-machine-readable formats that prevented meaningful reuse and made it more costly for rivals to compile and provide CUSIP Identifiers for customer use.[163] In the absence of such anticompetitive restraints on

---

[161] *See supra* Section VI.A.2.; Bergmann report, p. 30.
[162] *See supra* Section VI.A.2; *infra* Section VII; FRSI01013337 █████████████████

[163] *See supra* Sections VI.A.2 & VI.C; FRSI01013337 ████████████████

Lenz Report at ¶¶ 44-47, Table 1.

unlicensed use of CUSIP Identifiers, there would be no charge for CUSIP identifier use, and there would be greater innovation in offering related services that use CUSIP Identifiers, consistent with what we observe for similar identifiers in other countries without similar anticompetitive restraints.[164]

88.     Defendants have not claimed in this litigation that copyright law bars the collecting and dissemination of CUSIP Identifiers.[165]   CGS nonetheless restrained the use of CUSIP Identifiers through its contracts with entities that CGS classifies as CUSIP distributors.  Those distributors licensed CGS's database of CUSIP Identifiers and related data in order to provide services to those distributors' subscribers.  The CGS contracts to license its database to those distributors provided that the distributors could allow their subscribers to use the distributed CUSIP Identifiers only if the subscribers signed separate license agreements with CGS that imposed not only fees, but also restraints on the use of those CUSIP Identifiers, for which the Defendants are now not claiming any entitlement under copyright law.[166] The agreements thus imposed a restraint on CUSIP identifier usage that prevented a type of competition in the CUSIP identifier use market that would otherwise have existed in the but-for world.[167]



89.     A standard form of the distribution agreement that CGS made with its distributors laid out the obligations that the distributor had to undertake with respect to its subscribers.[170]

---

[164] Lenz Report ¶44; *Id.* Table 1.0 (Mr. Lenz reports that new, innovative data products include those offered by providers Wagner & Partner, SDS Wien, CPB, BearingPoint, Intalus Finanzsoftware, Infront, and several other companies.).

[165] *See supra* Sections VI.A.2

[166] *See e.g.,* RUS000001 "CUSIP Electronic Distribution Agreement" between CGS and Reuters.

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] FRSI0000073.

█████████████████████████████████████████.[171]

90.     The challenge to these restraining agreements differs from any claim of a duty to deal. My economic analysis assumes that Defendants have no duty to deal in offering its compilation of CUSIP identifier data to distributors like Bloomberg. But that is not the economic issue here. The economic claim is not that Defendants refuse to deal; the economic claim is that Defendants couple licenses to so-called distributors of CGS's CUSIP identifier collections with restraints that require those distributors to prevent their subscribers from using the CUSIP identifier numbers in those compilations without agreeing to a license with CGS that requires users pay for that use and restricts how they can use it.

91.     CGS has implemented a very robust compliance program that includes regular instructions by CGS to distributors, which distributors follow, to terminate access to the distributor's (data vendor's) data feed to any licensees who violate CGS's use licenses.[172]



## VIII.    ANTICOMPETITIVE EFFECTS

92.     Using methodologies and evidence common to each proposed Class or Subclass, I find that, throughout the Class Periods, Defendants' anticompetitive

---

[171] FRSI00135237.
[172] *See supra* Section VI.B.
[173] FRSI00254078 at '079 ████████████████████████████

████████████████████████████████████████████████

[174] *Id.* at '081 ████████████████████████████████

[175] *Id.* at '081 ████████████████████████████████

[176] FRSI00254077, CGS Usage Reviews Investment Case, August 2022, p. 3

exclusionary conduct caused anticompetitive harm to all users of CUSIP Identifiers, as well as harm to the competitive process itself. All proposed class members were directly harmed because the anticompetitive exclusionary conduct inflated fees for licenses to use CUSIP Identifiers. As detailed above, in the but-for world, CGS could not require that firms that obtained CUSIP Identifiers from CGS as third-party data vendors had to require end-users to obtain a license from CGS to use those CUSIP Identifiers.[177] Consequently, entrants would be free to collect CUSIP Identifiers and offer them for use by unrestrained users of them. The entry costs of collecting CUSIP Identifiers and the marginal costs of providing them to users are both extremely low.[178] Further, CGS would have lower costs in the but-for world because it would incur neither the costs of entering into end-user license agreements nor the costs of its extensive monitoring and compliance of end-users.[179] In the but-for world, as demonstrated above, the price for using CUSIP Identifiers would be zero.[180]

93. The anticompetitive exclusionary conduct also denied users the benefits of innovation, improved services, and operational flexibility that would typically arise under competitive conditions—including the ability to integrate identifiers across platforms, redistribute or repurpose them for internal or client-facing use, choose among alternative providers to suit their specific needs, or offer related services that use CUSIP Identifiers. For example, the Lenz Report notes that in Germany, the free use of the WKN and ISIN identifiers made available by WM Daten promotes competition and results in more innovation in the market of data services, which can be seen by the growing number of new data vendors and new products and services offered in the German market for associated data and information.[181] Likewise, but for CGS's exclusionary conduct, SWIFT, an international cooperative of about 7,000 banks, would have offered an innovative and highly valuable service that provided immediate notice that an imminent trade was subject to sanctions.[182] Dr. Bergmann states that CGS's exclusionary conduct prevented SWIFT from offering such a service: "If SWIFT had a CUSIP reseller's license, users of SWIFT's new service would have needed a CUSIP license as well, which means an administrative burden, legal uncertainty due to various provisions

---

[177] *See supra* Sections VI.A.2 & VII.
[178] *See supra* Sections VI.A.2 & VII.
[179] *See supra* Sections VI.A.2 & VII.
[180] *See supra* Sections VI.A.2, VI.B, & VII.
[181] Lenz Report ¶44; *see also id.* Table 1.0 (reporting that new, innovative data products include those offered by providers Wagner & Partner, SDS Vienna, CPB, BearingPoint, Intalus Finanzsoftware, Infront, and several other companies.).
[182] Bergmann Report pp. 21-22.

described above, limited freedom in using the service, and fees also for them"[183]

## IX.    PROCOMPETITIVE EFFECTS

94.    Using methodologies and evidence common to the Classes, I find that (a) the anticompetitive exclusionary conduct had no procompetitive benefits that could not have been achieved through less restrictive means, and (b) even if there were, any such procompetitive benefits were not sufficiently large—or passed through to licensees to a sufficient extent—to offset the anticompetitive harms experienced by licensees.

95.    Specifically, I find that the benefits of having the right to use CUSIP Identifiers for various financial instruments are not procompetitive benefits that were created by the challenged restraints on competition and thus cannot justify those restraints.  To begin with, CUSIP Identifiers would still be issued even without restraints and fees on their *use* because, in the market to *issue* CUSIP Identifiers, CGS would still be able to charge fees to issuers for the issuance of CUSIP Identifiers that more than cover the costs of issuance.  Profit and loss statements for 2020 and 2021 show that ████████████████████████████████████████████████[184] which is more than sufficient to maintain the issuance business, especially since ANNA rules require that issuance businesses operate at cost.[185]

96.    Also, any such benefits could have been achieved through less restrictive means—and at lower cost to users—than the anticompetitive exclusionary conduct.  As shown above, I find that in a but-for world without the challenged conduct, the use of machine-readable CUSIP Identifiers would be available to all market participants without charge and without executing any license agreement.[186] This finding is based on analysis and evidence common to the Classes that: (i) the marginal cost to CGS for the use of its CUSIP Identifiers is zero; and (ii) competitive yardsticks (including the identifiers for foreign financial instruments in over 120 nations) indicate that without similar restraints on competition, identifiers are widely used without charge.

---

[183] Bergmann Report p. 23.
[184] FRSI00570604.
[185] ANNA ("In the few instances where fees are charged for ISIN allocation, this is done on a cost-recovery basis only, in accordance with ANNA's ISO 6166 ISIN Registration Authority obligations.") https://anna-web.org/faq-page/, last accessed 8/9/2025.
[186] *See supra* Sections VI.A.2 & VII.

60

97. One potential argument that defendants may make for their challenged restraints is that they are necessary to prevent free riding. A user that was not required to sign a restrictive license could republish the CUSIP Identifiers and other users could simply rely on those republished identifiers rather than purchase a license from CGS. I express no view on the legal question of whether CGS has any intellectual property right to prevent the collection and provision of its CUSIP Identifiers. Whatever way that issue is resolved, free riding does not provide a justification for the challenged use license restraints in this case. To the extent that CGS **does** have an intellectual property right to prevent the collection and provision of its CUSIP Identifiers, then the use license restraints are **unnecessary** to enforce that intellectual property right, as CGS could sue users who wrongly collected and disseminated those CUSIP Identifiers. To the extent that CGS does **not** have an intellectual property right to prevent the collection and provision of CUSIP Identifiers, then the vertical agreements between CGS and its distributors that require those distributors to impose use license restraints on all subscribers require those subscribers to pay fees for data that intellectual property rights do not require.

98. Defendants may argue that because their restraints make all users pay a license fee, they assure that no user has an unfair advantage. However, without the restraints, the use of all CUSIP Identifiers would be free, and no user would have any unfair advantage, plus all users would enjoy zero-cost identifiers, along with greater competition and innovation. Further, with the restraints, there is significant price discrimination among users,[187] leading some to have significant advantages over others that would not exist in a but-for world with uniform zero pricing.

99. Defendants may argue their service is procompetitive because they provide a reliable source of continuously updated and accurate information. But as noted above, without the restraints on the use of CUSIP Identifiers, CGS could still charge to issue CUSIP Identifiers, which would more than suffice to cover the costs of providing a reliable source of continuously updated and accurate CUSIP Identifiers. This conclusion is confirmed by the fact that 120 NNAs reliably and accurately provide free access without charging a fee.

100. Defendants may also claim that interactions with end users enable CGS to obtain a deeper understanding of customer needs and provide better, more innovative products. However, its extensive and intrusive audit/compliance program in fact gives CGS unreasonable access to firm proprietary information,

---

[187] *See supra* Section VI.B.

61

giving it an unfair advantage and restricting free competition and innovation.[188]

101.  More generally, Defendants may claim that because the challenged restraints increase their profits, those restraints gave them increased incentives to invest in innovation.  However, as noted above, the challenged restraints have in fact decreased market innovation.[189]  This finding is consistent with empirical studies, which show that competitive markets create more innovation than monopoly markets.[190]  Nor is there any reason to think that reducing the amount that CGS can profit from its database of CUSIP Identifiers will deter future innovation, because CGS's monopoly in this market did not arise from innovation in the first place.  Rather, it arose from, and continues to be protected by, regulations and operational mandates requiring the use of their particular financial numbering system for numerous important applications and the restrictive licensing regime CGS has put in place.

## X.    CLASS MEMBER IDENTIFICATION AND DAMAGES METHODOLOGY

102.  I have been asked by Counsel to analyze CGS's customers in order to identify which of those customers are Class Members, and over what time frame. As discussed above, the Antitrust Damages Class definition is: [191]

> "All persons or entities that paid a license fee to S&P or FactSet for the use of CUSIP Identifiers pursuant to a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement at any time from March 4, 2018, until March 14, 2025 (the 'Class Period'), and did not license a database product or database service from CGS offered under such agreement, other than web-based products or services offered without further

---

[188] *See supra* Section VI.B.

[189] *See supra* Section VIII.

[190] *See* Juan A. Correa and Carmine Ornaghi, *Competition & Innovation: Evidence from U.S. Patent and Productivity Data*, THE JOURNAL OF INDUSTRIAL ECONOMICS, June 2014, Vol. 62(2), at 263 ("The results presented in this paper suggest that, in an economy with strong protection of intellectual property rights, like that of the United States, competition substantially increases innovation and productivity growth."); *id.* at 260 ("The overall message of this literature [looking at exogenous changes in competition] is that competition leads (almost unequivocally) to aggregate productivity growth through reallocation of production from less to more efficient firms and improvements within firms."); PHILLIP AREEDA & LOUIS KAPLOW, ANTITRUST ANALYSIS 25-26 (8th ed. 2022) ("as firm size increases . . . the number of innovations increases more slowly, and the focus of innovation shifts toward process innovations that can be exploited internally" and "innovation is maximized at intermediate levels of concentration.  In other words, innovation as a function of concentration is an 'inverted U.'").

[191] *See supra* ¶ 6.

charge."[192]

103.    Thus, to identify CGS customers that belong to the Antitrust Damages Class it is necessary to determine that: (i) the customer paid a (non-zero) license fee to use CUSIP Identifiers during the class period; (ii) such payment was pursuant to CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement; and (iii) the customer either did not license a database product or database service from CGS that was offered under such agreement or did but they were web-based products or services offered without further charge.

104.    For class member identification I used Master Book of Business (MBoB) files produced by the defendants.[193]  The purpose of these documents is to provide a complete client landscape for use across various groups within CGS.[194]  I have the following list of MBoBs for the related months:

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| January | FRSI01595020 |  |  | FRSI01595025 | FRSI01595026 | FRSI01595027 | FRSI01595028 | FRSI01807326 |
| February | FRSI01595014 |  |  | FRSI01754790 | FRSI01807096 | FRSI01807082 | FRSI01807327 |  |
| March | FRSI01595037 |  |  | FRSI01754796 | FRSI01595015 | FRSI01807097 | FRSI01807328 |  |
| April | FRSI01807069 |  |  | FRSI01595001 | FRSI01754784 | FRSI01754785 | FRSI01807329 |  |
| May | FRSI01595041 |  |  | FRSI01595042 | FRSI01807100 | FRSI01595043 | FRSI01807330 |  |
| June | FRSI01595032 |  |  | FRSI01595033 | FRSI01754795 | FRSI01807093 | FRSI01807331 |  |
| July | FRSI01595030 |  |  | FRSI01807087 | FRSI01595031 | FRSI01807088 | FRSI01807332 |  |
| August | FRSI01595007 |  |  | FRSI01807070 | FRSI01595008 | FRSI01754787 | FRSI01807333 |  |
| September |  |  |  | FRSI01807115 | FRSI01595051 | FRSI01595052 | FRSI01807334 |  |
| October |  |  | FRSI01807107 | FRSI01807108 | FRSI01807109 | FRSI01754803 | FRSI01807335 |  |
| November |  |  | FRSI01807102 | FRSI01807103 | FRSI01754801 | FRSI01807104 | FRSI01807336 |  |
| December |  |  | FRSI01807076 | FRSI01807077 | FRSI01807078 | FRSI01595012 | FRSI01807337 |  |

---

[192] *Id.*

[193] Deposition of CGS 30(b)(6) FactSet representative David Hunter, 100:10–101:4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id* 131:15-132:6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* 151:13-152 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[194] FRSI01620672, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

105.  MBoBs contain a list of agreements that are valid within the associated month.  These files contain customer-level information such as account name, account identification number, and account type, as well as product-level information such as product description, product type, and product family, and also contract dollar amounts.  There are 85 months during the class period of March 4, 2018, until March 14, 2025.  There are MBoBs for 58 of these months.  However, 27 of the months in the class period do not have the associated MBoBs.  For September 2018 to September 2020, I interpolated using the October 2020 MBoB, which includes a field that records when each customer first entered a contract with CGS and information about canceled contracts.

106.  Based on the class definitions in this case,[195] I developed a number of criteria for determining membership in the class from the available data.  First, class members must have signed a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement.  Second, I exclude those customers who licensed a database product or database service from CGS, other than web-based products or services offered without further charge.   Third, I remove defendants and entities they own from the class (FactSet Research Systems, Inc., Cabot Research LLCS&P Dow Jones Indices LLC, S&P Global Inc., S&P Global Limited, S&P Global Market Intelligence Inc., S&P Global Ratings Inc.; Standard & Poor's Financial Services LLC; Ipreo Holdings LLC, Visible Alpha, LLC).  These three criteria apply to all classes analyzed in this case.  For the NY and CT proposed Classes, I also started the damages period later, on March 7, 2019.  For the CT Class, I excluded from the class any customers not located in Connecticut, using addresses in the MBoBs.  If a customer is identified as a class member for any month of the dataset, then they are considered a class member.

107.  In addition to the MBoB files, I have received accounting data from the Expert Report of Alan A. Schachter.[196]  The Schachter Report is based on accrual accounting data from CUSIP Global Services consistent with Generally Accepted Accounting Principles as mandated by reporting purposes by the SEC.[197]  Both S&P and FactSet report revenue on an accrual accounting basis in their quarterly and annual SEC filings.[198]  Schachter's revenue calculations, for the quarters during which a comparison could be made, matched with the revenues reported to the ABA

---

[195] *See supra* Section  II.
[196] Schacter Report at ¶¶ 38, 60.
[197] Schacter Report ¶¶16-17.
[198] *Id.*

by S&P and FactSet at a rate of 99.7%.[199]  All but a few months of data were sourced from the General Ledgers or Subledgers of S&P's and FactSet's and related back up files.[200]

108.  The Schachter data includes license, subscription, and royalty fees by customer.[201]  I merged MBoB data with the accounting data to calculate the damages of the class members during the respective class periods.  Merging the class member identification resulting from the MBoBs with the revenue amounts by time period and customer from the accounting data produces estimated damages for each customer and time period.  For the CUSIP User Class, I start from March 4, 2018, taking 28/31 of the March 2018 revenue to account for the first three days of the month not being in the class period.  I end at the end of available accounting data, on December 31, 2024.  For the NY and CT classes, I start from March 7, 2019, taking 25/31 of the March 2019, revenue to account for the first six days of the month not being in the class period.  Again, I end at the end of the available data, on December 31, 2024.  If more data becomes available, I reserve the right to update my analysis to include it.  I also conservatively estimate damages through the class end date of March 14, 2025, by applying a ratio for the number of days passed in 2025 (73/365) to 2024 damages.  This is conservative because the trend has been for CGS revenue to increase rather than decrease over time,[202] so estimating that damages in 2025 would come in at the same rate as they did in 2024 is likely to underestimate them.  The Antitrust Damages Class and New York Unfair Business Practices Sub-Class contain thousands of class members while the Connecticut Unfair Business Practices Sub-Class contains over a hundred class members.

## XI.  DAMAGES TO THE CLASSES AND TO INDIVIDUAL MEMBERS

109.  Using methodologies and evidence common to each proposed Class and Subclass, I reach three principal conclusions.  First, all members of the Antitrust Damages Class, the Connecticut Unfair Business Practices Sub-Class, and the Injunctive Relief Class were injured by the challenged exclusionary conduct (or, in the case of the Injunctive Relief Class, threatened to be injured by it).  Second,

---

[199] *Id.* ¶ 34, Table 15.

[200] *Id.* ¶ 32 fn. 26; ¶ 66.

[201] *Id.* ¶1 ("calculate CUSIP Global Services' annual revenue, broken down by customer, during the period of March 4, 2018, through December 31, 2024."); *id.* ¶14 ("consider only the license fees, royalty fees, and subscription fees… issuance-related and any other revenue categories are to be excluded."); *id.* ¶17 ("my analysis focused on revenue as recorded in Defendants' books under accrual-based accounting.").

[202] Schachter Report at Tables 14, 15, and 16.

aggregate damages from the challenged restraints can be calculated for each of those Classes. Third, individual damages from the challenged restraints for all members of those Classes can be estimated using a common economic model, supported by class-wide evidence and a limited set of individualized data to be collected during the claims administration process. For the New York Sub-Class, all those principal conclusions apply if the factfinder accepts plaintiff's contention that, but for the challenged deception, there would have been no license agreements or fees for use paid by the New York Sub-Class members at all. All my measures of injury and damages include only overcharges to class members, so they conservatively ignore the additional harm that class members suffered by being denied the benefits of more innovation and better product quality. All my measures also exclude any possible additional damages from trebling, punitive damages, or fixed statutory damages.

110. The overcharge to members of the Antitrust Damages Class and the Connecticut Unfair Business Practices Sub-Class equals the difference between: (1) the fees Class members in fact paid to use CUSIP Identifiers with CGS's anticompetitive restraints; and (2) the fees Class members would have paid but for CGS's anticompetitive restraints. Likewise, the threatened anticompetitive overcharge that would occur to the Injunctive Relief Class without an injunction against CGS's anticompetitive restraints equals the difference between: (1) the actual use fees that Class Members would continue to pay if CGS's anticompetitive restraints continue; and (2) the but-for use fees that Class Members would pay without those anticompetitive restraints. The overcharge to members of the New York Unfair Business Practices Sub-Class equals the difference between: (1) the actual fees Sub-Class members in fact paid to use CUSIP Identifiers with the challenged deceptive business practices; and (2) the fees Sub-Class members would have paid but for the challenged deceptive business practices.

111. Because CGS licenses the use of US CUSIPs and other CUSIP Identifiers only as part of a bundled license, the actual fees charged to Class members in each proposed Class or Subclass equal the fees charged for these bundled licenses, regardless of how the market is defined. CGS's financial records can be used to determine the actual fees that CGS charged to Class members. The key question then becomes how to estimate the but-for fees that CGS would have charged Class members without the challenged restraints or deception.

## A.    *Overcharge Injury and Damages If the Relevant Market Is All CUSIP Identifiers*

112. If the relevant market is defined to include all CUSIP Identifiers, then

in a but-for world without the challenged restraints the fee to use them would have been zero, for the reasons discussed above.[203]  Under this market definition, the overcharge injury and damages suffered by members of the Antitrust Damages Class, the Connecticut Unfair Business Practices Sub-Class, and the Injunctive Relief Class because of the challenged restraints would be determined by what I will call Class-wide Method 1.  Under this method, the overcharge injury and damages equal the full amount of actual use license fees paid by Class members while they were members of that Class or Subclass during their respective Class Periods. Because each of those Classes are limited to class members who paid such use license fees, all those class members suffered injury under this method.

113.    For the New York Sub-Class members, but for fees instead turn on what fees would have been charged for use of CUSIP Identifiers without the challenged deception.  I understand that Plaintiffs contend that but for the deception, there would have been no license agreements or fees for use paid by the New York Sub-Class members at all.  If that contention is accepted by the factfinder, then damages to the New York Sub-Class would also be determined using Class-Wide Method 1, with the only difference being that the Class Period is different for the New York Sub-Class.  Because the NY Sub-Class is limited to class members who paid use license fees, all of its class members suffered injury under this method.

114.    Under Class-Wide Method 1, aggregate damages to each Class and Subclass would equal the total actual license fees paid by members of that Class or Subclass to use CUSIP Identifiers while they were members of that Class or Subclass during their respective Class Periods.  As discussed above, I have conducted an analysis to identify proposed Class Members based on Defendants' Master Books of Business (MBoB).    Combining that class-eligibility information with revenue records, my staff: (i) standardized and matched customer names; and (ii) for each month or quarter, included a customer only if it was flagged as class-eligible in the MBoB-based data and showed non-zero license payments in the corresponding accounting data for that same period (otherwise it was excluded for that period). Based on this approach, I estimate that, under Class-Wide Method 1, aggregate damages to the Antitrust Damages Class are ███████████, aggregate damages to the New York Unfair Business Practices Sub-Class are ███████, and aggregate damages to the proposed Connecticut Unfair Business Practices Sub-Class are ███████.  Individualized damages for each Class Member under Class-Wide Method 1 can be computed by confirming Class Member status and the license fees that member paid while a Member of the Class during the Class Period.

---

[203] *See supra* Sections VI.A.2, VI.B & VII.

### B.     *Overcharge Injury and Damages If the Relevant Market Is Limited to US CUSIP Use*

115.  If the relevant market is limited to US CUSIP use, then the but-for world without the challenged restraints would include zero fee to use US CUSIPs, for the reasons discussed above,[204] but might require positive fees for non-US CUSIP Identifiers if certain contentions are rejected.  Under this narrower market definition, the amount of injury and damages suffered by members of the Antitrust Damages Class, the Connecticut Unfair Business Practices Sub-Class, and the Injunctive Relief Class because of the challenged restraints depends on which of two distinct assumptions about the nature of the but-for world the factfinder confirms.[205] Applying either method, I can demonstrate injury (or in the case of the Injunctive Relief Class, threatened injury) to all the members of each of these Classes, estimate aggregate damages to each of these Classes, and estimate individual damages for each member of these Classes.

### *1.  Class-Wide Method 1*

116.   The first class-wide method rests on the premise that, in the but-for world, the challenged exclusionary conduct would not restrain the usage of CUSIP Identifiers for foreign-issued financial instruments that were included in the bundled license.  I understand that plaintiffs advance two contentions for why this premise would hold even if the relevant market were limited to US CUSIP use.  First, I understand that plaintiffs legally contend that the but-for world must be defined as the world in which the challenged exclusionary conduct—comprising contractual provisions and technical restraints—does not exist, and that because this challenged conduct applies to both U.S. CUSIPs and CUSIP Identifiers for foreign-issued financial instruments, its absence would eliminate restraints on both.  Second, I understand that plaintiffs factually contend that even if the law does not require defining the but-for world in this manner, CGS could not have effectively imposed usage restraints on its identifiers for foreign-issued financial instruments in the absence of the challenged usage restraints on US CUSIPs, because the

---

[204] *See supra* Sections VI.A.2, VI.B & VII.

[205] The New York Sub-Class is different because for it the but-for world is a world without the deception, rather than a world without the restraints.  For the New York Sub-Class, as noted above, injury and damages are determined by Class-wide Method 1 if the factfinder accepts plaintiffs' contention that but for the deception, there would have been no license agreements or fees for use paid by the New York Sub-Class members at all.

overwhelming demand for using financial instrument identifiers is for US CUSIPs. If *either* that legal contention is accepted by the court *or* that factual contention is accepted by the factfinder, the challenged exclusionary conduct would not restrain usage of CUSIP Identifiers for foreign-issued securities in the but-for world.  If either contention is accepted, then the but-for price for CUSIP Identifiers for foreign-issued financial instruments would be zero for the same reasons that the but-for price for US CUSIPs would be zero, and thus the but-for price for all CUSIP Identifiers in CGS's bundled license would also be zero.

117.   Accordingly, under this first class-wide method, the overcharge injury and damages suffered by each member of Antitrust Damages Class, the Connecticut Unfair Business Practices Sub-Class, and the Injunctive Relief Class would equal the entire amount of the license fees paid by each member for the use of CUSIP Identifiers during their respective Class Periods.[206]  Because each of those Classes is limited to class members who paid such license fees, all those class members suffered injury under this method.  Under Class-Wide Method 1, aggregate damages to each of these Classes would equal the total actual use license fees paid by members of that Class while they were members of that Class during their respective Class Periods.  In short, even if the market were limited to US CUSIPs, accepting the legal or factual contention that anticompetitive restraints on the use of CUSIP Identifiers for foreign-issued financial instruments could not exist in the but-for world would produce the same results for injury and damages as those summarized to exist if the market were defined to include all CUSIP Identifiers.

### 2.   Class-Wide Method 2

118.   The second class-wide method that could be used if the relevant market is limited to US CUSIP use rests on the premise that, in the but-for world, the challenged exclusionary restraints could and would have still restrained the use of CUSIP Identifiers for foreign-issued financial instruments that are in its bundled licenses.  This method requires calculating what the but-for fees would have been for CUSIP Identifiers for foreign-issued financial instruments that were included in the bundled license.

119.   Under this premise, I estimate but-for fees for CUSIP Identifiers for foreign-issued financial instruments by allocating the bundled price across US

---

[206] Because a proposed Class Member may not be in their Class for the entire duration of the Class Period, damages for a proposed Class Member reflect the sum of fees paid by the proposed Class Member during the Class Period while they were a Class Member.

CUSIPS and the CUSIP Identifiers for foreign-issued financial instruments in proportion to the estimated values of the identifiers themselves. Foreign-issued CUSIP Identifiers include Canadian CUSIPs and CINS identifiers. As described below, I estimate a CUSIP-CINS value allocation of 85.6% to CUSIPs and 14.4% to CINS. Within CUSIPs I estimate a CUSIP-value allocation of 97.6% to the US and 2.4% to Canada. Together these figures correspond to the following allocation of the bundle: US CUSIPs 83.5%, Canadian CUSIPs 2.1%, and CINS 14.4 %.

120.    **CUSIP-CINS Allocation.**    The CUSIP-CINS allocation of 85.6% to 14.4% is based upon an analysis of the Master Books of Business and the share of customers choosing to purchase CINS-based versus CUSIP-based datafeeds.

121.    **CUSIP Allocation.**    The CBOE Exchange, Inc. (CBOE) reports that the average daily dollar volume of trade in US equity markets in 2024 was USD $607.83 billion and that the average daily dollar volume of trade in Canadian equity markets in 2024 was USD $15.14 billion.[207]    This approximately 40:1 ratio corresponds to a CUSIP-value allocation of 97.6% to the US and 2.4% to Canada. Looking at the Canadian and U.S. fixed-income markets I find that the Canadian Governments/US Treasuries ratio is 143:1 corresponding to a CUSIP-value allocation of more than 99% to the US and less than 1% to Canada.[208]    To be conservative, I allocate the value of CUSIPs in the bundle as 97.6% to the US and 2.4% to Canada.

122.    **Bundle Allocation.** Given the CUSIP-CINS allocation and the US CUSIP-Canadian CUSIP allocation, the overall bundle allocation is as follows: US CUSIPs 83.5%, Canadian CUSIPs 2.1%, and CINS 14.4%.

123.    This estimate is conservative for at least two reasons. First, even in a

---

[207]    Cboe    Exchange    (Average    Daily    Trading    Share    Volume) https://ww2.cboe.com/insights/posts/north-american-equities-year-in-review/, last accessed 8/13/2025; OFX (2024 Average Foreign Exchange Rate of 0.729874) https://www.ofx.com/en-us/forex-news/historical-exchange-rates/cad/usd/, last accessed 8/13/2025.

[208] Canadian Investment Regulatory Organization (CIRO) (CIRO is the national self-regulatory organization that oversees all investment dealers, mutual fund dealers and trading activity on Canada's debt and equity marketplaces.) https://www.ciro.ca/markets/reports-statistics-and-other-information/bond-and-money-market-secondary-trading-statistics, last accessed 8/13/2025; Securities Industry and Financial Markets Association (SIFMA) (SIFMA is the leading trade association for broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets.) https://www.sifma.org/wp-content/uploads/2024/04/SIFMA-Insights-Fixed-Income-Market-Structure-Compendium_2-26.pdf, last accessed 8/13/2025.

but-for world that assumes CGS restraints on the use of CUSIP Identifiers for foreign-issued financial instruments would be similar to those imposed by CGS in the actual world on US CUSIP use, one might expect US CUSIP use prices to be more elevated given the extent of regulatory and market mandates requiring the use of US CUSIPs.  Second, for purchases of the bundled license, the ratio of the value of US CUSIPs to the value of other CUSIP Identifiers would likely exceed the ratio of the size of the US versus foreign markets because being unable to efficiently invest or trade in US instruments would have a much bigger effect on firm scale.  Thus, US CUSIPs would be proportionally more valuable in terms of achieving economies of scale.

124.   Under Class-Wide Method 2, the overcharge injury and damages would be less than they are under the Class-Wide Method 1, but they would equal 83.5% of the license fees paid by members of the Antitrust Damages Class, the Connecticut Unfair Business Practices Sub-Class, and the Injunctive Relief Class while they were members of those Classes during their respective Class Period.  Since each such Class is limited to class members who paid such license fees, they all suffered injury equal of at least 83.5% of those fees under this method.

125.   Under Class-Wide Method 2, aggregate damages to the Antitrust Damages Class and the Connecticut Unfair Business Practices Sub-Class equal 83.5% of the total actual use license fees that members of each of those Classes paid while they were members of that Class during their respective Class Periods.  I conservatively estimate that, under Class-Wide Method 2, aggregate damages to the Antitrust Damages Class are no less than ███████████ and aggregate damages to the proposed Connecticut Unfair Business Practices Sub-Class are no less than ███████████.  Individualized damages for each Class Member under Class-Wide Method 2 can be computed by confirming Class Member status and the license fees that member paid while a member of the Class during the Class Period and subtracting the same but-for prices.

# EXHIBIT A

**Einer Richard Elhauge**
**Harvard Law School**
**1575 Massachusetts Ave.**
**Cambridge, Ma 02138**

Tel: (617) 496-0860                                   **Hauser Hall 502**
Fax: (617) 496-0861                          **elhauge@law.harvard.edu**

## EMPLOYMENT

**Petrie Professor of Law, Harvard University**

Subjects: Antitrust, Contracts, Health Law Policy, Statutory Interpretation.

Founding Director, Petrie-Flom Center for Health Law Policy, Biotechnology and Bioethics.

Member, ABA Antitrust Section Transition Task Force 2012.

Chair, Obama Campaign's Antitrust Advisory Committee

Co-Chair, Obama Campaign's Blogs and Op-eds Committee

Member, Obama Campaign's Health Policy Advisory Committees.

Member, Editorial Board for Competition Policy International

Member, Advisory Board for the Journal of Competition Law & Economics.

Member, Advisory Board for the Social Sciences Research Network on Antitrust Law & Policy.

Member, Advisory Board for the Social Sciences Research Network on Telecommunications & Regulated Industries.

FTC Special Employee on Antitrust Issues.

Recipient, 2010 Jerry S. Cohen Memorial Fund Writing Award, for "Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory"

Recipient, Best Academic Anticompetitive Practice Article - 2015 Antitrust Writing Awards, for "Robust Exclusion and Market Division Through Loyalty Discounts"

Recipient, 2016, Award for being one of the top 10 corporate and securities articles of the year, for "Horizontal Shareholding"

Recipient, 2017 Jerry S. Cohen Memorial Fund Writing Award, for "Horizontal Shareholding"

Recipient, 2017, Society of Investment Law Prize for best investment law scholarship, for "Horizontal Shareholding"

Recipient, 2022 Jerry S. Cohen Memorial Fund Writing Award, for Best Antitrust Article on Common Ownership for "The Causal Mechanisms of Horizontal Shareholding"

## Books

ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS (4th ed. 2022) (Foundation Press: 3d ed. 2018; 2d ed. 2011; 1st ed. 2008).

ELHAUGE & GERADIN, GLOBAL ANTITRUST LAW & ECONOMICS (3d ed. 2018) (Foundation Press: 2d ed. 2011; 1st ed. 2007)

ELHAUGE, ED., RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW (Edward Elgar Publishing Ltd. 2013).

ELHAUGE, OBAMACARE ON TRIAL (2012), available at www.amazon.com

ELHAUGE & GERADIN, GLOBAL COMPETITION LAW & ECONOMICS (2D ED. HART PUBLISHING 2011; 1ST ED. 2007).

ELHAUGE, ED., THE FRAGMENTATION OF U.S. HEALTH CARE: CAUSES AND SOLUTIONS (Oxford University Press 2010).

ELHAUGE, STATUTORY DEFAULT RULES (Harvard University Press 2008).

AREEDA, ELHAUGE & HOVENKAMP, VOL X, ANTITRUST LAW (Little, Brown 1996).

## Academic Articles

Brito, Elhauge, Ribeiro, and Vasconcelos, *Modeling the Objective Function of Managers in the Presence of Overlapping Shareholding,* INTERNATIONAL JOURNAL OF INDUSTRIAL

ORGANIZATION 87 (2023) 102905, https://doi.org/10.1016/j.ijindorg.2022.102905

Elhauge, *Should the Competitive Process Test Replace the Consumer Welfare Standard?*, PROMARKET (May 24, 2022), https://www.promarket.org/2022/05/24/should-the-competitive-process-test-replace-the-consumer-welfare-standard/.

Elhauge, *The Inevitability and Desirability of the Corporate Discretion to Advance Stakeholder Interests*, 106 CORNELL LAW REVIEW (2021)

Elhauge, *The Causal Mechanisms of Horizontal Shareholding*, 82 OHIO STATE L.J. 1 (2021)

Einer Elhauge, Sumit K. Majumdar & Martin C. Schmalz, *Confronting Horizontal Ownership Concentration*, 66 Antitrust Bull. 3 (2021).

Elhauge, *How Horizontal Shareholding Harms Our Economy—And Why Antitrust Law Can Fix It,* 10 HARVARD BUSINESS LAW REVIEW 207 (2020)

Elhauge, *New Evidence, Proofs, and Legal Theories on Horizontal Shareholding* (Jan. 11, 2018), https://ssrn.com/abstract=3096812

Elhauge, *The Growing Problem of Horizontal Shareholding,* 3 ANTITRUST CHRONICLE 1 (June 2017)

Elhauge & Nalebuff, *The Welfare Effects of Metering Ties,* 33 JOURNAL OF LAW, ECONOMICS & ORGANIZATION 68 (2017)

Elhauge, *Contrived Threats v. Uncontrived Warnings: A General Solution to the Puzzles of Contractual Duress, Unconstitutional Conditions, and Blackmail,* 83 U. CHICAGO LAW REVIEW 503 (2016)

Elhauge, *Horizontal Shareholding*, 129 HARVARD LAW REVIEW 1267 (2016) (Awarded the Jerry S. Cohen Memorial Fund Writing Award for Best Antitrust Article, the Society of Investment Law Prize for best investment law scholarship, and an Award for being one of top ten corporate and securities articles of the year)

Elhauge*, Rehabilitating Jefferson Parish: Why Ties Without a Substantial Foreclosure Share Should Not Be Per Se Legal*, 80 ANTITRUST LAW JOURNAL 463 (2016)

McGuire, Drake, Elhauge, Hartman & Starr, *Resolving Reverse-Payment Settlements With The Smoking Gun Of Stock Price Movements*, 101 IOWA L. REV. 1581 (2016)

Elhauge & Wickelgren, *Robust Exclusion and Market Division Through Loyalty Discounts,* 43 INTERNATIONAL JOURNAL OF INDUSTRIAL ORGANIZATION 111 (2015) (Awarded Best Academic Anticompetitive Practice Article - 2015 Antitrust Writing Awards)

Elhauge*, How* Italian Colors *Guts Private Antitrust Enforcement by Replacing It With Ineffective Forms Of Arbitration,* 38 FORDHAM INT'L LAW JOURNAL 771 (2015)

Elhauge, *Obamacare and the Theory of the Firm,* in THE FUTURE OF HEALTH CARE REFORM (Malani and Schill, eds., U. Chicago Press 2015)

Elhauge, *Treating RAND Commitments Neutrally,* 11 JOURNAL OF COMPETITION LAW & ECONOMICS 1 (2015)

Elhauge, *I'm Not Quite Dead Yet—And Other Health Care Observations*, 49 TULSA L. REV. 607 (2014).

Elhauge, *Introduction and Overview to Current Issues in Antitrust Economics*, in Research Handbook on the Economics of Antitrust Law (Edward Elgar Publishing Ltd. 2013).

Elhauge & Krueger, *Solving the Patent Settlement Puzzle*, 91 TEXAS LAW REVIEW 283 (2012)

Elhauge, *The Irrelevance of the Broccoli Argument Against the Insurance Mandate,* NEW ENGLAND JOURNAL OF MEDICINE (Dec 21, 2011)

Elhauge, *Why the Google Books Settlement Is Procompetitive*, 2(1) JOURNAL OF LEGAL ANALYSIS 1 (2010).

Elhauge, *The Failed Resurrection of the Single Monopoly Profit Theory*, 6(1) COMPETITION POLICY INTERNATIONAL 155 (Spring 2010).

Elhauge, *Why We Should Care about Health Care Fragmentation and How to Fix It,* in THE FRAGMENTATION OF U.S. HEALTH CARE: CAUSES AND SOLUTIONS 1 (Oxford University Press 2010).

Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123

HARVARD LAW REVIEW 397 (2009).   (Awarded 2010 Jerry S. Cohen Memorial Fund Writing Award for Best Antitrust Article).

Elhauge, *Framing the Antitrust Issues in the Google Books Settlement*, GLOBAL COMPETITION POL'Y, (October 2009 Release 2).

Elhauge, *How Loyalty Discounts Can Perversely Discourage Discounting*, 5 JOURNAL OF COMPETITION LAW & ECONOMICS 189 (2009)

Elhauge, *Disgorgement as an Antitrust Remedy*, 76 ANTITRUST LAW JOURNAL 79 (2009).

Elhauge, *Do Patent Holdup and Royalty Stacking Lead to Systematically Excessive Royalties?,* 4 JOURNAL OF COMPETITION LAW & ECONOMICS 535 (2008)

Elhauge, *How Should Competition Law Be Taught?*, 4(1) COMPETITION POLICY INTERNATIONAL 267 (Spring 2008)

Elhauge, *Harvard, Not Chicago: Which Antitrust School Drives Recent Supreme Court Decisions*?, 3(2)  COMPETITION POLICY INTERNATIONAL 59 (Autumn 2007)

Elhauge, *Can Health Law Become a Coherent Field of Law?*, 41 WAKE FOREST L. REV. 365 (2006).

Elhauge, *Sacrificing Corporate Profits in the Public Interest,* 80 N.Y.U. LAW REVIEW 733 (2005)

Elhauge, *Corporate Manager's Operational Discretion to Sacrifice Corporate Profits in the Public Interest*, in ENVIRONMENTAL PROTECTION AND THE SOCIAL RESPONSIBILITY OF FIRMS 13-76  (Bruce Hay, Robert Stavins, & Richard Vietor eds., 2005)

Elhauge, *Defining Better Monopolization Standards*, 56 STANFORD LAW REVIEW 253 (2003)

Elhauge, *Why Above-Cost Price Cuts to Drive out Entrants Do Not Signal Predation or Even Market Power – and the Implications for Defining Costs,* 112 YALE LAW JOURNAL 681 (2003)

Elhauge, *Preference-Estimating Statutory Default Rules*, 102 COLUMBIA LAW REVIEW 2027 (2002)

Elhauge, *Preference-Eliciting Statutory Default Rules*, 102 COLUMBIA LAW REVIEW 2162 (2002)

Elhauge, *The Lessons of Florida 2000*, 110 POLICY REVIEW 15 (Dec 2001 -Jan 2002).

Elhauge, *What Term Limits Do That Ordinary Voting Cannot*, CATO POLICY ANALYSIS, No. 328
    (Dec. 16, 1998).

Elhauge, *Are Term Limits Undemocratic?*, 64 U. CHIC. L. REV. 83 (1997).

Elhauge, Lott & Manning, *How Term Limits Enhance the Expression Of Democratic Preferences*,
    5 SUPREME COURT ECON. REV. 59 (1997)

Elhauge, *The Limited Regulatory Potential of Medical Technology Assessment*, 82 VA. L. REV.
    1525

(1996).

Elhauge, *Allocating Health Care Morally*, 82 CALIF. L. REV. 1449 (1994)

Elhauge, *Toward a European Sale of Control Doctrine*, 41 AM. J. COMP. LAW 627 (1993)

Bundy & Elhauge, *Knowledge About Legal Sanctions*, 92 MICH. L. REV. 261 (1993)

Elhauge, *The Triggering Function of Sale of Control Doctrine*, 59 U. CHIC. L. REV. 1465 (1992)

Elhauge, *Making Sense of Antitrust Petitioning Immunity*, 80 CALIF. L. REV. 1177 (1992)

Bundy & Elhauge, *Do Lawyers Improve the Adversary System?  A General Theory of Litigation
    Advice and Its Regulation*, 79 CALIF. L. REV. 313 (1991)

Elhauge, *Does Interest Group Theory Justify More Intrusive Judicial Review?*, 101 YALE L.J. 31

(1991)

Elhauge, *The Scope of Antitrust Process*, 104 HARV. L. REV. 667 (1991)

Media Publications

"Donald Trump: The Protector," The Atlantic (March 2, 2016)

"Ted Cruz Is Not Eligible to Run for President," Salon (Jan. 20, 2016)

"The Best Way to Reform Health Care—and Cut the Deficit," The Daily Beast (January 6, 2013)

"Roberts' Real Long Game?," The Atlantic (July 20, 2012)

"The Fatal Flaw In John Roberts' Analysis Of The Commerce Clause," The New Republic (July

1, 2012)

"The Killer Precedent For Today's Decision," The New Republic (June 28, 2012)

"Even The Most Conservative Supreme Court Justices Have Already Declared Mandates Constitutional," The New Republic (June 21, 2012) (with Emily Bass)

"What a Nobel Prize-Winning Economist Can Teach Us About Obamacare," The Atlantic (May 23, 2012) (with Kevin Caves)

"A Further Response to Critics on the Founding Fathers and Insurance Mandates", The New Republic (April 21, 2012)

"A Response to Critics on the Founding Fathers and Insurance Mandates", The New Republic (April 19, 2012)

"It's Not About Broccoli!: The False Case Against Health Care," The Atlantic (April 16, 2012)

"If Health Insurance Mandates Are Unconstitutional, Why Did the Founding Fathers Back Them?" The New Republic (April 13, 2012)

"Commentary: The Roberts-Kagan Compromise on Obamacare?:, The National Law Journal (March 28, 2012)

"Don't Blame Verrilli for Supreme Court Health-Care Stumble," The Daily Beast (March 28, 2012)

"Economists Argue Over the Cost of Caring for the Uninsured," The Daily Beast (March 26, 2012)

"The Broccoli Test," New York Times (Nov. 16, 2011)

"Coverage vs Coercion," The Huffington Post (March 3, 2008)

"Rewire This Circuit," The Wall Street Journal, A26 (Sept. 17, 2003)

"Soft on Microsoft," The Weekly Standard (March 25, 2002)

"Despite What the Critics Say, it Wasn't a Bag Job," Boston Globe (March 3, 2002)

"Florida 2000: Bush Wins Again!," Weekly Standard (November 26, 2001 )

"State Made The Right Call On Microsoft," The Hartford Courant (Nov. 9, 2001)

"States Should Seek More From Microsoft," San Francisco Chronicle (Nov. 6, 2001)

78

"A Smart Move on Microsoft," Boston Globe (Sept. 11, 2001)

"Competition Wins in Court," New York Times, (June 30, 2001)

"Bush v. Florida," New York Times, A31 (Nov. 20, 2000)

"Florida's Vote Wasn't 'Irregular,'" Wall Street Journal (Nov. 13, 2000)

"The New 'New Property'," San Francisco Chronicle (Nov. 6, 2000)

"The Real Problem with Independent Counsels," The Washington Times, A19 (Jun 30, 1999)

"Foul Smoke," The Washington Post, A15 (August 4, 1998)

"The Court Failed My Test," The Washington Times, A-19 (July 10, 1998)

"Microsoft Gets an Undeserved Break," The New York Times, A21 (June 29, 1998)

"Medi-Choice," The New Republic, 24 (November 13, 1995)

"Term Limits: Voters Aren't Schizophrenic," Wall Street Journal, A-16 (March 14, 1995)


<u>Harvard Committees</u>

Chair, Harvard Law School Lateral Appointments Committee (1998-99), Member (2003-05, 2011-2014).

Member, Harvard Law School Entry Level Appointments Committee (2009-2011).

Member, Harvard University Standing Committee on the Degree of Doctor of Philosophy in Health Policy (1996-99, 2006-07).

Member, Harvard University Internal Advisory Board for the Interfaculty Initiative in Health Policy (1996-99).

Member, Harvard Law School Lecturers and Visitors Committee (1996-98).


**Past Academic Positions**

| | |
|---|---|
| 1988-95 | Professor of Law, Boalt Hall, University of California at Berkeley |
| 1995 | Visiting Professor of Law, Univ. of Chicago Law School |
| 1994 | Visiting Professor of Law, Harvard Law School |

| 1993 | Visiting Olin Faculty Fellow, Yale Law School |
|------|-----------------------------------------------|
| 1991-92 | Visiting Scholar in Europe at the Karolinska Institute, the Centre for Health Economics, the Rockefeller Foundation Study Center, Cambridge University, the European University Institute and the University of Florence |

**Clerkships**

| 1987-88 | Clerk for Justice William J. Brennan, Jr., United States Supreme Court |
|---------|----------------------------------------------------------------------|
| 1986-87 | Clerk for Judge William A. Norris, U.S. Court of Appeals for the Ninth Circuit |
| 1986 | Clerk for U.S. Solicitor General's Office, Washington, D.C. |

**Bar Admissions**: Massachusetts (2000); Pennsylvania (1986); United States Courts of Appeals for the Fourth (1997), Sixth (2008), and Ninth Circuits (1987); Supreme Court of the United States (1997).


## ECONOMICS EXPERT WORK

President, Legal Economics LLC, 2007 to present.

Senior Expert at Criterion Economics LLC, 2004-2007

Recipient in 2016 and 2020 of AAI award for Outstanding Antitrust Litigation Achievement in Economics.

Named One of World's Leading Competition Economists in the *International Who's Who of Competition Lawyers and Economists*.

Testifying Expert in *Mayor and City Council of Baltimore v. Merck Sharp & Dohme Corp.*, a case alleging anticompetitive bundling.

Testifying Expert in *In Re: Google Digital Advertising Litigation,* a case alleging tying and other exclusionary restraints in the ad tech stack.

Testifying Expert in *Pacific Steel Group v. Commercial Metals Company,* a case alleging

exclusivity restraints in the steel rebar market.

Testifying Expert in *NFL Sunday Ticket Antitrust Litigation,* a case alleging horizontal restraints, exclusive dealing, and tying restraints on NFL telecasts.

Testifying Expert in *PlusPass, Inc. v. Verra Mobility Corp.* a case alleging exclusionary restraints and an anticompetitive merger in the market for rental car electronic toll payment services.

Testifying Expert in *In Re Da Vinci Surgical Robot Antitrust Litigation,* a case alleging exclusionary restraints related to robot surgery devices.

Testifying Expert in *Illinois, ex rel. Edelweiss Fund, LLC v. J.P. Morgan Chase & Co;, New York, ex rel. Edelweiss Fund, LLC v. J.P. Morgan Chase & Co.;* and *State of California, ex rel., Edelweiss Fund v. J.P. Morgan Chase Bank,* cases alleging that certain financial institutions falsely represented they were individually marketing VRDOs.

Testifying Expert in *Moehrl v. Nat'l Ass'n of Realtors,* a case alleging that Realtor associations have agreements that restrain the market for real estate broker services.

Testifying Expert in *Markson v. CRST Int'l,* a case alleging an agreement not to poach truck drivers from rival trucking companies.

Testifying Expert in *In re Broiler Chicken Antitrust Litigation*, a case alleging that producers of broiler chickens engaged in conspiracies to share information, restrict output, and manipulate or fix prices.

Testifying Expert in *Cameron v. Apple,* a class action by app developers alleging that Apple has anticompetitively excluded competition for app distribution.

Testifying Expert in *In Re Novartis And Par Antitrust Litigation,* a case alleging an reverse payment patent settlement delayed generic competition with the branded pharmaceutical Exforge.

Testifying Expert in *In Re EpiPen Marketing Sales Practices and Antitrust Litigation*, a case alleging anticompetitive reverse payments and foreclosing agreements.

Testifying Expert in *Roxul USA, Inc. v. Armstrong World Industries, Inc.*, a case alleging exclusive

dealing agreements in the market for suspended acoustical ceiling tiles.

Testifying Expert in *Sitts v. Dairy Farmers of America, Inc.*, a case alleging a conspiracy to suppress raw milk prices.

Testifying Expert in *In Re Qualcomm Antitrust Litigation*, a case alleging tying and exclusive dealing involving modem chipsets and cellular standard essential patents.

Testifying Expert in *In Re Niaspan Antitrust Litigation*, a case alleging a reverse payment patent settlement.

Testifying Expert in *In Re Lamictal Direct Purchaser Antitrust Litigation*, a case alleging a reverse payment patent settlement.

Testifying Expert in *In re Namenda Antitrust Litigation*, a case alleging a reverse payment patent settlement and product hop.

Testifying Expert in *In re Lidoderm Antitrust Litigation*, a case alleging a reverse payment patent settlement.

Testifying Expert in *Valassis Communications v. News Corp*, a case alleging anticompetitive bundling and other exclusionary conduct.

Testifying Expert in *GN Netcom v. Plantronics*, a case alleging exclusive dealing in the distribution of contact center and office headsets.

Testifying Expert in *Louisiana Wholesale Drug v. Unimed Pharmaceuticals (Androgel case)*, a case alleging a reverse payment patent settlement.

Testifying Expert in *Garber v. Office of the Commissioner of Baseball*, a case alleging horizontal territorial restraints on broadcasting baseball games.

Testifying Expert in *Suture Express v. Cardinal Health*, a case alleging tying and bundled loyalty contracts in medical distribution.

Testifying Expert in *Savant v. Crestron*, a case alleging exclusive dealing in the high-end home control system market

Testifying Expert in *Castro et. al. vs Sanofi Pasteur*, a case alleging anticompetitive bundled

loyalty contracts in the vaccines industry.

Testifying Expert in *In re Mushroom Direct Purchaser Antitrust Litigation*, a case alleging price-fixing in the fresh mushroom market.

Testifying Expert in *It's My Party, Inc. v. Live Nation, Inc.*, a case alleging anticompetitive conduct in markets for promotion and amphitheaters.

Testifying Expert in *Retractable Technologies v. Becton Dickinson*, a case alleging exclusionary contracts in syringe and IV catheter markets.

Testifying Expert in *Caldon v. Westinghouse Electric*, a case alleging attempted monopolization.

Testifying Expert in *King Drug v. Cephalon*, a case alleging that a reverse payment settlement of a patent dispute delayed entry and restrained competition in a pharmaceutical market.

Testifying Expert for the United States in *United States v. Wyeth*, a case involving claims of bundled sales and bundled discounts in a pharmaceutical market, which resulted in a $784 million settlement for the United States.

Testifying Expert in *BAE Holdings AH v. ArmorWorks Enterprises*, a case alleging price discrimination by a ceramic tile manufacturer resulting in harm to downstream competition.

Testifying Expert in *In re Marsh & Mclennan Companies, Inc. Securities Litigation*, a case alleging securities violations from failure to disclose bid steering.

Testifying Expert in *Tessera Technologies v. Hynix Semiconductor*, a case alleging conspiracy to exclude outside technologies from semiconductor markets.

Testifying Expert in *American Steel Erectors v. Local Union No. 7*, a case alleging boycott claims related to steel erection and labor markets.

Testifying Expert in *BP America v. Repsol*, an arbitration.

Testifying Expert in *Food Lion v. Dean Foods Company*, a class action alleging conspiracies to restrict and foreclose competition in milk markets.

Testifying Expert in *Eisai Inc. v. Sanofi-Aventis U.S. LLC*, a case by a rival alleging foreclosure in

anticoagulant pharmaceutical markets.

Testifying Expert in *Daniels v. Tyco*, a case by a rival alleging foreclosure from sharps containers and GPO markets.

Testifying Expert in *Natchitoches Parish Hospital v. Tyco*, a class action concerning medical sharps containers and GPO markets.

Testifying Expert in *Amgen v. F. Hoffman La Roche*, concerning erythropoietin-simulating agents (ESAs) and white blood cell simulators (WBCs) pharmaceutical markets.

Testifying Expert in *White v. NCAA*, concerning markets for athletic and educational services.

Testifying Expert in *Applied Medical Resources v. Ethicon, Inc*, concerning sutures, trocars, and GPO markets.

Testifying Expert in *Masimo Corp. v. Tyco Health Care Group*, concerning oximetry products and GPO markets.

Testifying Expert in *Rochester Medical v. Bard*, concerning catheter and GPO markets.

Testifying Expert in *Retractable Technologies, Inc. v. Becton Dickinson*, concerning syringes and GPO markets.

Testifying Expert in *Spartanburg v. Hill-Rom*, a class action concerning hospital beds and GPO markets.

Testifying Expert in *Mountain Area Realty v. Wintergreen Partners*, concerning conduct in the real estate brokerage services market.

Testifying Expert in *Louisiana Municipal Police Employees' Retirement System v. Crawford*, concerning merger in the pharmacy benefit manager market.

Testifying Expert in *Capital Credit Alliance v. National Automated Clearing House Association*, concerning electronic checks market.

Testifying Expert for Intel before EC and Korean antitrust authorities on microprocessor markets.

Testifying Expert for AmBev before the EC and Brazilian antitrust authorities on beer market.

Testifying Expert for 1-800-Contacts before the FTC on OSI-CooperVision merger and

agreements restraining distribution by nonprescribing retailers.

Testifying Expert in *In Re Cardizem CD Antitrust Litigation*, concerning patents and pharmaceuticals.

Testifying Expert regarding the *B.F. Goodrich-Coltec* Merger, concerning the aerospace industry.

Testifying Expert regarding the *Alcoa-Reynolds* Merger, concerning the aluminum industry

Expert Consultant to National Cable Television Association on Internet Access Bills before Congress and Interactive Television Inquiry before FCC.

Expert for Royal Caribbean for proposed mergers of Princess with Royal Caribbean and Carnival, concerning the cruise industry.

Expert for the Medical Device Manufacturers Association, producing Report to U.S. Senate and Statement to FTC/DOJ regarding exclusionary agreements between medical device suppliers and Group Purchasing Organizations and their hospitals.

## EDUCATION

**Harvard Law School**                    J.D., June 1986

*Awards*

Fay Diploma -- for graduating first in class

Sears Prize -- Second Year -- to top two students in class

Sears Prize -- First Year -- to top two students in class

*Activities*

Harvard Law Review, Articles Office Co-Chair

Class Marshal

Author: *Modes of Analysis: The Theories and Justifications of Privileged Communications*, 98 HARV. L. REV. 1471-1500 (1985).

**Harvard College**          B.A., June 1982

      Graduated in three years, majoring in Biochemical Sciences.  GPA 3.9

**EXHIBIT B**

**EINER ELHAUGE STATEMENT OF PUBLICATIONS, PRIOR TRIAL AND DEPOSITION EXPERT TESTIMONY, AND COMPENSATION**

### I. Publications

My publications from the last 10 years are listed on my CV, which is attached as Exhibit A.

### II. Trial and Deposition Expert Testimony

Within the past four years, I have provided trial testimony as an expert in *In Re Broiler Chicken Antitrust Litigation* on September 18-19, 2023; and *In re NFL Sunday Ticket Antitrust Litigation* on June 24, 2024, and deposition testimony as an expert in *In Re Novartis and Par Antitrust Litigation* on December 20, 2021; *In Re Broiler Chicken Antitrust Litigation* on February 15, 2022, August 26, 2022, and September 16, 2023; *Moehrl v. Nat'l Ass'n of Realtors* on May 18-19, 2022, April 27, 2023, and August 25, 2023; *Markson v. CRST International, Inc.* on June 8, 2022; *In Re Da Vinci Surgical Robot Antitrust Litigation* on March 17, 2023, and July 24, 2024; *Illinois ex rel. Edelweiss Fund v. J.P. Morgan* on March 27, 2023; *PlusPass, Inc. v. Verra Mobility Corp.* on May 23, 2023; *In re NFL's Sunday Ticket Antitrust Litigation* on July 6, 2023; and *Pacific Steel Group v. Commercial Metals Company* on August 31, 2023; *New York ex rel. Edelweiss Fund v. J.P. Morgan* on May 1, 2024; *In Re: Google Digital Advertising Litigation* on March 11, 2025; and *State of California, ex rel., Edelweiss Fund v. J.P. Morgan Chase Bank* on May 7-8, 2025.

### III. Compensation

I am being compensated at a rate of $1900 per hour for my work on this case, and my consulting firm, Legal Economics LLC, is being compensated $245-945 per hour for the work of my staff on this report.