**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

DINOSAUR FINANCIAL GROUP LLC,
HILDENE CAPITAL MANAGEMENT, LLC and
SWISS LIFE INVESTMENT MANAGEMENT
HOLDING AG, on behalf of themselves and all
others similarly situated,

        Plaintiffs,

               -v-

S&P GLOBAL, INC., AMERICAN BANKERS
ASSOCIATION, and FACTSET RESEARCH
SYSTEMS INC.,

        Defendants.

---------------------------------------------------------------x

Case No. 1:22-CV-1860 (KPF)

# PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION AND
## <u>APPOINTMENT OF CLASS COUNSEL</u>

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 1

   A.  CUSIPs.......................................................................................... 1

   B.  Other CUSIP Identifiers: U.S. ISINs, CINS, and CINS-based ISINs ............................... 3

      1. U.S. ISINs Based on CUSIPs ............................................................ 3

      2. CINS ............................................................................... 3

   C.  The Markets in which CGS Operates ....................................................... 4

      1. The Issuance Market……………………..……………………………………..4

      2. The Use Market ..................................................................... 6

   D.  CGS's Restrictive Licensing Regime ....................................................... 7

      1. CGS's Contractual Relationship with TPDVs...………………………………..8

      2. License Agreements with End Users ................................................... 8

   E.  Defendants' False IP Rights Claims ...................................................... 11

      1. The IP Right Defined In The 2014 Agreement........................................ 11

      2. False claims of IP Right's in the CGS's Licensing Agreement ....................... 12

      3. CGS's False Claims of IP Rights to Regulators ..................................... 13

   F.  Enforcement of the Licensing Regime .................................................... 14

      1. Pre-Authorization: TPDVs may not transmit CUSIPs without CGS approval ............. 15

      2. Post Authorization: TPDV reporting obligations convert CUSIPs into "sale leads".....15

      3. CGS enforces licensing through systematic escalation regime ..................... 16

      4. CGS prevents CUSIP's from being publicly available without restrictions ................ 18

   G.  Financial Identifiers Not Issued By ABA and CGS ........................................ 20

   H.  The Licensing Regime Imposes Barriers to Innovation ................................... 21

1. Financial Instrument Global Identifier.................................................................21

2. ISNs Issued by Foreign NNA's...........................................................................21

I.    Proposed Class Definitions...........................................................................21

ARGUMENT.................................................................................................................23

I.    The Proposed Classes Satisfy Rule 23(a)..............................................................23

A.    Numerosity.............................................................................................23

B.    Commonality..........................................................................................24

C.    Typicality...............................................................................................25

1. Sherman Act Claims.............................................................................25

2. GBL § 349 Claims................................................................................27

3. CUTPA Claims.....................................................................................28

4. CGS prevents CUSIP's from being publicly available without restrictions.................18

D.    Adequacy...............................................................................................29

E.    Ascertainability......................................................................................29

II.   The Proposed Classes Satisfy Rule 23(b)(3)........................................................30

A.    Common Questions Predominate for Plaintiffs' Unlawful Maintenance-of-Monopoly Claim....................................................................................31

1. Common evidence shows Defendants have monopoly power in the relevant market..31

a. The Relevant Market.......................................................................31

b. Common evidence of Defendnats' monopoly power.................................32

2. Common evidence shows that Defendants unlawfully maintained a monopoly in the relevant market............................................................................33

a. Standardized Restrictions on Issuance and Redistribution.......................33

b. False Assertions of IP Rights.............................................................34

c. Anticompetitive Enforcement............................................................35

3. Common evidence shows that Defendants' conduct has caused anticompetitive harm in the relevant market ..................................................................................................37

4. Damages ..............................................................................................................................38

B. Common Questions Predominate on Plaintiffs' Conspiracy-to-Monopolize Claims ....... 40

C. Common Questions Predominate for Plaintiffs' GBL § 349 Claims .............................. 41

D. Common Questions Predominate Plaintiffs CUTPA § 42-110b(a) Claims...................... 44

E. Class Treatment is a Superior Method to Resolve these Disputes................................... 44

III. The Proposed CUSIP User Injunctive Relief Class Satisfies Rule 23(b)(2) ......................... 45

CONCLUSION ........................................................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AD/SAT, Div. of Skylight, Inc.* v. *Assoc. Press*,
  181 F.3d 216 (2d Cir. 1999) ................................................................................. 39

*Amchem Prods.*,
  521 U.S. ................................................................................................................. 30

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
  429 U.S. 477 (1977) ............................................................................................. 37

*City of Philadelphia v. Banc of America Secs. LLC*,
  2025 WL 2180607 (2d Cir. Aug. 1, 2025) ............................................................ 39

*Consol. Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) ................................................................................... 23

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*
  502 F.3d 91 (2d Cir. 2007) ................................................................................... 37

*Cruz v. FXDirectDealer, LLC*,
  720 F.3d 115 (2d Cir. 2013) ................................................................................. 41

*Dial Corp. v. News Corp.*,
  314 F.R.D. 108 (S.D.N.Y. 2015) .......................................................................... 44

*Espinoza v. 953 Assocs. LLC*,
  280 F.R.D. 113 (S.D.N.Y. 2011) .......................................................................... 23

*Fiest Pubs., Inc. v. Rural Telephone Serv. Co.*,
  499 U.S. 340 (1991) ............................................................................................. 34

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
  62 F.4th 704 (2d Cir. 2023) ................................................................................. 29

*In re Auction Houses Antitrust Litig.*,
  193 F.R.D. 162 (S.D.N.Y. 2000) .......................................................................... 24

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ...................................................... 23

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018) .................................................................. 29

*In re Namenda Indirect Purchaser Antitrust Litig.*,
    338 F.R.D. 527 (S.D.N.Y. 2021) ............................................................. 30, 40

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d. Cir. 2017) ........................................................................ 29

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ............................................................... 23, 30, 44

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) .................................................................... 31, 34

*Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*,
    2022 WL 2829880 (S.D.N.Y. June 30, 2022) ........................................ 24, 25, 27

*Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*,
    2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024) ................................................... 24

*Irvin Indus. v. Goodyear Aerospace Corp.*,
    974 F.2d 241 (2d Cir. 1992) ........................................................................ 38

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015) ........................................................................ 24

*Karlin v. IVF Am., Inc.*,
    93 N.Y.2d 282 (1999) ................................................................................ 41

*Laumann v. Nat'l Hockey League*,
    105 F. Supp. 3d 384 (S.D.N.Y. 2015) ............................................................. 45

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) .................................................................... 23, 25

*Mountz v. Global Vision Prods., Inc.*,
    3 Misc.3d 171, 770 N.Y.S.2d 603 (Sup. Ct. 2003) ............................................ 41

*Orlander v. Staples, Inc.*,
    802 F.3d 289 (2d Cir. 2015) ........................................................................ 41

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
    85 N.Y.2d 20 (1995) ................................................................................ 41

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ........................................................................ 30

*Small v. Lorillard Tobacco Co.*,
    252 A.D.2d 1 (1st Dep't 1998) ..................................................................... 41

*St. Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.*,
  2023 WL 1967133 n.5 (D. Conn. Feb. 13, 2023) ........................................ 24, 28, 43

*Sykes v. Mel S. Harris and Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015) ................................................................................ 24, 41

*Trump v. Casa, Inc.*,
  145 S. Ct. 2540 (2025) .............................................................................................. 46

*Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ..................................................................................................... 31

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  333 F.R.D. 39 (S.D.N.Y. 2019) ............................................................................... 25

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................................................. 23, 45

**Statutes**

NY GBL § 349 ................................................................................... 24, 25, 27, 41

CUTPA § 42-110b(a) ......................................................................... 24, 25, 28, 44

**Rules**

Federal Rule of Civil Procedure 23(a) ........................................ 1, 23, 24, 29, 45, 46

Federal Rule of Civil Procedure 23(b)(2) .......................................... 1, 23, 45, 46

Federal Rule of Civil Procedure 23(b)(3) ................................................... *passim*

**Glossary of Terms in Plaintiffs' Class Certification Papers**

Except as indicated elsewhere, Plaintiffs' papers in support of their motion for class certification use the following index of capitalized terms for ease of reference.

| | |
|---|---|
| ABA | Defendant American Bankers Association |
| ANNA | Association of National Numbering Agencies |
| Aranoff Declaration | Declaration of Ronald J. Aranoff in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Counsel |
| Bergmann Report | Expert Report of Bettina Bergmann, dated August 13, 2025 |
| CGS | CUSIP Global Services |
| CUSIP Identifiers | CUSIP identifiers, including any CUSIP (U.S. or Canadian) and any CUSIP International Number (CIN), as well as their corresponding CUSIP-derived International Securities Identification Numbers (ISINs) if any. This term is synonymous with CGS Identifiers. |
| Dinosaur | Plaintiff Dinosaur Financial Group LLC |
| Distribution Agreement | CUSIP Global Services Distribution Agreement |
| DTCC | Depository Trust & Clearing Corporation |
| Elhauge Report | Expert Report of Einer Elhauge, dated August 14, 2025 |
| FactSet | Defendant FactSet Research Systems Inc. |
| FIGI | Financial Instrument Global Identifier |
| Hildene | Plaintiff Hildene Capital Management, LLC |
| Lenz Report | Expert Report of Frank Lenz, dated August 12, 2025 |
| Powell Report | Expert Report of James Powell, dated August 12, 2025 |
| IP Rights | Intellectual Property Rights |
| ISIN | International Securities Identification Number |
| Miller Report | Expert Report of Arthur Miller, dated August 14, 2025 |

| | |
|---|---|
| MSRB | Municipal Securities Rulemaking Board |
| NASD | National Association of Securities Dealers |
| NNA | National Numbering Agencies |
| S&P | Defendant S&P Global, Inc. |
| Schachter Report | Expert Report of Alan A. Schachter, dated August 12, 2025 |
| SEC | Securities Exchange Commission |
| SNA | Substitute Numbering Agency |
| Swiss Life | Plaintiff Swiss Life Investment Management Holding AG |
| Subscription Agreement | CUSIP Global Services Subscription Agreement |
| TPDV | Third-Party Data Vendor |
| UOSS | CUSIP Use of Service Statement |
| 2014 Agreement | 2014 Agreement between ABA and CGS, September 15, 2014 |

# INTRODUCTION

Plaintiffs Dinosaur Financial Group LLC, Hildene Capital Management, LLC, and Swiss Life Investment Management Holding AG move for class certification under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). Plaintiffs seek to certify damages classes under Rule 23(b)(3) and an injunctive-relief class under Rule 23(b)(2) to redress Defendants' anticompetitive conduct concerning the licensing and use of CUSIP Identifiers.[1]

Defendants documented their anticompetitive conduct in the 2014 Agreement, between the ABA and CGS dated September 15, 2014, by which the ABA obligated CGS to require licenses from financial markets participants as a condition for using CUSIP Identifiers, even though the ABA had no lawful right to require such a license. The 2014 Agreement precluded CGS from permitting any use of CUSIP Identifiers that would allow anyone to create a service that competed with a CGS service. The 2014 Agreement thus perpetuated an unlawful monopoly in the CUSIP Identifier Use Market and forbade CGS from permitting any competition in that market. Defendants' conduct restricted output, prevented innovation, deprived End Users of the benefits of competition, and raised prices to supracompetitive levels.

The legal and factual questions in this case are ideally suited for class treatment. Class certification is not only warranted but essential to ensure fair and efficient adjudication of claims that impact thousands of institutions across the financial industry.

# BACKGROUND

## A.    CUSIPs

CUSIP Identifiers are unique alphanumeric codes that identify financial instruments and allow electronic systems to process, clear, and settle trades and match financial data to those

---

[1] This term is synonymous with "CGS Identifiers" (defined below) in all respects.

financial instruments. Ex-1[2] (Miller Report) ¶¶38-39. CUSIP Identifiers are standardized, meaning that their "design, use, and format are governed by a standards-setting organization." Ex-2 (Powell Report) pp.1-2. Because they are standardized, CUSIP Identifiers are the only identifiers that are "interoperable between vendors,"[3] meaning that regardless of "language or software or infrastructure vendors use, they [vendors] would be able to consume and receive access to [them]."[4] Although there are many types of non-standardized identifiers in financial markets, CUSIP Identifiers are alone in that no other identifier has been adopted both by the United States government and DTCC, the entity that clears and settles almost every financial markets transaction in the United States.

A public-private partnership created the CUSIP system in the 1960s. Ex-1 (Miller Report) ¶¶24-28. Today, CUSIPs are compulsory for securities trading, settlement, and clearing, whether by legal requirement or entrenched market convention. *Id.* ¶¶47-50. Their ubiquity is rooted in regulatory mandates, the requirement that CUSIPs be used in the clearing and settlement of financial transactions, and the absence of credible alternatives once CUSIPs were established as the default standard. *Id.* ¶¶19-21.

CUSIPs are embedded across virtually every operational facet of the financial system from pre-trade analytics and risk management to settlement, accounting, and collateral processing. Ex-2 (Powell Report) pp.10-12; Ex-1 (Miller Report) ¶¶47-50. Only CUSIPs satisfy the full range of legal, technical, and market prerequisites for seamless integration with U.S. securities infrastructure. Ex-2 (Powell Report) pp.10-12; Ex-1 (Miller Report) ¶¶20-21, 47-50. Even where

---

[2] All references to "Ex-" are to Exhibits attached to the Aranoff Declaration.

[3] *See* Ex-79 (FRSI01755311) at FRSI01755345.

[4] Ex-6 (Mitnick Dep.) at 111:19-113:11.

not legally mandated, powerful network effects have rendered CUSIPs indispensable. Ex.-2 (Powell Report) pp.29-33. Their deep integration into trading systems, compliance platforms, and internal operations creates lock-in effects, making deviation from the standard operationally and legally risky. *Id.*

### B. Other CUSIP Identifiers: U.S. ISINs, CINS, and CINS-based ISINs

#### 1. U.S. ISINs Based on CUSIPs

Only NNAs or their partners may issue standardized identifiers like CUSIP Identifiers. Ex-3 (Bergmann Report) pp.12-13; Ex-1 (Miller Report) ¶44. Generally, there is only one NNA and only one standardized identifier in a particular country that assigns local (*i.e.* national) identifiers for financial instruments issued under the laws and regulations of those countries. Ex-3 (Bergmann Report) p.11; Ex-1 (Miller Report) ¶44. Over 120 NNAs are associated through ANNA, including CGS. ANNA has adopted ISIN as a global identifier to facilitate cross-border trading. Ex-3 (Bergmann Report) pp.11, 14; Ex-1 (Miller Report) ¶44.

Only an NNA member or partner recognized by ANNA may issue an ISIN for its assigned country. Ex-3 (Bergmann Report) pp.12-14; Ex-1 (Miller Report) ¶44. In the case of ISINs for a financial instrument issued by a U.S.-based entity that ANNA member is CGS. Ex-3 (Bergmann Report) pp.10-13; Ex-1 (Miller Report) ¶46.[5] U.S. (and Canadian-based) ISINs are derivatives of CUSIPs. Ex-86 (Elhauge Report) ¶25.

#### 2. CINS

In 1989, ABA and CGS resolved to adopt a new identifier—the CUSIP International Numbering System or "CINS"—for all foreign countries other than Canada (which still uses

---

[5] CGS issues ISINs consisting of "US" in the first two characters, the nine-digit CUSIP, and a final check digit as the 12th character. Ex-3 (Bergmann Report) pp.11-12; Ex-1 (Miller Report) ¶45; https://www.cusip.com/identifiers.html#/ISIN.

CUSIPs) that elected to use CGS or its agents as their numbering agency.[6] CINS are almost identical to CUSIPs except the first character is always a letter that signifies the country of the issuer. CINS are today the exclusive "local identifier" assigned to financial instruments in over 30 countries and territories where CGS is recognized by ANNA as the NNA or SNA.[7] CGS refers to CUSIPs, CINS and CGS ISINs where CGS is the NNA or SNA collectively as "CGS Identifiers."[8]

## C.    The Markets in which CGS Operates

CGS performs the services identified in the 2014 Agreement in two markets—an issuance and a use market.

### 1.    The Issuance Market

When a company seeks to issue a financial instrument for public or private trading, it typically must apply to the NNA that has primary jurisdiction over the financial instrument for assignment of a local identifier in that country and, if wanted, a related ISIN. Ex-3 (Bergmann Report) pp.11-12; Miller Report ¶¶44, 46. That means CGS is a monopolist for the issuance of CUSIP Identifiers. Ex-86 (Elhauge Report) ¶27; Ex-1 (Miller Report) ¶46.

The issuance process for CUSIP Identifiers begins with an application to CGS—typically by an issuer or its agent called the "Requester." Ex-5 (Faulkner Dep.) 26:3-25. The Requester fills out the application and provides certain standard "descriptive" data items, such as the issuer's name and address and the type of the instrument. *Id.* 253:25-254:9. All descriptive data items are

---

[6] https://www.cusip.com/identifiers.html#/CINS.

[7] https://anna-web.org/anna-members/; https://www.cusip.com/pdf/CGS076_CINS_Master_File_w_ISIN_02_15_17-USLtr.pdf.

[8] https://www.cusip.com/identifiers.html. Professor Elhauge calls them CUSIP Identifiers because they are all based on the CUSIP numbering convention. Plaintiffs have adopted his "CUSIP Identifiers" terminology in lieu of "CGS Identifiers" for purposes of the proposed Class and Sub-Class Definitions. However, the content is the same: CUSIPs (U.S. and Canadian), CINs and corresponding ISINs, if any.

generated from issuer-provided information; CGS originates nothing other than the alphanumeric identifier itself. Ex-6 (Mitnick Dep.) 100:3-102:3.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████    Ex-5 (Faulkner Dep.) 241:3-253:7; Ex-7 (PX39) at FRSI00194699. Requestors are prohibited from redistributing CUSIP Identifiers—even internally—without a license agreement. Ex-7 (PX39) at FRSI00194699; Ex-8 (ABA-0000004547) at ABA-0000004557. Since owned by FactSet, the CGS invoices state, "CUSIP identifiers and standardized descriptions are the valuable intellectual property of the ABA." Ex-9 (PX204) at FRSI00537654. By contrast, in Germany, for example, once a local German identifier (WKN) is issued, it is placed in a public registry that is available free of charge. Ex-10 (Lenz Report) ¶¶24-27.

CGS is obligated to operate its issuance business on a cost-recovery basis, meaning it may charge only what is necessary to cover operating expenses. Ex-5 (Faulkner Dep.) 42:19-43:2. On September 9, 2020, the ABA executed a Memorandum of Understanding ("MOU") with X9 to serve as U.S. Registration Authority under the ASC X9.6 CUSIP standard. Ex-11 (PX124) at FRSI01625140. The MOU affirms that the ABA, as Registration Authority, ████████████

████████████████████████████████████████████████

████████████████. *Id.* at FRSI01625142 (§2.6); Ex-12 (PX125) at FRSI01755476.000013 (Annex B); Ex-5 (Faulkner Dep.) 92:18-94:25.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████. Ex-13 (PX159) (ABA-0000001526); Ex-14 (Preiss Dep.) 276:2-17,

284:18-290:21; Ex-13 (PX159) (ABA-0000001526). However, in fact, CGS has earned profit margins of ███████████████████████████████████████████████████████████████. Ex-14 (Preiss Dep.) 150:2-152-22, 292:2-5; Ex-15 (FactSet 30(b)(6) Dep.) 303:14-18.

### 2. The Use Market

The CUSIP Identifier Use Market consists of the post-issuance use of CUSIP Identifiers. There are many categories of "users" of CUSIP Identifiers from government regulators such as the SEC and the MSRB to clearinghouses for trades in financial instruments (such as DTC) to broker-dealers, mutual funds, insurance companies, banks, institutional and individual investors and their advisors, and many more. Miller Report ¶¶50-55; Powell Report p.16. CGS requires users to sign licenses to use CUSIP Identifiers and standard security descriptions. Ex-16 (PX501) at FRSI00000084 (§7.A(i)); Ex-17 (PX502) at FRSI00000068 (§1.1). Licensees obtain CUSIP Identifiers either from CGS in the form of a data feed or secured file transfer protocol, or through third-party data vendors ("TPDVs") from whom the user may purchase a panoply of data services not limited to CUSIP Identifiers and associated data. *Id.* The members of the proposed Classes—"End Users"—use the second method.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████ *Id.*; Ex-18 (Nagle Dep.) 72:8-73:4, 85:20-87:10; Ex-19 (Hunter Dep.) 135:7-25.

TPDVs use CUSIP Identifiers in creating their proprietary data services. *See* Ex-15 (FactSet 30(b)(6) Dep) 113:22-114:10. These TPDVs typically parse and select data from CGS, limit or change the descriptive fields to suit their own needs and add other information they gather and generate on their own (*not from CGS*), for inclusion in the TPDV's own data feeds to *their* customers, the End Users. *E.g.*, Ex-20 (Bloomberg 30(b)(6) Dep.) 23:20-24:12. ██████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████ Ex-15 (FactSet 30(b)(6) Dep.) 10:11-11:11, 24:1-25:14, 201:2-202:10, 212:22-214:18.

End Users do not obtain any CUSIP Identifiers or associated descriptive data directly from CGS

(other than through a free internet-based look-up service).[9] ██████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████. Ex-19 (Hunter Dep.) 152:7-

153:4.

### D.    CGS's Restrictive Licensing Regime

### 1.    CGS's Contractual Relationships with TPDVs

CGS imposes contractual relationships on each TPDV through a Distribution Agreement

Ex-15 (FactSet 30(b)(6) Dep.) 15:14-17:19.[10] ████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████ Ex-16 (PX501) at

FRSI00000075 (§5.D.). ████████████████████████████████████████

████████████████████████████████. *Id.* at FRSI00000076 (§8.F.).

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

---

[9] CGS offers a service called CGS CUSIP Access, which allows a licensed End User with an appropriate login and password from CGS the ability to "look up" CUSIP Identifiers in CGS's database through an internet browser. Ex-17 (PX502) at FRSI00000089 (§1.20). CGS usually provides these services to a paying licensee for no additional charge. Ex-23 (FRSI00125445) at FRSI00125458-59.

[10] All TPDVs are "Distributors" that are required to enter into Distribution Agreements with CGS. ████████████ ██████████████████████████████████████████████████ Ex-15 (FactSet 30(b)(6) Dep.) 34:14-25, 80:24-83:24.

████████████████████████ *Id.* at FRSI00000075 (§5.B.). ████████

████████████████████████████████████████████████

████████████████████ *Id.* at § 5.C. ████████████████

████████████████████████████████. *Id.* at FRSI00000088

(§§9.A. & B.). ████████████████████████████████

████████████████. *Id.* at FRSI00000089 (§11). ████████████

████████████████████ *See* Background § F, *infra*.

## 2.    License Agreements with End Users

As a result of the contractual framework between CGS and TPDVs, End Users must execute license agreements directly with CGS. Ex-19 (Hunter Dep.) 93:13-95:22; 173:17-174:6; Ex-21 (Lane Dep.) 25:25-29:24, 148:17-149:25, 169:23-175:25. This structure imposes a double charge on End Users: *first*, they pay their TPDVs for the data and analytics received from them which include CUSIPs; and *second*, they pay for a license from CGS to access the same identifiers.[11] End Users must pay CGS and adhere to the restrictive licensing terms or risk CGS instructing TPDVs to shut off End Users' supply of CUSIP Identifiers embedded in their TPDV data feeds. Ex-21 (Lane Dep.) 28:19-29:24; Ex-19 (Hunter Dep.) 207:13-208:22; Ex-24 (FRSI00529126) at FRSI00529130-33. Plaintiffs are among those so compelled: under the threat of losing access to CUSIP Identifiers, each entered into a license agreement with CGS despite receiving their data from TPDVs. *See* Ex-25 (HCM-00571657) (Letter to Hildene); Ex-26 (HCM-00571788) (Letter to Hildene); Ex-27 (Resnick Dep.) 224:11-22; Ex-81 (DX61) at SL-00067852

---

[11] ████████████████████████████████████████████
████████████████████████████████████████ Ex-6 (Mitnick Dep.) 216:24-219:5.
████████████████████ *Id.* at 219:6-220:3.

(Email to Swiss Life) (CGS "will cease delivery of CUSIPs"); Ex-84 (Dinosaur (30(b)(6) Dep.) 57:12-58:23.

CGS mandates that End Users accept one of two standardized contracts: the Subscription Agreement or the Distribution Agreement. Ex-15 (FactSet 30(b)(6) Dep.) 70:10-72:14. The terms of each are functionally equivalent for an End User. *Compare* Ex-16 (PX501) at FRSI00000084 ("CGS Services") *with* Ex-17 (PX502) at FRSI00000068 (same).

Under the Subscription Agreement, CGS imposes on an End User "a non-exclusive, non-transferable, limited license to access and use" the "CGS Service," as described in the attached Service Attachments. Ex-17 (PX502) at FRSI00000095 (§1.1). ██████████████████

██████████████████████████████████████████ Ex-16 (PX501) at FRSI00000074 (§2.B).

Both Agreements list a CGS service called a "CGS License," which "consists of CUSIP, CINS and/or CGS ISIN identifiers and standard security descriptions provided by either CGS directly **or** via a CGS-Licensed [or Authorized] Data Vendor."[12] *Id.* at FRSI00000084 (§7.A(i) "CGS License") (emphasis added); Ex-17(PX502) at FRSI00000068 (§1.1, same). ██████

██████████████████████████████████████████ *Id.*[13]

██████████████████████████████████████████

██████████████████████████.*See* Ex-29 (FRSI00454322) at FRSI00454323.

Each of the named Plaintiffs and members of the proposed Classes purchased a CGS License and paid for no other service from CGS. *See* Ex-23 (FRSI00125445) at FRSI00125458

---

[12] Although CGS has changed the title of the CGS License service over time, the contents of the service have not changed. Compare Ex-17 (PX502) at FRSI00000068 (§1.1) *with* Ex-28 (DX50) at SL-00118016 (§1.1).

[13] The Distribution Agreement Order Schedule contains substantially similar language to that in the Subscription Agreement Service Attachment except "Authorized Data Vendor" is replaced with "CGS-Licensed third-party vendor" and "Subscriber's agreement" is replaced with "Distributor's agreement." *Compare* Ex-16 (PX501) at FRSI00000084 (§7.A.i, "CGS License") *with* Ex-17 (PX502) at FRSI00000068 (§1.1, same).

(Dinosaur: license for 2,500 identifiers; $10,500); Ex-30 (FRSI00134772) at FRSI00134784 (Hildene: same); Ex-28 (DX50) at SL-00118023 (Swiss Life: license for 10,000 identifiers; $42,000).

Both the Subscription and Distribution Agreements incorporate the UOSS, which initiates the licensing process. Ex-21 (Lane Dep.) 18:5-10. End Users are required to disclose their operational use of CUSIP Identifiers and the number of unique identifiers they access. *Id.* at 20:10-21:2. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████. Ex-18 (Nagle Dep.) 84:22-87:10. ████████████

████████████████████████████████████████████████████████

█████████████████████████████████████. *Id.*; Ex-19 (Hunter Dep.) 25:14-26:6; Ex-31 (Nonparty Conning Inc. Dep.) 148:17-149:25. ███████████████████

█████████████████████████████████████████████████████. *Id.*; Ex-19 (Hunter Dep.) 29:6-19.

CGS prices its licenses to End Users in "tiers" or "bands" corresponding to how many CUSIP Identifiers the licensee uses in its own systems. Ex-21 (Lane Dep.) 21:13-23:13; Ex-19 (Hunter Dep.) 134:15-135:25, 137:2-138:2; Ex-15 (FactSet 30(b)(6) Dep.) at 78:23-79:16. The pricing tiers run from per annum use of a minimum of 500 to over 40,000 CUSIP Identifiers. Ex-17 (PX502) at FRSI00000092-93. CGS does not charge licensees who use fewer than 500 CUSIP Identifiers per year, ██████████████████████████████████████████████

████ Ex-21 (Lane Dep.) 264:4-265:11.

█████████████████████████████████████████████████████████

████████████████████████████████████. Ex-15 (FactSet 30(b)(6) Dep.) 27:20-29:1.

CGS requires a user to sign ███████████████████████████████████████

███████████████████████████████████████████. *Id.* at 34:14-25; *see* Ex-32

(Nonparty Dataminr interrogatory responses) at p. 9 (Response to No. 9). ████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ In substance, these End Users

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████. *E.g.*, Ex-31 (Conning Dep.) 151:9-152:8; Ex-27 (Resnick Dep.) 237:19-238:21.

### E.    Defendants' False IP Rights Claims

#### 1.    The IP Rights Defined In The 2014 Agreement

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Ex-33 (PX123) at FRSI01632491

(§1(a)). ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████. *Id.* at FRSI01632496

(§4(a)). ████████████████████████████████████████████████████████████████

*Id.*

██████████████████ ███████ ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Ex-6 (Mitnick Dep.)

---

[14] The ABA has a registered trademark in the word "CUSIP."

35:13-37:18, 40:8-15. The ABA's copyrights protect only the selection and arrangement of data in the compilation, not the actual data in the compilation.



Ex-33 (PX123) at FRSI01632495-96 (§3(e)).

*Id.* at FRSI01632497 (§4(c)).

. Ex-34 (Poole Dep.) 101:11-102:8; 181:23-185:6.

### 2.    False Claims of IP Rights in CGS's License Agreement



. Both the Subscription and Distribution Agreements contain misrepresentations concerning the ABA's and CGS's IP Rights in CUSIP Identifiers that End Users receive from their TPDVs.

Ex-17 (PX502) (Subscription Agreement) at FRSI00000096 (§2); Ex-16(PX501) (Distribution Agreement) at FRSI00000075 (§5.A), at FRSI00000076 (§8), at FRSI00000082 (Exhibit A-1); Ex-33 (PX123) (2014 Agreement) at FRSI01632495-96 (§3(e)). Section 2 of the Subscription Agreement and

Ex-17 (PX502) at FRSI00000096

(Subscription Agreement) (§2); Ex-16 (PX501) at FRSI00000076 (Distribution Agreement) (§8).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████. Ex-16 (PX501) at FRSI00000082 (Distribution Agreement) (Exhibit A-1).

████████████████████████████████████████████████████

███████████████████████████████████████████████████████. *See, e.g.*, Ex-24 (FRSI00529126) at FRSI00529130████████████████████████████████████████

*id.* at FRSI00529131 █████████████████████████████████████████████

███████ *id.* at FRSI00529132 (same). Although CGS changed its policy in or around 2021 to send two escalation letters to sales leads that refused to sign a license rather than five letters, Ex-21 (Lane Dep.) 92:11-98:5, the overall content of the form letters has not changed. *Compare* Ex-35 (FRSI00703185) (2020: "intellectual property of the ABA and CGS must protect these proprietary rights"); Ex-36 (FRSI00117560) (2020 letter: "steps necessary to protect the ABA's valuable intellectual property") *with* Ex-24 (FRSI00529126) at FRSI00529130; *id.* at FRSI00529132. Such assertions of IP Rights were repeated in letters sent to Plaintiffs. Ex-26 (HCM-00571788) at HCM-00571792; Ex-83 (DFG-00048332) at DFG-00048335 ("The CUSIP identifier is proprietary information of the ABA"); Ex-82 (SL-00067864) at SL-00067865 ("CUSIP data is our intellectual property").

### 3.     CGS's False Claims of IP Rights to Regulators

CGS has made the same false claims of IP Rights in communications with regulators. To deter regulatory efforts aimed at expanding access to CUSIP numbers, CGS made misrepresentations to government agencies, including the SEC, and the public.

In a 2010 letter to the SEC, CGS claimed "[t]he assignment of a CUSIP number as well as the selection and arrangement of database material are both editorial processes that involve discretion and judgment, and are therefore acts of authorship under the copyright laws," and falsely asserted the ABA "retains the copyright … in the CUSIP numbers themselves." Ex-37 (PX182) at ABA-0000016200-202. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ Ex-38 (Dearborn-000052); Ex-19 (Hunter Dep.) 287:12-291:6; Ex-39 (PX108) at FRSI01620715 (Exhibit A). CGS and the ABA also asserted to the MSRB "that the CUSIP Numbers and CUSIP Descriptions are and shall remain valuable intellectual property of CGS and the ABA." Ex-40 (SPGI-000009537) at SPGI-0000009539 (§3.3).

CGS reinforces these claims in presentation materials. For example, a CGS slide deck declares: "Vendors (MSCI, Bloomberg, Reuters, Thomson, etc.) agree that CUSIP Numbers are the intellectual property of the ABA." Ex-41(ABA-0000026779).

### F.    Enforcement of the Licensing Regime

Unlike the holder of valid IP Rights, who enforces its rights by filing suits for infringement against those who infringe the right, CGS shuns such suits and instead enforces its CUSIP licensing regime through a web of contractual mechanisms embedded in the Distribution Agreements with TPDVs. ██████████████████████████████████████

██████████████████████████████████████████. Ex-16 (PX501) at FRSI00000088; Ex-19 (Hunter Dep.) 93:13-95:22; Ex-21 (Lane Dep.) 25:25-29:24, 148:17-149:25, 169:23-175:25; Ex42 (PX357) at FRSI01435403 (Escalation Process).

### 1.    Pre-Authorization: TPDVs may not transmit CUSIPs without CGS approval

Under their Distribution Agreements, ████████████████████████████

████████████████████████████████████████████████████████████

████████████████ Ex-16 (PX501) at FRSI00000088 (§9.A); Ex-6 (Mitnick Dep.) 230:1-231:24. This requirement imposes substantial operational burdens and enables CGS to preemptively control downstream distribution. Ex-2 (Powell Report) pp.28-33. ████████████

██████████████████████████████████████████████████ Ex-43 (FRSI00243290) ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ Ex-21 (Lane Dep.) 169:23-170:10.[15]

### 2.    Post-Authorization: TPDV reporting obligations convert CUSIPs into "sales leads"

████████████████████████████████████████████████████████

████████████████████████████████████████████████████. Ex-16 (PX501) at FRSI00000088 (§9.B.); Ex-21 (Lane Dep.) 162:22-169:13. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ *E.g.*, Ex-44 (PX29) (Bloomberg June 2022 report) at FRSI00061702; Ex-45 (PX350) (Bloomberg February 2018 report) at BBG_0000000051; Ex-20 (Bloomberg 30(b)(6) Dep.) 80:15-81:9. ████████████████

████████████████████████████████████████████████████████████

---

[15] While CGS uses the language of legitimate commercial enterprise, like "sales leads" and "upsell," its conduct is more accurately characterized as extortion.

██████████████████ Ex-21 (Lane Dep.) 35:22-37:16, 168:23-170:10, 250:10-251:11; Ex-46 (PX26) at FRSI00298217.

████████████████████████████████████████████████

██ ██ ████ ███ ███ ██ █████ ██████ Ex-47 (FRSI01235698) at FRSI01235700. ████████████████████████████████ *Id.* at FRSI01235698. █████████████████████████

███████████████████████████████████████. Ex-44 (PX29) at FRSI00061702. ████████████████████████

██████ Ex-19 (Hunter Dep.) 152:7-153:4. ██████████████████

███████████████████████████████████████████

████████████████████████ Ex-6 (Mitnick Dep.) 247:9-251:15; Ex-48 (FRSI00848546) at FRSI00848549 ██████████████████████████

██████████████████████████

### 3.    CGS enforces licensing through systematic escalation regime

████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████ Ex-21 (Lane Dep.) 90:15-96:13, 253:15-255:25. ████

███████████████████████████████████████ *id.* at 169:23-175:16, ██████████████████████████ *See id.* at 90:6-96:13; Ex-24 (FRSI00529126) at FRSI00529130-32; Ex-42 (PX357) at FRSI01435403 (Escalation Process).

██████████████████████████████████████████████

██████████████████████████████████. Ex-16 (PX501) at FRSI00000088 (Section 9.B.). This includes:

- ██████████████████████████████████████████████████████

  ██████████████████████████████████████████████████████

  ████████████████████████████████████████████ *id.* at

  FRSI00000091 (Exhibit 1); and

- ██████████████████████████████████████████████████████

  *Id.* at FRSI00000088 (§9.B.).

████████████████████████████████████████████████████████

███████████████████████████████. *Id.*; Ex-21 (Lane Dep.) 29:3-24. ██████████

████████████████████████████████████████████████████. *E.g.*, Ex-

21 (Lane Dep.) 287:10-288:8; Ex-49 (PX32) at FRSI00290822.

████████████████████████████████████████████████████████

████████████████████████████████████████████████. *Id.*; Ex-50

(PX34) at FRSI00506586; Ex-51 (PX352) at BBG_0000000013-14; Ex-20 (Bloomberg 30(b)(6)

Dep.) 83:21-85:15, 85:19-25, 87:12-88:3. ███████████████████████

█████████████████████ Ex-21 (Lane Dep.) 173:24-175:25. ████████████

████████████████████████████████ Ex-50 (PX34) at FRSI00506586, imposing

severe operational risk to the End User's business. Ex-27 (Resnick Dep.) 318:17-319:15.

　　CGS supplements this enforcement with audits of licensed End Users. ████████████

█████████████████████████████████████████ Ex-21 (Lane Dep.) 110:4-

111:3. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ *Id.* at 251:5-22, 255:4-25; Ex-46 (PX26) at FRSI00298217; Ex-52

(FRSI00074682) at FRSI00074686. █████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex-21 (Lane Dep.) at 122:10-123:8, 230:15-22,

227:11-229:11. ████████████████████████████████████████████

████████████████████████ Ex-86 (Elhauge Report) ¶82; Ex-53 (FRSI00163032) at

FRSI00163154.

### 4. CGS prevents CUSIPs from being publicly available without restrictions

CGS's continued monopoly depends on its restricting the availability of CUSIP Identifiers.

If CUSIPs were freely available there would be no way for CGS to restrict their use and impose

supracompetitive prices on End Users. That is why Defendants employed an aggressive scheme to

lock up all possible sources of CUSIP Identifiers.

To eliminate potential competitors, CGS uses its contracts with TPDVs and End Users to

close off access to unrestricted CUSIP Identifiers. ████████████████████████████████

████████████████████████████████████████████. Ex-19 (Hunter Dep.) 369:15-

372:13; Ex-18 (Nagle Dep.) 289:19-292:20; Ex-54 (PX72) at FRSI01596435-36. For example,

CGS informed a company called Xignite, ████████████████████████████████████

████████████████████████████████████ See Ex-19 (Hunter Dep.)

329:14-333:15; Ex-55 (PX118) (Xignite breach notice). ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ See, e.g., Ex-56 (FRSI00170852) (CGS resolution letter); Ex-57

(XIG_000004); Ex-58 (XIG_000123); Ex-59 (XIG_000137); Ex-60 (XIG_000178).

To further suppress public availability, ███████████████████████████████████ ███████████████ Ex-61 (PX67) at FRSI00192331 (███████████ deck). ███████████ ███████████████████████████ Ex-62 (PX119) at FRSI01596435. ███████████ ███████████████████████████████████████ Ex-19 (Hunter Dep.) 370:16-374:17; Ex-62 (PX119) at FRSI01596435-36 (referencing "Rogue CUSIP sites"). As a result, multiple sites, including WhaleWisdom and StockMarketMBA, removed CUSIP and ISIN content from their public-facing websites. Ex-62 (PX119) at FRSI01596436.

███████████████████████████████████████ ███████████████████████████████ Ex-19 (Hunter Dep.) 313:18-315:6; Ex-63 (PX430) at FRSI01013340 (web addendum restricting display and access); Ex-64 (PX111) at FRSI00095556. ███████████████████████████ ███████████████████████████████████ Ex-63 (PX430) (web display addendum restricting display and access). ██████████████████████ ███████████████████████████. *See* Ex-72 (FRSI00145702). CGS and its licensed TPDVs are the only commercial source of CUSIP Identifiers in such format. Ex-14 (Preiss Dep.) 39:9-42:3; Ex-19 (Hunter Dep.) 302:25-304:6, 313:25-314:17. Thus, CGS has erected barriers that prevent reuse and raise costs for potential rivals. Ex-86 (Elhauge Report) ¶¶14, 70-71, 76, 86.

The monopoly CGS has created and maintained through these coercive and exclusionary techniques is extraordinarily profitable for CGS and the ABA. ███████████████████ ███████████████████████████████████████ ███████████████████████ *Id.* ¶84.

### G.    The Licensing Regime Imposes Barriers to Innovation

CGS's licensing regime imposes costly and burdensome licensing restrictions that stifle innovation. These restrictions have driven certain market participants toward limited use of non-standardized identifiers, undermining interoperability and creating systemic inefficiencies. Ex-2 (Powell Report) pp.13-19.

One example is Xignite. *See* Background §F.4., *supra*. Another is SWIFT, an international cooperative of about 7,000 banks specializing in secure transaction messaging. SWIFT kept an innovative service off the market because of the requirements of a CGS license. Ex-3 (Bergmann Report) p.22. SWIFT planned to offer a product called "ISIN Sanctions Service" that would use CUSIPs to deliver automated alerts when sanctioned securities were about to settle, offering compliance benefits for high-volume traders. *Id.* When SWIFT sought to bring its service to market, potential data vendors pointed to CGS's requirement that SWIFT obtain a CGS license before the vendors would provide CUSIPs to SWIFT. *Id.* SWIFT never launched its product because it would have been too burdensome and expensive to operate the service under the restrictions and obligations that CGS imposes in the license agreements. *Id.* pp.22-23.

LeafHouse Financial's experience further illustrates the problem. As a fiduciary advisor, LeafHouse receives non-standardized identifiers from record keepers like Morningstar. Ex-2 (Powell Report) p.17. LeafHouse must translate those non-standardized identifiers into CUSIPs through an error-prone "Rosetta stone" process. *Id.* pp.17-18 This not only increases costs and risks for LeafHouse but also jeopardizes retirement plan participants by raising the likelihood of unsuitable investments. *Id.* p.18.

### H.    Financial Identifiers Not Issued By ABA and CGS

#### 1.    Financial Instrument Global Identifier

There is only one identifier other than CUSIP for U.S. financial instruments that is recognized by X9: the FIGI. Ex-2 (Powell Report) pp.8-10. FIGI was created by the Bloomberg Company but is administered by The Object Management Group, a non-profit standards organization. *Id.* Like an ISIN, a FIGI is a 12-character alphanumeric code that uniquely identifies a financial instrument. Ex-1 (Miller Report) ¶95. Unlike CUSIPs, FIGIs are not mandatory to issue or trade U.S. financial instruments and thus are not viable substitutes or alternatives for CUSIPs. *Id.* ¶98. There are no corresponding ISINs for FIGIs. *Id.* ¶95.

#### 2.    ISINs Issued by Foreign NNAs

In countries where CGS is neither the NNA nor a designated "substitute" SNA, other ANNA members issue the ISINs. For example, in Germany, WM Daten is the NNA, and it issues both the local German identifier (WKN) and the German ISIN based on the WKN. Ex-10 (Lenz Report) ¶¶20-23. WM Daten does not charge for issuance of WKNs or related ISINs, nor does it charge for post-issuance use of those identifiers and basic associated descriptive data (identifier number, issuer name, maturity, coupon, currency). *Id.* ¶¶24-27, 37-38. WM Daten only charges for "enhanced" data beyond the "basic" package. *Id.* ¶¶36-38.[16]

### I.    Proposed Class Definitions

Plaintiffs seek to certify the following classes and sub-classes (collectively "Classes") of persons or entities that paid a license fee to S&P or FactSet for the use of CUSIP Identifiers pursuant to a Subscription Agreement or a Distribution Agreement. All members of the Classes

---

[16] CGS may assign a CINS (but not an ISIN) to a foreign financial instrument (such as a German one) even though another entity (like WM Daten) issues the "official" local identifier and ISIN because, if the foreign financial instrument trades and clears in the U.S., DTC will use the CINS as the primary identifier for the clearance. Ex-1 (Miller Report) ¶43. Thus, CINS may be used in the U.S. for foreign financial instruments.

purchased the identical product called a CGS License under the common terms of §7.a.(i) of the Order Schedule to the Distribution Agreements, Ex-16 (PX501) at FRSI00000084, and under §1.1 of the Services Attachment to the Subscription Agreements, Ex-17 (PX502) at FRSI00000068.

**The CUSIP Identifier User Class:** All persons or entities that paid a license fee to S&P or FactSet for the use of CUSIP Identifiers pursuant to a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement at any time from March 4, 2018, until March 14, 2025, and did not license a database product or database service from CGS offered under such agreement, other than web-based products or services offered without further charge.

**The CUSIP Identifier Injunctive Relief Class:** All persons or entities that currently are paying a license fee to FactSet for the use of CUSIP Identifiers pursuant to a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement and did not license a database product or database service from CGS offered under such agreement, other than web-based products or services offered without further charge.

**The New York Unfair Business Practices Sub-Class:** All persons or entities that paid a license fee to S&P or FactSet for the use of CUSIP Identifiers pursuant to a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement at any time from March 7, 2019, until March 14, 2025, and did not license a database product or database service from CGS offered under such agreement, other than web-based products or services offered without further charge.

**The Connecticut Unfair Business Practices Sub-Class:** All persons or entities that reside in Connecticut and paid a license fee to S&P or FactSet for the use of CUSIP Identifiers pursuant to a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement at any time from March 7, 2019, until March 14, 2025, and did not license a database

product or database service from CGS offered under such agreement, other than web-based products or services offered without further charge.

As detailed below, Plaintiffs submit that they have met their burden under Rules 23(a) and 23(b)(3) and (2). Plaintiffs also ask the Court to appoint Wollmuth Maher & Deutsch LLP, Kaplan Fox & Kilsheimer LLP, and Competition Law Partners as Class Counsel pursuant to Rule 23(g).

## ARGUMENT

## I.    The Proposed Classes Satisfy Rule 23(a)

A party seeking class certification must satisfy by a preponderance of the evidence the requirements of Rule 23(a) and at least one subsection of Rule 23(b). *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013). Plaintiffs seek class certification under Rules 23(b)(2) and (3).

The Second Circuit has consistently interpreted Rule 23 liberally to "maximize the benefits to both private parties and to the public provided by class actions." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020) (citing omitted); *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (Rule 23 should be "given liberal rather than restrictive construction"). The general preference of the Second Circuit is "granting rather than denying class certification." *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 124 (S.D.N.Y. 2011).

### A.    Numerosity

Under Rule 23(a)(1), a class may be certified only if it is "so numerous that joinder of all members is impracticable." Numerosity is "presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

The proposed Classes satisfy the numerosity requirement. The Classes comprise thousands of licensees (or, for the Connecticut sub-class, over a hundred) who paid fees to S&P or FactSet

under the Subscription Agreement or Distribution Agreement during the relevant class periods. Ex-86 (Elhauge Report) ¶108.

### B.    Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." A question is common if "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Even a single common question will suffice. *Id.* at 359. "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

Claims arising from a common course of conduct present a classic case for treatment as a class action. *Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*, 2022 WL 2829880, at *16 (S.D.N.Y. June 30, 2022) ("the question whether Defendants engaged in an antitrust conspiracy that caused class-wide impact and damages is a question "common to the class and capable of resolution through common proof") (citation omitted), *report and recommendation adopted*, 2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024) (Failla, J.). In addition, existence and scope of the alleged conspiracy presents "obvious" common questions. *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 164 (S.D.N.Y. 2000) (certifying Rule 23(b)(3) class).

The commonalty requirement for certification of CUTPA § 42-110b(a) claims mirrors the federal standard. *See St. Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.*, 2023 WL 1967133, at *7 n.5 (D. Conn. Feb. 13, 2023). In addition, courts routinely certify GBL § 349 claims based on uniform misrepresentations made in standardized contracts and communications. *Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 84-85 (2d Cir. 2015).

Plaintiffs' claims present many common issues of law and fact, including but not limited to:

- Whether CGS unlawfully maintains monopoly power in the CUSIP Identifier Use Market;

- Whether Defendants conspired to maintain that monopoly;

- Whether Defendants' actions were materially misleading;

- Whether Defendants' licensing regime, contractual restrictions, and enforcement techniques constituted anticompetitive conduct;

- Whether Plaintiffs and members of the proposed Classes were forced to enter into a license agreement and pay a fee for the use of CUSIP Identifiers due to Defendants' anticompetitive conduct;

- Whether Defendants' acts caused antitrust injury and class-wide damages;

- Whether Defendants' conduct violates Section 2 of the Sherman Act;

- Whether Defendants' conduct violates NY GBL § 349; and

- Whether Defendants' conduct violates CUTPA § 42-110b(a).

## C.    Typicality

Typicality is satisfied where "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Marisol*, 126 F.3d at 376; *accord Iowa Pub. Employees' Ret. Sys.*, 2022 WL 2829880, at *17. This requirement is "not demanding." *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 55 (S.D.N.Y. 2019).

### 1.    Sherman Act Claims

"In the antitrust context, plaintiffs and all class members alleging the same antitrust violations by defendants will establish typicality." *Iowa Pub. Employees' Ret. Sys.*, 2022 WL

2829880, at *17. In *Iowa Public Employees' Retirement System*, each class member "entered into stock lending transactions with [defendants] during the Class Period, and each br[ought] the same claims alleging that it was harmed in those dealings by Defendants' conspiracy." *Id.*

CGS, in coordination with the ABA, has engaged in a course of anticompetitive conduct, detailed above, that has a market-wide effect excluding potential competitors, eliminating innovation, and, ultimately, raising prices. This affected all End Users. This course of conduct forces End users to sign one of two standard form license agreements with restrictive provisions and pay fees to use CUSIP Identifiers. In a competitive market, CUSIP Identifiers would be available free of charge and free of restrictions on use. Ex-86 (Elhauge Report) ¶¶14, 76-79.

Each named Plaintiff entered into agreements with CGS that were materially identical to one another and those of the other Class members. *See* Ex-65 (FRSI00444955) at FRSI00444960 ██████████████████████████████████████ Each Plaintiff was subject to the same anticompetitive terms and effects, and each was compelled to pay licensing fees to S&P or FactSet as a condition of using CUSIP Identifiers. *See* Ex-23 (FRSI00125445) at FRSI00125458 (Dinosaur: $10,500); Ex-30 (FRSI00134772) at FRSI00134784 (Hildene: same); Ex-28 (DX50) at SL-00118023 (Swiss Life: $42,000). Each was forced to pay a fee directly to CGS for a "license" despite receiving CUSIP Identifiers in financial data exclusively from their TPDVs, and not directly from CGS. *Id.*

In addition, each named Plaintiff was subjected to the same false and deceptive statements about IP Rights contained in the form Subscription Agreements, ████████████████████ ████████████████████████████ Ex-23 (FRSI00125445) at FRSI00125451 (Preamble), at FRSI00125452 (§2) (Dinosaur); Ex-30 (FRSI00134772) at FRSI00134777 (Preamble), at FRSI00134778 (§2) (Hildene); Ex-66 (FRSI00134647) at FRSI00134647

(Preamble), at FRSI00134648 (§2) (Swiss Life); *see* Background §E.2., *supra*. Each Plaintiff received standardized communications from CGS asserting IP Rights over CUSIP numbers. Ex-26 (HCM-00571788) at HCM-00571792 (CUSIP Identifiers are "the valuable intellectual property of the ABA and CGS must protect these proprietary rights"); Ex-83 (DFG-00048332) at DFG-00048335 ("The CUSIP identifier is proprietary information of the ABA"); Ex-82 (SL-00067864) at SL-00067865 ("CUSIP data is our intellectual property"). Plaintiffs also received correspondence from CGS threatening to cut off access to CUSIP Identifiers if they did not enter into a license agreement. *See* Background §§D.2. & E.2., *supra*. The communications received by Plaintiffs were CGS standard-form documents. *Id.*

█████████████████████████████████████████████

███████████████████████████████████████████ *See* Ex-15 (FactSet 30(b)(6) Dep.) 70:10-76:4; Ex-6 (Mitnick Dep.) 189:22-191:22. They include the same restrictions on use of CUSIP Identifiers. *Compare* Ex-17 (PX502) at FRSI00000095-96 (§§1.3, 1.4) *with* Ex-16 (PX501) at FRSI00000073-75 (§§2.C & D, 5). These Agreements also falsely assert IP Rights over CUSIP Identifiers and "other information about financial instruments." Ex-17 (PX502) at FRSI00000096 (§2); Ex-16 (PX501) at FRSI00000076 (§8)

The claims of each named Plaintiff and members of the proposed Classes arise from the same course of conduct, licensing regime, and legal theory. Because Plaintiffs assert the same theory of unlawful monopolization and conspiracy to monopolize and were injured by the same conduct, their claims are typical of the proposed CUSIP Identifier User Class and CUSIP Identifier User Injunctive Relief Class. *See Iowa Pub. Employees' Ret. Sys.*, 2022 WL 2829880, at *17–18.

### 2.    GBL § 349 Claims

As discussed above, *see* Argument § I.C.1., each Plaintiff was exposed to the same deceptive representations contained in form license agreements and correspondence, which falsely

claimed IP Rights over individual CUSIP Identifiers. Plaintiffs and members of the New York Unfair Business Practices Sub-Class received these deceptive representations when deciding whether to enter into their respective Subscription or Distribution Agreements. *See* Background §§ D.2 & E.2, *supra*

Each Subscription and Distribution Agreement is governed by New York law. Ex-16 (PX501) at FRSI00000080 (§18.A.); Ex-17 (PX502) at FRSI00000098 (§11.4). When operated by S&P, each Agreement contained standardized notice provisions requiring that all communications be directed to "CUSIP Global Services, 55 Water Street, New York, New York." Ex-66 (FRSI00134647) at FRSI00134650 (§11); Ex-30 (FRSI00134772) at FRSI00134780 (same). During that time, CGS maintained offices in S&P's headquarters in New York. *Id.*; Ex-26 (HCM-00571788) at HCM-00571788. CGS sent invoices for licensing fees to End Users from its New York address on S&P letterhead, and End Users understood that payment was made to CGS who was located in New York. *See* Ex-67 (HCM-00054824), Ex-31 (Nonparty Conning, Inc. Dep.) 152:23-153:17. In addition, correspondence from CGS to End Users asserting IP Rights over CUSIP Identifiers was sent from New York. *E.g.*, Ex-26 (HCM-00571788) at HCM-00571792; Ex-69 (FRSI00108190). These uniform contract terms present in all the license agreements and New York-based communications evidence the typicality of the named Plaintiffs' claims in relation to the members of the proposed New York Unfair Business Practices Sub-Class.

### 3.    CUTPA Claims

"The standards governing an antitrust plaintiff's CUTPA claim alleging unfair competition largely mirror the standard governing federal claims arising under the Sherman and Clayton Acts and state claims arising under the Connecticut Antitrust Act." *St. Francis Hosp. & Med. Ctr., Inc.*, 2023 WL 1967133, at *7 n.5. Hildene is headquartered in Stamford, Connecticut and was injured in Connecticut when it paid license fees from its Connecticut office to S&P. Ex-67 (HCM-

00054824); Ex-70 (Hildene 30(b)(6) Dep.) 112:22-113:10; Ex-27 (Resnick Dep.) 31:6-15. Its claims are typical of members of the Connecticut Unfair Business Practices Sub-Class who were similarly harmed in the payment of unlawful license fees to Defendants when residing in Connecticut.

### D.    Adequacy

Under Rule 23(a)(4), adequacy is satisfied where: (1) there are no fundamental conflicts between the representative parties and the class; (2) the named Plaintiffs have a sufficient interest in the outcome; and (3) proposed class counsel is qualified and capable. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 461 (S.D.N.Y. 2018).

All of those elements are satisfied here. Plaintiffs and the Classes share a common interest in establishing that Defendants' exclusionary course of conduct is unlawful and in recovering damages. No antagonism exists between class members. Plaintiffs have demonstrated their commitment to the litigation. Class counsel are highly experienced in complex antitrust and consumer protection class actions and were appointed interim class counsel by this Court. *See* Interim Class Ruling at p.3 (ECF No. 51).

Moreover, adequacy for the New York Unfair Business Practices Sub-Class is reinforced by New York-based Plaintiff Dinosaur, and adequacy for the Connecticut Unfair Business Practices Sub-Class is supported by Hildene's Connecticut residency. While Plaintiffs signed Subscription Agreements, not Distribution Agreements, ███████████████████████

████████████████████████████████████████████

████████████████████████ *See* Argument § I.C.1., *supra*.

### E.    Ascertainability

Ascertainability is met where membership is "objectively possible." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 717 (2d Cir. 2023). Class membership is ascertainable

when the classes are defined "using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 264 (2d. Cir. 2017).

Professor Elhauge has established objective criteria to identify all members of the proposed Classes based on CGS's own master books of business, contracts, invoices, and UOSS. *See* Ex-86 (Elhauge Report) ¶¶103-108. Plaintiffs' methodology enables accurate determination of class membership by matching the licensee to license type, product type, date of license, and fee paid. *Id.* Plaintiffs have satisfied the ascertainability element of class certification for each of their claims.

## II.    The Proposed Classes Satisfy Rule 23(b)(3)

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that a class action be "superior to other available methods" for fairly and efficiently adjudicating the controversy. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 117.

Predominance is satisfied if resolution of the central issues "can be achieved through generalized proof" and are "more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). "Predominance is a test readily met in certain cases alleging … violations of the antitrust laws." *Amchem Prods.*, 521 U.S. 591, 625 (1977). Each of the issues in the case is susceptible to resolution through common proof. Defendants' course of conduct, exclusionary license agreements, false claims of copyright, and coercive enforcement strategies will be proved mainly through Defendants' documents and testimony, expert testimony, and other common evidence.

In antitrust actions, common questions generally predominate over individualized issues with regard to market definition, monopoly power, alleged anticompetitive conduct, violation of

antitrust law, and whether the injury suffered by plaintiffs was an antitrust injury. *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 550-52 (S.D.N.Y. 2021).

### A. Common Questions Predominate for Plaintiffs' Unlawful Maintenance-of-Monopoly Claim

"[T]he three required elements of an antitrust claim [are:] (1) a violation of antitrust law; (2) injury and causation; and (3) damages...." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001). A violation of Section 2 of the Sherman Act: (i) "the possession of monopoly power in the relevant market" and (ii) "'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (citation omitted). Each of these elements can and will be proven through common evidence.

#### 1. Common evidence shows Defendants have monopoly power in the relevant market

##### a) The Relevant Market

*Relevant Product Market.* Professor Elhauge concludes and common evidence demonstrates that the use of CUSIP Identifiers is a relevant product market and the use of US CUSIPs is a relevant submarket.[17] Ex-86 (Elhauge Report) ¶¶31, 61-65. His expert opinion uses the well-established hypothetical monopolist test, which is common to the proposed Classes. Ex-86 (Elhauge Report) ¶¶32-35. In concluding this test was satisfied, Professor Elhauge surveyed qualitative evidence including (1) the extensive array of statutory, regulatory, and operational mandates that require, or effectively compel, the use of CUSIP Identifiers, (2) entrenched network

---

[17] Plaintiffs seek class certification with respect to the CUSIP Identifier Use Market. But if that market is for any reason rejected by the Court or the jury, class certification would still be appropriate for the narrower US CUSIP Use Sub-Market identified by Professor Elhauge.

effects that have embedded CUSIP Identifiers into the infrastructure of financial markets in a way that makes them functionally indispensable, and (3) the widespread market perception that CUSIP Identifiers are indispensable for participation in the financial system. *Id.* ¶¶36-57. Professor Elhauge also identified quantitative evidence in support of his conclusion. He found that, because competitive benchmarks in over 120 other nations charged a price of zero for the use of their local financial instrument identifiers and that the marginal costs to CGS of allowing post-issuance use of CUSIP Identifiers are zero, the competitive price level is $0. *Id.* ¶¶59-60. CGS, as an actual monopolist, was able to raise prices by an infinite percentage above the competitive level. *Id.* This common evidence establishes a relevant product market.

*Geographic Market.* Professor Elhauge shows that the relevant geographic market is the United States because that is where CGS is located. *Id.* ¶66. But even if the geographic market were global, his conclusions would not change because CGS is the sole actual and perceived provider of licenses for the use of CUSIP Identifiers worldwide. *Id.* ¶67. Because market participants view CUSIP Identifiers as indispensable for participation in financial activities, they would not switch to alternatives regardless of where those alternatives are located. *Id.*

b)    *Common evidence of Defendants' monopoly power*

Common evidence establishes that CGS holds monopoly power in the CUSIP Identifier Use Market. Professor Elhauge identifies three independently sufficient bases, each provable via classwide evidence confirm CGS's monopoly position: (1) its at-or-near 100% market share combined with high barriers to entry and expansion; (2) direct evidence of CGS's ability to raise prices above competitive levels and engage in price discrimination; and (3) direct evidence of CGS's power to exclude actual or potential rivals from the market. Ex-86 (Elhauge Report) ¶¶14-86).

### 2. Common evidence shows that Defendants unlawfully maintained a monopoly in the relevant market.

Defendants engaged in exclusionary conduct to unlawfully maintain a monopoly in the CUSIP Identifier Use Market. Extensive common evidence establishes that CGS has systematically excluded competition by using false claims of IP Rights and real threats to shut off access to CUSIP Identifiers through TPDVs and to impose exclusionary licensing agreement on Plaintiffs; through contractual prohibitions on re-use, redistribution, public display, and sublicensing of CUSIP Identifiers; and a systematic enforcement policy to ensure compliance. *See* Background §§ D-F, H, *supra*. These exclusionary practices have foreclosed the development of alternative sources for post-issuance CUSIP Identifiers and of innovative services that make use of such Identifiers. Ex-86 (Elhauge Report) ¶¶87-93. As a result, CGS and its TPDVs remain the sole authorized sources of CUSIP Identifiers in bulk machine-readable format, reinforcing its monopoly position.

#### a) *Standardized Restrictions on Issuance and Redistribution*

Common evidence also demonstrates that CGS has unlawfully maintained its monopoly by locking up the essential inputs necessary for any competitor to offer or access an alternative source of CUSIP Identifiers unencumbered by CGS-imposed restrictions. The restrictions start at issuance. The terms associated with issuance of CUSIPs prohibit redistribution and assert proprietary claims over the identifiers themselves. *See* Ex-7 (PX39) at FRSI00194699 (invoice: "You may not... distribute...the Service(s)...within your business, outside of it or otherwise"); Ex-9 (PX204) at FRSI00537654 (CUSIPs described as "valuable intellectual property of the ABA"); Ex-71 (PX205) at FRSI01053996 (CGS-issued offering document language).

CGS further reinforces its control of the downstream use of CUSIP Identifiers through

embedded in the Distribution Agreements. *See* Background § F, *supra*; *see* Ex-16 (PX501) at FRSI00000074-76 (§§2.C., 6.B., 8.F.). ███████████████████

████████████████████████████████████████████████████████

Ex-6 (Mitnick Dep.) 204:20-205:7. CGS also asserts ████████████████████

*See id.* at 249:24-251:15; Ex-48 (FRSI00848546) at FRSI00848549. In addition, the Distribution

Agreements prohibit ███████████████████████████████████████

██████████████████████ *See* Ex-16 (PX501) at FRSI00000074 (§§7.B., 8.F.); Ex-55

(PX118) at FRSI01758682.

>    b)    *False Assertions of IP Rights*

Common evidence demonstrates that CGS systematically makes false and misleading claims regarding IP Rights to coerce firms into signing license agreements. Both the Subscription and Distribution Agreements ████████████████████████████████████

███████████████████████ *See* Ex-17 (PX502) at FRSI00000095 (Preamble), FRSI00000096

(§2); Ex-16 (PX501) at FRSI00000073 (Preamble), at FRSI00000076 (§8); Ex-85

(FRSI00229577) at FRSI00229583 ████████████████████████████████

████████████████████████████████████████████████████████;

*see also Fiest Pubs., Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 363-364 (1991) (holding

that compilation copyright over phonebook did not extend to individual telephone numbers).

CGS also asserts these false claims of IP Rights in standardized communications to End

Users. *See, e.g.*, Background § E.2, *supra*. ██████████████████████████

████████████████████████████████████████████. Ex-24 (FRSI00529126) at

FRSI00529130-32; Ex-35 (FRSI00703185); Ex-21 (Lane Dep.) 94:3-96:13. These positions are

repeated in threatening correspondence sent to Plaintiffs. Ex-26 (HCM-00571788) at HCM-

00571792; Ex-81 (DX61) at SL-00067852 (Email to Swiss Life) (CGS "will cease delivery of CUSIPs"); Ex-84 (Dinosaur (30(b)(6) Dep.) 57:12-58:23.

Moreover, CGS has made misrepresentations to regulators to deter rulemaking that might increase public access to CUSIP Identifiers, Ex-37 (PX182) at (ABA-0000016200-202), and to the public. *See* Background § E.3, *supra*. CGS also extends its false claims of IP Rights to publicly available data. *See id.* at § F.4., *supra*. As a result, multiple sites, including WhaleWisdom and StockMarketMBA, removed CUSIP and ISIN content from their public-facing websites. *Id.*

### c)    Anticompetitive Enforcement

Common evidence demonstrates that CGS systematically enforces the CUSIP Identifier licensing regime to maintain complete control of the CUSIP Identifier Use Market. ███████

████████████████████████████████████████████████████████████████████████

███████████████████████ Ex-42 (PX357) at FRSI01435400-06; Ex-21 (Lane Dep.) 73:11-14; *see* Background § F, *supra*.

CGS relies on its contractual relationships with TPDVs ████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████ *See* Background § F, *supra*. CGS's contracts with TPDVs are standardized and contain substantially similar terms. *See* Ex-15 (FactSet 30(b)(6) Dep.) 70:10-76:4; Ex-6 (Mitnick Dep.) 189:22-191:22.

When an End User refuses to enter into a Subscription or Distribution Agreement—or declines to upgrade an existing license—CGS initiates a structured escalation process. Ex-42 (PX357) at FRSI01435403 (Escalation Process); Ex-19 (Hunter Dep.) 93:13-95:22; Ex-21 (Lane Dep.) 25:25-29:24, 148:17-149:25, 169:23-175:25. CGS even has a "playbook" for coercing End

Users. Ex-73 (FRSI00192921) at FRSI00192922 (email referencing "CUSIP Playbook" for negotiators). This includes invoking enforcement provisions in the Distribution Agreements and sending standardized threat letters. Ex-21 (Lane Dep.) 90:15-91:19, 94:3-96:13, 169:23-175:25; Ex-42 (PX357) at FRSI01435403. These letters warn that failure to obtain a CGS license will result in termination of the End User's data feed access. Ex-24 (FRSI00529126) at FRSI0052913030-32; Ex-26 (HCM-00571788) at HCM-00571792.

To further suppress the availability of CUSIP Identifiers through public sources, ███

████████████████████████████████████████████████████████

████████████ *See* Background § F.4, *supra.* ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ Ex-19 (Hunter Dep.) 302:25-304:6, 313:25-314:17. These barriers raise costs for potential rivals attempting to offer competing services. Ex-86 (Elhauge Report) ¶¶14, 69-79, 86.

CGS has also abused audit provisions in its license agreements to extract intelligence about potential competitors, additional fee opportunities, and licensees' businesses and customers, to preserve market dominance. *See* Ex-21 (Lane Dep.) 51:14-52:21; 110:4-111:3, 122:10-123:7; Ex-74 (FRSI00197897) (████████████████████████████████████). These practices reflect CGS's strategic use of the licensing regime not only to assert control over CUSIP Identifiers but to suppress rivals, entrench its monopoly, and deter market alternatives, including innovative services that make use of such Identifiers.

### 3.    Common evidence shows that Defendants' conduct has caused anticompetitive harm in the relevant market

"'[A]ntitrust injury' poses two distinct questions. One is the familiar factual question whether the plaintiff has indeed suffered harm, or 'injury-in-fact.' The other is the legal question whether any such injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 106 (2d Cir. 2007) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).

The question of whether the harm is the type the antitrust laws were intended to prevent focuses on whether all or virtually all members of the proposed class have suffered the same injury and whether that injury is an injury to competition. *See City of Philadelphia v. Bank of Am. Corp.*, 2023 WL 6160534, at *8-10 (S.D.N.Y. Sept. 21, 2023). Plaintiffs have demonstrated that their injury—loss of the benefits of competition, loss of the benefits of innovation, and payment of supracompetitive licensing fees to CGS—is precisely the type of harm the antitrust laws are designed to prevent and directly flows from Defendants' exclusionary conduct. *See* Ex-86 (Elhauge Report) ¶¶92-93.

The proposed Classes also suffered injury-in-fact. Based on common evidence, Professor Elhauge found, among other harms, that each End User paid a license fee that should have been zero, thereby suffering harm. Ex-86 (Elhauge Report) ¶¶13-92-93.  As demonstrated in the reports of Bettina Bergmann and Frank Lenz, in markets like Germany where the at-issue restrictions and licensing scheme do not exist, official identifiers are freely available, and innovative services that use German identifiers (WKNs) as well as their respective ISINs to identify particular financial instruments also are available. Ex-10 (Lenz Report) ¶¶24-29, 35-38, 40-47; Ex-3 (Bergmann Report) pp.29-32. Using that as a yardstick, along with evidence that official identifiers for 120

countries around the world are available free of charge, Professor Elhauge concludes that the competitive market price for financial identifiers is $0, and any charge for their use above $0 is supracompetitive. Ex-86 (Elhauge Report) ¶¶14, 109-111.

### 4. Damages

Using methodologies and evidence common to the Classes, Professor Elhauge concludes that damages can be estimated using a common economic model, supported by class-wide evidence and a limited set of individualized data to be collected during the claims administration process. Ex-86 (Elhauge Report) ¶¶102-111; *see also* Ex-78 (Schachter Report) ¶¶1, 14, 16-17, 32, 34, Table 15. Because the competitive price for CUSIP Identifiers is zero, Professor Elhauge calculates damages as the full amount of the license fees paid by each Class member during the Class Period. Ex-86 (Elhauge Report) ¶¶112-114. Under this method, Professor Elhauge estimates

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████. *Id.* ¶114.

In the event the Court or jury were to conclude that the relevant product market should be the submarket for US CUSIP use, rather than the broader market for CUSIP Identifier use, Professor Elhauge can still comfortably present a common methodology for estimating damages. Under that alternative scenario, Professor Elhauge accounts for the fact that the bundled licenses CGS compels End Users to take includes not only US CUSIPs but also other CUSIP Identifiers— *i.e.*, Canadian CUSIPs, CINS, and their ISIN derivatives. Professor Elhauge estimates damages as 100% of the license fees paid by members of the proposed Classes during the Class Period *if* either of these two legal or factual propositions is accepted: (1) on the law, CGS's bundling of US CUSIPs with other CUSIP Identifiers renders the entire license agreements illegal; or (2) on the

facts, in the but-for world, CGS would be unable to charge fees for other CUSIP Identifiers. *Id.* ¶¶115-117.

The *legal* proposition should be accepted because CGS bundles the other identifiers together with the US CUSIPs to leverage the same anticompetitive restrictions and monopoly. While it might have been possible for CGS to seek to monetize these identifiers in a legal way—a doubtful proposition, since the competitive price for identifiers worldwide is zero—it did not do so. *See Irvin Indus. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 245–46 (2d Cir. 1992) (defendant cannot defeat causation of damages by arguing that it could have caused the same injury through lawful conduct). The *factual* proposition should be accepted because, as a matter of economic reality, the U.S. financial markets are dominant worldwide. Ex-86 (Elhauge Report) ¶¶116-117. It is doubtful at best that CGS could monetize identifiers for smaller markets like Canada and the Caribbean if US CUSIPs were free. But either way, those are common questions. *See City of Philadelphia v. Banc of Am. Secs. LLC*, 2025 WL 2180607, at *3 (2d Cir. Aug. 1, 2025) ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be *answered*, on the merits, in favor of the class.") (citation omitted).

If neither of the above propositions is accepted, Professor Elhauge would still estimate damages using a common methodology, by discounting the damages to account for inclusion of other identifiers beyond US CUSIPs in the bundled license. Ex-86 (Elhauge Report) ¶118. Using this alternative, class-wide methodology, damages represent the difference between the actual bundled license fees paid and the estimated but-for fees for the identifiers other than US CUSIPs and their ISIN derivatives. *Id.* ¶¶119-124. Under this premise, Professor Elhauge estimates but-for fees by allocating the bundle price between US CUSIPs (and their ISIN derivatives) and other CUSIP Identifiers. Under this method, Professor Elhauge estimates aggregate damages to be

███████████████████████████████████████████████████

███████████████████████. *Id.* ¶125.

**B.    Common Questions Predominate on Plaintiffs' Conspiracy-to-Monopolize Claims**

To prevail on a conspiracy-to-monopolize claim, Plaintiffs must establish: (i) concerted action; (ii) specific intent to achieve or maintain unlawful monopoly power; and (iii) an overt act in furtherance of the conspiracy. *See AD/SAT, Div. of Skylight, Inc.* v. *Assoc. Press*, 181 F.3d 216, 233 (2d Cir. 1999).

Common evidence shows that S&P (prior to March 2022) and FactSet (since March 2022) conspired with the ABA to maintain CGS's monopoly over the CUSIP Identifier Use Market. The centerpiece of Defendants' conspiracy is the 2014 Agreement. ████████████████████████

███████████████████████████████████████████████. Ex-33 (PX123) at FRSI01632497 (§4(c)). ███████████████████████████

███████████████████████████████████████████████████

*See id.* at FRSI01632491 (§1(a)). The 2014 Agreement codifies the longstanding, coordinated arrangement under which S&P and now FactSet (through CGS) has administered the CUSIP licensing regime on behalf of the ABA and prevented competition. *See* Background § E, *supra*.

The discovery record contains extensive class-wide evidence of concerted conduct and overt acts undertaken by Defendants in furtherance of their shared objective of maintaining CGS's monopoly. The ABA exercised substantial and ongoing control over CGS's licensing regime—

███████████████████████████████████████████████████

███████████████████. *See* Background § E, *supra*; Ex-75 (PX144) at FRSI01174591

███████████████████████████████████████████████████

██████ Ex-14 (Preiss Dep.) 237:2-238:4; Ex-76 (PX156) (ABA-CGS QBR deck) at

FRSI01173329. This common evidence confirms the ABA's deep operational involvement and oversight of CGS. *See* Ex-14 (Preiss Dep.) 154:24-155:11, 231:4-238:4; Ex-77 (PX169) at ABA-0000013023.

This evidence of agreed joint development of strategy and tactics, agreed joint development of monetization strategies and consultation on fee levels, coordination of oversight, shared financial interest, and coordinated enforcement is common to all class members and underscores the systemic nature of the conspiracy. As the *Namenda* court recognized, such evidence of a centralized anticompetitive scheme "will focus solely on Defendants' conduct and will not vary across class members." 338 F.R.D. at 550-55.

As demonstrated above, each Plaintiff and member of the proposed Classes has been injured by and suffered damages from Defendants' conspiracy to unlawfully maintain CGS's monopoly in the CUSIP Identifier Use Market. *See* Argument §§ II.A.3 & 4, *supra*. Common evidence predominates each element of a conspiracy-to-monopolize claim.

### C.  Common Questions Predominate for Plaintiffs' GBL § 349 Claims

To prevail under GBL § 349, Plaintiffs must show: (1) Defendants' acts were directed at consumers; (2) were materially misleading; and (3) caused injury. *See Orlander* v. *Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015). Materiality is judged objectively—whether the challenged act is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.*

The New York Court of Appeals has defined the type of conduct that is "consumer-oriented" as "conduct of any business, trade or commerce or … the furnishing of any service." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 24 (1995). Section 349 applies to "virtually all economic activity" within the State. *Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 290-291 (1999).

Section 349 does not require proof of reliance or an intent to mislead. *Oswego Laborers'*
*Local 214 Pension Fund*, 85 N.Y.2d at 26. Rather, Plaintiffs need only establish a causal
connection between a misrepresentation and the injury. *Small v. Lorillard Tobacco Co.*, 252
A.D.2d 1, 15 (1st Dep't 1998); *Sykes*, 780 F.3d at 87 (affirming certification where each class
member's claim arose from "defendants' uniform, widespread practice").

In addition, a deceptive transaction will fall within the territorial reach of Section 349 as
long as "some part of the underlying transaction … occurs in New York State." *Cruz v.*
*FXDirectDealer, LLC*, 720 F.3d 115, 123–24 (2d Cir. 2013) (*quoting Mountz v. Global Vision*
*Prods., Inc.*, 3 Misc.3d 171, 770 N.Y.S.2d 603, 608 (Sup. Ct. 2003)). In *FXDirectDealer*, the
Second Circuit found that, as here, the deceptive transaction occurred in New York when defendant
was paid in New York, required that all customer communications be sent to New York, and the
agreement at issue provided that all suits relating to the agreement are to be adjudicated in courts
in New York. 720 F.3d at 123-24.

Common evidence demonstrates that Plaintiffs and all members of the proposed New York
Unfair Business Practices Sub-Class were subject to materially identical misrepresentations
regarding IP Rights in CUSIP Identifiers, causing harm, and that each of their "transactions" with
CGS occurred in New York.

The Subscription and Distribution Agreements contain misrepresentations concerning IP
Rights in CUSIP Identifiers. Ex-17 (PX502) (Subscription Agreement) at FRSI00000096 (§2);
Ex-16 (PX501) (Distribution Agreement) at FRSI00000075 (§5.A), at FRSI00000076 (§8), at
FRSI00000082 (Exhibit A-1); Ex-33 (PX123) (2014 Agreement) at FRSI01632495-96 (§3(e)). In
addition, CGS requires TPDVs ████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████████████████████. *See* Background § E.2., *supra*. CGS has also mispresented to End Users that CUSIP Identifiers themselves are allegedly protected by copyright in communications with regulators, standardized communications with End Users, and public statements. *See id.* §§ E.2. & 3, *supra*. These claims are materially misleading, as neither CGS nor the ABA holds valid IP Rights in individual CUSIP Identifiers.

In addition, each Subscription and Distribution Agreement is governed by New York law and contains a New York forum selection clause. Ex-16 (PX501) at FRSI00000080 (§18.A.); Ex-17 (PX502) at FRSI00000098 (§11.4). When operated by S&P, CGS was located in S&P's offices in New York. Ex-66 (FRSI00134647) at FRSI00134650 (§11); Ex-30 (FRSI00134772) at FRSI00134780 (same). All contract-related correspondence originated or was received from this address. *Id.* End Users understood that payment was made directly to CGS which was located in New York. *See* Ex-67 (HCM-00054824) at HCM-00054824, Ex-68 (Nonparty FinMason (Remstein) Dep.) 79:20-80:19. In addition, correspondence from CGS to End Users asserting IP Rights over CUSIP Identifiers was sent from New York. *E.g.*, Ex-26 (HCM-00571788) at HCM-00571792; Ex-69 (FRSI00108190) at FRSI00108190.

Plaintiffs and members of the proposed New York Unfair Business Practices Sub-Class suffered measurable economic harm as a direct result of Defendants' deceptive conduct. Virtually all members of this Sub-Class were exposed to misrepresentations concerning the ABA's IP Rights and paid license fees based on these misrepresentations. Ex-86 (Elhauge Report) ¶¶19, 109, 113-114. The central question—whether CGS compelled End Users to enter into license agreements and charged fees based on false claims of IP Rights —presents a common issue that predominates across the New York Unfair Business Practices Sub-Class.

### D.    Common Questions Predominate Plaintiffs CUTPA § 42-110b(a) Claims

Plaintiffs' claims under the CUTPA § 42-110b(a) mirror the federal standards governing antitrust and are evaluated under substantially the same legal framework. *See St. Francis Hosp. & Med. Ctr.*, 2023 WL 1967133, at *7 n.5.

As detailed above, the record contains overwhelming common evidence establishing Defendants' exclusionary conduct, their maintenance of monopoly power, and the supracompetitive fees paid by End Users, including Plaintiff Hildene and the members of the Connecticut Unfair Sub-Class. *See* Argument § II.B., *supra*.

Accordingly, the same common questions that predominate under Rule 23(b)(3) for Plaintiffs' Sherman Act claims also predominate for this Sub-Class, satisfying the predominance requirement with equal force.

### E.    Class Treatment is a Superior Method to Resolve these Disputes.

Rule 23(b)(3) also requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The rule identifies four non-exhaustive factors relevant to this inquiry: (A) the class members' interest in individually controlling the litigation; (B) the extent of existing litigation involving the controversy; (C) the desirability of concentrating claims in a single forum; and (D) the likely difficulties in managing a class action. Class treatment is favored where "class-wide litigation of common issues will reduce litigation costs and promote judicial efficiency." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 121 (S.D.N.Y. 2015).

These considerations overwhelmingly support certification here. The claims at issue involve annual licensing fees of in the range of $10,000 to $130,000 pre-2019, Ex-80 (PX342) at FRSI01151482, and approximately $11,000 to $144,000 presently. *See* https://www.cusip.com/services/license-fees.html#/endUserFeeCalculator. These per-Plaintiff amounts are too modest to support individual lawsuits, particularly where litigating against a

monopolist would impose substantial expense. Class actions are the superior mechanism for aggregating such claims, providing a viable path to relief for entities that otherwise could not afford to litigate independently. *See Amchem*, 521 U.S. at 615-16.

Centralizing adjudication before a single court will eliminate potentially duplicative proceedings and promote consistent rulings. Plaintiffs have proposed objective class definitions, and CGS's internal licensing records provide reliable, administrable means of identifying class members. As the Second Circuit has recognized, "substituting a single class action for numerous trials … will achieve significant economies of time, effort and expense, and promote uniformity of decision." *U.S. Foodservice*, 729 F.3d at 130.

## III.    The Proposed CUSIP User Injunctive Relief Class Satisfies Rule 23(b)(2)

Rule 23(b)(2) authorizes class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." As the Supreme Court explained, "[w]hen a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident." *Dukes*, 564 U.S. at 360.

There are two additional 23(b)(2) requirements: cohesiveness and necessity. The cohesiveness requirement parallels Rule 23(a)(2)'s commonality standard, requiring a showing that all class members "have suffered the same injury." *Id.* at 349–50. The necessity requirement asks whether class certification is needed to ensure that injunctive relief extends to all class members, or whether a single-plaintiff ruling would suffice. *See Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 395-96 (S.D.N.Y. 2015).

Plaintiffs satisfy all these elements. The proposed CUSIP Identifier User Injunctive Relief Class consists of entities currently paying licensing fees to FactSet under standardized Subscription and Distribution Agreements that contain materially identical restrictive and coercive terms. These licensees face ongoing injury, including loss of the benefits of competition, unlawful license fees, audit exposure, and threats of losing access to CUSIP Identifiers, all arising from the same unlawful conduct. Every member of the CUSIP Identifier User Injunctive Relief Class remains subject to Defendants' ongoing conduct and will benefit from uniform injunctive relief.

A single injunction prohibiting Defendants from charging fees to End Users and enforcing contractual exclusionary restrictions including those based on false assertions of IP Rights would provide indivisible relief to the class. Defendants have neither stipulated, nor suggested, that they would apply a favorable judgment to non-party licensees. Absent certification, Defendants could argue that injunctive relief applies only to the prevailing Plaintiffs, leaving others unprotected. *Trump v. Casa, Inc.*, 145 S. Ct. 2540, 2555 (2025). Accordingly, certification under Rule 23(b)(2) is both appropriate and necessary to ensure complete and uniform relief to all members of the Injunctive Relief Class.

## CONCLUSION

Plaintiffs can prove all aspects of their claims using common proof. The Court should, therefore, certify the Classes under Rule 23(a), (b)(2), and (b)(3). The Court should also appoint Wollmuth Maher & Deutsch LLP, Kaplan Fox & Kilsheimer LLP, and Competition Law Partners PLLC as Class Counsel for the Classes pursuant to Rule 23(g).

Dated: August 14, 2025

Respectfully submitted,

/s/ *Ronald J. Aranoff*
Ronald J. Aranoff
Ryan A. Kane
Joshua M. Slocum
Lyndon M. Tretter
Grant J. Bercari
William Hagan
Reuben R. Bauer
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue, 12th Floor
New York, New York 10110
Telephone: (212) 382-3300
raranoff@wmd-law.com
rkane@wmd-law.com
jslocum@wmd-law.com
ltretter@wmd-law.com
gbercari@wmd-law.com
whagan@wmd-law.com
rbauer@wmd-law.com

/s/ *Leiv Blad*
Leiv Blad
Jeffrey Blumenfeld
Meg Slachetka
COMPETITION LAW PARTNERS PLLC
601 Pennsylvania Avenue NW
Washington, DC  20004
Telephone: (202) 742-4300
Email: leiv@competitionlawpartners.com
jeff@competitionlawpartners.com
meg@competitionlawpartners.com

/s/ *Robert N. Kaplan*
Robert N. Kaplan
Gregory K. Arenson
Elana Katcher
KAPLAN FOX & KILSHEIMER LLP
800 Third Ave., 38th Floor New York, NY 10022
Telephone: (212) 687-1980
Email: rkaplan@kaplanfox.com
garenson@kaplanfox.com
ekatcher@kaplanfox.com

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 4(B) of the Court's Individual Rules of Practice in Civil Cases, and the parties' Joint Stipulation and Order Regarding the Extension of Word Limits for Class Certification Briefing so ordered by the Court ("Joint Stipulation") (ECF 212), Plaintiffs certify that this computer-generated memorandum of law was prepared using Microsoft Windows and Microsoft Word. The total number of words in this memorandum, exclusive of the caption, table of contents, table of authorities, the signature block, and this certificate of compliance is 13,476, which is in accordance with the maximum 13,500 words as permitted under the Joint Stipulation.

By: _/s/ Ronald J. Aranoff_

**CERTIFICATE OF SERVICE**

I certify that on August 14, 2025, I caused a true and correct copy of the foregoing to be served on all parties through their counsel of record via the Court's CM/ECF system and via email to each counsel of record's known email address.

*/s/ Ronald J. Aranoff*