# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------- X
                                                   :
DINOSAUR FINANCIAL GROUP, LLC,                     :
HILDENE CAPITAL MANAGEMENT,                        :
LLC, and SWISS LIFE INVESTMENT                     :
MANAGEMENT HOLDING AG on behalf                    :      Case No. 1:22-cv-1860-KPF
of themselves and all others similarly             :
situated,                                          :
                                                   :
                Plaintiffs,                        :
                                                   :
         -against-                                 :
                                                   :
S&P GLOBAL, INC., AMERICAN                         :
BANKERS ASSOCIATION, and FACTSET                   :
RESEARCH SYSTEMS INC.,                             :
                                                   :
                Defendants.                        :
                                                   :
-------------------------------------------------- X
```

**EXPERT REPORT OF JAMES POWELL**

## I.    ASSIGNMENT

I have been retained by counsel for the Plaintiffs to provide expert testimony on the role of Financial Identifiers in the financial industry, the differences between standardized and non-standardized Financial Identifiers, and the issues that can arise from the use of non-standardized Financial Identifiers beyond their limited use cases.

## II.    DEFINITIONS

Throughout this report I use terms that have specialized meanings in the financial industry. For the sake of clarity and ease of use, I define those terms in this section.

**Technology Platform** refers to the platform a user or organization has selected to power and enable the digital portion of its business, including the functioning and creation of devices, processes, and technologies. The Technology Platform could be a proprietary terminal running on a proprietary platform provided by a data vendor such as Bloomberg or Refinitiv, a non-data provider platform, or an in-house platform. Technology Platforms are used to support the business and may use proprietary data formats developed by a particular company in the financial industry or open standards widely used within the industry.

A **Financial Identifier** is an alphanumeric code that identifies a financial instrument, such as a stock or bond.[1]

A **Standardized Identifier** is a Financial Identifier whose design, use, and format are approved by a standards-setting organization.[2] Because these identifiers are standardized, they are

---

[1] https://www.cusip.com/identifiers.html.

[2] JP Morgan has acknowledged that Proprietary Identifiers are "inconsistent" and lead to "error-prone solutions. https://www.jpmorgan.com/insights/markets/standardized-identifier-access-private-markets.

"interoperable between vendors,"[3] meaning that regardless of "language or software or infrastructure the vendors use, they would be able to consume and receive access to [them]."[4] Examples of Standardized Identifiers are CUSIPs and ISINs.[5]

A **Non-Standardized Identifier** is a Financial Identifier that is not approved by a standards-setting organization. Non-Standardized Identifiers are typically used within the proprietary platform of the company that issues the Non-Standardized Identifiers. Since they are not widely adopted, Non-Standardized Identifiers are not interoperable across technology environments.

Non-Standardized Financial Identifiers may be divided into three categories. **Proprietary Identifiers** are Financial Identifiers created by a company to identify financial instruments used by that company on its Technology Platform. These identifiers identify financial instruments that the company that created the Proprietary Identifiers uses. Examples include Morningstar Sec IDs.[6] **Venue-Specific Identifiers** identify financial instruments on a particular exchange. For example, NASDAQ issues ticker symbols to identify stocks traded on its exchange.[7] Venue-Specific Identifiers do not identify financial instruments that are not traded on that exchange. **Instrument-**

---

[3] *See* FRSI01755311 at 345; *see also* what appears to be a statement by CGS on the website of Interactive Brokers. https://www.interactivebrokers.com/en/trading/providers/cusip-global-services.php.

[4] Mitnick tr. at 111-13.

[5] The Accredited Standards Committee X9 Inc. ("X9") has approved the CUSIP standard (ANSI X9.6) as the standard for unique securities identifiers. *See* https://x9.org/cusip-re-approved-as-u-s-standard-for-securities-identification/. The Association of National Numbering Agencies ("ANNA"), the global association of National Numbering Agencies ("NNAs"), is the registration authority for the International Securities Identification Number ("ISIN"), a standard (ISO 6166) approved by the International Organization for Standardization ("ISO"). ISIN is an alphanumeric code that uniquely identifies a financial instrument. https://anna-web.org/identifiers/.

[6] For examples of Sec IDs, *see* https://advisor.morningstar.com/Enterprise/VTC/SMA%20Category%20Changes%20Effective%202012-31-2017.pdf.

[7] For a discussion of Nasdaq ticker symbols, *see* https://www.cgaa.org/article/nasdaq-ticker-symbol.

**Specific Identifiers** identify financial instruments in a particular asset class, such as credit default swaps. Instrument-Specific Identifiers do not identify financial instruments outside that particular asset class.[8]

## III.    SUMMARY OF OPINIONS

1.    This report analyzes financial instrument identifiers. I conclude that there are two categories of such identifiers: Standardized Financial Identifiers (like CUSIPs and ISINs) and Non-Standardized Identifiers (such as RIC Codes and RED Codes).

2.    Standardized Identifiers are crucial for accurate trading, clearing, settlement, regulatory compliance, and data management. Non-Standardized Identifiers can cause inefficiencies if used outside their intended scope, and CUSIP licensing costs and contractual restrictions drive these inefficiencies and associated risk and cost.

3.    The need for mapping between different identifiers to maintain clarity and accuracy in financial operations causes high switching costs and network effects and makes moving away from CUSIP Identifiers difficult due to their widespread use.

## IV.    QUALIFICATIONS

### A.    Education

I have a Bachelor of Science Degree in Mathematics (1982), and a Master's in Science Degree in Industrial Robotics (1986) from Imperial College in London.

### B.    Professional Experience

From June 1982 to July 1985, I was a Senior Field Engineer at Schlumberger, a global oilfield services company. I was response for Wireline logging operations, a data collection methodology, on oil wells in various countries in the Middle East.

---

[8] *Id.*

From September 1986 through November 1989, I was Development Manager for Reuters, working on the company's MS-Windows based financial terminal. I designed and implemented page and quote display components of the software on the terminal.

From November 1989 through November 1991, I was a Quality Manager for International Business Software, a start-up developing a virtual file service for the Apple Macintosh.

From November 1991 through June 1992, I was a developer at Union Bank of Switzerland – Phillips & Drew. I developed a distributed data package that provided network-based real-time data for a number of in-house development tools using MS-Windows.

From June 1992 through March 1993, I was Lead Developer and Product Manager at Mercury Communications, a telecommunications company. I was responsible for developing new products in the Messaging Communications division.

From August 1993 to October 1996, I was a Lead Developer and Product Manager at Teknekron Software Systems. I developed and managed a state-of-the-art product allowing users to graphically build applications with real-time components linking user actions to events using an embedded scripting language. I also managed development of a Java-based product that displayed financial data. Teknekron was acquired by Reuters in 1995 and the financial systems piece became TIBCO Finance Technology.

From October 1996 to May 1999, I was Vice President and Chief Technology Officer at TIBCO Finance Technology, an enterprise software company. Among other things, I was responsible for all aspects of the software specification, design, development, testing, and release of the TIBCO Finance product line including trading, integration, distribution, real-time and historical databases and UNIX, MS-Windows and Java front-end applications.

From May 1999 through December 2005, I occupied a number of positions at Reuters Group, which later became Thomson Reuters and then Refinitiv and today is owned by the London

Stock Exchange Group. I rose to Chief Technology Officer and Global Head of Product Development in August 2003. I was responsible for development and operations using architecture, standards, policy and process across the Reuters Group; defining Reuters' system architecture; reviewing all systems design for architectural, implementation and operational compliance; and IT sourcing to provide effective cost control, alignment with systems architecture, and use of standard technologies.

From May 2005 through December 2005, I was Managing Director, Real-Time and Research Data at Citadel Investment Group. I was responsible for firm-wide strategy, acquisition, and distribution of real-time and static data and for developing quantitative alpha strategies tools and databases.

From November 2006 through July 2007, I was Chief Technology Officer at Solace Systems, a manufacturer of middleware equipment and software. I was responsible for product management, architecture, technical sales, and product strategy.

From July 2007 through June 2015, I was Executive Vice President and Chief Technology Officer at Thomson Reuters. I was responsible for the company's technology initiatives and strategy, including the application of newly emerging technologies to advance the development and delivery of intelligent information. I was also responsible for, among other things, governance across technology including enterprise architecture, information architecture, security, and content.

From July 2015 through August 2017, I was Chief Technology Officer at Nielsen, known today as Nielsen Media Research. I was responsible for all technology and transforming Nielsen to a digital data business, including preparing the company for a data as a service future.

From September 2017 through September 2018, I was Senior Vice President, Technology Officer at Warburg Pincus, a global private equity firm headquartered in New York. I was

responsible for technology diligence with prospective investments and ongoing work with the existing portfolio companies.

From September 2018 through August 2019, I was Chief Technology Officer and Chief Information Officer at Digital Asset, a New York-based FinTech startup. I was responsible for all technology at the company.

From June 2020 through June 2023, I was Chief Technology Officer at Human Rights Watch. I was responsible for all technology, including building machine learning and artificial intelligence technology to scale research.

I am being compensated at a rate of $1000 per hour for my work on this case, none of which is contingent on the outcome of the case or any aspect of the case. I have not been deposed or testified at trial in the last four years, nor have I authored any publications in the past 10 years.

## C.    Experience in Financial Identifiers

As a technologist, I have worked with data-building systems to display, organize, and distribute data. Most of my career has been with financial services providers that built software to collect, clean, enhance, and distribute data (from numerous sources including exchanges and data providers) to financial clients.  To enable these systems to be built, large investments were made in designing, building, and evangelizing identifiers to enable these systems to be widely sold and used. Identifiers were critical to scaling the system, enabling evolution of the system, and driving adoption of the companies' terminals and data feeds.

At all of the firms at which I worked, data or software to distribute that data was the key product. Understanding Financial Identifiers was key to building those products, making them efficient, powerful, usable, and useful. In my early career I built the software powering proprietary terminals at Reuters which provided users access to the underlying data platform via Financial Identifiers. At Teknekron I built the software powering terminals for Telekurs to display Swiss

6

market data and later managed the development of the TIB market data platform which integrated Reuters, Bloomberg and other data providers for our customers. At Reuters, I was involved in the integration of Thomson Financial and Reuters market data systems and the subsequent integration of Bridge market data systems. While at Thomson Reuters ("TR") I was heavily involved in efforts to link data in systems across the entire TR portfolio of companies driving reduction of duplication and critically reducing the errors associated with multiple identifiers.

Each of these jobs required a deep understanding of identifiers, building systems to manage the identifiers, and integrating multiple sources of identifiers for consumption.

## V.    CHARACTERISTICS OF A FINANCIAL IDENTIFIER

An identifier identifies (that is, labels the identity of) a particular object. Examples could be a VIN number that identifies a car, a social security number that identifies a person, or a bar code that identifies a product in a supermarket. A Financial Identifier identifies a financial instrument, such as a stock or a bond.

An effective Financial Identifier should possess the following characteristics:

- **Uniqueness**: Each identifier must correspond to a single instrument.

- **Persistence**: Identifiers should remain constant over time.

- **Timeliness**: Identifiers should be quickly assigned and updated as instruments are created or modified.

- **Interoperability**: Identifiers should be usable across multiple systems and jurisdictions.

- **Accessibility**: Identifiers should be low-cost or free to use.[9]

---

[9] ANNA has identified these characteristics of Standardized Identifiers. *See* https://anna-web.org/identifiers/.

While anyone can create and manage their own Proprietary Identifiers, the real value of an identifier is only achieved if it is widely adopted. Ubiquity reduces friction in data exchange and promotes interoperability.

The licensing terms for identifiers and associated costs are key to achieving and sustaining ubiquity.

## VI.    THE CHARACTERISTICS OF STANDARDIZED FINANCIAL IDENTIFIERS

A system of standardized Financial Identifiers must have two characteristics.

*First*, the system must be used by market participants. If a buyer and seller are using two different identification systems to refer to a stock that is being traded, the exchange and the entity performing the clearing and settlement functions may not be able to process the transaction. An identification system works at an optimum level when every market participant is using the same system. As CUSIPs have become pervasive, CGS licensing has evolved and CUSIP codes have been bundled with additional extraneous data, which has made the license more expensive and difficult to use given the added restrictions over the use of the CUSIP Identifier. All this has made it harder for market participants to rely on the CUSIP as that essential common identification.

*Second*, the system must provide a unique and consistent alphanumeric code for each financial instrument. This ensures that when the identifier is used, financial market participants and computer systems understand precisely which financial instrument is being referred to. That is the only way to ensure, for example, that an employee investing in a 401(k) plan is investing in an asset appropriate for that employee's risk profile. If financial professional and electronic systems do not have a common reference identifier for financial instruments, there is a real risk that they could miscommunicate and invest the retiree's money in an inappropriate asset.

Standardized identification systems satisfy these two criteria.[10] The two most common standardized identification systems for US financial instruments are CUSIPs and ISINs. CUSIPs identify US financial instruments for trading in the United States, and ISINs identify US financial instruments for trading outside the United States.

Both CUSIPs and ISINs are governed by standards-setting organizations. CUSIP was adopted as an American national standard by the Accredited Standards Committee X9 and is governed by the ANSI X.9 standard. ISIN was adopted as a standard by the International Organization for Standardization ("ISO") and is governed by the ISO 6166 standard. These standards govern the structure of the identifiers, ensure uniformity in the creation of the identifiers for each financial instrument, and guarantee that they are carefully managed by the standards-setting organizations. For CUSIPs, the X.9 standard consists of a six-character issuer code, a two-character issue number, and a check digit. For example, the CUSIP for Apple Inc. common stock is 037833100.[11]

The United States government requires that CUSIPs be used in certain regulatory reporting. Similarly, the European Union requires that ISINs be used in regulatory reporting, including ISINs identifying financial instruments issued in the United States that incorporate CUSIPs.

Another Financial Identifier approved by a standards-setting organization is the Financial Instrument Global Identifier ("FIGI").[12] FIGI is a system of Financial Identifiers first created by Bloomberg and now operated by Object Management Group. FIGI was approved as an alternative

---

[10] *See* C. Sutcliffe, "Trust the data: why financial identifiers are essential for efficient digital processes in OTC derivative markets," April 10, 2025 (Standardized Identifiers like ISINs "perform specific regulatory and market functions that other identifiers simply cannot match." https://www.anna-dsb.com/2025/04/10/trust-the-data-why-financial-identifiers-are-essential-for-efficient-digital-processes-in-otc-derivative-markets/.

[11] https://www.sec.gov/Archives/edgar/data/102909/000110465921017199/tv0010-appleinc.htm.

[12] FIGI "is an established global standard issued under The Object Management Group (OMG.org, an international, non-profit standards organization), founded in 1989." https://www.openfigi.com.

standard in the United States by the Accredited Standards Committee X9 in 2021 but has not gained traction among market participants for the reasons I discuss below in Section XIII.

## VII.    THE BENEFITS OF STANDARDIZED FINANCIAL IDENTIFIERS

Standardized identifiers are essential for the functioning of financial services. They facilitate accurate trading, clearing, and settlement; support compliance with regulations; and enable efficient data management. Financial institutions rely on Standardized Identifiers to identify financial instruments, link data across systems, monitor risk, research financial instruments, manage portfolios, and report to regulators. Efficient financial markets depend on financial institutions being able to communicate with each other regarding financial instruments. Financial institutions must agree on how to refer to the things they are trading, and that depends on their using a system of Standardized Identifiers.

The use of Standardized Identifiers facilitates efficient operations in financial markets:

- **Clearing and Settlement.** Standardized identifiers like CUSIPs are pivotal for streamlining the electronic clearing and settlement of trades, which involves confirming transaction details and finalizing ownership transfers and payments.[13] They enable "book entry" transfer of ownership (transfer of ownership without a physical exchange of documentation) and help reduce trade failures and operational risks.[14] The creation of a common, machine-readable alphanumeric numbering system (a Standardized Identifier) is essential to resolving settlement issues and ensuring smooth, accurate clearance and settlement.[15]

---

[13] Mitnick tr. at 109; FactSet 30(b)(6) tr. at 247-49.
[14] *See* https://www.dtcc.com/clearing-and-settlement-services/equities-clearing-services.
[15] *See* https://www.cusip.com/identifiers.html ("CGS identifiers ensure that essential front- and back-office functions run smoothly, enabling custodians and sub-custodians to easily communicate, manage and examine the details of a transaction for accurate and efficient clearance and settlement").

- **Data Integration and Interoperability.** CUSIPs allow for the seamless integration of data across different electronic platforms, trading exchanges, and internal systems of financial institutions.[16] This commonality is crucial for linking financial data to specific instruments and ensuring consistent information flow from multiple sources.[17]

- **Record-keeping and Internal Processes.** Financial firms utilize CUSIPs and associated descriptive data for managing internal record-keeping, tracking security holdings, verifying data accuracy, and identifying relationships between companies and their affiliates.[18] This helps ensure the timely payment of dividends and interest.

---

[16] *See* FRSI01755311 at 345.

[17] *See* Moody's Analytics, "Data Interoperability's Importance in the Financial Services Industry." https://www.moodys.com/web/en/us/hosted-assets/MA_DS_Data-Interoperability-FinlSvcs-Report.pdf.

[18] Belskin tr. v. 2 at 8-11.

Using Standardized Identifiers also enhances market transparency and improves risk management:

- **Regulatory Compliance and Reporting**: CUSIPs are widely used and are often required by regulators for various financial reporting forms and agency operations, including Treasury issuances, Treasury auctions, and mortgage-backed securities ("MBS").[19] The Defendants contend that this standardized identification helps regulators monitor and assess systemic risk across the financial system.[20]

- **Fungibility**: CUSIPs are fungible, meaning a single CUSIP Identifier uniquely represents the same security regardless of where it was purchased or traded. This fungibility is critical for minimizing trade failures, ensuring transparent reporting, and consistent monitoring of systemic risk. Unlike other identifiers that may vary based on trading venue, CUSIPs' fungibility ensures consistency and reliability across markets.[21]

- **Pre-Trade Information**: CGS is a primary source for pre-trade security information, helping to identify valid offerings and providing the essential descriptive data of the name of the issuer and the type of issue to investors.[22] This aids in the capital-raising process and facilitates the flow of money in financial markets.

---

[19] *See* below at p. 31.

[20] *See* R. Nichols letter to Office of Comptroller of the Currency, Oct. 21, 2024 at 6, https://www.sec.gov/comments/s7-2024-05/s7202405-532915-1528742.pdf; *see also See* J. Ritter & P. Wool, "Anatomy of a World-Class Standards Body: The Origins and Future of the CUSIP System," January 2001, https://site.warrington.ufl.edu/ritter/files/CUSIP-Ritter-Wool.pdf. ("In addition to creating costs, delays, and operational risk, fragmentation inhibits the ability of market authorities to analyze systematic risk.").

[21] *Id.*

[22] *See* CGS, Processes & Procedures, at 4-5, https://www.cusip.com/pdf/resource/CGS-Online-Learning-Module_ProcessesandProcedures.pdf.

## VIII.  NON-STANDARDIZED IDENTIFIERS ARE LIMITED IN SCOPE AND UTILITY

Non-Standardized Identifiers lack the widespread uniform adoption, and consistent application across the financial industry that characterizes Standardized Identifiers like CUSIPs and ISINs. Primarily this is because Non-Standardized Identifiers are not approved by standard-setting organizations, are onerous to adopt, and are not interoperable, meaning that, unlike Standardized Identifiers, their users cannot "consume and receive access to [them]" regardless of "language or software or infrastructure."[23]

There are many Non-Standardized Identifiers in use in financial markets. They fall into three categories.

**Proprietary Codes.** Individual companies or vendors use internal identification systems. An example is what are now known as Refinitiv Instrument Codes ("RIC Codes"). RIC Codes were known as Reuters Instrument Codes when they were introduced by Reuters Group plc in the 1980s. RIC Codes originally consisted of an instrument's ticker symbol followed by a period and then a letter designating the exchange on which the instrument was traded. The RIC Code for IBM shares traded on the New York Stock Exchange is IBM.N, while the code for IBM shares traded on the London Stock Exchange is IBM.L. Over time the naming scheme has become more complex to handle different types of financial instruments and other types of information carried on the Refinitiv network.

I worked with RIC Codes while I was at Teknekron, Reuters, and ThomsonReuters. The RIC Codes were designed to be intuitive to users of Reuters' data terminals for the IDN network so that the terminals were easy to use. Instead of using identifiers like CUSIP Identifiers to refer to a financial instrument, Reuters used an identifier rooted in the ticker symbol of a financial

---

[23] Mitnick tr. at 111-13.

instrument, which tended to be known to the user. This leveraged the terminal user's familiarity with ticker symbols but also reduced the flexibility and the scalability of the RIC Codes.

RIC Codes were designed to operate only internally on Reuters terminals or their consolidated data feeds. They are Proprietary Identifiers and were a key underlying part of Reuters' technology environment. A Reuters terminal user could operate within the Reuters technology environment using only the RIC Codes, but once the user left that environment to use a third-party service, the RIC Codes were unusable because no third-party service recognized them. Thus, a user that left the Reuters technology environment would have to use a Standardized Identifier, such as a CUSIP, in order to trade an instrument. This is because as Standardized Identifiers CUSIP Identifiers are interoperable, meaning that regardless of "language or software or infrastructure the vendors use, [users] would be able to consume and receive access to [them]."[24] Thus, to be useful outside of the Reuters technology environment the RIC Codes must be mapped to Standardized Identifiers like CUSIPs and ISINs.[25]

RICs were originally proprietary, but following an antitrust investigation by the European Commission in 2009, they are now widely licensable for mapping purposes, meaning they are available to non-Reuters subscribers for the purpose of mapping them to Standardized Identifiers.[26] Prior to the European Commission's action, RICs could only be used with Reuters-provided data.[27]

The limitations that are present in RIC Codes characterize all Proprietary Identifiers. Many other companies, such as Morningstar, have developed their own numbering systems for use in

---

[24] Mitnick tr. at 111-13.

[25] *See* G. Bal, "Symbology (CUSIP/ISIN/SEDOL) conversion to RIC using Datascope," July 4, 2024. https://developers.lseg.com/en/article-catalog/article/symbology--isin-cusip-sedol--conversion-to-ric-using-datascope.

[26] Foo Yun Chee, "EU Ends Thomson Reuters codes probe after concessions," Dec. 20, 2012. https://www.reuters.com/article/business/media-telecom/eu-ends-thomson-reuters-codes-probe-after-concessions-idUSL5E8NK65F/.

[27] *Id.*

their own technology environment.[28] While these numbering systems can be used by users of these companies' technology, they are not widely adopted, not interoperable like CUSIP Identifiers and are therefore not replacements for CUSIP Identifiers.

**Venue-Specific Identifiers.** There are numerous identifiers that are linked to specific exchanges or platforms. The most common of these are ticker symbols, which are short codes issued by exchanges like the New York Stock Exchange or NASDAQ.[29] For example, instead of the nine-character CUSIP Identifier for Apple Inc. common stock, NASDAQ has issued a four-character ticker symbol—AAPL.[30] These ticker symbols can be used to refer to a financial instrument in internal record-keeping or communications with third parties. However, ticker symbols are limited to financial instruments traded on a specific venue.[31] As an example, NASDAQ codes can be used only to identify financial instruments traded on that exchange. They are not used to identify financial instruments other than equity instruments traded on the NASDAQ exchange. Venue-Specific Identifiers also are not interoperable and are not intended to be—and are not—replacements for Standardized Identifiers generally. They are also not managed for that purpose. For example, an exchange may transfer a ticker symbol from one to another equity investment for its own purposes – famously C was the symbol for Chrysler but later became the symbol for Citibank.[32] This deprives ticker symbols of one of the main attributes of Standardized Identifiers – their permanence in referring to a particular financial instrument.

---

[28] *See* Morningstar Data Documentation, Investment Identifier. https://docs-analyticslab.morningstar.com/latest/morningstar_data/investment_identifier.html (SEC_ID's are Morningstar's primary internal identifier).

[29] *See*, *e.g.*, the following listing of New York Stock Exchange ticker symbols: https://www.nyse.com/listings_directory/stock.

[30] https://www.nasdaq.com/market-activity/stocks/aapl.

[31] *See* J. Ritter & P. Wool, footnote 20, above.

[32] For an example of the confusion and inefficiency this change created, *see* https://community.quicken.com/discussion/7952242/citigroup-vs-chrysler-stock-symbol-c; *see also* J. Ritter & P. Wool, footnote 20, above.

**Instrument-specific identifiers.** Some entities have created identifying numbers to identify specific categories of financial instruments. These identifying systems fill gaps in the coverage of Standardized Identifiers like CUSIP Identifiers. An example is Reference Entity Data ("RED") Codes, which S&P Global, Inc. ("S&P") created to identify credit default swaps ("CDS").[33] A CDS is a financial swap agreement by which the seller of the CDS agrees to compensate the buyer if a reference asset defaults.[34] The buyer of the CDS pays a fee to the seller in exchange for a payout if the reference asset defaults. CDS instruments were created in the 1990s and have become increasingly popular as an element of a hedging strategy.[35]

S&P describes RED Codes in this way: "Unique alphanumeric RED codes are assigned to reference entities and reference obligations, and are used to confirm trades…."[36] The Depository Trust & Clearing Corporation ("DTCC") "mandates the use of RED index codes for all CDS index trade confirmations."[37]

Instrument-specific codes like RED Codes are useful for identifying specific financial instruments, like credit default swaps, but they are limited to those instruments in that the codes do not identify any other type of instrument. They are not intended to—and do not—replace Standardized Identifiers like CUSIP Identifiers.

---

[33] S&P Global, RED for CDS. https://www.spglobal.com/market-intelligence/en/solutions/products/red-cds.

[34] S&P Global, Reference Data: RED for CGS. https://cdn.ihsmarkit.com/www/pdf/RED-CDS-Factsheet.pdf.

[35] S&P Dow Jones Indices, CDS Indices Primer, January 2023. https://www.markit.com/Company/Files/DownloadFiles?CMSID=7555ba2ea97d446e99426eb0538a6ce4.

[36] S&P Global, Reference Data: RED for CGS. https://view.highspot.com/viewer/66b0a30961c59e84cf5a5626#1.

[37] *Id.*

## IX.   THE INEFFICIENCIES IN USING NON-STANDARDIZED IDENTIFIERS BEYOND THEIR LIMITED USE CASES

While Non-Standardized Identifiers are useful for limited purposes, using them outside those limited use-cases can create significant inefficiencies. Because Non-Standardized Identifiers are not universal either in terms of their use for all financial instruments or by all market participants, any use outside their core competencies imposes significant burdens on financial market participants. If CUSIP Identifiers were freely available without cost and without restrictions on their use, there would be very little incentive for market participants to use Non-Standardized Identifiers outside their limited use cases. Unfortunately, CGS imposes significant costs and restrictions on the use of CUSIP Identifiers, which encourages market participants seeking to avoid those costs and restrictions to use Non-Standardized Identifiers outside their limited use cases.

A good example of this problem was described by witnesses for LeafHouse Financial, a fiduciary advisor in the retirement space. Both LeafHouse witnesses[38] described that LeafHouse receives Non-Standardized Identifiers from record keepers—for example Morningstar—which those record keepers use to identify financial instruments that are potential investments for employee participants in 401(k) plans.[39] Because those Proprietary Codes are not interoperable, LeafHouse must create a "rosetta stone" that translates the Proprietary Codes into CUSIP

---

[38] The two LeafHouse witnesses were Todd Kading, Chief Executive Officer, and Dale Homburg, Chief Technology Officer.

[39] Holcomb tr. 39-42, 44-49; 59-61; Kading tr. 21-25. Morningstar announced a change in its data policies that was required by CGS's license and that anticipated the problem LeafHouse experienced. Morningstar warned its users that did not have a license with CGS that they could experience disruptions: "If you are not licensed with S&P and/or the LSE, and do not use this data [i.e., the CUSIP Identifier], you should ensure that the absence of these identifiers after July 31st will not disrupt your processes." https://advisor.morningstar.com/ReleaseNewsLive/releasePopUp.aspx?Id=291&type=Release%20Notes&name=Licensed%20Data.

Identifiers.[40] And because different record keepers refer to the same investments using different terms, this translation process is prone to error, which causes LeafHouse to incur very significant and unnecessary risks and costs.[41] It also creates risks for employees participating in 401(k) plans, who are in danger of having their money invested in financial instruments that are inappropriate for their risk profiles.[42]

## X.     THE INEFFICIENCIES OF BUNDLING AN IDENTIFIER WITH OTHER DATA

CGS does not license just the CUSIP Identifier alone — it bundles the identifier with associated metadata, such as issuer name, instrument type, maturity date, etc.[43] The parties to an initial offering of a financial instrument create the associated metadata at the time of the initial offering, and that metadata relates to facts about the initial offering that are not generally necessary or even relevant to trading the financial instrument after the initial offering.[44] CGS then matches an identifier to the financial instrument and bundles the identifier with the associated data. CGS claims that there are 60 or more reference data fields of the associated data.[45] None of that associated data is CGS's, let alone proprietary.

But CGS bundles the identifier with the associated data and requires that a user of the identifier agree to license the associated data as well. This bundling creates problems for users.

---

[40] Holcomb tr. 42-44; Kading tr. 25-30.

[41] Holcomb tr. 54-59; 61-64; Kading tr. 25-30, 34-35, 38-39.

[42] Holcomb tr. 61-64; Kading tr. 38-39.

[43] *See* the list of "CGS Services" in the Services Attachment to the Subscription Agreement, each of which describes a combination of Financial Identifiers and metadata. FRSI00000068.

[44] As one witness stated, the issuer and the underwriter create the metadata, such as the coupon rate for a debt instrument, which then lives with the financial instrument throughout its life. Zolan tr. 159-64.

[45] https://www.cusip.com/services/index.html.

## A.     Blurs the Line Between Identifier and Data

Identifiers are infrastructure in financial markets. Like a barcode or an address, an identifier's function is to uniquely label an object, not to carry proprietary value. While the CUSIP does not carry proprietary value, CGS asserts that the bundle does.[46] CGS effectively creates ownership over the identifiers by linking them to data: By arguing that the identifier is inseparable from the metadata, CGS claims ownership over the entire bundle.

Thus, even if a user just wants to use the identifier (*e.g.*, to satisfy regulatory reporting), that user is forced to license some or all of the entire dataset.[47] Because CGS claims a right to the dataset, it claims the right to exert control over the use of the identifier that it could not exert without the bundling of the identifier and the metadata. This limits the user's options in using the identifier and allows CGS to impose unnecessary burdens on the user.[48] The effect is to undermine the reason for the identifier existing – creating efficiency and transparency in financial markets.

## B.     Blocks Open Mapping and Cross-Referencing

Many financial entities need to map CUSIPs to other identifiers like ISINs or FIGIs. But if CUSIPs are bundled with proprietary metadata, that mapping is often restricted by license terms.[49] Firms must pay licensing fees not just to use the identifier, but to look up or publish it — because CGS claims ownership of the CUSIP + data bundle. This locks institutions into CGS products, even if they would prefer to use an open alternative or their own internal systems.

---

[46] FRSI00000073 (the Distribution Agreement describes the database of CUSIP Identifiers and associated data as "proprietary"); FRSI00000095 (same).

[47] FRSI00000095 (expressing the license to the user as a license to "proprietary" rights in the database).

[48] *See*, *e.g.*, FRSI00000095, Section 1.3 (limiting use of the identifiers and data to the subscriber's internal use and precluding the user from distributing the identifiers and data).

[49] For a description of these problems, *see* https://assetidbridge.com/the-hidden-costs-of-cusip-licensing-and-how-to-mitigate-them/.

### C.    Regulatory Conflicts

U.S. regulators (like the SEC) mandate the use of CUSIP Identifiers by name and other times mandate CUSIPs as the only practical way to meet reporting obligations. This leads to a situation where a proprietary identifier becomes essential for legal compliance, yet subject to private licensing control.

| Aspect | Identifier Alone (Public Good) | Identifier + Data (Licensed Product) |
|---|---|---|
| Purpose | Unique labeling | Includes descriptive and reference data |
| Openness | Should be universally accessible | Often restricted by licensing agreements |
| Example Use | Filing, mapping, lookups, building innovative products and services | Limited to user's internal use |
| Risk | None | Suppression of innovation, limitation on user options |

## XI.    THE IMPORTANCE OF MAPPING TO ADDRESS THE USE OF NON-STANDARDIZED IDENTIFIERS BEYOND THEIR NARROW USE CASES

Because various institutions, including banks, broker-dealers, regulators, exchanges, and data vendors, use Non-Standardized Identifiers, including their own Proprietary Identifiers, mapping of the Non-Standardized Identifier to a Standardized Identifier becomes essential to ensure clarity, efficiency, and accuracy in financial operations and reporting.[50] Mapping often

---

[50] In May 2020, two years before Defendant FactSet purchased the CGS business, the Wharton School mapped FactSet's Proprietary Identifiers, which were Non-Standardized Identifiers, to a Standardized                  Identifier—CUSIPs.              *See*          https://wrds-www.wharton.upenn.edu/documents/1366/Factset_CRSP_Linking_Overview.pdf.

entails establishing connections between various identifiers, using cross-reference tables or mapping files, and matching descriptive data elements. In this way, mapping provides the essential "glue" to connect all these systems together.[51] Because Standardized Identifiers offer the broadest coverage of any Financial Identifiers, the most efficient means of mapping identifiers for financial instruments issued in the United States involves the mapping of a Non-Standardized Identifier to a CUSIP Identifier.[52]

Mapping involves the use of one set of Financial Identifiers – usually Standardized Identifiers – to ensure that the identifiers in two different data feeds accurately identify the same financial instruments.[53] For example, if one user is receiving two data feeds from two different sources each using CUSIP Identifiers to identify the financial instruments, the user can easily integrate those feeds because the common, interoperable Standardized Identifier of a CUSIP number identifies every financial instrument in both feeds.

On the other hand, if a user is receiving two data feeds from two different sources each using a different Proprietary Identifier to identify the financial instruments in its feeds, the user needs a means to map those different Proprietary Identifiers to a common code or common field in order to be able to integrate those feeds. The CUSIP Identifier is the best choice operationally because it is the only ubiquitously used identifier for US financial instruments.[54]

---

[51] ANNA provides a free service by which a user can map ISINs to Legal Identity Identifiers, which are Standardized Identifiers for legal entities, not individual financial instruments. According to ANNA, this service "ensures that organizations which map the LEI to their own identifiers use state of the art methodologies and / or processes to do so accurately." https://www.gleif.org/en/lei-data/lei-mapping/download-isin-to-lei-relationship-files.

[52] Consistent with the importance of mapping, CGS offers a mapping service but requires a license to do so. *See* https://www.cusip.com/pdf/CGS087_Identifier_Linkage_Comparison_02_15_17-USLtr.pdf.

[53] *See*, *e.g.*, https://www.digital-alpha.com/elequin-case-study-automating-security-identifier-mapping/.

[54] *See* https://www.digital-alpha.com/elequin-case-study-automating-security-identifier-mapping/.

Without a common code doing this can be difficult - for instance while both feeds may have a field called "Name" one may use a different spelling or abbreviation. ("International Business Machines" vs "Intl Bus Machines"). Or there may be no common identifier so it would be necessary to build or license a cross-reference data source. Matching these fields often requires heuristics and can be error prone requiring manual intervention.

Here is a diagram that depicts this process graphically:



In this example, the user is receiving data in three data feeds, and Apple common stock is a financial instrument in each feed. However, there is only one common reference field in each data feed for Apple common stock—the CUSIP Identifier. That field allows the user to understand that the financial instrument in each feed is Apple common stock. If the CUSIP Identifier field were not present in the data feeds, either because the user did not have a CUSIP license or the data feed providers did not include the CUSIP Identifier in their data feeds, it would be difficult for the user to match the three instruments in the data feeds because they each use different reference data fields for the financial instrument. Most obviously, each feed refers to Apple common stock using a different reference point. Feed A uses the ticker symbol, Feed B uses the RIC Codes, and Feed C uses the CUSIP Identifier. Without mapping, the user's electronic systems will not be able to match these financial instruments, and the user will have to find some manual way of doing so, which will be costly and time consuming and vastly increases the chances of operational errors.

Using a Standardized Identifier solves this mapping problem. If each proprietary numbering system is mapped to the Standardized Identifier—the CUSIP Identifiers—the user can quickly and efficiently map the data in the three data feeds.[55] And if CUSIP Identifiers were widely available and free to use and distribute then CUSIP Identifiers would solve the mapping issue.[56]

---

[55] *See* https://developer.gs.com/docs/gsquant/data/accessing-data/map-symbology-secmaster/ ("A Security Master provides financial product reference data and is a foundational building block of any quantitative financial analytics engine. The core component of Goldman Sachs' Security Master is symbology, the data necessary to map from one identifier to another.").

[56] Financial institutions recognize that CGS's licensing restrictions inhibit mapping. *See id.* ("You can look up a security using any of the identifier types in Security Master (e.g. ric, bbid, cusip, sedol). Identifiers that refer to the same security will be returned, *subject to licensing*.") (emphasis added).

There are a number of reasons why mapping is needed in the financial industry:

**To Bridge Disparate Identification Systems.**

- Mapping serves as a "universal translator" or "Rosetta Stone" between different Proprietary and Standardized Identifiers. This is vital because many institutions have their own internal codes for financial instruments, which is done for many reasons, including protecting the institution from license fees and to create a unique user interface on internal and external systems.

- Mapping allows these diverse systems to "speak the same language" about a specific asset, ensuring precision and reliability in communication.

- Financial institutions often have multiple fragmented systems that otherwise might need extensive reprogramming if identifiers were simply replaced. Mergers, acquisitions, and divestitures means that this is always a moving target by causing companies to have to integrate different systems. In practice a single naming system is not practical for large complex, dynamic organizations as there are always systems being built, decommissioned, integrated, or retired.

**To Facilitate Efficient Operations and Reduce Risk**

•      Mapping allows for the seamless integration of data across various electronic platforms, trading exchanges, and internal systems of financial institutions. It ensures consistent information flow from multiple sources.

•      The absence of a single, ubiquitous identifier can lead to "data distortion," where different entities use different codes for the same investment, or the same code for different investments.[57] Mapping is the process undertaken to mitigate the costs and risks of such data distortion.

•      Mapping is crucial for smooth front- and back-office functions, including accurate and efficient clearance and settlement of transactions.

**To Ensure Regulatory Compliance and Accurate Reporting**

•      Financial regulators often mandate the use of specific identifiers for various reporting forms and agency operations. If a firm's internal systems use different identifiers, mapping is required to comply with these regulatory mandates. For example, the Municipal Securities Rulemaking Board's ("MSRB") EMMA disclosure platform requires the use of CUSIPs,[58] and a shift to a different identifier like FIGI for reporting would necessitate extensive mapping.

•      CUSIPs are fungible, meaning one unique identifier represents the same security regardless of where it is traded. This fungibility is critical for consistent reporting and effective systemic risk monitoring. In contrast, non-fungible identifiers like FIGI often assign different IDs for the same security based on each trading venue

---

[57] J. Ritter & P. Wool, footnote 20, above ("Ultimately, the confusion introduced by a proliferation of identifiers increases risks for all market participants.").
[58] https://www.msrb.org/sites/default/files/LocatingCUSIPsinvestor.pdf.

or country. This lack of fungibility means that firms must map multiple identifiers to the same underlying security to achieve accurate and consistent reporting.

- By clarifying connections between entities, such as through cross-referencing new and former CUSIPs for acquired or merged issuers, mapping helps manage operational and systemic risk in financial markets. The interoperability that mapping enables among regulators, banks, vendors, exchanges, and depositories also supports systemic risk monitoring.

Mapping also allows for the association of an identifier with any additional descriptive data that is necessary to uniquely identify a security and to link data from different sources into a single consistent view of a specific instrument.

Despite its necessity, mapping is a complex and often costly process. It requires significant software development, updates to application programming interfaces that are critical to the functionality of the system and to the user interface, rigorous testing to clean the data and reconciliation of the various data sets to ensure accuracy and avoid errors that can impact reporting quality and operational stability.

## XII. THE CONSEQUENCES OF THE INABILITY TO MAP NON-STANDARDIZED IDENTIFIERS TO CUSIP IDENTIFIERS

Receiving Proprietary Identifiers from multiple sources puts in a difficult situation companies that receive data feeds from companies like Morningstar and that use Proprietary Identifiers to refer to financial instruments.[59] Morningstar can map its Proprietary Identifiers to the CUSIP Identifiers for its internal purposes to ensure that the Morningstar numbers accurately

---

[59] *See*, *e.g.*, R. Robinson, "The Case for Universal Open Symbology," 2014 (complexity generated by a multitude of identifiers "introduces a tremendous amount of friction into the trade life cycle and creates opaqueness where clarity is sought"), https://data.bloomberglp.com/professional/sites/10/imported/solutions/sites/8/2015/10/63074878 1_GD_Open_Symbology_WP_151020.pdf.

identify financial instruments,[60] even if it describes the instruments differently from the way in which CGS describes the instruments.

However, CGS's Distribution Agreement with Morningstar prevents Morningstar (and similarly situated companies with CGS Distribution Agreements) from showing unlicensed customers CUSIP Identifiers in addition to its own Proprietary Identifiers so that customers can map Morningstar identifiers to CUSIP Identifiers.[61] So, Morningstar customers would need a license from CGS to be able to do the same mapping in their own systems.[62] But because the reporting, monitoring, and other burdens of the CGS license may result in some entities being unable to sign a license with CGS, Morningstar customers that do not have a CGS license cannot map the Morningstar identifiers to the CUSIP Identifiers.[63] Instead, those Morningstar customers must try to perform that work manually and must bear the expense of creating their own "Rosetta stones."[64]

This creates significant operational risk. Financial companies can try to reduce the risk of misidentifying financial instruments to the detriment of their customers. But they will never be able to reduce that risk in the way that they could if they could use the CUSIP Identifiers to map the Proprietary Identifiers. This problem is propagated across the entire financial services industry – each firm has to decide on CUSIP licensing and the associated risks and costs.

---

[60] *See* footnote 44, above.
[61] *See* FRSI00000083 (Section 9 of Order Schedule requires distributors to obtain CGS approval before providing CUSIP Identifiers to users or to assist CGS in obtaining license agreements from those customers).
[62] *See* footnote 44, above.
[63] *Id.*
[64] *See* footnote 61, above.

## XIII. THE IMPORTANCE OF HIGH SWITCHING COSTS ON CGS'S DATA LICENSING POLICIES

Switching costs refer to the expenses, disruptions, and complexities incurred when moving from one product, service, or system to another.[65] These costs are not solely the hard costs of dollars spent but also necessarily include the soft costs of time, effort, and the risk of operational errors.[66] In the context of CUSIP Identifiers, switching costs are particularly significant and arise primarily from (1) the widespread adoption of the CUSIP Identifiers as the Standardized Identifier of financial instruments issued in the United States; and (2) the network externalities that both drive and result from that widespread adoption of CUSIP Identifiers.[67] These switching costs make it more difficult for users to switch to competing identifiers, even when CGS imposes inefficient licensing policies on market participants.[68]

**Network externalities.** A network externality (often referred to as a network effect) occurs when the value of a product or service increases for each user as the number of other users of the same product or service also increases. In the context of Financial Identifiers, this means that the utility and efficiency of a system for identifying financial instruments grow significantly as more

---

[65] The letter comments on the government's proposed regulations implementing the provisions of the Financial Data Transparency Act by the American Bankers Association quoted numerous financial market participants on the high costs of switching from CUSIP Identifiers to FIGI. *See* letter from T. Pinder, Jan. 16, 2025, https://www.sec.gov/comments/s7-2024-05/s7202405-557575-1599062.pdf.

[66] *See id*. at 6 ("Operational risk is also present in data mapping when there are opportunities for error –whether human or technological. . . . Additionally, data inaccuracies may create security vulnerabilities and undermine reliability, which can affect a company's reputation. This issue is particularly relevant in the transition from CUSIP, which has a unique identifier for each security across all exchange venues, to FIGI, which can have many different identifiers for the same security traded on each of the exchanges.").

[67] *See id*. at 5 ("With respect to other proposed common identifiers, DTCC urges the Agencies to avoid imposing one for financial instruments that is not, and provides different information than, the incumbent standard used across the securities market, as it would give rise to significant and immediate cost and implementation concerns without obvious benefits.")

[68] J. Ritter & P. Wool, note 20, above ("When surveyed, over sixty percent of the industry estimated the cost of pivoting from CUSIP to be anywhere from significant to extreme for their firm.").

financial institutions adopt and consistently use it.[69] The more widespread the adoption, the more valuable the standard becomes to all participants in the network.

CUSIP Identifiers exemplify strong positive **network externalities** through their design, history, and widespread adoption in financial markets:

| Positive Effects | Negative Effects |
|---|---|
| Interoperability across systems | Market lock-in and reduced competition |
| Standardization and consistency | Pricing power and vendor dependence |
| Regulatory and vendor integration | Slower innovation and openness |
| Reduced onboarding friction | Inflexibility in multi-market contexts |

**Widespread adoption of CUSIP Identifiers.** Their widespread adoption means that CUSIPs are deeply ingrained in the systems of market participants.[70] They serve as a "common language" for identifying financial instruments, facilitating efficient and accurate trading and settlement across different platforms and exchanges.[71] All major data vendors in the United States consume CUSIP feeds and use CUSIPs on behalf of their customers, indicating CGS's foundational role in the distribution of CUSIP Identifiers.[72]

---

[69] CGS' own literature refers to these network externalities. See, e.g., https://www.cusip.com/pdf/news/CUSIP-ACommonLanguageForEfficientMarkets_2022.pdf (CUSIP Identifiers are "widely integrated throughout the industry"; "While CUSIP is a US system, it is an integral part of a global network of security identifiers, a network that has evolved over 20 plus years").

[70] J. Ritter & P. Wool, note 20, above ("The 2020 CUSIP Global Services Survey conducted on behalf of the American Bankers Association (ABA) demonstrated that the overwhelming majority of the financial industry (some 87 percent), including asset managers, broker-dealers, banks, insurance companies, and market authorities have adopted the CUSIP identifier as their primary key.").

[71] See ABA-0000000334 at 343 ("CUSIP is a common language regardless of environment").

[72] See id. ("All major Market Data Vendors consume CUSIP feeds on behalf of their customers").

Most firms have aligned their internal identification schemes with CUSIPs for communication with counterparties.[73] CUSIPs are integral to critical market functions, including pre-trade research and analytics, position management, performance measurement, attribution, accounting, reconciliation, pricing, risk management, trade confirmation and settlements, corporate action processing, collateral management, pre- and post-trade compliance, and maintaining security master files.[74]

CUSIP Identifiers are also the designated and required means of identifying financial instruments for financial reporting to United States regulatory agencies and are the identifiers for many Agency operations like Treasury issuances and auctions:

| SEC Form | Purpose | CUSIP Role |
|---|---|---|
| **Form S-1** | Registration of securities (initial offering) | Required |
| **Form S-3 / F-3** | Shelf registration for seasoned issuers | Required |
| **Form S-4** | Securities in mergers or exchange offers | Required |
| **Form S-11** | REIT and real estate company offerings | Required |
| **Form F-1 / F-10** | Foreign issuer registration | Required |
| **Form N-1A / N-2 / N-3** | Investment company and mutual fund filings | Required |
| **Form 8-A / 10-12B** | Registering securities for exchange listing | Required |
| **Schedule TO** | Tender offer statement | Required |
| **Schedule 13E-3** | Going-private transactions | Required |

---

[73] *See* note 70, above (citing numerous comments from market participants that would have to overhaul internal "systems" and "processes" with a switch from CUSIPs to FIGI).

[74] *See, e.g.,* FRSI01648858 ███████████████████████████████

████████████████████████████████████████████ *see also* J. Ritter & P. Wool, note 20, above ("Today, CUSIP is accepted as the common denominator for settlement and relied on as the foundational building block for efficient market operations.").

| **Form 424(b)** | Prospectus filings | Required |

Having aligned their systems to the use of CUSIP Identifiers,[75] market participants would incur significant costs in switching to an alternative identification system.

**The combined effect of high switching costs and network externalities.** Users are effectively locked into the use of CUSIP Identifiers by the combined effects of high switching costs and network externalities. Surveys indicate that over 60% of the industry estimated the cost of pivoting from CUSIP to be anywhere from significant to extreme for their firm.[76] Switching to an alternative like FIGI would be both costly and disruptive. This is not merely a regulatory hurdle; it's a major operational challenge. The financial industry would need to undertake an enormous undertaking to move away from CUSIPs.

Among other things, a user looking to switch to a competing identifier would have to undertake the following steps:

**System Overhauls and Updates**: Legacy systems would need to be updated or entirely reconfigured. Firms have dozens of source systems, data warehouses, risk analytics systems, and reference data management repositories that would need to be updated and kept synchronized if CUSIP numbers were replaced.

**Data Mapping and Integration**: A shift would require massive inter-identifier mapping to link CUSIP to new identifiers. This involves reviewing inventory, conducting impact analysis, detailing specification changes to each system and use case, and updating APIs. For example, firms

---

[75] J. Ritter & P. Wool, note 20, above ("As part of that same customer survey for the ABA, almost 80% of the industry indicated that there was absolutely no appetite for an additional identifier within their institution.").
[76] J. Ritter & P. Wool, note 20, above.

would need to map between Proprietary Identifiers (like RIC Codes or SecIDs) and CUSIPs, which is complex and costly.

**Operational Disruption and Inefficiencies**: Switching away from CUSIPs would lead to operational disruptions, errors, and inefficiencies because financial institutions would lose the Standardized Identifiers on which they have built their data systems and which allow them to map Non-Standardized Identifiers. Moving to a system that requires manual reconciliation and error correction is extremely complex and extremely expensive.

**Software Development and Training**: There would be a need for significant new software development along with retraining personnel on the new software systems. Many market participants likely would need to hire a third-party vendor or consultancies for assistance to ensure proper conversion work.

**Testing and Validation**: Replacing CUSIPs would require extensive testing within each effected firm and more broadly across the industry. This is expensive and time consuming and could be similar in scale to something like the Y2K testing that was crucial to ensuring that remediated systems accurately handled dates beyond 1999.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 12, 2025.

James Powell