# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X

DINOSAUR FINANCIAL GROUP, LLC, :
HILDENE CAPITAL MANAGEMENT, :
LLC, and SWISS LIFE INVESTMENT :
MANAGEMENT HOLDING AG on behalf :  Case No. 1:22-cv-1860-KPF
of themselves and all others similarly :
situated, :
 :
    Plaintiffs, :
 :
  -against- :
 :
S&P GLOBAL, INC., AMERICAN :
BANKERS ASSOCIATION, and FACTSET :
RESEARCH SYSTEMS INC., :
 :
    Defendants. :
 :
------------------------------------------------------- X


# EXPERT REPORT OF BETTINA BERGMANN

I am an attorney practicing in Germany and the European Union. I have expertise in financial instrument identifiers used by participants in financial markets in Germany and the European Union.

## I.     Assignment

I have been retained by counsel for the Plaintiffs to provide expert testimony on three issues in Germany and the European Union: 1) the need for, and utility of, standardized financial instrument identifiers, meaning identifiers that have been approved by a standards-setting organization and the use of which has been made mandatory by the respective regulatory authority for financial markets; 2) the requirement of a license from CUSIP Global Services ("**CGS**", a division of FactSet and formerly of Standard & Poor's), for the use of International Securities Identification Numbers ("ISIN") identifying United States financial instruments traded in Germany and the European Union; and 3) whether imposing usage restrictions and charging fees are necessary for an issuer of standardized financial instrument identifiers to be able to maintain a business of issuing such identifiers.

## II.     Summary of Opinions

I have reached opinions on these three issues.

First, standardized financial instrument identifiers are required for the operation of financial businesses. Non-standardized identifiers, such as stock ticker symbols or company-specific identifiers, such as Refinitiv RIC codes that can refer to financial instruments in certain circumstances, are insufficient. The financial market laws in Germany and the European Union require that ISINs be used in regulatory reporting. Similarly, ISINs are necessary to process and clear transactions in Germany and the European Union in critical investments, such as U.S.

treasury securities. For these reasons, the ISIN is necessary for business operations, and any other numbering system cannot be used instead of ISINs.

Second, ISINs for United States financial instruments ("CUSIP-based ISINs") are necessary to process and clear transactions and for regulatory reporting. ISINs are the only financial instrument identifiers accepted by government regulators in Germany and the European Union for financial instruments, including those issued in the U.S. Given the importance of U.S. treasury instruments, and given that the market value of U.S. financial instruments is almost 70% of the market value of all available financial instruments, financial market participants in Germany and the European Union with a diversified global investment strategy must retain the option of investing in U.S. financial instruments. Given that the only way for these participants to clear and settle transactions or to fulfill regulatory reporting obligations in Germany and the European Union for United States financial instruments is to use CUSIP-based ISINs issued by CGS, and because CGS demands user licenses for the use of ISINs it issues—the CUSIP-based ISINs— German and European financial market participants must have a license from CGS to engage in these functions.

Third, usage restrictions and usage fees are not necessary to enable an entity to operate a business in issuing financial market identifiers. No entity in Germany or the European Union that issues financial market identifiers imposes restrictions on use by, or demands usage fees from, financial market participants that use those identifiers. In fact, no entity that issues financial market identifiers in Germany or the European Union imposes any limitations on the use of those financial instrument identifiers. Yet, each such provider is able to operate a functional issuance business that reliably provides ISINs to market participants in Germany and the European Union.

III. **Qualifications**

### III.1 Education and Professional Experience

I studied law and economics at the Free University of Berlin, from which I received my doctorate in 1995. I am an attorney licensed to practice law in Germany and the European Union. I was admitted to the bar in 1996. Before opening my own law firm in 2007, I worked for ten years in the competition law groups at major international law firms in Düsseldorf (Shearman & Sterling, now A&O Shearman), Brussels (Cleary Gottlieb), and Bonn (Redeker, Dahs & Sellner). A short CV is attached as Exhibit A, and a list of my publications is attached as Exhibit B.

My firm (Bergmann Law) advises numerous well-known corporate clients and company representatives in German and European Union on  competition law. I am a member of Studienvereinigung Kartellrecht, the German competition law association.

I am being compensated at a rate of EUR 335 per hour for my work on this case. None of my compensation in this case is contingent on the outcome of the case or any aspect of the case. I have not been deposed or testified at trial in the last four years.

### III.2 Relevant expertise in CGS's licensing and identifier markets

I have had a particular focus in the area of financial instrument identifiers. A financial instrument identifier is a unique code that identifies a financial instrument so that, for instance, electronic systems used by market participants, regulators, and providers of market infrastructure can process transactions regarding that financial instrument and match financial data to that financial instrument. In the European Union, the default financial identifier is the ISIN because, among other things, it is required for financial reporting to government regulators. United States financial instruments that are traded on international exchanges incorporate the CUSIP Identifier ("CUSIP") into the ISIN. I refer to these financial instruments as "CUSIP-based ISINs."

3

I have studied and analyzed the use of financial identifiers in Germany and the European Union for almost 20 years. I have also studied and analyzed the operations and business models of data vendors across Europe, including (i) SIX Financial Information ("SIX"), headquartered in Zurich, Switzerland, (ii) Refinitiv, now known as the London Stock Exchange Group ("LSEG"), and (iii) WM Datenservice ("WM Daten"), headquartered in Frankfurt, Germany, and the ways in which financial institutions like banks and funds use financial identifiers. I have spoken with executives and data managers at data vendor companies extensively about their business and the effects of the licensing policies of CGS. One of the results of my work for the industry was the European Commission's investigation into the US ISIN licensing by CGS and its commitment decision of 2011.

Once a year, in late fall, there is a conference on financial identifiers in Paris, organized by COSSIOM[1], an industry association of identifier users. Surrounding the conference, there are numerous meetings and discussions to help understand how financial information systems work and what the latest developments are. There are other conferences for financial market data users, such as the FIMA in Frankfurt. I regularly take part in industry conferences as an attendee and speaker and have spoken with numerous industry representatives on site.[2] In this way, I have obtained a deep knowledge of financial identifier usages by financial institutions.

I am familiar with CGS's licensing program because I have represented several associations of financial institutions in a complaint against the licensing policies of S&P Global, Inc. ("S&P") with respect to CUSIP-based ISINs before the European Commission over a period

---

[1]    Comité chargé des Services et Systèmes d'Informations destinés aux Opérateurs de Marchés; in English, the Market Data Information Systems and Services Committee for Market Operators.

[2]    See, for instance, invitation for FIMA in 2012, attached as **Exhibit 1**.

of 17 years beginning in 2008.[3] The complaint resulted in a Commitment Decision (*i.e.*, a decision imposing binding commitments on S&P) from the European Commission in 2011 preventing S&P (then the owner of CGS) from charging end users (mostly financial institutions) in the European Union for using CUSIP-based ISINs associated with financial instruments issued in the United States.[4]

The 2011 Commitment Decision expired after five years, although CGS has continued to abide by its terms. The model agreements offered as part of S&P's commitments were changed in 2014 after user complaints, in which I represented the complainants.[5] In 2017, CGS offered a voluntary extension of the Commitments,[6] which is still in effect.

The complainants are all European industry associations whose members are financial institutions and users of ISINs that are directly affected by CGS's licensing practices. They are:

- **EFAMA** (European Fund and Asset Management Association) is the voice of the European investment management industry with 29 member associations, 52 corporate members, and 26 associate members, managing around EUR 33 trillion of assets on behalf of clients in Europe and around the world.

- **AFG**, the French Asset Management Association (Association Française de la Gestion Financière) is the professional organisation representing the French asset management industry. The French asset management sector is the largest in continental Europe: 630 asset management companies employ directly and

---

[3]  See article on the case in JUVE, the German legal market magazine, at https://www.juve.de/verfahren/eu-kommission-geht-gegen-standard-poor-s-vor, English translation attached as **Exhibit 2**.

[4]  Decision of 15 November 2011 in case AT.39592 ("Commitment Decision"); available on the European Commission website at https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf, attached as **Exhibit 3**.

[5]  See press release from Efama of 29 September 2014, attached as **Exhibit 4**.

[6]  See press release of CGS and ABA of 17 March 2017, attached as **Exhibit 5**.

indirectly 85,000 people and invest on behalf of their clients close to EUR 4.5 trillion in bonds, shares and other assets. About 50% of French asset managers commercialise their funds on a cross-border basis, and more than 30% of the assets managed by AFG's members are issued by corporate entities or states of the Euro zone (excluding France), which makes the industry a key source of funding for the European economy.

- **Assogestioni** is the Italian investment management association. Assogestioni's members include managers of Undertakings for Collective Investment in Transferable Securities, accredited investment fiduciaries, portfolio managers and open-ended pension schemes. Assogestioni represents the interests of all Italian investment managers and the majority of foreign investment managers operating in Italy, consisting of more than 60 investment groups managing assets in excess of EUR 2.5 trillion. Since 1984, Assogestioni has been representing the interests of the industry regarding institutions and market authorities, actively contributing to the debate on regulation at the domestic and European level.

- **BVI** (the German Investment Funds Association) represents the interests of the German fund industry at national and international level. The association promotes sensible regulation of the fund business as well as fair competition vis-à-vis policy makers and regulators. Asset managers act as trustees in the sole interest of the investor and are subject to strict regulation. Funds match funding investors and the capital demands of companies and governments, thus fulfilling an important macro-economic function. BVI's 116 members manage assets of EUR 4.5 trillion for retail investors, insurance companies, pension and retirement schemes, banks, churches

and foundations. With 26% of the retail investing assets, German funds represents the largest fund market in the EU.

- **IPUG**, the Information Providers User Group, is a non-profit organisation, established in 1989 to represent the current and future interests of its member firms. It is now the principal organization in the United Kingdom advising and representing users of market data services on technical, administrative, and strategic questions.

- **INVERCO** (Asociación de Instituciones de Inversión Colectiva y Fondos de Pensiones) is the association of collective investment institutions and pension funds in Spain and brings together practically all of the Spanish collective investment institutions (funds and investment companies), Spanish pension funds, and registered foreign collective investment institutions in the Spanish National Securities Market Commission (CNMV).

- **SIPUG** (Swiss Information Providers User Group) is a collaboration of an informal group of experts from large Swiss banks. Founded in 1992 and registered as an association in the Zurich commercial register, it is now comprised of more than 30 member institutions. These groups are primarily major Swiss banking, financial, commodity and insurance companies. As a non-profit organization, SIPUG supports the common interests of its members in commercial, technical, administrative, and strategic terms. Its primary counterparties are vendors providing systems and solutions using data to streamline the end-to-end investment lifecycles.

In the context of preparing the original complaint against S&P and during the proceedings before the European Commission beginning in 2008, I consulted with a large number of ISIN users in Germany and the European Union and had meetings with these users in person in order to understand how identifiers are used on user terminals in the IT systems of a financial institution bank and what happens if the ISIN is not available.[7] I also participated in a large number of video conferences, in-person meetings, and telephone calls bilaterally with ISIN users or with the associations that brought the complaint. In this work, I spoke or interacted with numerous financial market participants about their ISIN usage and problems caused by CGS's licensing system. I also participated in an on-site visit together with the European Commission in Frankfurt at a financial institution in 2009.

In the course of preparing the complaints and during the proceedings including responding to questions from the European Commission, I educated myself on the issues users faced by speaking with all the complainants, with several of their members, and with numerous witnesses and other industry insiders. The complainants provided me with knowledge about the use of ISINs and the various contractual situations of data vendors and end users with CGS, including contracts I attached to the complaints. In response to information requests from the European Commission, I prepared written responses from industry participants. In doing so, I spoke with a large number of financial institutions in order to understand their ISIN usage and contract situation with CGS.

---

[7] Throughout this report I refrain from providing the names of users I interviewed or otherwise worked with in the European Commission's investigation out of respect for the confidences of these users and the confidential interests S&P has asserted in this litigation and otherwise regarding the investigation. I have intentionally not disclosed in this report or to Plaintiffs' counsel any confidential information of S&P I obtained directly from S&P or indirectly from the European Commission during the Commission's investigation. In addition, I have not reviewed any confidential information any of the Defendants produced in this case. Counsel for Plaintiffs has not provided me any documents Defendants produced in the case or transcripts of any depositions. In fact, counsel for Plaintiffs did not provide me with any documents or information I relied on in reaching my opinions in this report. My report is based on information I gathered during the almost 20 years in which I have been investigating S&P's policies (and FactSet's policies after the acquisition of CGS from S&P), and the use of financial instrument identifiers in the European Union.

With the aim of learning more about the relevant facts and the history of ISINs and CUSIPs, I also spoke with representatives of the various bodies involved in the development of financial instrument identifier standards and disputes that had arisen about CGS's licensing claims.

Through my work on financial instrument identifiers, I have gained much expertise on CGS, its licensing policies, and the effects of those policies on data vendors and financial institutions in Germany and the European Union. I have also gained much expertise in how financial identifiers are issued in Germany and the European Union and whether fees imposed on financial institutions are necessary for the ongoing operation of the issuance and use of financial instrument identifiers.[8]

## IV.    European Financial Market Participants Require Standardized Financial Instrument Identifiers

In this section I explain ISINs, their structure, and their relationship to other financial identifiers. For the reasons I describe below, it is my opinion that financial market participants require standardized financial instrument identifiers like ISINs to operate their businesses. It also is my opinion that other identifiers, such as stock ticker symbols or company-specific identifiers, such as Refinitiv RIC codes, cannot be used instead of ISINs.

### IV.1    The Structure of an ISIN

The ISIN is a 12-character alpha-numerical code which serves as the uniform and unique identification of a financial instrument, e.g., at trading and settlement. The ISIN number issuance and distribution is based on a standard ("ISO 6166") developed by the International Organization for Standardization ("ISO").

---

[8] In Europe, the creation of a financial instrument identifier for a new financial instrument is referred to as "allocation." I understand that in the United States the term used for that process is "issuance." For the avoidance of confusion, I have used the U.S. term "issuance" throughout this report to refer to what I normally would call the "allocation" function.

ISO is an international standard-setting organization composed of representatives from various national standards associations. Founded on 23 February 1947, the organization promotes worldwide proprietary, industrial, and commercial standards. It is headquartered in Geneva, Switzerland. ISO has published 22,975 international standards and related documents, covering almost every industry, from technology to food safety, to agriculture and healthcare.

ISO has adopted standards for financial identifiers and other numbering systems used by financial institutions to refer to financial instruments and legal entities. ISO 6166 is the standard that defines the structure of an ISIN.[9]

The first two characters of the ISIN are the ISO country code identifying the domicile of the issuer of the given financial instrument. For example, each one of the ISINs issued in Germany begin with "DE," the country code for Germany. The country code is followed by the national securities identification number of the issuer. A national securities identification number is a number issued by the National Numbering Agency ("NNA") in a country for securities issued or domiciled in that country. Where the national number consists of fewer than nine characters, zeros are inserted in front of the number so that the full nine spaces are used. The ISIN ends with a control number, which is based on the Luhn algorithm.[10] The Luhn algorithm is also an ISO standard, ISO/IEC 782.[11] The Luhn algorithm will detect all single-digit errors, as well as almost all transpositions of adjacent digits. The CUSIP number, together with the country code and the

---

[9]    See https://anna-web.org/identifiers/; https://www.iso.org/news/ref2616.html.

[10]    For instance, the shares of Apple Inc. have the ISIN US0378331005, Bayer AG has the ISIN DE0005752000, and the Treasury Corporation of Victoria's 5 ¾% bond, 2005-2016, has the ISIN AU0000XVGZA3.

[11]    The Luhn algorithm is a check digit formula used to validate identificiation numbers, as in various other numerical codes, such as credit card numbers etc. Patented in 1960, it is now in the public domain.

control number as issued under the rules of ISO 6166, constitutes the CUSIP-based ISIN or ISIN for countries/territories where CGS acts as a substitute NNA.[12]

## IV.2    National Securities Identification Numbers and Their Relationship to ISINs

The ISIN contains the respective national securities identification number issued by the NNA in each country in the European Union. In Germany, the ISIN contains the national German Wertpapierkennnummer ("WKN") (German for "securities identification number"). The WKN is a 6-digit numerical code. Like ISINs in other countries, the twelve-digit ISIN in Germany consists of a two-digit country code ("DE"), the national identification number, and a check digit. The German national securities identification number WKN is contained in the sixth to eleventh digits.[13]

For a financial instrument issued in the United States and traded on an exchange in the European Union, CGS, as the United States NNA, assigns a CUSIP-based ISIN to that instrument.[14] Each CUSIP-based ISIN incorporates the CUSIP identifier as the nine digits following the country code.[15] As an example, the ISIN for Apple, Inc., is US0378331005. Following the country code (US) is the nine-digit CUSIP identifier for Apple (0377833100) followed by a single check digit. Thus, companies in the European Union that (for regulatory

---

[12]  In the absence of any primary NNA, FactSet/CGS is the only issuer of ISINs for 36 countries/territories (per May 2025) such as American Samoa, Anguilla, Antigua and Barbuda, Aruba, Bahamas, Belize, Bermuda, Bonaire, St. Estatius and Saba, Canada, Cayman Islandsf, Dominica, Grenada, Guam, Guyana, Haiti, Marshal Islands, Mayotte, Mexico, Micronesia, Netherlands Antilles, Northern Mariana Islands, Palau, Puerto Rico, Saint Barthélemy, St. Kitts and Nevis, Saint Lucia, Saint Martin, Saint Vincent and the Grenadines, Sint Maarten (Dutch part), South Georgia and the South Sandwich Islands, Suriname, Trinidad and Tobago, United States Minor Outlying, Uruguay, Virgin Islands (British), and Virgin Islands (U.S.), see ISIN Geographical division of countries among substitute agencies as per May 2019 attached as **Exhibit 6**.

[13]  See https://www.boerse-frankfurt.de/en/know-how/lexikon/wkn.

[14]  See the European Commission's Commitment Decision *supra* n.4 & **Exhibit 3**, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf, para. 17.

[15]  See https://www.investopedia.com/terms/i/isin.asp.

reasons) must use ISINs for financial instruments issued in the United States also have to use the embedded CUSIP identifiers both of which are issued by CGS.[16]

Also for ISINs issued in European countries, such as Germany, the United Kingdom or Switzerland, or in Asian countries, the ISIN contains the national securities identification number for each such country issued by that country's NNA. For example, for instruments issued in the United Kingdom, the ISIN contains the SEDOL number for each such instrument, which is the national numbering system in that country. And for instruments issued in Switzerland, the ISIN contains the Valoren number, which is the national numbering system in that country.

### IV.3. Source of ISINs

ISINs are issued by the respective NNA of a country.[17] All NNAs worldwide are organized in the Association of National Numbering Agencies ("ANNA"), a global industry association. Through its members, ANNA is present in more than 120 countries.[18] ISO appointed ANNA as the Registration Authority and Maintenance Agency for ISO 6166.[19] ANNA states its mission as "seeking to foster standardisation within the financial industry by upholding the International Organization for Standardization (ISO) principles, and by promoting International Securities Identification Numbers (ISIN), Financial Instrument Short Name (FISN), and Classification of Financial Instruments (CFI) codes for financial instruments."[20]

---

[16]     See also the European Commission's Commitment Decision *supra* n.4 & **Exhibit 3**, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf, para. 17.

[17]     See *id.* para. 16.

[18]     The full list of NNAs is published on ANNA's website at https://anna-web.org/anna-members/.

[19]     See https://anna-web.org/identifiers/; https://www.iso.org/maintenance_agencies.html.

[20]     https://anna-web.org.

As examples, the NNA in the United States is CGS; the NNA in Germany is WM Daten; the NNA in Switzerland is SIX (formerly known as Telekurs); and in the United Kingdom, the NNA is LSEG.[21]

Only NNAs have the authority to issue ISINs. According to ANNA's Articles of Association, NNAs must be recognized by their local supervisory authority or other similar supervisory authorities, international securities depositories, or organizations sub-designated by ANNA in order to be eligible for becoming an ANNA Member.[22] But ANNA is not the authority to appoint NNAs. The appointment occurs under national laws.[23] There is only one NNA per country.[24]

### IV.4    ISINs Are Necessary for Government Reporting and the Clearing and Settlement of Transactions in Germany and the European Union

There are other numbering systems that could be used to refer to financial instruments in certain circumstances. In addition to ISINs and CUSIP-based ISINs, stock ticker symbols and company-specific numbering systems such as the Refinitiv RIC codes, can be used to refer to financial instruments. However, it is my opinion that users in the European Union require standardized identifiers like ISINs instead of other, non-standardized numbering systems for a number of reasons, including that ISINs are required for regulatory reporting and the clearing and settlement of transactions.[25]

---

[21]    See https://anna-web.org/anna-members/.

[22]    https://anna-web.org/wp-content/uploads/2023/02/ANNA-Articles-of-Association-17Jan23-English.pdf; Article 9 of ANNA's Articles of Association.

[23]    See explanations under https://anna-web.org/anna-members/.

[24]    See *id.*

[25]    See the European Commission's Commitment Decision *supra* n.4 & **Exhibit 3**, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf, paras. 18 *et seq.*

The use of the ISIN has been made mandatory by European regulations mainly for statutory reporting purposes. For example, the European Parliament enacted the European Union's Markets in Financial Instruments Directive II ("MiFID II") in 2018.[26] MiFID II standardizes oversight of the financial industry among European Union member nations and broadens the scope of the European Union's regulation of securities markets. MiFID II requires that ISINs be used in identifying the financial instruments listed in all reports filed under the law.[27] These regulatory requirements reflect the fact that ISINs are the only accepted common identifier that is capable of identifying financial instruments across national boundaries with numerous national securities exchanges in the European Union.[28] For these reasons other identification codes cannot be used in place of ISINs, including CUSIP-based ISINs.[29] The European Commission therefore regards the first-hand electronic distribution and licensing of US ISINs as a market in itself, in which FactSet with CGS (formerly part of Standard & Poor's) has a monopoly.[30]

Other numbering systems such as the Refinitiv RIC and the Bloomberg FIGI can refer to financial instruments and can also be used internally by financial institutions. However, it is my opinion that such identifiers can never replace the ISIN, and one reason is because the use of the ISIN is mandatory for regulatory reporting in the European Union.[31]

---

[26]  https://eur-lex.europa.eu/eli/dir/2014/65/oj/eng.

[27]  Directive 2014/65/EU of the European Parliament and of the Council of 15 May 2014 on markets in financial instruments, Art. 65; https://www.intalus.com/wertpapiere-eindeutig-identifizieren-vor-und-nach-mifid-ii/ (English translation attached as **Exhibit 7b**).

[28]  See the European Commission's Commitment Decision *supra* n.4 & **Exhibit 3**, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf, paras. 16 *et seq.*

[29]  See https://www.finextra.com/news/fullstory.aspx?newsitemid=20768 with a reference to the European Commission's Statement of Objections; the Statement of Objections itself is a non-public document containing business secrets; see also https://anna-web.org/identifiers/.

[30]  See the European Commission's Commitment Decision *supra* n.4 & **Exhibit 3**, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf, para. 24.

[31]  See "Regulatory requirements regarding ISIN usage in the EU" attached as **Exhibit 8**.

ISINs are also necessary for financial market business operations in Germany and the European Union because CUSIP-based ISINs are necessary for the clearing and settlement of transactions involving U.S. financial instruments. Every significant clearing and settlement company in the European Union, including the two largest such companies — Euroclear Group and Clearstream International S.A. — require that ISINs be used to settle and clear transactions.[32] It therefore is not possible for financial market participants in Germany and the European Union to engage in transactions involving U.S. financial instruments without using ISINs. And the ISINs used for U.S. instruments are CUSIP-based ISINs issued by CGS, CGS being the national numbering agency (NNA) for the U.S.

The European Commission's commitment decision lists the main reasons why the ISIN cannot be replaced by other identifiers, neither national identifiers nor identifiers of service providers:

*"Certain service providers such as exchanges or global ISPs have developed their own securities identification systems (such as Bloomberg Tickers, Reuters Instrument Codes (RICs) or S&P's US stock Ticker symbols. However, those proprietary identifiers do not offer the same coverage as ISINs in terms of types of securities covered. Moreover, there are a number of operations in which ISINs cannot be replaced by alternative identifiers. These are inter-bank communications, asset and portfolio valuation, clearing and settlement, front office operations in relation to bonds, custody issues, internal reporting or reporting to authorities, reference data management, and all other legally and economically sensitive operations which require the highest degree of security and accuracy. Also, only NNAs are required to allocate a number when*

---

[32]     See                https://www.lseg.com/en/insights/data-analytics/isins-powering-t1-stp-transformation-and-more; https://www.banque-france.fr/system/files/2023-04/819029_livre_chapitre_13_en.pdf, p. 212 *et seq.*

*approached by an issuer. In contrast, the allocation of proprietary identifiers is at the discretion of the system owner.*"[33] And: "*As regards other national identifiers, national securities identification systems only cover securities issued in their respective countries. Outside the US, those systems generally do not cover securities issued in the US at all. National identifiers are thus not substitutes for US ISINs.*"[34]

Because Germany and the European Union have adopted the ISO-approved ISINs as the default identifier for regulatory reporting, and because European financial market participants must use CUSIP-based ISINs to engage in transactions involving U.S. financial instruments which account for a significant portion of financial market transactions in Germany and the European Union (as described below), it is my opinion that other numbering systems like ticker symbols and company-specific numbering systems cannot be used in place of ISINs in Germany and the European Union overall.

## V.    A License Agreement with CGS Is Required for European Financial Market Participants

It is my opinion that a license agreement with CGS is required for financial market participants to conduct normal business operations in Germany and the European Union for three reasons, all related to the need to use CUSIP-based ISINs for regulatory reasons and for trading of US financial instruments in Europe.

### V.1    Global Investors Invest in U.S. Financial Instruments

Investments in U.S. financial instruments are an important portfolio component for global financial institutions based in Europe and for most European financial institutions with diversified investment portfolios. U.S. financial instruments are too numerous and too valuable for European

---

[33]    See the European Commission's Commitment Decision *supra* n.4 & **Exhibit 3**, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf, para. 19.

[34]    See *id.*, para. 18.

investors to ignore. The current share of U.S. stocks in global market capitalization is approximately 70%, as measured by the MSCI World Index[35], which includes about 1,325 large and mid-cap companies from 23 developed countries.[36] Also, basic currency hedging strategies of sophisticated financial institutions depend, in part, on the purchase of U.S. treasury bonds.[37] For these reasons, most financial institutions in Germany and the European Union invest in U.S. financial instruments and therefore need U.S. ISINs to operate their business.[38]

### V.2    CUSIP-Based ISINs Are Necessary to Invest in U.S. Financial Instruments

As stated above, CUSIP-based ISINs are the only standardized identifier that government regulators and clearing and settlement companies accept in Germany and the European Union for U.S. financial instruments. Because financial market participants with diversified portfolios include U.S. financial instruments in their investment portfolios (see previous paragraph and footnote 37) and because CUSIP-based ISINs are the only standardized identifier that regulators and clearing companies accept, financial market participants must be able to use CUSIP-based ISINs.

For decades, European financial market participants investing in U.S. financial instruments have obtained financial data from data vendors such as Bloomberg, Refinitiv, and SIX. Yet CGS did not require that financial market participants in the European Union sign CGS license agreements in order to be able to use CUSIP-based ISINs until around 2002.[39] The licenses CGS

---

[35]    See    https://www.thedailyupside.com/economics/international-economics/us-markets-represents-70-of-total-world-market-capitalization/.

[36]    See https://www.msci.com/documents/10199/178e6643-6ae6-47b9-82be-e1fc565ededb.

[37]    See https://www.bis.org/events/221213_bis_bdi_ecb_exchange_rates/paper_brauer.pdf.

[38]    See    the    European    Commission's    Commitment    Decision    *supra*    n.4    &    **Exhibit    3**, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf, para. 22.

[39]    Excerpt from IPUG presentation by Martin Wilson "ISINs and US licensing issues" from 18 March 2008, p. 2, attached as **Exhibit 9**.

has imposed since that date applies to data vendors using the CUSIP/ISIN database, and also to end users using the CUSIP-based ISIN for reference purposes, e.g., in order to be able to use ISINs as an access key in the data vendors' financial information systems ("terminals").[40]

The contracts between CGS and these data vendors include provisions that oblige the data vendor to acknowledge CGS's intellectual property rights whether or not they agreed that CGS had such intellectual property rights and to demand from the user the execution of CGS's standard licensing agreement before permitting the use of services with CUSIP-based ISINs as the uniform access key.[41] The data vendor is required to report any CUSIP or CUSIP-based ISIN use to CGS and to comply with CGS's requests to block the access of an end user who did not enter into a licensing agreement with CGS.[42] Through the data vendor's reporting to CGS, CGS would know each user including its branches, affiliates, contact details etc. and whether each user "consumed" more than a certain number of CUSIP-based ISINs.

CGS's sales teams introduced a Use of Service Statement ("UoSS") that provided CGS even more information about financial institutions' businesses and their use of CUSIP-based ISINs. This UoSS, which has to be completed as a condition for a licensing agreement with CGS, has seen several editions increasing the invasive nature of CGS' demands each time (see, e.g., the attached exemplar UoSS).[43] This includes confidential descriptions of the user's sources and use of CUSIP-based ISINs.

---

[40]    See the European Commission's Commitment Decision *supra* n.4 & **Exhibit 3**, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf, para. 38 stating that none of the NNAs in the Union (including WM Daten) charge customers simply for using ISINs in databases.

[41]    See model ISIN end user agreement according to the revised commitments of 2014 (attached as **Exhibit 10**), at Section 1: "CGS will be entitled to and will instruct all ISPs to cease furnishing Subscriber with ISIN Records".

[42]    See *id.*; see also letter from Bloomberg to Martin Wilson of Nomura of June 6, 2001, **Exhibit 11.**

[43]    See use of service statements dated 2008, 2009, and 2012 attached as **Exhibits 12 through 14**.

Once CGS has an agreement with a data vendor in place, the user has to sign a licensing agreement with CGS in order to receive data from its data vendor on securites for which CUSIP-based ISINs are the uniform access key.[44] That agreement contains a provision that obliges the user to acknowledge that the CUSIP database and the information contained therein is the valuable intellectual property of CGS and the American Bankers Association ("ABA") whether or not they agreed that CGS and the ABA had such intellectual property rights.[45] The Subscription Agreement prohibits the subscriber from using the CUSIP-based ISINs in any way not authorized by CGS or the ABA. It also obligates the subscriber to honour and comply with CGS's requests to protect the ABA's alleged intellectual property rights.[46]

Additionally, the Subscriber is prohibited from distributing US ISIN information or from allowing access to the services for a person, organization, affiliate or subsidiary that are not explicitly authorized.[47] The Subscription Agreement further requires the user to delete all CUSIP information from its internal databases in case the Agreement is terminated ("expunge of data")[48] – which would lead to a partial destruction of the user's operational database. CGS does not even warrant the content of the service provided. Because the agreement provides for jurisdiction in

---

[44]   See model ISIN end user agreement, *supra* n. 41 & **Exhibit 10** at Section 1: "CGS will be entitled to and will instruct all ISPs to cease furnishing Subscriber with ISIN Records."

[45]   See standard subscription agreement (attached as **Exhibit 15**), at Section 2. The standard agreement is still in use also in the European Economic Area as the Model Agreements offered as a result of the European Commission's Commitment Decision are subject to many conditions, e.g., that the user must not use "additional data" such as the CUSIP. Also, the model agreements do not cover ISINs for all securities that the user needs, but only for US securities, while CGS acts as an NNA or substitute NNA also for many other countries, see also the European Commission's Commitment Decision *supra* n.4 & **Exhibit 3**, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf, paras. 66 *et seq.* The reason for the limitation of the Commitment decision to U.S. ISINs is of a technical nature about which I cannot disclose further confidential information. See Efama's presentation of the case at https://www.bvi.de/fileadmin/user_upload/Regulierung/Positionen/ISIN/efama-ISIN_Case-situation-post-expiry-20170517.pdf, attached as **Exhibit 16**.

[46]   See standard subscription agreement, *supra* n.45 & **Exhibit 15**, Section 2.

[47]   See standard subscription agreement, *supra* n.45 & **Exhibit 15**, Section 1.3.

[48]   See standard subscription agreement, *supra* n.45 & **Exhibit 15**, Section 6.4.

New York and applies New York law,[49] it would be prohibitively expensive for any user in the European Union to challenge any provision in the agreement in a court in New York on an individual basis. And if users challenge any provision in the licensing contract, they risk being cut off from access to vital financial information for which the ISIN is the essential access key.[50] Losing access to the CUSIP-based ISINs would prevent users (and data vendors) from working as a financial institution (e.g., trading and settling instruments) and executing proper regulatory reporting which is a requirement for operating as a financial institution.[51]

The European Commission investigated the licensing practice of CGS (formerly a division of Standard & Poor's) and closed the investigation with a Commitment Decision of November 15, 2011 making commitments from Standard & Poor's binding,[52] as a result of which users in the European Economic Area can use CUSIP-based ISINs free of charge under certain conditions. There are no fees or restrictions on the use of non-CUSIP-based ISINs in the European Union.

### V.3    Market Participants Must Obtain a CGS License Because CGS Controls a Critical Input to Their Business Model

CGS's and the ABA's assertion of an ownership interest in the CUSIP-based ISINs, based on a claim to an intellectual proprety right in them, combined with the restrictions in CGS's agreements with data vendors, gives CGS control of a critical input of the user's business model— CUSIP-based ISINs. Armed with its agreements with the data vendors, CGS can hold up any user with the threat to withhold that critical input—CUSIP-based ISINs—if a user refuses to sign a CGS licensing agreement and comply with its restrictive provisions. CGS can require that a data

---

[49]    See standard subscription agreement, *supra* n.45 & **Exhibit 15**, Section 11.4; see also Model End User Agreement https://www.cusip.com/pdf/End_User_Agreement_for_US_ISINs.pdf, Section 9(d).

[50]    See standard licensing agreement, *supra* n.45 & **Exhibit 15**, Section 6.2 & Section 2.

[51]    Regarding the obligation to use the ISIN for regulatory reporting see overview of regulatory requirements see **Exhibit 8**.

[52]    See the European Commission's press release of November 15, 2011, https://ec.europa.eu/commission/presscorner/detail/en/ip_11_1354.

vendor create a data interruption for the user or even prevent a vendor from entering into a data supply agreement with a user in the first place.[53] Thus, the only way a user can avoid such a data interruption is to sign a license in which it agrees to the restrictive CGS provisions, which limit its ability to use CUSIP-based ISINs in any way not authorized by CGS.

CGS's license agreement also imposes its favored business model on data vendors. The CGS license puts data vendors to a choice. They can obtain all CUSIP-based ISINs by adopting CGS's restrictions, restricting the flow of data, and monitoring the customers' use of data. Or, data vendors can preserve their own business model, use the CUSIP-based ISINs in any way they choose, but be at risk of not having all CUSIP-based ISINs if they do not receive CUSIPs from CGS, which would put them at a strategic disadvantage vis-à-vis their competitors. Not signing the CGS license agreement also forces data vendors to devote time and resources to obtaining CUSIP-based ISINs from public sources. Data vendors must divert these resources away from more innovative purposes only because CGS has the power through its contracts to control the use the of a critical input—the CUSIP-based ISINs.

The result of all of this is that the use of CUSIP-based ISINs is unavoidable for most financial market participants in Germany and the European Union investing in U.S. financial instruments because they cannot operate their businesses without these financial identifiers. And CGS requires that they obtain a license from CGS to use these financial identifiers to operate their businesses.

In fact, the demand of a license from CGS has caused companies to keep innovative services off the market that otherwise would have required a CGS license. For example, SWIFT is an international cooperative of about 7,000 banks specializing in secure transaction messaging.

---

[53]    See model ISIN end user agreement, *supra* n. 41 & **Exhibit 10**, Section 1 and 5.

SWIFT planned to offer a so-called "ISIN Sanctions Service" that would have provided transactional notices for the settlement of securities trades (MT54x) in case the trade would have fallen under international sanctions rules.[54] The intended service would have sent automatically a notice on sanctions to enable the trader to annul the trade immediately. The service was intended to be fully automated. A specialized service provider would have regularly provided SWIFT with lists of ISINs/CUSIPs of securities concerned. The service would have been highly valuable for companies trading automatically in a multitude of instruments because it would have provided immediate notice that an imminent trade was subject to sanctions. The sanctions service would have been an innovative and useful specialized product. Swift was about to choose from four providers to take the product into their service portfolio. However, these providers all pointed to CGS's CUSIP licensing policy and the requirement for SWIFT to obtain a CUSIP license.

The SWIFT sanctions service would have been an original product or service similar to other such products or services identified by Mr. Lenz in his report, which were able to come to market in a business environment where there were no restrictions of the use of CUSIPs. SWIFT sought to introduce its sanctions service in a business environment where CGS imposed restrictions and obligations on the use of CUSIPs which would have applied to the SWIFT sanctions service.

The SWIFT sanctions service was never launched.[55] In my opinion that is because enforcing the provisions of the CUSIP license would have been administratively burdensome and too expensive. SWIFT does not have a CUSIP license. The CUSIP licensing fees and the legal risks of licensing would not have stood in any reasonable relationship to the risk of bringing the

---

[54]    See https://www.swift.com/products/transaction-screening. This service is mentioned on Swift's website, but seemingly is still not operational (cannot be booked); the client can only contact an account manager.

[55]    See *id.*

sanctions service to the market and any possible revenues. If SWIFT had a CUSIP reseller's license, users of SWIFT's new service would have needed a CUSIP license as well, which means an administrative burden, legal uncertainty due to various provisions described above, limited freedom in using the service, and fees also for them.

SWIFT has been reviewing the situation in view of integrating this specific service into a large financial crime compliance service covering all financial services, not only securities transactions. The problems of administrative burdens, legal uncertainty, and fees caused by the CGS license remain the same.

### V.4. Special Situation in Europe after the European Commission's Commitment Decision of 2011 and Model Contracts Revised in 2014

As explained above, the situation concerning the licensing of ISINs in the EU is different from the situation, for instance, in the US. This is due to the European Commission's Commitment Decision. Under this decision, ISIN users in the EU can use ISINs issued by CGS free of charge under certain conditions. CGS offers certain model contracts permitting this free use. However, users still have to sign a licensing agreement (the model contract), unless they use only a marginal number of CUSIP-based ISINs. Thus, most financial institutions have to conclude licenses. After complaints with the European Commission about the non-implementation of the commitment decision shown by these and other CGS actions, CGS changed the Model Agreements in 2014.[56] The Model Agreements of 2014 are still in use. The Commitments and the Model Agreements do not cover all CUSIP-based ISINs uses by end users (banks and other financial institutions) in Europe. Many users still have to sign a full CUSIP subscription agreement. And the Commitments only apply to ISINs included in the ANNA database. However, the database does not include

---

[56] See the European Commission's EPTF report of 2017, https://finance.ec.europa.eu/system/files/2017-07/170515-eptf-report_en.pdf, at p. 67.

municipal bonds. And financial institutions in the European Economic Area that also operate outside the European Economic Area via affiliates usually have to sign a full CUSIP subscription agreement, because the commitments only apply to use of the ISIN in the EEA.[57] The Commitments expired in 2017, but CGS continues to offer the fee-free use of the ISIN under the conditions of the Commitments and the Model Agreements,[58] and to impose fees and restrictions where not prohibited by the Commitments and the Model Agreements.

## VI. Usage fees and License Restrictions Are Not Necessary to Operate an Issuance Business

It is my opinion that usage fees and license restrictions are not necessary to enable an NNA to to operate a business issuing ISINs. Of the more than 120 NNAs in the world, only CGS imposes usage fees or use restrictions on ISIN users.[59] In Germany, one of the largest financial markets in the European Union, the NNA — WM Daten — does not charge any fees for the use of financial instrument identifiers, and does not impose any license restrictions on users of the ISINs.[60] Yet, that NNA continues to offer its issuance business to issuers of financial instruments without interruption and without any hint of inefficiency.

---

[57] See model end user agreement at https://www.cusip.com/pdf/End_User_Agreement_for_US_ISINs.pdf; and the CUSIP standard agreement *supra* n.45 & **Exhibit 15**.

[58] See CGS and ABA press release of March 17, 2017, *supra* n.6 & **Exhibit 5**.

[59] See European Commission's Commitment Decision *supra* n.4 & **Exhibit 3**, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf, para. 38.

[60] See *id.* and WM Daten's website offering a Master File at https://www.wmdatenservice.com/en/product/gat/. The "Master File" contains the content WM Daten offers, such as stock exchange data and interest rates. And the "Products" offered by WM Daten do not include an ISIN license, at https://www.wmdatenservice.com/en/products-services/.

### VI.1   The General Rule in the European Union Is That No Usage Fees Should Be Charged

The ISO standards mandate the assignment of a registration authority agreement for the implementation and supervision of the standard. As I explained above, for the ISIN under ISO 6166, the registration authority in charge is ANNA. According to "ISO/IEC Directives, Part 1 — Consolidated ISO Supplement — Procedures specific to ISO" (hereinafter: "ISO Directives") the election of a registration authority is subject to a confirmation that issuance fees, if any, will be charged on a cost-recovery basis only.[61] That condition applies if registration functions are delegated to a third party, such as an NNA.[62] Thus, NNAs must not charge, for the issuance of ISINs, any more than necessary to recover the reasonable costs incurred for such distribution.

This fee limitation is a general rule inherent to ISO standards and prevents abuse of standards for profit-making. Standards have the purpose of making processes easier, not more difficult. By encouraging more widespread issuance and therefore use of ISINs, the fee limitation creates more efficiency and transparency in financial markets in the European Union. According to the same principle, when a NNA is not the direct supplier of ISINs to users, NNAs should not charge for the mere use of ISINs.[63] In other words, charges to direct users (such as the charge for issuance of ISINs to issuers of a security) should observe the cost recovery principle, and there should be no charges for subsequent users.[64] Financial institutions are subsequent users as they

---

[61]   See ISO directives, Annex H, at Section H.4.4; https://www.iso.org/sites/directives/current/consolidated/index.html.

[62]   See *id.*, definitions, at Section H.3.4.

[63]   See letter from Mike Smith of ISO to ANNA of March 23, 2004, attached as **Exhibit 17.**

[64]   Please also refer to the European Commission's Commitment Decision *supra* n.4 & **Exhibit 3**, (https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf), para. 29.

receive their ISINs either in the public domain or from data vendors, such as Bloomberg. Globally, CGS is the only NNAs that charges for the mere use of the ISIN, e.g., by financial institutions.[65]

Regarding fees for the issuance of ISINs, ANNA states that "the majority of NNAs do not charge for ISIN [issuance] and fees do not apply for maintenance/renewal of [issued] ISINs."[66] Also, according to ANNA, "[i]n the few instances where fees are charged for ISIN [issuance], this is on a cost-recovery basis only, in accordance with ISO 6166 ISIN Registration Authority obligations."[67]

Each NNA administers its own numbering system.[68] For CGS it is the CUSIP numbering system. For LSEG, for instance, it is the SEDOL numbering system.[69] While both CGS and LSEG charge for CUSIP and SEDOL issuance respectively, ISO and ANNA regulations limit the fees to cost-recovery. "On a cost-recovery basis only" under ISO and ANNA regulations means that NNAs are permitted to charge for issuance only enough to recover their own cost and are not permitted to make a profit on the issuance of ISINs, not even a small profit.[70]

Regarding fees for the use of ISINs *after issuance*, ANNA does not even mention fees for the use of the ISIN. Given the obvious purpose of encouraging use of ISINs, it is my opinion that the absence of any mention of usage fees demonstrates that ANNA presumed that the use of ISINs

---

[65]    See    the    European    Commission's    Commitment    Decision    *supra*    n.4    &    **Exhibit    3**, (https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf), para. 38 (for the European Economic Area); see also *supra* n. 63.

[66]    https://anna-web.org.

[67]    *Id.*

[68]    https://en.wikipedia.org/wiki/National_Securities_Identifying_Number; https://uk.practicallaw.thomsonreuters.com/Glossary/PracticalLaw/I0f9fe9edef0811e28578f7ccc38dcbee?transition Type=Default&contextData=%28sc.Default%29.

[69]    https://en.wikipedia.org/wiki/National_Securities_Identifying_Number

[70]    See *supra* n. 63 & **Exhibit 17**; article from Inside Market Data of May 9, 2005 attached as **Exhibit 18**; opinion of Marc van der Haegen of Nauta Dutilh of 30 November 2004, attached as **Exhibit 19**; European Commission's Commitment Decision *supra* n.4 & **Exhibit 3**, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/ 39592_2152_5.pdf; para. 29.

would be free of charge as the ISIN is in the public domain once issued. This was also the position of the European Commission in its Commitment decision of 2011.[71]

CGS is the only NNA worldwide that charges users for the use of ISINs once issued.[72] I have reviewed the policies of each of the NNAs in the European Union and Asia. All of them use ISINs as the default identifier, and no NNA in the European Union or in Asia charges a fee for issuing or using ISINs. The use of all ISINs in the European Union and Asia is license free and fee free with the exception of CUSIP-based ISINs issued by CGS[73] with the result that there are no conditions or restrictions on the use of ISINs and there is no fee charged to end users for the use of such ISINs.

### VI.2.    CGS's Policies Regarding Other ISO Identifiers Also Demonstrate that Usage Fees Are Not Necessary to Maintain an Issuance Business

ISO standards for financial information, such as the ISIN, create a common language of machine-readable codes that support accuracy, efficiency, and mutual trust in global markets. ISO standards include two numbering systems other than ISINs which are relevant to an analysis of CGS's usage fees.

#### VI.2.i  CFI

The first is the CFI ("classification of financial instruments"). ISINs and CFIs are assigned by the NNAs for each country and are part of a larger family of financial identifiers known as the ISO-standard identifiers. The CFI identifies aspects such as the country and currency in which financial instruments are traded, where they were issued, the names of the issuer and the home-country depository, and the exact type of financial instrument and its terms. ISO-standard

---

[71]    Please also refer to the European Commission's Commitment Decision *supra* n.4 & **Exhibit 3**, para. 29.

[72]    See *id.* para. 38 (for the European Union).

[73]    See *id.* para. 38 (for the European Union).

identifiers have become the common language for financial transactions and processing around the world, because they are developed by the financial industry itself, under processes established by ISO.

CGS issues CFI identifiers. In fact, CGS informs the market that it is a "trustworthy source for getting the CFI."[74] Yet, CGS does not charge fees for issuance or use of the CFI, even though CGS bears costs for issuing CFIs similar to the costs it bears for issuing CUSIP-based ISINs, including maintaining a database of such numbers.

### VI.2.ii LEI

The second is the Legal Entity Identifier ("LEI"). At the request of the G20 Finance Ministers and the Financial Stability Board ("FSB"), the Global Legal Entity Identifier Foundation developed the LEI standard under ISO 17442. The LEI uniquely identifies legal entities that engage in financial transactions (as opposed to financial instruments which again are identified by the ISIN). In 2011, the G20 called on the FSB, an international body located in Basel, Switzerland, that coordinates "international standard-setting bodies as they work toward developing strong regulatory, supervisory, and other financial sector policies,"[75] to take the lead in developing recommendations for a global LEI and a supporting governance structure. The related FSB recommendations endorsed by the G20 in 2012 led to the development of the Global LEI System that provides unique identification of legal entities participating in financial transactions across the globe. The FSB recommended the creation of the LEI Regulatory Oversight Committee ("LEI ROC") to the G20, which subsequently endorsed the creation of the LEI ROC to uphold the

---

[74]     https://www.linkedin.com/posts/cusip-global-services_see-how-the-cfi-operates-in-tandem-with-the-activity-7212095070882123776-wJ7q/.

[75]     https://www.fsb.org/about/.

governance principles of the Global LEI System. Since 2014, over 2.2 million LEIs have been issued.[76]

In my opinion, it has always been clear that the usage of the CFI, like the use of ISINs, would be free of charge. The reason for this was to encourage usage of the numbering systems because the systems would create more efficiency and transparency in financial markets. Consistent with those purposes, CGS does not charge issuance or usage fees for the CFI. This is also the case for mapping the LEI with the ISIN of new issues.[77]

### VI.3    The Experience of WM Daten Demonstrates that Usage Fees Are Not Necessary to Operate an Issuance Business

WM Daten is a data vendor. It competes globally with other data vendors such as Defendants S&P and FactSet. WM Daten was founded in 1947 and is headquartered in Frankfurt, Germany. The way WM Daten operates shows that an NNA does not need to charge end users for their use of the ISIN in order to operate successfully and cover all ISIN-related costs to issue and maintain a database of issued ISINs.[78]

WM Daten is also the NNA for Germany. In this function, it issues ISINs to issuers of financial instruments in Germany.[79] If a German company needs an ISIN for the public trading of its shares (e.g., on the Frankfurt stock exchange), it will request an ISIN from WM Daten. After a brief compliance check (e.g., do the company and the security in question exist?), WM Daten will issue the ISIN. However, WM Daten does not impose any obligations for issuing the ISIN for the new security and maintaining a database of issued ISINs. Neither the issuer nor the end user

---

[76] https://www.lei-worldwide.com/lei-code-faq.html.

[77] For details, please see: https://www.gleif.org/en/lei-data/access-and-use-lei-data.

[78] See *supra* n. 65.

[79] See https://www.wmdatenservice.com/en/wkn-isin/; see *supra* n. 60.

making use of the ISIN later on (e.g, for trading or reporting or any other purposes) have any obligations vis-à-vis WM Daten to agree to a license or to pay usage fees of any kind.

The issuance of ISINs generates only a small cost, as the NNA performs a small check and needs to maintain a database or file of all the ISINs it issued. ISO allows NNAs to pass this cost, but only this cost, to the issuer. As the use of the ISIN does not generate significant costs, there is no form of or need for cross-subsidization with other activities of WM Daten, and WM Daten, like almost all NNAs worldwide, does not impose charges or usage fees to support ISIN issuance.

Nor does WM Daten require users to sign any agreement including any agreement termed a "license" to use ISINs. WM Daten does not impose any conditions on the use of ISINs, and there are no restrictions at all on the use of the ISINs WM Daten issues. There are also no restrictions on the use of other ISINs, including US ISINs, that WM Daten collects as a data vendor in the public domain. Therefore, any user is permitted to use the ISINs issued by or otherwise available from WM Daten in any way it chooses.

As WM Daten does not have any contractual relationship with the user of the ISIN, the subsequent usage of ISINs does not impose any cost on WM Daten. After the issuance of the ISIN, the ISIN number is in the public domain. Substantially all costs in relation to WM Daten's ISIN business are generated by the *issuance* of the ISIN. The only cost in the context of end user licensing – arising from such activities as controlling whether the end user has a license and pays a fee, cost of employees to engage with end users and ensure licenses are executed, lawyers' fees for pursuing users of the ISIN who do not have licenses – result from the end user *licensing business*, not from the use of the ISIN and certainly not from the issuance of ISINs. CGS's claim to need fees for its licensing of CUSIP use is therefore circular reasoning: CGS "needs" these fees

only as a result of administering the end user licensing. Or in other words, CGS needs the fees for licenses because it insists on getting licenses and charging fees.

Because WM Daten does not control, monitor, or track the use of ISINs, users have free access to the ISINs they need to run their businesses. The ISINs are in the public domain once issued, and available from multiple sources, including the services of data vendors, stock exchange apps, or newspapers. And because WM Daten does not control, monitor, or track the use of ISINs, WM Daten has no costs related to controlling, monitoring, or tracking the use of ISINs.

Customers of WM Daten's data services can use ISINs available with WM Daten's data feed without any restrictions. As long as users use only WM Daten as a data vendor, they do not have any involvement or problem with CGS's licensing policy. The licensing issue only begins when users use the services of other service providers such as Bloomberg because those service providers are generally obliged, under their contracts with CGS, to ensure that users have a CGS license in place, something that WM Daten was able to avoid. Often such vendors offer information (including ISINs) on a broader spectrum of non-German securities.

### VI.4    Usage Fees Are Inconsistent with the Purpose of Standardized Identifiers

Numbering systems are used by financial institutions to refer to financial instruments and legal entities. These numbering systems are used everywhere in the European Union and Asia without any usage fees with the exception of CGS's fees on the use of CUSIP-based ISINs for all financial institutions, other than those that operate only within the European Union and make use of CGS's Model End User Agreements according to the Commitments of 2011/2014 to the European Commission.

The fact that financial identifiers are issued and used without fees in more than 120 countries around the world demonstrates that it is not necessary to charge a fee to operate a system

of issuing and maintaining a database of issued financial instrument identifiers. This is clear not only from the fact that NNAs in Asia and the European Union do not charge usage fees, but also from the fact that CGS itself does not charge usage fees on the CFI.

The purpose and intent behind the creation of these standardized financial instrument identifiers is to encourage their use, both from the perspective of issuance and use after issuance. The use of standardized identifiers increases efficiency and transparency in financial markets. CGS's usage fees and license restrictions are inconsistent with the purpose and intent of standardized financial instrument identifiers and risk reducing usage of standardized identifiers like CUSIP-based ISINs and therefore also introduce inefficiency and risks in financial markets.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 13, 2025.

_____
Bettina Bergmann

# EXHIBIT A

**Bettina Bergmann**

Bettina Bergmann, born in 1969 in Frankfurt/ Main, Germany, and grown up in Frankfurt, Iowa City and Berlin, studied law and economics at the Free University of Berlin, from which she received her doctorate in 1995. She was admitted to the bar in 1996.

Before opening her own law firm in Cologne in 2007, Bettina Bergmann worked for ten years with major international law firms in Dusseldorf (Shearman & Sterling), Brussels (Cleary Gottlieb) and Bonn (Redeker, Dahs & Sellner), where she gained extensive experience in antitrust/competition and EU law.

In her own firm, Bettina continues to advise numerous well-known corporate clients and company representatives in all areas of competition/antitrust and EU law.

Bettina is a member of Studienvereinigung Kartellrecht, the German antitrust/competition law association.

Bettina works in English and German and also speaks Italian and French.

# EXHIBIT B

# Dr. Bettina Bergmann

## Publications

- Zentralvermarktung von Medienrechten, der Fußball heiligt alle Mittel? in: Kokott/Pohlmann/Polley, Festschrift für Dirk Schroeder, 2018 (article broadcasting rights for the football league in Germany).

- „Die Ministererlaubnis im Fall Edeka/ Tengelmann – wer hat Recht?", recht. Die Zeitschrift für Europäisches Lebensmittelrecht 2016, S. 110 ff. (article on the ministerial approval of the food retailers' merger Edeka and Tengelmann in Germany)

- „Kartellverfahren gegen EDEKA – lebt das Anzapfverbot noch?", recht. Die Zeitschrift für Europäisches Lebensmittelrecht 2016, S. 76 ff. (article on an abuse of dominance decision by a German higher court)

- „Kartellverfahren gegen Lebensmittelhersteller - wo geht die Reise hin", recht. Die Zeitschrift für europäisches Lebensmittelrecht, 2015, S. 29 ff. (article on cartel investigations in the food industry)

- „Praktische Fragen im Zusammenhang mit Zusagenentscheidungen nach Art. 9 Abs. 1 VO 1/2003", WuW 2014, 467. (article on practical problems in connection with commitment decisions by the European Commission)

- „Two Bodies of Law Separated by a Common Mission: Unilateral Conduct by Dominant Firms at the IP/Antitrust Intersection in the EU and the US", European Competition Law Journal 2013, 623 ff., with Amedeo Arena and Jay Himes

- „Sportsponsoring und Kartellrecht - was müssen Sponsoren, Verbände, Vereine beachten?" SpuRt 2009, 102 ff. (article on competition law issues in connection with sports sponsoring)

- Kommentar zu §§ 50 a, b und c und § 90 a GWB in: Frankfurter Kommentar zum Kartellrecht (commentary on provisions in the German Act against Restraints of Competition)

- „Keine Nichtigkeit bei De-facto-Vergabe", Neue Zeitschrift für Verwaltungsrecht (NVwZ) 2004, 946 ff. (zusammen mit Joachim Grittmann) (article on a public procurement law topic)

- Kommentar zu §§ 71, 72, 75, 76 und 77 TKG 1997 (§ 71 zusammen mit Dr. Thomas Mayen) in: Scheurle/Mayen, Kommentar zum Telekommunikationsgesetz, 1. Auflage 2002 (commentary on several provisions in the German Telecommunications Act)

- Kommentar zu §§ 127, 128, 129 und 135 TKG 2004 in: Scheurle/Mayen, Kommentar zum Telekommunikationsgesetz, 3. Auflage 2018 (commentary on several provisions in the German Telecommunications Act)

- „Maßstäbe zur Beurteilung einer Kosten-Preis-Schere im Kartellrecht", Wirtschaft und Wettbewerb (WuW) 2001, 234 ff. (article on the legal assessment of margin squeezes under German and European competition law)

- „Ein Netzzugang Dritter in der Elektrizität und Grundrechte der Versorgungsunternehmen", 1995 (dissertation thesis on third party access to electricity networks and fundamental rights of utiliies)