**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X

DINOSAUR FINANCIAL GROUP LLC,     :
HILDENE CAPITAL MANAGEMENT,     :    Case No. 1:22-cv-1860-KPF
LLC and SWISS LIFE INVESTMENT     :
MANAGEMENT HOLDING AG, on behalf     :
of themselves and all others similarly     :
situated,     :
    :
                Plaintiffs,     :
    :
       -against-     :
    :
S&P GLOBAL, INC., AMERICAN     :
BANKERS ASSOCIATION, and FACTSET     :
RESEARCH SYSTEMS INC.,     :
    :
                Defendants.     :
    :

------------------------------------------------------- X

 

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

<b>Page</b>

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 4

    A.   Origin and History of CUSIP ................................................................. 4

    B.   CGS Identifiers and Associated Data. ................................................... 4

        1.   CGS Identifiers. ............................................................................. 4

        2.   CGS Data. ...................................................................................... 5

    C.   CGS Services and Pricing. ..................................................................... 6

        1.   Identifiers and Basic Data Elements Are Available In Some Formats For Free. ............................................................................. 7

            (a)   CGS ISIN Look-Up Service. ................................................... 7

            (b)   Display Service ("Level 2"). .................................................... 7

            (c)   Government and Other Public Websites. ................................... 8

        2.   CGS Licensing Practices. ............................................................. 9

    D.   Overview of Putative Class ................................................................... 13

        1.   Putative Class Members' Use of Alternative Identifiers. ................ 14

        2.   Class Members Have Different Needs for Descriptive Data in the CGS Database. ............................................................................ 15

LEGAL STANDARD ........................................................................................................ 15

ARGUMENT ..................................................................................................................... 16

I.   Plaintiffs Fail to Establish Predominance. ................................................... 16

    A.   Plaintiffs' Zero-Price Model Ignores That Class Members Would Pay for Additional CGS Data Elements in the But-For World. ............... 18

    B.   If CGS Could Not Charge End Users , It Likely Would Increase Fees to Direct Licensees Who Would Pass On those Costs. ............................. 25

    C.   Plaintiffs' Purported Evidence That CGS Would Choose to Charge Zero Dollars is Meritless. ..................................................................... 30

1.  Plaintiffs' Purported "Competitive Benchmarks" Are Meritless. ..................... 31

2.  Plaintiffs' Zero Marginal Cost Theory is Meritless. ............................................ 33

D.  Plaintiffs' Relevant Market and Market Power Assertions Raise Additional
Individualized Questions. ......................................................................................... 36

E.  The Need to Exclude Amounts Paid for Non-U.S. Identifiers Creates Further
Individual Issues. ..................................................................................................... 38

F.  Multiple Other Individual Issues Weigh Against Class Certification. ....................... 41

1.  The Statute of Limitations Requires Individualized Determinations. .............. 41

2.  Plaintiffs' State Law Claims Cannot Be Proved on a Common Basis. ............. 42

3.  The Proposed Class Definition is Overbroad. .................................................... 44

II.  Plaintiffs' Injunction Class Fails Under Rule 23(b)(2). ....................................................... 44

CONCLUSION ................................................................................................................................ 45

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page (s)**

*4 K & D Corp. v. Concierge Auctions, LLC,*
   2 F. Supp. 3d 525 (S.D.N.Y. 2014).......................................................44

*Allen v. Dairy Farmers of Am., Inc.,*
   748 F. Supp. 2d 323 (D. Vt. 2010)......................................................42

*Bell Atl. Corp. v. AT&T Corp.,*
   339 F.3d 294 (5th Cir. 2003) .............................................................29

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962)..........................................................................38

*Califano v. Yamasaki,*
   442 U.S. 682 (1979)..........................................................................16

*City of New York v. Grp. Health Inc.,*
   649 F.3d 151 (2d Cir. 2011)..............................................................38

*Cline v. TouchTunes Music Corp.,*
   211 F. Supp. 3d 628 (S.D.N.Y. 2016).............................................43, 44

*Cruz v. FXDirectDealer, LLC,*
   720 F.3d 115 (2d Cir. 2013)..............................................................42

*Davis v. Angelcare USA, LLC,*
   727 F. Supp. 3d 99 (D. Conn. 2024)..................................................42

*Gaidon v. Guardian Life Ins. Co. of Am.,*
   750 N.E. 2d 1078 (N.Y. 2001)..........................................................41

*Haft v. Haier US Appliance Sols., Inc.,*
   578 F. Supp. 3d 436 (S.D.N.Y. 2022)................................................43

*In re Aluminum Warehousing Antitrust Litig.,*
   336 F.R.D. 5 (S.D.N.Y. 2020) ................................................... passim

*In re Cotton Yarn Antitrust Litig.,*
   505 F.3d 274 (4th Cir. 2007) ............................................................41

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page (s)**

*In re Delta Dental Antitrust Litig.*,
  2025 WL 2696575 (N.D. Ill. Sept. 22, 2025) ..........................................................38

*In re Digital Music Antitrust Litig.*,
  321 F.R.D. 64 (S.D.N.Y. 2017) ...............................................................29, 44

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008)..........................................................................40

*In re Int. Rate Swaps Antitrust Litig.*,
  2023 WL 8675625 (S.D.N.Y. Dec. 15, 2023) .........................................16, 29, 30

*In re Intuniv Antitrust Litig.*,
  496 F. Supp. 3d 639 (D. Mass. 2020) ....................................................................35

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  2025 WL 3240044 (S.D.N.Y. Nov. 20, 2025)........................................................44

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  2025 WL 2733020 (S.D.N.Y. Sept. 25, 2025)........................................................31

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018).....................................................................30

*In re Lithium Ion Batteries Antitrust Litig.*,
  2017 WL 1391491 (N.D. Cal. 2017) ......................................................................29

*In re NFL "Sunday Ticket" Antitrust Litig.*,
  2024 WL 3628118 (C.D. Cal. Aug. 1, 2024)..........................................................31

*In re Photochromic Lens Antitrust Litig.*,
  2014 WL 1338605 (M.D. Fla. 2014) ......................................................................29

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 171 (E.D. Pa. 2015)..............................................................................40

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
  725 F.3d 244 (D.C. Cir. 2013) ....................................................................23, 25, 30

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page (s)**

*In re Sears Holdings Corp.*,
    51 F.4th 53 (2d Cir. 2022) .................................................................................17

*In re Wireless Tel. Servs. Antitrust Litig.*,
    385 F. Supp. 2d 403 (S.D.N.Y. 2005)...............................................................35

*Jacob v. Duane Reade, Inc.*,
    293 F.R.D. 578 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015) ................................16

*Johnson v. Nextel Comm'cs Inc*,
    780 F.3d 128 (2d Cir. 2015)...............................................................................41

*Kronenberg v. Allstate Ins. Co.*,
    743 F. Supp. 3d 465 (E.D.N.Y. 2024) ...............................................................42

*Laumann v. Nat'l Hockey League*,
    105 F. Supp. 3d 384 (S.D.N.Y. 2015).........................................................19, 29

*Mahmud v. Kaufman*,
    607 F. Supp. 2d 541 (S.D.N.Y. 2009)................................................................39

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008), *abrogated on other grounds*, *Bridge v. Phx.
    Bond & Indem. Co.*, 553 U.S. 639 (2008)..........................................................17

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
    676 F. Supp. 486 (S.D.N.Y. 1987)....................................................................30

*Miramontes v. Ralph Lauren Corp.*,
    2023 WL 3293424 (S.D.N.Y. May 5, 2023) .....................................................43

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010)...............................................................................16

*N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*,
    710 F. Supp. 3d 1090 (D. Utah 2023)................................................................24

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
    2018 WL 1750595 (S.D.N.Y. Apr. 11, 2018).....................................................41

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page (s)**

*Series 17-03-615 v. Express Scripts, Inc.*,
    2024 WL 1834311 (N.D. Ill. Apr. 26, 2024) ........................................................................31

*Sykes v. Mel S. Harris and Associates LLC*,
    780 F.3d 70 (2d Cir. 2015).................................................................................................44

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019).........................................................................................41, 42

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).........................................................................................................15

*Wright v. Publishers Clearing House, Inc.*,
    439 F. Supp. 3d 102 (E.D.N.Y. 2020) ..........................................................................43, 44

**STATUTES**

15 U.S.C. § 15b ..........................................................................................................................41

Conn. Gen. Stat. § 42-110g(f) .....................................................................................................41

N.Y. Gen. Bus. Law § 349(a) .....................................................................................................42

**RULES**

NY CPLR 201 ............................................................................................................................41

Fed. R. Civ. P., Rule 23(b)(2) ...............................................................................................4, 44

Fed. R. Civ. P., Rule 23(b)(3) .............................................................................................16, 29

## Glossary of Terms

Except as otherwise indicated, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification uses the following capitalized terms for ease of reference.

| Term | Definition |
|------|-----------|
| ABA | Defendant American Bankers Association |
| ANNA | Association of National Numbering Agencies |
| ASC X9 | Accredited Standards Committee X9, the standard-setting organization that approved the CUSIP and FIGI standards |
| Authorized Data Vendor | A CGS customer licensed to use CGS Data for external distribution.  This term is interchangeable with "Third-Party Data Vendor" as used in Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification and Appointment of Class Counsel (ECF 216 at 6). |
| Bergmann Report | Expert Report of Bettina Bergmann, dated August 13, 2025, ECF 231-3 |
| CGS | CUSIP Global Services |
| CGS Data | CGS Identifiers and 60-plus descriptive data fields linked to each Identifier. |
| CGS Identifiers | Umbrella term for CUSIP Identifiers, CINS, and CGS-issued ISINs |
| CGS ISIN | ISINs issued by CGS in its capacity as NNA for the U.S., Canada and 30+ other countries |
| CINS | CUSIP International Numbering System identifier for equity and debt offerings offered in 30+ countries outside the U.S. and Canada |
| Contreras Report | Expert Report of Jorge Contreras, dated November 26, 2025 |
| CUSIP Access | A real-time, web-based service for licensees that provides look up and download capabilities of the entire universe of CGS Data |
| CUSIP Identifiers | 9-character alphanumeric code that identifies financial instruments offered in the U.S. and Canada |
| Data Distributor | A company that redistributes financial data within its products and services.  Authorized Data Vendors are those Data Distributors who have signed CGS Distribution Agreements. |

| | |
|---|---|
| Dinosaur | Plaintiff Dinosaur Financial Group LLC |
| Distribution Agreement | A CGS Distribution Agreement permitting an Authorized Data Vendor to use CGS Data for external distribution |
| Defs. Mot. to Exclude Elhauge | Defendants' Notice of Motion and Motion to Exclude Testimony of Einer Elhauge |
| Elhauge Report | Corrected Expert Report of Einer Elhauge, dated August 29, 2025, ECF 231-86 |
| End User | A CGS customer licensed to use CGS Data for internal business purposes |
| Ex- | Prefix indicating an exhibit attached to the Kiernan Declaration |
| FactSet | Defendant FactSet Research Systems Inc. |
| Faulkner Decl. | Declaration of Gerard Faulkner in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification |
| FIGI | Financial Instrument Global Identifier |
| FINRA | Financial Industry Regulatory Authority |
| Gaebel Report | Expert Report of Katerina Gaebel, dated October 28, 2025 |
| Hildene | Plaintiff Hildene Capital Management, LLC |
| ICE | Intercontinental Exchange, Inc. |
| ISIN | International Securities Identification Number, a 12-character alphanumeric identifier used for financial instruments globally |
| Kiernan Declaration | Declaration of David C. Kiernan in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification |
| Lenz Report | Expert Report of Frank Lenz, dated August 12, 2025 |
| Meyn Report | Expert Report of Cynthia Meyn, dated November 26, 2025 |
| Miller Report | Expert Report of Arthur Miller, dated August 14, 2025, ECF 231-1 |
| Mot. | Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification and Appointment of Class Counsel, ECF 216 |
| Mot. to Exclude Lenz | Defendants' Memorandum of Law in Support of Motion to Exclude Testimony of Frank Lenz |
| MSRB | Municipal Securities Rulemaking Board |
| NNA | National Numbering Agency |
| Powell Report | Expert Report of James Powell, dated August 12, 2025, ECF 231-2 |
| SAC | Second Amended Complaint, ECF 87 |

| SEC | Securities and Exchange Commission |
| --- | --- |
| S&P | Defendant S&P Global, Inc. |
| Stiroh Report | Expert Report of Lauren Stiroh, dated November 26, 2025 |
| Subscription Agreement | A CGS Subscription Agreement permitting an End User to use CGS Data for internal business purposes |
| Swiss Life | Plaintiff Swiss Life Investment Management Holding AG |

## INTRODUCTION

Plaintiffs' motion for class certification should be denied because they cannot show that common issues predominate over individual ones.  Most important, Plaintiffs cannot prove classwide injury with common evidence because many putative class members likely would have been worse off absent the challenged conduct.  And identifying which putative class members would have been better or worse off (or no different) depends on a multitude of individualized questions that overwhelm any common questions.

Plaintiffs fail to address these issues because they do not undertake any examination of the putative class they purport to represent.  The putative class includes a diverse set of financial services firms, including asset managers, broker-dealers, private banks, Data Distributors, and "FinTech" technology services providers.  These diverse putative class members need different data, and use CGS Data in myriad ways, depending on what type of entity they are, what types of securities they handle, and what functions they perform for their many distinct categories of clients.  While claiming a "relevant market" for the "use" of CGS Identifiers generally, Plaintiffs ignore how these innumerable use cases differentiate the purported class and bear upon what putative class members would have done—and how CGS would have priced to them—if CGS had to adopt a model for licensing data that is different from the one Plaintiffs challenge.

Plaintiffs seek to paper over all these differences by betting their entire class certification motion on a single, highly implausible, and unsupported theory—that common injury can be proven because, in the absence of the challenged conduct, every putative class member, regardless of category or individual need, would have paid nothing—*zero dollars*—to access CGS Data.  This theory cannot withstand even a modicum of scrutiny.

***First***, it assumes that CGS would not only license CGS Identifiers (CUSIP, CINS, or CGS ISIN) to putative class members for free in the absence of the challenged conduct, but also

that the putative class wants nothing more from CGS than the CGS Identifiers (and perhaps 1-2 more fields of basic information). This house of cards collapsed when Plaintiffs' expert, Professor Einer Elhauge, admitted at deposition that this was contrary to the evidence. He admitted that even if, absent the challenged conduct, CGS Identifiers were free, "some" putative class members would still continue to value and pay for access to the additional CGS data elements—over sixty—linked to the identifiers that CGS licenses. Elhauge thus disavowed Plaintiffs' theory that putative class members would have paid nothing for CGS Data in the absence of the challenged conduct and confirmed that his damages model cannot show what putative class members would have paid absent the challenged conduct. Plaintiffs' model thus cannot establish whether putative class members would have paid more, less, or the same without individualized inquiries. By itself, this defeats class certification, because Plaintiffs' zero-price model is their sole proffered basis for asserting that injury and damages can be shown through common proof.

**_Second,_** Plaintiffs' damages model ignores that, if CGS were confronted with a situation where it could not charge end users for its data, it would likely instead simply pivot and charge direct customers, the Authorized Data Vendors, for such usage, who would then pass along those increases to putative class members. Elhauge conceded that this response by CGS would have been a legitimate and plausible outcome absent the challenged conduct. Many putative class members would have been worse off under this alternative model. Whereas CGS currently charges End Users only once to download CGS Data from many sources, if CGS had to adopt a new licensing model that relied on charges to Authorized Data Vendors (and those Vendors then passed on those costs), putative class members that receive CGS Data from multiple Authorized Data Vendors (65% of the putative class) would have paid more to each of those vendors to

access the CGS data. For those putative class members, the aggregate fees they would have paid almost certainly would exceed the single fee they pay CGS now.

*Third*, Plaintiffs cannot salvage their zero-price model by pointing to 120 foreign countries where Plaintiffs claim that local firms charge nothing for financial identifiers. Plaintiffs make no attempt to show that the products at issue in those countries, or the legal and economic conditions there, are remotely comparable to the U.S. market. Instead, they rely on the "expert" opinion of a European lawyer whose opinions should be disregarded for numerous reasons, including that she has no experience with, and conducted no investigation of, virtually all the 120 foreign countries that are supposedly appropriate yardsticks for this case. Contrary to Plaintiffs' (and their "experts") contention, the local firms in these countries do charge for structured data associated with their identifiers much like CGS does in the U.S.

*Fourth*, individualized issues also arise for a host of additional reasons. Plaintiffs' zero-price model includes amounts paid for foreign identifiers, which are not part of Plaintiffs' claims, and accounting for each putative class member's use of foreign identifiers requires individualized proof. In addition, given the varying needs of different class members for CGS Data, the "relevant market" in which the CGS Data is licensed (and the related question of whether CGS exercises market power in a properly defined relevant market) varies greatly depending on each category of class members—creating further individualized questions.

*Fifth*, Plaintiffs' request to certify classes under Connecticut and New York law fails for the same reasons as under federal law. And the New York claim cannot be certified for the additional reason that New York law requires individual inquiries into where the alleged deception occurred, and whether the putative class member participated in a marketplace in New York.

**Finally**, Plaintiffs cannot certify an injunctive relief class under Rule 23(b)(2) both because they have not shown a common method for proving classwide injury and because they cannot establish that the purported class would benefit from injunctive relief when at least some members would be worse off absent the challenged conduct.

## FACTUAL BACKGROUND

### A.    Origin and History of CUSIP.

Trading volumes in the early 1960s overwhelmed the markets' ability to clear and settle trades on paper by hand.[1]  The ABA responded in 1964 by convening a committee of industry stakeholders (the "Committee on Uniform Security Identification Procedures"), which developed the 9-character alphanumeric code that would uniquely and reliably identify each financial instrument issuance; that code is known as the CUSIP Identifier.[2]

The ABA thereafter created the CUSIP Service Bureau, now CGS, as an independent entity to issue CUSIP Identifiers and publish a database of CUSIP Identifiers with associated data fields.[3]  In 1968, ABA selected Standard & Poor's to operate CGS.[4]  FactSet acquired the rights to operate CGS in 2022.[5]

### B.    CGS Identifiers and Associated Data.

#### 1.    CGS Identifiers.

**CUSIP.**  CGS issues the CUSIP Identifier for financial instruments offered in the U.S.

---

[1] *See* Virginia B. Morris and Kenneth M. Morris, *CUSIP: A Common Language for Efficient Markets*, CUSIP Global Services, 4 (2023), https://experience.cusip.com/brochure/cusip-a-common-language-for-efficient-markets ("Morris and Morris").

[2] *Id*. 4, 6.

[3] *Id*. 5, 10.

[4] *Id*. 5.

[5] *CGS History*, CUSIP Global Services, https://www.cusip.com/about/history.html.

and Canada.  Ex-28 at 19.[6]  CUSIP Identifiers now cover more than 30 types of equity, debt, and other financial instruments.[7]

      **CINS.**  In 1989, CGS began issuing the CUSIP International Numbering System (CINS) Identifier for equity and debt offerings outside the United States and Canada.[8]

      **ISIN.**  International Securities Identification Numbers (ISINs) are 12-character identifiers used for financial instruments globally.  They are assigned by the NNA of the country in which the instrument is issued.[9]  They consist of the Local Identifier (CUSIPs in the case of U.S. and Canada) plus characters identifying the country of origin.[10]  CGS issues ISINs (CGS ISINs) for the U.S., Canada, and 30 other jurisdictions.[11]

      **2.**     **CGS Data.**

      Beyond issuing identifiers, CGS creates, maintains, and regularly updates a database that includes over 34 million active securities with a CGS-issued identifier and more than 60 associated data elements (the "CGS Data").[12]  The CGS Data fields are broken down by security type, "Debt-General, "Debt Municipal," or "Equity Issues," and include a multitude of necessary

---

[6] Unless otherwise indicated, all "Ex" references are to the exhibits to the Kiernan Declaration.

[7] Morris and Morris 4-5; Ex-28 at 12.

[8] *About CGS Identifiers (CINS)*, CUSIP Global Services, https://www.cusip.com/identifiers.html#/CINS.

[9] *About CGS Identifiers (ISIN)*, CUSIP Global Services, https://www.cusip.com/identifiers.html#/ISIN.

[10] *Id*.

[11] *CGS ISIN Master File*, CUSIP Global Services, https://www.cusip.com/pdf/fact_sheet/CGS%20ISIN%20Master%20File-2021.pdf.

[12] *CGS Services*, CUSIP Global Services, https://www.cusip.com/services/index.html; Ex-4 (Faulkner Decl.) ¶¶ 4-5.  CGS's master database is known as the "CGS Master File."  CGS also offers specialized database products and services tailored to specific asset types or client services (e.g., syndicated loans, mortgage-backed securities, and hedge funds) and delivery preferences (e.g., API, datafeed, web browser, and SFTP).  *See* Ex-41 at -068-069.

data points such as Coupon Rate, Currency, Maturity Date, and Underwriter.[13]  Depending on

the financial instrument, the data fields are critical to identification, which helps to avoid trading

and accounting errors and facilitate accurate reporting to regulators.  *See* Ex-2 (Meyn Rep.) ¶¶

130, 187.  In fact, putative class members indicate a broad and diverse usage of CGS Data

elements, which varies by who they are, the "stage of the security investment lifecycle," and

what instrument is at issue.  *Id.* ¶ 189, Table 1 (███████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████).  To ensure

data quality and accuracy, CGS primarily collects this information directly from issuers of the

underlying security.  Ex-5 (Faulkner Dep.) 36:14-37:10.

CGS constantly updates and enhances its database, including by adding data on

approximately 3,000 securities to its CUSIP Master File each day.  *See* Ex-4 (Faulkner Decl.)

¶¶ 4-5.  ████████████████████████████████████████████████████████

████████████████████████████████████████  *See* Ex-8 (Fitzpatrick (ICE

30(b)(6)) Dep.) 207:8-23; Ex-9 (Dubois (Xignite 30(b)(6)) Dep.) 91:19-92:22.

C.      **CGS Services and Pricing.**

CGS makes CGS Identifiers and associated descriptive data available in a variety of

formats, ranging from free access to identifiers and select data elements (including on public

websites) to full access to the entire CGS database (including download capability) with a paid

license.

---

[13] *CGS CUSIP Master File*, CUSIP Global Services,
https://www.cusip.com/pdf/fact_sheet/CUSIP%20Master%20File.pdf.

1.     **Identifiers and Basic Data Elements Are Available In Some Formats For Free.**

(a)    **CGS ISIN Look-Up Service.**

The CGS website provides a free look-up service that users can access free of charge.[14]

Users can look up any CGS ISIN by number or description.[15]  The service displays the CGS

ISIN and five descriptive fields:  ISO Issuer Name, ISO Issue Description, Currency, Interest

Rate, and Maturity Date.[16]

(b)    **Display Service ("Level 2").**

Anyone with a display or on-screen product provided by an Authorized Data Vendor,

███████████████████████ can access CGS Data in display form without a CGS license and

with no charge from CGS. ████████████████████████████████████████

███████████████████████████ CGS places no limits on the number of identifiers and

associated CGS Data that an End User can access in this "Level 2" display format.[17]  ████

████████████████████████████████████████████████████████

████████████████████████████████████████  Ex-12

(Jefferson Dep.) 270:9-18; Ex-13 (Perez-Santalla Dep.) 19:8-20:5, 20:12-21:5; Ex-14 (Kälin

Dep.) 156:22-157:8; 235:24-236:14; Ex-15 (████████  (Maverick 30(b)(6)) Dep.) 44:11-18;

---

[14] *CGS ISIN Service*, CUSIP Global Services, https://www.isin.cusip.com/isin/login.html#, *CGS ISIN Service License Agreement*, CUSIP Global Services, https://www.isin.cusip.com/isin/login.html#/isinRegisterLicenseModal.

[15] Ex-64.

[16] *Id.*

[17] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

Ex-16 (███ (Wilshire 30(b)(6)) Dep.) 74:21-75:15; Ex-10 (███ (Bloomberg 30(b)(6)) Dep.) 44:3-45:17; Ex-11 (███ (Refinitiv 30(b)(6)) Dep.) 33:16-34:4. █████████ ████████████████████████████████████████████████ *See* Ex-17 at -854.

### (c)    Government and Other Public Websites.

For many U.S. financial instruments, CGS Identifiers and descriptive data, including the issuer name and type of security, are available without charge or license from CGS via several government websites, including:

- the SEC's EDGAR website.  Ex-18 (Mitnick Dep.) 125:4-21.  The SEC also publishes a quarterly list of securities, with CUSIP Identifiers, eligible for reporting on Form 13F.[18]

- the MSRB's EMMA website, which publishes CUSIP Identifiers and related data for municipal bonds.  Ex-20 (███ (MSRB 30(b)(6)) Dep.) 18:16-19:20.[19]

- the FINRA website, which makes available CGS Data regarding securities reported to FINRA.  Ex-21 (███ (FINRA 30(b)(6)) Dep.) 133:21-134:7.[20]

Many CGS Identifiers can also be obtained free of charge through searches on Google and Yahoo Finance (Ex-13 (Perez-Santalla Dep.) 76:25-77:19; Ex-22 (Miller Dep.) 229:23-230:10), as well as e-trading websites such as Fidelity and Charles Schwab and issuer websites.

---

[18] *See, e.g.*, *List of Section 13F Securities*, *Third Quarter FY 2025,* Securities and Exchange Commission, https://www.sec.gov/files/investment/13flist2025q3.pdf; Ex-19 (McKinnon (Dearborn 30(b)(6)) Dep.) 22:25-23:13.

[19] *See, e.g.*, *Issue Details*, EMMA, https://emma.msrb.org/IssueView/Details/P1434647.

[20] *See, e.g.*, *Fixed Income Security Lookup*, FINRA, https://www.finra.org/finra-data/fixed-income/bond?symbol=FB5458288&bondType=CORP.

2.    **CGS Licensing Practices.**

CGS licenses CGS Data to numerous financial market participants to give them broader access to robust structured data associated with CGS Identifiers that allows market participants to reliably and accurately identify the security, among other functions.  By maintaining an accurate compilation of this data, CGS saves market participants the effort, expense, and risk of error associated with manually retrieving and connecting CGS Identifiers with accurate descriptive data.  Ex-23 (Kälin (Swiss Life 30(b)(6)) Dep.) 175:23-177:2; ██████████████████ ████████████████; Ex-2 (Meyn Rep.) ¶ 266. ██████████████████ ██████████████████████████████████████ ██████████████████████████████ Ex-19 (██████ (Dearborn 30(b)(6)) Dep.) 38:17-40:8; Ex-16 (████ (Wilshire 30(b)(6)) Dep.) 153:19-155:5.

As illustrated in the below graphic, CGS licenses access to CGS Data Services directly and indirectly:





Ex-1 (Stiroh Rep.) ¶ 45, Fig. 2.4.

CGS licenses CGS Data to both Authorized Data Vendors and End Users. ██████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████    *See* Ex-25 at -073-074.  End Users execute a CGS Subscription

Agreement, which permits them to use CGS Data for internal business purposes.  *See* Ex-26 at

-095-096.  As shown above, End Users and Authorized Data Vendors alike may elect to receive

CGS Data directly from CGS, indirectly via another Authorized Data Vendor, or from some

combination thereof.

Plaintiffs' proposed classes consist of Authorized Data Vendors and End Users who

receive CGS Data from Authorized Data Vendors.

Regardless of how many Authorized Data Vendors provide them with CGS Data, all CGS licensees, including putative class members, pay only *once* for their usage of CGS Data.[21] Once a licensee enters a single agreement with CGS, it can access CGS Data from as many Authorized Data Vendors as it chooses (and from CGS itself) with no further charge.[22] This benefits the 65 percent of the putative class members that receive CGS Data from more than one Authorized Data Vendor.  Ex-1 (Stiroh Rep.) ¶¶ 90-91, Figs. 4.2, 4.3.

CGS structures its pricing to avoid charging both Authorized Data Vendors and End Users for the same access rights to CGS Data.  F██████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████[23]  *See* Ex-29 at -089.  However, CGS does not charge the Authorized Data Vendor's clients/End User customers for such display usage or require a Subscription Agreement for such Level 2 display usage.  *See, e.g.*, Ex-17 at -854, -859.

████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████  Ex-6 (Hunter (FactSet 30(b)(6)) Dep.) 112:21-113:21; Ex-1 (Stiroh Rep.) ¶ 55, Fig. 2.5.

These direct and indirect licensing approaches are commonly used by companies

---

[21] *License Fees*, CUSIP Global Services, https://www.cusip.com/services/license-fees.html.

[22] *Id.*; Ex-27 (Nagle Dep.) 81:10-15.

[23] ████████████████████████████████████████████.  Ex-1 (Stiroh Rep.) ¶ 56.

operating as data suppliers. 

Ex-11 ( (Refinitiv 30(b)(6)) Dep.) 94:2-95:3; Ex-10 ( (Bloomberg 30(b)(6)) Dep.) 55:25-56:23.

Ex-8 ( (ICE 30(b)(6)) Dep.) 49:20-50:15; Ex-21 ( (FINRA 30(b)(6)) Dep.) 156:7-157:16; Ex-3 (Contreras Rep.) ¶¶ 80-81, 85-87.

*See, e.g.*, Ex-11 ( (Refinitiv 30(b)(6)) Dep.) 64:10-20; Ex-30; Ex-3 (Contreras Rep.) ¶ 82.

CGS Distribution Agreements vary according to what CGS product(s) the Authorized Data Vendor opts to receive, whether they receive database products directly from CGS or through third parties, and how they intend to provide CGS Data to their subscribers. *E.g.,* Ex-17 at -852-853 (listing products), -856-857 (listing products and data formats).

*See* Ex-11 ( (Refinitiv 30(b)(6)) Dep.) 56:4-57:11, 60:20-61:10; Ex-8 ( (ICE 30(b)(6)) Dep.) 121:21-123:7; Ex-9 ( (Xignite 30(b)(6)) Dep.) 167:7-20, 242:2-14.

For putative class members that receive CGS Data in bulk download or data feed format, CGS's license fee is predicated on (1) the number of unique financial instruments for which the user obtains CGS Data; (2) the number of business lines utilizing CGS Data; and (3) the number

of geographic regions where CGS Data will be used, aside from any applicable discounts.[24]  It is

not based on the number of bulk downloads or data feeds or the data elements utilized.

CGS also offers a product called "CUSIP Access."  That product enables licensees to

look up or download all CGS Identifiers and associated 60-plus data elements.[25] ████████

████████████████████████████████████████████████████████.  Ex-6

(Hunter (FactSet 30(b)(6)) Dep.) 50:25-51:14.  Licensees must elect to receive CUSIP Access;

about half the putative class members do so.  Ex-1 (Stiroh Rep.) ¶¶ 149-50.  Putative class

members have elected to pay for additional login credentials, and some have purchased CUSIP

Access as a freestanding fee-based product.  *Id*. ¶¶ 151-53.

### D.    Overview of Putative Class.

The putative class includes a diverse array of financial services industry participants,

ranging from broker-dealers to insurers and FinTech companies.  *See* Ex-2 (Meyn Rep.) ¶ 189,

Table 1.  Some of these firms manage investment portfolios for their clients, others perform a

host of services related to such wealth management, and others compile financial services data,

including CGS Data, to create derivative products for their customers.  *See id.* ¶¶ 191-92

(describing activities of Investment Banks); ¶¶ 225-31 (describing activities of Wealth

Management companies); ¶¶ 260-68 (describing activities of FinTech companies).  These

companies vary considerably in the instrument types they deal with, the financial identifiers they

utilize, the descriptive data they require along with the identifiers, and the ways they access this

data and from whom.  *See id*.  Putative class members typically pay licensee fees to receive bulk

---

[24] *End User Fee Estimator*, CUSIP Global Services, https://www.cusip.com/services/license-fees.html#/endUserFeeCalculator; *see* Ex-27 (Nagle Dep.) 92:7-93:8.

[25] *CGS CUSIP Access*, CUSIP Global Services, https://www.cusip.com/pdf/fact_sheet/CUSIP%20ACCESS.pdf.

downloads or data feeds of CGS Data through Authorized Data Vendors.

**1.    Putative Class Members' Use of Alternative Identifiers.**

CGS Identifiers identify a broad range of financial instruments, including various stocks and bonds (equities), municipal bonds (debts), and derivatives (other).[26]  CGS Identifiers do not cover all asset classes; alternative identifiers are used for financial instruments such as credit default swaps and some privately placed securities.  *See, e.g.*, ECF 231-2 (Powell Rep.) 16; Ex-22 (Miller Dep.) 297:5-9; Ex-32 (Powell Dep.) 194:4-6.  Putative class members have access to multiple identifier options and may use these identifiers in different ways, depending on the asset type and point in the lifecycle of an investment.  *See* ECF 231-1 (Miller Rep.) ¶¶ 93, 101, 104; Ex-2 (Meyn Rep.) ¶¶ 14-16.  For example, "Ticker Symbols have not been approved as a standard, but are in ubiquitous use" by the putative class members.  Ex-2 (Meyn Rep.) ¶¶ 17, 189, Table 1.  As another example, Bloomberg has developed FIGI, which substantially covers the same asset classes as CUSIP.[27]  Firms also use different CGS Identifiers, depending on the geography of the assets they cover.  *See* ███████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████

---

[26] *Supporting efficient global capital markets*, CUSIP Global Services, https://www.cusip.com/identifiers.html (listing over 30 instrument types).

[27] Bloomberg October 21, 2024, Letter, 30, https://www.sec.gov/comments/s7-2024-05/s7202405-533215-1528962.pdf.  The standard-setting organization ASC X9 adopted FIGI as a U.S. standard identifier for financial instruments.  *ASC X9 Publishes U.S. Standard for the Financial Instrument Global Identifier,* Accredited Standards Committee X9, Inc., https://x9.org/asc-x9-publishes-u-s-standard-for-the-financial-instrument-global-identifier/.

###### 2. Class Members Have Different Needs for Descriptive Data in the CGS Database.

Putative class members utilize the structured data associated with CGS Identifiers for a host of reasons, including that this data is often needed to accurately identify the financial instrument. Ex-2 (Meyn Rep.) ¶ 40. Their need for this structured descriptive data linked to the identifier varies considerably based on factors such as the type of firm, the instruments that it is trading or analyzing, and the business functions it needs them to perform. Ex-32 (Powell Dep.) 290:1-291:8; Ex-7 (Elhauge Dep.) 50:10-19; Ex-2 (Meyn Rep.) ¶¶ 59-61. The three named class representatives illustrate the divergent data needs of the putative class. Those firms use anywhere from six data points (Swiss Life) to 21 data points (Hildene) that coincide with the fields available within CGS Data, Ex-2 (Meyn Rep.) ¶ 189, Table 1, though they have access to the full set of 60-plus data fields in the CGS Data. The variation among putative class members is compounded by the fact that the putative class also includes Authorized Data Vendors who need broad access to CGS Data associated with CGS Identifiers for the data services they provide to their customers. *See id.*

Due to the varying needs of End Users, Authorized Data Vendors incorporate a robust selection of CGS Data into their services. For example,



Ex-8 ( (ICE 30(b)(6)) Dep.) 72:13–73:2. . Ex-33 ( Decl.) ¶ 2.

### LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348

(2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  Plaintiffs "bear[] the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met," including the requirement of predominance under Rule 23(b)(3).  *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (internal citations omitted).

## ARGUMENT

### I.    Plaintiffs Fail to Establish Predominance.

Plaintiffs fail to meet the "rigorous" requirement of showing that common issues predominate.  *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 592-93 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015).  In antitrust cases, the class certification analysis often "begins and ends with the issue of predominance."  *In re Int. Rate Swaps Antitrust Litig.*, 2023 WL 8675625, at *5 (S.D.N.Y. Dec. 15, 2023).  And certification is often denied in antitrust cases when proving injury to the class would require an individualized analysis.  *Id.* at *6.

Here, Plaintiffs are unable to prove injury to the class without highly individualized analyses.  To prove fact of injury, Plaintiffs must show that "the fee[s] [actually] paid were higher than the but-for fee," i.e., the fee that would have been charged in the absence of the challenged conduct.  *Cordes & Co. Fin. Servs., Inc.*, 502 F.3d 91, 107 (2d Cir. 2007).  Because Plaintiffs cannot use common proof to "'show *all* class members suffered some injury' as part of the predominance inquiry," the predominance requirement cannot be satisfied.  *See Int. Rate Swaps*, 2023 WL 8675625, at *8 (emphasis added) (internal citations omitted).

To satisfy their burden, Plaintiffs implausibly contend that, absent the challenged conduct (i.e., the "but-for world"), every putative class member would have paid nothing, ***zero dollars***, for CGS Data.  Plaintiffs thus calculate "damages as the *full amount of the license fees* paid by each Class member during the Class Period."  Mot. 38 (citing ECF 231-86 (Elhauge Rep.)

16

¶¶ 112-14) (emphasis added).[28]  Plaintiffs essentially claim that putative class members would have received a bulk download or data feed of up to 60-plus fields of data for up to millions of financial instruments—maintained and supplied with significant effort by CGS—for *free*. Mot. 32, 37-38.

Plaintiffs' implausible zero-price theory fails to provide common proof of injury for at least three independent reasons.  *See McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 230 (2d Cir. 2008) (predominance cannot be satisfied based on theory of injury that is not "plausible"), *abrogated on other grounds*, *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008).  *First*, Plaintiffs' zero-price theory is based on a fiction—that the CGS service at issue is limited just to CGS Identifiers, and that putative class members want only that basic information.  That fiction unraveled at Plaintiffs' economic expert's deposition where he admitted that many putative class members pay for and value the broader structured data (i.e., dozens of other data elements) licensed to them by CGS, and that CGS "could charge" class members for those other data elements in the but-for world.  Ex-7 (Elhauge Dep.) 130:10-18.  That means that the "but-for prices" for licensing CGS Data would not be zero for all class members, and thus Plaintiffs cannot prove the but-for prices for these members with common evidence.  Indeed, Plaintiffs have not identified *any* class members that would prefer a standalone product of just Identifiers (even if free).

*Second,* in a but-for world where CGS could not charge End Users for indirect access to CGS Data, it would likely shift these fees to direct licensees—Authorized Data Vendors—for the CGS Data they redistribute, and those vendors would pass along at least some of those increases

---

[28] Plaintiffs do not specify "other harms," Mot. 37, and so that argument is waived.  *In re Sears Holdings Corp.*, 51 F.4th 53, 65 (2d Cir. 2022).

to putative class members.  *Third*, the record cannot support a finding that CGS Identifiers would be provided for free in the but-for world.

*Further*, individual issues predominate in this action for several additional reasons.

### A.    Plaintiffs' Zero-Price Model Ignores That Class Members Would Pay for Additional CGS Data Elements in the But-For World.

Plaintiffs' zero but-for price theory is based on a premise lacking any evidentiary support and one which their own expert now concedes is false—i.e., that every class member would have paid zero for CGS Data in the but-for world.  To support that theory, Plaintiffs must prove their claims that (1) the only data those class members want from CGS is CGS Identifiers themselves (and possibly 1-2 additional basic data elements such as the name or type of the issuer), and (2) such basic data would have been provided by CGS for free in the but-for world.  But this theory fails.  Among other reasons, it ignores that the CGS Data license entitles putative class members to access and download highly valuable data that includes not just CGS Identifiers but also up to ***60-plus*** data elements ***linked to*** each identifier.[29]  And it ignores the extent to which putative class members want and need that CGS Data to utilize CGS Identifiers in their businesses.

Putative class members, including Authorized Data Vendors, testified that they want and are willing to pay for these numerous additional data elements from CGS beyond the mere basic data.  *See infra*, 19-21.  Elhauge conceded this at deposition, where he acknowledged that (1) in the but-for world, CGS would continue to "charge for other data fields," apart from the CGS Identifiers, Ex-7 (Elhauge Dep.) 220:6-11; *see id.* 130:10-131:6, and (2) at least some class

---

[29] *See supra*, 5-6.  Elhauge seems to misunderstand what class members pay for with the CGS Data license, as he testified that the "basic license" "just covers the CUSIP identifiers."  Ex-7 (Elhauge Dep.) 154:21-24; *see* Defs. Mot. to Exclude Elhauge 16.

members value those additional data fields and in the but-for world "might . . . continue paying CGS for [these] data elements" they receive from CGS indirectly through these Authorized Data Vendors, *id.* 132:21-133:7.

By itself, this admission—that at least some putative class members would still be paying for CGS Data in the but-for world—defeats class certification. Plaintiffs proffered only one model for proving injury and damages common to the class—the zero-price model—and Elhauge now concedes that this model is invalid. In conceding that at least some putative class members will continue to pay for CGS Data in the but-for world—but with no common model that can predict how much—Plaintiffs cannot show classwide injury with common proof. Plaintiffs' purported "single formula" can support class certification as a common method *only* if it can "be employed to make a *valid comparison* between the but-for fee and the actual fee paid." *Cordes*, 502 F.3d at 107 (emphasis added). But the facts—and Elhauge's concessions at deposition—now confirm that the theorized but-for fee of zero fails to meet that standard. *Cf. In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 46-47 (S.D.N.Y. 2020) (a court must "rigorously examine the soundness" of a model at the class certification stage, and may certify a class "only where the Court finds the model methodologically sound"); *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 398-99 (S.D.N.Y. 2015).

As the record shows, putative class members need numerous data elements in the structured CGS Data for various reasons, including that in many cases, one cannot reliably and accurately identify a security with the financial identifier and basic information (i.e., issuer name and type) alone. *See* Ex-2 (Meyn Rep.) ¶¶ 40, 62. In those instances, putative class members want more than the mere basic data. Moreover, putative class members testified that they license and pay CGS for these data elements—and will continue to do so—because they value, among

other things, the CGS Data's reliability and accuracy.  *See, e.g.,* ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████ [30]  That over half of the putative class elect to

receive CUSIP Access—which provides access to the entire structured database—while others

pay for additional CUSIP Access credentials, reinforces the conclusion that CGS licensees,

including many putative class members, value that structured data and would pay for it in the

but-for world.  Ex-1 (Stiroh Rep.) ¶¶ 153, 157.  The following captures examples of the extent to

which putative class members rely on the structured CGS Data along with CGS Identifiers,

including how differentiated that use is:



- ███████████████████████████████████████
  ███████████████████████████████, Ex-16
  (███ (Wilshire 30(b)(6)) Dep.) 79:7-80:12; *see id.* 102:10-103:4;

- ███████████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  █████ Ex-37 (███ (FinMason 30(b)(6)) Dep.) 11:6-22;

- ███████████████████████████████████████
  ███████████████████████████████, Ex-38 at 3; and

---

[30] *See also, e.g.,* Ex-34 (Flynn (ABA 30(b)(6)) Dep.) 177:5-15 ("[T]here is tremendous value in
the business of maintaining a highly accurate database of financial instruments" and in
"mak[ing] sure . . . there's no fraudulent information in there."); ███████████████████
███████████████████████████████████████

- ███████████████████████████████████████████████████

████████████████, Ex-39 at 4.[31]

Consistent with this, each named Plaintiff and many absent class members confirmed in their interrogatory responses that they use numerous CGS Data elements along with CGS Identifiers.  *See* Ex-2 (Meyn Rep.) ¶ 189, Table 1; Defs. Mot. to Exclude Elhauge 19 n.10.

The Authorized Data Vendors also testified that they obtain numerous valuable data elements from CGS, corroborating its value to their customers, the members of the putative class. ██████████████████████████████████████████████

████████████████  *See* Ex-8 (█████████ (ICE 30(b)(6)) Dep.) 72:13-20; *id.* 207:8-23.

███████████████████████████████████████████████████

████████.  *See, e.g.,* Ex-33 (█████████ Decl.) ¶ 2. █████████████████████

███████████████████████████████████████████████████

████████████  *Compare id.*, *with* Ex-40 at 7-8 (listing overlapping data elements); *see* Ex-1 (Stiroh Rep.) ¶ 138.

Significantly, Elhauge conceded at deposition that Authorized Data Vendors may continue to incorporate significant portions of the CGS database in their products in the but-for world.  *See* Ex-7 (Elhauge Dep.) 135:11-22.  They would do so for a simple reason:  their customers value such data and value receiving it from CGS as part of an Authorized Data Vendor's product.  *See, e.g.,* ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[31] *See also* Ex-2 (Meyn Rep.) ¶ 189, Table 1.

████████████████████████████████████████████

Moreover, there is no evidence that putative class members would be willing to rely on information scraped from the Internet as a replacement for the CGS Data. ████████████

███████████████████████████████████████████

████████████████████████    *See* Ex-9 (██████(Xignite (30)(b)(6)) Dep.) 91:19-92:22.    █

████████████████████████████████████████████

████████████████████    *Id.*

As detailed above, *see supra*, 7-8, CGS Identifiers and basic data have long been available for free from numerous sources (including directly from CGS itself). If all putative class members want is free access to CUSIPs and certain basic information, such as issuer name, they can already do that today. Many firms, nonetheless, purchase broader access to CGS Data to receive bulk, structured data in a data feed from an Authorized Data Vendor. *See supra*, 19-21.

When confronted with these industry realities, Elhauge abandoned his zero-price theory and began speculating about a new one: that even though the but-for price for CGS Data **would not be zero**, he would expect it to be lower than the license fees the class members actually paid. Ex-7 (Elhauge Dep.) 123:13-124:4. According to Elhauge, "[w]e just know that CGS would have less market power to charge for those data elements because they would no longer be coupled to highly valuable CUSIP identifier elements." *Id.* 145:16-19. But such conjecture cannot support class certification for at least three reasons.

**First**, it is mere *ipse dixit*. Elhauge offers no method for showing that these prices would be lower, or what they would be. He has undertaken no analysis to examine whether some putative class members might in fact pay the same, or even higher, prices, in the but-for world

for those additional data elements (as described below). That prevents class certification because "there exists no reliable means of proving classwide injury in fact." *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252-53 (D.C. Cir. 2013).

**Second**, Plaintiffs cannot reverse course now. During discovery, Defendants repeatedly pressed Plaintiffs as to whether they planned to rely on any theory or calculation of damages beyond their claim of damages for 100% of the license fees class members paid (i.e., that all CGS Data should have been free). In response, Plaintiffs repeatedly and adamantly identified only their zero-price calculation. ECF 167-1 at 1; ECF 167-5 at 1; ECF 174 at 1; ECF 193 at 4. Having staked their entire theory of common injury and damages on a patently deficient zero-price model, and deprived Defendants of the opportunity to take discovery into alternative damages models, Plaintiffs cannot now reverse course and adopt a different model.

**Third**, even if Plaintiffs were permitted to change their theory of injury and damages at this stage of the case through their expert's deposition, the record contradicts any notion that a common method exists to show that every class member would have paid less in the but-for world or what that supposedly lower price would be. To begin, as explained above, CGS's prices to putative class members are based on factors that would not change in the but-for world,

████████████████████████████████████████████████████

████████████████████████████████ *See supra*, 12-13. The but-for prices for many class members could thus be exactly the same.

Moreover, assuming arguendo that CGS adopted a new pricing methodology in the but-for world due to Elhauge's theory that CGS Identifiers would be free, and the prices to some licensees were thus lower, the new methodology might result in prices for other class members being higher. Individualized factors would determine what particular putative class members

would have paid in the but-for world (and whether such prices would be higher or lower than the current prices), including: (1) which putative class members would continue to license or pay for access to CGS Data; (2) what functions (research, trading, analysis, reporting) would require access to broader structured CGS Data; (3) what data elements would putative class members need to perform those functions; (4) how would putative class members gain access to such data, including whether they would do so directly or indirectly; and (5) how much would putative class members be willing to pay for access to the particular structured CGS Data they need.

These factors could influence whether an individual putative class member would be willing (and likely) to continue paying CGS the same fees as before if CGS did not lower its prices in the but-for world, or whether CGS might choose to charge a putative class member more reflecting the greater value it places on CGS Data. Elhauge admitted as much, testifying that the effect on pricing for particular putative class members "would all depend on the user[s] [and] how they want to use them" in the but-for world because "the CUSIPs are used to identify what the financial instruments are, and the other fields are either useful or not useful to the extent that they provide information that the user values." Ex-7 (Elhauge Dep.) 50:10-19; *see id*. 125:8-12; *see also id*. 123:16-124:4 (speculating that a class member "*might* choose not to get a license for CGS's CUSIPs coupled with all 60 data fields" or "*may* prefer to get the other data fields from other data vendors, or they *may* not want all the other data" (emphasis added)).

In sum, Plaintiffs' damages model—based on an insupportable theorized "zero price"—is simply not capable of calculating damages, nor "capable of showing whether any individual class member was injured, let alone all of them, and . . . not capable of disaggregating between lawful and unlawful overcharges." *N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 710 F. Supp. 3d 1090, 1109 (D. Utah 2023). Plaintiffs have no other method of determining classwide injury,

and thus fail to show predominance for that reason standing alone.  *See, e.g., Rail Freight Surcharge*, 725 F.3d at 255 ("No damages model, no predominance, no class certification.").

**B.    If CGS Could Not Charge End Users , It Likely Would Increase Fees to Direct Licensees Who Would Pass On those Costs.**

Plaintiffs do not challenge CGS's ability to charge fees to its direct licensees, i.e., the Authorized Data Vendors and End Users that take CGS Data directly from CGS.  *See* ECF 231-86 (Elhauge Rep.) ¶ 6; Ex-7 (Elhauge Dep.) 277:22-278:5.  Nor could they given this Court's ruling that there is nothing anticompetitive in CGS's charging fees for its licenses.  ECF 107 at 38 ("[T]he mere fact that Plaintiffs and other CUSIP Users are required to pay a fee to Defendants does not necessarily present an antitrust problem.").  Thus, if CGS were unable to enter into paid licenses with putative class members/End Users (i.e., utilize an indirect licensing model), CGS could simply pivot and charge a fee for such products to the Authorized Data Vendors (i.e., utilize a direct licensing model).  *See, e.g.*, Ex-3 (Contreras Rep.) ¶¶ 81-82.  That direct licensing fee to Authorized Data Vendors could, for example, be calculated based on the number and scope of that Authorized Data Vendor's own clients' (i.e., End Users') usage of CGS Data.[32]  And in such a case, Authorized Data Vendors would almost certainly pass on all or much of those new fees to putative class members.  Determining the specifics of how that would happen, including how much any particular putative class member would pay in those circumstances, raises numerous individualized issues.  *See* Ex-1 (Stiroh Rep.) ¶¶ 83-85, 90, 94-

---

[32] *See, e.g.,* Ex-7 (Elhauge Dep.) 104:22-105:10 (agreeing that "[t]here's nothing inherently anticompetitive about an information supplier charging a data vendor a fee that varies depending on how many subscribers receive the licensed information from that data vendor" and is situation dependent); *id*. 152:11-153:16 ("Q. And you don't disagree that if the charges were shifted to the distributors or the data vendors instead of the end users, that one possible outcome would be that the data vendors pass along that charge to the end users in their fees, correct? . . .  A. There could be some pass-through of the lower charge.  But to the extent there was, it would still be the net effect is that the end users would pay less than they do in the actual world.").

101.  Plaintiffs would "need to present evidence that varies from member to member to establish antitrust injury [and so] will almost inevitably make individual questions more prevalent or important than common ones," precluding class certification.  *Aluminum Warehousing*, 336 F.R.D. at 45 (internal quotations omitted).

███████████████████████████████████████████

███████████████████████████████████████████

███████     *See supra*, 10-11.  For an Authorized Data Vendor's data feed or bulk download product that incorporates CGS Data, CGS currently utilizes an indirect-pricing model, and only charges the End User.  But if CGS could not do so, the economically rational profit-maximizing response by CGS would be to place that charge on Authorized Data Vendors instead, in a direct-licensing model, as it already does for display-only products.  Ex-1 (Stiroh Rep.) ¶ 94.



*Id.* ¶ 100, Fig. 4.4.

Elhauge admitted that it was plausible that CGS might adopt an alternative pricing

model—such as a direct licensing model utilizing metered pricing, or a revenue share model based on End User usage—in the but-for world.  *See* Ex-7 (Elhauge Dep.) 111:17-112:13; *see also* Ex-1 (Stiroh Rep.) ¶¶ 81-85; Ex-3 (Contreras Rep.) ¶ 66.  Indeed, the fact that CGS already uses a direct licensing model for its display-only product only reinforces that likelihood.  And any such alternative pricing methodology would result in individual questions as to whether it would result in prices to Authorized Data Vendors that, when passed down to particular putative class members, would result in those putative class members paying more or less in the but-for world.  *Cf.* Ex-7 (Elhauge Dep.) 114:9-117:4 (discussing several variables impacting a firm's "profit maximizing course of action" in this context); *id*. 145:11-146:1 (admitting "we don't know how CGS would seek to recover revenue for those remaining [chargeable] data elements" in the but-for world).

The factual record also supports the probability of a pass-through of costs from Authorized Data Vendors to putative class members in such an alternative pricing scenario.  *See* Ex-1 (Stiroh Rep.) ¶¶ 85-101. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████ .[34] ████████████████████████████████████

---

[33] *See, e.g.,* ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

[34] *See, e.g.,* ███████

████████████████████████████████████████████████



As one Plaintiff bluntly testified regarding its

agreement, "[t]here is no negotiation to be had on that price." Ex-65 (Resnick Dep.) 322:15-

323:3. Thus, if Authorized Data Vendors raised prices to pass new CGS fees through to putative

class members, many if not most putative class members would accept the price increase, given

their lack of negotiating power and the value they ascribe to CGS Data.

This backdrop raises a host of individual questions that are incompatible with proving

classwide injury through common evidence. Specifically, whether any given putative class

member would pay more, the same, or less in the but-for world turns on at least the following



---

[35] *See, e.g.,*

[36] *See, e.g.*, Ex-47 (Greenstein (Dinosaur 30(b)(6)) Dep.) 17:24-18:17 ("Bloomberg agreements are very standardized. There's no negotiating, in my experience. I've tried it in prior roles. It doesn't work, and so you just get them and you sign."); Ex-23 (Kälin (Swiss Life 30(b)(6)) Dep.) 220:7-12 ("Q. Has SLIM ever sought to negotiate this term [in a data provider agreement]? . . . A. Not to my knowledge."); Ex-14 (Kälin Dep.) 44:17-45:13 ("[I]t was useless to have this call because everybody knew that – that Bloomberg would not reduce the fee."); Ex-65 (Resnick Dep.) 322:15-323:3 ("A. There is no negotiation to be had on that price. Q. Why not? A. There just isn't. Q. So Bloomberg sets the price and Hildene executes the contract? A. Yes."); *id*. 124:18-21 (regarding Hildene's Intext data license: "You're assuming there was a negotiation of some sort. Sometimes these documents are just signed [without negotiation], because we – that's how it goes"). Some end users do not negotiate the price with their TPDVs because they can just pass through those costs to their customers.

individual inquiries:  (1) whether the putative class member would download CGS Data through one or more Authorized Data Vendors; (2) the product(s) or service(s) the putative class member uses from each Authorized Data Vendor; (3) how much CGS would increase prices to each Authorized Data Vendor for the putative class member's use of CGS Data; (4) each Authorized Data Vendor's bargaining power relative to CGS in relation to that price change; (5) each Authorized Data Vendor's pricing strategies, including the degree to which it would pass through the price increase to its customers; (6) the extent to which each Authorized Data Vendor may vary the degree of pass-through based on differences between putative class members; and (7) the extent to which putative class members would agree to pay the pass-through cost (itself a multi-factor consideration that varies user to user).

Because these individualized questions are necessary to determine whether a class member was injured, common issues do not predominate, preventing class certification.  *Cf. Indus. Diamonds*, 167 F.R.D. 374, 384 (S.D.N.Y. 1996); *Int. Rate Swaps*, 2023 WL 8675625, at *8.[37]

Importantly, many putative class members receive CGS Data from several Authorized Data Vendors, and thus they likely would be worse off in Plaintiffs' but-for world.  *See* Ex-1 (Stiroh Rep.) ¶¶ 90-91,  Figs. 4.2, 4.3 (showing 65% of putative class members get CGS Data from more than one Authorized Redistributor); *see, e.g.,* Ex-48 at -082 ███████████

███████████████████████████████  In the but-for world, those

---

[37] *See also, e.g.*, *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 93 (S.D.N.Y. 2017) ("Because [plaintiffs' expert's] model fails to account for price variability in the but-for world . . . [they] failed to satisfy Rule 23(b)(3)'s predominance requirement."); *Laumann*, 105 F. Supp. 3d at 398-99; *In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at *17-18 (N.D. Cal. 2017); *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *25 (M.D. Fla. 2014); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307-08 (5th Cir. 2003).

putative class members would pay increased fees to each of their Authorized Data Vendors, instead of paying just one fee to CGS. The aggregate sum paid by those putative class members would likely in many cases exceed the single price that each currently pays CGS.[38] *See* Ex-1 (Stiroh Rep.) ¶¶ 98-100.

These putative class members would have been better off under the current pricing model and are thus uninjured by the challenged conduct. Where a putative class includes uninjured class members, and determining injury is necessarily an individualized inquiry, class treatment is improper. *See Aluminum Warehousing*, 336 F.R.D. at 62 ("[M]odel's showing of a lack of injury to some class members would necessitate individualized adjudications of injury for those class members, preventing certification." (citing *Rail Freight*, 934 F.3d at 626)); *Int. Rate Swaps*, 2023 WL 8675625, at *8 (denying class certification where "presence of uninjured [class members]" can "defeat predominance").

### C.    Plaintiffs' Purported Evidence That CGS Would Choose to Charge Zero Dollars is Meritless.

The foregoing conclusions are underscored by the lack of evidentiary support for Plaintiffs' assertion that CGS would make its data available for free in the but-for world. Plaintiffs contend that CGS would be forced by competition to charge zero dollars on the purported bases that (1) zero-dollar prices for similar data are common around the globe, and (2) CGS incurs zero marginal costs to provide access to CGS Data. Mot. 32, 37. Neither proposition withstands scrutiny.

---

[38] *See, e.g. Minpeco, S.A. v. Conticommodity Servs., Inc*., 676 F. Supp. 486, 589 (S.D.N.Y. 1987) (holding that "[a]n antitrust plaintiff may recover only to the net extent of its injury" (internal quotation marks omitted)); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 543-44 (S.D.N.Y. 2018) (noting that netting was "required" to determine antitrust damages and would entail a "highly individualized inquiry").

1.      **Plaintiffs' Purported "Competitive Benchmarks" Are Meritless.**

Plaintiffs contend based on their experts' reports that the "competitive price" of CGS

Data is zero because identifiers are supposedly "freely available" in certain foreign markets.

Mot. 37-38.  This contention is baseless.

To start, the validity of a benchmark requires "data from analogous geographic markets

or industries that are not affected by the [alleged violation]."  *In re LIBOR-Based Fin.*

*Instruments Antitrust Litig.*, 2025 WL 2733020, at *81 (S.D.N.Y. Sept. 25, 2025) (quotation

omitted); *see Series 17-03-615 v. Express Scripts, Inc.*, 2024 WL 1834311, at *3 (N.D. Ill. Apr.

26, 2024) ("The benchmark approach depends on identifying a similar market.").  But Plaintiffs

have made no effort to establish that the competitive environment in the foreign markets to

which they point is comparable to the highly complex U.S. financial services market.  *Cf. In re*

*NFL "Sunday Ticket" Antitrust Litig.*, 2024 WL 3628118, at *6 (C.D. Cal. Aug. 1, 2024)

(faulting an expert for unreliably comparing the broadcast markets for college and NFL football,

given their marked differences); *see also* Herbert Hovenkamp, *A Primer on Antitrust Damages*,

U. Iowa Legal Studies Rsch. Paper, at 46 (2011) ("To the extent that either the markets or firms

being compared are dissimilar, the yardstick theory will not produce a trustworthy estimate of

what the plaintiff would have earned but for the defendant's conduct.").  Plaintiffs' yardstick

approach, therefore, should be disregarded.

But even if Plaintiffs had satisfied this threshold criteria, Plaintiffs either have no valid

evidence of how identifiers are priced in those markets, or the pricing shows the opposite of what

Plaintiffs contend.  The only example Plaintiffs identify with particularity is WM Daten in

Germany.  Mot. 37 (citing ECF 231-10 (Lenz Rep.) ¶¶ 24-29, 35-38, 40-47 and ECF 231-3

(Bergmann Rep.) 29-32); ECF 231-86 (Elhauge Rep.) ¶ 79.  Plaintiffs point to a product that

bears no resemblance to the CGS database—a manual, web-based lookup tool that WM Daten

offers that permits users to access identifiers and a handful of other basic data elements for certain German securities.  Ex-49 (Lenz Dep.) 109:13-112:7, 121:17-123:15; ECF 231-10 (Lenz Rep.) ¶¶ 25-26, 35.  To the extent that product has any relevance here, CGS also offers such a free, publicly accessible tool.[39]  Beyond WM Daten's free tool, when it comes to access to structured data that resembles what CGS provides, WM Daten users pay *individually negotiated fees* to obtain data feeds and "mass download[s]" for "enhanced" services containing additional data fields.  ECF 231-10 (Lenz Rep.) ¶¶ 30-31, 36; Ex-49 (Lenz Dep.) 40:11-41:17, 145:22-148:7, 157:14-159:8, 160:2-182:18, 187:11-188:12.  Thus, to the extent it has any relevance here, the WM Daten example confirms that, even where identifiers and basic data are available through a free lookup tool, participants in the financial services industry pay for access to structured data, along with the identifier, to ensure that it is reliable and accurate, and that the fees may vary based on the individual circumstances of the subscriber.  *See, e.g.* Mot. to Exclude Lenz 16-17.

Apart from WM Daten, Plaintiffs claim that "official identifiers for 120 countries around the world are available free of charge."  Mot. 37-38.  But rather than offer evidence to support that assertion, Elhauge relies only on the reports of Bergmann and Lenz.  ECF 231-86 (Elhauge Rep.) ¶¶ 59, 79, 86; Ex-7 (Elhauge Dep.) 225:14-227:12, 229:14-230:21.[40]  For her part, Bergmann admitted that she has no experience working with virtually all the 120 NNAs she referenced and undertook no study or analysis of them.  Ex-50 (Bergmann Dep.) 184:6-18, 185:22-186:7, 186:15-20.  For nearly all of them, she simply relied on the assumption that her

---

[39] *See supra*, 7.

[40] Elhauge also points to a statement in an email from a CGS employee.  ECF 231-86 (Elhauge Rep.) 59 n.97; Ex-7 (Elhauge Dep.) 230:7-21 (mistakenly characterizing it as "testimony").  However, it was shown in deposition that the employee had no personal knowledge to support his speculation.  Ex-51 (Hunter Dep.) 61:3-62:2.

clients and their members (whom she did not ask about the practices of the 120 NNAs) would have told her if one of the 120 NNAs imposed usage fees or charges. *Id.* 185:22-188:15. That is not even close to a sufficient basis for concluding that those NNAs offer identifiers free of charge—let alone that they offer for free a structured database of the kind CGS offers. To the contrary, Bergmann admitted that ANNA, the central service for the 120 NNAs, maintains a database of structured data associated with ISIN identifiers, and that it charges access fees for that data. *Id.* 192:3-196:7, 208:4-11.[41]

For his part, Lenz similarly conceded that he did no research or analysis for this portion of his report, and his knowledge is limited to three NNAs in the EU whose contracts he saw years ago during his IT consulting work. Ex-49 (Lenz Dep.) 86:14-89:15; Mot. to Exclude Lenz 15-17. Put simply, Plaintiffs have offered no admissible or reliable evidence that anyone in the world offers for free a structured database, available through bulk download or data feed products, that is linked to the identifier that is comparable to the structured data CGS charges. Even a cursory review reveals that NNAs across the world *do charge* customers for access to their structured data. Ex-1 (Stiroh Rep.) ¶¶ 119, 124; *see also id.* ¶ 123 (explaining many NNAs do not provide comparable structured data).

### 2.    Plaintiffs' Zero Marginal Cost Theory is Meritless.

Although Plaintiffs broadly claim that "providing CUSIP identifier use has zero marginal costs," ECF 231-86 (Elhauge Rep.) ¶ 81, Plaintiffs cannot dispute that CGS has incurred and continues to incur significant ongoing costs attributable to providing CGS Data to its licensees.

---

[41] Bergmann also relies on the 2011 Commitments Decision by the EC for her conclusions. *See* ECF 231-3 (Bergmann Rep.) 24 & n.59. That citation does nothing to salvage Bergmann's opinion because the EC decision concerned only nations in the European Union, and it did not address whether any of those nations charge for access to structured data along with the identifier.

██████████████████████████████████████████

██████████████████████

   ██████████████████████████████████████

██████████████████████████████████████

███ *See* Ex-1 (Stiroh Rep.) ¶ 58 n.207. ██████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████   *See supra*, 6; Ex-4 (Faulkner Decl.) ¶¶ 4-5. CGS

offers its licensees near-real-time data updates every five minutes.[42] Additionally, over time,

CGS has added new fields to the CGS Data as market needs arise. *See* Ex-7 (Elhauge Dep.)

55:11-13.

   Elhauge does not deny that CGS or a hypothetical competitor would incur at least these

same costs when "making [a set of CUSIP identifiers] available in a continuous data feed." *Id.*

213:22-214:2; *see id.* 207:16-17, 208:9-12, 214:14-19, 216:16-17. He also does not deny that

there is a "cost of issuing *and maintaining* the database of CUSIPs," *id.* 180:14-20 (emphasis

added), and that if CGS did not do so itself, other companies would have to incur "the cost of

updating," *id.* 191:12; *see also id.* 190:17-21.

   Elhauge, nonetheless, quibbles by asserting that in the but-for world CGS could avoid

certain licensing costs. *See* ECF 231-86 (Elhauge Rep.) ¶ 78. But any such avoided costs would

be only a fraction of the overall costs that CGS would still be incurring to maintain and

disseminate the CGS Data, including keeping the data updated and accurate. *See* Ex-1 (Stiroh

---

[42] CGS CUSIP Access, CUSIP Global Services,
https://www.cusip.com/pdf/fact_sheet/CUSIP%20ACCESS.pdf.

Rep.) ¶¶ 107-10. Similarly, Elhauge claims that adding updates is attributable to the issuance side of the business, *see* Ex-7 (Elhauge Dep.) 180:21-182:13, and occurs only when a new CUSIP is added to the database, *see id.* 182:8-13. But that is incorrect— ███████████

███████████████████████████████████████████████████████████

████████████████████ *See* Ex-1 (Stiroh Rep.) ¶ 38. These ongoing costs of maintaining and improving the database are necessary for the CGS licensing business.[43]

Against this backdrop, no basis exists for asserting that CGS would offer its database for free merely because incremental users purportedly result in zero "marginal cost." This conclusion defies basic business and economic logic. Any rational business (including any firm attempting to compete with CGS) would seek to recover the significant costs of maintaining and updating its database in its pricing, or go out of business. *See* Ex-1 (Stiroh Rep.) ¶¶ 107-10. Firms with recurrent fixed costs for their businesses must charge more than just their marginal cost to survive—including when that marginal cost is claimed to be zero. *See* Ex-1 (Stiroh Rep.) ¶ 110.[44] Indeed, Elhauge agrees that "just because the cost of a product to serve an incremental user is zero doesn't mean that the information supplier will set that price." Ex-7 (Elhauge Dep.) 225:4-13; *see also id.* 40:7-12 ("So it's typical in markets for pricing – competitive prices – to be at marginal cost, and because that's at the higher end of the cost curve, it covers the recurring fixed costs of remaining in business."). And he acknowledges that in the real world, all types of

---

[43] *See generally* Ex-52 (investment and costs associated with CGS Data); Ex-53 (similar); Ex-34 (Flynn Dep.) 50:1-7 ██████████████████████████████████████

██████████████████████████ .

[44] *See, e.g.*, *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 3d 403, 422 (S.D.N.Y. 2005) (when there are high fixed costs, "all market participants will price above marginal cost to cover fixed costs"); *In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 659 (D. Mass. 2020) (similar observation).

data suppliers facing allegedly zero marginal costs do not currently charge a price of zero. *Id.* 224:24-225:13.

Elhauge's assertion that the Bloomberg OpenFIGI experience supports his conclusions, ECF 231-86 (Elhauge Rep.) ¶ 77, is also misguided. █████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██, Ex-1 (Stiroh Rep.) ¶¶ 112-13; *see* Ex-31 (████████ (Bloomberg 30(b)(6)) Dep.) 66:2-20, 75:24-76:25. Plaintiffs' zero-price model rests on the premise that CGS would makes its entire database available for free, and the Bloomberg example refutes that premise.

### D. Plaintiffs' Relevant Market and Market Power Assertions Raise Additional Individualized Questions.

As discussed above, Plaintiffs' but-for world is based on a fiction: that all or nearly all of the putative class want nothing more from CGS than access to the CGS Identifiers (and possibly basic additional data such as the identity of the issuer and the nature of the security). *See* SAC ¶¶ 9, 98, 109; Mot. 26, 27-28, 34. Elhauge relies on this false assumption to support his claimed market definition—which is limited to the use of all CGS Identifiers, or alternatively, all U.S. CUSIP Identifiers—and his findings of market power that are similarly based on the erroneous conception that putative class members want nothing more than the CUSIP Identifier (and possibly 1-2 other basic data elements) to run their business. ECF 231-86 (Elhauge Rep.) ¶¶ 74-76. As for the rest of the 60-plus data fields that CGS compiles and maintains in connection with each CGS Identifier it issues, they are virtually absent from Elhauge's analysis.

In claiming the relevant market and market power are common in the "market for using [CGS] Identifiers" for all putative class members, Elhauge, tellingly, fails to analyze: (1) the putative class member types; (2) the various reasons why they need or want financial identifiers

for their businesses; or (3) their need for additional data along with the financial identifier. *See* ECF 231-86 (Elhauge Rep.) ¶¶ 68-86. And in fact, contrary to Elhauge's simplistic conclusions, the "use" of financial identifiers, including CGS Identifiers, is highly differentiated among the putative class members. That stems from the fact that the putative class members are made up of a wide range of financial entities that all utilize and need different types of financial identifiers and descriptive data. *See* Ex-1 (Stiroh Rep.) ¶ 69, Fig. 3.1 (listing 15 different "self-reported industry classifications" among the putative class members); Ex-2 (Meyn Rep.) ¶ 189, Table 1 (tracking putative class member financial identifier and data usage). The unwieldly nature of the putative class is compounded by the inclusion of Fintech companies and traditional Data Distributors in the class definition. Ex-2 (Meyn Rep.) ¶¶ 259-68. These firms create derivative products for their customers that incorporate a wide range of financial services data and, thus, they need broad access to the CGS structured data for their clients. *Id.*

The individual differences between putative class members informs the "market for using [CGS] Identifiers," i.e., when putative class members need a financial identifier, the non-CGS Identifiers alternatively available to them, and the manner in which they need access to the numerous CGS Data fields beyond the identifier to facilitate their business objectives. Firms can use alternative identifiers depending on the security at issue and the step in the "investment lifecycle." *Id.* ¶¶ 73-104 (listing numerous financial identifiers that can or must be used instead of a CUSIP). And in some instances, firms can only use alternative identifiers because the CGS Identifier is not applied to the security in question. Ex-22 (Miller Dep.) 144:12-24 (admitting that the Options Clearing Corporation requires usage of OCC Symbols for "trade processing" of options). This complexity renders both market definition and market power highly individualized questions, thus further ensuring that individualized questions will predominate

this action.  *See In re Delta Dental Antitrust Litig.*, 2025 WL 2696575, at *14 (N.D. Ill. Sept. 22,

2025) (denying class certification, in part, on grounds that the proposed relevant geographic

market did not "correspond to the commercial realities of the industry" (quoting *Brown Shoe Co.*

*v. United States*, 370 U.S. 294, 336 (1962)).

E.    **The Need to Exclude Amounts Paid for Non-U.S. Identifiers Creates Further Individual Issues.**

Plaintiffs also have not offered a valid common method for calculating damages.

Plaintiffs propose two models:  Method 1, which measures the purported overcharge in a global

market for the use of ***all*** CUSIP Identifiers, including Canadian CUSIPs, ISINs, and CINS; and

Method 2, which purports to limit the overcharge to just U.S. CUSIPs (and U.S.-based ISINs).

*See* Ex-7 (Elhauge Dep.) 275:13-276:8.  Neither approach is valid.

Method 1 is invalid because Plaintiffs limited their product market to just U.S. CUSIPs,

not global identifiers.  Plaintiffs' SAC expressly disavowed any claim over identifiers for non-

U.S. instruments.  SAC ¶ 126.  Consistent with that, Plaintiffs refused to produce documents

"that relate solely to CINS Identifiers."  Ex-54 at 3.

Plaintiffs try to justify Method 1 by arguing that CGS "bundled" U.S. CUSIPs with other

identifiers; and speculating that it is "doubtful" whether CGS could have charged for other

identifiers if U.S. CUSIPs were free.  Mot. 38-39; *see* Ex-7 (Elhauge Dep.) 275:13-19.  But

"plaintiffs' class certification expert may not pursue a theory of classwide antitrust injury that

plaintiffs' operative complaint has explicitly repudiated."  *See Aluminum Warehousing*, 336

F.R.D. at 54.  Moreover, permitting Plaintiffs to inject these foreign identifiers into the case at

this late stage after the close of discovery would significantly prejudice Defendants.  Because

Plaintiffs disavowed this claim, Defendants conducted ***no*** targeted discovery on either question.

That prejudice is reason enough to reject Method 1.  *See City of New York v. Grp. Health Inc.*,

649 F.3d 151, 158 (2d Cir. 2011) (denying motion to amend market definition); *Mahmud v. Kaufman*, 607 F. Supp. 2d 541, 555 (S.D.N.Y. 2009) (disallowing use of revised market).

As for Method 2, that method purports to limit damages to the portion of the fee supposedly attributable to U.S. CUSIPs, which Elhauge claims is a uniform 83.6% for every class member. *See* Ex-63 (Elhauge Rep. Errata) 1; Ex-7 (Elhauge Dep.) 281:4-7; *see id.* 277:22-278:5; *see also* Ex-1 (Stiroh Rep.) ¶¶ 171-82 (explaining Elhauge's flawed methodology in deriving his uniform discount rate).

This method fails for two reasons. First, it directly contradicts Plaintiffs' repeated assurances they are not seeking any damages other than 100% of license fees. *See supra,* 23.

Second, it impermissibly glosses over individual issues. As an initial matter, the average was wholly constructed from the data of non-putative class members, and Elhauge offers no analysis to support this approach other than the conclusory assertion that he did not see "any reason to think that their relative valuation of CUSIPs or – [] CINS differs from the class members." Ex-7 (Elhauge Dep.) 278:13-21. But CGS Identifier usage varied across the class, i.e., some use more foreign CGS Identifiers while others use more U.S. CGS Identifiers. Ex-1 (Stiroh Rep.) ¶¶ 179–80. Method 2 ignores this individualized "usage" and simply applies an average across the class. ECF 231-86 (Elhauge Rep.) ¶¶ 124-25. As a result, Method 2 does not carry out Elhauge's objective of limiting damages to U.S. CUSIPs, which he openly conceded at deposition. *See* Ex-7 (Elhauge Dep.) 288:16-20 (agreeing that "there will be putative class members that use CINS identifiers, and [Method 2] will attribute damages to them"). But moreover, no common method exists for determining class member U.S. CUSIP usage rates.

*Id.*[45]  Instead, a user-by-user examination of each class member will be required.

Because it adopts a single, uniform rate for all class members that ignores individual variations in usage of CGS Identifiers, Method 2 is not a valid common method for proving injury or damages.  Plaintiffs must account for individual differences, not ignore them.  *See Aluminum Warehousing*, 336 F.R.D. at 62-63 (rejecting average model); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 199 (E.D. Pa. 2015) (requiring Plaintiffs to "la[y] a sufficient foundation for the inferential finding that the impact reflected in the single average overcharge was shared by virtually every class member."); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 494 (N.D. Cal. 2008) ("While averaging may be tolerable in some situations, the record here shows that it has in fact masked important differences between products and purchasers.").

Nor can Plaintiffs justify Method 2's imposition of a uniform 83.6% rate by claiming that, in the but-for world, CGS would have adopted that single rate for all users regardless of their varying individual usage.  Elhauge offered no basis for concluding that, if CGS were limited to charging only for global identifiers, it would disregard a user's actual usage in deciding what to charge that user.  Ex-1 (Stiroh Rep.) ¶¶ 171, 182.  And the method Elhauge used to calculate his single, uniform rate does not in any event validly measure even overall relative usage of U.S. CUSIPs versus global identifiers.  *Id.* ¶¶ 172-76.

---

[45] When entering Subscription Agreements, End Users select whether they will be accessing CUSIPS, CINS, or ISINs or some combination.  But these selections do not reveal the relative proportion of each that the user actually accesses.  And Plaintiffs were unable to specify at the depositions what they actually used.  *See, e.g.*, Ex-47 (Greenstein (Dinosaur 30(b)(6)) Dep.) 95:2-96:9 (Dinosaur designees unable to state whether Dinosaur uses CINS or ISINs); Ex-14 (Kälin Dep.) 85:6-12 (Swiss Life unaware of whether it uses CINS); Ex-46 (Hildene (Resnick 30(b)(6)) Dep.) 154:8-11 (Hildene stated it does not use CINS, despite access in Bloomberg's June 2022 Activity Report).

**F.      Multiple Other Individual Issues Weigh Against Class Certification.**

**1.      The Statute of Limitations Requires Individualized Determinations.**

Individual defenses, including statute of limitations defenses, that "affect different class members differently" are factors that the court "must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues." *Johnson v. Nextel Comm'cs Inc*, 780 F.3d 128, 138 (2d Cir. 2015) (quotations omitted); *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co*., 2018 WL 1750595, at *17 (S.D.N.Y. Apr. 11, 2018).  Here, calculating each class member's statute of limitations will require two distinct individualized inquiries.

First, individualized inquiries are required to determine how much time each plaintiff had to bring its claims and which claims are time-barred.  The limitations period for Plaintiffs' Sherman Act claim is four years, 15 U.S.C. § 15b, and three years for each state claim, *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E. 2d 1078, 1083 (N.Y. 2001); Conn. Gen. Stat. § 42-110g(f).  But these laws do not prevent parties from bargaining for a shorter period.  *See In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 287 (4th Cir. 2007); NY CPLR 201; Conn. Gen. Stat. § 42-110g(f).  Some class members agreed to a one-year limitations period.  *See, e.g.*, Ex-55 at -754.  Others agreed to two- or three-year period.  *See, e.g.* Ex-56 at -119 (two-years); Ex-57 at -657 (three-years).  And still other agreements do not address the limitations period at all.  *See, e.g.*, Ex-58.  This Court should not certify a class when these contracts will need to be evaluated for thousands of putative class members, along with any individual class member's arguments why their claims are timely even though filed outside their agreed-upon limitations period.

Second, individualized inquiries are needed to determine when the statute of limitations began to run.  The "overt act" from which each plaintiff's limitations period runs is the decision to enter a contract containing allegedly unlawful restrictions.  *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019).  When that period begins depends on individual

consideration of each contract and cannot be resolved by common evidence that Plaintiffs have continued to perform in their contracts to the present. *See id.* Likewise, common evidence that existing agreements were regularly renewed would only show "reaffirmation" of the existing contracts, not independent acts giving rise to new causes of action. *See Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 350-51 (D. Vt. 2010).

        **2.**        **Plaintiffs' State Law Claims Cannot Be Proved on a Common Basis.**

Certification of Plaintiffs' proposed New York and Connecticut sub-classes should be denied for the same reasons as their proposed federal antitrust class. New York and Connecticut law similarly require proof of injury. *Kronenberg v. Allstate Ins. Co.*, 743 F. Supp. 3d 465, 497 (E.D.N.Y. 2024); *Davis v. Angelcare USA, LLC*, 727 F. Supp. 3d 99, 132, 137 (D. Conn. 2024). Plaintiffs rely on the same defective zero-price model for those state-law claims.

In addition, determining which class members can invoke New York law raises further individual issues. The New York Unfair Business Practices Act applies to "[d]eceptive acts or practices . . . *in this state.*" N.Y. Gen. Bus. Law § 349(a) (emphasis added). This geographic nexus can be satisfied by showing that the "plaintiff actually view[ed] a deceptive statement while in New York" or that the underlying transaction occurred in New York, "regardless of the plaintiff's location or where the plaintiff is deceived." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 123 (2d Cir. 2013).

Common evidence cannot establish either condition here. Plaintiffs' proposed sub-class for GBL 349 includes "[a]ll persons or entities that paid a license fee to S&P or FactSet." Mot. 22. That definition provides no limit on ***where*** the class member viewed the alleged deception. *Cf. In re Rock 'n Play Sleeper Mktg., Sales Pracs., & Prods. Liab. Litig.,* 2022 WL 22922234, at *9 (W.D.N.Y. June 2, 2022) (noting that a class limited "to purchases that occurred within New York or ownership . . . by a New York resident" would satisfy predominance). Nor

can evidence of location or where notice was sent fill this gap. A class member based in New York did not necessarily view the contract terms or receive allegedly deceptive communications there, while those located elsewhere may have still reviewed them in New York. *See Haft v. Haier US Appliance Sols., Inc.*, 578 F. Supp. 3d 436, 459-60 (S.D.N.Y. 2022) (denying certification when New York resident purchased oven in New Jersey without viewing statements in New York).

Nor have Plaintiffs offered common evidence they engaged in transactions in New York. *See Wright v. Publishers Clearing House, Inc.*, 439 F. Supp. 3d 102, 110, 112 (E.D.N.Y. 2020) (explaining this test asks if the plaintiff "participated in a marketplace located in New York" and did not simply "transact[] with a seller who resides in New York"). Some of Plaintiffs' supposed common evidence is factually incorrect. For instance, Plaintiffs claim CGS sent invoices from New York on S&P letterhead, Mot. 28, but invoices sent by CGS under S&P actually required payment to Illinois, *see, e.g.*, Ex-59 at -516, or, under FactSet, Massachusetts, *see, e.g.*, Ex-60 at -880. ██████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████; *see also Cline v. TouchTunes Music Corp.*, 211 F. Supp. 3d 628, 633-34 (S.D.N.Y. 2016) (place of payment and processing of payment is relevant to transaction determination).

Other evidence that Plaintiffs cite is "irrelevant" to locating the transaction, such as the mere fact that Defendants were headquartered in New York. *Miramontes v. Ralph Lauren Corp.*,

2023 WL 3293424, at *5 (S.D.N.Y. May 5, 2023).  Likewise, a New York choice-of-law clause "does not, in itself, provide any indication as to where a transaction occurred."  *4 K & D Corp. v. Concierge Auctions, LLC,* 2 F. Supp. 3d 525, 547-48 (S.D.N.Y. 2014); *see Wright,* 439 F. Supp. 3d at 112 (choice-of-law clause can only "enhance[] the transactions' connection to the state" in the presence of sufficient other factors).  And even if *some* enforcement correspondence was sent from New York (and Plaintiffs' Brief notably does not claim *all* was), this evidence does not establish that Defendants processed every class member's information there.  *See Cline*, 211 F. Supp. at 634 (explaining that New York choice-of-law provision, New York servers, and data transmission from New York were insufficient for nexus when funds collection and processing occurred elsewhere).

### 3.    The Proposed Class Definition is Overbroad.

Plaintiffs' proposed class definition also improperly includes governmental and other entities and persons that Plaintiffs' complaint excludes from the class.  *See* SAC ¶ 139.

## II.    Plaintiffs' Injunction Class Fails Under Rule 23(b)(2).

Plaintiffs' request for injunction class certification also fails.  An injunction class may be certified only when an injunction "is appropriate respecting the class *as a whole*."  Fed. R. Civ. P. 23(b)(2) (emphasis added).  In other words, certification under Rule 23(b)(2) requires that any injunction prove "beneficial" to each class member.  *Digital Music*, 321 F.R.D. at 91 (quoting *Sykes v. Mel S. Harris and Associates LLC*, 780 F.3d 70, 97 (2d Cir. 2015)).  That is not true here for two reasons.  First, Plaintiffs' failure to prove a common method for showing classwide injury means they have failed to show that each class member is entitled to an injunction.  *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 3240044, at *14 (S.D.N.Y. Nov. 20, 2025).  Second, an injunction against enforcement of the CGS licenses would not make all putative class members better off.  As discussed above (at *supra*, 29-30),

numerous class members would be worse off in Plaintiffs' but-for world.

## CONCLUSION

For the forgoing reasons, Plaintiffs' motion should be denied.

Respectfully submitted,

/s/ Eric J. Stock
Eric J. Stock
Jefferson E. Bell
Esther Lifshitz
GIBSON, DUNN &
CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel.: (212) 351-2301
Fax: (212) 716-0801
estock@gibsondunn.com
jbell@gibsondunn.com
elifshitz@gibsondunn.com

*Attorneys for Defendant
S&P Global Inc.*

/s/ Jeffrey I. Shinder
Jeffrey I. Shinder
Ellison A. Shider (*pro hac vice*)
SHINDER CANTOR LERNER
LLP
14 Penn Plaza, 19th Floor
New York, NY 10122
Tel.: (646) 960-8601
Fax: (646) 960-8625
jeffrey@scl-llp.com
esnider@scl-llp.com

James J. Kovacs (*pro hac vice*)
Keagan H. Potts (*pro hac vice*)
SHINDER CANTOR LERNER
LLP
Tel: (646) 960-8601
600 Washington, D.C. 20005
james@scl-llp.com
kpotts@scl-llp.com

W. Stephen Cannon (*pro hac vice*)
Seth D. Greenstein (*pro hac vice*)
Patrick Kennedy (*pro hac vice*)
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., NW
Suite 1300N
Washington, D.C. 20004
Tel.: (202) 204-3500
Fax: (202) 204-3501
scannon@constantinecannon.com
sgreenstein@constantinecannon.com
pkennedy@constantinecannon.com

Sarah Bayer
CONSTANTINE CANNON LLP
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 350-2700

*Attorneys for Defendant FactSet
Research Systems, Inc.*

/s/ David C. Kiernan
JONES DAY
David C. Kiernan (*pro hac vice*)
Craig E. Stewart (*pro hac vice*)
Caroline N. Mitchell (*pro hac vice*)
Kapri Saunders (*pro hac vice*)
Paul C. Hines (*pro hac vice*)
555 California St., 26th Fl.
San Francisco, CA 94104
Tel.: (415) 626-3939
Fax: (415) 875-5700
dkiernan@jonesday.com
cestewart@jonesday.com
cnmitchell@jonesday.com
ksaunders@jonesday.com
phines@jonesday.com

Alexander V. Maugeri
Amanda L. Dollinger
250 Vesey Street
New York, NY 10281
Tel.: (212) 326-3939
Fax: (212) 755-7306
amaugeri@jonesday.com
adollinger@jonesday.com

*Attorneys for Defendant
American Bankers
Association*

## <u>SIGNATURE CERTIFICATION</u>

Pursuant to Section 8.5(b) of the Electronic Case Filing Rules and Instructions of the Southern District of New York, I certify that all other signatory parties have consented to the filing of this document.


*/s/ David C. Kiernan*
David C. Kiernan

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 4(B) of the Court's Individual Rules of Practice in Civil Cases, and the parties' Joint Stipulation and Order Regarding the Extension of Word Limits for Class Certification Briefing so order by the Court ("Joint Stipulation") (ECF 212), Defendants certify that this computer-generated Memorandum of Law was prepared using Microsoft Windows and Microsoft Word.  The total number of words in this Memorandum, exclusive of the caption, table of contents, table of authorities, the signature block, and this certificate of compliance is 13,468, which is in accordance with the maximum 13,500 words as permitted under the Joint Stipulation.

_____*/s/ David C. Kiernan*_____
David C. Kiernan

## CERTIFICATE OF SERVICE

I certify that on November 26, 2025, I caused the foregoing to be served on all counsel of record via ECF.

_/s/ David C. Kiernan_
David C. Kiernan