<u>**UNITED STATES DISTRICT COURT**</u>
<u>**SOUTHERN DISTRICT OF NEW YORK**</u>
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |
|---|---|
| DINOSAUR FINANCIAL GROUP LLC, HILDENE CAPITAL MANAGEMENT, LLC and SWISS LIFE INVESTMENT MANAGEMENT HOLDING AG, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    -v-<br><br>S&P GLOBAL, INC., AMERICAN BANKERS ASSOCIATION, and FACTSET RESEARCH SYSTEMS INC.,<br><br>    Defendants. | <u>**Case No. 1:22-CV-1860 (KPF)**</u> |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO**
<u>**EXCLUDE TESTIMONY OF BETTINA BERGMANN**</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 5

II.     RELEVANT BACKGROUND................................................................................ 6

III.    LEGAL STANDARD ........................................................................................... 9

IV.     ARGUMENT ...................................................................................................... 10

    A.      Ms. Bergmann uses no reliable methodology. ........................................ 10

        1.      Ms. Bergmann's Conclusions Rest on Pure *Ipse Dixit*. ...................................11

        2.      Ms. Bergmann Relies on Hearsay Without Applying Any Expert
                Methodology. ............................................................................... 15

        3.      Because Ms. Bergmann Withholds Her Sources, Her Testimony Is a "Black
                Box." ......................................................................................... 19

    B.      Ms. Bergmann is not qualified as an independent expert, because her only
            arguable experience is her advocacy as an attorney representing European clients
            against CGS. ......................................................................................... 20

    C.      Ms. Bergmann's proposed testimony is, by her own admission, irrelevant to this
            case, and plainly contradicted by the discovery record she ignores, rendering it
            unreliable............................................................................................. 23

    D.      Ms. Bergmann is an advocate, not an independent expert.................................... 27

V.      CONCLUSION.................................................................................................. 29

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*523 IP LLC v. CureMD.com,*
  48 F. Supp. 3d 600 (S.D.N.Y. 2014) ....................................................... 1, 16, 18, 22

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
  303 F.3d 256 (2d Cir. 2002) ................................................................... 5, 16

*Boucher v. U.S. Suzuki Motor Corp.,*
  73 F.3d 18 (2d Cir. 1996) ....................................................................... 10

*Buland v. NCL (Bahamas) Ltd,*
  992 F.3d 1143 (11th Cir. 2021) .............................................................. 10

*Cal. Shoppers, Inc. v. Royal Globe Ins. Co.,*
  221 Cal. Rptr. 171 (Ct. App. 1985) ........................................................ 17

*Conceptus, Inc. v. Hologic, Inc.,*
  771 F. Supp. 2d 1164 (N.D. Cal. 2010) .................................................. 11, 14

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.,*
  301 F.R.D. 116 (S.D.N.Y. 2014) ............................................................ 5

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997) ............................................................................... 7, 9

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II),*
  341 F. Supp. 3d 213 (S.D.N.Y. 2018) .................................................... 6, 9, 10, 14

*In re Orthopedic Bone Screw Prods. Liab. Litig.,*
  No. MDL 1014, 1997 WL 39583 (E.D. Pa. Jan. 23, 1997) ..................... 17

*Kumho Tire Co. v. Carmichael,*
  526 U.S. 137 (1999) ............................................................................... 5, 6

*Lang v. Kohl's Food Stores, Inc.,*
  217 F.3d 919 (7th Cir. 2000) ................................................................. 6

*Lippe v. Bairnco Corp.,*
  288 B.R. 678 (S.D.N.Y. 2003) ............................................................... 17, 22, 24

*LLC v. Usenet.com, Inc.,*
  608 F. Supp. 2d 409 (S.D.N.Y. 2009) .................................................... 12

*Malletier v. Dooney & Bourke, Inc.,*
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) .................................................... 11

*Marria v. Broaddus,*
  200 F. Supp. 2d 280 (S.D.N.Y. 2002) .................................................... 24

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013) ................................................................ 11

*Nora Beverages, Inc. v. Perrier Grp. Am., Inc.*,
    164 F.3d 736 (2d Cir. 1998) ................................................................ 18

*Ollier v. Sweetwater Union High Sch. Dist.*,
    768 F.3d 843 (9th Cir. 2014) ............................................................... 10

*Pac. Life Ins. Co. v. Bank N.Y. Mellon*,
    571 F. Supp. 3d 106 (S.D.N.Y. 2021) ................................................... 9

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ......................................................... 5, 7

*Tikkun v. City of New York*,
    265 F.R.D. 152 (S.D.N.Y. 2010) ......................................................... 15

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2003) .................................................................. 11

*United States v. Mejia*,
    545 F.3d 179 (2d Cir. 2008) ................................................................ 11

*Zaremba v. Gen. Motors Corp.*,
    360 F.3d 355 (2d Cir. 2004) ................................................................ 16

## Rules

Federal Rule of Civil Procedure 26 ...................................................... 14, 15

Federal Rule of Evidence 702 .................................................... 5, 6, 16, 18

Federal Rule of Evidence 703 ............................................................ 11, 13

## I.    INTRODUCTION[1]

In exercising its gatekeeping role over expert testimony, the Court is presented with three basic questions: "(i) whether the witness is qualified to be an expert; (ii) whether the opinion is based upon reliable data and methodology; and (iii) whether the expert's testimony on a particular issue will assist the trier of fact." *523 IP LLC v. CureMD.com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014). Plaintiffs' proposed expert Bettina Bergmann, a European lawyer, fails all three. ***First***, Ms. Bergmann does not ground her opinion in a cognizable methodology applied to reliable data. Instead, she relies on information fed to her by her clients, who in turn received it from undisclosed and/or unknown sources, without doing anything to verify whether the information was complete or accurate—and, in many cases, it was not. ***Second***, she is not qualified to render the opinions in her report concerning the use and licensing of financial data because she has no industry experience in financial services, data licensing, or any other relevant field. Her experience comes solely from her work as an interested attorney with a long history of advocating against CGS, S&P, and FactSet in Europe on behalf of her trade association clients. ***Finally***, Ms. Bergmann admitted at deposition that her opinion will not assist the trier of fact. Specifically, Ms. Bergmann admits the European-based subject matter of her report is irrelevant to this case, which explains why she disregarded the discovery record. Ms. Bergmann also admitted that critical aspects of her opinion were based on nothing more than her speculation. In sum, Ms. Bergmann's utter lack of subject matter expertise, the absence of factual support for her opinions, the irrelevance of the subject matter, and her manifest lack of impartiality render her opinions unreliable and unhelpful to a jury and, therefore, inadmissible.

---

[1] All capitalized terms are as defined in the Glossary set forth in Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, or as otherwise defined therein.

Despite these glaring problems, Ms. Bergmann's unreliable, unqualified, unfounded, and irrelevant testimony is foundational to Plaintiffs' theory of common injury, and thus their entire motion for class certification. Ms. Bergmann's purported opinion about the practices of over 120 National Numbering Agencies ("NNAs") worldwide—the veracity of which she never investigated—is the backbone of Plaintiffs' economic expert Professor Einer Elhauge's opinion that the "but-for price for CUSIP identifier use would be zero." *See, e.g.*, ECF No. 231-86 (Elhauge Report) ¶ 79. Plaintiffs' motion for class certification, in turn, puts forward a single theory of common injury—that, but for the alleged conduct, putative class members would have paid zero licensing fees to CGS. Mot. 37-38. That argument hinges on Professor Elhauge's purported use of the NNAs as a "yardstick," for which he relied on Ms. Bergmann. Thus, the problem is not simply that Ms. Bergmann's testimony is unreliable; it is that her unreliable testimony infects Plaintiffs' entire theory of class-wide harm.

The Court should exclude this testimony in its entirety.

## II.    RELEVANT BACKGROUND

Ms. Bergmann is "an attorney practicing in Germany and the European Union." Ex-1[2] (Bergmann Report) 1. She has been an attorney for the entirety of her professional career. Ex-2 (Bergmann Dep.) 67:15-17. Her law firm specializes in "German and European antitrust/competition, state aid and EU law." https://bergmann-law.com/en. She does not hold herself out as an expert in financial regulatory reporting, or as a financial markets lawyer. Ex.-2 (Bergmann Dep.) 117:5-15.

---

[2] Citations to exhibit numbers are to the exhibits attached to the Declaration of Patrick M. Kennedy accompanying this Motion.

Since 2008, Ms. Bergmann has been representing clients advocating against CGS in Europe. Ex-1 (Bergmann Report) at 4-5. That year, on behalf of several trade associations operating in Europe, Ms. Bergmann filed a complaint against CGS[3] with the European Commission ("EC"), pursuant to European Union law. *Id.* The resulting proceeding culminated in 2011, when the EC issued a public decision describing its investigation and announcing certain commitments S&P made with respect to the EU market, which resolved the matter (the "Commitments Decision").[4] After 2011, Ms. Bergmann continued to represent trade-association clients lodging both formal and informal complaints against CGS in Europe. Ex-2 (Bergmann Dep.) 33:14-34:20. Ms. Bergmann has thus continually represented clients against CGS in Europe since 2008. *Id.* 19:19-20:11.

In late 2024, Ms. Bergmann was retained as an expert in the U.S. case. *Id.* 13:14-17. Although Ms. Bergmann's report was submitted in support of Plaintiffs' motion for class certification, she disclosed that, when preparing her report, "I have not reviewed any confidential information any of the Defendants produced in this case. Counsel for Plaintiffs has not provided me any documents Defendants produced in the case or transcripts of any depositions. In fact, counsel for Plaintiffs did not provide me with any documents or information I relied on in reaching my opinions in this report." Ex-1 (Bergmann Report) 8 n.7. Ms. Bergmann also disclosed in her report that she relied on interviews she conducted over the years with "users," but declined to identify any of those individuals to protect their "confidences." *Id.* She

---

[3] At the time, CGS was known as the CUSIP Service Bureau and was a division of S&P.

[4] Decision of European Commission relating to a proceeding under Article 102 of the Treaty on the Functioning of the European Union and Article 54 of the EEA Agreement (Case COMP/39.592 - Standard & Poor's), available at https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf.

confirmed at deposition that those interviews were conducted mostly with respect to her advocacy in Europe and not for her expert report in this case. Ex-2 (Bergmann Dep.) 28:2-29:2; 31:10-32:22.

Ms. Bergmann, nonetheless, proffers three opinions in this case. She purports to opine that "usage restrictions and usage fees are not necessary to enable an entity to operate a business in issuing financial market identifiers." Ex-1 (Bergmann Report) 2. Crucial to this opinion is her assertion that "[o]f the more than 120 NNAs in the world, only CGS imposes usage fees or use restrictions on ISIN users." *Id.* at 24.[5] Despite Ms. Bergmann's ignorance of—and intentional disregard of—the record in this case, her proffered opinion on this subject is critical to Plaintiffs' motion for class certification. Plaintiffs' sole theory of common harm is that every putative class member would have paid zero fees to access CGS Data in the but-for world. Mot. at 37-38. For this argument, Plaintiffs rely on Professor Einer Elhauge, who purports to offer the 120 NNAs as a yardstick for what he considers to be a competitive but-for world based on Ms. Bergmann's opinion. ECF No. 231-86 (Elhauge Report) ¶¶ 79, 83, 85. For her opinion, Ms. Bergmann cited the Commitments Decision, which said nothing about the vast majority of the 120 NNAs, which are outside Europe. Ex-1 (Bergmann Report) 24 n.59 (citing Commitments Decision ¶ 38). Ms. Bergmann did not investigate any of these NNAs in connection with her opinion. Ex-2 (Bergmann Dep.) 184:6-187:8. Nor does she have any experience with them. *See id.*

Additionally, Ms. Bergmann purports to opine that "standardized financial instrument identifiers are required for the operation of financial businesses." Ex-1 (Bergmann Report) 1. She

---

[5] Not even Plaintiffs' other purported expert, Frank Lenz, agrees with Ms. Bergmann. While he also had done no investigation into the practices of all 120 NNAs worldwide, he states in a footnote that worldwide, he is "only aware of two – CGS and LSEG – who charge usage fees." *See* Defendants' Motion to Exclude Testimony of Frank Lenz 14 (citing Lenz Report 19 n.27).

defines "standardized financial identifiers" as "identifiers that have been approved by a standards-setting organization and the use of which has been made mandatory by the respective regulatory authority for financial markets." *Id.* In support of this purported opinion, she asserts that other, "non-standard identifiers," are "insufficient," because "financial market laws in Germany and the European Union require that ISINs be used in regulatory reporting." *Id.*

Lastly, she purports to opine that "ISINs for United States financial instruments . . . are necessary to process and clear transactions and for regulatory reporting." *Id.* 2. Here again, her opinion rests on her assertion about regulatory reporting requirements in Europe; she claims that "ISINs are the only financial instrument identifiers accepted by government regulators in Germany and the European Union for financial instruments." *Id.* She further purports to opine that "German and European financial market participants must have a license from CGS to engage in these functions," meaning processing and clearing transactions and reporting to regulators. *Id.*

As further described below, Ms. Bergmann's proffered opinions are not supported by record evidence or reliable methodology and should be excluded.

### III.    LEGAL STANDARD

Expert testimony is admissible "only if it is both relevant and reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Federal Rule of Evidence 702 requires the proponent of an expert witness to demonstrate that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." In exercising its "gatekeeping" role, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method

by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Courts in the Second Circuit "subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 126 (S.D.N.Y. 2014).

## IV.    ARGUMENT

### A.    Ms. Bergmann uses no reliable methodology.

Federal Rule of Evidence 702 requires that expert testimony be the "product of reliable principles and methods." Fed. R. Evid. 702(c). "An expert is . . . expected to 'employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018) (quoting *Kumho Tire*, 526 U.S. at 152). "[E]xperts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

Here, Ms. Bergmann fails to support her purported conclusions with any methodology, let alone a reliable expert methodology, for at least three reasons. *First*, her conclusions are pure *ipse dixit*. She posited that she had no need to research or support the factual assertions in her report because, if there were any changes to what she had first been fed by her clients—back in 2008, when she and her clients were preparing a complaint against CGS—she "would have known" the relevant information. *Second*, she relies on hearsay—often double hearsay—without applying any analysis or methodology to the underlying assertions by her clients and her clients' undisclosed sources, rendering her opinion a mere conduit for inadmissible material. *Third*, she

refuses to disclose her sources, leaving the Defendants and the Court with no way of testing the reliability of the many hearsay statements that form the foundation of Ms. Bergmann's report.

### 1.    Ms. Bergmann's Conclusions Rest on Pure *Ipse Dixit*.

It is well established that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). Here, Ms. Bergmann repeatedly offers opinions based on no analysis whatsoever; instead, she simply presumes that, as an "observer" of the market, she "would have known" information that might be relevant to her report. *E.g.*, Ex-2 (Bergmann Dep.) 141:5-14.

Ms. Bergmann makes a sweeping claim about over 120 NNAs, a claim that is central to Plaintiffs' theory of common injury to the putative class, without having investigated whether that claim was true. In her report, she opines that "[o]f the more than 120 NNAs in the world, only CGS imposes usage fees or use restrictions on ISIN users." Ex-1 (Bergmann Report) 24. Plaintiffs cite this "opinion" in their motion for class certification, asserting that "evidence that official identifiers for 120 countries around the world are available free of charge" supports their theory that any charge for CGS Data "above $0 is supracompetitive." Mot. 37-38.[6] But when asked whether she had "undertaken any analysis of the 120 NNAs for purposes of this opinion," Ms. Bergmann admitted, "I have not." Ex-2 (Bergmann Dep.) 186:15-186:8; *see also id.* 184:6-9 ("I have not studied all of the 120 NNAs"); *id.* at 185:22-186:4 ("I didn't interview people with respect to the 120 NNAs").

---

[6] Specifically as to Germany, Plaintiffs rely on the report of Frank Lenz, which is similarly unreliable for reasons set forth in Defendants' Motion to Exclude Expert Testimony of Frank Lenz. Mot. 37. As for all other NNAs in the world, Plaintiffs and Professor Elhauge rely on Ms. Bergmann. *Id.* 37-38; ECF No. 231-86 (Elhauge Report) ¶¶ 79, 83, 85.

For this proposition, her report cites a single source, the Commitments Decision, Ex-1 (Bergmann Report) 24 n.59, which was rendered 14 years ago and speaks only to licensing fees regarding ISINs in countries within the European Union, not the 120 countries Ms. Bergmann claims. Commitments Decision ¶ 38 ("In its Statement of Objections, the Commission also noted that none of the NNAs in the Union charge customers simply for using ISIN records in their own databases, independently of the source of the data, as S&P does."). The Commitments Decision doesn't mention fees in any other country, nor does it mention "usage restrictions" at all. *Id.* Ms. Bergmann admitted that she did not do "any detailed analysis of whether market conditions in Europe had changed since 2011" when the Commitments Decision issued. Ex-2 (Bergmann Dep.) 141:5-14. When asked why not, Ms. Bergmann testified, "I'm observing the market since more than -- since almost 20 years. I do not have to do any detailed analysis. If something significant changes, I would know that." *Id.*

Instead of doing any research of her own on the practices of any of the 120 NNAs, Ms. Bergmann assumes that others, mainly her clients, would have alerted her if they discovered another NNA that charged "usage fees" or imposed "usage restrictions." *Id.* 185:22-187:8. For instance, Ms. Bergmann explained that she did not need to interview anyone with respect to the NNAs because "if anyone apart from CGS would have started a licensing business of the ISIN, I would surely have known." *Id.* 186:4-7. Similarly, Ms. Bergmann defended her decision not to undertake any investigation of the NNAs for purposes of her expert report by saying, "[a]s I said, if anything like that would have happened, I would have known." *Id.* 187:2-3.

Not only did Ms. Bergmann fail to investigate any of the NNAs she opines on, she avoided learning information that would have contradicted her argument. For example, even though she testified that she relies on her clients to inform her about NNA practices, she

admitted that she never even asked any of her clients for information relevant to NNAs for her report. At deposition, she was asked, "Did you actually ask them about the 120 NNAs?" *Id.* 188:11-12. Ms. Bergmann answered, "No, I have not, but I'm sure that [there] would have been a complaint, and even a request to do something about it." *Id.* 188:13-15. In short, the foundation for Ms. Bergmann's sweeping claim about over 120 agencies, operating throughout the globe, which is critical to Plaintiffs' motion for class certification, is simply that she had not been alerted otherwise—by clients who have been adverse to CGS for nearly two decades. She saw no need to investigate, or even ask the question, as part of the exercise of presenting herself as an "expert" in this case. *See Pac. Life Ins. Co. v. Bank N.Y. Mellon*, 571 F. Supp. 3d 106, 117 (S.D.N.Y. 2021) (Failla, J.) (excluding proposed expert testimony that was "not the product of independent analysis" and where the expert could not "articulate a valid basis" for a "key assumption").

This is no methodology at all, and it taints Plaintiffs' entire theory of common class-wide injury. What it amounts to is Plaintiffs asking the Court and the jury to simply trust Ms. Bergmann and her contention that others, unsolicited and unprompted, would have alerted her to information contrary to her opinion—an opinion based on her advocacy against CGS almost 15 years ago. This is *ipse dixit* at its worst. *See Joiner*, 522 U.S. at 146; *see also Mirena*, 341 F. Supp. 3d at 305 ("Accepting Dr. Salpietro's never-vetted model would, unacceptably, require the jury to accept 'the ipse dixit of the expert.' [*Joiner*, 522 U.S. at 146]. This *Daubert* does not permit."). Such unreliable testimony is inadmissible on its face, but it is particularly troubling when it is being offered to prop up Plaintiffs' entire theory of class-wide harm.

Because she did no investigation, it is unsurprising that Ms. Bergmann did not know basic information about the individual NNAs or their global member association, the Association

of National Numbering Agencies (ANNA), which contradict her conclusions. Although she

purports to offer an expert opinion on "usage fees or use restrictions on ISIN users," Ex-1

(Bergmann Report) 24, her deposition confirmed she had no knowledge of how and to what

extent the numerous NNAs and ANNA make available their own ISIN data to users in the

financial marketplace. She did not know the format in which NNAs make ISIN data available to

the market. Ex-2 (Bergmann Dep.) 192:3-194:7. She did not know that ANNA makes its

database of ISIN and other financial data, the ANNA Service Bureau ("ASB"), to which the

NNAs contribute their ISIN data, available to financial market participants, and that it ***charges***

***for the service***. *Id.* 199:16-21.[7] She thought, incorrectly, that the ASB contained only the limited

information defined in the EC Commitments Decision as the "ISIN Record." Ex-2 (Bergmann

Dep.) 205:4-206:11; *see also* Commitments Decision 26 (listing the seven data fields comprising

the ISIN Record). In fact, the ASB contains dozens of additional data fields.[8] Ms. Bergmann also

opined that the "NNAs do not make available the ISIN to end users." Ex-2 (Bergmann Dep.)

192:10-11. To the contrary, numerous NNAs do make ISIN data available for display or

download to end users, in addition to contributing to the ASB. *See* Stiroh Report ¶¶ 120-24. And

in fact, these NNAs commonly impose restrictions on the use of the data they distribute. *See,*

*e.g.*, *id.* ¶¶ 120, 124. These factual inaccuracies only reinforce why Ms. Bergmann's *ipse dixit*

should be excluded.

---

[7] *ANNA Service Bureau*, https://anna-web.org/wp-content/uploads/2025/05/ASB-PDF-for-website-10.pdf ("The ASB is the golden source of global financial and referential instrument identification data**.** It is the central data hub that collects and enriches securities identification data from global National Numbering Agencies (NNAs) making it available to other ANNA members, authorities and *financial market participants*.") (emphasis added).

[8] *See ASB Format & Field Definition*, https://anna-web.org/wp-content/uploads/2025/10/ASB-Record-Format-enhancement-November-2025-V_5.0_public.pdf (listing 49 data fields available in the ASB database).

When Ms. Bergmann did not know basic information, she defaulted to rank speculation. "Expert testimony should be excluded if it is speculative or conjectural[.]" *Mirena*, 341 F. Supp. 3d at 241 (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *see also Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) ("[S]peculative testimony is inherently unreliable."); *Buland v. NCL (Bah.) Ltd*, 992 F.3d 1143, 1151 (11th Cir. 2021) (excluding expert testimony that was "entirely speculative"). When asked basic information about the NNAs, such as the format in which they make data available to data vendors, Bergmann admitted she had no personal knowledge—but speculated based on incorrect information anyway. Ex-2 (Bergmann Dep.) 193:22-194:8 ("Q. Okay. Ms. Bergmann, what format do the NNAs make the ISIN data available to data vendors? A. I don't have the data vendor contracts. I don't know. I assume that they offer database access, and an FTP access where the data vendors can download all of the -- all of the data available on CGS database. Q. Okay. A. But I haven't seen this."). Speculative testimony is unhelpful to a jury under any circumstances, but it is particularly worrisome here, where the factual basis for the expert's opinion, an opinion that Plaintiffs' economic expert relies on for a critical part of his opinion, is shrouded behind *ipse dixit*.

2.   Ms. Bergmann Relies on Hearsay Without Applying Any Expert Methodology.

Federal Rule of Evidence 703 permits an expert to rely on inadmissible hearsay only if "experts in the particular field would reasonably rely on those kinds of facts or data." Fed. R. Evid. 703. "The expert may not, however, simply transmit that hearsay to the jury. Instead, the expert must form his own opinions by 'applying his extensive experience and a reliable methodology' to the inadmissible materials. Otherwise, the expert is simply 'repeating hearsay evidence without applying any expertise whatsoever,' a practice that allows the [party] 'to

circumvent the rules prohibiting hearsay.'" *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (quoting *United States v. Dukagjini*, 326 F.3d 45, 54, 58-59 (2d Cir. 2003)) (internal citations omitted); *see also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.") (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007)); *Conceptus, Inc. v. Hologic, Inc.*, 771 F. Supp. 2d 1164, 1179 (N.D. Cal. 2010) ("[T]hat is not evidence; it is double hearsay.").

For several of her opinions, Ms. Bergmann simply repeated information given to her by her clients—who in turn obtained the information from other, unidentified sources—and passed it off as evidence in support of her expert report, without doing anything to verify that the information was true. As she admitted, "I was mostly fed with information by my clients." Ex-2 (Bergmann Dep.) 48:6-7; *see also id.* 31:20-32:3 ("[M]y clients are associations. So they collected -- mostly they collected the information, and provided it to me"). Although she occasionally spoke with "users" of the ISIN (typically, members of her own clients), she testified that she was "not even sure that I got new information from the interviews, or whether they were just confirming what I already knew from the associations that fed me with info." *Id.* 45:15-19.

If that were not bad enough, Ms. Bergmann made no attempt to confirm the accuracy of the information her clients "fed" to her, even on issues central to her report. *See Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 429 (S.D.N.Y. 2009) ("An expert who simply repeats the hearsay of the client who retained him, *without any independent investigation or analysis*, does not assist the trier of fact in understanding matters that require specialized knowledge.") (emphasis added). Ms. Bergmann attaches to her report a chart described as a summary of

regulations requiring the use of the ISIN in the EU, France, and Germany. Ex-3. This chart is intended to support one of her principal conclusions that "the use of the ISIN is mandatory for regulatory reporting in the European Union." Ex-1 (Bergmann Report) 14 & n.31. Nothing on the face of the exhibit indicates that anyone other than Ms. Bergmann prepared it. She did not. Instead, she "got it from my client, BVI, and he got it from someone else. We tried to find out where it came from. . . . [H]e was not sure anymore." Ex-2 (Bergmann Dep.) 113:11-18. Notably, Ms. Bergmann received the chart from her client not for purposes of preparing her expert report, but rather "in the context of the Complaint" against CGS in Europe. *Id.* 116:4-8. After receiving it from this unknown source, she "didn't do anything with it." *Id.* 114:11-13.

One of the regulations cited in the exhibit, Solvency II, sets forth reporting requirements for the insurance and reinsurance industry. Ex-3. Epitomizing Ms. Bergmann's lack of the kind of specialized knowledge, skill, experience, training, or education that Rule 702 requires of any expert witness, Ms. Bergmann admitted she had no knowledge of the exhibit's contents. Ms. Bergmann could not even answer the most basic question about it: "Q. What is Solvency II? A. You know, I don't care." Ex-2 (Bergmann Dep.) 118:14-15. She later admitted she did not know what the regulation was. *Id.* 119:13-15. When asked, "[d]id you ever read the regulations cited in Exhibit 8 to your report," Ms. Bergmann answered, "No." *See id.* at 125:12-14. Further, Ms. Bergmann had to admit that the exhibit misquotes Solvency II. Although the exhibit suggests that only the ISIN can be used for reporting, Ms. Bergmann conceded that the immediately following language in the regulation—which whoever prepared it intentionally omitted—allows numerous other identifiers for reporting purposes, plus a catch-all category for "[o]ther code by members of" ANNA. *Id.* at 124:5-125:11; Ex-4 347/482 (listing accepted identifiers); *see also* OpenFIGI,

*Regulations*, https://www.openfigi.com/about/regulations ("FIGI is a supported identifier for insurance company financial instrument exposure reporting in EU Solvency II legislation.").

Rule 703 allows experts to consider hearsay only if "experts in the particular field would reasonably rely" on it. Fed. R. Evid. 703. No expert in any field would consider it reasonable to rely on an exhibit without reading it or confirming the accuracy and completeness of the information detailed in it.

Later in her report, Ms. Bergmann relies on double hearsay to support her "opinion" that "the demand of a license from CGS has caused companies to keep innovative services off the market that otherwise would have required a CGS license." Ex-1 (Bergmann Report) 21. The only example Ms. Bergmann offers to support this sweeping assertion is a banking cooperative called SWIFT. *Id.* 21-23. According to Ms. Bergmann, SWIFT was developing what it called an "ISIN Sanctions Service" and according to Ms. Bergmann the service never launched because, "enforcing the provisions of the CUSIP license would have been administratively burdensome and too expensive." *Id.* at 22. At her deposition, however, Ms. Bergmann admitted she had "no direct knowledge" of why this service was discontinued, or even if it was developed at all. Ex-2 (Bergmann Dep.) 241:2-244:8. Her "sole source" was her client, who supposedly "got the information from [SWIFT]," although she refused to identify ***who*** from SWIFT. *Id.* 241:11-242:8. But this unidentified SWIFT employee also told her client that the proposed service "would not have led to very high revenues," which Ms. Bergmann admitted could have been an independent reason why the service did not launch. *Id.* 245:22-246:11 ("Q. So when you said 'the service would not have led to very high revenues' -- A. Mm-hmm. Q. -- wouldn't that be an independent reason, assuming you're correct that it's not operational, for the service not being launched? A. It is possible. I cannot exclude this."). "[T]hat is not evidence; it is double

hearsay." *Conceptus*, 771 F. Supp. 2d at 1179. Moreover, when questioned about her lack of knowledge about the SWIFT "ISIN Sanctions Service," Ms. Bergmann admitted that she "cannot swear" to the factual assertions in her report. Ex-2 (Bergmann Dep.) 242:15-17 ("Q. So when you say you assume, is it fair to say you actually don't know? A. I cannot swear at it."); *see also id.* 244:15-20. Such speculative and conjectural testimony should be excluded. *Mirena*, 341 F. Supp. 3d at 241.

3.      Because Ms. Bergmann Withholds Her Sources, Her Testimony Is a "Black Box."

Federal Rule of Civil Procedure 26 requires experts to disclose, among other things, "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) *the facts or data considered by the witness in forming them*." Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). "An expert opinion cannot be a 'black box,' immune from scrutiny by the opposing party, merely because the expert relies exclusively on privileged information in forming his or her opinion." *Tikkun v. City of New York*, 265 F.R.D. 152, 156 (S.D.N.Y. 2010). Here, not only did Ms. Bergmann fail to independently verify the information fed to her by her sources; she also refused to disclose her sources, making it impossible for *anyone*, including the Court or the jury, to verify what she was supposedly told.

Although Ms. Bergmann relies throughout her report on information fed to her by her clients, she repeatedly refused to disclose their identity. *See, e.g.*, Ex-2 (Bergmann Dep.) 74:9-22; 187:12-20. Ms. Bergmann claims, as part of the basis of her expertise, that she "consulted with a large number of ISIN users in Germany and the European Union and had meetings with these users in person in order to understand how identifiers are used on user terminals in the IT systems of a financial institution bank and what happens if the ISIN is not available." Ex-1 (Bergmann Report) 8. But she refuses to disclose not only the identity of these "ISIN users," but

also the content of what they told her. Ex-2 (Bergmann Dep.) 35:8-21 ("Q. What confidences are you referring to there? A. Their identity. Q. Anything else? A. Of course, also the content of what they said to me."). She thus relies on double hearsay *and* refuses to disclose the identity of either of the two declarants.

Notably, she did disclose the name of her client when it suited her. When discussing her speculation regarding SWIFT, she disclosed "I have this information from my client, Rudolf Siebel, the CEO of my association client, BVI, Bundesbank Investment and Asset Management." *Id.* 241:11-18. As a result, Ms. Bergmann has created a black box that she will open only when she finds it helpful. But the Court cannot conduct a "rigorous examination of the facts on which the expert relies" if the expert refuses to disclose what those facts are. *Amorgianos*, 303 F.3d at 267. In sum, Ms. Bergmann's "methodology" boils down to unverified hearsay, from unidentified sources, that is connected to her ultimate conclusions only by *ipse dixit* and is not factually accurate. That is no methodology at all, let alone a reliable methodology, and the Court should exclude her testimony on that basis.

> **B.    Ms. Bergmann is not qualified as an independent expert, because her only arguable experience is her advocacy as an attorney representing European clients against CGS.**

There is a reason Ms. Bergmann has no expert methodology: she is not qualified to act as an expert. "Rule 702 requires that expert testimony come from someone who is 'qualified as an expert by knowledge, skill, experience, training or education,' whose testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 359-60 (2d Cir. 2004) (quoting Fed. R. Evid. 702). Whether the expert is qualified under Rule 702 is a "threshold" question for the court." *523 IP*, 48 F. Supp. 3d at 642.

Indeed, a proposed expert's "meager qualifications" can render the remainder of the *Daubert* analysis "almost superfluous." *Zaremba*, 360 F.3d at 360.

Here, Ms. Bergmann is patently unqualified to act as an expert. She claims to have "expertise in financial instrument identifiers," Ex-1 (Bergmann Report) 1, but she does not have any of the qualifications that would render someone capable of opining on how these identifiers and the related financial data are used in the market. She has never been employed by any company that provides financial services, trades financial securities, licenses financial data or any form of data, handles the clearance and settlement of financial transactions, or creates or maintains financial databases. Ex-2 (Bergmann Dep.) 67:19-69:19. She has no firsthand experience with the costs or technical aspects of building a database, creating a security master file, or negotiating a data distribution contract. *Id.* 69:20-70:21. She has no degrees in finance, information systems, or engineering. *Id.* 58:20-59:3. She has a doctoral degree in economics, but her dissertation had nothing to do with financial identifiers or data licensing. *Id.* 57:19-58:13. And although she cites attending and speaking at conferences as part of the basis of her expertise in financial identifiers, *see* Ex-1 (Bergmann Report) 4, she could not recall any specifics about what, if anything, she spoke about at these conferences, because the conferences were "very long ago." Bergmann Dep. 81:6-82:9.

Instead, Ms. Bergmann's sole exposure to the market for financial identifiers has been through her work as an attorney. Ex-2 (Bergmann Dep.) 67:15-17. But without any actual industry experience, independent research, or efforts to verify the double hearsay "fed" her by her clients, nothing in her work as an attorney qualifies her to render her opinions in this case. *See In re Orthopedic Bone Screw Prods. Liab. Litig.*, No. MDL 1014, 1997 WL 39583, at *4 (E.D. Pa. Jan. 23, 1997) (holding that "mere exposure" to subjects "which happen to comprise a

facet of this litigation is not enough to allow [someone] to testify as an expert on those subject areas"); *Cal. Shoppers, Inc. v. Royal Globe Ins. Co.*, 221 Cal. Rptr. 171, 208 (Ct. App. 1985) (excluding the expert opinion of a "particularly aggressive advocate of plaintiffs' cases against insurance companies" because "no foundation whatsoever was laid to demonstrate that [the attorney] had any special knowledge, skill, experience, training or education such as would qualify him as an expert on *insurance company practices*"). She has never published a paper concerning the financial services industry, except to the extent she wrote about her legal work against CGS before the EC. Ex-2 (Bergmann Dep.) 72:16-20. She relies almost exclusively on her experience representing trade-association clients against CGS in Europe. Ex-1 (Bergmann Report) 4-9; *see Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) ("[B]ecause of his advocacy on behalf of plaintiffs as counsel and legal advisor, I do not believe that he can now testify with the detachment and independence that one would expect from an expert witness offering views as a professional."). But even her representation before the EC, she admitted, comprised "clearly below 10 percent" of her legal practice; "[p]erhaps it's 5 percent." Ex-2 (Bergmann Dep.) 65:22-66:7.

Ms. Bergmann even admits she is not an expert in several of the fields on which she purports to render an opinion. For instance, she purports to opine that ISINs are "required for regulatory reporting," Ex-1 (Bergmann Report) 13, but she admits she is "not an expert on regulatory reporting," Ex-2 (Bergmann Dep.) 117:5-11. Additionally, she offers opinions throughout her report on financial markets, *see, e.g.*, Ex-1 (Bergmann Report) 32 ("The use of standardized identifiers increases efficiency and transparency in financial markets."), but she admits she is "not a financial markets lawyer." Ex-2 (Bergmann Dep.) 117:14-15. Ms. Bergmann

thus has neither the "knowledge, skill, experience, training [nor] education" necessary to act as an expert in this case. Fed. R. Evid. 702.

> C.    **Ms. Bergmann's proposed testimony is, by her own admission, irrelevant to this case, and plainly contradicted by the discovery record she ignores, rendering it unreliable.**

Finally, Plaintiffs bear the burden to show their proposed expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "This inquiry looks primarily to whether the testimony is relevant." *523 IP*, 48 F. Supp. 3d at 644; *see also id.* at 648 (excluding testimony as "irrelevant advocacy rather than helpful expert testimony"); *Nora Beverages, Inc. v. Perrier Grp. Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) (affirming exclusion of expert opinions on grounds they were "not relevant" and "may have tended to mislead rather than assist the finder of fact"). Ms. Bergmann's testimony will offer no help to the factfinder because it is, by her own admission, entirely irrelevant. She deliberately declined to review the discovery record, instead relying on her experience as an attorney in the European market. But that experience, she admits, "doesn't have anything to do" with what is at issue in this U.S. case. Ex-2 (Bergmann Dep.) 52:13-15.

Rule 702(d) requires that expert testimony "reflect[] a reliable application of the principles and methods *to the facts of the case*." Fed. R. Civ. P. 702(d) (emphasis added). Here, however, Ms. Bergmann intentionally ignores the facts of this case, because she did not consider them relevant to her analysis. In her report, she explains that she did not review "any confidential information any of the Defendants produced in this case." Ex-1 (Bergmann Report) 8 n.7. When asked why not, she testified that "it had no relevance for me." Ex-2 (Bergmann Dep.) 50:13-15.

She did not even consider the allegations in the complaint relevant; merely "the fact of the Complaint" was "sufficient" for her purposes. *Id.* 50:15-17.

Moreover, she freely admitted that her experience in Europe was irrelevant to the U.S. case. Ms. Bergmann relies throughout her report on her experience litigating against CGS in Europe. She cites her work on the EC case in her report's summary-of-qualifications section; in fact, the majority of that section is dedicated to the EC case. *See* Ex-1 (Bergmann Report) 3-9. She attaches the EC's 2011 Commitments Decision as an exhibit to her report, which she repeatedly cites and quotes at length. *See id.* 5, 11-20, 23-27. But at her deposition, she testified that the EC case "doesn't have anything to do with the US, in my view. Here, you're applying US law, and even if I oppose to [sic] the licensing system of CGS, I cannot give any opinion or view on what's happening in the US. To me, this is an entirely different thing." Ex-2 (Bergmann Dep.) 52:10-20.

If the irrelevance of Ms. Bergmann's opinions were not clear from her admissions alone, the distance between her opinions and the facts of the case cements the conclusion. Her opinions on numerous issues, on which she purports to have expertise, are proven wrong by the discovery record she chose to disregard. For instance, although she was retained to give expert testimony on "the requirement of a license from CUSIP Global Services," Ex-1 (Bergmann Report) 1, Ms. Bergmann gave factually incorrect testimony about CGS's licensing requirements. She testified that CGS requires a license to access ISINs and CUSIPs on a Bloomberg terminal and other display-only terminals, and that CGS charges fees to users for such display access. Bergmann Dep. 167:8-168:1. That is incorrect. *See* Ex-5 (Lane Dep.) 20:3-9 ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ Ex-6 (Mitnick

Dep.) 228:6-12 ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

     Ms. Bergmann also testified that no other data supplier other than CGS requires a direct license with the downstream end user if the data is supplied through another data vendor. Ex-2 (Bergmann Dep.) 181:4-12. The discovery record contains numerous examples disproving Ms. Bergmann's claim. *See, e.g.,* Ex-7 (████ (Bloomberg 30(b)(6)) Dep.) 56:12-23 ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████ Even public sources prove her statement wrong. The London Stock Exchange Group, for example, licenses its SEDOL identifier and related data both directly and indirectly through third-party vendors, just as CGS does.[9]

     Although Ms. Bergmann purports to have expertise in the market for financial identifiers, Ex-1 (Bergmann Report) 3, her assertions about basic facts of alternative identifiers are disproven by both the discovery record and the public record. For example, she opines that other identifiers, such as the "Bloomberg FIGI . . . can never replace the ISIN," *id.* 14, but she does not know basic facts about FIGI. She testified that "Bloomberg does not collect the entire ISIN

---

[9] LSEG, *SEDOL Masterfile Pricing and Policy Guidelines 2025*, at 4 https://www.lseg.com/content/dam/lseg/en_us/documents/sedol/sedol-masterfile-pricing-and-policy-guidelines-2025.pdf ("Any interaction with the SEDOL Masterfile database or SEDOL codes can be in direct form, *or indirectly via a third-party provider*. Interaction with SEDOL codes via a third-party service will be counted where any Licensable Event occurs and assessed in the same way.") (emphasis added).

universe, but only instruments that it believes are important for its subscribers." Ex-2 (Bergmann

Dep.) 236:11-13. To the contrary, Bloomberg was approved as an X9 standard in the United

States because (among other reasons) the committee determined that "[t]he FIGI provides, both

in practice and in future implementation, *a much broader scope than does ISIN*. In particular,

FIGI identifies not only securities, but, potentially, all financial instruments."[10] (emphasis

added.)

Ms. Bergmann also did not know basic market information that shows how the EC

Commitments Decision has been superseded by market developments. For example, Ms.

Bergmann did not know whether the FIGI could be used for "reference data management,"

which is one of the operations listed in the 2011 EC Commitments Decision (and quoted at

length in Ms. Bergmann's report) as "operations in which ISINs cannot be replaced by

alternative identifiers." Ex-1 (Bergmann Report) 15-16 (quoting Commitments Decision ¶ 19);

Bergmann Dep. 238:11-239:2. FIGI did not exist in 2011 when the EC rendered the

Commitments Decision.[11] But it does now and it can be used for "reference data management"

along with many other functions.[12] If Ms. Bergmann had reviewed the discovery record, or even

the public record, she would have seen FIGI repeatedly referred to (by Bloomberg and others) as

---

[10] *ANSI X9.145-2021 Financial Instrument Global Identifier FIGI*, at 47, https://x9.org/wp-content/uploads/2021/08/ANSI-X9.145-2021-Financial-Instrument-Global-Identifier-FIGI.pdf ("FIGI X9 Approval").

[11] *See* Letter from Bloomberg L.P. to Clinton Jones, General Counsel, Federal Housing Finance Agency 10 (October 21, 2024), https://www.fhfa.gov/sites/default/files/2024-10/Bloomberg%20 L.P.%20Comment%20Letter%20to%20the%20FHFA%20-%20RIN%202590-AB38%20% 282024.10.21%29.pdf ("Bloomberg October FDTA Letter"); *What's in a Name? The Bloomberg Global ID is Reborn as FIGI*, Bᴌᴏᴏᴍʙᴇʀɢ (Oct. 9, 2014), https://www.bloomberg.com/ company/press/whats-name-bloomberg-global-id-reborn-figi/.

[12] OpenFIGI, *Benefits*, https://www.openfigi.com/about/benefits  ("The [FIGI] identifiers can be used for research, trading and mapping.").

a "data management standard." *See* FIGI X9 Approval at 47; Bloomberg October FDTA Letter at 6-7, 18, 28, 33, 56, 66, 69, 76, 78.

In summary, testimony that Ms. Bergmann admits is irrelevant, that deliberately ignores the facts of the case, and that is so clearly belied by the discovery record and public information cannot provide any value to the court or the jury.

### D.    Ms. Bergmann is an advocate, not an independent expert.

At the end of the day, Ms. Bergmann offers "irrelevant advocacy rather than helpful expert testimony." *523 IP*, 48 F. Supp. 3d at 648; *Lippe*, 288 B.R. at 688 ("[P]laintiffs have gone too far, for they seek to call as a witness someone who has acted as their attorney . . . ."). What little exposure she has to financial identifiers comes, almost exclusively, from her years of advocating against CGS in Europe. She is not an independent expert; she is an advocate. Her obvious bias pervades her report and testimony.

To begin with, Ms. Bergmann represents trade associations whose members overlap with the members of the putative class. One of the named Plaintiffs in this litigation, Swiss Life, is a member of Ms. Bergmann's client, the Swiss Information Providers Usage Group (SIPUG). *See* Ex-8 (Kyburz Dep.) 23:10-11 ("[W]e are a member of the SIPUG in Switzerland"); SIPUG, *Members*, https://sipug.ch/member/. Ms. Bergmann did not know—and had not done any investigation into—whether other members of SIPUG, or her other trade-association clients, were also members of the putative class. Ex-2 (Bergmann Dep.) 53:18-22.

When asked whether her clients' members (and thus her clients) would benefit if the plaintiffs prevailed in the U.S. case, Bergmann testified, "[a]ctually, ***that would be great***." *Id.* 54:1-4 (emphasis added). Because this was "still a US case," however, Ms. Bergmann felt that she and her clients would need to "continue fighting in the EU." *Id.* 54:5-9.

Her clients, on whom Ms. Bergmann relies without independent confirmation, *see supra* § I.2, cannot be characterized as "independent" sources, and their animus towards CGS pervades her report. Ms. Bergmann, for example, attaches as an exhibit to her report, for background on the history of CGS, a 2008 advocacy piece pressing companies to bring "ammunition" for a legal case in Europe against CGS (then known as the CUSIP Service Bureau): "To get to this stage, our various organisations need to individually make representations to the EUCC [EU Competition Committee]. Prior to this, we also need to construct as solid a case as possible, using lawyers suitably qualified with the appropriate jargon and skills, with the ammunition to convince the EUCC that our complaints are worth fighting." *See* Ex-1 (Bergmann Report) 17 & n.39; Ex-9 at 10. A few months later, Ms. Bergmann brought that complaint against CGS and S&P in Europe, on behalf of her trade association clients.

Moreover, where Ms. Bergmann openly speculates, she frequently betrays her obvious bias against CGS. For instance, when shown a template data licensing agreement used by the ANNA Service Bureau—which Bergmann admitted she had never seen before—she repeatedly testified that licensing restrictions for ANNA data were drafted by, and precipitated by, CGS, and then admitted that her testimony was based on nothing more than speculation. Ex-2 (Bergmann Dep.) 215:17-22 ("Q. Since you haven't seen this agreement before, is it your speculation that CGS wrote this agreement? A. *Yes. It's speculation.* Q. But that's your speculation? A. *That's my speculation.*") (emphasis added); *see also id.* 231:13-22 ("Q. So, when you started your answer, you assume this -- A. Yes. Q. That means you are speculating; correct? A. I mean, *it's not a fact what I'm saying. It's indeed speculation* because ANNA is co-owned by CGS, and ANNA has CGS data. So the scenario I'm talking about doesn't exist. *To that extent, yes, this is speculative.*") (emphasis added).

28

In sum, Ms. Bergmann has no specialized knowledge apart from taking advocacy positions against CGS in Europe, on an ongoing basis, for nearly two decades. She relied on her trade association clients as her primary source of information for her expert report, without attempting to independently verify the information in her report. And she has demonstrated her willingness to give opinions that are overtly speculative and biased against CGS. Accordingly, Ms. Bergmann cannot testify "with the detachment and independence that one would expect from an expert witness offering views as a professional." *Lippe*, 288 B.R. at 687-89; *see also id.* at 688 ("But here plaintiffs have gone too far, for they seek to call as a witness someone who has acted as their attorney . . . ."); *Marria v. Broaddus*, 200 F. Supp. 2d 280, 291 (S.D.N.Y. 2002) (excluding expert testimony for, among other things, relying on "biased and therefore unreliable evidence"). Rule 702 requires excluding such biased, unfounded, and unreliable testimony.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Court should grant Defendants' Motion to exclude Ms. Bergmann's testimony in its entirety.

Dated: November 26, 2025

Respectfully submitted,

/s/ Eric J. Stock
Eric J. Stock
Jefferson E. Bell
Esther Lifshitz
GIBSON, DUNN &
CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel.: (212) 351-2301
Fax: (212) 716-0801
estock@gibsondunn.com
jbell@gibsondunn.com
elifshitz@gibsondunn.com

*Attorneys for Defendant
S&P Global Inc.*

/s/ Jeffrey I. Shinder
Jeffrey I. Shinder
Ellison A. Snider (*pro hac vice*)
SHINDER CANTOR LERNER LLP
14 Penn Plaza, 19th Floor
New York, NY 10122
Tel.: (646) 960-8601
jeffrey@scl-llp.com
esnider@scl-llp.com

James J. Kovacs (*pro hac vice*)
Keagan H. Potts (*pro hac vice*)
SHINDER CANTOR LERNER LLP
Tel.: (646) 960-8601
600 14th Street NW, 5th Floor
Washington, D.C. 20005
james@scl-llp.com
kpotts@scl-llp.com

W. Stephen Cannon (*pro hac vice*)
Seth D. Greenstein (*pro hac vice*)
Patrick Kennedy (*pro hac vice*)
CONSTANTINE CANNON LLP
Tel.: (202) 204-3500
1001 Pennsylvania Avenue NW,
Suite 1300N
Washington, D.C. 20004
scannon@constantinecannon.com
sgreenstein@constantinecannon.com
pkennedy@constantinecannon.com

Sarah Bayer
CONSTANTINE CANNON LLP
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 350-2700
sbayer@constantinecannon.com

*Attorneys for Defendant FactSet
Research Systems Inc.*

/s/ David C. Kiernan
JONES DAY
David C. Kiernan (*pro hac vice*)
Craig E. Stewart (*pro hac vice*)
Caroline N. Mitchell (*pro hac vice*)
Kapri Saunders (*pro hac vice*)
Paul Hines (*pro hac vice*)
555 California Street, 26th Floor
San Francisco, CA 94104
Tel.: (415) 626-3939
Fax: (415) 875-5700
dkiernan@jonesday.com
cestewart@jonesday.com
cnmithcell@jonesday.com
ksaunders@jonesday.com

Alexander V. Maugeri
Amanda L. Dollinger
250 Vesey Street
New York, NY 10281
Tel.: (212) 326-3939
Fax: (212) 755-7306
amaugeri@jonesday.com
adollinger@jonesday.com

*Attorneys for Defendant
American Bankers
Association*

## **SIGNATURE CERTIFICATION**

Pursuant to Section 8.5(b) of the Electronic Case Filing Rules and Instructions of the

Southern District of New York, I certify that all other signatory parties have consented to the

filing of this document.


_/s/ David C. Kiernan_
David C. Kiernan

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 4(B) of the Court's Individual Rules of Practice in Civil Cases, Defendants certify that this computer-generated Memorandum of Law was prepared using Microsoft Windows and Microsoft Word.  The total number of words in this Memorandum, exclusive of the caption, table of contents, table of authorities, the signature block, and this certificate of compliance is 7,974, which is in accordance with the maximum 8,750 words as permitted under Local Civil Rule 7.1.

*/s/ David C. Kiernan*
David C. Kiernan

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 26, 2025, I caused the foregoing to be served on all counsel of record via ECF.

_/s/ David C. Kiernan_
David C. Kiernan