UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DINOSAUR FINANCIAL GROUP LLC,
HILDENE CAPITAL MANAGEMENT,
LLC and SWISS LIFE INVESTMENT
MANAGEMENT HOLDING AG, on
behalf of themselves and all others
similarly situated,

                    Plaintiff,

        -against-


S&P GLOBAL, INC., AMERICAN
BANKERS ASSOCIATION, and
FACTSET RESEARCH SYSTEMS
INC.,

                    Defendants.

Case No.: 1:22-cv-1860-KPF

**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF
<u>EINER ELHAUGE</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

RELEVANT BACKGROUND .............................................................................................. 2

LEGAL STANDARD ............................................................................................................ 5

ARGUMENT ......................................................................................................................... 6

    A.  Elhauge's Model Predicting Zero Prices Should be Excluded Because He
         Admitted at Deposition That Class Members Would Still Pay for Non-CUSIP
         Data Fields From CGS in the But-for World. .............................................................. 6

    B.  Elhauge's Opinion that, Due to the Allegedly Zero Marginal Cost of Serving
         Additional Customers, CGS Would Charge "Zero" Prices For its Data in the
         But-For World Should Be Excluded. ......................................................................... 11

    C.  Elhauge's Opinions That the Prices for Financial Identifiers in Certain Other
         Countries Are an Appropriate "Yardstick" For the Prices CGS Should be
         Charging Must be Excluded as Unreliable. ............................................................... 13

        1.  Elhauge Conducted No Independent Investigation of Critical Factual Premises,
            Making His Yardstick Model Unreliable. ..................................................... 14

        2.  The Data Products Offered by the Foreign NNAs Are Not Reasonably
            Comparable Benchmarks for CGS Data. ..................................................... 17

    D.  Both Methods Elhauge Employs to Calculate Damages Are Unreliable. .................. 20

        1.  Method 1 Overestimates Damages by Ignoring the Fact That the CGS License
            Fee Covers Data for Non-U.S. Financial Instruments. ................................ 21

        2.  Method 2 Impermissibly Uses Average Prices to Address the Presence of Non-
            U.S. Financial Identifiers. ........................................................................... 23

CONCLUSION .................................................................................................................... 27

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ........................................................ 6, 11

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
   537 F. Supp. 3d 273 (N.D.N.Y. 2021) ...................................... 14, 16, 17

*Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*,
   910 F. Supp. 2d 629 (S.D.N.Y. 2012) ............................................ 17

*Bell Atl. Corp. v. AT&T Corp.*,
   339 F.3d 294 (5th Cir. 2003) ................................................... 25, 26

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) ........................................................ 14

*Chartier v. Brabender Tech., Inc.*,
   No. 08-40237 (D. Mass. Oct. 5, 2011) ............................................ 9

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ............................................................... 21

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ............................................................ 1, 6

*Dependable Sales & Serv., Inc. v. TrueCar, Inc.*,
   311 F. Supp. 3d 653 (S.D.N.Y. 2018) ............................................ 21

*Devito v. Smithkline Beecham Corp.*,
   2004 WL 3691343 (N.D.N.Y. Nov. 29, 2004) ...................................... 10

*F. Hoffmann-LaRoche Ltd. Empagran S.A.*,
   542 U.S. 155 (2004) ............................................................. 23

*Franklin v. Consol. Edison Co. of New York, Inc.*,
   37 F. App'x 12 (2d Cir. 2002) ................................................... 11

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ............................................................. 10

*Houser v. Prtizker*,
   28 F. Supp. 3d 222 (S.D.N.Y. 2014) ................................................................. 21

*In re Aluminum Warehousing Antitrust Litig.*,
   336 F.R.D. 5 (S.D.N.Y. 2020) ................................................................... 5, 24

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ..................................................................... 24

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ................................................. 18, 21

*In re Lamictal Direct Purchaser Antitrust Litig.*,
   957 F.3d 184 (3d Cir. 2020) ............................................................................. 26

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   2025 WL 2733020 (S.D.N.Y. Sept. 25, 2025) ......................................... 12, 18, 20

*In re M/V MSC FLAMINIA*,
   2017 WL 3208598 (S.D.N.Y. July 28, 2017) ..................................................... 15

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
   341 F. Supp. 3d 213 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020) ............. 26

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
   725 F.3d 244 (D.C. Cir. 2013) ......................................................................... 21

*In re Zyprexa Prods. Liab. Litig.*,
   489 F. Supp. 2d 230 (E.D.N.Y. 2007) ............................................................... 16

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ......................................................................................... 6

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. 2005) ................................................................ 14

*Mahmud v. Kaufman*,
   607 F. Supp. 2d 541 (S.D.N.Y. 2009) ............................................................... 23

*Nike, Inc. v. StockX LLC*,
   2024 WL 3361411 (S.D.N.Y. July 10, 2024) ....................................................... 6

*Pac. Life Ins. Co. v. Bank of N.Y. Mellon*,
   571 F. Supp. 3d 106 (S.D.N.Y. 2021) ........................................................... 6, 14

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ........................................................................ 5

*Sullivan v. Ford Motor Co.*,
    2000 WL 343777 (S.D.N.Y Mar. 31, 2000) ................................................... 13

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) ............................................................................. 21

*Union Carbide Corp. v. Montell N.V.*,
    28 F. Supp. 2d 833 (S.D.N.Y. 1998) ............................................................. 23

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) ............................................................................. 6

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ........................................................................... 15

## RULES

Fed. R. Civ. Proc. 23 ....................................................................................................... 5

Fed. R. Evid. 702 ............................................................................................................. 1

# INTRODUCTION[1]

Defendants move to exclude four opinions of Plaintiffs' expert Professor Einer Elhauge under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

*First*, Elhauge's opinion that putative class members would have paid nothing for data from the CUSIP Global Services ("CGS") business absent the challenged conduct, and that the class's damages are therefore equal to all license fees paid by putative class members during the relevant period, must be excluded because that opinion was based on a factual misunderstanding about the CGS Data that Elhauge now admits was incorrect. At his deposition, Elhauge conceded that, absent the challenged conduct, some class members would still pay for CGS Data because they value its numerous data elements.

*Second*, Elhauge's opinion that, due to the supposedly zero marginal cost of serving an additional customer, CGS and/or other suppliers of financial data would have the economic incentive to provide their customers with vast amounts of data for free should also be excluded. That opinion is economically irrational and contrary to the factual record because it ignores the significant recurrent costs associated with maintaining, hosting, and updating a central database of millions of financial instruments—costs that no company would incur if it could not earn revenue from doing so.

*Third*, Elhauge's effort to point to the supposed practices in 120 foreign jurisdictions as a "yardstick" for how CGS should have behaved in this case should be excluded, as Elhauge, by

---

[1] All capitalized terms are as defined in the Glossary set forth in Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, or as otherwise defined therein.

his own admission, knows nothing of those jurisdictions and their practices, and did nothing to demonstrate that they are appropriate benchmarks for CGS's business in the U.S. market.

*Fourth*, Elhauge's proposed methodologies for calculating damages must be excluded because they include damages for products not at issue in this case.

## RELEVANT BACKGROUND

Plaintiffs allege Defendants have maintained a monopoly and conspired to restrain competition in a purported market for the use of CUSIP Identifiers for U.S. financial instruments. SAC ¶ 10. Plaintiffs moved for class certification, attaching reports from six purported experts—Arthur Miller, James Powell, Bettina Bergmann, Frank Lenz, Katerina Gaebel, and Einer Elhauge. *See* Dkt. 231, 231-1, 231-2, 231-3, 231-10, 231-78,[2] 231-86.

Elhauge asserts in his report that he has developed "methodologies and evidence common to each proposed Class and Subclass" that can demonstrate injury to every putative class member, and that a unified economic model can compute individual damages for all putative class members. Dkt. 231-86 ("Elhauge Rep.") ¶ 19. Elhauge's report opines that, in the absence of the challenged conduct by Defendants, CGS would have developed and maintained a robust database of millions of financial instruments, including the CGS Identifiers (CUSIPs, CINs, and ISINs) and related information, and distributed that CGS Data to customers across the financial service industry *free of charge*. Ex-1 (Elhauge Dep.) 186:5–189:8. Elhauge does not cite any record evidence suggesting that any particular Data Distributor has expressed a willingness to take on the burden of maintaining and distributing a database of CGS Identifiers for free, much less the accompanying descriptive data that would make such a database useful. Instead, he

---

[2] Ms. Gaebel was substituted for Alan Schachter. *See* Dkt. 233.

simply theorizes that *someone* would do so or that CGS would voluntarily opt to do so itself, and that all class members would therefore have paid zero licensing fees for access to such data but-for the challenged conduct. Elhauge Rep. ¶ 78.  Elhauge offers no coherent economic explanation to substantiate this theory and it is notable that Elhauge has virtually no economics training or real-world experience with the financial data licensing businesses or pricing strategies on which he expresses his opinions.  Ex-1 (Elhauge Dep.) 27:4–28:2, 35:5–8, 35:9–36:10.

Elhauge's opinion regarding how the market would evolve absent the challenged conduct changed dramatically at his deposition.  Elhauge explained at deposition that his report assumed, incorrectly, that a CGS license only entitles the class member licensee to access CGS Identifiers themselves (i.e., CUSIP, CIN, and CGS-ISIN codes), and perhaps 1-2 additional data fields accompanying the identifier.  *Id.* 154:21–155:17, 212:15–213:7.  Elhauge calls this as a "basic" license.  *Id*. 154:21–155:17.

When confronted with the reality that there is no "basic" license and that putative class members utilize the CGS license at issue to obtain far more than just access to CGS Identifiers and "basic" data—indeed, they obtain access to a reliable and updated feed of up to 60-plus data elements linked to the identifier (the "CGS Data")—Elhauge backtracked from his report's core theory.  Elhauge thereafter admitted, in light of the factual record, that these additional data elements supplied by CGS have significant value, and that at least some putative class members would continue paying CGS to obtain these additional data elements from the CGS Data in the but-for world, even absent the challenged conduct.  *Id.* 130:10–131:6; 220:6–11; 132:21–133:7.  This admission nullified his (and Plaintiffs') prior assumption that all putative class members would pay zero dollars for CGS Data in the but-for world—an assumption that serves as the key

basis for Plaintiffs' model of injury and damages (which asserts as damages *all* licensing fees paid by class members to CGS).

To support his zero-price conclusion, Elhauge purports to use what is referred to as a "yardstick" economic model. A yardstick model takes a market that was unaffected by anticompetitive conduct and uses it as a benchmark to estimate how a market allegedly affected by anticompetitive conduct would have behaved absent the at-issue conduct. Elhauge claims that his benchmark markets are approximately 120 countries throughout the world where financial identifiers are issued and distributed by a national numbering agency ("NNA"), supposedly free of charge. Elhauge Rep. ¶ 59 n.97.

Elhauge's report, however, undertakes no effort to assess the characteristics of the claimed 120 markets that he asserts are appropriate benchmarks. Indeed, he conducts no independent investigation of them. Instead, he relies almost exclusively on another of Plaintiffs' experts—Bergmann, a private lawyer practicing in Europe—whose reliability Elhauge did not confirm. In her report, Bergmann states that "in over 120 nations without similar restraints, identifiers for financial instruments from those nations can be used free of charge." *Id.* ¶ 79 (citing Dkt. 231-3 (Bergmann Rep.) p. 26). However, Bergmann offers no support for that proposition either, and, in fact, walked back from that position at her deposition. Indeed, Bergmann acknowledged she relied on ***only one source*** for this opinion: a statement in a 2011 European Commission decision—a decision that concerned only certain European countries, and which said nothing about the vast majority of the NNAs outside Europe or the licensing of structured data associated with the identifier. *See* Defs.' Mot. to Exclude Bergmann, 8–9. Bergmann conceded that she had no actual experience with virtually all of the 120 jurisdictions.

4

*Id.* at 7-11; Ex-2 (Bergmann Dep.) 174:7–177:1; 184:6–8.  The result is a Russian nesting doll of unsupported opinions layered on top of one another.

Finally, Elhauge proposes two alternative methodologies for calculating damages.  These two methods adopted different strategies for addressing a particular challenge of calculating damages based on the CGS license fee, namely, that putative class members not only licensed CUSIPs for certain financial instruments issued in the United States—the basis of Plaintiffs' claims—but also licensed certain international identifiers for non-US financial instruments.  In Elhauge's first method ("Method 1"), he assumes that all the licensing fees paid by class members are part of damages, even though he does not dispute that a portion of those licensing fees cover identifiers that are not part of the damages claim.  Elhauge Rep. ¶ 116.  "Method 2" attempts to address this over inclusiveness problem by allegedly eliminating the fees attributable to foreign CGS Identifiers from the damages calculation.  *Id.* ¶ 118.  But Method 2 fails in its mission and instead applies one, uniform average discount to all licensing fees, ignoring the vast differences between individual class members in terms of each member's relative use of the U.S. CGS Identifiers subject to Plaintiffs' claims, and the non-U.S. CGS Identifiers that are not.  *Id.* ¶ 124–25.

## LEGAL STANDARD

Courts in the Second Circuit routinely "subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis."  *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020) (holding *Daubert* standard applies at class certification).

Under the *Daubert* standard, expert testimony must be both relevant and reliable.  *Kumho*

*Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  The district judge plays the critical role of gatekeeper, ensuring that "(1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact."  *Nike, Inc. v. StockX LLC*, 2024 WL 3361411, at *2 (S.D.N.Y. July 10, 2024).  This requires "a rigorous examination" of the expert's methods.  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  Expert testimony cannot be based on "subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  And "an expert may not merely adopt another expert's opinions as his or her own reflexively and without understanding the materials or methods underlying the other expert's opinions."  *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, 571 F. Supp. 3d 106, 116 (S.D.N.Y. 2021) (Failla, J.).

Plaintiffs bear the burden of establishing, by a preponderance of the evidence, the admissibility of their experts' testimony.  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *Daubert*, 509 U.S. at 592 n.10.

## ARGUMENT

### A.    Elhauge's Model Predicting Zero Prices Should be Excluded Because He Admitted at Deposition That Class Members Would Still Pay for Non-CUSIP Data Fields From CGS in the But-for World.

Elhauge's model finding that, but for the challenged conduct, the price of the CGS license would be zero (the "but-for price"), should be excluded because it is based on false assumptions about the CGS Data that putative class members receive under their licenses.  When confronted with record evidence inconsistent with his assumptions, Elhauge acknowledged his error and withdrew his opinion that putative class members would pay nothing for CGS Data.  Ex-1 (Elhauge Dep.) 130:10-131:6, 132:21-133:7, 220:6-11, 221:5-6.  He instead agreed that CGS could and would continue to charge at least some customers for data elements from CGS Data

(other than identifiers) in the but-for world.  *Id.*  His disavowed zero-price model should thus be excluded.

In his report, Elhauge claimed that without the alleged anticompetitive conduct, the cost of class members obtaining CGS Identifiers would be zero.  Elhauge Rep. ¶ 112.  The report concludes, without providing further analysis of the broader structured CGS Data that many putative class members want, that the ***entire*** license fee for CGS Data constitutes overcharge damages.  *Id.* ¶ 112 ("[T]he overcharge injury and damages equal the full amount of actual use license fees paid by Class members . . . ."); *see also id.* ¶¶ 114, 125.

Elhauge's model is based on two fundamental misunderstandings: (1) that putative class members obtained from CGS only a "basic license" comprised solely of CGS Identifiers and one or two other basic data elements (e.g., security name); and (2) that this basic license provides putative class members with all that they need or want from CGS.  The factual record shows conclusively that both of those assumptions are wrong.  Elhauge did not know and did not properly examine what a CGS license actually buys:  not just access to a list of CGS Identifiers, but a continually updated structured data product of up to 60-plus data elements linked to CGS Identifiers for millions of financial instruments maintained in the CGS database.[3]  *See* Ex-4 (CGS Master File) (listing descriptive data included with the CGS license, e.g., rate type, maturity date, issue description, and currency); Ex-3 (Stiroh Rep.) ¶¶ 38–39; Ex-5 (Meyn Rep.) ¶ 189, Table 1.

Putative class members want and receive this much broader set of structured data, linked to CGS Identifiers, from CGS in order to meet the data needs of their businesses, including to

---

[3] *See* Ex-3 (Stiroh Rep.) ¶¶ 38–40.

reliably and accurately identify the financial instrument in question.[4]  Elhauge stated in his report

that "CGS itself would also have incentives to charge a zero price for *CUSIP identifier use* in the

but-for world."[5]  Elhauge Rep. ¶ 78 (emphasis added).  But CGS does not charge for "CUSIP

identifier use."  CGS charges licensees for access to its highly reliable and accurate structured

data product, which includes not only the basic identifier but also dozens of other data elements

describing the relevant financial instruments.  Numerous putative class members and data

vendors provided testimony confirming they want and value the comprehensive data elements in

the CGS database, as well as the reliability ensured by CGS's ongoing updates, and specifically

value receiving such data *from CGS* due to the accuracy and reliability of the CGS Data.[6]  As a

result, even if the CUSIP Identifiers themselves were free (and they already are publicly

available for free), putative class members would continue to pay for broader access to the

structured CGS Data along with the convenience of receiving that data in a bulk download or

data feed format.[7]  They would do so to reliably and accurately identify the financial instrument,

and to perform a host of related business functions that require linking CGS Identifiers to the

---

[4] Ex-5 (Meyn Rep.) ¶ 189, Table 1.

[5] Elhauge could not explain what "incentives" CGS has to offer its data for free.  At deposition, he speculated that distributing free data could make CGS's issuance business more valuable.  Ex-2 (Elhauge Dep.) 176:5–19.  He was unable to explain the why or how, and appeared not to consider that CGS's issuance business is essentially operated at cost.

[6] *See* Ex-6 (███████ Dep. (Xignite 30(b)(6))) 91:19–92:22 ███████████████████ ██████████); Ex-7 (Flynn Dep.) 177:5-15 ("[T]here is tremendous value in the business of maintaining a highly-accurate database of financial instruments that underpin billions of transactions."); Ex-8 (Refinitiv (███████) Decl.) ¶ 2 ████████████████████████ ███████████████; Ex-9 (███████ Dep. (Wilshire 30(b)(6))) 80:4–81:25 ████████████████████ ███████████ Ex-10 (███████ Dep. (ICE 30(b)(6))) 72:13-20 (████ ████████████████████████████████████); *see also, e.g.*, Ex-5 (Meyn Rep. ¶ 189, Table 1 ████████████████████████████████████████ .

[7] Ex-5 (Meyn Rep. ¶ 189, Table 1).

comprehensive structured CGS Data. Given this context, treating the bare identifier as having a but-for price of zero dollars does not result in the full license fee having a but-for price of zero dollars.

When confronted with this fundamental flaw in his reasoning, Elhauge retreated from his premise, conceding that class members would continue to pay for the broader CGS Data even if, in the but-for world, they would not pay specifically for CGS Identifiers themselves. Ex-1 (Elhauge Dep.) 130:10–131:6. This opinion—in direct conflict with Elhauge's opinion that putative class members would have paid nothing—is not "an inadvertent slip of the tongue": it is a wholesale repudiation of the model's zero-price premise. *Chartier v. Brabender Tech., Inc.*, No. 08-40237, at *8 (D. Mass. Oct. 5, 2011). Elhauge made abundantly clear that his damages "opinion[] [is] based on the fact that the CGS [I]dentifiers themselves would be available for free. . . [and] not based on an assessment of the but-for price for CGS data products." Ex-1 (Elhauge Dep.) 127:3–7.

That admission alone nullifies Elhauge's injury and damages model, which is based on the false notion that all that matters to putative class members is the CGS Identifiers, and that they would have paid nothing for them in the but-for world. Elhauge acknowledged several times during his deposition that, contrary to his report, in the but-for world at least some members of the putative class might continue paying CGS for the broader structured CGS Data, which they need along with CGS Identifiers to make use of the data in their business. *Id.* 130:10–131:6; 220:6–11; 132:21–133:7 ("Q. So in your opinion, [CGS] would simply provide those CUSIPs for free and make its return only on the issuance business? . . . A. Well, at least as to the basic license it would be providing not for free. It could still charge for other data fields."); *id.* 132:21–133:7 ("Q. And then on the other hand, ***there might be some end users that***

***decide to continue paying for data elements other than the CUSIP element*** that they receive

from CGS through their data vendor, correct?  A.  And when you're saying 'decide to continue

paying for data elements,' you mean decide to continue paying CGS for data elements?  Q.

Correct.  ***A. Yes. Some of them might do so.***") (emphases added).

Because Elhauge abandoned his opinion that putative class members would have paid

nothing for CGS Data in the but-for world, his zero-price model supporting common fact of

injury and damages is inadmissible.  *See Devito v. Smithkline Beecham Corp.*, 2004 WL

3691343, at *4 (N.D.N.Y. Nov. 29, 2004) (excluding expert opinion where expert disavowed it

during his deposition); *Chartier*, 2011 WL 4732940, at *7 ("The purpose behind . . . expert

depositions, would be defeated if an expert were permitted to give varying versions of his

opinion, leaving the opponent to guess at which version will be rendered at trial.").  Indeed, the

abandoned zero-price premise was the cornerstone of Elhauge's damages model; once debunked,

the link is missing between the data and the conclusion that damages equal all licensing fees

paid.  This leaves "too great an analytical gap between the data and the opinion proffered."  *Gen.*

*Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Critically, Elhauge's admission makes clear that he is not able to calculate through

common proof how much class members would pay for the CGS Data in the but-for world, and

whether that amount would be more or less than the actual world, i.e., prove injury classwide

with a common method.  Elhauge tried to remedy this problem by first acknowledging that the

but-for price would not be zero and then speculating that it would still be lower.  Ex-1 (Elhauge

Dep.)  123:13–124:4; 127:9–16("[T]he fact that the price they get for the basic CUSIP identifier

would be lower would suggest they could also get a lower price for it coupled with all 60 data

fields, even if they wanted to continue getting that from CGS.").  But his "remedy," a ***lower fee***

10

*above zero*, serves only to disavow his own "zero price" conclusions. In any event, it is *ipse dixit*, as he offered no analysis of this "remedy" in his report or at deposition. *Amorgianos*, 303 F.3d at 267 (expert opinion inadmissible where it "is connected to existing data only by the *ipse dixit* of the expert"). Consistent with the belated nature of this opinion, Elhauge did not specify how much lower CGS license fees would be or provide any method for determining this supposed reduced price. Nor could he, because there is no way to assess this amount on a class-wide basis. The damages opinions expressed in his report must therefore be excluded.

### B.    Elhauge's Opinion that, Due to the Allegedly Zero Marginal Cost of Serving Additional Customers, CGS Would Charge "Zero" Prices For its Data in the But-For World Should Be Excluded.

Elhauge's opinion that the supposedly zero marginal cost for CGS serving additional customers would cause CGS to charge zero prices for its data in the but-for world should also be excluded because it is speculative, illogical, and lacks a reliable foundation.

Elhauge opines that the marginal cost to CGS of providing CGS Identifiers (i.e., the incremental cost for providing access to its identifier data to a new customer) is zero. Elhauge Rep. ¶ 18. He then contends that given these "low collection costs and nonexistent marginal costs" other nameless, financial service firms would also be willing to compile, maintain, and distribute lists of millions of CGS Identifiers in the but-for world for free. *Id.* ¶ 77. Elhauge then makes the giant leap to conclude that, in a but-for world, "the use of machine-readable CUSIP Identifiers and US CUSIPs would be available to all market participants without charge and without executing any license agreement." *Id.* ¶ 18.

This reasoning must be excluded as speculative, illogical, and unsupported by the evidence. *See Franklin v. Consol. Edison Co. of New York, Inc.*, 37 F. App'x 12, 14 (2d Cir. 2002) (excluding expert testimony where it was "unreliable" and "did not 'fit' with the facts of

plaintiff's case"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2025 WL 2733020, at *26 (S.D.N.Y. Sept. 25, 2025) (excluding expert opinion that engaged in "circular reasoning" with a "reversed engineer[ed] theory to fit" his "assum[ed] conclusion") (citation omitted). Even assuming, *arguendo*, that marginal cost of serving additional customers is zero, that does not mean the cost of maintaining the CGS database is zero. Instead, the record evidence supports that CGS incurs substantial, recurring costs each year to maintain, update, and preserve the accuracy of the CGS database. *See* Ex-3 (Stiroh Rep.) ¶¶ 107–10; Ex-11 (FRSI01807347).

Elhauge offers **no explanation** for why hypothetical market entrants would choose to incur these substantial recurring costs without the prospect of making any profit. And he fails to identify any market mechanism by which these apparently charitable actors could recoup the costs of aggregating, updating, and hosting identifiers for millions of financial instruments when the supposed market price for such data is zero. *See* Ex-1 (Elhauge Dep.) 186:5–189:8. In lieu of such analysis, his claim simply restates the pleadings. *See* SAC ¶¶ 196–97.[8] That is not reliable expert testimony, in part because it conflates the cost of a user accessing information with the costs of aggregating, maintaining, updating, and hosting that information.

Such unsupported and illogical theories from a purported expert underscore how ill-equipped Elhauge is to opine on these issues. Elhauge has no experience predicting how a firm will set prices in complex data markets and he lacks the formal training to allow him to do so

---

[8] The only citation Elhauge offers for his "inference" that firms would offer an accurate list of more than 17 million CUSIPs for free is the existence of Bloomberg OpenFIGI. Elhauge Rep. ¶ 77. But Elhauge does not establish that product is comparable to CGS Data or determinative of its competitive price. He admits Bloomberg only currently offers the FIGI identifier for free as a marketing strategy "in order to encourage customers to use their broader data offerings." *Id.* The use of promotional loss leaders does not establish that the competitive price of an offering is zero; it simply shows that some firms are willing to absorb initial costs and recoup them through alternative means or through other, related products. In other words, customers will still pay for these products, just perhaps via high prices on other products offered by that same supplier.

reliably. Elhauge is a law professor, not an economist. Ex-1 (Elhauge Dep.) 25:19-21; 25:22-26:3. While he may have an understanding of basic economic concepts, he does not have the right training or experience to express his "zero-price" opinions. Elhauge holds no economics degree, and his formal training in quantitative economics is limited to a few undergraduate courses, such as a single class of statistics, he took decades ago. Ex-1 (Elhauge Dep.) 27:4–28:2; *Sullivan v. Ford Motor Co.*, 2000 WL 343777, at *5 (S.D.N.Y Mar. 31, 2000) (Where "the purported expert [has] neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered," the opinion must be excluded.). No business has ever retained Elhauge for assistance in setting prices or predicting a firm's behavior if its distribution model has changed. Ex-1 (Elhauge Dep.) 35:5–8, 35:9–36:10. This shows not only that Elhauge is unqualified to assert these opinions, but also why Elhauge would come up with such unreasonable and economically incoherent conclusions.

      C.     **Elhauge's Opinions That the Prices for Financial Identifiers in Certain Other Countries Are an Appropriate "Yardstick" For the Prices CGS Should be Charging Must be Excluded as Unreliable.**

Elhauge's opinion comparing the U.S. market to 120 other purported "yardstick" markets should also be excluded. Elhauge attempts to buttress his unsupported conclusion that the competitive price of the CGS Data license is zero by utilizing a purported yardstick model comparing CGS to NNAs in 120 other countries—collectively, his "benchmark"—where the price of financial identifiers is supposedly zero. Elhauge Rep. ¶ 18. But Elhauge blindly relies on Plaintiffs' other experts rather than conducting an independent investigation into the comparability of his yardstick markets. And because he did not understand the markets or products at issue, his yardstick model relies on benchmark products that are not reasonably comparable to the CGS Data license. Elhauge's model is thus "an apples and oranges

comparison," not reliable economics. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quotation modified).

### 1. Elhauge Conducted No Independent Investigation of Critical Factual Premises, Making His Yardstick Model Unreliable.

Elhauge never independently investigated the markets in his supposed 120-country benchmark. Any expert must conduct "independent analysis" of the opinions in his report. *Pac. Life Ins. Co.*, 571 F. Supp. 3d at 117 (citation omitted); *see AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 341 (N.D.N.Y. 2021) (excluding expert that not only "select[ed] arguably inappropriate benchmarks, but utterly 'failed to perform *any* substantive analysis of those factors most relevant to comparability'") (citation omitted). Moreover, it is well-established that an expert who offers a yardstick model must understand and demonstrate the comparability of the benchmark market. *See Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 813 (N.D. Ill. 2005) (excluding expert's yardstick model when he "knew nothing about . . . relevant factor[s] that would bear upon the question of comparability"). Elhauge did not, for example, evaluate whether the legal frameworks in these 120 jurisdictions are comparable to the U.S. legal system, whether the competitive circumstances are similar, and/or whether the data products at issue are similar. Ex-1 (Elhauge Dep.) 226:21–227:4 ("I did not myself review the evidence on the regulatory environments."); *id.* 227:7–12 ("I relied on the evidence from the Bergmann and Lenz reports on [the competitive environments]."); *id.* 237:6–238:4 ("I don't know what the precise format in which [the identifiers are] available for free in these other nations."). At deposition, Elhauge did not even know which countries were in his yardstick markets; for example, he did not know whether the NNA in Switzerland—Swiss Infrastructure and Exchange Group ("SIX"), one of the largest NNAs—was one of the yardstick markets. *Id.* 235:20–24.

Rather than doing his own work, Elhauge blindly relied on Plaintiffs' other purported experts to opine on how the foreign NNAs operate.  To support the premise that there are allegedly 120 other NNAs offering financial identifiers for free, Elhauge cites little more than the Bergmann Report.[9]  *See* Elhauge Rep. at ¶¶ 59 n.97, 79 n.144, 83 n.156.  But Elhauge testified that he only "looked" at Plaintiffs' expert reports, never spoke with Bergmann (or Mr. Lenz), and "didn't independently investigate the factual premises or statements made in [Plaintiffs' expert reports]."  Ex-1 (Elhauge Dep.) 46:14–23, 16:5–13.  Because he did no meaningful research of his own, Elhauge was incapable of "demonstrat[ing] why he believed the [Bergmann report was] reliable."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012).

This reliance is made worse by the fact that Bergmann and Lenz are themselves unreliable.  "If one expert's opinions are built upon a foundation laid by another, reliability of the latter requires reliability of the former."  *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *5 (S.D.N.Y. July 28, 2017).  For example, Bergmann cites to just **one** source in support of her conclusion about the 120 foreign NNAs: a 2011 EU Commission decision—which itself lacked further detail and support and was also limited to just a handful of European NNAs.  *See* Dkt. 231-3 (Bergmann Rep.) p. 24 n.59.  As explained in Defendants' Motion to Exclude Ms. Bergmann, her opinions are entirely speculative and unreliable, in part, because she has no experience with, and conducted no independent investigation of, virtually all of the 120 NNAs.

---

[9] Elhauge also cites an email between CGS employee and █████████████.  Elhauge Rep. ¶ 59 n.97 ; Ex-12 (FRSI00145370) at -379.  That email, however, only indicates that one CGS employee personally thought, at the time, that other NNAs do not require licenses for end users under at least some circumstances.  *Id.*  That employee also admitted that he had no personal knowledge of what other NNAs do.  Dkt. 231-19 (Hunter Dep.) 61:13-62:2. Further, that statement was only made in the context of an informal request by a customer to clarify how global identifiers work.  *See id.*  One employee's speculation about other firms does not substitute for a real investigation by an expert witness into the benchmark markets and products at issue here.

*See* Defs.' Mot. to Exclude Bergmann, 7–11.  She did not even know basic facts about these NNAs, including that they charge fees for access to broader structured data associated with the ISIN identifier.  *Id*. at 9-10.

Elhauge also failed to independently investigate the data products that these benchmark NNAs supposedly offer for free.  Ex-1 (Elhauge Dep.) 229:20–230:05 ("I did not myself review [licensing agreements in the other 120 markets].").  Courts have repeatedly held that *Daubert* generally requires exclusion of a yardstick model when the expert has "failed to perform *any* substantive analysis of those factors most relevant to comparability."  *AngioDynamics, Inc.*, 537 F. Supp. 3d at 342 (citation omitted) (excluding expert's yardstick model as unreliable); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 288 (E.D.N.Y. 2007) (excluding expert testimony where the expert lacked specific knowledge on matter and failed to conduct independent investigation).

Elhauge did not learn the mechanics of how a CGS license works, and how that compares with the data products licensed by other NNAs.  As noted above, he was operating from the mistaken assumption that CGS offers some kind of "basic license," rather than the actual product offered by CGS:  a structured data product with dozens of data elements associated with CGS Identifiers.  *See supra* § A; Ex-1 (Elhauge Dep.) 154:21–155:17, 212:15–213:7.  And with respect to the foreign NNA data products—the purported benchmark products—Elhauge did not even know the format in which other NNAs offered their data to customers or what information was included with that data, let alone whether they offered a ***data feed*** for free, or whether they charged for ***bulk downloads***.  Ex-1 (Elhauge Dep.) 237:6–239:23.  Knowing what these alleged yardstick data products are is the most basic "substantive analysis" required of an expert offering

a yardstick model that compares the product at issue in the case to these yardstick products. But all such evidence and reasoning is absent from Elhauge's opinions.

Elhauge instead simply took the vague assertions of Plaintiffs' other experts as gospel, without any review. He relies on Lenz's report to conclude (erroneously) that WM Daten offers free data products that are supposedly comparable to the CGS licenses at issue here. Elhauge Rep. ¶ 76 n.137. But Lenz walked back his claim that the WM Daten product was comparable at his deposition, stating that WM Daten did charge a fee—not a zero-dollar price—for the type of license that is more comparable to the CGS license obtained by class members (i.e., one that permits bulk downloads or a data feed of structured data). *See, e.g.,* Ex-13 (Lenz Dep.) 110:12–112:7; 218:24–219:7; *see also* Defs.' Mot. to Exclude Lenz. The mechanics of how data is delivered and displayed to customers, along with the kind of data included in that service, is a crucial factor when comparing CGS with any foreign NNA. But Elhauge is "ignoran[t] as to the most basic facts" of these products, *AngioDynamics*, 537 F. Supp. 3d at 339, thus making his conclusions unreliable.

"Where the record indicates that the expert failed to consider necessary factors or that his analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony[.]" *Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 640 (S.D.N.Y. 2012). Here, Elhauge has not demonstrated sufficient understanding of the legal regimes, licensing practices, or underlying data products in the yardstick markets to make any reliable conclusions about whether these purported yardsticks are a reasonable basis for predicting how CGS would have behaved in the but-for world.

### 2. The Data Products Offered by the Foreign NNAs Are Not Reasonably Comparable Benchmarks for CGS Data.

Even putting aside whether Elhauge did enough investigation to satisfy *Daubert,* his

17

opinions must be excluded because of what the actual evidence shows—i.e., that the data products at issue in the foreign yardstick markets are not "reasonably comparable" to the CGS Data licensed to putative class members. *See, e.g., In re LIBOR*, 2025 WL 2733020, at *81, *85 (excluding expert's yardstick as inapposite); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *11 (S.D.N.Y. Jan. 30, 2025) ("[T]here comes a point where a benchmark is so different" that it "cannot support the yardstick analysis.") (citation omitted). That evidence shows that Elhauge's analysis is an "apples and oranges comparison." *Boucher*, 73 F.3d at 21 (citation omitted).

The CGS license provides putative class members access to a structured data product consisting of a continually updated database of up to 60-plus data fields for millions of financial instruments, with pricing based roughly on the number of financial instruments accessed. Ex-3 (Stiroh Rep.) ¶¶ 38–39, 48. Many of these data fields are often necessary to reliably and accurately identify the financial instrument. Ex-5 (Meyn Rep.) ¶ 40. And with respect to the means of transmission, the CGS license entitles putative class members to access those data elements in a data feed or bulk download format. Ex-3 (Stiroh Rep.) ¶ 47. If an end user does not need access to the CGS Data in a data feed or bulk download format—i.e., it needs only to lookup a CGS Identifier, have the CGS Data displayed on a computer screen, or download limited numbers of CGS Data records over a given month—the end user does **not** need to enter into or pay for a CGS license. *Id.* ¶ 49. Only end users that engage in ***bulk downloads*** or access the CGS Data through a ***data feed*** must pay the fee for the CGS license that Plaintiffs challenge in this action. *Id.* ¶¶ 47–49.

Simply put, none of the 120 foreign NNAs offer a comparable data feed or bulk download product for free, and the evidence cannot support such a position. The only NNA of

the 120 Elhauge even briefly discusses is WM Daten, relying on the Lenz Report. Elhauge Rep. ¶¶ 76 n.137, 76 n.138, 78 n.142, 93 n.181 (citing exclusively to Lenz to support statement that WM Daten offers its identifiers "free of charge"). The evidence demonstrates that WM Daten's free product is extremely limited—indeed, it is little more than a lookup tool that displays limited numbers of German financial identifiers. Ex-13 (Lenz Dep.) 110:12–112:7 (clarifying that what WM Daten offers for free is limited to the "information in the publicly available securities register"). It also has capped download capabilities and does not provide any kind of data feed to its customers. *Id.* 123:5–15 ("Q. . . . So what I'm simply asking is *nowhere in your report* do you say that WM Daten provides a *data feed for free;* is that correct? . . . A. That's *correct*.") (emphasis added); *see also* Ex-21 (WM Daten License and Usage Agreement). In short, the free WM Daten product is not comparable to the CGS license, which, as noted, grants CGS licensees data feed and/or unlimited bulk download access to CGS Identifiers *and* 60+ data elements. Ex-3 (Stiroh Rep.) ¶ 38–40.[10]

    That said, WM Daten does offer a data feed product that includes its financial identifiers and other structured data elements, but, like CGS, it *charges customers* for that product. Ex-13 (Lenz Dep.) 119:20–120:4 ("Q. . . . [I]f you want anything other than this free security lookup

---

[10] *See, e.g.*, Dkt. 231-27 (Resnick Dep.) 320:14-20 ("Q. So it's more efficient to just have it in a data feed, in a usable form that can be downloaded? A. Sure. Much like, you know, taking the subway is more efficient than walking, yes, ten miles."); Ex-14 (Kälin Dep. (Swiss Life 30(b)(6))) 176:22-177:2 ("Q. So there's a value that SLIM identified in obtaining the ISINs in a data feed directly to the SCD system, right? A. Absolutely."); Ex-15 (████ Dep. (Kiski 30(b)(6))) 64:9-65:2 ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

tool, you actually have to pay WM Daten for it; is that correct? . . . A. Yes, to pay for the providing of a file as a service."); *see also* Ex-21 (WM Daten License and Usage Agreement). Moreover, WM Daten engages in individual negotiations with customers over the price of its license. *See* Ex-13 (Lenz Dep.) 40:11-41:17, 130:25–132:18.

Further, other foreign NNAs—NNAs that would be included in Elhauge's illusory list of 120—also ***do charge*** for structured data products that are comparable to that licensed by CGS to class members here. For example, SIX, the fourth largest NNA in the world, charges end users for bulk downloads or data feed access to its national identifiers. *See* Ex-16 (SIXUSA_000026). Like CGS, it offers a structured data product called Valordata Feed ("VDF") that offers "comprehensive data coverage using a wide variety of current international identifiers." *Id.* Also like CGS, SIX restricts redistribution of its data product to others. *See* Ex-17 (SIX Data Distribution Agreement) § 5.1(a) ("Subscribers accessing Data for Professional Use as defined in the Price List may not distribute real-time Data to third parties outside Subscriber's Group[.]").

Had Elhauge conducted ***any*** independent investigation into his chosen benchmarks, he would have learned that they refute his zero-price assumption. Indeed, the only evidence in the record proves that the NNAs in the alleged 120 yardstick markets behave similarly to CGS and do not offer comparable products for free. This opinion that the 120 markets are appropriate "yardsticks" that demonstrate that CGS should have licensed its products in the U.S. for free must therefore be excluded. *In re LIBOR*, 2025 WL 2733020, at *81.

### D. Both Methods Elhauge Employs to Calculate Damages Are Unreliable.

Elhauge's damages model does not provide a "reliable means of proving classwide injury in fact" because it also fails to reliably remove non-U.S. financial identifiers from the damages calculation. *See In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244,

252–53 (D.C. Cir. 2013). Elhauge offers two independently flawed methods. Method 1 is overinclusive, because it includes in damages the fees paid by class members for foreign-issued financial identifiers and related data outside the scope of Plaintiffs' claims. *In re Keurig*, 2025 WL 354671, at *31 ("[D]amages studies that fail to disaggregate lawful and unlawful conduct are inadequate."). Method 2, in a sloppy attempt to rectify the deficiencies of Method 1, applies a standard, average discount across all class members for international data, which fails to accurately reflect the individual damages of those class members. *See Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653, 665 (S.D.N.Y. 2018) (excluding expert's damages opinion for applying "single, across-the-board figure for calculating lost profits, which reflect[ed] a national average and not the actual losses of any plaintiff.").

### 1. Method 1 Overestimates Damages by Ignoring the Fact That the CGS License Fee Covers Data for Non-U.S. Financial Instruments.

Elhauge's Method 1 does not align with Plaintiffs' market definition and the scope of Plaintiffs' claims and therefore must be excluded. "[A] model purporting to serve as evidence of damages . . . must measure only those damages attributable to [plaintiffs'] theory." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Damages estimates are overinclusive when they contain amounts not directly linked to the plaintiff's alleged injury or account for individuals who were not injured. *See Houser v. Prtizker*, 28 F. Supp. 3d 222, 253 (S.D.N.Y. 2014) ("Plaintiffs' pro rata model makes no attempt whatsoever to separate those class members who are entitled to damages from those who are not."). Elhauge's Method 1 fails to show that all accounted-for damages "stemmed from the defendant's actions that created the legal liability." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (citation omitted).

Plaintiffs allege that the relevant product market is limited to "***only*** the use of identifiers of United States financial instruments." SAC ¶ 126 (emphasis added). Identifiers for foreign

financial instruments, such as Canadian CUSIPs, CINs, and non-US ISINs, are therefore not part of the relevant market and not within the scope of Plaintiffs' purported class claims. But Elhauge explicitly includes fees paid for CGS Data for foreign-issued financial instruments in his Method 1 damages model. As he concedes, the CGS license fee "covers all CUSIP Identifiers, thus including US CUSIPs, Canadian CUSIPs, CUSIP International Numbers, and their derivative CUSIP-based ISINs." Elhauge Rep. ¶ 19.B. Elhauge presumably created this overinclusive Method 1 to conform with Plaintiffs' argument that the injury in common across class members is the *entire* license fee and requires no individualized assessment.[11] But in so doing, the calculation fails to match Plaintiffs' theory of liability.

To justify inclusion of fees for foreign financial instruments, Elhauge claims that CGS "bundle[s]" foreign financial identifiers with U.S. CUSIPs, which he contends would place all CGS Identifiers in the same market. *Id.* ¶ 111.[12] But Plaintiffs' complaint does not allege an illegal bundling or tying arrangement; instead, the relevant market defined in the complaint is limited to identifiers for U.S. financial instruments *only*. SAC ¶ 126. Because Method 1 employs a market definition that is inconsistent with Plaintiffs' liability case, it must be

---

[11] To calculate damages, Elhauge uses total revenue data, offered by another of Plaintiffs' purported experts, as a proxy for class members' licensing fees. Elhauge Rep. ¶¶ 108, 114. But that data includes revenue associated with license fees, royalty fees, and subscription fees. *See* Dkt. 231-78 (Schachter Rep.) ¶¶ 13-14. Elhauge does not assess which revenue streams were a result of the challenged conduct. *See* Ex-3 (Stiroh Rep.) ¶¶ 160–63. Moreover, the expert he relies on disclaimed that this revenue data was intended to reflect damages or was even related to Plaintiffs' allegations. Ex-18 (Gaebel Dep.) 85:14–19 ("Q. How would you in this matter convert your ████████ of revenue into a damages figure? . . . A. It would depend on a lot of things. So I can't really answer that."); *id.* 60:21–25 ("Q. How do license fees relate to the allegations in this case? . . . A. I don't know the details behind all of that.").

[12] Elhauge's theory of "bundled" foreign financial identifiers is also belied by the record, which shows that licensees can select just CUSIPs or just CINs in their Use of Service Statements. *See* Ex-3 (Stiroh Rep.) ¶ 179, figure 6.1 (showing breakdown of the identifiers accessed by a sample of putative class members based on their Use of Service Statements).

excluded.[13]  *Comcast Corp.*, 569 U.S. at 35 ("[A]ny model supporting a plaintiff's damages case must be consistent with its liability case.") (citations omitted).

The limited product definition in Plaintiffs' SAC was not a mistake.  Expanding the relevant product from CUSIPs to those also issued for foreign financial instruments would have required significant additional evidentiary and legal arguments, which Plaintiffs have never sought to prove.  To justify the inclusion of foreign identifiers in damages, Plaintiffs would have had to claim and prove a global relevant market.  *Union Carbide Corp. v. Montell N.V.*, 28 F. Supp. 2d 833, 840 (S.D.N.Y. 1998) (citation omitted).  And Plaintiffs would have had to contend with the jurisdictional bar against asserting antitrust claims relating to foreign commerce, i.e., the Foreign Trade Antitrust Improvements Act ("FTAIA").  *F. Hoffmann-LaRoche Ltd. Empagran S.A.*, 542 U.S. 155, 164 (2004) (finding that, because of the FTAIA, the Sherman Act did not apply to price-fixing that had a "foreign effect" "independent of any adverse domestic effect").  Plaintiffs have not even attempted to take those steps.

At bottom, Elhauge may not offer a damages methodology that includes harm attributable to products outside of Plaintiffs' chosen relevant market.  Method 1 does not comport with Plaintiffs' own definitions demonstrates that it is unreliable and must be excluded.

### 2.  Method 2 Impermissibly Uses Average Prices to Address the Presence of Non-U.S. Financial Identifiers.

In tacit recognition that his Method 1 is not legally viable, Elhauge offers a second, flawed method intended to capture damages solely attributable to the use of CGS Data for U.S. financial instruments.  It fails to do so.  Critically, each putative class member uses a different

---

[13] Plaintiffs are precluded from amending their market definition at this late stage.  *Mahmud v. Kaufman*, 607 F. Supp. 2d 541, 555 (S.D.N.Y. 2009) (disallowing use of revised market).

mix of U.S. and non-U.S. financial identifiers (and accompanying descriptive data).  Ex-3 (Stiroh Rep.) ¶¶ 178, 179, Figure 6.1; *see also* Ex-5 (Meyn Rep.) ¶ 189, Table 1.  In Method 2, Elhauge ignores this undeniable fact, and, in an effort to exclude non-U.S. CGS Identifiers from the damages calculation, applies a uniform average discount rate of 16.4% to class damages calculated under Method 1 (i.e., across all revenues from license agreements with class members), an average cannot appropriately account for the varied mix of each licensee's CGS Identifier use.  *See* Ex-3 (Stiroh Rep.) Section VI.B.2. Method 2 is therefore unreliable, belied by the record, and should be excluded.  *Aluminum Warehousing*, 336 F.R.D. at 62 ("[A] model proffered as common proof of classwide antitrust injury may be defective . . . where it relies on average impact and thereby masks the existence of uninjured class members."); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 494 (N.D. Cal. 2008) ("While averaging may be tolerable in some situations, the record here shows that it has in fact masked important differences between products and purchasers.").

To attribute damages for CGS Data usage solely for U.S. financial instruments, Method 2 purports to **remove** non-U.S. CGS Identifiers, e.g., Canadian CUSIPs, non-U.S. ISINs, and CINS, from the Method 1 damages calculation.  Elhauge Rep. ¶¶ 117–18.[14]  To do so, Elhauge multiplies his Method 1 damages estimate by an 83.6% uniform rate and attributes that 83.6% as damages across all class members.  *Id.* ¶ 124–125; *see* Ex-3 (Stiroh Rep.) ¶¶ 172–76 (describing

---

[14] The CGS Use of Service Statement ("UOSS") allows CGS licensees, including the putative class members, to check up to three boxes to represent the kind of CGS Data they use: "CUSIPs," "CINS," and/or "CGS ISINs."  Dkt. 231-16 (FRSI00000092) at -092.  The CGS UOSS, therefore, does not distinguish between U.S. and Canadian CUSIPs and between U.S. and foreign ISINs. Therefore, a putative class member that checks the "CUSIP" box on the CGS UOSS may use U.S.-based CUSIPs, Canadian-based CUSIPs, or some combination of the two. To understand a CGS licensee's CGS Identifier usage, CGS conducts usage reviews (discussed further below).  These individual audits of a licensee's data usage show the proportion of CGS Data usage that is for US financial instruments.

Elhauge's methodology and its flaws)).  To arrive at this discount rate, Elhauge attempts to estimate the value of CGS Identifiers for U.S. financial instruments relative to CGS Identifiers for foreign financial instruments based on the product choices of ***non-class*** members and average equity market trading volume.  Ex-3 (Stiroh Rep.) ¶¶ 173–74.  He does not explain why these non-class members are appropriate proxies for putative class members for this purpose.  Moreover, his allocation of "value" is arbitrary, his method to arrive at his uniform average discount rate unsound, and its application ignores variation among class members in their usage of CGS Data.  *Id.* ¶¶ 172–73, 175, 178.  Simply put, his Method 2 does not work.

Applying a uniform discount rate of 16.4% to the damages calculated in Method 1 fails to eliminate the fees putative class members paid for CGS Data for non-US financial instruments, i.e., the goal of Method 2.   That rate does not reflect the ***actual CGS Data usage*** of putative class members and the proportion covering U.S. versus foreign financial instruments—that proportion varies for each CGS licensee.  *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) ("[P]laintiffs' damages formula—a formula based on nationwide averages that makes no effort to adjust for the variegated nature of the businesses included in the classes—cannot reasonably approximate the actual damages suffered[.]").

Record evidence, available to Elhauge, demonstrates the individualized nature of CGS Identifier usage by each putative class member.  For example, according to CGS Data usage reports, ████████████████████████████████████████████████████████████
████████████████████   Ex-3 (Stiroh Rep.) ¶ 180; Ex-19 (FRSI00267334) at -353.  Even though CINS and Canadian CUSIPs are theoretically not included in Method 2, Elhauge includes 83.6% of ███████████ licensing fees as damages, where, at most, only ██████ of those fees are attributable to U.S. identifiers.  As another example, consider ████████████████████████

25

███████████████████████████████████████████

████. Ex-20 (FRSI00168108) at -124. ███████████████████████ meaning that

approximately ████ of ███████ data usage is for foreign instruments that should be excluded as

outside of the scope of Plaintiffs' alleged damages.  But again, for this putative class member,

Elhauge would still apply the same uniform discount, such that ███████ estimated damages

would equal 83.6% of its license fees, incorrectly including foreign-derived ISINs in this

calculation.  These two examples demonstrate that Elhauge did not include a "just and reasonable

estimate of the damages of every class member[.]"  *Bell Atlantic*, 339 F.3d at 304; *see also In re*

*Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 242

(S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020) ("Where an expert ignores evidence that is

highly relevant to his conclusion, contrary to his own stated methodology, exclusion of the

expert's testimony is warranted.")

In short, Elhauge's Method 2 never adjusts for a customer whose needs are primarily

foreign or whose usage mix otherwise diverges from his model, assigning an ill-fitting 83.6%

licensing fee damage to each and every putative class member.  And in fact, he admitted this

weakness at deposition.  *See* Ex-1 (Elhauge Dep.) 288:16–20 ("Q.  In your Method 2 damages

analysis, there will be putative class members that use CINS identifiers, and you will attribute

damages to them, correct?  A.  Yes.").  The entire purpose of Method 2 was to remove the

putative class members' usage of foreign CGS Identifiers, but Elhauge knows it cannot be done

in any consistent fashion.  It is therefore impermissible under the law for Elhauge to simply

ignore this variation in injury by employing an average, and his Method 2 should be excluded as

unreliable.  *See In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020)

(holding that absent a rigorous analysis, averages are not acceptable).

## CONCLUSION

The Court should grant Defendants' motion to exclude Einer Elhauge's testimony.

Dated: November 26, 2025

Respectfully submitted,

| | | |
|---|---|---|
| /s/ Eric J. Stock | /s/ Jeffrey I. Shinder | /s/ David C. Kiernan |
| Eric J. Stock | Jeffrey I. Shinder | JONES DAY |
| Jefferson E. Bell | Ellison A. Snider (*pro hac vice*) | David C. Kiernan (*pro hac vice*) |
| Esther Lifshitz | SHINDER CANTOR LERNER LLP | |
| GIBSON, DUNN & | 14 Penn Plaza, 19th Floor | Craig E. Stewart (*pro hac vice*) |
| CRUTCHER LLP | New York, NY 10122 | |
| 200 Park Avenue | Tel.: (646) 960-8601 | Caroline N. Mitchell (*pro hac vice*) |
| New York, NY 10166 | jeffrey@scl-llp.com | |
| Tel.: (212) 351-2301 | esnider@scl-llp.com | Kapri Saunders (*pro hac vice*) |
| Fax: (212) 716-0801 | | |
| estock@gibsondunn.com | James J. Kovacs (*pro hac vice*) | Paul Hines (*pro hac vice*) |
| jbell@gibsondunn.com | Keagan H. Potts (*pro hac vice*) | 555 California Street, 26th Floor |
| elifshitz@gibsondunn.com | SHINDER CANTOR LERNER LLP | San Francisco, CA 94104 |
| | Tel.: (646) 960-8601 | Tel.: (415) 626-3939 |
| *Attorneys for Defendant* | 600 14th Street NW, 5th Floor | Fax: (415) 875-5700 |
| *S&P Global Inc.* | Washington, D.C. 20005 | dkiernan@jonesday.com |
| | james@scl-llp.com | cestewart@jonesday.com |
| | kpotts@scl-llp.com | cnmithcell@jonesday.com |
| | | ksaunders@jonesday.com |
| | W. Stephen Cannon (*pro hac vice*) | |
| | Seth D. Greenstein (*pro hac vice*) | Alexander V. Maugeri |
| | Patrick Kennedy (*pro hac vice*) | Amanda L. Dollinger |
| | CONSTANTINE CANNON LLP | 250 Vesey Street |
| | Tel.: (202) 204-3500 | New York, NY 10281 |
| | 1001 Pennsylvania Avenue NW, Suite 1300N | Tel.: (212) 326-3939 |
| | Washington, D.C. 20004 | Fax: (212) 755-7306 |
| | scannon@constantinecannon.com | amaugeri@jonesday.com |
| | sgreenstein@constantinecannon.com | adollinger@jonesday.com |
| | pkennedy@constantinecannon.com | |
| | | *Attorneys for Defendant* |
| | Sarah Bayer | *American Bankers* |
| | CONSTANTINE CANNON LLP | *Association* |
| | 230 Park Avenue, 17th Floor | |
| | New York, NY 10169 | |
| | Tel.: (212) 350-2700 | |

sbayer@constantinecannon.com

*Attorneys for Defendant FactSet
Research Systems Inc.*

## **SIGNATURE CERTIFICATION**

Pursuant to Section 8.5(b) of the Electronic Case Filing Rules and Instructions of the Southern District of New York, I certify that all other signatory parties have consented to the filing of this document.

*/s/ David C. Kiernan*
_____
David C. Kiernan

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to Rule 4(B) of the Court's Individual Rules of Practice in Civil Cases, Defendants certify that this computer-generated Memorandum of Law was prepared using Microsoft Windows and Microsoft Word.  The total number of words in this Memorandum, exclusive of the caption, table of contents, table of authorities, the signature block, and this certificate of compliance is 8,748, which is in accordance with the maximum 8,750 words as permitted under Local Civil Rule 7.1.

*/s/ David C. Kiernan*
David C. Kiernan

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 26, 2025, I caused the foregoing to be served on all counsel of record via ECF.

*/s/ David C. Kiernan*
David C. Kiernan