**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DINOSAUR FINANCIAL GROUP LLC,
HILDENE CAPITAL MANAGEMENT, LLC
and SWISS LIFE INVESTMENT
MANAGEMENT HOLDING AG, on behalf
of themselves and all others similarly situated,

        Plaintiffs,

        -v-

S&P GLOBAL, INC., AMERICAN
BANKERS ASSOCIATION, and FACTSET
RESEARCH SYSTEMS INC.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**Case No. 1:22-CV-1860 (KPF)**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT FRANK LENZ

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND ............................................................................... 3

III.   LEGAL STANDARD ......................................................................................... 4

IV.   ARGUMENT ...................................................................................................... 6

   A.   Mr. Lenz's Opinions on WM Daten's Business Practices Are Merely Factual Narrative on Lay Matters and Should be Excluded. ....................................................................... 6

     1.   Plaintiffs Do Not Rely on Mr. Lenz for his Expertise, But As a Backdoor to Present Factual Testimony on Lay Matters .................................................................... 6

     2.   Mr. Lenz Is Not a Reliable Source for Information on WM Daten's Practices and Policies. ................................................................................................. 8

     3.   The Introduction of Mr. Lenz's Factual Testimony After the Close of Discovery Is Improper and Prejudicial to Defendants. ............................................................. 11

     4.   Mr. Lenz's Reliance on His Memory of Undisclosed Contracts Is Inappropriate and Impermissible ........................................................................................... 13

   B.   Mr. Lenz's Opinion on the Charging Practices of the 120 NNAs Worldwide is Outside His Expertise and Rests on No Reliable Foundation. ............................................ 15

   C.   Mr. Lenz's Opinions on Innovation and Competition in the German Market are Inadmissible—They are Irrelevant to Class Issues and Offered by a Witness Who is Unqualified and Employed No Methodology. ....................................................... 17

   D.   Mr. Lenz Provided New Testimony Two Days Before This *Daubert* Motion Was Due, Which Is Improper and Highlights His Unreliability. ............................................. 21

V.    CONCLUSION ................................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*,
    280 F.R.D. 78 (E.D.N.Y. 2012) .................................................................18

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002).......................................................................5

*Atl. Specialty Ins. v. AE Outfitters Retail Co.*,
    970 F. Supp. 2d 278 (S.D.N.Y. 2013)......................................................11

*Bourjaily v. United States*,
    483 U.S. 171 (1987).....................................................................................4

*Brush v. Old Navy LLC*,
    No. 2:21-CV-0155, 2022 WL 3106566 (D. Vt. Aug. 4, 2022)................14

*Chen-Oster v. Goldman, Sachs & Co.*,
    114 F. Supp. 3d 110 (S.D.N.Y. 2015)......................................................18

*Daval Steel Prods. v. M/V Fakredine*,
    951 F.2d 1357 (2d Cir. 1991).....................................................................12

*Fantasia Distribution, Inc. v. Cool Clouds Distribution, Inc.*,
    693 F. Supp. 3d 335 (E.D.N.Y. 2023) .....................................................16

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014) ...............................................................5

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...........................................................................11, 20

*H. Daya Int'l Co., Ltd. v. Do Denim, LLC*,
    No. 1:16-CV-8668, 2023 WL 1340422 (S.D.N.Y. Jan. 31, 2023) .........20

*Highland Cap. Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005)......................................................15

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009)........................................................7

**TABLE OF AUTHORITIES**

**Cases**                                                                                                   **Page(s)**

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018).................................................................5, 7

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    No. 1:11-MD-2262, 2025 WL 2733020 (S.D.N.Y. Sept. 25, 2025)........................7

*In re Lyondell Chem. Co.*,
    558 B.R. 661 (S.D.N.Y. 2016).........................................................7, 8, 9

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)...................................................13

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    No. 13-MD-2445, 2021 WL 662292 (E.D. Pa. Feb. 19, 2021) ............................18

*In re Zyprexa Prods. Liab. Litig.*,
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) ..................................................16

*Irish v. Tropical Emerald LLC*,
    No. 1:18-CV-0082, 2022 WL 2716182 (E.D.N.Y. July 13, 2022)...................11, 12

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013)........................................................5, 7, 14

*Northway Med. Ctr. Condo v. Hartford Fin. Servs. Grp., Inc.*,
    745 F. Supp. 3d 170 (S.D.N.Y. 2024)...................................................10

*Paul v. Postgraduate Ctr. for Mental Health*
    97 F. Supp. 3d 141, 188 (E.D.N.Y. 2015) ..............................................14

*Philmar Dairy, LLC v. Armstrong Farms*,
    No. 2:18-CV-0530, 2019 WL 3070588 (D.N.M. July 12, 2019) ..........................19

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ......................................................5, 18

*Sheridan v. Caesars Enter. Servs. LLC*,
    No. 2:20-CV-0126, 2021 WL 279614 (D. Nev. Jan. 27, 2021)..............................22

## **TABLE OF AUTHORITIES**

**Cases**                                                                          **Page(s)**

*United States v. Amuso,*
    21 F.3d 1251 (2d Cir. 1994)......................................................................6

*United States v. Frazier,*
    387 F.3d 1244 (11th Cir. 2004) ...........................................................19

*United States v. Locascio,*
    6 F.3d 924 (2d Cir. 1993)....................................................................13

*United States v. Mulder,*
    273 F.3d 91 (2d Cir. 2001)..................................................................5, 7

*United States v. Ray,*
    583 F. Supp. 3d 518 (S.D.N.Y. 2022)...................................................19

*United States v. Tin Yat Chin,*
    371 F.3d 31 (2d Cir. 2004)..................................................................18

*United States v. Williams,*
    506 F.3d 151 (2d Cir. 2007).................................................................5

*Yeend v. Akima Glob. Servs., LLC,*
    No. 1:20-CV-1281, 2025 WL 959968 (N.D.N.Y. Mar. 31, 2025) ...........8

**RULES**

Fed. R. Civ. Proc. 23.......................................................................................5, 18

Fed. R. Civ. Proc. 26.......................................................................................2, 12

Fed. R. Civ. Proc. 31..........................................................................................12

Fed. R. Evid. 401 ...............................................................................................21

Fed. R. Evid. 403 ...............................................................................................12

Fed. R. Evid. 702 ...............................................................................2, 4, 5, 6, 20

Fed. R. Evid. 703 ...............................................................................................13

## I.    <u>INTRODUCTION</u>

Plaintiffs offer Frank Lenz as a purported expert on the licensing practices of a German company, WM Daten, and the impacts of those alleged practices on innovation and competition in the German market for data on financial instrument identifiers. Based on his report, Plaintiffs and their expert Professor Einer Elhauge contend that comparable financial identifier data to that offered by CGS is available in Germany at no cost and without restriction.

But Mr. Lenz's report is unreliable and inadmissible for several reasons. First, the testimony involves no expert methodology. Most of it offers no opinions at all—it simply repeats facts found in publicly available websites. The primary focus of Mr. Lenz's report—and the primary purpose for which Plaintiffs and Professor Elhauge rely on it—is a series of factual assertions about the data access and licensing practices of a German data vendor and National Numbering Agency ("NNA") named WERTPAPIER-MITTEILUNGEN Keppler, Lehmann GmbH & Co. KG ("WM Daten").

Second, Mr. Lenz lacks a reliable basis for his opinions. Mr. Lenz does not represent WM Daten and has never been an employee of WM Daten. His only affiliation with WM Daten was past work as a third-party consultant, most of which took place more than 15 years ago. Yet that experience is the sole basis for his report. He reviewed no contracts and conducted no research to prepare his report, relying solely on his "industry experience" as a consultant. At deposition he was unable to answer questions bearing directly on the WM Daten practices that were the subject of his report—including with respect to the restrictions WM Daten places on the only free source of WKN/ISIN data available, which he said were "not [his] field"—and introduced new alleged facts on those practices that WM Daten subsequently has stated were incorrect.

Third, the report—fact testimony masquerading as expert testimony—improperly seeks to evade the procedural protections of Rule 26(a). Plaintiffs submission of Mr. Lenz's report for the purpose of introducing alleged facts about WM Daten's policies and practices is particularly egregious given that they never disclosed Mr. Lenz—or anyone from WM Daten—as someone in possession of information relevant to their claims, and gave no indication at all that they would try to rely on the alleged business practices of a foreign NNA as a core component of their case. Their belated introduction of this factual testimony has deprived Defendants of any opportunity to actually take discovery from WM Daten to be able to test or refute Mr. Lenz's assertions. That is contrary to the fundamental purpose of Rule 26(a) disclosures, which is to give notice of the factual testimony and documents that a party plans to use in its case so that the other side has an opportunity to take relevant discovery that would permit it to effectively rebut factual assertions and cross-examine fact witnesses.

Finally, Mr. Lenz offers—seemingly almost as afterthoughts—opinions on the supposed licensing practices of 120 National Numbering Agencies ("NNAs"), and alleged impacts of WM Daten's business practices on innovation within the German market for financial instrument identifier data. By his own admission, however, the former was based entirely on some anecdotal experience he had working with the NNAs in only three countries in Europe, and the latter was speculation based on no methodology at all. Mr. Lenz also made clear that his innovation opinion was not based on any causal relationship between WM Daten's licensing practices and the new data products he identifies in his report.

Federal Rule of Evidence 702 requires more. Expert testimony must be grounded in reliable principles and supported by sufficient facts; it cannot rest on outdated anecdotal information and unmoored *ipse dixit*. Mr. Lenz's Report should be stricken.

2

## II.    **FACTUAL BACKGROUND**

A critical basis for Plaintiffs' motion for class certification is their contention that the existence of antitrust injury is a common question because the license fee that every putative class member paid for access to CGS data would have been zero in the absence of the conduct challenged in this case (i.e., the "but-for world"). Plaintiffs rely for that contention on the opinion of their law professor expert, Einer Elhauge, who apparently believes that financial identifiers are available for free in countries around the world. Mr. Elhauge relies for that belief, in significant part, on Mr. Lenz's report. ECF No. 216 at 37; ECF No. 231-86 (Elhauge Report) at ¶¶ 76, 79, 83, 87; *see also* Ex-5 (Elhauge Dep.) 45:12–20 (confirming that he cites Mr. Lenz for the assertion that in Germany "there is no fee for using financial identifiers."). Professor Elhauge concedes he did not conduct an independent review of Mr. Lenz's factual statements. Ex-5 (Elhauge Dep.) 45:24–46:3.

For his part, Mr. Lenz offers up WM Daten as comparable to CGS and asserts that, unlike CGS, it provides free and unrestricted access to financial identifiers and certain limited related data. ECF No. 216 at 5, 21, 37–38; ECF No. 231-86 (Elhauge Report) at ¶ 76. Establishing this fact is fundamental for Plaintiffs' and Professor Elhauge's injury and damages theories, as Mr. Lenz's report about WM Daten's licensing practices is one of the only bases Professor Elhauge relies on to support his *own* opinion that in the but-for world the price for using CGS data would be zero. ECF No. 216 at 26, 37–38; ECF No. 231-86 (Elhauge Report) at ¶¶ 75–79, 87. It is also through Mr. Lenz's report that Plaintiffs and Professor Elhauge try to support their claims that CGS's licensing practices stifle innovation and impede competition. ECF No. 216 at 37; ECF No. 231-86 (Elhauge Report) at ¶¶ 87, 93.

Mr. Lenz's report addresses three subjects: (1) a general description of identifiers and NNAs; (2) factual assertions about WM Daten's product offerings, restrictions, and pricing; and

3

(3) his opinion that WM Daten's licensing practices increased innovation, lowered barriers to entry, and expanded competition among data providers and data products and services in the German identifier market.[1]  ECF No. 231-10 (Lenz Report) at ¶¶ 16–47.  However, Mr. Lenz's knowledge is extremely limited, even as to these three subjects.  He is a consultant on financial information data systems who has worked with various financial entities and data providers in Germany, Switzerland, and Luxembourg—including WM Daten.  ECF No. 231-10 (Lenz Report) at ¶¶ 6–10; Ex-1 (Lenz Dep.) 55:12–66:20.  He has never been employed by WM Daten, and currently is not a consultant for WM Daten; in the past, he consulted with the WM Daten IT department regarding the specific use of the data in WM Daten's system.  Ex-1 (Lenz Dep.) 7:16–20, 61:5–64:4.  He has never had direct responsibility for the data licensing practices of WM Daten.  *Id.*  He has no expertise in economics, intellectual property licensing, or market analysis.  Ex-1 (Lenz Dep.) 73:4–75:17.

In his deposition, Mr. Lenz confirmed that his testimony rests solely on dated personal anecdotal experience, public webpages, his recollection of contracts that he contended he could not disclose, and conclusions that were reached without the application of any recognized methodology or reliable analysis.  Ex-1 (Lenz Dep.) 23:5–16, 72:15–19, 86:2–8, 194:6–195:13, 211:10–212:12.

## III.   <u>LEGAL STANDARD</u>

Plaintiffs have the burden of establishing by a preponderance of the evidence the admissibility of Mr. Lenz's opinions under Rule 702.  *See Bourjaily v. United States,* 483 U.S.

---

[1] Mr. Lenz's report fails to provide a consistent definition of the product market to which his opinions apply—variously referring to the "market for securities identifiers in Germany and beyond in Europe," ECF No. 231-10 (Lenz Report) at ¶ 15, the "German market for security identifiers," *id*. at ¶ 44, and the "market for data services with security identifiers in Europe," *id*. at ¶ 47.  To correct Mr. Lenz's shortcomings and ensure that the record is clear for purposes of this motion, Defendants will refer to the "German identifier market."

171, 175 (1987); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  To carry their

burden, Plaintiffs must show ***all*** of the following:

> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to
> determine a fact in issue;
> (b) the testimony is based upon sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> ***and***
> (d) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702 (emphasis added).  If an expert's testimony fails to meet any of these

"threshold requirements" it cannot be admitted as expert testimony.  *See In re LIBOR-Based Fin.*

*Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 548 (S.D.N.Y. 2018) (explaining that "Rule

702 . . . establishes threshold requirements that an expert opinion must satisfy before that opinion

may be considered").  In exercising its "gatekeeping" role, "the district court should undertake a

rigorous examination of the facts on which the expert relies, the method by which the expert

draws an opinion from those facts, and how the expert applies the facts and methods to the case

at hand."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266–67 (2d Cir. 2002).

Courts in the Second Circuit "subject expert testimony to *Daubert*'s rigorous standards insofar as

that testimony is relevant to the Rule 23 class certification analysis."  *Scott v. Chipotle Mexican*

*Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016); *Fort Worth Employees' Ret. Fund v. J.P. Morgan*

*Chase & Co.*, 301 F.R.D. 116, 126 (S.D.N.Y. 2014).

  To be admissible under Rule 702, "[e]xpert testimony must be helpful to the [trier of fact]

in comprehending and deciding issues *beyond* the understanding of a layperson."  *Marvel*

*Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013) (emphasis added).  Expert testimony

that is "directed solely to lay matters which a jury is capable of understanding and deciding

without the expert's help" should not be admitted.  *United States v. Mulder*, 273 F.3d 91, 101 (2d

Cir. 2001); *see also United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court

may commit manifest error by admitting expert testimony where the evidence impermissibly

mirrors the testimony offered by fact witnesses, or the subject matter or the expert's testimony is

not beyond the ken of the average juror.").

IV.    <u>ARGUMENT</u>

    A.    **Mr. Lenz's Opinions on WM Daten's Business Practices Are Merely Factual Narrative on Lay Matters and Should be Excluded.**

        1.    <u>Plaintiffs Do Not Rely on Mr. Lenz for his Expertise, But As a Backdoor to Present Factual Testimony on Lay Matters.</u>

The core of Mr. Lenz's report is not expert opinion—it is simply a series of factual

assertions about the business practices and policies of a company for which Mr. Lenz was

previously a consultant.  ECF No. 216 at 5, 21, 26, 37–38; ECF No. 231-86 (Elhauge Report) at

¶¶ 75–79, 87.  Mr. Lenz's principal function is to describe what WM Daten is, what data it makes

available for free and what it charges for, and what restrictions it does (or does not) impose on

the use of that data.  ECF No. 216 at 21; ECF No. 231-10 (Lenz Report) at ¶¶ 16–32.  These

descriptions are lay testimony regarding WM Daten's business practices, not expert testimony.

In fact, Mr. Lenz's narrative descriptions of WM Daten in his report are almost entirely sourced

from public webpages—he refers to no other sources of information.  *See* ECF No. 231-10 (Lenz

Report) at 4 n.2–3, 6 n.4, 9 n.5, 9 n.7, 10 n.8–11, 11 n.12–15, 12 n.16–17, 12 n.19, 13 n.21, 14

n.22, 15 n.23, 16 n.24–25, 20 n.28.

A mere purported description of a single company's data distribution practices is not

expert testimony.  The factual assertions made by Mr. Lenz could just as effectively have been

made by a lay witness with knowledge of WM Daten's business practices, and could have been

more accurately presented by a witness from WM Daten itself.  Admissible expert testimony

must provide more: Rule 702's "helpfulness requirement" mandates that "the proffered expert

testimony must actually help the factfinder understand facts that are outside common understanding." *In re Lyondell Chem. Co.*, 558 B.R. 661, 667 (S.D.N.Y. 2016) (internal quotes and citations omitted).  Proper expert testimony must therefore address matters "beyond the understanding of a layperson," on which the expert can provide specialized assistance to help the jury comprehend and decide issues.  *Marvel*, 726 F.3d at 135; *see also Mulder*, 273 F.3d at 101 (explaining that expert testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help" should not be admitted).  "An expert [] may not merely recite a factual narrative that does not draw technical or scientific conclusions." *Lyondell Chem.*, 558 B.R. at 667; *see also In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (excluding in part expert's report because experts may not "regurgitate the evidence") (internal quotes omitted); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 1:11-MD-2262, 2025 WL 2733020, at *91 (S.D.N.Y. Sept. 25, 2025) (excluding expert opinions "because these 'opinions are not the product of [their] expertise, as the documents [they] purport[ ] to interpret are equally understandable by the trier of fact at this stage, and these opinions are therefore inadmissible.'" (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 584).

But that is precisely what almost the entirety of Mr. Lenz's report does: it simply recites facts regarding WM Daten and its practices, largely pulled directly from public websites.  ECF No. 231-10 (Lenz Report) at ¶¶ 24–29, 33–35, 38–41.  During his deposition, Mr. Lenz acknowledged that the basis for his factual assertions about WM Daten's free issuance and unrestricted post-issuance use of identifier data came from WM Daten's public website,

specifically the webpages related to the "WM Daten securities register."[2]  Ex-1 (Lenz Dep.)
109:13–112:12.  When asked to clarify the product or service to which his factual assertions of
free and unrestricted use related, Mr. Lenz explained that the only thing to which his report
referred was the fact that WM Daten has a "securities register" that is "publicly available, free,
and unrestricted."  Ex-1 (Lenz Dep.) 119:20–121:24.  The few statements in the Lenz Report that
do not cite directly to public websites recite similarly basic facts requiring no expert analysis or
interpretation (e.g., that WM Daten customers are required to disclose end users who disseminate
their data).  ECF No. 231-10 (Lenz Report) at ¶ 42.

Courts within this Circuit have made clear that experts may not simply "parrot"
documents or witness testimony, or offer summaries masquerading as expert analysis.  *See Yeend
v. Akima Glob. Servs., LLC*, No. 1:20-CV-1281, 2025 WL 959968, at *5 (N.D.N.Y. Mar. 31,
2025) (noting that an expert may not "recite[] testimony and characterize[] it in a manner that is
favorable" to a party or "simply rehash [] otherwise admissible evidence about which he has no
personal knowledge[.]") (quoting *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461,
468–69 (S.D.N.Y. 2005)).  Accordingly, courts routinely strike purported "expert" recitations of
publicly available materials that do not involve technical analysis.  *See Lyondell Chem.*, 558 B.R.
at 667 ("An expert [] may not merely recite a factual narrative that does not draw technical or
scientific conclusions.").  That is precisely the outcome warranted here—Mr. Lenz's factual
recitations regarding WM Daten practices should be stricken.

        2.       <u>Mr. Lenz Is Not a Reliable Source for Information on WM Daten's
Practices and Policies.</u>

---

[2] The "Securities Register" is a publicly accessible online service offered by WM Daten that allows users to look up, without charge, securities identified by an ISIN or the domestic German WKN identifier, with certain limited accompanying fields of information.  *See* ECF No. 231-10 (Lenz Report) at ¶¶ 26–27.

Exclusion of Mr. Lenz's report is particularly justified because, even assuming *arguendo* that the factual information Mr. Lenz recites regarding WM Daten's alleged practices required some special knowledge or expertise to understand and explain (it does not), Mr. Lenz lacks sufficient knowledge to be a reliable conduit for such information.  He does not purport to speak for WM Daten—nor could he, as he has no affiliation with them.  Ex-1 (Lenz Dep.) 7:16–20, 61:5–64:4.  While Mr. Lenz worked as a consulting data analyst for WM Daten from 2002–2010, in the past 15 years his only affiliation with WM Daten was a brief stint providing training services, outside his regular employment at a bank (Julius Baer).  *Id*.; ECF No. 231-10 (Lenz Report) at 24–25 (Appendix A).  By Mr. Lenz's own admission, he did not review a single WM Daten contract when preparing his report.  He instead based his conclusions on his *memory* of old WM Daten contracts he had previously encountered during his consulting work—including contracts he had not seen in 20 years.  Ex-1 (Lenz Dep.) 30:9–17, 88:21–89:15, 207:2–212:12.  He further admitted that, even when he was serving as an external consultant for WM Daten, he never managed or drafted contracts.  Ex-1 (Lenz Dep.) 61:5–63:15, 128:19–134:9.  Instead, he only viewed the contracts to understand the permitted uses of the WM Daten data under the terms of a particular contract, which did not require, for example, any knowledge of the pricing structures.  *Id*.

Moreover, Mr. Lenz was incapable of explaining at his deposition basic aspects of WM Daten's data practices and policies relevant to his testimony.  For example, when asked to elaborate on the types of fees WM Daten would charge end users who wanted WM Daten "to do something [to the financial data]," Mr. Lenz admitted he was unable to answer because he was not part of those pricing decisions and did not know the terms that were included in those agreements.  Ex-1 (Lenz Dep.) 128:19–134:9.  He could only speculate it would be a "[s]ervice-

level agreement." *Id.*  Similarly, when presented with evidence that WM Daten's English-language terms of service governing the use of its free Securities Register placed restrictions on use and redistribution that were not present in the German-language terms of service, Mr. Lenz was unable to offer any explanation for those differences, stating that "I cannot answer this.  This is not my field."  Ex-1 (Lenz Dep.) 125:19–127:24 (emphasis added).  This admission is particularly damning for the admissibility of his opinion given that the restrictions that WM Daten places on the use and redistribution of the data on its free Securities Register is the central topic of his expert report.  *See* ECF No. 231-10 (Lenz Report) at 12–20.

Moreover, Mr. Lenz introduced wholly new factual assertions at his deposition, which subsequent communications directly with WM Daten revealed to be incorrect.  Mr. Lenz testified that WM Daten provides free credentials to the public that allow people with no other WM Daten subscription to login to WM Daten's website and access functionality in the Securities Register beyond that available in the public webpage.  Ex-1 (Lenz Dep.) 114:14–119:2, 121:17–122:2, 217:2–17.  Mr. Lenz confirmed during his deposition that none of those new factual assertions appear in his report, and offered no evidence to support them other than his say-so.  *Id.*; *cf.* ECF No. 231-10 (Lenz Report) at 12–20.  However, these new assertions appear to be incorrect. When WM Daten sales personnel were contacted after Mr. Lenz's deposition to verify his assertions, WM Daten confirmed that the only service WM Daten offered for free (other than issuance of new WKNs/ISINs) is the publicly-accessible Securities Register look-up service, and that only paid subscribers can login to WM Daten's website to obtain additional services.  Garrett Decl. at ¶¶ 10–12; Garret Decl. Exhibit A.[3]

---

[3] The Garrett Declaration sets forth the efforts that an investigative service retained by Defendants made to determine the veracity of these new and unsupported factual assertions.  It is submitted solely for purposes of impeaching the improper testimony of Mr. Lenz, following Mr. Lenz's deposition.

"'Rule 702 requires that expert testimony rest on knowledge, a term that connotes more than subjective belief or unsupported speculation.'" *Northway Med. Ctr. Condo v. Hartford Fin. Servs. Grp., Inc.*, 745 F. Supp. 3d 170, 181 (S.D.N.Y. 2024) (quoting *Atl. Specialty Ins. v. AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 291 (S.D.N.Y. 2013)), *aff'd sub nom. Northway Med. Ctr. Condo v. Sentinel Ins. Co., Ltd.*, No. 24-2468, 2025 WL 1703194 (2d Cir. June 18, 2025). Moreover, "an expert's opinion must be 'sufficiently grounded in *reliable* facts.'" *Id*. (emphasis added). Accordingly, "[w]hen presented with an expert opinion that is not sufficiently grounded in reliable facts, '[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Atl. Specialty Ins.*, 970 F. Supp. 2d at 285 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Here, Mr. Lenz purports to offer factual testimony, in the guise of opinions, based on outdated, undisclosed, and incorrect information on a company he has never been employed by and has no current affiliation with; and by his own admission he cannot explain aspects of WM Daten's practices that bear directly on the subject matter of his report. That is far from the grounding in reliable facts that the law requires for his testimony to be admitted.

3.      The Introduction of Mr. Lenz's Factual Testimony After the Close of
        Discovery Is Improper and Prejudicial to Defendants.

The fact that Mr. Lenz is a former consultant offering unreliable factual testimony based on evidence not in the record, also serves to underscore that his testimony is procedurally improper and grossly prejudicial to Defendants. *See Irish v. Tropical Emerald LLC*, No. 1:18-CV-0082, 2022 WL 2716182, at *4, 9–11 (E.D.N.Y. July 13, 2022) (affirming magistrate's finding that, even if the witness's testimony could be accepted as lay factual and opinion testimony, it should have been disclosed during fact discovery and excluding it, noting that "[w]hile an order precluding evidence 'is strong medicine, such orders are necessary on

appropriate occasion to enforce compliance with the discovery rules and maintain a credible deterrent to potential violators.'") (quoting *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991)).

Here, Mr. Lenz is introducing new fact issues after the close of fact discovery relating to the alleged practices of a company he does not represent. *See* Ex-1 (Lenz Dep.) 61:5–14, 66:3–4. If Plaintiffs believed that these assertions regarding WM Daten's products and services were relevant to their case and intended to use such information "to support its claims or defenses," under Rule 26(a) Plaintiffs were required to disclose them during the fact discovery period, so that Defendants could have had the proper opportunity to take discovery from WM Daten itself to verify its practices and any possible relevance to this case. Fed. R. Civ. Proc. 26(a)(1)(A)(i); *see also Irish*, 2022 WL 2716182, at *4, 9–11. No plaintiff disclosed Mr. Lenz, WM Daten, or for that matter any of the other NNAs about whom they now make blanket factual assertions that were untested in discovery. *See* Ex-6 (Dinosaur Initial Disclosures); Ex-7 (Hildene Capital Initial Disclosures); Ex-8 (Swiss Life Initial Disclosures).

Fact discovery closed months ago. ECF No. 116 (Civil Case Management Plan and Scheduling Order) at 3. Allowing Plaintiffs to introduce a new fact witness masquerading as an expert—on new factual issues—at this late stage of litigation will unfairly prejudice Defendants' ability to take fact discovery from WM Daten to verify or rebut Mr. Lenz's assertions. Accordingly, Mr. Lenz's testimony should be excluded as in violation of the discovery rules, and unfairly prejudicial. *See* Fed. R. Evid. 403 ("A court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]"); Fed. R. Civ. Proc. 31(c)(1) ("If a party fails to provide information or identify a witness as required by Rule

26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

> 4.    Mr. Lenz's Reliance on His Memory of Undisclosed Contracts Is Inappropriate and Impermissible.

Furthermore, to the extent Mr. Lenz's testimony is allegedly based on the contents of undisclosed and unproduceable contracts he has seen earlier in his career as a consultant, this testimony is inadmissible.

Even if Mr. Lenz were offering actual expert opinions regarding WM Daten's practices (he is not), his testimony would be subject to exclusion for reliance on inherently unreliable information.  Under the *Daubert* standards, while a court may allow experts to testify based on inadmissible evidence, the court must be satisfied that the underlying evidence is reliable.  *See*, *e.g.*, *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 561 (S.D.N.Y. 2004) ("*Daubert's* broad mandate requiring district courts to act as gatekeepers to prevent the admission of untrustworthy expert testimony applies fully to the analysis under Rule 703, and courts have broad discretion in determining whether hearsay evidence is 'of a type reasonably relied upon by experts.' Moreover district courts must make an independent determination that the material in question is sufficiently reliable for experts in the field to rely upon it and are not bound merely 'to accept expert testimony based on questionable data simply because other experts use such data in the field.'") (quoting *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993)).  Here, Mr. Lenz is relying on his memory of contracts he previously encountered in the course of his consulting work—some of which he admitted he had not seen in decades.  Ex-1 (Lenz Dep.) 30:9–17, 88:21–89:15, 207:2–212:12.  He did not review a single WM Daten contract when preparing his report to even refresh his dated recollections.  *Id.*  That is an inherently unreliable

basis for expert testimony, particularly where the contracts in question have not been produced and thus his recollections cannot be tested or verified.

Mr. Lenz, however, is not actually offering expert opinions, as explained in the sections above—he is simply a percipient fact witness dressed up in an expert's clothes. As a result, his reliance on undisclosed contracts is in clear violation of the best evidence and hearsay rules. *See, e.g.*, *Paul v. Postgraduate Ctr. for Mental Health,* 97 F. Supp. 3d 141, 188 (E.D.N.Y. 2015) (discounting "under the best evidence rule, Plaintiff's testimony as to the contents of [the form] that [he] testified about but did not produce," and citing *DiCristi v. Liberty Mut. Ins. Co.*, 806 N.Y.S.2d 444, 2005 WL 1981314 at *2 (N.Y. Sup. Ct. 2005) for the proposition that "[w]ithout the insurance contract itself, any recitation of the contract's terms through testimony or other documents in evidence is rank hearsay and contrary to the best evidence rule."); *Marvel*, 726 F.3d at 136 (explaining that "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.") (internal quotes and citations omitted).

The unproduced contracts on which Mr. Lenz allegedly bases his testimony about WM Daten's licensing practices are not in the record. In fact, Mr. Lenz made clear that he is unable to produce the contracts that form the basis of his testimony, or even identify who the licensee was, given the contracts' respective confidentiality provisions. Ex-1 (Lenz Dep.) 30:18–32:5; *see Brush v. Old Navy LLC*, No. 2:21-CV-0155, 2022 WL 3106566, at *4 (D. Vt. Aug. 4, 2022) (explaining that although an expert "may [] rely on [hearsay] facts in forming his opinion, [] his testimony cannot serve as the sole basis by which those facts are admitted."). His testimony as to the contract and licensing practices of WM Daten should therefore be excluded on these bases as well.

**B.    Mr. Lenz's Opinion on the Charging Practices of the 120 NNAs Worldwide is Outside His Expertise and Rests on No Reliable Foundation.**

Mr. Lenz states in a footnote that, of the 120 NNAs worldwide, he is "only aware of two – CGS and LSEG – who charge usage fees." ECF No. 231-10 (Lenz Report) at 19 n.27. It is unclear why Mr. Lenz included this footnote, as his report does not otherwise discuss CGS (or any other NNA) at all, *cf.* ECF No. 231-10 (Lenz Report) at 1–21, but presumably it was offered in support of Plaintiffs' contention that all other NNAs offer financial identifier data for free. *See, e.g.*, ECF No. 216 at 26, 37–38; ECF No. 231-86 (Elhauge Report) at ¶¶ 75–79, 87. However, Mr. Lenz's assertion is devoid of substance. Mr. Lenz opines simply that CGS and LSEG are the only NNAs that charge usage fees that he is "aware of." ECF No. 231-10 (Lenz Report) at 19 n.27. His testimony says nothing about what the practices of the 120 NNAs worldwide *actually are* and tells the fact finder nothing about what the *basis* or *scope* of his awareness is. Thus, on its face, this factual assertion is unable to "assist the trier of fact to understand the evidence or to determine a fact in issue." *Highland Cap. Mgmt.*, 379 F. Supp. 2d at 468.

Further, the evidence refutes any contention that Mr. Lenz has any reliable knowledge about the usage charges of NNAs around the world. Mr. Lenz only has experience with a limited set of NNAs in Europe, specifically the NNAs for the three countries where he worked, Luxembourg, Germany, and Switzerland. Ex-1 (Lenz Dep.) 87:22–88:7. Mr. Lenz testified that he only "know[s] a few numbering agencies," and could not even recall the names of multiple NNAs when asked. Ex-1 (Lenz Dep.) 86:14–87:21. Mr. Lenz did not review any documents from any NNA to prepare his report; his knowledge was limited to simply those three NNAs he was familiar with based on his consulting work. Ex-1 (Lenz Dep.) 87:22–89:15. Even there, his familiarity was limited to having purportedly seen contracts involving those NNAs during that

prior work.  *Id.*  Mr. Lenz did not know whether the Association of National Numbering

Agencies ("ANNA") decides what terms an NNA can place on financial identifiers they issue.

Ex-1 (Lenz Dep.) 85:12–18.  In fact, although Mr. Lenz said he reviewed ANNA's website to

prepare his report, he did not review any of ANNA's policies or rule documents.  Ex-1 (Lenz

Dep.) 85:19–86:13.

Thus, Mr. Lenz has no meaningful basis to testify about the practices of the 120 NNAs

worldwide and for this reason his testimony should be excluded.  *Fantasia Distribution, Inc. v.*

*Cool Clouds Distribution, Inc.*, 693 F. Supp. 3d 335, 345 (E.D.N.Y. 2023) ("Expert opinions

based on insufficient facts or data, or on unsupported suppositions [are] not acceptable.

Anecdotal evidence and 'generalized assumptions' are inadequate bases for an expert report.")

(quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007)).

Mr. Lenz's testimony on the practices of 120 NNAs is not only unreliable, it is not even

clear as to what he is claiming when he asserts that only CGS and LSEG "charge usage fees."

ECF No. 231-10 (Lenz Report) at 19 n.27.  The only WM Daten product his report claims is

"actually publicly available, free, and unrestricted" is the static basic FI data in the Securities

Register—WM Daten's free online lookup tool.  Ex-1 (Lenz Dep.) 111:18–112:12, 121:17–24,

135:5–11.[4]  Mr. Lenz admits that anything beyond the free Security Register requires the

payment of fees to WM Daten.  Ex-1 (Lenz Dep.) 119:20–120:18, 135:5–11.  In fact, at his

deposition, Mr. Lenz was confronted with WM Daten contracts with FactSet Research Group

which placed restrictions on use and distribution of the WKN, the ISIN, certain basic financial

information that Mr. Lenz considers free and unrestricted basic "FI," and one additional data

---

[4] While, as noted above, he claimed for the first time in deposition that the Securities Register offers more
functionality than is available on the publicly-accessible website if a user obtains a free login from WM Daten, WM
Daten itself says that is untrue. Garrett Decl. at ¶¶ 10–12; Garret Decl. Exhibit A.

field—the "Ticker" symbol.  Ex-1 (Lenz Dep.) 160:2–165:2, 166:7–172:21; Ex-2 (Lenz Dep. Ex. 1282); Ex-3 (Lenz Dep. Ex. 1283).  Mr. Lenz confirmed that the addition of a *single* additional data field beyond the basic FI data will result not only in fees being charged, but the *same* sorts of use and distribution restrictions CGS imposes on data recipients.  *See* Ex-1 (Lenz Dep.) 161:5–14, 167:21–172:21 (confirming the inclusion of the ticker symbol in a data product that is otherwise composed of only basic FI data gives WM Daten the right to restrict the use (internal display only) and distribution (redistribution to third parties) of WM Daten's WKNs and ISINs data); Ex-2 (Lenz Dep. Ex. 1282); Ex-3 (Lenz Dep. Ex. 1283); Ex-4 (Lenz Dep. Ex. 1284).  Mr. Lenz also confirmed that the only thing he is aware of CGS charging for and placing restrictions on are data feeds and downloads, and that he is aware they also provide a free look-up tool.  Ex-1 (Lenz Dep.) 188:13–192:6.  Therefore it is unclear what Mr. Lenz is contending when he suggests that CGS "charge[s] usage fees" in some way that WM Daten does not.  ECF No. 231-10 (Lenz Report) at 19 n.27.  So, in addition to Mr. Lenz's opinion about the 120 NNAs being entirely unfounded and uninformed, it doesn't even seem to reconcile with his own evidence on the one NNA he actually provides testimony about, WM Daten.

Mr. Lenz's opinions on the practices of 120 NNAs is therefore plainly unreliable and must be excluded.

### C.    Mr. Lenz's Opinions on Innovation and Competition in the German Market Are Inadmissible—They are Irrelevant to Class Issues and Offered by a Witness Who is Unqualified and Employed No Methodology.

To the extent Mr. Lenz addresses any topic that could be the subject of an "expert opinion" (as opposed to a mere recitation of fact), it is relegated to three paragraphs at the end of the report, where he speculates that WM Daten's data policies have "enabled robust competition between data providers and data service providers as well as an increase in innovation," and has "lead[] to more innovation in the market for data services with security identifiers in Germany."

17

ECF No. 231-10 (Lenz Report) at ¶¶ 44–45, 47.  However, this testimony should be excluded because it does not "help the trier of fact" on any issue presently before it, given that WM Daten's data policies are not pertinent to class certification, and, even if it were relevant, Mr. Lenz is not qualified to offer this baseless, speculative opinion.

To be admissible support for class certification, expert testimony must be "relevant to the Rule 23 class certification analysis." *Scott*, 315 F.R.D. at 55.  Mr. Lenz's opinions about WM Daten's polices and their impact on innovation in the German identifier market are not pertinent to class certification—they do not relate to common issues, individualized injury, or any Rule 23 analysis.  Devoid of any connection to class certification, Mr. Lenz's innovation opinion is irrelevant, inappropriate, and must be excluded.  *See Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 127–28 (S.D.N.Y. 2015) (excluding expert testimony on industry practices because "it [was] not pertinent to class certification" even if it "might ultimately be relevant [] to support a [party's] defense").

Moreover, Mr. Lenz possesses no relevant knowledge, education, experience, or skill that renders him qualified to opine on the impact of data licensing on innovation in the German identifier market.  "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). Mr. Lenz is not an expert in economics, intellectual property, or on the market impacts of intellectual property licenses.[5]  Ex-1 (Lenz Dep.) 74:2–75:17.  He has not read any scholarly

---

[5] In contrast, where experts have been held sufficiently qualified to opine on drivers of innovation, and the impact of conduct on innovation, they have possessed expertise in economics.  *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2021 WL 662292, at *16 (E.D. Pa. Feb. 19, 2021) (noting that "courts have repeatedly recognized that economists are qualified to testify on the market effects of certain collusive or anticompetitive conduct," and citing cases); *All Star Carts & Vehicles, Inc. v. BFI Canada*

publications on the impact of licensing policies on innovation.  Ex-1 (Lenz Dep.) 203:21–204:12.

Mr. Lenz admitted that he was not aware of any experts that studied the impacts of licensing on

innovation in the German market and only knew generally that consulting companies studied this

in the broader market, speculating that he "may have read some reports."  Ex-1 (Lenz Dep.)

201:18–202:21.  Moreover, Mr. Lenz is not aware of any methodologies used for actually

assessing the impact of licensing policies on innovation.  Ex-1 (Lenz Dep.) 203:5–20.

Instead, Mr. Lenz relies for his opinion, solely on his consulting experience working in

the financial industry as it relates to data use and data systems.  Ex-1 (Lenz Dep.) 72:15–19,

73:4–25.  However, Mr. Lenz's work experience is entirely unrelated to the study of innovation

in data services markets and its causes, unrelated to market analysis, or even business strategy

within the data services market—it is confined to experience designing systems for data use for

specific customers in the financial industry.  Ex-1 (Lenz Dep.) 73:4–25; ECF No. 231-10 (Lenz

Report) at ¶ 6.  Neither Mr. Lenz's report nor his testimony explain how his consulting

experience in data use and data systems qualify him to opine on the impact of licensing policies

on barriers to entry and innovation in the German identifiers market.  *See Philmar Dairy, LLC v.*

*Armstrong Farms*, No. 2:18-CV-0530, 2019 WL 3070588, at *3 (D.N.M. July 12, 2019) (noting

that "generalized experience does not automatically qualify a person to testify about a

specialized subject."); *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (just

because an expert is qualified by experience "does not mean that experience, standing alone, is a

sufficient foundation rendering reliable any conceivable opinion the expert may express").

---

*Income Fund*, 280 F.R.D. 78, 83 (E.D.N.Y. 2012) (holding expert is qualified to offer her expert opinion as she
"holds a Ph.D. in economics from the Massachusetts Institute of Technology and served on the faculty of Columbia
University" and "has studied the industry about which she opines and has conducted studies regarding
anticompetitive conduct and its effects.").

Worse still, by Mr. Lenz's own admission there is <u>no</u> methodology behind his opinion as to whether WM Daten's data policies cause higher levels of innovation.  Ex-1 (Lenz Dep.) 203:5–13 ("There is no methodology behind it."); *see also United States v. Ray*, 583 F. Supp. 3d 518, 542 (S.D.N.Y. 2022) (explaining that "a lack of methodology cannot satisfy the reliability prong of Rule 702 and *Daubert*."); *H. Daya Int'l Co., Ltd. v. Do Denim, LLC*, No. 1:16-CV-8668, 2023 WL 1340422, at *5 (S.D.N.Y. Jan. 31, 2023) (excluding an expert's report because "[t]he Court [was] not able to discern any reliable methodology articulated or employed by [the expert] to reach her conclusions.").  He admittedly did nothing to determine whether any causal relationships exists between the purported innovation he claims to have anecdotally observed and WM Daten's data policies.  Ex-1 (Lenz Dep.) 198:11–201:17.  In fact, Mr. Lenz "didn't care about the causal relationship."  Ex-1 (Lenz Dep.) 201:6–17.  He just "observed what companies would do using the WM Data," and gave no consideration to other factors such as access to capital or the regulatory environment that might contribute to the growth of new products, services, and data providers.  Ex-1 (Lenz Dep.) 200:4–201:17.  Indeed, Mr. Lenz did not even attempt to quantify the number of new data providers or compare it to another market.  Ex-1 (Lenz Dep.) 194:6–198:10, 201:6–17.

Federal Rule of Evidence 702 demands more of expert testimony.  Mr. Lenz's opinion on the impact of data licensing on innovation in the German identifier market is baseless *ipse dixit* and must be excluded.  *See Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Furthermore, despite his claims in his report that WM Daten's policies "enabled robust competition . . . as well as an increase in innovation," ECF No. 231-10 (Lenz Report) at ¶ 44, if

Mr. Lenz's deposition testimony is accepted, <u>he actually has no opinion at all on whether WM Daten's policies had any causal connection to the supposed increase in innovation</u>. Ex-1 (Lenz Dep.) 200:4–201:17.  Rather he simply "observed what companies would do using the WM Data." Ex-1 (Lenz Dep.) at 200:4–19.  If that is true, then the scope of his opinion reduces to nothing more than an observation that some companies have offered new products incorporating WM Daten data.  Such a limited observation is entirely unmoored to any issue pending before this court.  Observations on what companies in the German identifier market "do using WM Data" could only conceivably be relevant if *both* innovation in Germany is causally connected to WM Daten's data licensing practices *and* the German identifier market is comparable to the market for U.S. identifier data.  By his own admission, Mr. Lenz has not made any attempt to analyze either of those things.  Ex-1 (Lenz Dep.) 195:14–196:25, 200:4–201:17.  His opinion in this regard is therefore entirely irrelevant and should be excluded.  *See* Fed. R. Evid. 401 (relevant evidence must (1) make a fact more or less likely and (2) be of consequence to the lawsuit).

### D.    Mr. Lenz Provided New Testimony Two Days Before This *Daubert* Motion Was Due, Which Highlights His Unreliability.

At 5:00 PM Eastern time on November 24, 2025—*two days before this motion was due*—Plaintiffs submitted a purported "errata" to Mr. Lenz's deposition transcript, in which he introduces substantial new testimony not given in his actual deposition.  The "errata" repeatedly supplements the simple answers he gave at the deposition, like "Exactly," "Yes," or "Yes, absolutely," with numerous new caveats or explanations.  *See* Ex-9 (Lenz Dep. Corrections) at 1–3.  This untimely new testimony underscores the unreliable nature of Mr. Lenz's testimony.  For example, in his new testimony Mr. Lenz purports to add to his deposition answer ("Yes, absolutely.") to now suggest a distinction between WM Daten's contracting policies in

21

2012 and the restrictions it "currently" imposes, *id*. at 2, despite the fact that Mr. Lenz has no

current affiliation with WM Daten, and has had no affiliation with WM Daten in the last 15 years

other than a limited consultancy to train some employees on security master data.  Ex-1 (Lenz

Dep.) 7:16–20, 61:5–64:4; ECF No. 231-10 (Lenz Report) at 24–25 (Appendix A).  In addition,

Mr. Lenz has now "corrected" the straightforward testimony he provided on a basic WM Daten

order form, available online, which Mr. Lenz claimed to have seen as recently as three or four

months prior to his deposition.  Ex-1 (Lenz Dep.) 148:10–150:16; Ex-9 (Lenz Dep. Corrections)

at 2.  No explanation is provided for why Mr. Lenz was unable to sufficiently testify to that

document at his deposition, and instead needs to provide new testimony a month later, when

Defendants cannot examine him on that new testimony.  That Mr. Lenz took a month to add new

testimony on basic current WM Daten contract provisions and policies demonstrates clearly why

he is utterly unqualified to provide expert testimony and that factual testimony wrapped in the

garb of "expert" opinion is entirely improper.  If anything, these English-language supplements

(which do not purport to be certified translations, despite coming from a witness who prepared

his report in German and testified in German) suggest the strong hand of Plaintiffs' counsel,

rather than *bona fide* attempts by Mr. Lenz to correct errors in his transcript.[6]

At the end of the day, this belated deposition testimony vividly illustrates that Mr. Lenz is

being proffered to provide factual testimony on the licensing policies of a German numbering

agency and not as an expert—thus compounding the prejudice to Defendants from this

---

[6] In this regard, Defendants note what should be obvious: "a deposition differs from interrogatory answers and an attorney is precluded from coaching a witness during the depositions."  *Sheridan v. Caesars Enter. Servs. LLC*, No. 2:20-CV-0126, 2021 WL 279614, at *2 (D. Nev. Jan. 27, 2021) (striking a deposition errata sheet where "[e]ven the phrasing of the clarifications does not reflect Plaintiff's own voice or words compared to the deposition testimony," because "[a]llowing a deponent to alter testimony through after-the-fact changes (potentially in consultation with her attorney) would undermine these well-settled deposition rules, effectively permitting the substitution of interrogatory answers for deposition testimony and permitting attorneys to alter the deponent's testimony.")  Such improper conduct is bad enough when it is done during fact discovery, it is even more egregious here where Plaintiffs are trying to introduce new fact testimony through a supposed "expert" after fact discovery has closed.

undisclosed fact witness.  Plaintiffs provided no inkling during the discovery period that they would be relying on purported information on the policies and practices of WM Daten.  Had that fact been disclosed timely, Defendants could have sought information from WM Daten directly, to meaningfully test Mr. Lenz's testimony.  And they have now, on the eve of the *Daubert* motion deadline, added additional factual testimony from him that Defendants cannot test through examination of Mr. Lenz in deposition, since it was added only after his deposition was long concluded.  That is a clear abuse of the expert process and intended to sneak unchallengeable factual testimony into the record.

Plaintiffs' gamesmanship tactics serve only to provide additional cause to exclude Mr. Lenz's testimony and opinions in their entirety.  Nevertheless, Defendants reserve all rights with respect to Plaintiffs' untimely introduction of this new testimony from Mr. Lenz, particularly should Plaintiffs seek to rely on this untested new testimony in its reply submission in support of its motion for class certification.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should strike the Expert Report of Frank Lenz, and the facts and opinions contained therein.

Dated: November 26, 2025

Respectfully submitted,

| /s/ Eric J. Stock | /s/ Jeffrey I. Shinder | /s/ David C. Kiernan |
|---|---|---|
| Eric J. Stock | Jeffrey I. Shinder | JONES DAY |
| Jefferson E. Bell | Ellison A. Snider (*pro hac vice*) | David C. Kiernan (*pro hac vice*) |
| Esther Lifshitz | SHINDER CANTOR LERNER LLP | Craig E. Stewart (*pro hac vice*) |
| GIBSON, DUNN & CRUTCHER LLP | 14 Penn Plaza, 19th Floor | Caroline N. Mitchell (*pro hac vice*) |
| 200 Park Avenue | New York, NY 10122 | Kapri Saunders (*pro hac vice*) |
| New York, NY 10166 | Tel.: (646) 960-8601 | Paul Hines (*pro hac vice*) |
| Tel.: (212) 351-2301 | Fax: (646) 960-8625 | |
| Fax: (212) 716-0801 | jeffrey@scl-llp.com | |
| estock@gibsondunn.com | esnider@scl-llp.com | |

23

jbell@gibsondunn.com
elifshitz@gibsondunn.com

*Attorneys for Defendant*
*S&P Global Inc.*

James J. Kovacs (*pro hac vice*)
Keagan H. Potts (*pro hac vice*)
SHINDER CANTOR LERNER
LLP
Tel.: (646) 960-8601
600 14th Street NW, 5th Floor
Washington, D.C. 20005
james@scl-llp.com
kpotts@scl-llp.com

W. Stephen Cannon (*pro hac vice*)
Seth D. Greenstein (*pro hac vice*)
Patrick Kennedy (*pro hac vice*)
CONSTANTINE CANNON LLP
Tel.: (202) 204-3500
1001 Pennsylvania Avenue NW,
Suite 1300N
Washington, D.C. 20004
scannon@constantinecannon.com
sgreenstein@constantinecannon.com
pkennedy@constantinecannon.com

Sarah Bayer
CONSTANTINE CANNON LLP
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 350-2700

*Attorneys for Defendant FactSet*
*Research Systems, Inc.*

555 California Street, 26th
Floor
San Francisco, CA 94104
Tel.: (415) 626-3939
Fax: (415) 875-5700
dkiernan@jonesday.com
cestewart@jonesday.com
cnmithcell@jonesday.com
ksaunders@jonesday.com

Alexander V. Maugeri
Amanda L. Dollinger
250 Vesey Street
New York, NY 10281
Tel.: (212) 326-3939
Fax: (212) 755-7306
amaugeri@jonesday.com
adollinger@jonesday.com

*Attorneys for Defendant*
*American Bankers*
*Association*

24

## <u>SIGNATURE CERTIFICATION</u>

Pursuant to Section 8.5(b) of the Electronic Case Filing Rules and Instructions of the

Southern District of New York, I certify that all other signatory parties have consented to the

filing of this document.


*/s/ David C. Kiernan*
David C. Kiernan

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 4(B) of the Court's Individual Rules of Practice in Civil Cases, Defendants certify that this computer-generated Memorandum of Law was prepared using Microsoft Windows and Microsoft Word.  The total number of words in this Memorandum, exclusive of the caption, table of contents, table of authorities, the signature block, and this certificate of compliance is 7,749, which is in accordance with the maximum 8,750 words as permitted under Local Civil Rule 7.1.


                                                      */s/ David C. Kiernan*
                                                     David C. Kiernan

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on November 26, 2025, I caused the foregoing to be served on all counsel of

record via ECF.

_/s/ David C. Kiernan_

David C. Kiernan
