**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

DINOSAUR FINANCIAL GROUP LLC, HILDENE CAPITAL MANAGEMENT, LLC and SWISS LIFE INVESTMENT MANAGEMENT HOLDING AG, on behalf of themselves and all others similarly situated,

                Plaintiffs,

                -v-

S&P GLOBAL, INC., AMERICAN BANKERS ASSOCIATION, and FACTSET RESEARCH SYSTEMS INC.,

                Defendants.

----------------------------------------------------------------x

Case No. 1:22-CV-1860 (KPF)

 

**PLAINTIFFS' REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION AND**
<u>**APPOINTMENT OF CLASS COUNSEL**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.     Defendants' Attempt to Change The Relevant Product Market from the Use of "CUSIP Identifiers" to Access to "CGS Data" Fails ........................................................ 2

     A.     A reasonable juror could believe Elhauge's product market definition .................. 2

     B.     The plain language of the license agreements confirms class members license only CUSIP Identifiers and standard security descriptions ........................ 3

     C.     Defendants falsely claim that Elhauge "abandoned" his theories ........................... 5

II.     Common Evidence Shows All Class Members Were Injured ............................................ 7

III.     The Competitive Price of CUSIP Identifiers in the But-For World is Zero ...................... 9

     A.     Elhauge's competitive yardsticks are reasonable and supported by common evidence ............................................................................................................... 9

     B.     Plaintiffs' zero marginal cost analysis is supported by common evidence ........... 11

IV.     The Relevant Market and Market Power can be Proven by Common Evidence ............. 12

V.     Elhauge's Damages Models Do Not Create Individual Issues ....................................... 14

     A.     Method 1 conforms to Plaintiffs' class definition and Defendants took ample discovery ............................................................................................................ 14

     B.     Method 2 does not create individual issues ....................................................... 16

VI.     Common Questions Predominate Concerning the Statute Of Limitations, State Law Claims, and the Class Definition ...................................................................................... 18

     A.     The statute of limitations .................................................................................... 18

     B.     State law claims .................................................................................................. 19

     C.     The class definition ............................................................................................ 20

VII.     The Injunctive Relief Class meets Rule 23(b)(2)'s Requirements .................................. 20

Conclusion ......................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Aghaeepour v. N. Leasing Sys., Inc.*,
2015 WL 7758894 (S.D.N.Y. Dec. 1, 2015)................................................................. 20

*Cayetano v. Fed. Express Corp.*,
2022 WL 2467735 (S.D.N.Y. July 6, 2022)................................................................ 18

*City of New York v. Grp. Health Inc.*,
649 F.3d 151 (2d Cir. 2011) ....................................................................................... 15

*City of Philadelphia v. Banc of Am. Sec. LLC*,
2025 WL 2180607 (2d Cir. Aug. 1, 2025) ............................................................... 2, 19

*Cruz v. FXDirectDealer, LLC*,
720 F.3d 115 (2d Cir. 2013) ....................................................................................... 19

*Glenview Const., Inc. v. Bucci*,
165 F. Supp. 2d 545 (S.D.N.Y. 2001) ....................................................................... 18

*Hanks v. Lincoln Life & Annuity Co. of New York*,
330 F.R.D. 374 (S.D.N.Y. 2019) .................................................................................. 5

*In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*,
2021 WL 4481215 (S.D.N.Y. Sept. 30, 2021) ............................................................. 4

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020)............................................................................... 15, 17

*In re Buspirone Pat. Litig.*,
210 F.R.D. 43 (S.D.N.Y. 2002).............................................................................. 7, 8

*In re Elec. Books Antitrust Litig.*,
2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ............................................................ 7

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008) ............................................................................... 17

*In re Namenda Direct Purchaser Antitrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018) ........................................................................ 14

*In re Processed Egg Prods. Antitrust Litig.*,
312 F.R.D. 171 (E.D. Pa. 2015)................................................................................. 17

*In re Restasis Antitrust Litig.*,
   335 F.R.D. 1 (E.D.N.Y. 2020) ......................................................................... 20

*In re WorldCom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) ..................................................................... 19

*Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*,
   2022 WL 2829880 (S.D.N.Y. June 30, 2022) ................................................. 17

*Mahmud v. Kaufmann*,
   607 F. Supp. 2d 541 (S.D.N.Y.) ..................................................................... 16

*Meijer, Inc. v. Warner Chilcott Holdings Co. III*,
   246 F.R.D. 293 (D.D.C. 2007) .......................................................................... 7

*Polk v. Del Gatto, Inc.*,
   2021 WL 3146291 (S.D.N.Y. July 23, 2021) .................................................. 20

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
   96 F.4th 327 (2d Cir. 2024) .............................................................................. 2

*Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*,
   708 F. Supp. 2d 257 (E.D.N.Y. 2010) ............................................................ 19

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
   2018 WL 1750595 (S.D.N.Y. Apr. 11, 2018) .................................................. 19

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) .......................................................................................... 2

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019) ......................................................................... 18, 19

*Van-Go Transp. Co. v. New York City Bd. of Educ.*,
   53 F. Supp. 2d 278 (E.D.N.Y. 1999) .............................................................. 18

**Rules**

Fed. R. Evid. 801(d)(2)(D) ................................................................................ 10

iii

## Glossary

Except as indicated elsewhere, Plaintiffs' reply memorandum of law in support of their motion for class certification and appointment of class counsel uses the following index of capitalized terms for ease of reference.

| | |
|---|---|
| ABA | American Bankers Association |
| ANNA | Association of National Numbering Agencies |
| ANSI X9 | American National Standards Institute Committee X9 |
| Bergmann Report | Expert Report of Bettina Bergmann, dated August 13, 2025 |
| CFI Identifier | Classification of Financial Instruments Identifier |
| CGS | CUSIP Global Services |
| CGS Data | CUSIP standard identifiers, CUSIP standard descriptions, CGS ISINs, CINS Identifiers, and other information about financial instruments as defined in the Subscription Agreement and Distribution Agreement |
| CGS License | Item 1.1 in the Services Attachment and item 7(A)(i) in the Order Schedule. This term is synonymous with the "basic license" referenced in the Elhauge deposition. |
| CINS | CUSIP International Numbering System numbers: a 9-character alphanumeric code that identifies financial instruments issue by companies headquartered outside the U.S. and Canada |
| CUSIP | A 9-character alphanumeric code that identifiers financial instruments issue by companies headquartered in the U.S. and Canada |
| CUSIP Identifiers | Any CUSIP (U.S. or Canadian) and any CUSIP International Number (CINS), as well as their corresponding CUSIP-derived International Securities Identification Numbers (ISINs) if any. This term is synonymous with CGS Identifiers. |

iv

| | |
|---|---|
| Ex- | A prefix indicating an exhibit attached to either the September 18, 2025 Corrected Declaration of Ronald J. Aranoff in Support Plaintiffs Motion for Class Certification and Appointment of Class Counsel (Exhibits 1 through 86) or an exhibit attached to the February 18, 2026 Declaration of Grant J. Bercari in Support Plaintiffs Motion for Class Certification and Appointment of Class Counsel (Exhibits 87 through 119) |
| D.Ex- | A prefix indicating an exhibit attached to the Declaration of David C. Kiernan in Support of Defendants' Memorandum of Law in Opposition to Plaintiffs Motion for Class Certification |
| Defendants | The ABA, FactSet, and S&P |
| Dinosaur | Dinosaur Financial Group, LLC |
| Distribution Agreement | The CUSIP Global Services Distribution Agreement |
| DTCC | Depository Trust & Clearing Corporation |
| Elhauge Report | Expert Report of Einer Elhauge, dated August 29, 2025 |
| FactSet | FactSet Research Systems Inc. |
| FIGI | Financial Instrument Global Identifier |
| FINRA | Financial Industry Regulatory Authority |
| Hildene | Hildene Capital Management, LLC |
| HMT | Hypothetical Monopolist Test |
| Lenz Report | Expert Report of Frank Lenz, dated August 12, 2025 |
| Powell Report | Expert Report of James Powell, dated August 12, 2025 |
| ISIN | International Securities Identification Number: a 12-character alphanumeric code that identifiers financial instruments. |
| ISO 6166 Standard | International Standards Organization Standard 6166: Financial services — International securities identification number (ISIN) |
| Meyn Report | Expert Report of Cynthia Meyn, dated November 26, 2025 |
| Miller Report | Expert Report of Arthur Miller, dated August 14, 2025 |

v

| | |
|---|---|
| Mot. | Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification and Appointment of Class Counsel |
| MSRB | Municipal Securities Rulemaking Board |
| NNA | National Numbering Agency |
| Opp | Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification |
| Order Schedule | The Order Schedule attached to the Distribution Agreement |
| Plaintiffs | Dinosaur, Hildene, and Swiss Life |
| Services Attachment | The Services Attachment to the Subscription Agreement |
| S&P | S&P Global, Inc. |
| SNA | Substitute Numbering Agency |
| Stiroh Report | Expert Report of Lauren Stiroh, dated November 26, 2025 |
| Swiss Life | Swiss Life Investment Management Holding AG |
| Subscription Agreement | The CUSIP Global Services Subscription Agreement |
| TPDV | Third-Party Data Vendor |
| UOSS | Use of Service Statement to the Subscription Agreement or Distribution Agreement |

**INTRODUCTION**

Defendants do not challenge any Rule 23 element except predominance. All other elements are conceded. As to predominance, Defendants make three main arguments.

First, Defendants try to change the class definition and relevant product market from "the use of CUSIP Identifiers" to "access to CGS Data." Plaintiffs are masters of the class definition, not Defendants. Professor Elhauge, the only economics expert to opine on the relevant product market, concluded that CUSIP Identifier use is the relevant product market because there are no substitutes. Class members use data from TPDVs, not CGS, but due to its monopoly, CGS imposes license agreements on them anyway. The plain language of those license agreements confirms that class members only pay to license CUSIP Identifiers and standard security descriptions, not the full suite of "CGS Data." *See* Section I.

Second, Defendants claim that, in the but-for world, CGS would raise prices for non-class members (namely, TPDVs) for "CGS Data," and the TPDVs might pass those higher costs on to class members. Defendants' argument is based on rank speculation, which is insufficient to defeat Plaintiffs' common evidence that, without the anticompetitive restrictions, CGS would lack market power to raise prices or control the use of CUSIP Identifiers in the but-for world. *See* Section II.

Third, Defendants fail to rebut Plaintiffs' evidence that non-CGS financial identifiers are free of restrictions around the globe and the market price for their use is zero. Defendants introduce no contrary evidence, and their representatives have repeatedly admitted that Plaintiffs are correct. *See* Section III.

Defendants' other arguments also fail: Elhauge did not abandon or change his opinions; Elhauge's class-wide damages calculations are appropriate; there are no substitutes or alternative sources for CUSIP Identifiers; and common issues predominate concerning the statute of limitations, state-law subclasses, and the injunctive relief subclass. *See* Sections IV-VII.

**ARGUMENT**

## I.    DEFENDANTS' ATTEMPT TO CHANGE THE RELEVANT PRODUCT MARKET FROM THE USE OF "CUSIP IDENTIFIERS" TO ACCESS TO "CGS DATA" FAILS

Plaintiffs will show through common evidence that CGS unlawfully maintains a monopoly over the CUSIP Identifier use market. Mot. at 31-36; Ex-86 (Elhauge Report) ¶¶31-91. Defendants' opposition brief is grounded in the fiction that the relevant product market is *access to CGS Data* when the market at issue is for the *use of CUSIP Identifiers*. Virtually all of Defendants' arguments are based on this fallacy.

### A.    A reasonable juror could believe Elhauge's product market definition

Using the well-accepted hypothetical monopolist test ("HMT"), Professor Elhauge opined that the relevant product market is the CUSIP Identifier use market or, alternatively, the US CUSIP use market. Ex-86 (Elhauge Report) ¶¶13, 31-67; *see Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) (endorsing HMT).

Defendants do not contest the admissibility of this opinion.[1] At the class certification stage, "'once a district court finds expert evidence to be admissible,' a district court can only deny class certification based on the persuasiveness of the expert evidence if 'no reasonable juror could have believed' the expert evidence." *City of Philadelphia v. Banc of Am. Sec. LLC*, 2025 WL 2180607, at *3 (2d Cir. Aug. 1, 2025) (cleaned up) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016)).

A reasonable juror could believe Elhauge because he used an accepted economic methodology—the HMT—which stands unchallenged. Defendants' expert, Dr. Stiroh, did not

---

[1] Defendants moved to exclude four of Elhauge's other opinions in their meritless Daubert motion.

conduct the HMT or any other analysis to define a different relevant product market. Ex-87 (Stiroh Dep.) 145:7-146:25. Stiroh's opinions are based on her assumption that class members license not only CUSIP Identifiers and standard security descriptions, but also "60 different fields" of "CGS Data." *Id.* at 104:13-113:8. Her assumption contradicts the plain language of the license agreements, as shown below, and her opinions derived from that false premise fail to establish that no reasonable juror could believe Elhauge's evidence.

### B. The plain language of the license agreements confirms class members license only CUSIP Identifiers and standard security descriptions

Defendants' arguments rely on the fallacy that class members license the full suite of "CGS Data," including 60+ data elements. Opp. at 1-2, 16-25. The unambiguous terms of the license agreements prove Defendants wrong.

The putative classes consist of firms who paid to license "the use of CUSIP Identifiers pursuant to a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement." Mot. at 21-22. The Subscription and Distribution Agreements each contain 20 items. Class members purchased the "CGS License," which is item 1.1 on the Services Attachment to the Subscription Agreement, Ex-17 (Subscription Agreement) at 068, and item A.i on the Order Schedule to the Distribution Agreement, Ex-16 (Distribution Agreement) at 084. Mot. at 9, 21-22. Class members do not pay for the other 19 items in Defendants' agreements.[2]

The CGS License grants the right to use "CUSIP, CINS and/or CGS ISIN identifiers and standard security descriptions." Ex-17 (Subscription Agreement) at 068 (§1.1); Ex-16 (Distribution Agreement) at 084 (§7.A.(i)); Mot. at 6. "Standard security descriptions" refers to

---

[2] Class members may receive free versions of the web-based CGS Portfolio Service or CGS Access.

the CUSIP "standard security description system," which consists of three data elements: "1. The CUSIP identifier …; 2. The issuer's name in a standard abbreviated form; 3. The description of the issue." Ex-88 (FRSI01129359) at 366.[3] Beyond the right to use these three elements, class members do not purchase anything from CGS.

The Subscription and Distribution Agreements define "CGS Data" more broadly than the CGS License: "CUSIP standard identifiers, CUSIP standard descriptions, CGS ISIN identifiers, CINS identifiers, and *other information about financial instruments*." Ex-17 (Subscription Agreement) at 095 (emphasis added); *see* Ex-16 (Distribution Agreement) at 073. It encompasses data elements not included in the CGS License, as denoted by the phrase "other information about financial instruments," which refers to "up to 60+ additional data attributes" that CGS compiles. *See* D.Ex-1 (Stiroh Report) ¶47.

Interpreting the CGS License, which is limited to "CUSIP, CINS and/or CGS ISIN identifiers and standard security descriptions," to also include 60+ data elements is untenable as it would render the phrase "other information about financial instruments" from the "CGS Data" definition surplusage. *See In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*, 2021 WL 4481215, at *15 (S.D.N.Y. Sept. 30, 2021) (Failla, J.). Defendants' brief does not analyze the language of the CGS License or explain why it purportedly includes 60+ data elements. Even if it did, differing "interpretations of a form contract" present a common question and "the classic case

---

[3] These standard security descriptions correspond to the ANSI X9 standard, which governs CUSIPs and defines what information is included with and in the identifier and what is necessary to uniquely identify a financial instrument. Ex-118 (ANSI X9.6-2020) §1, Annex B.4.1. The other 60+ data elements within CGS Data are extrinsic to this standard and not included in the CGS License.

for treatment as a class action." *Hanks v. Lincoln Life & Annuity Co. of New York*, 330 F.R.D. 374, 380 (S.D.N.Y. 2019) (quotations and citations omitted).

Defendants' business practices confirm this straightforward interpretation of the license agreements. CGS imposes fees on class members based on the number of CUSIP Identifiers used. Mot. at 10. CGS's invoices indicate that class members purchased a "CUSIP License to [number] Identifiers," without reference to other data elements. *E.g.*, Ex-67. ███████████████████ ████████████████████████████████████ Mot. at 15-16.

The limited scope of the CGS license is further confirmed by marketplace realities. Class members obtain data from TPDVs, not from CGS. TPDVs do not merely redistribute "CGS Data"; they have many sources for the data they sell. For example, ███████, the largest TPDV selling data to ███ of class members (D.Ex-1 (Stiroh Report) nn.389, 455) ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

*Id*. 131:21-132:8; D.Ex-1 (Stiroh Report) ¶87. ████████████████████

████████████████████████████████████

████████████ Mot. at 6-7.

### C.    Defendants falsely claim that Elhauge "abandoned" his theories

As a cornerstone to their opposition, Defendants claim that Elhauge "admitted" to misunderstanding the evidence; "disavowed" and "abandoned" his theories; and "conceded" that class members would continue paying CGS for the other 60+ data elements in the but-for world. Opp. at 2, 17-19, 22. He made no such concessions.

Defendants base these claims on the false premise that class members paid for the 60+ fields of CGS Data, which we disproved above. Elhauge testified that "an important part" of "why

all the class members suffer an anticompetitive overcharge" and "what their overcharge is" is that the CGS License, which Elhauge called the basic license, "just covers the CUSIP Identifiers," Ex-90 (Elhauge Dep.) 154:12-155:17; *see also id*. 160:6-161:23, and the issuer name and type of issue, *id*. 212:11-213:12. The testimony Defendants cite addressed whether CGS could charge for the other 60+ data elements included in CGS's "data products beyond the basic license," which class members do not purchase. *Id*. 154:12-155:17. Defendants cannot recast Elhauge's testimony about other data products as being about the CGS License or impose their misreading of the CGS License and class definition onto Elhauge's testimony.

For example, Defendants claim Elhauge "admitted" that CGS "could charge" *class members* for the other 60+ data elements in the but-for world. Opp. at 17-19 (citing D.Ex-7 at 130:10-18, 132:21-133:7, 220:6-11). Elhauge actually testified that CGS could charge for "data products that they're selling" if "those other data elements are valuable and they're packaged in a way by CGS that makes them attractive." Ex-90 (Elhauge Dep.) 130:2-18. Elhauge clarified that "class members are defined to exclude those who are purchasing those other data elements." *Id*. 133:10-17. All Elhauge acknowledged in these passages is the unremarkable proposition that, in the but-for world, CGS could market (to class members or anyone else) database products that contain the 60+ data elements and customers *might* be willing to buy them. Similar mischaracterizations are found in Defendants' other citations. *See, e.g.*, Opp. at 18-24 (citing D.Ex-7 at 123:13-124:4, 125:8-12; 130:10-131:6, and 145:16-19).

Defendants also incorrectly assert that Elhauge "abandoned his zero-price theory" and "speculated" that CGS would charge class members some lower but non-zero price for "CGS Data." Opp. at 22-24 (citing D.Ex-7 at 123:16-124:4, 125:8-12; 145:16-19). Elhauge's testimony was that the fees charged for products *other than* the CGS License would be lower in the but-for

6

world. Ex-90 (Elhauge Dep.) 145:10-146:1, 152:20-155:17. That is because in the but-for world those products would not be coupled with CGS's monopoly over CUSIP Identifiers, *id.* 138:13-140:7; 145:10-146:1, and because CGS would face competition. *Id.*; *see also id.* 123:13-124:4; 126:8-18, 130:2-133:17; 135:1-136:13; 198:11-199:24. But again, class members do not purchase those products.

## II.    COMMON EVIDENCE SHOWS ALL CLASS MEMBERS WERE INJURED

Defendants claim that in the but-for world, where CGS could not charge class members for the CGS License, CGS would raise the prices it charges TPDVs for "CGS Data," who would pass on the higher prices to class members. According to Defendants, those speculative pass-through costs should offset the license fees class members paid directly to CGS, requiring individualized determinations of injury. Opp. at 25-30. Courts have consistently rejected speculative offsets as defenses to antitrust injury, and Defendants' speculation is refuted by common evidence that CGS would lack market power to raise prices or control the use of CUSIP Identifiers in the but-for world.

Defendants cannot defeat predominance with "an offset argument rooted in rank speculation about the but-for world." *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *20 (S.D.N.Y. Mar. 28, 2014); *see also In re Buspirone Pat. Litig.*, 210 F.R.D. 43, 58-61 (S.D.N.Y. 2002) (rejecting argument that offsets based on "larger market forces" created individual issues of antitrust injury); *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 303 (D.D.C. 2007) (holding that antitrust injury "is considered complete when the direct purchaser pays an illegal overcharge" and rejecting "subtle variation[s]" of the pass-on argument that plaintiffs "otherwise benefit[ed]") (citations omitted). Defendants offer only speculation to establish whether CGS could have raised prices on TPDVs or the extent to which any price increase would be passed through.

7

Defendants' argument also suffers from a fundamental economic flaw: without the anticompetitive restrictions, CGS would lack the market power to control the use of CUSIP Identifiers or raise prices on TPDVs—indeed CGS would have to lower its prices, as Elhauge testified. Ex-90 (Elhauge Dep.) 126:8-129:9.

In the actual world, CGS has monopoly power over the use of CUSIP Identifiers. Ex-86 (Elhauge Report) ¶¶68-86. CGS bundles CUSIP Identifiers with other data elements and provides them to TPDVs in data feeds. CGS's prices for these data feeds are inflated due to its monopoly power over CUSIP Identifier use. Ex-90 (Elhauge Dep.) 145:10-146:1.[4]

In the but-for world, where CGS's anticompetitive restrictions are removed, CGS could not prevent other entities from building competing databases of CUSIP Identifiers or incorporating them into their products without contracting with CGS. *Id*. 126:8-129:9; Mot. at 18-20. ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

*See* Ex-89 ██████ ██████ 32:23-33:23, 68:21-70:7. ███ ███ ████ ██

████████████████████████████████████████ Mot. at 4-5, 18-19, 33-36. In the but-for world, TPDVs could obtain all CUSIP Identifiers directly from issuers or other sources and compete with CGS. *See id.*; Ex-86 (Elhauge Report) ¶¶76-79. This competition would deprive CGS of the market power to raise prices to TPDVs and would require CGS to lower its prices. *See* Ex-90 (Elhauge Dep.) 138:13-140:7; *see also id*. 152:11-153:16 ("There could still

---

[4] To the extent TPDVs have passed overcharges to class members, Plaintiffs do not seek damages for those overcharges.

be some pass-through of the lower charge. But to the extent there was, … the net effect is that the end users would pay less than they do in the actual world").

### III. THE COMPETITIVE PRICE OF CUSIP IDENTIFIERS IN THE BUT-FOR WORLD IS ZERO

Elhauge opined that in a competitive market, the price for CUSIP Identifier use would be zero. In such a market, CGS could not impose a license on or charge fees to class members for using CUSIP Identifiers received from TPDVs. In support of his opinion, Elhauge cites nine pieces of evidence including that (1) identifier use is free in more than 120 other countries and (2) CGS's marginal cost for allowing "downstream" use of CUSIP Identifiers is zero. Ex-86 (Elhauge Report) ¶¶76-79.

Defendants mischaracterize Plaintiffs' position to be that, in the but-for world, CGS would give away licenses to *CGS Data* for free, and class members would receive a free "data feed of up to 60-plus fields of data for up to millions of financial instruments." Opp. at 1, 17. That is a strawman. Plaintiffs will prove that, in the but-for world without anticompetitive restrictions, CUSIP Identifiers would be freely available, like financial identifiers are around the world. Given that, Elhauge's competitive yardsticks and analysis of marginal costs are appropriate.

#### A. Elhauge's competitive yardsticks are reasonable and supported by common evidence

Defendants claim Plaintiffs failed to establish that the competitive environment outside the US for structured databases is a valid yardstick. Opp. at 31-33. Defendants focus on the wrong product market. The proper yardstick for the CUSIP Identifier use market is not access to structured databases outside the US but the use of financial identifiers outside the US.

By international treaty, an NNA or SNA is designated for each jurisdiction to issue identifiers under the ISO 6166 standard. Ex-86 (Elhauge Report) ¶¶26-30. CGS is the NNA for the United States, and the NNA or SNA for certain other jurisdictions. *Id.* CUSIP Identifiers—

9

specifically, their ISIN derivatives—are functionally identical in purpose, format, and use to financial identifiers issued by NNAs around the world. *Id*. The markets for using ISIN identifiers offered by other NNAs are therefore an appropriate yardstick.

Defendants do not contest that *financial identifiers* are available for use around the globe without a fee or a license imposing restrictions. Nor could they, since they have admitted this numerous times. *E.g.*, Ex-91 (FRSI01451166) p.5 (Scott Preiss (CGS), John Burke (CGS), Geoff Dolan (S&P): ███████████████████████████████████████ ████████████████ Ex-92 (FRSI00943613) at 628 (Dowson Chan (CGS) "Non-CGS ISIN are free for use and have no licensing requirement"); *see also* Ex-93 (FRSI00590806) at 806 (Nick Kelly (CGS)); Ex-94 (FRSI00897242) at 245 (Ashley Wang (S&P)). Bergmann and Lenz confirmed this fact based on their industry experience. Ex-3 (Bergmann Report) p.24; Ex-10 (Lenz Report) ¶39, n.27. The European Commission found the same was true throughout the European Union. Ex-86 (Elhauge Report) ¶59 n.97.

Defendants seek to impeach the admission of CGS's head of licensing compliance, David Hunter, who informed ██████ "[T]he other NNAs have decided not to charge separately for the use of the ISINs, because they have substantial revenue streams via their primary roles," Ex-95 (FRSI00279013) at 023, arguing that Hunter had no personal knowledge. Opp. at 32 n.40. ████████ ██████████████████████████████████████████████████████████████ ██████Ex-96 (Hunter Dep.) 61:3-62:2. Hunter's statement to ██████ which Hunter had the duty and incentive to ensure was accurate, is a party admission. Fed. R. Evid. 801(d)(2)(D).

Defendants' evidence that WM Daten and ANNA charge for data feeds is irrelevant because (1) data feeds are not identifiers and (2) both only charge *direct subscribers* to those data feeds,

not *indirect* users that obtain identifiers from TPDVs like class members do. Opp. at 31-33; Ex-3 (Bergmann Report) p.24; Ex-10 (Lenz Report) ¶37.

### B.    Plaintiffs' zero marginal cost analysis is supported by common evidence

Defendants argue Elhauge's zero marginal cost analysis is economically irrational because CGS incurs costs providing "CGS Data" to its customers. Opp. at 33-36. This fails for multiple reasons.

First, the "CGS Data" strawman fails for the reasons set forth above. Class members only license the use of CUSIP Identifiers and standard security descriptions.

Second, Elhauge found that CGS incurs no marginal costs when class members *use* CUSIP Identifiers provided to them by TPDVs, not that CGS incurs no costs when creating databases or that CGS could not charge to directly license its databases. Ex-86 (Elhauge Report) ¶¶59, 76-77.

Third, the costs of creating and maintaining the database—the CUSIP Master File—are part of CGS's issuance business, not the licensing business. *See* Ex-97 (Flynn Dep.) 49:21-50:7; Ex-98 (FRSI01632489) at 494 (██████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████) Ex-86 (Elhauge Report) ¶84.

Fourth, Defendants fail to grapple with the import of Elhauge's Bloomberg example. *Id*. ¶77 & n.140. ████████████████████████████ ███████████████████ Opp. at 36. That supports Elhauge's analysis because it shows (as Hunter admitted to ████████ above) it is economically rational to allow free use of financial identifiers to grow interest in data products.

11

Finally, Defendants largely ignore other evidence cited by Elhauge, including low barriers to entry for competitors, that CGS charges nothing to certain users of CUSIP Identifiers, and that CGS does not charge for the use of CFI Identifiers. *See* Ex-86 (Elhauge Report) ¶¶76-78.

## IV.    THE RELEVANT MARKET AND MARKET POWER CAN BE PROVEN BY COMMON EVIDENCE

Defendants advance three meritless arguments against Elhauge's opinion that Defendants have market power in the CUSIP Identifier use market.

First, Defendants claim Elhauge's opinion is based on the "fiction" that class members only want CUSIP Identifiers and standard security descriptions from CGS. Opp. at 36. As shown in Section I.B above, that is nonfiction.

Second, Defendants contend that there are substitute identifiers for some purposes. Opp. at 37. That does not undermine Elhauge's opinion. Defendants do not dispute that CUSIP Identifiers are necessary to settle and clear trades through the DTCC and Euroclear. Ex-1 (Miller Report) ¶¶51-58; Ex-3 (Bergmann Report) p. 15; D.Ex-2 (Meyn Report) ¶¶77, 93. ████████████

████████████████████████████████████

████████████████    *See* Ex-86 (Elhauge Report) ¶54. There are also widespread regulatory mandates to use CUSIP Identifiers for reporting that apply to categories of CGS customers such as broker dealers, mutual funds, insurance companies, and fund administrators. *See* Ex-1 (Miller Report) ¶¶59-90 (listing regulations); Ex-2 (Powell Report) pp. 9, 12, 20, 31. For these purposes, there are no substitute financial identifiers.

Even for uses where CUSIP Identifiers are not mandated, network effects make them "functionally indispensable." Ex-86 (Elhauge Report) ¶¶48-55; Ex-2 (Powell Report) pp. 29-32. Defendants' experts did not analyze network effects. Ex-99 (Meyn Dep.) 170:2-22; Ex-87 (Stiroh Dep.)  178:7-17. ██████████████████████

████████████████████████████████ Ex-100 (SPGI-0000005742); Ex-2 (Powell Report) pp. 29-32.

Defendants have repeatedly admitted—indeed, boasted—that CUSIP Identifiers are indispensable. *See, e.g.*, Ex-101 (FRSI01676189) at 190 ███████████████████████ Ex-102 (FRSI00565700) p.12 (████████████████████████████████████ ████████████; Ex-103 (ABA Comment Letter) at n.5 ("No other financial instrument identifier compares to CUSIP and its closely related ISIN in coverage and utility"); *see also* Ex-104 ██████████ 30(b)(6)--█████████) 81:13-82:8 ████████████████████ ████████████). CGS touts CUSIP Identifiers as the "single interoperable common language" that uniquely identifies securities across platforms, Ex-105 (FRSI01130559) at 566, and facilitates "communication with external counterparties." Ex-106 (ABA-0000003175) at 180. Defendants' contrary litigation position is not credible.

Third, Defendants argue that CUSIP Identifiers are available for free from various sources. Opp. at 7-8. This argument goes to the merits and can be addressed with common evidence. For example, Defendants admit class members need CUSIPs in bulk downloadable form, not through manual look-up services. *See* Opp. at 9; D.Ex-2 (Meyn Report) ¶¶67, 142, 155. While firms can look at CUSIP Identifiers through display services, Defendants concede that, if firms download identifiers from a display service, then licensing fees apply. Opp. at 8. ████████████████████ ████████████████████████████████████████ Mot. at 19. And to the extent CUSIP Identifiers can be found online, when CGS learns that firms have downloaded purportedly free identifiers, it charges them. *See, e.g.*, Ex-107 (FRSI00003998) at 008 ███████ ████████████████████████████████████████████████

## V.    ELHAUGE'S DAMAGES MODELS DO NOT CREATE INDIVIDUAL ISSUES

### A.    Method 1 conforms to Plaintiffs' class definition and Defendants took ample discovery

Defendants argue that Elhauge's Method 1 for calculating damages is "invalid" because it uses a class definition different from the complaint by including Canadian CUSIPs, CGS ISINs, and CINS in the relevant product market. Opp. at 38. Defendants further claim they were prejudiced because they did not have a chance to take discovery, *id.*, despite the facts that they took substantial discovery and it was into their own products. Neither argument holds weight.

Further, and as a threshold matter, Elhauge's Method 1 applies equally to a product market for CUSIP Identifier use or US CUSIP use. Mot. at 38-39; Ex-86 (Elhauge Report) ¶¶112-117. Since Defendants' objections to Method 1 were limited to the inclusion of purportedly foreign identifiers, Elhauge has provided an unchallenged method of calculating damages for 100% of license fees.

#### 1.    The complaint did not exclude Canadian CUSIPs, CGS ISINs, and CINS

The Court is not bound by the class definition proposed in the complaint. *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 210-212 (S.D.N.Y. 2018). Even so, it is incorrect that Canadian CUSIPs, CGS ISINs, and CINS were excluded from the relevant product market in the Second Amended Complaint, which does not expressly refer to these identifiers but defined the relevant market as the market for using identifiers for U.S. financial instruments. ECF 87, ¶¶1, 126. Discovery revealed that these identifiers can and do identify financial instruments that are issued or trade in the United States. For example, CINS are issued to U.S. companies for certain Regulation S stock offerings, Ex-108 (FRSI01560513) p.16, and are needed for securities that trade in the U.S. Ex-1 (Miller Report) ¶¶43 nn.44, 47, 49. While Canadian CUSIPs identify instruments issued by Canadian firms, they are necessary to comply with U.S. regulations and to

14

identify instruments that also trade in the United States. *See id.* at ¶¶61(i), 61(ii); Ex-86 (Elhauge Report) ¶¶30, 43, 44. Defendants do not dispute that, if a CUSIP or CINS identifier is in the market, its derivative ISIN is also in the market. *Id.* ¶¶61-62. These facts contributed to Elhauge's opinion that all CUSIP Identifiers belong in the relevant product market. Ex-86 (Elhauge Report) ¶¶13, 31.

2.      Defendants took discovery into these identifiers

Defendants took extensive discovery into Canadian CUSIPs, CGS ISINs, and CINS throughout the fact discovery period from the named Plaintiffs, absent class members, and third parties. Exs. 109-113 (Rule 1006 summaries documenting examples of search terms[5], subpoenas, interrogatories, deposition testimony, and requests for admission).

As ordered by the Court, Plaintiffs disclosed to Defendants their operative class definition on April 25, 2025, three months before the close of fact discovery, which made clear that the relevant product market was for the use of CUSIP Identifiers. Ex-114 (4/25/2025 Arenson email).[6] Upon being asked, Plaintiffs expressly confirmed for Defendants 6.5 months prior to their opposition brief that "the present class definition incorporates the phrase 'CGS Identifiers' and includes persons who … could have used non-U.S. ISINs and CINs." *Id.* at (5/9/2025 Arenson email); *see also* Exs. 109-111 (RFAs 24, 31-34). Defendants proceeded to serve discovery on 20 absent class members about these identifiers. *See* ECF 201.

This record distinguishes *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 54 (S.D.N.Y. 2020), where plaintiffs sought to change their claims during class certification briefing; *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 158 (2d Cir. 2011), where plaintiffs sought an

---

[5] As reflected in the search terms, Defendants' assertion that Plaintiffs refused to search for and produce documents about these identifiers is wrong.

[6] That definition used the term "CGS Identifiers." We have since adopted the term CUSIP Identifiers, but the terms are synonymous.

untimely motion to amend; and *Mahmud v. Kaufmann*, 607 F. Supp. 2d 541, 555 (S.D.N.Y.), *aff'd*, 358 F. App'x 229 (2d Cir. 2009), where plaintiffs first raised the amended market definition as part of summary judgement briefing.

### B.    Method 2 does not create individual issues

Defendants argue that damages Method 2 contradicts Plaintiffs' representation that they are not seeking damages other than 100% of licensing fees. That is wrong. Plaintiffs seek damages of 100% of all licensing fees under Method 1. Method 2 seeks 100% of license fees attributable to US CUSIPs and their ISIN derivatives as an alternative if the trier of fact were to reject Method 1.

Defendants criticize Method 2 because Elhauge did not estimate the but-for price of a license without US CUSIPs based on the individual usage by each class member of US CUSIPs and their ISIN derivatives, versus other identifiers. Opp. at 39. But as Elhauge testified, the but-for market price of a license without US CUSIPs depends not on individual usage but on a market-wide determination of how economically valuable using the remaining identifiers is. Ex-90 (Elhauge Dep.) 286:24-288:15. Defendants are also wrong that Elhauge's method of estimating economic value is unreliable because it relies on data from non-class members. Such data provides a reasonable proxy because, as Defendants concede, TPDVs license CUSIP Identifiers to include in products they sell to class members. *See* Opp. at 21.

Defendants claim Elhauge "openly conceded" Method 2 fails to limit damages to US CUSIPs. Opp. at 39. He did not. In the cited testimony, Elhauge merely agreed Method 2 would attribute damages to class members who use CINS. Ex-90 (Elhauge Dep.) 288:16-20. That is unremarkable. All class members receive licenses to use CINS and all other CUSIP Identifiers. The premise of Method 2 is to isolate the share of license fees attributable to US CUSIPs and their ISIN derivatives from the share attributable to other identifiers.

16

Defendants admit their proposed damages methodology based on each licensee's usage would be impossible to calculate because CGS has bundled CUSIP Identifiers together under a single license. Opp at 39-40, n.45. As there is a "dearth of market information" about relative usage of identifiers due to Defendants' actions, "[p]laintiffs' burden of proving damages is, to an extent, lightened, for it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." *Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*, 2022 WL 2829880, at *24 (S.D.N.Y. June 30, 2022) (citations omitted), *report and recommendation adopted as modified sub nom. Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024) (Failla, J.).

Defendants cite *In re Processed Egg Prods. Antitrust Litig.*, but that case supports Plaintiffs because it certified a class on the basis that "the single average overcharge was shared by virtually every class member." 312 F.R.D. 171, 199 (E.D. Pa. 2015). Here, too, all class members were overcharged by the price of a US CUSIP-only license, which Elhauge has estimated. Defendants' other cases are inapposite. In *Aluminum Warehousing*, 336 F.R.D. at 62-63, when the average was disaggregated, over 50% of class members suffered no damages. Here, Defendants do not show that Elhauge's aggregation hid uninjured class members. Likewise, the court in *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490-97 (N.D. Cal. 2008), found the plaintiffs' expert failed to show common impact because he aggregated multiple product lines. Here, all class members paid for one product, a license that included US CUSIPs, so there is common impact.

17

## VI.    COMMON QUESTIONS PREDOMINATE CONCERNING THE STATUTE OF LIMITATIONS, STATE LAW CLAIMS, AND THE CLASS DEFINITION

### A.    The statute of limitations

Defendants advance two arguments as to why individualized issues predominate regarding the statute of limitations. Opp. at 41-42. Both fail.

First, Defendants point to ███████████████████████████████ ███████████████████████████████████████ ██████████████████████████ Opp. at 41 (citing D.Exs. 55-57). These arguments can be addressed on a common basis because CGS's standard language does not apply to Plaintiffs' Sherman Act claims. "If the parties to a contract intend for a provision to act as a bar to claims brought under federal law, they must specifically refer to such federal claims." *Van-Go Transp. Co. v. New York City Bd. of Educ.*, 53 F. Supp. 2d 278, 284 (E.D.N.Y. 1999); *accord Cayetano v. Fed. Express Corp.*, 2022 WL 2467735, at *11 n.6 (S.D.N.Y. July 6, 2022). Defendants' Exhibits 55-57 do not do so. Similar language was rejected for this reason in *Van-Go* and *Glenview Const., Inc. v. Bucci*, 165 F. Supp. 2d 545, 554 (S.D.N.Y. 2001).

Second, Defendants claim individualized inquiries are needed because the limitations period began to run when each class member entered its license agreement. Opp. at 41-42 (citing *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 67 (2d Cir. 2019)). That fails because the date when each contract was entered and the date when each contract was last amended are in CGS's Master Books of Business, which is common evidence Plaintiffs used to determine class membership. *See e.g.*, Ex-115 (FRSI01807326) (███████████████████ ████████████████████████████████████████

No class member's claims are untimely because ████████████████████ ████████ Ex-116 (FRSI00182687) at 688. That act was within the Clayton Act's four-year

18

limitations period and restarted any otherwise-lapsed statute of limitations because it was "a new and independent act that is not merely a reaffirmation of a previous act" and "inflict[ed] new and accumulating injury on the plaintiff." *US Airways*, 938 F.3d at 68-69; *see also Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 271 (E.D.N.Y. 2010) (holding price increase was new and independent overt act), *abrogated in part on other grounds by US Airways*.

Even if some individual inquiries were necessary, they would not predominate. Where, as here, "a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose certification." *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 303 (S.D.N.Y. 2003) (citation omitted). Nor will there be any need for a "complicated application of New York's borrowing statute" due to assignments of claims, as was the case in *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 1750595, at *17 (S.D.N.Y. Apr. 11, 2018).

## B. State law claims

Defendants raise the same objections to Plaintiffs' Connecticut and New York state law claims as they raised to Plaintiffs' Sherman Act claims. Opp. at 42. Those arguments fail for the same reasons expressed above.

Defendants claim the geographic nexus for Plaintiffs' New York state law claims is not satisfied. Opp. at 42-44. But whether Plaintiffs' evidence establishes that the relevant transactions occurred in New York is a common issue. *City of Philadelphia*, 2025 WL 2180607, at *3 ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be *answered*, on the merits, in favor of the class.") (citation omitted).

The transactions occurred in New York because, when CGS was owned by S&P, all contract-related correspondence was sent to "55 Water St, New York, NY." Mot. at 28; *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 123-24 (2d Cir. 2013). CGS's invoices from the same period

19

billed customers from New York, even if certain administrative aspects were handled elsewhere. Mot. at 43 (citing Ex-67). CGS continued to operate out of New York after being acquired by FactSet. Ex-119 (ABA-0000001469) at 469.

Defendants do not deny CGS routinely sent enforcement correspondence from New York. Mot. at 44. They argue they may not have sent every such letter from New York. That is insufficient. *See Aghaeepour v. N. Leasing Sys., Inc.*, 2015 WL 7758894, at *16 (S.D.N.Y. Dec. 1, 2015), *as corrected*, 2016 WL 828130 (S.D.N.Y. Feb. 25, 2016).

Plaintiffs' reliance on New York choice of law clauses in the license agreements is not a freestanding argument; it bolsters the other facts mentioned above and in Plaintiffs' opening brief. *See Polk v. Del Gatto, Inc.*, 2021 WL 3146291, at *10 (S.D.N.Y. July 23, 2021).

### C.     The class definition

Defendants argue that the proposed class includes certain of Defendants' subsidiaries and government entities. Those entities account for 2.9% of the class (110 out of 3794 class members), D.Ex-1 (Stiroh Report) ¶¶184-185; Ex-117 (Class Members List), a *de minimis* share. *See In re Restasis Antitrust Litig.*, 335 F.R.D. 1, 17-18 (E.D.N.Y. 2020). Stiroh's report shows there is a common method of identifying these firms and they can be excluded if required.

## VII.   THE INJUNCTIVE RELIEF CLASS MEETS RULE 23(B)(2)'S REQUIREMENTS

Defendants argue the injunction class should not be certified because Plaintiffs have failed to prove class-wide injury and an injunction would not make all class members better off. Opp. at 44. Here, Defendants repeat their arguments against certifying the damages classes, which should be rejected for the same reasons.

## CONCLUSION

Plaintiffs' motion for class certification and to appoint class counsel should be granted.

Dated: February 18, 2026                          Respectfully submitted,

/s/ *Ronald J. Aranoff*                            /s/ *Leiv Blad*
Ronald J. Aranoff                                  Leiv Blad
Ryan A. Kane                                       Jeffrey Blumenfeld
Joshua M. Slocum                                   Meg Slachetka
Lyndon M. Tretter                                  COMPETITION LAW PARTNERS PLLC
Grant J. Bercari                                   601 Pennsylvania Avenue NW
Reuben R. Bauer                                    Washington, DC  20004
Russell B. Filip                                   Telephone: (202) 742-4300
WOLLMUTH MAHER & DEUTSCH LLP                        Email: leiv@competitionlawpartners.com
500 Fifth Avenue, 12th Floor                       jeff@competitionlawpartners.com
New York, New York 10110                           meg@competitionlawpartners.com
Telephone: (212) 382-3300
raranoff@wmd-law.com                               /s/ *Robert N. Kaplan*
rkane@wmd-law.com                                  Robert N. Kaplan
jslocum@wmd-law.com                                Gregory K. Arenson
ltretter@wmd-law.com                               Elana Katcher
gbercari@wmd-law.com                               KAPLAN FOX & KILSHEIMER LLP
rbauer@wmd-law.com                                 800 Third Ave., 38th Floor New York,
rfilip@wmd-law.com                                 NY 10022
                                                   Telephone: (212) 687-1980
                                                   Email: rkaplan@kaplanfox.com
                                                   garenson@kaplanfox.com
                                                   ekatcher@kaplanfox.com

## WORD COUNT CERTIFICATION

Pursuant to Rule 4(B) of the Court's Individual Rules of Practice in Civil Cases, and the parties' Joint Stipulation and Order Regarding the Extension of Word Limits for Class Certification Briefing so ordered by the Court ("Joint Stipulation") (ECF 212), Plaintiffs certify that this computer-generated memorandum of law was prepared using Microsoft Windows and Microsoft Word. The total number of words in this memorandum, exclusive of the caption, table of contents, table of authorities, glossary, the signature block, and this certificate of compliance is 5996, which is in accordance with the maximum 6,000 words as permitted under the Joint Stipulation.

By: _____

Grant J. Bercari

22

## CERTIFICATE OF SERVICE

I certify that on February 18, 2026, I caused a true and correct copy of the foregoing to be served on all parties through their counsel of record via the Court's CM/ECF system and via email to each counsel of record's known email address.

By: _____

Grant J. Bercari

23