UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
DINOSAUR FINANCIAL GROUP LLC,    :
HILDENE CAPITAL MANAGEMENT,    :
LLC and SWISS LIFE INVESTMENT    :
MANAGEMENT HOLDING AG, on behalf :
of themselves and all others similarly    :
situated,    :
    :
                        Plaintiffs,    :        Case No. 1:22-cv-1860-KPF
    :
         -against-    :
    :
S&P GLOBAL, INC., AMERICAN    :
BANKERS ASSOCIATION, and FACTSET :
RESEARCH SYSTEMS INC.,    :
    :
                        Defendants.    :
------------------------------------------------------- X


**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY**
**<u>OF DR. LAUREN J. STIROH</u>**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ..........................................................................................................1

BACKGROUND .............................................................................................................1

LEGAL STANDARD .....................................................................................................5

ARGUMENT...................................................................................................................7

CONCLUSION................................................................................................................10

**TABLE OF AUTHORITIES**

**Cases**                                                                                           **Page(s)**

*A.V.E.L.A., Inc. v. Est. of Marilyn Monroe*,
    364 F Supp. 3d 291 (S.D.N.Y. 2019) ................................................................. 6

*Am. Bearings Co. v. Litton Indus., Inc.*,
    540 F. Supp. 1163 (E.D. Pa. 1982), *aff'd*, 729 F.2d 943 (3d Cir. 1984) ........................... 7

*Catalyst Advisors, LP v. Catalyst Advisors Invs. Glob. Inc.*,
    21 Civ. 4855 (KPF), 2024 WL 522751 (S.D.N.Y. Feb. 9, 2024) ..................................... 5

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ...............................................................................5, 6

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    Master File No. 06-MD-1175 (JG)(VVP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014),
    *report and recommendation adopted,*
    No. 06-MD-1775 (JG)(VVP), 2015 WL 5093503 (E.D.N.Y. July 10, 2015) ................... 6

*In re KIND LLC "Health & All Nat." Litig.*,
    627 F. Supp. 3d 269 (S.D.N.Y. 2022) ........................................................... 5

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
    801 F. Supp. 3d 330 (S.D.N.Y. 2025) ........................................................... 7

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ........................................................... 6

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
    589 F. Supp. 3d 302 (S.D.N.Y. 2022) ........................................................... 5

*N. Am. Soccer League LLC v. U.S. Soccer Fed'n, Inc.*,
    17-cv-5495 (BMC), 2024 WL 2959967 (E.D.N.Y. June 12, 2024)................................ 7

*Nimely v. City of N.Y.*,
    414 F.3d 381 (2d Cir. 2005).....................................................................5, 6

*Old Chief v. United States*,
    519 U.S. 172 (1997) .............................................................................. 6

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004) ........................................................... 6

*United States v. Downing*,
      753 F.2d 1224 (3d Cir. 1985) ......................................................................................... 5

*United States v. Williams*,
      506 F.3d 151 (2d Cir. 2007) .......................................................................................... 5

*United States v. Young*,
      745 F.2d 733 (2d Cir. 1984) .......................................................................................... 6

## Rules

Federal Rules of Evidence
      401 ................................................................................................................................. 5
      403 ..............................................................................................................................6, 7
      702 ...........................................................................................................................5, 6, 7

## Other Authorities

4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Fed. Evidence* § 702.03[1] (Joseph M.
      McLaughlin ed., 2d ed.1997) ..........................................................................................6

## INTRODUCTION

The testimony of defendants' economics expert, Dr. Lauren J. Stiroh, should be excluded because it does not fit the facts of this case and will confuse the trier of fact. The product at issue in this case is the use of CUSIP Identifiers (described below), which Dr. Stiroh calls CGS Identifiers, and the proposed class is users of CUSIP Identifiers. Much of Dr. Stiroh's analysis and testimony concerns entities with access to CGS Data (described below). As such, her testimony concerns the wrong product for a nonexistent class.

## BACKGROUND

A CUSIP is a "nine-character alphanumeric code that uniquely identifies certain financial instruments in the United States and Canada." Stiroh report,[1] p. 17 ¶ 29; Stiroh Tr.[2] 46:21-47:2. A CINS, which stands for CUSIP International Numbering System, is "a nine-character identifier developed by CGS for use in international markets[, which is] . . . the same as CUSIPs for the same financial instruments, except for the first character, which is replaced by a character representing the country of issue." Stiroh report p. 19 ¶ 34; Stiroh Tr. 49:19-50:9. An ISIN is "an identifier that can be used globally to uniquely identify financial instruments . . . assigned by National Numbering Agencies or Substitute Numbering Agencies in over 120 countries." Stiroh report p. 18 ¶ 32; Stiroh Tr. 47:3-18. A CGS ISIN is an ISIN issued by CGS as the National Numbering Agency or the Substitute Numbering Agency "for the United States, Canada, and a number of other countries in the Caribbean, Central America, and South America." Stiroh report pp. 18-19 ¶ 32; Stiroh Tr. 49:10-18.

---

[1] The Stiroh report is the Expert Report of Lauren J. Stiroh, Ph.D. dated November 26, 2025, attached as Exhibit 1 to the Declaration of Gregory K. Arenson in Support of Plaintiffs' Motion to Exclude Testimony of Dr. Lauren J. Stiroh dated February 18, 2026 ("Arenson Stiroh Declaration"), submitted on this motion.

[2] "Stiroh Tr." is the transcript of the January 8, 2026 deposition of Dr. Lauren J. Stiroh, excerpts of which are under Exhibit 2 to the Arenson Stiroh Declaration.

Dr. Stiroh "use[s] the term 'CGS Identifiers' to refer to CUSIPs, CINS, and CGS ISINs, collectively." Stiroh report p. 5 ¶ 10; Stiroh Tr. 51:9-25. Plaintiffs' economics expert, Professor Einer Elhauge, defines CUSIP Identifiers as "any CUSIP (US or Canadian) and any CUSIP International Number (CIN), as well as their corresponding CUSIP-derived International Securities Identification Numbers (ISINs) if any." Elhauge report[3] p. 8 ¶ 13. Dr. Stiroh's CGS Identifiers and Professor Elhauge's CUSIP Identifiers refer to the same set of financial identifiers.

According to Dr. Stiroh, CGS Data "refer[s] to the data contained in the CGS databases [which] . . . include[s] CGS Identifiers, and more than 60 fields of structured data associated with the CGS Identifiers." Stiroh report p. 5 ¶ 10; Stiroh Tr. 52:16-22; *see also* Stiroh report p. 27 ¶ 47. Dr. Stiroh testified that this definition is substantively the same as the definition of CGS Data in CGS's form Subscription Agreement (P-502[4] at FRSI00000095) and form Distribution Agreement (P-501[5] at FRSI00000073), which define CGS Data as "CUSIP standard identifiers, CUSIP standard descriptions, CGS ISIN identifiers, CINS identifiers, *and other information about financial instruments*." Stiroh Tr. 80:5-82:21 (emphasis added). "This 'additional information' consists of '[u]p to 60+ additional data attributes' relating to the financial instruments originating from CGS's databases." Stiroh report p. 27 ¶ 47.

---

[3] The Elhauge report is the corrected Expert Report of Einer Elhauge dated August 29, 2025, with Errata to Corrected August 29, 2025, Expert Report of Professor Einer Elhauge dated October 20, 2025, Exhibit 3 to the Arenson Stiroh Declaration.

[4] "P-502" is the CUSIP Global Services Subscription Agreement with CUSIP Global Services Services Attachment to the CUSIP Subscription Agreement and CUSIP Use of Service Statement, FRSI00000095 – 99, FRSI00000068 – 72, FRSI00000092 – 94, Exhibit 5 to the Arenson Stiroh Declaration.

[5] "P-501" is the CUSIP Global Services CUSIP Distribution Agreement with Order Schedule ___ and CUSIP Use of Service Statement, FRSI00000073 – 94, Exhibit 6 to the Arenson Stiroh Declaration.

Citing Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification and Appointment of Class Counsel, Dr. Stiroh acknowledged that plaintiffs seek to certify classes of "[a]ll persons or entities that paid [or currently are paying] a license fee to S&P or FactSet for the use of CUSIP Identifiers pursuant to a . . . Subscription Agreement or a . . . Distribution Agreement . . . and did not license a database product or database service from CGS . . . other than web-based products or services offered without further charge." Stiroh report, p. 2 n.3. Nonetheless, Dr. Stiroh based her opinions on her definition of the class:

> "In this matter, putative Class members are only comprised of entities that pay a CGS License fee *and receive access to CGS Data* via a bulk electronic download, data feed, or similar capability, delivered indirectly through Authorized Data Vendors and/or directly from CGS through CGS's web-based services [without paying an additional fee in addition to their licensing fee], and do not access CGS Data directly from CGS through other CGS Database Services."

Stiroh report p. 34 ¶ 59 & n. 209 (emphasis added); Stiroh Tr. 139:14-141:10. She admitted that she did not know whether what Professor Elhauge means by "the CUSIP identifier user class" is the same as she uses. Stiroh Tr. 56:18-24.

Both the Services Attachment to CGS's form Subscription Agreement in section 1.1 (P-502 at FRSI00000068) and the Order Schedule to CGS's form Distribution Agreement in section 7.A.(i) (P-501 at FRSI00000084) describe a CGS service or product called a CGS License as "CUSIP, CINS and/or CGS ISIN identifiers and standard security descriptions." Stiroh Tr. 101:2-103:4; 104:13-19. CGS defines standard security descriptions as: (1) the CUSIP identifier, (2) the issuer's name in standard abbreviated form, and (3) the description of the issue. FRSI01129360 – 78[6] at FRSI01129366; *compare* Elhauge Tr.[7] 212:15-213:12. Consistent with

---

[6] FRSI01129360 – 78 is Inside the CGS Identification System dated August 2010, Exhibit 7 to the Arenson Stiroh Declaration.

[7] "Elhauge Tr." is the transcript of the October 21, 2025 deposition of Professor Einer Elhauge, excerpts of which are under Exhibit 4 to the Arenson Stiroh Declaration.

plaintiffs' class definition, Professor Elhauge restricted class membership to entities that paid for this CGS License. Elhauge Report p. 64, ¶ 106; Elhauge Tr. 154:21-24. Nonetheless, despite the plain language of CGS's form agreements, Dr. Stiroh testified that "what is licensed is access to *CGS data* that includes a CUSIP, CIN or CGS ISIN identifier *and additional data*," and that the "additional data" are "up to 60 different fields." Stiroh Tr. 105:7-12, 109:6-10 (emphasis added); *see also id.* 123:20-124:9.

Professor Elhauge found "that there is a relevant product market for the use of CUSIP Identifiers." Elhauge report p. 8 ¶ 13. He based this finding on the hypothetical monopolist test of the U.S. merger guidelines, which here shows qualitatively that "there are no economically reasonable substitutes" given the "array of statutory, regulatory, and operational mandates that require . . . the use of CUSIPs or CINS" and quantitatively that "CGS was able to impose prices that were far more than 5% above competitive levels." Elhauge report pp. 9-10, 24 ¶¶ 13A.i., 13.A.ii., 32. Dr. Stiroh did not analyze a relevant product market or employ the hypothetical monopolist test. Stiroh Tr. 145:16-22, 146:22-25.

Instead, Dr. Stiroh's analysis is predicated on her view that:

> Putative Class members obtain *access to CGS Data* from one or more Authorized Data Vendors, with the data originating from CGS's databases. Putative Class members enter into agreements with and pay license fees to CGS *to receive CGS Data* in a bulk download, data feed, or similar capability from Authorized Data Vendors that package *CGS Data* with additional services.

Stiroh report p. 6 ¶ 13.i.a. (emphasis added). She claims that "Professor Elhauge has not evaluated the ways in which CGS licensees value and use *CGS Data*." *Id.* ¶ 13.iv. (emphasis added), *see also id.* ¶¶ 62-65, 67-72, 128-39. Dr. Stiroh opines that it would be economically irrational for there to be zero fees paid in the but-for world to access *CGS Data*. *Id.* ¶¶ 13.ii., 77-79, 103. She further opines that, in the but-for world, CGS would increase its charges to third-

4

party data vendors for *CGS Data*, who would then pass such increases to their subscribers. *Id.* ¶¶ 13.i.a.-c., 60, 81-85, 94-101. Dr. Stiroh asserts that for *CGS Data* "an economically rational pricing structure would reflect more than just marginal cost." *Id.* ¶ 13.iii.a.-b., *see also id.* ¶¶ 58 & n.207, 107-14; Stiroh Tr. 212:11-213:3, 215:17-216:3, 218:23-219:19. She also claims that Professor Elhauge offers no economic analysis to support the conclusion that the market and regulatory conditions and format for offering information comparable to *CGS Data* in the 120 countries of his yardstick analysis are comparable to the conditions in the U.S. financial services industry. Stiroh report ¶¶ 13.iii.b., 104, 115-26; Stiroh Tr. 224:6-13, 225:13-23, 230:19-231:23, 232:10-20, 233:18-234:10. Dr. Stiroh says that Professor Elhauge in his damages calculations relies on an arbitrary methodology that fails to account for variation in the use of *CGS Data* relating to non-U.S. financial instruments. Stiroh report ¶¶ 13.v.b., 171-82.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702." *Catalyst Advisors, LP v. Catalyst Advisors Invs. Glob. Inc.*, 21 Civ. 4855 (KPF), 2024 WL 522751, at *9 (S.D.N.Y. Feb. 9, 2024). "The Second Circuit has distilled Rule 702's requirements into three broad criteria: [i] qualifications; [ii] reliability; and [iii] relevance and assistance to the trier of fact." *Id.* (quoting *In re KIND LLC "Health & All Nat." Litig.*, 627 F. Supp. 3d 269, 282 (S.D.N.Y. 2022) (citing *Nimely v. City of N.Y.*, 414 F.3d 381, 396-97 (2d Cir. 2005)).

District courts have a "gatekeeping" duty under Federal Rule of Evidence 702 to ensure that proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The proponent of expert testimony bears the "burden of establishing by a preponderance of the evidence that the

5

admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

"Relevance can be expressed as a question of 'fit'—'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 329 (S.D.N.Y. 2022) (quoting *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). "This helpfulness requirement is 'akin to the relevance requirement of Rule 401, which is applicable to all proffered evidence[,] [but] . . . goes beyond mere relevance . . . because it also requires expert testimony to have a valid connection to the pertinent inquiry.'" *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (quoting 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Fed. Evidence* § 702.03[1] (Joseph M. McLaughlin ed., 2d ed.1997)).

Moreover, "[e]ven if admissible under Rule 702, expert testimony is still subject to exclusion under Rule 403." *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 226 n.5 (S.D.N.Y. 2004). Rule 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

> These dangers are particularly pronounced in the context of expert testimony, given the unique weight that the factfinder may place on such testimony. *See Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (quotation omitted); *Nimely* [*v. City of N.Y.*], 414 F.3d [381,] 397 [(2d Cir. 2005)]; *United States v. Young*, 745 F.2d 733, 766 (2d Cir. 1984).

*In re Air Cargo Shipping Servs. Antitrust Litig.*, Master File No. 06-MD-1175 (JG)(VVP), 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted,* No. 06-MD-1775 (JG)(VVP), 2015 WL 5093503 (E.D.N.Y. July 10, 2015). *Accord A.V.E.L.A., Inc. v. Est. of Marilyn Monroe*, 364 F. Supp. 3d 291, 325 (S.D.N.Y. 2019) (Failla, J.).

**ARGUMENT**

**I.      Dr. Stiroh's testimony does not fit the facts of this case and will confuse the trier of fact.**

Much of Dr. Stiroh's report and testimony concerns the wrong product: access to CGS Data, not use of, in her words, CGS Identifiers. It also concerns the wrong class: entities with access to CGS Data, not users (licensees) of CUSIP Identifiers. Accordingly, the bulk of her report (all but section VI.C.) and testimony should be excluded under Rule 702 as irrelevant, that is, not fitting the facts of this case, and under Rule 403 as confusing the issues for the trier of fact.

In *N. Am. Soccer League LLC v. U.S. Soccer Fed'n, Inc.*, 17-cv-5495 (BMC), 2024 WL 2959967, at *16, *18 (E.D.N.Y. June 12, 2024), the court excluded both sides' experts' testimony as concerning downstream markets that were not relevant to harm in the upstream markets at issue in the case. Similarly, in *Am. Bearings Co. v. Litton Indus., Inc.*, 540 F. Supp. 1163, 1171-72 (E.D. Pa. 1982), *aff'd*, 729 F.2d 943 (3d Cir. 1984), the court granted a judgment notwithstanding the verdict after excluding plaintiff's economist's testimony defining a relevant product market for thermal bearings but calculating the size of the relevant market and defendant's market share by including bearings outside the defined market. *See also In re Libor-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 384-85 (S.D.N.Y. 2025) (excluding expert's "analysis [that] generates conclusions about a conspiracy that . . . is not at issue in this

7

case"). These precedents support exclusion of Dr. Stiroh's testimony concerning a product and a class other than that at issue in this case.

**II.      Dr. Stiroh's opinions should be excluded because she has no economic basis for a market consisting of access to CGS Data.**

"[A] plaintiff claiming monopolization is obligated to establish the relevant market because the power to control price or exclude competition only makes sense with reference to a particular market." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006). The relevant product market is defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Professor Elhauge used the well-accepted hypothetical monopolist test to define the relevant product market as the market for CUSIP Identifier use, as well as a submarket for US CUSIP use. Elhauge report pp. 9-10, 24-31 ¶¶ 13A.i., 13.A.ii, 32-65; *see Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) (endorsing the hypothetical market test). In contrast, Dr. Stiroh neither analyzed a relevant product market nor employed the hypothetical monopolist test. Stiroh Tr. 145:16-22, 146:22-25.

Instead, Dr. Stiroh's opinions rest on the unsupported notion that the relevant product market is for access to CGS Data. *See* Stiroh report p. 34 ¶ 59 & n. 209 (emphasis added); Stiroh Tr. 139:14-141:10. Because Dr. Stiroh failed to attempt in an economically rigorous manner to define a relevant product market, her opinions should be excluded. *See Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009) (affirming exclusion of economic expert's opinion regarding a relevant product market for inadequately examining possible substitutes and improperly conducting a hypothetical monopolist test); *Ky. v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880, 890-92 (W.D. Ky. 2020) (excluding expert's testimony regarding a relevant geographic market for failing to employ a hypothetical

8

monopolist test or alternative method and to reflect the economic realities of the proposed market); *In re Live Concert Antitrust Litig.*, 863 F.Supp.2d 966, 983-997 (C.D. Cal. 2012) (excluding expert's opinion regarding a relevant product market for failing to define a relevant product market by improperly using his own subjective opinion or an unreliable methodology for interpreting and applying industry information to determine which performers were in the purported market, failing to conduct a proper hypothetical monopolist test or a thorough qualitative analysis of practical indicia, and failing to consider the cross-elasticity of supply).

Dr. Stiroh acknowledged that offering an opinion about the relevant product market was not within the scope of her expert retention. *See* Stiroh Tr. 145:19-22 ("For the purpose of this report and the assignment that I have been given, I have not identified an antitrust relevant product market."). She conceded that her discussion of access to CGS Data as the "relevant product at issue in this case" was only meant "colloquially" and was "not [her] definition of a relevant product for antitrust purposes." Stiroh Tr. 144:25-145:15. Unlike Professor Elhauge, Dr. Stiroh did not conduct an analysis of any of the qualitative or quantitative factors that the form the basis for the fact-intensive market definition inquiry. *Compare* Elhauge report pp. 9-10, 24 ¶¶ 13A.i., 13.A.ii., 32. Dr. Stiroh's opinions must be excluded because she "has no methodology for defining the relevant markets. [She] includes no math or economic modeling. [She] never analyzes potential competitors in any depth. All [she] does is make brief, conclusory assertions," *Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, 751 F. Supp. 3d 381, 390 (D. Del. 2024), that "the relevant product in this case is the licensing of access to data needed to both identify financial instruments and perform a host of business functions . . . [and] extend[s] beyond the identifier itself," Stiroh report p. 37 ¶ 62.

9

**CONCLUSION**

Dr. Stiroh's report and testimony based on CGS Data and entities with access to CGS

Data should be excluded under Federal Rules of Evidence 702 and 403.

Dated: February 18, 2026                              Respectfully submitted,

/s/ *Ronald J. Aranoff*                               */s/ Leiv Blad*
Ronald J. Aranoff                                     Leiv Blad
Ryan A. Kane                                          Jeffrey Blumenfeld *(pro hac vice)*
Joshua M. Slocum                                      Meg Slachetka
Lyndon M. Tretter                                     COMPETITION LAW PARTNERS PLLC
Grant J. Bercari                                      601 Pennsylvania Avenue NW
William Hagan                                         Washington, DC 20004
Reuben R. Bauer                                       Telephone: (202) 742-4300
WOLLMUTH MAHER & DEUTSCH LLP                          leiv@competitionlawpartners.com
500 Fifth Avenue, 12th Floor                          jeff@competitionlawpartners.com
New York, New York 10110                              meg@competitionlawpartners.com
Telephone: (212) 382-3300
raranoff@wmd-law.com                                  */s/ Robert N. Kaplan*
rkane@wmd-law.com                                     Robert N. Kaplan
jslocum@wmd-law.com                                   Gregory K. Arenson
ltretter@wmd-law.com                                  Elana Katcher
gbercari@wmd-law.com                                  KAPLAN FOX & KILSHEIMER LLP
whagan@wmd-law.com                                    800 Third Ave., 38th Floor
rbauer@wmd-law.com                                    New York, NY 10022
                                                      Telephone: (212) 687-1980
                                                      Email: rkaplan@kaplanfox.com
                                                      garenson@kaplanfox.com
                                                      ekatcher@kaplanfox.com

10

## <u>SIGNATURE CERTIFICATION</u>

Pursuant to Section 8.5(b) of the Electronic Case Filing Rules and Instructions of the

Southern District of New York, I certify that all other signatory parties have consented to the

filing of this document.

/s/ Robert N. Kaplan
Robert N. Kaplan

## WORD COUNT CERTIFICATION

Pursuant to Rule 4(B) of the Court's Individual Rules of Practice in Civil Cases, plaintiffs certify that this computer-generated reply memorandum of law was prepared using Microsoft Windows and Microsoft Word. The total number of words in this memorandum, exclusive of the caption, table of contents, table of authorities, the signature block, signature certification, this word count certification, and certificate of service is 3,019, which is in accordance with the maximum 8,750 words as permitted under Local Civil Rule 7.1.

/s/ Gregory K. Arenson
Gregory K. Arenson

2

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served on all parties through

their counsel of record via the Court's CM/ECF system, on February 18, 2026.

/s/ Gregory K. Arenson
Gregory K. Arenson

3