**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------- X
                                                 :
DINOSAUR FINANCIAL GROUP              :
LLC,                                             :
HILDENE CAPITAL MANAGEMENT,    :
LLC AND SWSS LIFE INVESTMENT      :
MANAGEMENT HOLDING AG, on          :
behalf of themselves and all other           :    Case No.: 1:22-cv-1860-KPF
similarly situated,                                :
                                                 :
           Plaintiffs,                           :    ORAL ARGUMENT REQUESTED
                                                 :
           -v-                                   :
                                                 :
S&P GOLBAL, INCL, AMERICAN         :
BANKERS ASSOCIATION, and             :
FATSET RESEARCH SYSTEMS INC.      :
                                                 :
           Defendants.                           :
                                                 :
------------------------------------------------- X

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO**
**EXCLUDE TESTIMONY OF DR. LAUREN J. STIROH**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ......................................................................................................... 3

I.    Product At-Issue ........................................................................................ 3

II.   License Fees as Alleged Damages ............................................................ 5

III.  Relevant Market and Market Share ........................................................ 6

IV.  Common Impact ........................................................................................ 8

     A.    Pass Through ............................................................................... 8

     B.    A Zero Price for CGS Data ........................................................11

V.    Damages ....................................................................................................13

LEGAL STANDARD ................................................................................................14

ARGUMENT .............................................................................................................15

I.    Dr. Stiroh's Opinions are Relevant and Reliable
Because They Focus on the Correct Product-At-Issue. ..............................15

II.   Dr. Stiroh Need Not Define the Relevant Market to Provide Admissible Expert
Opinions at the Class Certification Stage. .................................................22

III.  Dr. Stiroh's Rebuttal Opinions Exposing the Numerous Flaws in Prof. Elhauge's
Analyses are Relevant and Helpful. ..........................................................24

CONCLUSION .........................................................................................................26

## Table of Authorities

### Cases

*Am. Bearings Co. v. Litton Indus., Inc.*,
  540 F. Supp. 1163 (E.D. Pa. 1982) *affd*, 729 F.2d 943 (3d Cir. 1984) ............................... 21-22

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) .................................................................................................. 14

*Capri Sun GmbH v. Am. Beverage Corp.*,
  595 F. Supp. 3d 83 (S.D.N.Y. 2022) ...................................................................................... 14

*Caridad v. Metro-N. Commuter R.R.*,
  191 F.3d 283 (2d Cir. 1999) .................................................................................................. 23

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ............................................................................................... 24

*In re Digit. Music Antitrust Litig.*,
  321 F.R.D. 64 (S.D.N.Y. 2017) ............................................................................................. 25

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ................................................................ 14, 19, 23

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
  801 F. Supp. 3d 330 (S.D.N.Y. 2025) .................................................................................... 22

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................................. 23-24

*In re: Tether & Bitfinex Crypto Asset Litig.*,
  2026 WL 629826 (S.D.N.Y. Mar. 6, 2026) ............................................................................ 19

*Kentucky v. Marathon Petroleum Co. LP*,
  464 F. Supp. 3d 880 (W.D. Ky. 2020) ................................................................................... 23

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
  588 F.3d 908 (6th Cir. 2009) ................................................................................................ 23

*Luitpold Pharms., Inc. v. ED. Geistlich Sohne A.G. Fur Chemische Industrie*,
  2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015) ....................................................................... 24

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008) .................................................................................................. 22

*N. Am. Soccer League LLC v. U.S. Soccer Fed'n, Inc.*,
  2024 WL 2959967 (E.D.N.Y. June 12, 2024)........................................................21

*Nike, Inc. v. StockX LLC*,
  2024 WL 3361411 (S.D.N.Y. July 10, 2024).........................................................14

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)................................................................................................23

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*,
  751 F. Supp. 3d 381 (D. Del. 2024) ......................................................................24

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019).....................................................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...............................................................................................22

**Rules**

Federal Rule of Evidence 702..........................................................................................14

**INTRODUCTION**[1]

Dr. Lauren Stiroh, a respected economist who has produced expert reports and testified on behalf of defendants and plaintiffs in scores of antitrust cases, submitted a detailed and thorough report in this case exposing: (1) Plaintiffs' lack of a common method to prove impact or damages on the diverse members of the putative class, i.e., indirect Authorized Data Vendors and End Users of CGS Data; and (2) the implausibility of the "but-for world" posited by Plaintiffs' expert Prof. Einer Elhauge, which reinforces the conclusion that Plaintiffs cannot prove a common injury across the putative class.  Dr. Stiroh supported her economic opinions with copious references to the record, including documents produced and deposition testimony given by Plaintiffs, putative class members, Authorized Data Vendors, and Defendants.

Not surprisingly, Plaintiffs do not challenge Dr. Stiroh's qualifications or her methodologies.  Plaintiffs instead base their motion on a myth—that Dr. Stiroh's opinions should be excluded because they purportedly address the "wrong" product.  In so doing, Plaintiffs do not even attempt to explain which of Dr. Stiroh's opinions turn on her alleged reliance of the wrong product or how any of those opinions are rendered unreliable based on this wholly contrived issue.  Plaintiffs simply offer a conclusory statement that nearly all of Dr. Stiroh's opinions must be excluded on this basis.  For that reason alone, their motion should be denied.

But as Dr. Stiroh's report explains, Plaintiffs' argument has it exactly backwards, as they seek to certify a class that is predicated on a "basic license" that does not now exist and has never existed.  Dr. Stiroh addresses the actual product-at-issue: a license to access "CGS Data," consisting of CGS Identifiers and up to 60+ fields of data, in bulk download or datafeed format,

---

[1] All capitalized terms are as defined in the Glossary set forth in Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, Dkt. 320, or as otherwise defined therein.

1

which is precisely what CGS's licenses are and *what the named Plaintiffs themselves admittedly receive*.  Thus, Dr. Stiroh explains that Prof. Elhauge's conclusion on class-wide impact is flawed because, among other things, it is entirely focused on this nonexistent "basic license."

The record evidence and testimony cited by Dr. Stiroh prove that the actual "CGS License," upon which Plaintiffs assert liability and damages, provides access broadly to "CGS Data": the CGS Identifiers and up to 60+ fields of related descriptive data.  Plaintiffs' contrary argument hangs on an undefined term appearing just once in the CGS Subscription Agreement ("standard security descriptions"), which they contend limits the CGS License to just *three* of the available data elements: CGS Identifiers, issuer names, and issue descriptions.  Plaintiffs' jerry-rigged argument has no support in the record.  Plaintiffs themselves concede that they receive many more fields of CGS Data from their Authorized Data Vendors.  Those same Authorized Data Vendors obtain access to CGS's entire database and attested that their product offerings to Plaintiffs and other putative class members include, in some cases, all 60+ CGS Data fields, and in other instances, 20 or more fields of data from CGS.  Indeed, Plaintiffs ignore testimony from a key CGS executive—the *only* fact witness whom Plaintiffs asked what "CGS License" and "standard security descriptions" mean—who stated that the CGS License grants access to *all CGS Data*.  This testimony repudiates Plaintiffs' theory that the putative class members purchased a "basic license"—which does not exist.

Separately, Plaintiffs cannot exclude Dr. Stiroh's critiques of Plaintiffs' proffered relevant product market definition on the basis that she did not present an alternative at the class certification stage.  Plaintiffs bear the burden of proving a relevant product market, and they offer no authority to support the proposition that Dr. Stiroh must introduce an alternative market definition at any stage of the case, let alone at class certification.

Finally, Dr. Stiroh's rebuttal opinions criticizing the economic analyses of Prof. Elhauge and Plaintiffs' other experts are admissible.  A rebuttal expert need not put forth competing methodologies or new opinions—she can simply identify errors and question the logic and viability of another expert's analysis.  That is precisely what Dr. Stiroh has done, and her testimony will aid the trier of fact.

For these reasons, Plaintiffs' motion should be denied.

## BACKGROUND

Dr. Lauren Stiroh is a Senior Managing Director at National Economic Research Associates, specializing in the economics of antitrust, intellectual property, and commercial damages.  Dkt. 337-1 ("Stiroh Rep.") Ex. 1.  Dr. Stiroh has provided economic testimony and consulted in scores of antitrust and class action cases across a variety of industries.  *Id.* ¶¶ 1–3, Ex. 1.  Dr. Stiroh earned a PhD in economics from Harvard University.  *Id.* ¶ 3, Ex. 1. Defendants retained Dr. Stiroh as a rebuttal expert to assess the economic evidence in this case and "evaluate and comment on the opinions, methodologies, analyses, and calculations presented in the reports of Plaintiffs' experts" to determine whether a common methodology for class-wide impact and damages had been established.  *Id.* ¶ 4 (footnote omitted).

## I.    Product-At-Issue

Plaintiffs contend that the product-at-issue is defined by a creative interpretation of two unrelated documents that limit the "CGS License" in "Item 1.1 in the Services Attachment" to only the identifier, the issuer name, and issue description, which they contend "is synonymous with the 'basic license' referenced in the Prof. Elhauge deposition."  *See* Dkt. 352, Pls. Reply Glossary at iv.  Dr. Stiroh found no evidence to support Plaintiffs' characterization of the product-at-issue.  Her report describes what the product-at-issue is based on a meticulous review of undisputed record evidence showing that neither Prof. Elhauge's "basic license" nor Plaintiffs'

definition of "CGS License" describes what CGS licensed to the putative class members or what those putative class members actually receive.

In reviewing the information available regarding the CGS License, Dr. Stiroh confirms that the "product at issue in this case is the licensing of access to data that are needed to both identify financial instruments and perform a host of business functions related to those financial instruments, via a bulk electronic download, data feed, or similar capability." Stiroh Rep. ¶ 62 (citing Revenue line-item descriptions, ABA-0000028927–29 at '927 ("A license agreement with CGS is required when an end-user or 3rd party redistributor wishes to obtain access to an electronic download, datafeed or similar capability to retrieve CGS Data in bulk format . . .")).

Dr. Stiroh confirms that the CGS License grants a licensee access to all the CGS Data in a bulk download or datafeed format citing, among other things, the agreements through which a CGS License is provided. Stiroh Rep. ¶ 46 (citing CGS Services Attachment to the CUSIP Subscription Agreement, FRSI00000068 at -068, and Order Schedule of the CUSIP Distribution Agreements, FRSI00000083 at -084). She also reviewed statements on the CGS public-facing website—accessible to licensees and anyone interested in obtaining a CGS License—that explain what a CGS License includes and how fees are calculated. *Id.* ¶¶ 47–48 (quoting "License Fees," *CGS Website*, available at https://www.cusip.com/services/license-fees.html and "CGS License Structure for End User Customers," *CGS Website*, available at https://www.cusip.com/services/license-fees.html#/licenseStructure) (explaining that CGS License fees are "applicable to end user customers who receive the benefits of CGS Data," which CGS defines as "CUSIP, CINS, CGS ISIN Identifiers, and any other identifiers issued by CGS . . . plus additional information about financial instruments originating from CGS's

4

databases"; the "additional information" consisting of "[u]p to 60+ additional data attributes" related to the financial instruments in CGS's databases)).

## II.    License Fees as Alleged Damages

To understand the CGS License fees, i.e., the *sole source* of Plaintiffs' alleged damages, Dr. Stiroh reviewed CGS executive deposition testimony and statements on the CGS public-facing website that explain CGS based licensing fees on (a) the amount of CGS Data accessed by download or datafeed as measured per unique CGS Identifiers, (b) the number of the licensee's business lines using the CGS Data, and (c) the number of geographic regions that used the CGS Data.  Stiroh Rep. ¶ 48 (citing Hunter Dep. 24:22–26:6; Nagle Dep. 162:24–163:22; "CGS License Structure for End User Customers," *CGS Website*, available at https://www.cusip.com/services/license-fees.html#/licenseStructure).[2]  Lastly, Dr. Stiroh relied on explanations on public-facing CGS webpages and CGS agreements of the various ways End Users can access and use CGS Data without paying any license fee.  Stiroh Rep. ¶ 49 (citing "Are all end user customers of CGS Data required to obtain a CGS License?" *CGS Website*, available at https://www.cusip.com/services/licensefees.html#/CGSLicensingPoliciesFAQs; Amendment No. 3 To CUSIP Electronic Distribution Agreement, January 1, 2012, BBG_0000000929 at -952; and Order Schedule to the CUSIP Distribution Agreement, FRSI00000083 at -087).  Dr. Stiroh's characterization of the product-at-issue, that is, the product that is licensed by CGS to putative class members, is supported in the factual record through the

---

[2] The cited testimony clarifies that the number of "CGS Identifiers" refers to the CGS Data that an End User accesses through the CGS License, as the CGS Identifiers are connected to the related descriptive data.

testimony of CGS employees, Authorized Data Vendors, and putative class members.  *See, e.g.*, Stiroh Rep. ¶¶ 20, 46–48, 137, 18, and Fig. 2.2; *see also* Ex-1[3] (Stiroh Dep.) 111:20–112:13.

After confirming what the product-at-issue is, which is the source of Plaintiffs' alleged damages and the product that is licensed by CGS to putative class members, the bulk of Dr. Stiroh's report evaluates and rebuts Prof. Elhauge's analyses and opinions.[4]

### III.    Relevant Market and Market Share

Dr. Stiroh rejects Prof. Elhauge's assertion that there is a relevant product market for the "use of the CUSIP Identifiers, which includes any CUSIP (US or Canadian) and any CUSIP International Number (CIN), as well as their corresponding CUSIP-derived International Securities Identification Numbers (ISINs)."  Dkt. 337-3 "Elhauge Rep." ¶ 13; *see* Stiroh Rep. ¶¶ 13.iv, 62.  Dr. Stiroh explains that Prof. Elhauge's "CUSIP Use Market" makes no economic sense and is unsupported because, among other things, it is predicated on an incorrect assumption that putative Class members only use CGS Identifiers rather than a broader range of CGS Data they access through their license. *See* Stiroh Rep. ¶¶ 62–63.

Moreover, Dr. Stiroh opines that Prof. Elhauge's opinions on class-wide harm fundamentally lack any analytical basis from the record.  Although Prof. Elhauge claims that alleged harm is linked to the mere "use" of CGS Identifiers, he failed to evaluate how the highly differentiated members of the putative class actually use CGS Identifiers and CGS Data, including whether putative class members access, need, and use additional CGS Data elements to identify financial instruments and fulfill the many other business purposes for which CGS

---

[3] Citations to exhibit numbers are to the exhibits attached to the Declaration of James J. Kovacs accompanying this Opposition.

[4] Throughout the report, Dr. Stiroh also evaluates the opinions of Plaintiffs' other proffered experts, including Katerina Gaebel, Arthur Miller, Frank Lenz, Bettina Bergmann, and James Powell.  *See, e.g.*, Stiroh Rep. ¶ 8.

licensees use CGS Data. Stiroh Rep. ¶¶ 65–70. In forming these opinions, Dr. Stiroh relied, in part, on an interview with Defendants' industry expert, Cynthia Meyn. Ms. Meyn, whose opinions Plaintiffs do not challenge, explained that the use of CGS Identifiers often requires more structured CGS Data beyond just "the name of the issuer and nature of the financial instrument." Stiroh Rep. ¶ 68 & n.220. Ms. Meyn further opined that putative class members often need access to more structured CGS Data than just the CGS Identifiers to identify the security in question. Stiroh Rep. ¶ 38 n.123; Ex-2 (Meyn Report) ¶ 10 ("Virtually all businesses within the financial services industry need detailed data beyond the financial identifier and basic fields, such as the issuer name and type of issue, to identify financial securities with certainty and to perform necessary functions in the lifecycle."). Thus, Dr. Stiroh notes that the putative class, including both End Users and indirect Authorized Data Vendors that redistribute CGS Data, consists of a diverse set of financial entities with varying use cases that require more than just the basic data that Prof. Elhauge contends is all they need. Stiroh Rep. ¶¶ 13.iv, 68–69.

Dr. Stiroh also determines that Prof. Elhauge failed to support his contention that CGS has a 100% or near-100% share of the purported relevant market. Elhauge Rep. ¶ 59; *see* Stiroh Rep. ¶¶ 13.iv, 61–62. Dr. Stiroh finds that Prof. Elhauge's contention cannot be correct because, among other things, his relevant market fails to account for (1) the widespread public availability of CGS Identifiers, (2) unlicensed Level 2 usage,[5] and (3) the availability of various substitute identifiers, depending on the use case. Stiroh Rep. ¶¶ 69, 72.

---

[5] ███████████████████████████████████████████████████████████ Stiroh Rep. ¶ 49. All three named Plaintiffs utilize a Level 2 service, meaning they can and do receive CGS Data (which includes the CGS Identifiers) without the need for a CGS License. *See id.* ¶ 59 n.210.

## IV.    Common Impact

Dr. Stiroh directly addresses and analyzes whether fact of injury can be proven in common over the *exact* putative Class asserted by Prof. Elhauge.  *See generally* Stiroh Rep.; *id.* ¶ 10 ("I use the term 'putative Class' to refer to the 'Antitrust Damages Class' that Prof. Elhauge defines in his report.").  Prof. Elhauge posits that every putative class member was injured by the alleged anticompetitive conduct because, in his but-for world where indirect licensing does not exist, the price for the use of CUSIP Identifiers would have been zero.  Elhauge Rep. ¶ 19.C; *see* Stiroh Rep. ¶ 13.ii–iii.  Dr. Stiroh's analysis shows why Prof. Elhauge's zero-price theory is unworkable.

### A.    Pass-Through

As Dr. Stiroh explains, Prof. Elhauge's analysis "does not consider how other prices and services likely would have been altered in response to this significant change in economic circumstances."  Stiroh Rep. ¶¶ 82–83; *see also id.* ¶ 13.i.  According to Dr. Stiroh, in Plaintiffs' but-for world, "it would have been economically rational for CGS to develop a different direct pricing model where it did not charge fees for indirect access to CGS Data and sought to replace those fees by charging more to entities that access CGS Data directly from CGS."  *Id.* ¶¶ 83, 97.

Dr. Stiroh reached this conclusion by applying her unchallenged expertise to the record evidence and sound economic theory.  ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████.  *Id.* ¶ 84.  Dr. Stiroh reasoned that, in a but-for world where CGS could not enforce a license to indirect users for the additional right to access CGS Data by download or datafeed, it would be economically rational for CGS to raise prices to Authorized Data Vendors, who likely would pass on that increased or adjusted charge to end users.  *Id.* ¶ 85.

████████████████████████████████████████████████████████████

8

██████████████████████████████████████████████████████████████ .

*Id.* ¶ 84.  It would be irrational for CGS not to seek to replace revenue it would no longer receive.  Dr. Stiroh further concluded that the Authorized Data Vendors would have passed through at least a portion of those increased charges to putative class members.  *Id.* ¶ 85.  Plaintiffs do not challenge CGS's direct licenses to Authorized Data Vendors, or its ability to charge license fees to such vendors.

While Prof. Elhauge's report did not contemplate what alternative pricing actions CGS would undertake in the but-for world or how Authorized Data Vendors would respond, he acknowledged that this pass-through was a possibility in his but-for world.  Ex-3 (Elhauge Dep.) 153:5–16 ("Q.  And you don't disagree that if the charges were shifted to the distributors or the data vendors instead of the end users, that one possible outcome would be that the data vendors pass along that charge to the end users in their fees, correct?  A.  There could be some pass-through of the lower charge.") (objection to form omitted).  Given his admission that some pass-through may occur—meaning, End Users would ultimately pay some amount for the increased costs to their Authorized Data Vendors of their direct licenses—Prof. Elhauge's opinion that every class member would pay zero in the but-for world is unjustifiable.

Because Prof. Elhauge failed to consider the impact of pass-through costs, he also did not provide any methodology for assessing the amount of pass-through costs to the putative class members, and Dr. Stiroh pointed out the difficulty of doing so on any class-wide basis.  As Dr. Stiroh observed, "[t]he extent to which Authorized Data Vendors would have passed on these adjusted costs to their customers (which include putative class members) would have varied by Authorized Data Vendor, based on their respective business models and competitive conditions, and by the downstream users' elasticity of demand," raising individual issues among putative

9

class members.  Stiroh Rep. ¶ 85.  And without analyzing which putative class members would pay more in the but-for world due to such pass-through costs, Prof. Elhauge's theory is insufficient to prove class-wide injury.  Individual inquiries would be necessary to prove fact of injury.

To support this conclusion, Dr. Stiroh drew on economic literature to explain that pass-through "is an empirical question, which can vary widely from one entity to the next."  *Id.* ¶ 95 & nn.284–85. Dr. Stiroh also relied on record testimony from Authorized Data Vendors showing that "at least some of the additional costs to access CGS Data would have been passed through to their direct customers, some of which are members of the putative Class."  Ex-4 ███████████ ████████████ 92:5–93:20 ████████████████████████████████████ ████████████████████████████████████; Ex-5 █████████ ████████████████████████ 145:21–146:18 ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████; Stiroh Rep. ¶ 96 (citing ████████████████████████ 92:5–93:20 and █████████ ████████████████████ 145:21–146:18).

Thus, in Plaintiffs' but-for world, pass-through would have been a likely outcome, impacting putative class members depending on various considerations including which (and how many) Authorized Data Vendors they use to support their businesses.  Stiroh Rep. ¶¶ 97–99. In this regard, most putative class members get CGS Data from multiple Authorized Data Vendors, and so "could have ended up paying a data access fee multiple times."  *Id.* ¶¶ 90, 98 & App'x 1.  Another outcome is that putative class members could have chosen to purchase a different array of data products from Authorized Data Vendors, depending on how the but-for

world pricing structure impacted their preferred data products.  *Id.* ¶ 98.  Consequently, Dr. Stiroh concludes that, the extent of pass-through in the but-for world is "not ascertainable through information that is common to the Class."  *Id.* ¶ 99.  Because Prof. Elhauge failed to assess how fees paid by Authorized Data Vendors would change in the but-for world, "he has not and cannot establish that, all, or substantially all, putative Class members suffered adverse impact."  *Id.* ¶ 101.

### B.    A Zero Price for CGS Data

Additionally, Dr. Stiroh discredits Prof. Elhauge's "zero price" theory as not economically rational, because: (1) building an alleged identifier list involves costs that a rational business would attempt to recoup; (2) his 120 international comparators are not appropriate benchmarks; (3) direct Authorized Data Vendors would still need to access the CGS Identifiers and CGS Data directly from CGS; and (4) the "zero price" product that Prof. Elhauge alleges would be free in the but-for world is not sufficient for most putative class members, because they utilize CGS Data along with the CGS Identifiers.  Stiroh Rep. ¶¶ 13.ii-iii.a–b, 102–57.

According to Dr. Stiroh, Prof. Elhauge's concept of "free lists" of CGS Identifiers ignores the record testimony on the high costs and burdens actually incurred by entities that attempted to utilize public sources to create competing databases.  Ex-5 ███████████████



███████ 153:19–154:4 ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ ; Ex-6 (DuBois Dep. (Xignite (30(b)(6))) 173:19–176:10 (describing "years of effort to build a [historical] database," including "very expensive" development costs, "resource intensive" database maintenance, and "very resource intensive" data distribution)); Stiroh Rep. ¶ 109 (citing ████████████ ███████ 153:19–154:4 and ████████████ 173:19–176:10).  Given

the cost to create and maintain these data products, if "free lists" of CGS Identifiers "were redistributed at a zero price, the lists would be loss-making products, despite the marginal cost of redistributing them being close or equal to zero." Stiroh Rep. ¶ 110.[6]

Dr. Stiroh also refutes Prof. Elhauge's reliance on over 120 national numbering agencies ("NNAs") as purported "competitive yardsticks" for the but-for world. Dr. Stiroh emphasized that Prof. Elhauge "makes no attempt to explain why these international comparators involve markets that are appropriate yardsticks for the complex U.S. financial services industry." *Id.* ¶ 104. Instead, Prof. Elhauge relied on the opinions of attorney Ms. Bergmann to support his reliance on the 120 benchmark NNAs. *Id.* ¶ 116. Prof. Elhauge did not independently confirm the accuracy of Ms. Bergmann's opinions, which Ms. Bergmann admitted at deposition were not grounded in a study of the NNAs. *Id.* (citing Bergmann Dep. 184:6–18); *see also* Dkt. 322, Bergmann Daubert Mot. at 11–12. As Dr. Stiroh noted, Prof. Elhauge's benchmark NNAs do not provide access to structured financial identifier data in a comparable scope or format to the CGS Data that putative Class members rely on to conduct their business. *Id.* ¶¶ 123–25.

In addition, Dr. Stiroh concludes that Prof. Elhauge's reliance on NNAs in the European Economic Area is particularly inapposite because their prices "are not examples of arms-length market prices in markets purportedly free of the alleged restraints at issue because those zero-fee prices appear to be prescribed by the European Commission."[7] *Id.* ¶¶ 115, 126 n.357 (citing

---

[6] Prof. Elhauge's claim that Bloomberg's business supports his "free list" conception also ignores that Bloomberg provides a limited set of data to its FIGI users to sell it as a loss leader and motivate firms to purchase Bloomberg's other data products and services. *See* Stiroh Rep. ¶¶ 112–13.

[7] *See* Stiroh Rep. ¶ 126 ("Moreover, it is also important to note that multiple of the NNAs that are full members of ANNA are located in the European Economic Area, including Spain. In these countries, a zero price for ISIN identifiers appears to be prescribed by the European Commission, and therefore is not a competitive market price.").

12

"Commission Decision of 15.11.2011 relating to a proceeding under Article 102 of the Treaty on the Functioning of the European Union and Article 54 of the EEA Agreement (Case COMP/39.592 – Standard & Poor's)," *European Commission Website*, ¶ 29, available at https://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf).

Dr. Stiroh further opines that it would be economically rational to expect that most, if not all, Authorized Data Vendors would continue to directly license CGS Data, even in a but-for world with "free lists" of CGS Identifiers. Stiroh Rep. ¶ 135. The record demonstrates that CGS Data is considered timely, reliable, and accurate, and includes a breadth of data elements in structured formats that meets the business needs of putative class members that are the Authorized Data Vendors' customers. *Id.* ¶¶ 130, 135 (citing ███████████████████ ███████ 20:17–24, 140:11–141:4; ████████████████████ 203:7–204:3, 207:8–23; ██████████████████████ 64:9–23). And finally, Dr. Stiroh explains that Prof. Elhauge's "zero-price" but-for world would not be a market-driven outcome because putative class members require structured CGS Data for variable business purposes. Stiroh Rep. ¶¶ 136, 139; *see id.* ¶¶ 68 nn.220–21; *see also* Ex-2 (Meyn Report) Section IX (demonstrating that variable data fields are required for different types of financial services entities, working with different types of financial instruments, at different investment lifecycle stages).

## V.    Damages

Dr. Stiroh demonstrates that both of Prof. Elhauge's damages methodologies are flawed and unreliable, even under Plaintiffs' inaccurate description of the product at-issue. His "Method 1" included damages related to foreign-issued foreign instruments that fall outside of Plaintiffs' claims. Elhauge Rep. ¶ 19.F; *see* Stiroh Rep. ¶¶ 169–70. And his "Method 2" damages assessment, which attempted to exclude revenues attributable to such foreign-issued instruments, failed to assess which putative class members need access to CGS Data for foreign financial

13

instruments or how licenses for that data would be priced in the but-for world.  Elhauge Rep. ¶ 19.G; *see* Stiroh Rep. ¶¶ 171–76.  Dr. Stiroh also explains that "Method 2" damages failed to consider variation among the putative class members in their valuation of CGS Data associated with U.S. financial instruments compared to the CGS Data for foreign financial instruments. Stiroh Rep. ¶¶ 177–82.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  The district court functions as the "gatekeeper" to ensure that "(1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact."  *Nike, Inc. v. StockX LLC*, 2024 WL 3361411, at *2 (S.D.N.Y. July 10, 2024).  In that role, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  Importantly, "a rebuttal expert need not proffer a methodology or model, but *only critique* the opposing expert's."  *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 140 (S.D.N.Y. 2022) (emphasis added); *see also Nike, Inc.*, 2024 WL 3361411, at *8 ("This is particularly true on rebuttal, where an expert may merely criticize the opinions presented by the opposing party and need not develop any methodologies of his own.").  Exclusion of an expert under Rule 403 is particularly inappropriate at this stage, and even at trial is only "appropriate where the testimony clouds the issue for the jury, wastes time by diverting attention from the relevant evidence, or would induce the jury to decide the case on a purely emotional basis."  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *5 (S.D.N.Y. Jan. 30, 2025) (internal quotation marks omitted) (citation omitted).

**ARGUMENT**

Dr. Stiroh bases her opinions on sound economic methodologies and fully supported her opinions with citations to the factual record. Plaintiffs do not challenge Dr. Stiroh's qualifications or methodologies but move to exclude nearly all of her opinions as irrelevant and unreliable because they purportedly address the "wrong product" and, therefore, the "wrong class." *See* Dkt. 337, Stiroh Daubert Mot. at 3. Plaintiffs' blanketed approach fails to confront the substance of any of Stiroh's opinions, much less explain how those opinions depend on this purported dispute over the product-at-issue. Worse yet, Plaintiffs' arguments are wholly predicated on a product that does not exist, without any record support, whereas *all of* Dr. Stiroh's rebuttal opinions are supported by ample authority and citations to the factual record. Additionally, Dr. Stiroh, as a rebuttal expert, need not define a relevant antitrust market, and her rebuttal opinions are relevant and admissible as they cast serious doubt on Prof. Elhauge's various analyses.

**I.      Dr. Stiroh's Opinions are Relevant and Reliable Because They Focus on the Correct Product-At-Issue.**

Dr. Stiroh's opinions pass muster irrespective of any determination of what is the correct product. That said, Dr. Stiroh's opinions are based on the correct product-at-issue—the CGS License that grants access to all CGS Data—and the overwhelming record evidence supports that conception of the correct product. Plaintiffs' attempt to discredit Dr. Stiroh by pointing to a product that does not exist should be disregarded.

Given that Plaintiffs have chosen to base their entire theory of the case on a product that does not exist, it is worth noting that the starting place for any antitrust case is the product-at-issue—that is, the product that the defendant sells (or in this case, licenses) in the marketplace. *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64 (2d Cir. 2019) ("The relevant

15

market includes *the product or service at issue as well as its substitutes*.") (emphasis added). Plaintiffs seek to certify a "use class" and certain subclasses that "purchased the identical product called a CGS License," Dkt. 230, Pls.' Class Brief at 21–22.  Plaintiffs further seek to "calculate[] damages *as the full amount* of license fees paid by each Class member during the Class Period."  *Id.* at 38 (emphasis added).

To evaluate the product-at-issue, Dr. Stiroh analyzed the CGS License and determined the type and scope of data it covers.  Dr. Stiroh observes that CGS witnesses consistently testified that the CGS License provides access to all of the CGS Data.  *See, e.g.*, Stiroh Rep. ¶ 48 n.166 (citing Hunter Dep. 24:22–26:6 ("A.  . . . what we are licensing is the CGS data.  And what I would say when . . .  we talk about the identifiers, it's basically to understand more about what . . . is contained in the database.  But the identifie[r]s are connected to the related descriptive data. . . . The number of CGS identifiers was used to calculate the license fee based on what they use in the database."")).[8]

In addition, Dr. Stiroh relied on record evidence from putative class and non-class members that pay for a CGS License to access the broader structured CGS Data along with CGS Identifiers.  Ex-8 ██████████████████████ 72:7–73:2 ████████████████████ ████████████████████████████████████████████████████████ ██████████████ ; Stiroh Rep. ¶ 114 (citing ██████████████████ 72:7–73:2); Ex-9, ████████████████ Decl. ¶ 2 ██████████████████████████████████

---

[8] *See also, e.g.*, Ex-7 (Hunter Dep. (FactSet 30(b)(6)) 75:17–76:4 ("Q.  On the first one which is whether it's 7 (A) (i) or 1.1, the term is CGS license; do you see that? A.  Yes. Q.  And you're saying that's a product that one could get either directly from CGS or through a third-party data vendor? A.  That's the license for the customer to either receive the CGS data directly from CGS or the license for the customer to receive the CGS data through the licensed third-party vendor."); Stiroh Rep. Ex. 2 at 2–3 (listing reliance on Hunter Dep. (FactSet 30(b)(6))).

16

 ; Stiroh Rep. ¶ 138 (citing ███

███ Decl. ¶ 2); Ex-5 ████████████████ 80:4–81:25 ████

████████████████████ .[9]

Dr. Stiroh also notes that Plaintiffs *admitted* they received and use more than just the three data fields that they claim the CGS License is limited to. *See* Stiroh Rep. ¶ 20 (Figure 2.2). The record evidence demonstrates that Plaintiffs, in fact, require more than just these three data elements for various business use cases and thus need the additional data elements included in the CGS Data. Defendants' industry expert Cynthia Meyn explained why numerous data elements beyond the financial identifier, issuer name, and issue type are needed to perform a host of functions, including the reasons why such structured data "are necessary to identify the financial instrument reliably and accurately." Stiroh ¶ 38 n.123 (citing a discussion with Ms. Meyn); *see* Ex-1 (Stiroh Dep.) 32:3–43:10 (describing communications with Ms. Meyn and verifying that her references to Ms. Meyn's report are accurate).

Based on this evidence, Dr. Stiroh determined that the putative class members receive CGS Data (the CGS Identifiers along with up to 60+ data fields) through products and services offered by Authorized Data Vendors and/or through the CGS CUSIP Access product that also spans the entire CGS database, which is covered under the cost of the CGS License. *See* Stiroh Rep. ¶¶ 41, 45–48, 150, Fig. 2.4, Fig. 5.1 (over half of the putative class elects to take the CGS CUSIP Access product, which provides those entities with access to all CGS Data directly from CGS). Her opinion is consistent with the scope of the license that CGS grants to its Authorized

---

[9] Putative class members receive CGS Data indirectly from Authorized Data Vendors like ███ and ██████ Dr. Stiroh found that approximately 13 percent of the putative class members received CGS Data from ██████ and another 20 percent receive it from ███. *See* Stiroh Report ¶ 138 n.389.

Data Vendors, under which those Vendors pass scores of CGS Data fields on to the End Users and indirect Authorized Data Vendors that are included in Plaintiffs' definition of the putative class.[10]

In analyzing and rebutting Prof. Elhauge's opinions, Dr. Stiroh determined that Prof. Elhauge's misunderstanding of the product-at-issue was a glaring foundational problem. Specifically, Prof. Elhauge's opinions are entirely based on Plaintiffs' unsupported assertion that the CGS License is limited to three data fields—the CGS Identifier, the name of the issuer and the nature of the security—and, as he testified at his deposition, that defines his "basic license." Ex-3 (Elhauge Dep.) 154:17–155:7 ("A.  . . . So if they're just taking a basic license right now, then I wouldn't expect them to be paying for the other data fields from CGS in the but-for world. Q.  What did you mean when you said a 'basic license'?  A.  That's just the basic license which just covers the CUSIP identifiers.  Q.  Is that an important element of your opinion, that there's a basic license that covers just the CUSIP identifiers?  A.  *Yes, it's an important part of my opinion*

---

[10] There are over 300 Authorized Data Vendors, which include companies like ICE, Refinitiv/LSEG, and Bloomberg.  Stiroh ¶ 60, Fig. 2.7.  Bloomberg, like every other Authorized Data Vendor, licenses the entire CGS Database.  Ex-10 (Cole Dep. (Bloomberg (30(b)(6))) 27:20–25 ("Q.  But you license the entire file, correct?  A.  We do.  Q.  And you're paying for the entire file, correct?  A.  Correct.").  Nevertheless, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Dkt. 352 "Pls.' Reply Brief" at 5; Ex-10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 42:23–25.  Bloomberg's testimony stands as an outlier among the Authorized Data Vendors for a simple reason: Bloomberg offers FIGI, a financial identifier that competes with CGS Identifiers, and to compete with CGS, Bloomberg compiles the associated data along with the FIGI as part of its broad array of services.  Ex-11 (Meizanis Dep. (Bloomberg (30(b)(6))) 21:2–17, 66:12–20.  There is no support in the record that any putative class member selected Bloomberg due to its claimed limited reliance on CGS Data, and tellingly, Plaintiffs offer no such support.  In fact, all three Plaintiffs accessed CGS Data—including many data fields beyond the non-existent "Basic License"—from one or more Data Vendors other than Bloomberg." Stiroh Rep. ¶ 89, Figure 4.1 (listing FINRA, FactSet, SIX Financial Information, and U.S. Bank as Authorized Data Vendors).

with regard to why all the class members suffer an anticompetitive overcharge and to measure what their overcharge is.") (emphasis added). No such "basic license" exists, and Prof. Elhauge does not even use that term in his report. Nor does he cite the documents that Plaintiffs now utilize to prop up their non-existent "basic license" that underpins their case. *See generally* Elhauge Rep.

Plaintiffs' contention that Dr. Stiroh analyzed the "wrong" product rests on their contrived argument that the scope of the CGS License is limited by an undefined term— "standard security descriptions"—which appears exactly *once* in the Order of Services attachment to the CGS Subscription Agreement.[11] Dkt. 303 ("Pls. Motion") at 9. Relying on those three words,[12] Plaintiffs attempt to cabin the "CGS License" to just three fields: the CGS Identifier, the issuer name, and the name of the issue. Pls.' Reply Br. at 3–4. To conjure support for this proposition, Plaintiffs cite a single, unrelated document that uses "standard security descriptions" when explaining how the "CUSIP Descriptive System" prescribes the meaning of each digit of the CUSIP Identifier, and then lists hundreds of abbreviations and conventions that CGS uses to condense the name of an issuer and of the issued security into 120 characters or less. Ex-12, FRSI01129359 (cited in Pls.' Reply. Br. at 4).

---

[11] Plaintiffs' manufactured factual dispute (notwithstanding that there is *no dispute* in the record) cannot form the basis to exclude an expert under the Federal Rules of Evidence. *See In re Keurig*, 2025 WL 354671, at *9 ("[A]lthough an expert's opinion cannot be devoid of factual support, the opinion is not unreliable simply because another expert's opinion better accounts for the factual record because experts disagree on the proper interpretation of the record."); *In re: Tether & Bitfinex Crypto Asset Litig.*, 2026 WL 629826, at *11 (S.D.N.Y. Mar. 6, 2026) (Failla, J.) (explaining that "factual disputes [can be] misplaced in a *Daubert* motion."). On this basis alone, Plaintiffs' motion should be denied.

[12] Prof. Elhauge did not cite to or offer any interpretation of these three words in his report *or* at his deposition.

19

Plaintiffs are grasping at straws, drawing conclusions from different documents that have no direct connection to each other.  The term "standard security descriptions" is not defined anywhere in the CGS Subscription or Distribution Agreements.  The document that Plaintiffs' cite to conjure a definition of "standard security description" does not refer to the CGS Subscription or Distribution Agreements or include any definition of "CGS Data."  Nor do those Agreements cross-reference that document in any way.

Tellingly, Plaintiffs cite no deposition testimony in support of this new-found and wholly contrived argument.  To the contrary, the testimony on point refutes it.  When asked at his deposition *by Plaintiffs* to explain the "CGS License," Roger Fahy, the CGS Senior Vice President of Data Operations, confirmed that it includes all of the CGS Data:

> Q. What's your business understanding of what the CGS License product is?
>
> A. As it states here, its service consists of CUSIP CINS and/or CGS ISIN identifiers and standard security descriptions provided by either CGS directly or via an authorized data vendor.
>
> Q. So this is a service, as I think you just mentioned, CGS can provide directly or an authorized data vendor can provide a customer?
>
> A. Yes.
>
> Q. Is the CGS license the entire CGS database that you described to me or some part of it?
>
> A. We license all of our content.  It's all of it.
>
> Q. So if someone purchases CGS License they have access to the entire CGS database?
>
> A. Yes, they do.
>
> Q. And they can get that directly from CGS?
>
> A. Yes, they can.

> Q. They can get that from an authorized data vendor, in your view?
>
> A. If they so choose.

Ex-13 (Fahy Dep.) 162:18–163:24 (objection to form removed).

Plaintiffs' counter-factual argument also contradicts the plain language of both the Subscription and Distribution Agreements concerning the licensing of *CGS Data*.  Dkt. 304-5, CGS Subscription Agreement, FRSI00000095–099 at -095 (defining "CGS Data" as "CUSIP standard identifiers, CUSIP standard descriptions, CGS ISIN identifiers, CINS identifiers, and *other information about financial instruments* . . . which CGS regularly maintains and periodically enhances and further develops") (emphasis added); Dkt. 304-6, CUSIP Distribution Agreement, FRSI00000073 at -073 (defining "CGS Data" as "CUSIP standard identifiers, CUSIP standard descriptions, CGS ISINs, CINS identifiers, and *other information about financial instruments* . . . which CGS regularly maintains and periodically enhances and further develops") (emphasis added)); Stiroh Rep. n.16 (citing CUSIP Distribution Agreement, FRSI00000073 at -073).  On the face of these agreements, the "CGS License" includes the CGS Identifiers and up to 60+ additional data fields constituting the "other information about financial instruments."

As a rebuttal expert, Dr. Stiroh highlighted the fundamental flaws of Prof. Elhauge's opinions, including his underlying assumption that the CGS License only granted access to CGS Identifiers and not also the underlying CGS Data.  In providing this relevant rebuttal testimony, Dr. Stiroh offered a reliable analysis of the CGS License based on uncontroverted record evidence.  The cases Plaintiffs cite are thus wholly inapposite.  *See N. Am. Soccer League LLC v. U.S. Soccer Fed'n, Inc.*, 2024 WL 2959967, at *16, *18 (E.D.N.Y. June 12, 2024) (excluding analysis by both parties outside the "proposed relevant markets"); *In Am. Bearings Co. v. Litton*

*Indus., Inc.*, 540 F. Supp. 1163, 1171–72 (E.D. Pa. 1982), *aff'd*, 729 F.2d 943 (3d Cir. 1984) (expert based damages calculations on a product outside the relevant market); *In re Libor-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 384–85 (S.D.N.Y. 2025) (expert opinions excluded because they focused on a conspiracy not alleged by plaintiffs).  To the extent those cases have any bearing here, they support *excluding the opinions of Prof. Elhauge*, whose analyses claim damages based on a product that does not exist.

In sum, the undisputed record evidence shows that the product that Plaintiffs receive, and the product that CGS provides under its agreements, is the right to access and use the CGS Identifiers and up to 60+ CGS Data elements in a machine-readable format.  Accordingly, this Court can determine that Dr. Stiroh has analyzed the correct product-at-issue, and that the "product" contrived by Plaintiffs and Prof. Elhauge has no support in the record.  *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008) ("[C]ourts may resolve contested factual issues where necessary to decide on class certification, and when a claim cannot succeed as a matter of law, the Court should not certify a class on that issue.") (quotation omitted); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–52 (2011) (holding that courts at the class certification stage may consider merits questions, including fact issues, to the extent necessary to determine Rule 23 compliance).  On that ground alone, Plaintiffs' motion should be denied.

## II.      Dr. Stiroh Need Not Define the Relevant Market to Provide Admissible Expert Opinions at the Class Certification Stage.

In her rebuttal report, Dr. Stiroh addressed Prof. Elhauge's market definition opinions since Plaintiffs offer those opinions to support their motion for class certification.  In doing so, Dr. Stiroh determined that Plaintiffs' and Prof. Elhauge's purported relevant market suffers from several critical flaws, including, among other things, a failure to understand the diverse usage of

CGS Data by the putative class. *See supra* Background 6–7. Additionally, Prof. Elhauge fails to account for the public availability of CGS Identifiers, unlicensed and free Level 2 CGS Data access, and various available substitute financial identifiers. *See id.* As a result, Dr. Stiroh's rebuttal opinions demonstrate that Prof. Elhauge's "use" market fails to acknowledge these "commercial realities." *See Ohio v. Am. Express Co.*, 585 U.S. 529, 542–43 (2018) (holding that reliance on "formalistic distinctions rather than actual market realities" prevent "an accurate definition of the relevant market") (quotation omitted).

Plaintiffs now claim that these critiques must be excluded because Dr. Stiroh did not provide an affirmative counter-definition of the relevant market. *See* Stiroh Daubert at 8–9. Dr. Stiroh had no such obligation, and that is especially true at the class certification stage. *See Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999) ("[A] motion for class certification is not an occasion for examination of the merits of the case."). It is Plaintiffs who bear the burden of proving a plausible and coherent relevant market for their antitrust case. *Cf. In re Keurig*, 2025 WL 354671, at *9–11, 17, 51. Defendants have no such burden, and accordingly, Dr. Stiroh is not required to put forward a relevant market at *any* stage of the case, let alone at class certification. Plaintiffs cite no authority to support excluding a rebuttal expert at class certification solely because she did not provide an alternative relevant market definition. Rather, Plaintiffs rely on inapposite, non-binding summary judgment cases addressing merits expert opinions on the relevant market, and in which the plaintiffs or counter-plaintiffs ultimately fail on the merits. *See* Stiroh Daubert at 8–9 (citing *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009) (affirming exclusion of plaintiff's economic expert's relevant market definition at summary judgment); *Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880, 892 (W.D. Ky. 2020) (same); *In re Live Concert*

23

*Antitrust Litig.*, 863 F. Supp. 2d 966, 983, 986, 1000 (C.D. Cal. 2012) (same); and *Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, 751 F. Supp. 3d 381, 390 (D. Del. 2024) (excluding defendant's economic expert's product market definition at summary judgment for failure to conduct any analysis of potential competitors or perform any economic or mathematical modeling)).

Given that Plaintiffs have made their claimed market definition, which is based on a non-existent product, central to their motion for class certification, Dr. Stiroh's rebuttal opinions on this subject clearly will be helpful to the trier of fact and should be admitted as relevant and reliable.

### III.    Dr. Stiroh's Rebuttal Opinions Exposing the Numerous Flaws in Prof. Elhauge's Analyses are Relevant and Helpful.

As a rebuttal expert, Dr. Stiroh was asked "to evaluate and comment on the opinions, methodologies, analyses, and calculations presented in the reports of Plaintiffs' experts . . . ." Stiroh Rep. ¶ 4 (footnote omitted).  To offer these rebuttal opinions, Dr. Stiroh relied on her economic expertise and the record to expose significant faults in opinions offered by Plaintiffs' experts.  *See supra* Background at 4–13.  Disregarding Dr. Stiroh's role in this litigation, Plaintiffs seek to exclude *nearly all* of Dr. Stiroh's opinions on the basis that they are somehow irrelevant or will confuse issues for the jury.  Stiroh Daubert Mot. at 7 (seeking to exclude all opinions except Section VI.C).

Plaintiffs' arguments fundamentally misunderstand Dr. Stiroh's role as a rebuttal expert. "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another.  There is no requirement that a rebuttal expert [her]self offer a competing analysis." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020) (quoting *Luitpold Pharms., Inc. v. ED. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *12 (S.D.N.Y. Sept.

24

16, 2015)); *see also In re Digit. Music Antitrust Litig.*, 321 F.R.D. 64, 78 (S.D.N.Y. 2017) (holding that "rebuttal experts . . . have a less demanding task because they have no burden to produce models or methods of their own" and "contradictory expert testimony does not control admissibility [] [s]o long as the expert's testimony is reliable") (internal quotation marks and citations omitted).  That is precisely what Dr. Stiroh has done—identify and criticize various proffered opinions from Plaintiffs' experts, with a particular focus on Prof. Elhauge's economic shortcomings.  Further, Dr. Stiroh's opinions are valid rebuttal points even if there is a colorable dispute—which there is not—over the product-at-issue in this case.

For example, in addition to rebutting Prof. Elhauge's misconception of the product-at-issue, Dr. Stiroh criticizes Prof. Elhauge for failing to establish that any of the purported 120 benchmark NNAs (i) operate in countries that have a financial services industry remotely comparable to the extraordinarily complex U.S. financial services industry and (ii) offers a "product" that is comparable to the CGS License.[13]  *See supra* Background at 11–12; Stiroh Daubert Mot. at 5; Stiroh Rep. ¶¶ 115, 123–25.  These critiques are relevant and admissible regardless of what the "relevant product" is.

Dr. Stiroh also criticizes Prof. Elhauge's failure to consider pass-through, and its potentially detrimental impact on putative class members.  *See supra* Background 8–11; Stiroh Daubert Mot. at 4–5; Stiroh Rep. ¶ 94; *see also* Pls.' Reply Br. at 8 (acknowledging Prof. Elhauge failed to consider pass-through).  Many of the putative class members, including the named Plaintiffs, receive CGS Data through multiple Authorized Data Vendors.  *See* Stiroh ¶ 89,

---

[13] In addition to offering no analysis of whether the U.S. financial services market is remotely comparable to the markets in the 120 NNAs, Prof. Elhauge relies on Ms. Bergmann for this conclusion even though she testified that the U.S. market is "an entirely different thing" which caused her to avoid offering any conclusions about the U.S.  Ex-14 (Bergmann Dep.) 52:19–20.

Fig. 4.1, ¶ 91, Fig. 4.3. Given those market dynamics, many putative class members could have paid "data access fee[s] multiple times to the multiple data vendors" in Plaintiffs' but-for world, making them worse off. *See* Stiroh Rep. ¶ 98. Again, this critique is valid even if putative class members did obtain Prof. Elhauge's imaginary "basic license"—because even if there were a "basic license" that was free, Prof. Elhauge does not explain why CGS could not alter its pricing model and charge Authorized Data Vendors higher fees for direct access to the CGS Data. Those additional charges to the Authorized Data Vendor could be passed down to the putative class.

Finally, Dr. Stiroh observes that Prof. Elhauge failed to consider the costs of maintaining, operating, and continually updating a database of either his purported "basic license" or the actual license to access all the CGS Data. Stiroh Rep. ¶ 107; Stiroh Dep. Tr. 218:3–220:10 ("I have an opinion on even if its marginal costs were zero, it is not rational to charge that price, and I have an opinion that its costs are not zero. . . . [I]t is not economically rational to sell a product at a zero price regardless of the marginal cost.").

Because Dr. Stiroh's rebuttal opinions, developed through a rigorous review of the evidentiary record and application of sound economic principles, fit the facts and legal issues of this case, they are relevant under Rule 403 and admissible under Rule 702, as they will help the trier of fact.

## CONCLUSION

The Court should deny Plaintiffs' Motion to exclude Dr. Stiroh's testimony.

Dated: April 15, 2026

Respectfully submitted,

/s/ Eric J. Stock
Eric J. Stock
Jefferson E. Bell
Esther Lifshitz
GIBSON, DUNN &
CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel.: (212) 351-2301
Fax: (212) 716-0801
estock@gibsondunn.com
jbell@gibsondunn.com
elifshitz@gibsondunn.com

*Attorneys for Defendant
S&P Global Inc.*

/s/ Jeffrey I. Shinder
Jeffrey I. Shinder
Ellison A. Snider (*pro hac vice*)
SHINDER CANTOR LERNER LLP
14 Penn Plaza, 19th Floor
New York, NY 10122
Tel.: (646) 960-8601
jeffrey@scl-llp.com
esnider@scl-llp.com

James J. Kovacs (*pro hac vice*)
Keagan H. Potts (*pro hac vice*)
SHINDER CANTOR LERNER LLP
Tel.: (646) 960-8601
600 14th Street NW, 5th Floor
Washington, D.C. 20005
james@scl-llp.com
kpotts@scl-llp.com

W. Stephen Cannon (*pro hac vice*)
Seth D. Greenstein (*pro hac vice*)
Patrick Kennedy (*pro hac vice*)
CONSTANTINE CANNON LLP
Tel.: (202) 204-3500
1001 Pennsylvania Avenue NW,
Suite 1300N
Washington, D.C. 20004
scannon@constantinecannon.com
sgreenstein@constantinecannon.com
pkennedy@constantinecannon.com

Sarah Bayer
CONSTANTINE CANNON LLP
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 350-2700
sbayer@constantinecannon.com

*Attorneys for Defendant FactSet
Research Systems Inc.*

/s/ David C. Kiernan
JONES DAY
David C. Kiernan (*pro hac vice*)
Caroline N. Mitchell (*pro hac vice*)
Kapri Saunders (*pro hac vice*)
Paul Hines (*pro hac vice*)
555 California Street, 26th Floor
San Francisco, CA 94104
Tel.: (415) 626-3939
Fax: (415) 875-5700
dkiernan@jonesday.com
cnmithcell@jonesday.com
ksaunders@jonesday.com

Alexander V. Maugeri
Amanda L. Dollinger
250 Vesey Street
New York, NY 10281
Tel.: (212) 326-3939
Fax: (212) 755-7306
amaugeri@jonesday.com
adollinger@jonesday.com

*Attorneys for Defendant
American Bankers
Association*

27

28

## <u>SIGNATURE CERTIFICATION</u>

Pursuant to Section 8.5(b) of the Electronic Case Filing Rules and Instructions of the Southern District of New York, I certify that all other signatory parties have consented to the filing of this document.

*/s/ Eric J. Stock*

Eric J. Stock

## WORD COUNT CERTIFICATION

Pursuant to Rule 4(B) of the Court's Individual Rules of Practice in Civil Cases, Defendants certify that this computer-generated Memorandum of Law was prepared using Microsoft Windows and Microsoft Word. The total number of words in this Memorandum, exclusive of the caption, table of contents, table of authorities, the signature block, and this certificate of compliance is 8,385, which is in accordance with the maximum 8,750 words as permitted under Local Civil Rule 7.1.

/s/ Eric J. Stock

Eric J. Stock

29

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 15, 2026, I caused the foregoing to be served on all counsel of record via ECF.

*/s/ Eric J. Stock*

Eric J. Stock