UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

DINOSAUR FINANCIAL GROUP LLC,  :
HILDENE CAPITAL MANAGEMENT,  :
LLC and SWISS LIFE INVESTMENT  :
MANAGEMENT HOLDING AG, on behalf:
of themselves and all others similarly  :
situated,  :
  :
                Plaintiffs,  :      Case No. 1:22-cv-1860-KPF
  :
     -against-  :
  :
S&P GLOBAL, INC., AMERICAN  :
BANKERS ASSOCIATION, and FACTSET:
RESEARCH SYSTEMS INC.,  :
  :
           Defendants.  :
------------------------------------------------------- X

### REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DR. LAUREN J. STIROH

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................................i

TABLE OF AUTHORITIES........................................................................................................ ii

INTRODUCTION .........................................................................................................................1

ARGUMENT.................................................................................................................................2

I.      The product at issue on plaintiffs' motion for class certification is the use of
        CUSIP Identifiers, not access to CGS Data. ...................................................................2

        A.      The plain language of the agreements shows that the CGS License was for
                CUSIP Identifiers and standard security descriptions, not CGS Data. ..................3

        B.      Defendants' arguments cannot vary the terms of the CGS License. ......................5

        C.      Plaintiffs did not admit to receiving CGS Data. ....................................................7

        D.      That CGS Data is provided to TPDVs is irrelevant to the CGS License
                class members pay for. ...........................................................................................8

II.     Dr. Stiroh's opinions are based on her product: access to CGS Data. ...............................9

III.    Dr. Stiroh's opinions are not relevant to the class certification inquiry. .........................10

IV.     Dr. Stiroh failed to present a reliable methodology for defining her alternative
        product market. .................................................................................................................11

CONCLUSION............................................................................................................................12

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) ..........................................................................................12

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ................................................................................... 10, 11

*In re Generic Pharms. Pricing Antitrust Litig.,*
    MDL No. 2724, 16-md-2724, 2024 WL 4980784 (E.D. Pa. Dec. 3, 2024)................. 1, 11

*In re Libor-Based Fin. Instruments Antitrust Litig.,*
    801 F. Supp. 3d 330 (S.D.N.Y. 2025) .............................................................10

*In re Zyprexa Prods. Liab. Litig.,*
    489 F. Supp. 2d 230 (E.D.N.Y.2007).............................................................10

*McCarthy v. Am. Int'l Grp., Inc.,*
    283 F.3d 121 (2d Cir. 2002).........................................................................6

*Nypl v. JP Morgan Chase & Co.,*
    15 Civ. 9300 (LGS), 2022 WL 819771 (S.D.N.Y. Mar. 18, 2022) ...............................11

*Quadrant Structured Prods. Co. v. Vertin,*
    23 N.Y.3d 549 (2014)...................................................................................5

*Scott v. Chipotle Mexican Grill, Inc.,*
    315 F.R.D. 33 (S.D.N.Y. 2016) ................................................................ 10, 12

**Rules**

Federal Rule of Civil Procedure 23(b)(3) ................................................................10

Federal Rules of Evidence
    403.................................................................................................... 1, 10, 12
    702 ................................................................................................... 1, 10, 12

## INTRODUCTION

Dr. Lauren J. Stiroh's class-certification expert opinions suffer from two fatal flaws. First, they are irrelevant and a source of confusion to the class certification inquiry, in which the relevant issue is whether plaintiffs' product market can be proven by common evidence. Plaintiffs define the proposed class as users of CUSIP Identifiers based on the terms of CGS's Subscription and Distribution Agreements, which leads to a product market of the use of CUSIP Identifiers.

Defendants do not dispute that Dr. Stiroh's opinions are based on a different product market. Instead, in their opposition, defendants attempt to create a factual dispute over the definition of the relevant product, an inquiry the Court need not address at this stage of the case. But, Dr. Stiroh's opinions about the relevant product still do not fit the facts on the motion for class certification. Dr. Stiroh's product definition is not based on the relevant terms of the agreements, but instead on statements about those terms which are contradicted by defendants' proposed intellectual-property expert. Accordingly, Dr. Stiroh's opinions are irrelevant to class certification and confusing and should be excluded under Rules 702 and 403.

Second, Dr. Stiroh failed to employ any sound economic methodology to define her alternative product market. When a rebuttal expert seeks to discredit another expert's analysis, they "must still provide good grounds based in methods and principles of analytical evaluation to ground their opinions." *In re Generic Pharms. Pricing Antitrust Litig.*, MDL No. 2724, 16-md-2724, 2024 WL 4980784, at *14 (E.D. Pa. Dec. 3, 2024). Dr. Stiroh's failure to do so mandates excluding her opinions.

1

## ARGUMENT

### I. The product at issue on plaintiffs' motion for class certification is the use of CUSIP Identifiers, not access to CGS Data.

Plaintiffs' position that the CGS License consists of CUSIP, CINS and CGS ISIN identifiers and standard security descriptions is not "new-found and wholly contrived." *Compare* SOpp.[1] at 20. The limited nature of the CGS License was described in plaintiffs' class certification brief (ECF 216 under seal, ECF 230 redacted) at 6, 9. Plaintiffs defined the proposed classes as: "All persons or entities that paid a license fee to S&P or FactSet for the *use of CUSIP identifiers* pursuant to a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement . . . and did not license a database product or database service from CGS offered under such agreement, other than web-based products or services offered without further charge." *See* ECF 216 at 21-22; Professor Einer Elhauge's report (Exhibit 3[2]) ¶¶ 6-9 (emphasis added). Consistent with plaintiffs' definition of the class, Professor Elhauge opined that the product at issue is the "use of CUSIP Identifiers." *Id.* ¶ 13.

Dr. Stiroh re-wrote plaintiffs' class definition as firms that "pay a CGS License fee and *receive access to CGS Data*" and relied on it for her analyses. Stiroh report (Exhibit 1) ¶ 59 (emphasis added); Stiroh Tr. (Exhibit 2) 139:19-141:10. Therefore, Dr. Stiroh's opinions do not address plaintiffs' proposed class or the concomitant product plaintiffs were forced to license. Defendants' attempt to create a factual dispute and argue that the Court should deny class certification by finding that there is no support for plaintiffs' reading of the agreements (SOpp. at

---

[1] The "SOpp." is Defendants' Opposition to Plaintiffs' Motion to Exclude Testimony of Dr. Lauren J. Stiroh (ECF No. 363 under seal).

[2] Exhibits 1 through 7 were submitted with the opening declaration of Gregory K. Arenson on this motion (ECF 304-1 – 304-7 under seal; ECF 337-1 – 337-5 redacted). Exhibits 8 through 27 are being submitted concurrently with Mr. Arenson's reply declaration.

22) is substantively wrong, as explained below, and, at most, raises an issue that is common to the entire class and, therefore, not a ground to decline to certify the class.

A.    **The plain language of the agreements shows that the CGS License was for CUSIP Identifiers and standard security descriptions, not CGS Data.**

The "CGS License" for which class members paid "consists of CUSIP, CINS and/or CGS ISIN identifiers and standard security descriptions." Subscription Agreement Services Attachment § 1.1 (Exhibit 5 at FRSI00000068); Distribution Agreement Order Schedule § 7.A.(i) (Exhibit 6 at FRSI00000084); *see also* Stiroh Tr. (Exhibit 2) 101:8-103:8. CGS has defined "standard security descriptions" to mean "1. The CUSIP identifier …; 2. The issuer's name in a standard abbreviated form; [and] 3. The description of the issue." Inside the CGS Identification System (Exhibit 7) at FRSI01129366. Thus, proposed class members' licenses covered only this limited information, *not* the 60+ fields of CGS Data (Stiroh report ¶ 10).

Defendants' intellectual-property-rights expert, Professor Jorge Contreras, confirmed that the CGS License was not for the use of CUSIP databases or CGS Data generally. When asked whether the class members' license covered the entire database of CGS Data, Professor Contreras testified that the database was "not part of the operative license grant" under Subscription Agreement Services Attachment § 1.1 and the similar language under Distribution Agreement Order Schedule § 7.A.(i) because the only data class members received was "the CUSIP identifiers, the CINS identifiers and the CGS ISIN identifiers and the security descriptions." Contreras Tr. (Exhibit 9) 205:4-208:2.

Defendants argue there is no relationship between the phrase "standard security descriptions" in class members' agreements and the definition of "standard security descriptions" in the "Inside the CGS Identification System" documentation cited in plaintiffs' motion. *See* SOpp. at 19-20. This argument is baseless. An up-to-date version of "Inside the CGS

3

Identification System" is the first document listed on the Resource Center of CGS's current website and confirms plaintiffs' definition matches CGS's own. *Compare* https://www.cusip.com/resources.html#/cusipSystem (Inside the CUSIP System) with Exhibit 7. In an email to a new CGS board member, CGS's CEO Scott Preiss explained that this document was "full of useful information and insight into the development and structure of the CUSIP System." FRSI01173749 – 70 (Exhibit 24) at FRSI01173749, FRSI01173758. CGS's Head of Operations Gerard Faulkner provided the document to a customer to explain "the CUSIP standard naming convention and procedures." FRSI01450061 – 81 (Exhibit 26) at FRSI01450061, FRSI01450069. CGS's user manuals define standard security descriptions identically. *See* CUSIP_db Master File User Documentation (FRSI01417360 – 420 (Exhibit 25)) at FRSI01417402; CUSIP/CINS_db Master File file version 16 User Documentation (FRSI01498548 – 622 (Exhibit 27)) at FRSI0149607. While defendants try to disavow the definition of "standard security descriptions" repeated in CGS's documents, they tellingly fail to offer any alternative explanation for what the term means.

CGS Data is a defined term in the agreements. *See* Subscription Agreement first whereas clause at FRSI00000095; Distribution Agreement second whereas clause at FRSI00000073. It consists of: (1) CUSIP Identifiers, (2) CINS Identifiers, (3) CGS ISIN Identifiers, (4) standard security descriptions, and (5) *other information about financial instruments. Id.* (emphasis added).[3] *Id.* The product that class members bought expressly states that it covers the use of only the first four items, omitting "other information about financial instruments." Services Attachment § 1.1 at FRSI00000068; Order Schedule § 7.A.(i) at FRSI00000084. Where, as here,

---

[3] That the agreements define CGS Data does not mean that the product class members paid for includes all CGS Data. *Compare* SOpp. at 21.

a "sophisticated drafter omit[ted] a term, *expressio unius* precludes the court from implying it from the general language of the agreement." *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014) (emphasis in original).

Defendants and Dr. Stiroh assert that class members purchased "access to CGS Data," but they do not explain which specific words in the CGS License support that conclusion. *See* SOpp. at 4 (citing Stiroh report ¶ 46). Paragraph 46 acknowledges that plaintiffs have identified Services Attachment § 1.1 and Order Schedule § 7.A.(i) as the product at issue, and footnote 161 recites that the CGS License entails "CUSIP, CINS and/or CGS ISIN Identifiers and standard security descriptions." Stiroh report ¶ 46, n.161. However, footnote 161 also claims that the Order Schedule, but not the Services Attachment, states that distributors "shall receive a license to access . . . the CGS Master File Database." *Id.* But, that language is *not* in the CGS License in Order Schedule § 7.A.(i). In any event, Professor Elhauge's damages methodology screened out any distributors receiving databases using defendants' business records. *See* Elhauge report (Exhibit 3) ¶¶ 103-108.

Defendants also claim some class members receive CGS Data through the CGS CUSIP Access product. *See* SOpp. at 17. But, proposed class members obtained CGS CUSIP Access tacked onto the CGS License merely as a free promotion requiring online lookups of fewer than 500 identifiers in one session. *See* Fahy Tr. (Exhibit 12) 177:5-13; Hunter 4/1/25 Tr. (Exhibit 16) 51:9-52:12. Moreover, if a subscriber or a distributor paid for CGS CUSIP Access, they were excluded from the class. *See* Stiroh report ¶¶ 51-52; Stiroh Tr. (Exhibit 2) 100:16-25.

**B.    Defendants' arguments cannot vary the terms of the CGS License.**

Defendants argue that Dr. Stiroh based her product definition on marketing language from CGS's website. SOpp. at 4, 5 citing Stiroh report ¶¶ 47-49. This argument essentially

5

claims that CGS may modify the agreements by unilateral pronouncements on its website. Such a claim runs afoul of the provisions in the agreements barring modifications unless signed by both parties. *See* Subscription Agreement § 11.3 at FRSI00000098; Distribution Agreement § 18.C at FRSI00000080. Substituting the phrases "CGS Data" or "other information about financial instruments" for the phrase "standard security descriptions" is not interpreting the agreements. It is amending them. As the drafter of the agreements, CGS is bound by the words it chose and, even if there were an ambiguity (which there is not), any ambiguity should construed against CGS by not inserting the words "CGS Data" into provisions where they were not written. *See McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121, 124 (2d Cir. 2002).

Defendants argue that the deposition testimony of some CGS employees allegedly shows that the CGS License covers the entire database of CGS Data. *See* SOpp. at 16, 20. However, Dr. Stiroh did not rely on the testimony of Roger Fahy quoted by defendants (SOpp. at 20-21). *See* Stiroh report Exhibit 2 at 2. Further, his testimony, as well as the testimony of David Hunter, *see* SOpp. at 5, 16, and Robert Nagle, *see* SOpp. at 5, is inconsistent with the terms of the agreements, which are the bases for plaintiffs' proposed class and product market. Moreover, as shown above, defendants' expert, Professor Jorge Contreras, confirmed that the CGS License was not for use of CUSIP databases or CGS Data generally.

Defendants also quote (SOpp. at 4) and Dr. Stiroh referenced (Stiroh report (Exhibit 1) ¶ 47 n.162, ¶ 62 n.216) an ABA document titled "Revenue line-item descriptions." ABA-0000028927 – 29 (Exhibit 20). The description of license revenue that defendants cite is an amalgamation of license revenue from the CGS License with "█████████████ ██████" revenue. *Id.* at ABA-0000028927. The document does not purport to define what is covered solely by the CGS License.

## C.   Plaintiffs did not admit to receiving CGS Data.

Contrary to defendants' arguments (SOpp. at 1-2, 17, 18 n.10), the named plaintiffs do not license CGS Data. Indeed, Dr. Stiroh could not point to anywhere in the named plaintiffs' agreements where they licensed access to CGS Data. *See* Stiroh Tr. (Exhibit 8) 153:22-167:19.

Hildene Capital Management, LLC purchased a "CUSIP License to 2,500 Identifiers." Hildene Subscription Agreement (FRSI00087277 – 94 (Exhibit 21)) at FRSI00872289. Dinosaur Financial Group LLC purchased a "CUSIP License to 2,500 Identifiers" and received a free "log-in for CUSIP Access." Dinosaur Subscription Agreement (FRSI00370172 – 84 (Exhibit 23)) at FRSI00370179-80). Swiss Life Investment Management Holding AG purchased a "CUSIP License to 10,000 Identifiers" and received a free "CUSIP Access" login. Swiss Life Subscription Agreement (FRSI00134497 – 513 (Exhibit 22)) at FRSI00134508.

The named plaintiffs, like other class members, obtained the use of CUSIP Identifiers from third-party data vendors ("TPDVs" called Authorized Data Vendors by defendants and Dr. Stiroh) together with other data that have common-domain "counterparts or similar attributes to" CGS Data, such as the ticker symbol, coupon rate, maturity date, or currency. *See* Hildene's second interrogatory responses (Exhibit 18) No. 5 at 9-11; Dinosaur's second interrogatory responses (Exhibit 17) No. 5 at 10-11; Swiss Life's second interrogatory responses (Exhibit 19) No. 5 at 10. The named plaintiffs admitted to using certain common-domain data elements that appeared in a list of CGS Data elements, but denied that they "accessed the CUSIP Master File" to receive them. *Id.*; *compare* SOpp. at 17 (citing Stiroh report ¶ 20 (Figure 2.2: "Self-Reported Use of Data Elements *With Similar Attributes* to CGS Data Elements" (emphasis added))). Nor is it true that Professor Elhauge's CUSIP Use Market "is predicated on an incorrect assumption that putative Class members only *use* CGS Identifiers." SOpp. at 6. Further, defendants' argument

7

that Dr. Stiroh purportedly relied on Ms. Cynthia L. Meyn's statements that users require more than CUSIP Identifiers (SOpp. at 7, 17) is beside the point: the CGS License is for CUSIP Identifiers and standard security descriptions.

**D.      That CGS Data is provided to TPDVs is irrelevant to the CGS License class members pay for.**

This case focuses on CGS's asserted right to require a license to use CUSIP Identifiers even though proposed class members do not obtain those identifiers from CGS. That a TPDV provided a class member with common-domain data elements that also happen to be in CGS's database does not mean that the data elements originated from CGS. CGS does not know whether any data elements provided by TPDVs to class members besides the CUSIP Identifier originated from CGS. *See* Hunter 1/14/25 Tr. (Exhibit 15) 152:7-156:21. Indeed, defendants' industry expert, Ms. Meyn, admitted that "[n]obody knows" whether the purported CGS Data that class members use was actually sourced from CGS. Meyn Tr. (Exhibit 10) 236:12-19.

Thus, defendants' references (SOpp. at 16-17) to CGS Data being provided to TPDVs ███████████ and ███ have no relationship to the CGS License class members obtain. *See* ██████████████ (Exhibit 13) 72:13-73:2; ████████████████████ (Exhibit 14) 40:14-42:6; *see also* Stiroh report ¶ 87. And ████████████████ representative confirmed that it received data other than CUSIP Identifiers from TPDVs. *See* █████████ (Exhibit 005[4]) 78:5-22. Further, Bloomberg, the largest TPDV (*see* Stiroh Report nn. 389, 455), has "████████████████████ ███████" (Cole Tr. (Exhibit 11) 131:21-132:8), but its representative testified that ██████████████ ██████████████████████████████████" (*id.* 42:23-43:8).

---

[4] Exhibits 001 through 014 were submitted with the declaration of James J. Kovacs in opposition to this motion (ECF Nos. 364-1 – 14 under seal).

## II.     Dr. Stiroh's opinions are based on her product: access to CGS Data.

Defendants claim that "[p]laintiffs do not even attempt to explain which of Dr. Stiroh's opinions turn on her alleged reliance of [sic] the wrong product." SOpp. at 1. However, plaintiffs summarized those opinions at 4-5 of their opening memorandum of law (ECF 365).

Dr. Stiroh's opinions regarding Professor Elhauge's relevant product market, CGS's share of that market, and CGS's market power are clearly based on her erroneous definition of the relevant product market as access to CGS Data. *See* Stiroh report ¶¶ 13.ii., 13.iv., 59, 61-72, 136-39, 147-57; SOpp. at 6-7.

Dr. Stiroh's opinion that it would be economically irrational for there to be zero fees paid in the but-for world is based on her erroneous view that TPDVs and proposed class members would access CGS Data, not just use CUSIP Identifiers, in the but-for world. Stiroh report ¶¶ 13.i.a., 13.ii., 13.iii.a., 73-93, 103, 107-14, 127-30, 132, 134-39; S.Opp. at 11-13. Moreover, in trying to distinguish the zero fees paid for financial identifiers in over 120 jurisdictions, Dr. Stiroh meaninglessly compares fees paid for "structured financial identifier data," not for financial identifiers. SOpp. at 12-13; Stiroh report ¶¶ 13.iii.b., 115-26.

She further speculates that, in the but-for world, CGS would increase its charges for CGS Data to TPDVs, who would then pass such increases to their subscribers. *Id.* ¶¶ 13.i.a.-b., 60, 81-85, 94-101; SOpp. 8-11. The but-for price that customers would allegedly pay *data vendors* for data that may also appear in *CGS Data* is irrelevant to calculating the overcharge that *class members* paid *CGS* for the use of CUSIP Identifiers.

Additionally, Dr. Stiroh's criticism of Professor Elhauge's damages methodologies (Stiroh report ¶¶ 13.i.c., 13.v., 169-82), as described by defendants in their opposition (SOpp. 13-

9

14), is based on "access to CGS Data" or "valuation of CGS Data," not valuation of the use of CUSIP Identifiers.

In sum, almost all Dr. Stiroh's opinions are infected by her erroneous product definition.

## III.   Dr. Stiroh's opinions are not relevant to the class certification inquiry.

Dr. Stiroh is not entitled to base her opinions on a product that class members did not purchase. *See Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y.2007)) ("rebuttal experts must meet *Daubert*'s threshold standards"). Because Dr. Stiroh analyzed a product of access to CGS Data, which no class member purchases, instead of the at-issue product of use of CUSIP Identifiers (*see* Stiroh Tr. (Exhibit 2) 145:16-22, 146:22-25), her testimony does not fit the facts of this case as required by Rule 702, and it will cause confusion in violation of Rule 403. *See, e.g., In re Libor-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 384-85 (S.D.N.Y. 2025) (holding that an expert cannot offer opinions "about a conspiracy . . . not at issue in this case"). Further, defendants' arguments and Dr. Stiroh's contentions that plaintiffs misinterpreted the CGS License and that the true product market is for access to CGS Data (*see* SOpp. at 22) at most raise common issues and cannot help defendants prove that individual issues predominate. *See* Rule 23(b)(3). Accordingly, contrary to defendants' arguments (SOpp. at 23-26), Dr. Stiroh failed to meet the standard under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), that her testimony be relevant "to the task at hand."

Defendants essentially do not contest the holdings of the cases cited by plaintiffs excluding expert testimony based on products outside the relevant market or an unpleaded conspiracy. *See* SOpp. at 21-22. Defendants' counter-argument is that the cases support the

10

exclusion of Professor Elhauge's opinions "based on a product that does not exist" (SOpp. at 22), which actually applies to Dr. Stiroh's opinions, not Professor Elhauge's.

Defendants also argue that other cases cited by plaintiffs are inapplicable because they are summary-judgment decisions rather than class-certification decisions. *See* SOpp. at 23-24. However, the standard under *Daubert* is the same for both: Is the testimony relevant to the task at hand and based on a reliable methodology? *See Nypl v. JP Morgan Chase & Co.*, 15 Civ. 9300 (LGS), 2022 WL 819771, at *2-3 (S.D.N.Y. Mar. 18, 2022).

## IV. Dr. Stiroh failed to present a reliable methodology for defining her alternative product market.

Defendants argue that Dr. Stiroh was not required to present an alternative product market. SOpp. at 2, 22-24. They miss the point. Dr. Stiroh employed no reliable methodology for establishing her alternative product market.

When "a rebuttal expert is to discredit another expert's model by making affirmative statements or findings of their own they must still provide good grounds based in methods and principles of analytical evaluation to ground their opinions." *Generic Pharms.*, 2024 WL 4980784, at *14; *see Scott, supra*. Dr. Stiroh attempted to discredit Professor Elhauge by finding that the product market was for CGS Data. *See* SOpp. at 3-4, 16; Stiroh report ¶¶ 46-49, 59; Stiroh Tr. (Exhibit 2) 141:4-10. Dr. Stiroh does not just criticize Professor Elhauge's market definition but rather offers her own affirmative opinion.

Dr. Stiroh's methodology for defining her product market was unreliable. She did not conduct the economic analyses required to "identif[y] an antitrust relevant product market." Stiroh Tr. (Exhibit 2) 145:16-22, 146:22-25. Instead, she purportedly defined her alternative market by "analyz[ing] the CGS License and determin[ing] the type and scope of data it covers" (SOpp. at 16) and by otherwise reading statements on CGS's website (*id.* at 4-5). Defendants do

11

not identify any cases where an economist defined the scope of a product market in such a manner. This is because it is black-letter law that to define the scope of a product market an economic expert must analyze "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Dr. Stiroh conducted no such economic analysis, and her testimony should therefore be excluded.

## CONCLUSION

Dr. Stiroh's testimony based on the wrong product market, access to CGS Data, must be rejected as irrelevant and unreliable and excluded under Rules 702 and 403.

Dated: May 13, 2026                          Respectfully submitted,

/s/ Ronald J. Aranoff                        /s/ Leiv Blad
Ronald J. Aranoff                            Leiv Blad
Ryan A. Kane                                 Jeffrey Blumenfeld (*pro hac vice*)
Joshua M. Slocum                             Meg Slachetka
Lyndon M. Tretter                            COMPETITION LAW PARTNERS PLLC
William Hagan                                601 Pennsylvania Avenue NW
Reuben R. Bauer                              Washington, DC 20004
WOLLMUTH MAHER & DEUTSCH LLP                 Telephone: (202) 742-4300
500 Fifth Avenue, 12th Floor                 leiv@competitionlawpartners.com
New York, New York 10110                     jeff@competitionlawpartners.com
Telephone: (212) 382-3300                    meg@competitionlawpartners.com
raranoff@wmd-law.com
rkane@wmd-law.com                            /s/ Robert N. Kaplan
jslocum@wmd-law.com                          Robert N. Kaplan
ltretter@wmd-law.com                         Gregory K. Arenson
whagan@wmd-law.com                           Elana Katcher
rbauer@wmd-law.com                           KAPLAN FOX & KILSHEIMER LLP
                                             800 Third Ave., 38th Floor
                                             New York, NY 10022
                                             Telephone: (212) 687-1980
                                             rkaplan@kaplanfox.com
                                             garenson@kaplanfox.com
                                             ekatcher@kaplanfox.com

12

## SIGNATURE CERTIFICATION

Pursuant to Section 8.5(b) of the Electronic Case Filing Rules and Instructions of the Southern District of New York, I certify that all other signatory parties have consented to the filing of this document.

*/s/ Robert N. Kaplan*
Robert N. Kaplan

1

## WORD COUNT CERTIFICATION

Pursuant to Rule 4(B) of the Court's Individual Rules of Practice in Civil Cases, plaintiffs certify that this computer-generated reply memorandum of law was prepared using Microsoft Windows and Microsoft Word. The total number of words in this memorandum, exclusive of the caption, table of contents, table of authorities, the signature block, signature certification, this word-count certification, and certificate of service is 3,460, which is in accordance with the maximum 3,500 words as permitted under Rule 4(B) of the Court's Individual Rules of Practice in Civil Cases and Local Civil Rule 7.1.

Gregory K. Arenson

2

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on all parties through

their counsel of record via the Court's CM/ECF system, on May 13, 2026.

*Gregory K. Arenson*

Gregory K. Arenson

3