UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

DINOSAUR FINANCIAL GROUP LLC,  :
HILDENE CAPITAL MANAGEMENT,  :
LLC and SWISS LIFE INVESTMENT  :
MANAGEMENT HOLDING AG, on behalf:
of themselves and all others similarly  :
situated,  :
                                         :
                     Plaintiffs,  :     Case No. 1:22-cv-1860-KPF
                                           :
       -against-  :
                                           :
S&P GLOBAL, INC., AMERICAN  :
BANKERS ASSOCIATION, and FACTSET:
RESEARCH SYSTEMS INC.,  :
                                           :
                  Defendants.  :

------------------------------------------------------- X

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
TO EXCLUDE TESTIMONY OF PROFESSOR JORGE CONTRERAS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ......................................................................................................... 1

ARGUMENT .............................................................................................................. 3

I.     DEFENDANTS' ATTEMPT TO REFORMULATE PROFESSOR CONTRERAS'S
       OPINION CONTRADICTS HIS TESTIMONY, WHICH SUPPORTS PLAINTIFFS'
       MARKET DEFINITION ...................................................................................... 3

II.    PROFESSOR CONTRERAS'S FAILURE TO ANALYZE THE LICENSING
       POLICIES OF OTHER NNAs RENDERS HIS CONTRACT COMPARISON
       ANALYSIS UNRELIABLE…………………………………………………………5

III.   DEFENDANTS' RELIANCE ON PROFESSOR CONTRERAS'S EXPERIENCE AND
       EXPERTISE IS UNAVAILING BECAUSE HIS OPINION HAS NO PROBATIVE
       VALUE………………………………………………………………………………7

IV.    DEFENDANTS' AUTHORITY DOES NOT EXCUSE PROFESSOR CONTRERAS'
       METHOLOGICAL PROBLEMS……………………………………………………..10

CONCLUSION ............................................................................................................ 12

# TABLE OF AUTHORITIES

**CASES**

*Alfa Corp. v. OAO Alfa Bank*, 475 F. Supp. 2d 357 (S.D.N.Y. 2007) …………………………10, 11

*A.V.E.L.A. v. Estate of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291 (S.D.N.Y. 2019)………….10

*Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354 (S.D.N.Y. 2014) …………………...11

*Calltrol Corp. v. Loxysoft AB*, 2025 WL 2720984 (S.D.N.Y. Sept. 25, 2025) …………………10

*Ctr. for Indep. of Disabled, N.Y. v. Metro. Transp. Auth.*, 2023 WL 5744408 (S.D.N.Y. Sept. 6, 2023)…..………………………………………………………………………………………11

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ...................................................... 1,3

*Intl. Bus. Machs. Corp. v. BGC Partners, Inc.*, 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013) ...11

*Rowe Entm't, Inc. v. William Morris Agency, Inc.,* 2003 WL 221249913 (S.D.N.Y. Sept. 15, 2003) ...................................................................................................................................... 9

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, (S.D.N.Y. 2004)…………………………………………………………………………………...9

*Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404 (S.D.N.Y. 2015) …………...…11

**RULES**

Fed. R. Evid. 403 .............................................................................................................. 12

Fed. R. Evid. 702 .............................................................................................................. 1, 12

## INTRODUCTION

Plaintiffs' Motion to Exclude some testimony of Defendants' expert, Professor Contreras ("Motion")—in which he compares CUSIP Global Services ("CGS") agreements with 44 data license agreements produced in this litigation—demonstrated that his comparisons are not reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702. The Motion showed that this portion of Professor Contreras's opinion suffers from two fatal problems requiring its exclusion.

*First*, Professor Contreras admitted that he designed a methodology that predetermined the outcome of his analysis. Defendants' counsel, not Professor Contreras, selected the data licensing agreements to be analyzed from only agreements produced in this litigation, and Professor Contreras eliminated from his analysis any agreement that did not contain the exclusionary and restrictive provisions he sought. He also rejected the licensing policies of the closest analogs to CGS—the 120 National Numbering Agencies ("NNAs") that, like CGS, issue International Securities Identification Numbers ("ISINs"). CGS is the only NNA in the world that requires a license for, and imposes restrictions on, the use of the ISINs it issues.

*Second*, Professor Contreras's opinion—that some of the words in CGS's restrictive license agreements also appear in a limited number of other license agreements—is so general that it has no probative value. Because he did not perform a competitive analysis linking any of the markets in which the licensing of the data subject to these other agreements takes place, Professor Contreras does not know whether his opinion relates to any of the facts in this case. Permitting Professor Contreras to offer his opinions would give jurors the false impression that his conclusions are legally significant, which they are not.

1

Defendants' Opposition to Plaintiffs' Motion to Exclude Testimony of Professor Jorge Contreras ("Contreras Opp.") rewrites the record and ignores Professor Contreras's admissions. *First*, Defendants claim Professor Contreras opined that CGS's licensing policies are consistent with "typical and customary practices" in the industry. Contreras Opp. at 1. To the contrary, Professor Contreras revealed the extreme interpretation that is the core of CGS's anticompetitive policy. He testified that CGS has the power to stop any entity that has signed a Distribution Agreement with CGS (a so-called "Distributor") from using "CGS Data," which Professor Contreras said includes both (i) any data in the CUSIP Database and (ii) any data anywhere in the world that also appears in the CUSIP Database.[1] *See* Ex. A, Contreras tr. 170:17-171:25.[2] This, the name "Apple Inc." is CGS Data even if the Distributor obtains the name from a non-CGS source:

> Because there is – there – there is only one Apple name associated with this debt security. Apple is the issuer of the debt. It's – it's the same piece of data, right? I mean, it – it's the same name and it refers to the same thing, Apple as the issuer of this particular security. And so if it's in the CGS database, it is CGS data for purposes of this distribution agreement. The distributor who signs this distribution agreement agrees that the name Apple associated with this security is CGS data. ***And so even if the distributor just receives it by looking at CNN***, it's still, as defined, CGS data. I mean, that – that is what the definition of CGS data is. It – it's the same piece of data. So it – I'm not sure why that is unclear.

Ex. A, 172:14 – 173:5 (emphasis added). This testimony exposes both CGS's market power and the means by which it prevents other market participants from using publicly available data to compete against CGS. There can be no clearer articulation of CGS's extreme position than the admission of its intellectual property expert that CGS claims to control the use of the name "Apple Inc."

---

[1] Capitalized terms not defined herein have the meanings ascribed in Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification and Appointment of Class Counsel (ECF No. 216 (under seal); ECF No. 222 (redacted)).

[2] Exhibit A is attached to the Reply Declaration of Leiv Blad filed herewith.

*Second*, the Opposition argues Professor Contreras's testimony demonstrates that Defendants correctly articulate a relevant product market consisting of the licensing of data compilations like the CUSIP Database, not individual data items like CUSIP Identifiers. Contreras Opp. at 1. That is wrong. Professor Contreras testified that licensees like Plaintiffs and members of the Class license CGS Identifiers and standard security descriptions, not the entire CUSIP Database. *See* Ex. A, 205:4 – 208:2.

*Third*, the Opposition claims that Professor Contreras rejected the other NNAs' licensing policies as a comparator because the NNAs issue ISINs but do not license other financial data. *See* Contreras Opp. at 10-12. However, Professor Contreras admitted that he knew little or nothing about the NNAs' businesses. As such, the Opposition fails to rebut the arguments in the Motion, which should be granted.

## ARGUMENT

### I.    DEFENDANTS' ATTEMPT TO REFORMULATE PROFESSOR CONTRERAS'S OPINION CONTRADICTS HIS TESTIMONY, WHICH SUPPORTS PLAINTIFFS' MARKET DEFINITION

Defendants' Opposition attempts to rewrite Professor Contreras's opinion:

> Drawing on his expertise, and after reviewing deposition testimony and scores of data licensing agreements produced in this case by Plaintiffs, putative class members, and major financial data providers, Professor Contreras opined that the data licensing practices of [CGS] are consistent with typical and customary practices ***for licensing data compilations, including compilations of financial data***.

Contreras Opp. at 1 (emphasis added). This is a *post hoc* attempt to make Professor Contreras's opinion consistent with Defendants' preferred product market—the licensing of data compilations—in contrast to Plaintiffs' defined market consisting of the use of CGS Identifiers.

Professor Contreras's deposition testimony supports Plaintiffs' market definition and thus reveals the flaws in his analysis from a *Daubert* standpoint. Plaintiffs have alleged and will

3

ultimately prove that members of the Class take a license to use CGS Identifiers and standard security descriptions, not to obtain or use a data compilation such as the CUSIP Database. Indeed, Professor Contreras agrees. He testified that Section 7(A)(1) of the Order Schedule to the CGS Distribution Agreement, which so-called "Distributors" sign, and Section 1.1 of the Services Attachment to the CGS Subscription Agreement, which "Subscribers" sign, both provide a "CGS Service" limited to "CUSIP, CINS and/or CGS ISIN identifiers and standard security descriptions provided by either CGS directly or via a CGS-licensed third-party data vendor." Ex. A, 177:14-178:15, *see also id.* 205:4-207:9. This is the service to which every member of the proposed Class subscribes—not any broader license to any database, as Defendants contend. As explained *infra,* this is why Professor Contreras's refusal to examine the licensing practices of NNAs who issue ISIN identifers and standard security descriptions render his methodology inadmissible under expert testimony standards.

Professor Contreras admitted that a Subscriber to Section 1.1 of the Services Attachment to the CGS Subscription Agreement does not receive access to the entire CUSIP Database, because it is not part of the operative license grant:

> Q.  But a subscriber who is subscribing to Section 1.1 of the services attachment is not receiving a database; correct? It's receiving the CUSIP identifiers, the CINS identifiers and the CGS ISIN identifiers and the security descriptions; correct?
>
> A.  Yes, as we have already gone over what Section 1.1 of this services attachment says, and that is what it says. But the reference to the CUSIP database, it's only in a whereas clause here. I'm not sure what – why that matters.
>
> Q.  Well—
>
> A.  ***It's not part of the operative license grant***.

*Id.* 206:19 – 207:9 (emphasis added).

This admission that the operative license grants the members of the proposed Class a license to use only CUSIP Identifiers and standard security descriptions and that the reference to

4

the fuller database compilation appears only in the "whereas clause" is fatal to Defendants' attempt to recast Professor Contreras's testimony as consistent with their incorrect purported market definition. Defendants characterize Plaintiffs' market definition as a "contrived argument with no support" (Contreras Opp. at 11), but their own intellectual property expert retained to review and analyze CGS's license agreements testified that Plaintiffs' interpretation is consistent with the literal terms of CGS's Distribution and Subscription Agreements.

II.     **PROFESSOR CONTRERAS'S FAILURE TO ANALYZE THE LICENSING POLICIES OF OTHER NNAs RENDERS HIS CONTRACT COMPARISON ANALYSIS UNRELIABLE**

The Opposition asserts that Professor Contreras "rejected national numbering agency (NNA) licensing practices as comparators" to CGS's practices because "'the CGS service includes much more than ISIN numbers … so what an [NNA] does … isn't particularly relevant to the practices relating to the licensing of a large and frequently updated database like the CGS database.'" Contreras Opp. at 11 (quoting Contreras tr. at 94:9-13). Professor Contreras's excuse for excluding NNAs from his analysis—that the NNAs do not license other data in addition to the ISINs—is not credible because he admitted that he knew little or nothing of the NNAs' business models:

> Q.  In other words, these NNAs around the world have businesses that are very similar to CGS's business of issuing financial identifiers; correct?
>
> A.  I -- I'm not sure that I could say that -- I -- *I certainly don't know what their businesses are.*
>
> Q.  When you say "their businesses," are – do you mean the businesses of the NNAs around the world other than CGS?
>
> A.  Yes, I'm familiar with CGS's business, but the other NNAs -- to my understanding, some may be government entities, other types of entities that may have businesses that are very different than CGS.

Ex. A, 70:7-22 (emphasis added).

Professor Contreras specifically testified that he did not know whether the NNAs licensed data other than the ISINs:

> Q.  So to compare CGS's licensing policy to the typical custom in the industry, wouldn't you want to know whether NNAs other than CGS engage in the same – that are engaged in the same business as CGS require a license for the use of the financial identifiers they issue?
>
> A.  So, again, I am not aware of the scope of the business or activities of these other 120 NNAs. And in addition, CGS's business is more than licensing the identifier. There is a whole body of related data that CGS licenses that forms its business as well. ***I have no knowledge about what the other NNAs do in that respect.***

*Id.* 71:16 – 72:6 (emphasis added).[3]

Given Professor Contreras's sworn lack of knowledge about other NNAs and their businesses, Defendants' argument that he supposedly analyzed and determined independently that those businesses were not analogous to CGS's business is not credible. Professor Contreras's testimony shows that he did not have the knowledge necessary to analyze whether the NNAs had different business practices than CGS.

For that reason, Professor Contreras's contract comparison analysis, which is based on the exclusion of the licensing policies of the NNAs from his analysis, is not reliable and should be excluded.[4] *See* Mot. at 8-10.

---

[3] Indeed, Professor Contreras did not even know that at least one of the license agreements he reviewed was from SIX Financial Information, a major global data vendor like Defendants FactSet and S&P, and an NNA. Ex. A, 80:20 – 81:17.

[4] Defendants contend that Plaintiffs' Motion "suggest[s] that Professor Contreras should have compared CGS's policies to those of 'data companies' like Apple, Microsoft, Amazon, banks and mortgage companies." Contreras Opp. at 12. Plaintiffs' point is that the description of his task in Professor Contreras's report to opine on industry norms in the licensing of digital data, including financial data, is so sprawling as to be meaningless by not focusing on those with business models like that of CGS. It is not clear how an attempt to describe norms in the licensing of digital data generally, without regard to the much more specific inquiry of the licensing in the NNAs' business of issuing ISINs, would lead to anything that would help the factfinder here.

6

### III.   DEFENDANTS' RELIANCE ON PROFESSOR CONTRERAS' EXPERIENCE AND EXPERTISE IS UNAVAILING BECAUSE HIS OPINION HAS NO PROBATIVE VALUE

Much of Defendants' Opposition relies on Professor Contreras' experience and expertise but says nothing about his anodyne conclusion, which was merely a word-matching exercise. Defendants repeatedly refer to his expertise, but do not link that to the portions of Professor Contreras' report that Plaintiffs challenged. This is evident from the first paragraph of Defendants' argument:

> His experience, scholarship, expertise, and open-source licensing research provide both 'sufficient facts or data' and 'knowledge [that] will help the trier of fact' to assess whether CGS's practices reflect typical data licensing practices or are unusual, as Plaintiffs' experts suggest.

Contreras Opp. at 5. This is yet another example of Defendants rewriting the record to create the impression of support it does not actually provide. Professor Contreras never cited his "open-source licensing research" as a basis for his conclusions. Indeed, the words "open-source" do not appear anywhere in the text of his expert report or in his deposition transcript, only in his listing of publications and speeches appended to his CV in Appendix A to his report.

Moreover, the point on which Defendants contend Professor Contreras applied his expertise and experience in this case—Plaintiffs' and their experts' contentions that CGS's practices are allegedly "unusual" (Contreras Opp. at 4)—mischaracterizes Plaintiffs' argument. Plaintiffs contend that CGS's policies are exclusionary and anticompetitive and impose undue burdens on market participants which increase prices, limit innovation, and reduce competitive choices in the market. Whether Defendants' restrictions that impose those burdens in the relevant market are present in other license agreements in other markets involving database compilation products and services is irrelevant to any issue in this case, unless Defendants prove that the competitive conditions in those markets are sufficiently similar to the competitive conditions in

7

the relevant market. Professor Contreras admitted that he had not done such an analysis, and Defendants have yet to offer one.

For that reason, Professor Contreras could not link the section of his report analyzing data licensing agreements generally—Section V—to the facts of this case:

> Q. So the discussion then in Section V is just that provisions that are in CGS's agreements also appear in other agreements in other markets and in other factual situations that you haven't analyzed whether those circumstances would apply to this case?
>
> A. I think that's fair.

Ex. A, 224:11-18.

Even when Professor Contreras analyzed 44 agreements from 22 licensors set forth in Tables 1 and 2 of his report, the most he could say is that words in the CGS Subscription and Distribution Agreements also appear in agreements of those 22 licensors:

> Q. So I take it, then, your opinion that you're offering in this case is that the data license agreements from these 22 entities contain provisions whose language is similar to the language in provisions in the CGS subscription and distribution agreements?
>
> A. Yes. Their language or their – their effect. Language differs among agreements, but the effect is – is very similar as, again, I discussed throughout most of the report.
>
> Q. And based on that, you opine that the provisions in the CGS agreements constituting the CGS licensing practices are typical and customary in the – in the industry?
>
> A. More or less, yes.

*Id.* 64:4-21. While Defendants trumpet the "diversity" of those 44 agreements, they are in fact a remarkably small number of self-selected documents that were screened of contradictory evidence. *See id.* at 52:20 – 54:13.

Thus, far from applying his experience to craft a rigorous methodology leading to a meaningful conclusion, Defendants' counsel asked Professor Contreras to engage in a word-matching exercise which required no expertise whatsoever.

Defendants' attempts to distinguish the cases Plaintiffs cited also fail. Defendants attempt to wave away *Rowe Entertainment, Inc. v. William Morris Agency, Inc.,* 2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003), by claiming that Professor Contreras conducted independent research. *See* Contreras Opp. at 19. But whatever that independent research was, it did not relate to the word-matching exercise Professor Contreras performed. As Professor Contreras admitted, the analysis Plaintiffs seek to exclude consisted of him determining whether the agreements counsel provided contained restrictions that were similar to those in the CGS agreements. Ex. A, 53:1 – 55:17. That Professor Contreras may have conducted independent research for other parts of his report does not salvage his flawed analysis. As to *U.S. Information Systems, Inc. v. International Brotherhood of Electrical Workers Local Union No. 3*, 313 F. Supp. 2d 213, 233-34 (S.D.N.Y. 2004) Defendants are correct that it is improper for an expert to rely on a data set provided for counsel to reach a predetermined outcome. Contreras Opp. at 19. That is exactly what happened in this case when Professor Contreras only reviewed a predetermined set of contracts gathered by counsel, as Plaintiffs' opening brief established. Mot. at 8-11; Ex. A, 55:15 – 55:17 ("this exercise … was to review the agreements that were produced in this case").

Defendants argue that these cases are inapposite because Professor Contreras relied on his "own expertise" in forming his opinion. *See*, *e.g.*, Contreras Opp. at 14. Even if that were true, it would not excuse the fatal methodological errors Professor Contreras committed in failing to consider contrary evidence. In any event, it is not true that Professor Contreras meaningfully relied on his expertise in forming his opinion. His admitted inability to offer more than the anodyne

conclusion that words that appear in CGS agreements also appear in the other agreements means that anyone who can read could offer the same conclusion. That is not the work of an expert plying his unique skill-set to assist the trier of fact in coming to a conclusion.

## IV.    DEFENDANTS' AUTHORITY DOES NOT EXCUSE PROFESSOR CONTRERAS' METHOLOGICAL PROBLEMS

Defendants assert that Professor Contreras was not required to perform a statistical analysis. Contreras Opp. at 12-14. This is a misstatement both of Plaintiffs' argument and of the way courts evaluate an expert's opinion under Rule 702. Plaintiffs do not argue that Professor Contreras was required to perform a statistical analysis, but rather that his opinion is unreliable and unhelpful to the jury. Among other things, he made no attempt to construct a sample on his own, to review evidence other than that provided by counsel, or construct an opinion that was anything more than that words that appear in one agreement also appear in another.[5]

This is consistent with the cases Defendants cite, which require that an expert's opinion be "based upon reliable data and methodology [and] will assist the trier of fact." *See A.V.E.L.A. v. Estate of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 323-24 (S.D.N.Y. 2019) (Failla, J.). In *Calltrol Corp. v. Loxysoft AB*, 2025 WL 2720984 (S.D.N.Y. Sept. 25, 2025), the expert's specialized education and experience qualified him to testify on call-center technologies, but the court precluded him from testifying on a business's profitability and viability, contractual interpretation, or the nature of the parties' business relationship because those were subjects the jury could evaluate on their own. *Id*. at 4-5. In *Alfa Corp. v. OAO Alfa Bank*, 475 F. Supp. 2d 357 (S.D.N.Y. 2007), the court allowed a native Russian speaker who taught Russian, worked as an interpreter, and held advanced degrees in Russian from Moscow State University and Yale

---

[5] For these reasons, Defendants' attempts to distinguish the cases on which Plaintiffs relied (Contreras Opp. at 14-17) are unavailing.

10

University to testify on the proper transliteration of the defendant's name. *Id*. at 361-62. While the defendants objected that the expert reviewed unreliable internet sites among other sources, the Court noted that his broad base of sources made his opinion reliable. *Id*. Unlike Professor Contreras's word-matching exercise, this was a narrow issue on which language specialization was required and therefore helpful to the jury. Similarly, the court in *Center for Independence of the Disabled, New York v. Metropolitan Transportation Authority*, 2023 WL 5744408, *3-6 (S.D.N.Y. Sept. 6, 2023), allowed an expert's testimony on the availability of public transportation for riders with mobility disabilities because the expert was not merely repeating customer complaints but was aggregating and analyzing large amounts of data that was otherwise unavailable to the jury. *See also Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 443-47 (S.D.N.Y. 2015) (allowing expert testimony on the norms in financial markets regarding duties under Rule 10b).

Defendants' reliance on *International Business Machines Corp. v. BGC Partners, Inc.*, 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013), is misplaced because the plaintiff there challenged the expert's qualifications and experience. *Id*. at *15. Here, Professor Contreras' analysis of contract language did not require any specialized knowledge and will not help jurors, all of whom could perform the same kind of analysis just by reading the documents. *See also Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354 (S.D.N.Y. 2014) (allowing limited expert testimony on complex damages in Lanham Act case).

11

## CONCLUSION

Professor Contreras's contract-comparison analysis should be excluded under Federal Rules of Evidence 702 and 403.

Dated: May 13, 2026

Respectfully submitted,

/s/ *Ronald J. Aranoff*
Ronald J. Aranoff
Ryan A. Kane
Joshua M. Slocum
Lyndon M. Tretter
William Hagan
Reuben R. Bauer
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue, 12th Floor
New York, New York 10110
Telephone: (212) 382-3300
raranoff@wmd-law.com
rkane@wmd-law.com
jslocum@wmd-law.com
ltretter@wmd-law.com
whagan@wmd-law.com
rbauer@wmd-law.com

/s/ *Leiv Blad*
Leiv Blad
Jeffrey Blumenfeld (*pro hac vice*)
Meg Slachetka
COMPETITION LAW PARTNERS PLLC
601 Pennsylvania Avenue NW
Washington, DC 20004
Telephone: (202) 742-4300
leiv@competitionlawpartners.com
jeff@competitionlawpartners.com
meg@competitionlawpartners.com

/s/ *Robert N. Kaplan*
Robert N. Kaplan
Gregory K. Arenson
Elana Katcher
Carihanna Morrison
KAPLAN FOX & KILSHEIMER LLP
800 Third Ave., 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Email: rkaplan@kaplanfox.com
garenson@kaplanfox.com
ekatcher@kaplanfox.com
cmorrison@kaplanfox.com

12

**SIGNATURE CERTIFICATION**

Pursuant to Section 8.5(b) of the Electronic Case Filing Rules and Instructions of the Southern District of New York, I certify that all other signatory parties have consented to the filing of this document.

/s/ Leiv Blad
Leiv Blad

13

## WORD COUNT CERTIFICATION

Pursuant to Rule 4(B) of the Court's Individual Rules of Practice in Civil Cases, plaintiffs certify that this computer-generated reply memorandum of law was prepared using Microsoft Windows and Microsoft Word. The total number of words in this memorandum, exclusive of the caption, table of contents, table of authorities, the signature block, signature certification, this word count certification, and certificate of service is 3,456 which is in accordance with the maximum 3,500 words as permitted under Local Civil Rule 7.1.

/s/ Leiv Blad
Leiv Blad

14

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served on all parties through

their counsel of record via the Court's CM/ECF system, on February 18, 2026.

*/s/ Leiv Blad*
Leiv Blad