**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------x

DINOSAUR FINANCIAL GROUP LLC, HILDENE CAPITAL MANAGEMENT, LLC and SWISS LIFE INVESTMENT MANAGEMENT HOLDING AG, on behalf of themselves and all others similarly situated,

Plaintiffs,

-v-

S&P GLOBAL, INC., AMERICAN BANKERS ASSOCIATION, and FACTSET RESEARCH SYSTEMS INC.,

Defendants.

---------------------------------------x

**Case No. 1:22-CV-1860 (KPF)**

**DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO EXPANSION OF THE PUTATIVE CLASS DEFINITION TO INCLUDE CGS DISTRIBUTORS**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

I. Distributors Need Far More Than "Basic" Data. ........................................................ 3

II. Subscribers and Distributors Occupy Fundamentally Different Positions. ................. 6

III. Determining Which Data Elements Distributors Purchase and Receive From Which Sources Requires a Complex, Individualized Inquiry. ................................................ 8

IV. Distributors are Not "End Users." .......................................................................... 10

V. The "Basic License" Does Not Exist for Distributors or Anyone Else, Reinforcing the Conclusion that No Class Should Be Certified. ................................................ 11

CONCLUSION ........................................................................................................ 13

# TABLE OF AUTHORITIES

## CASES

*Cuevas v. Citizens Fin. Grp., Inc.*,
526 F. App'x 19 (2d Cir. 2013) .................................... 2, 3, 13

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) .................................... 6

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
140 F. Supp. 3d 339 (D. Del. 2015) .................................... 8

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008) .................................... 6

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) .................................... 2,3

*In re Int. Rate Swaps Antitrust Litig.*,
2023 WL 8675625 (S.D.N.Y. Dec. 15, 2023) .................................... 8

*In re Methionine Antitrust Litig.*,
204 F.R.D. 161 (N.D. Cal. 2001) .................................... 8

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010) .................................... 3, 4, 10

## STATE STATUTES

Conn. Gen. Stat. Ann. 35.35-46a .................................... 8

N.Y. Gen. Bus. Law § 340(6).................................... 8

## FEDERAL RULES

Fed. R. Civ. P. 23.................................... 2, 3, 6, 8

## INTRODUCTION

Plaintiffs' Second Amended Complaint sought to certify and represent classes of Subscribers who, like them, access CGS Data through Third Party Data Vendors and license the right to download CGS Data for internal use under a Subscription Agreement.[1] ECF 87 ¶¶135-138. At the end of fact discovery, Plaintiffs expanded their proposed classes to include certain Distributors, which license the additional right to redistribute that CGS Data downstream to their own customers, including Subscribers, pursuant to Distribution Agreements. Distributors use that CGS Data to create products or services to resell to their own customers. That difference has profound implications for the economic analyses central to the class inquiry. Subscribers only consume CGS Data; many Distributors redistribute it for a fee and for profit. Distributor classes thus raise different and substantially more complicated questions that Plaintiffs have never addressed.

Plaintiffs attempt to shoehorn this differentiated group into a putative class based on a single theory, that Subscribers and Distributors only license three pieces of data from CGS—the CUSIP Identifier, the name of the issuer, and the type of issue—the so-called "basic license." *See* ECF 352 ("Class Cert. Reply Br.") at 4 ("Beyond the right to use these three elements, class members do not purchase anything from CGS."); Ex-1[2] (Elhauge Dep.) 154:12-155:17 (grounding his overcharge theory on a license that "just covers the CUSIP Identifiers"). But fact discovery confirmed what was always well-known in the industry: Distributors want, license, and obtain many different CGS Data elements they selectively use to create products and services tailored to the particularized needs of their financial customers.

[1] Unless otherwise indicated, capitalized terms have the same meaning as in Defendants' Opposition to Plaintiffs' Motion for Class Certification. ECF 320.

[2] Citations to "Ex-_" correspond to the accompanying Declaration of Patrick M. Kennedy.

Distributors should not be certified in the proposed class because Plaintiffs cannot make the Rule 23 showing their inclusion requires. *First*, the factual predicate to Plaintiffs' theory of Distributors' antitrust injury—that all Distributors license and take only three pieces of data from CGS—is flatly disproved by the discovery record. Distributors consistently testified that, under their Distribution Agreements, they each receive, use, redistribute, and generate revenue using many additional CGS Data elements. Thus, whether Plaintiffs' fictitious "basic license" exists is a predicate to Plaintiffs' class certification theory that the Court should resolve when deciding class certification. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) ("*IPO*"); *Cuevas v. Citizens Fin. Grp., Inc.*, 526 F. App'x 19, 21 (2d Cir. 2013).

*Second*, individual issues predominate. Plaintiffs' but-for world—a free "basic license"— would affect each Distributor differently than Subscribers. To establish that each Distributor accesses no more than the three "basic" CGS Data elements would require complex Distributor-by-Distributor inquiries to determine whether individual issues predominate, such as (1) where each Distributor sources the CGS Data, and (2) what CGS Data it incorporates into its data products and services and redistributes downstream. Plaintiffs cannot paper over these individual inquiries by claiming Distributor class members are merely "End Users." *See* ECF 216 (Pls. Opening Br.) 7 n.10, 11. Plaintiffs' only explanation for including Distributors is that [redacted]. That theory does not reach entities that actually do redistribute CGS Data. *See infra*, sections I and IV.

*Third*, the named Plaintiffs, all Subscribers, cannot satisfy Rule 23(a)'s typicality or adequacy requirements as to Distributors. *See* Section II, *infra*. Distributors and Subscribers have fundamentally different businesses, economic contexts, and incentives: Subscribers consume CGS Data internally; Distributors repackage and redistribute it for profit, building CGS license

costs into their prices, and competing against rivals inside and outside the proposed class. The respective interests of Subscribers and Distributors at the heart of this case are not aligned. Damages deepen the divide. Because many Distributors pass CGS charges on to Subscribers in the same proposed class, Subscribers have incentives to recoup those passed-on overcharges from Distributors under state law, while Distributors have the opposite incentive—to keep them as their own damages.

*Finally*, that both the Distribution and Subscription Agreements utilize the same language that Plaintiffs rely on to contrive the non-existent "basic license" undermines the viability of the "basic license" for *any* putative class member. Given the reality that most Distributors cannot do business with just three data elements, it makes no sense to construe the terms "CGS License service" or "standard security descriptions" to limit the scope of the licenses they purchase. The same conclusion holds for Subscribers, as nothing in the record suggests the language could mean one thing in Distribution Agreements and another in Subscription Agreements. Therefore, the Court should not certify Plaintiffs' proposed classes premised on a fiction and misinterpretation of the CGS License service.

## I. Distributors Need Far More Than "Basic" Data.

Plaintiffs "bear[] the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). The Court must undertake a "rigorous analysis" to determine whether Plaintiffs have met that burden, which "can only be made if the judge resolves factual disputes relevant to each Rule 23 requirement." *Cuevas*, 526 F. App'x at 21 (quoting *IPO*, 471 F.3d at 41).

Plaintiffs' sole theory of antitrust injury is that putative class members, including Distributors, take only a three-element "basic license" that should have been cost-free. *See* Class Cert. Reply Br. at 4; Ex-1 (Elhauge Dep.) 154:12-155:17. Professor Elhauge confirmed that

Plaintiffs' proposed class is "defined to exclude those who are purchasing other data elements." Ex-1 (Elhauge Dep.) 132:21-133:17. Plaintiffs therefore must prove that each Distributor in the putative class purchased a license for, and received, no more than the CUSIP Identifier, the issuer name, and the type of issue under their CGS agreements. *Myers*, 624 F.3d at 547. They identify no such evidence.

Under *IPO* and *Cuevas*, whether Distributors purchased only a "basic license" is a fundamental dispute that the Court must resolve now. The discovery record overwhelmingly proves Plaintiffs' claim to be false: Distributors require, license, and receive far more than three "basic" data elements. The table below shows examples of Distributors that Plaintiffs contend are putative class members, because each takes the "CGS License service" and no direct services from CGS. Yet each Distributor confirmed in discovery that it received under its Distribution Agreement much more than the three "basic" data elements.

| Distributor | CGS Data Elements Beyond the "Basic" Three | Source |
|---|---|---|
| [redacted] | [redacted] | Ex-2 ([redacted] Response to ABA Interrogatory No. 10) |
| [redacted] | [redacted] | Ex-3 ([redacted]) 69:12-70:10 |
| [redacted] | [redacted] | Ex-4 ([redacted]); Ex-5 ([redacted] Response to ABA Interrogatory No. 10) |
| [redacted] | [redacted] | Ex-6 ([redacted]) |
| [redacted] | [redacted] | Ex-7 ([redacted] Tr. 40:3-17; 46:12-47:8) |
| [redacted] | [redacted] | Ex-8 ([redacted] Response to ABA Interrogatory No. 10) |
| [redacted] | [redacted] | Ex-9 ([redacted] Tr. 20:22-21:6; 207:5-19; 208:7-8; 279:4-23) |

*See also* ECF 278-2 ("Meyn Report") at 80-85.

This evidence is unsurprising. The redistribution business requires Distributors to provide *their* customers access to many different types of financial data obtained from various sources. *See* Ex-10 ("Meyn Dep.") 229:5-230:11 (explaining Distributors ingest "hundreds of data fields" from "hundreds of custodians" to meet their end users' needs). Putative class member [redacted] for example, "[redacted]" Ex-9 ([redacted] Tr.) 12:9-21. [redacted] products included "[redacted]" "[redacted]

[redacted]" *Id.* 223:23-224:3. Which CGS Data a Distributor takes and utilizes depends on the needs of its end users, which vary significantly. Distributors "all have different uses and purposes across the ecosystem. Different financial services firms that they service. Different portions of the investment lifecycle that they service. Different geographies. Different asset classes." Meyn Dep. 226:8-26; *see also* Meyn Report ¶64.

The record thus establishes that Distributors need, license and receive much more than three data elements.

**II. Subscribers and Distributors Occupy Fundamentally Different Positions.**

Plaintiffs' proposed class expansion independently fails Rule 23(a)'s typicality and adequacy requirements. No named Plaintiff is a Distributor, and Distributors differ fundamentally from Subscribers in their businesses, economic context, incentives, and damages interests. Typicality fails where absent members occupy fundamentally different positions. *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490 (N.D. Cal. 2008). Adequacy fails where the named Plaintiffs' interests are antagonistic to those of other class members. S*ee In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 39-43 (S.D.N.Y. 2020).

Distributors use CGS Data to provide new data services to their customers for a fee, and the cost of that data affects the pricing and profitability of their downstream products. *See* ECF 278-1 ("Stiroh Rep.") ¶96; *see also* Ex-11 ([redacted] Tr.) 145:9-146:18; Ex-12 ([redacted] 30(b)(6) Tr.) 92:24-93:20. Subscribers do not resell CGS Data. Accordingly, CGS license costs affect Distributors' costs and margins in ways that cannot affect Subscribers, and Distributors can pass CGS charges on to downstream customers, including Subscribers in the same class.

Distributors also compete with Distributors that Plaintiffs have excluded from the class. Two examples:

- Putative class member [redacted], a premier trading platform that competes with other industry giants, under a CGS Distribution Agreement. *See* Meyn Report ¶¶48, 65. The form CGS Use of Service Statement lists [redacted] alongside [redacted] (none of whom fits Plaintiffs' proposed class definition), and others as vendors from which CGS licensees can receive CGS Data. *See* Ex-13 (FRSI00000092) §5.
- Putative class member [redacted] Ex-14 (FRSI00055650), at -663, offers "[redacted]" "[redacted]"[3] and competes with [redacted], [redacted] [redacted], Ex-15 ([redacted]), and offers ESG data with over 2,000 underlying data points.[4]

These differences defeat typicality because the named Plaintiffs cannot prove Distributors' claims by proving their own. The named Plaintiffs claim they paid for a "basic license" that should have been free. Even if the named plaintiffs receive only the three data elements under a "basic license," which they do not, a Distributor's claim would turn on facts unique to a Distributor, including the redistribution rights it licensed and how mandating Plaintiffs' "but-for" world would shift each Distributor's position against competitors inside and outside the putative class.

They defeat adequacy as well. Many Distributors not only need far more than the three "basic" fields, but also need the right to redistribute all that CGS Data, and would keep paying

3 [redacted]
4 [redacted]

for both. They have no incentive to dismantle the licensing regime the named Plaintiffs seek to enjoin.

The damages conflict is starker still. Professor Elhauge measures each putative class member's damages by the fees and royalties it paid to CGS. Under New York and Connecticut law, Subscribers may pursue the full amount of any alleged overcharges they absorb—including overcharges passed on to them by Distributors; and Defendants have pass-through defenses against Distributors they do not have against Subscribers. *See* N.Y. Gen. Bus. Law § 340(6); Conn. Gen. Stat. Ann. § 35-46a. The two groups thus compete for the same dollars: a Subscriber maximizes its recovery by proving that Distributors passed CGS charges downstream, while a Distributor protects its recovery by opposing Subscribers' claims. The named Plaintiffs cannot serve both. *See In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 140 F. Supp. 3d 339, 349 n.7 (D. Del. 2015) (noting that under relevant state laws "there appears to be fundamental conflict defeating certification as . . . resellers within the class have an interest in proving that they passed-through zero overcharge in order to recover 100% of the damages attributed to each resale, while the downstream purchasers have an opposite interest"); *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 167 (N.D. Cal. 2001) (same).

Plaintiffs therefore cannot satisfy Rule 23(a)(3) or (a)(4) as to Distributors.

## III. Determining Which Data Elements Distributors Purchase and Receive From Which Sources Requires a Complex, Individualized Inquiry.

Plaintiffs also cannot meet their burden under the predominance requirement of Rule 23(b)(3), because they cannot "demonstrate that the elements of their underlying claims can be proven by common evidence." *In re Int. Rate Swaps Antitrust Litig.*, 2023 WL 8675625, at *5 (S.D.N.Y. Dec. 15, 2023) (cleaned up). Determining which CGS Data elements any CGS licensee receives, and which elements came from CGS's database, demands a complex,

individualized inquiry into the flow of the CGS Data. This is particularly true for Distributors, who aggregate data from many sources into their own commercial fee-bearing data services.

Consider [redacted], an investment-analytics company and Distributor captured by Plaintiffs' proposed class definition. [redacted] Ex-2 ([redacted] Response to ABA Interrogatory Nos. 8 & 10); Ex-16 ([redacted]), at -0021. [redacted]. *See* Ex-17 ([redacted] Decl.) ¶2. [redacted].

So, too, for [redacted]. An investment-advisory firm, provider of analytics and index data products, and a Distributor captured by Plaintiffs' proposed class definition, [redacted]. *See* Ex-8 ([redacted] Response to ABA Interrogatory Nos. 8 & 10). [redacted]. ECF No. 321-8, 72:13-73:2. *See also* Ex-18 ¶7 ([redacted]).

To appreciate the complex individualized inquiries required by Plaintiffs' theory of antitrust injury and inclusion of Distributors within the proposed class definition, consider an end user customer of [redacted]' data services. Determining whether [redacted] received anything beyond the three "basic" elements is complex enough, [redacted]. An end user would need to conduct that analysis as to [redacted] *and then repeat it* for each of its other data vendors. The

evidence shows most of CGS's licensees take CGS Data from more than one data vendor, with many taking from 10 or more vendors. *See* Stiroh Rep. Fig. 4.3. Tracing this data flow for each putative class member is a quintessential individual inquiry, rendering class treatment unworkable.

Finally, Plaintiffs' claim that it is "impossible for CGS to know . . . whether data elements besides the CUSIP Identifier originated from CGS" (*see* Class Cert. Reply Br. at 5) has it exactly backwards. It is *Plaintiffs' burden* to show that their proposed class is capable of common proof of antitrust injury. *Myers*, 624 F.3d at 547. They put forward the theory that putative class members, including Distributors, do not purchase or receive anything from CGS but the three "basic" data elements. Reply Br. at 4. If they cannot prove it, they have not met their burden. Indeed, Plaintiffs have not proven that *any* Distributor meets their class definition. And many of Plaintiffs' claimed putative class member Distributors provided evidence proving the opposite.

**IV. Distributors are Not "End Users."**

Plaintiffs attempt to sweep aside these individual inquiries by claiming the Distributors in the proposed class were really "End Users" and arguing that "CGS requires End Users to execute Distribution Agreements." ECF 216 at 7 n.10. But the only explanation Plaintiffs offer is that [redacted] making them [redacted] *Id.* 11. By Plaintiffs' own logic, an entity that *does* distribute CGS data would inherently be distinguishable from a Subscriber. And that's exactly what Distributors do. Plaintiffs' proposed class includes hundreds of entities that redistribute data in bulk download, data feed, and other formats, under a license to "access, distribute, and utilize CGS Data" that no Subscription Agreement conveys. Ex-19 ("Fahy Decl.") ¶12. Definitionally, these Distributors cannot be "End Users." Nor does excluding licensees that take CGS's database product directly from CGS solve the problem. That

exclusion turns on how a licensee receives CGS Data, not what it receives or does with it. Distributors like [redacted] take "all" CGS Data elements and redistribute them, so do not fit the putative class.

**V. The "Basic License" Does Not Exist for Distributors or Anyone Else, Reinforcing the Conclusion that No Class Should Be Certified.**

Both the CGS Distribution and Subscription Agreements contain the same "CGS License" language that Plaintiffs claim supports the existence of a "basic license." Class Cert. Reply Br. at 3-4 (claiming CUSIP identifiers and "standard security descriptions" creates the basis for the "basic license."). The facts discussed above flatly disprove Plaintiffs' theory—each Distributor can and does receive more CGS Data under its "CGS License service." Subscribers, including the named Plaintiffs,[5] also testified that they receive far more than the three "basic" data elements, from many different vendors.

| **Subscriber** | **CGS Data Elements** | **Data Vendors** | **Source** |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | Ex-23 ([redacted] Declaration) ¶14; Ex-24 ([redacted]), at -0012-13 |
| [redacted] | [redacted] | [redacted] | Ex-25 ([redacted] Declaration) ¶7; Ex-26 ([redacted]), at -0025 |
| [redacted] | [redacted] | [redacted] | Ex-27 ([redacted] Response to S&P Interrogatory No. 10); Ex-28 ([redacted]), at -0095-96 |
| [redacted] | [redacted] | [redacted] | Ex-29 ([redacted] Response to ABA Interrogatory No. 10); Ex- |

[5] Plaintiffs themselves receive, through their vendors, as many as 21 of the CGS Data elements that appear in the CUSIP Master File. Exs-20-22 (Plaintiffs' Responses to S&P's Interrogatory No. 5). Plaintiffs never proved that their vendors obtained these elements from any source *other than CGS. See id.*

| | | | |
|---|---|---|---|
| | | | 30 ([redacted]-0001-00001), at -0018-19 |

Furthermore, the only witness to be asked about the language in the Subscription Agreement that Plaintiffs claim establishes a "basic license," CGS Senior Vice President Roger Fahy, explained that this language, and the licenses themselves, provided Subscribers "*access to the entire CGS database*." Fahy Decl. Ex-B (Fahy Tr.) 163:15-18 (emphasis added). The same language appears in the Distribution Agreement Order Schedule, which confirms that the "CGS License service" entitles Distributors to access all 60+ data fields in CGS's database. Fahy Decl. ¶10. In fact, many CGS licensees switch between Subscription and Distribution Agreements as their business needs evolve, because what distinguishes the two is not the scope of the license, but the redistribution right. Fahy Decl. ¶13. Indeed, these licensees' access to the comprehensive CGS Database under the "CGS License service" is further demonstrated by Subscribers' and Distributors' contractual rights to use the CUSIP Access service, a web lookup tool that contains all 60+ data elements in the CUSIP Master File at no additional charge. *See id.* ¶14. If the "CGS License service" encompassed only three pieces of data, allowing access to the full set of CGS Data for free would be nonsensical. *See* Stiroh Rep. ¶150 (more than half the putative class members receive CUSIP Access complimentary).

Finally, the European Commission's 2011 decision—repeatedly invoked by Plaintiffs and their experts—underscores that no "basic license" *has ever existed*. To resolve the EC inquiry, CGS committed to create a *new* unbundled "ISIN Basic" record service to "distribute US ISIN records separately from other added value information," with just the US ISIN and a handful of "basic" fields. *See* Ex-31 (EC Decision) ¶46. Had the "basic license" posited by Plaintiffs existed, it would have been unnecessary for CGS to create it anew; and nothing in the EC

Decision suggested that a parallel "basic" license had ever existed in the U.S. for CUSIP identifiers.

In short, there is no record evidence supporting Plaintiffs' contrived "basic license," because it does not exist—for Distributors or anyone else. Because this fiction is a predicate to Plaintiffs' class certification theory, the Court must resolve the question on this motion, and Plaintiffs' failure of proof compels denial of class certification. *See Cuevas*, 526 F. App'x at 21 (vacating class certification because the court "did not analyze rigorously the conflicting evidence before it and resolve the material disputed facts").

**CONCLUSION**

For the foregoing reasons, Defendants respectfully submit that Distributors should not be included in the putative class.

Dated: October 13, 2026

Respectfully submitted,

*/s/ Eric J. Stock*
Eric J. Stock
GIBSON, DUNN &
CRUTCHER LLP
200 Park Avenue, 47th Fl.
New York, NY 10166
Tel.: (212) 351-2301
Fax: (212) 716-0801
estock@gibsondunn.com

Attorney for Defendant S&P Global, Inc.

*/s/ Jeffrey I. Shinder*
Jeffrey I. Shinder
SHINDER CANTOR
LERNER
14 Penn Plaza, Suite 1900
New York, NY 10122
Tel.: (646) 960-8601
jeffrey@scl-llp.com

Attorney for Defendant FactSet Research Systems, Inc.

*/s/ David C. Kiernan*
David C. Kiernan
JONES DAY
555 California Street, 26th Fl.
San Francisco, CA 94104
Tel.: (415) 626-3939
Fax: (415) 875-5700
dkiernan@jonesday.com

Attorney for Defendant American Bankers Association

cc: All Counsel of Record (*via ECF*)

**SIGNATURE CERTIFICATION**

Pursuant to Section 8.5(b) of the Electronic Case Filing Rules and Instructions of the Southern District of New York, I certify that all other signatory parties have consented to the filing of this document.

/s/ *Patrick M. Kennedy*
Patrick M. Kennedy (*pro hac vice*)
CONSTANTINE LLP
700 12th Street NW, Suite 700
Washington, DC 20005
Tel.: (202) 204-3500
pkennedy@constantinellp.com

Attorney for Defendant FactSet
Research Systems, Inc.

**WORD COUNT CERTIFICATION**

Pursuant to Rule 4(B) of the Court's Individual Rules of Practice in Civil Cases, and the Court's Order dated September 11, 2026, ECF No. 417 ("September 11 Order"), Defendants certify that this computer-generated Supplemental Memorandum of Law was prepared using Microsoft Windows and Microsoft Word. The total number of words in this Supplemental Memorandum, exclusive of the caption, table of contents, table of authorities, the signature block, and this certificate of compliance is 3,499, which is within the maximum of 3,500 words permitted under the Court's September 11 Order.

/s/ *Patrick M. Kennedy*
Patrick M. Kennedy (*pro hac vice*)
CONSTANTINE LLP
700 12th Street NW, Suite 700
Washington, DC 20005
Tel.: (202) 204-3500
pkennedy@constantinellp.com

Attorney for Defendant FactSet
Research Systems, Inc.

**CERTIFICATE OF SERVICE**

I certify on October 13, 2026, I caused the foregoing to be served on all counsel of record via ECF.

/s/ *Patrick M. Kennedy*
Patrick M. Kennedy (*pro hac vice*)
CONSTANTINE LLP
700 12th Street NW, Suite 700
Washington, DC 20005
Tel.: (202) 204-3500
pkennedy@constantinellp.com

Attorney for Defendant FactSet Research Systems, Inc.