# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**********************************

DINOSAUR FINANCIAL GROUP LLC,
SWISS LIFE INVESTMENT MANAGEMENT
HOLDING AG, and HILDENE CAPITAL
MANAGEMENT, LLC, on behalf of themselves
and all others similarly situated,

Plaintiffs

vs. CA NO. 22-CIV-1860 (KPF)

S&P GLOBAL, INC., AMERICAN BANKERS
ASSOCIATION, and FACTSET RESEARCH
SYSTEMS, INC.,

Defendants

**********************************

VIDEOTAPED DEPOSITION OF:
EINER ELHAUGE
Boston Marriott Newton
2345 Commonwealth Avenue
Newton, Massachusetts
October 21, 2025 9:38 a.m.

Darlene M. Coppola, RPR, RMR, CRR

Q. From the reduction of the CUSIP data element, correct?
A. Right.
Q. But there could be other effects that have the opposite effect on CGS pricing, right?
A. I don't know what you mean.
Q. Well, there could be other changes in the but-for world that cause CGS to charge higher prices?
I think you said you didn't look at this question.
MR. ARENSON: Objection.
A. No. I said that the direction was clear that it would be a lower price because in the but-for world, they wouldn't be able to charge any price for the CGS identifiers themselves, and certainly they form at least part of the value of the complete CGS database.
So there's no reason to think that CGS would gain any market power to charge higher prices for that database in the but-for world.
BY MR. STOCK:

Q. Is there any opinion expressed on that topic in your report?

A. I don't know if it's expressed in those words, but I think it's expressed because I specifically say in the but-for world the price for CUSIP identifiers would be zero, and that necessarily implies less market power to charge for a bundle of data that includes those CUSIP identifiers.

Q. There could -- there could still be some market power for the -- for those 60-plus data elements, correct?

A. There still could be some power to charge a price for those, yes, but it would just be less of an ability to charge a price for it because now they would be constrained by the possibility that users could get CUSIP identifiers for free and get other data fields from other data vendors.

Q. Okay. I have a hypothesis for you.

Let's assume that CUSIP was charging the distributors zero dollars for CGS data and instead was acquiring all of the fees for such data from the end users. Okay?

A. Okay.
Q. In that case, in the but-for world, is CUSIP able to charge end users money for the data elements in the database aside from the CUSIP itself?
A. It may be able to do so to the extent those other data elements are valuable and they're packaged in a way by CGS that makes them attractive in the but-for world.
Q. Okay. So in your but-for world, absent the challenged conduct, CGS could still charge end users for other data elements that those end users utilize from the CGS data other than the CUSIP data elements, correct?
A. They could charge for data products that they're selling to those end users, but they couldn't restrict their ability to use CUSIP identifiers.
Q. Okay. So in the but-for world, it would still be feasible for CGS to enter into licensing agreements with end users that charge those end users for data elements from the CGS data apart from the CUSIP data element, correct?

MR. ARENSON: Objection.

A. It may or may not be feasible for CGS to do so, depending upon how attractive those data elements are standing alone and what the alternatives that end users would have to acquire those other data elements.

BY MR. STOCK:

Q. Okay. So some users -- some data users might decide not to pay anymore for the CGS data that they receive, correct?

MR. ARENSON: Objection.

A. So by data users, are we talking about third-party vendors, or are we talking about end users?

BY MR. STOCK:

Q. I should have said end users.

Some end users might decide not to pay anymore for the CGS data that they receive through a data vendor, correct?

MR. ARENSON: Objection. I'm going to make this a speaking objection.

When you say "CGS data," do you mean just the CUSIP ISINs and CINS, or are you meaning part of the 66 data elements that you

had been using all along in the hypothetical?

That's my confusion.

MR. STOCK: Okay.

BY MR. STOCK:

Q. Some end users that use more than just the CUSIP data element might choose not to pay anymore for the CGS data, and, in your view, they might try to acquire those other data elements elsewhere, correct?

A. So when you say "might choose not to pay for the CGS data," you mean just the CUSIP identifiers themselves?

Q. No. I mean the additional data elements.

A. Oh, so they might -- yeah. They might not choose to, I guess, pay for or get it from CGS. They might choose to acquire other data elements from rivals of CGS or from the data vendors themselves or do without some of those data elements.

Q. And then on the other hand, there might be some end users that decide to continue paying for data elements other than the CUSIP element that they receive from CGS

through their data vendor, correct?
A. And when you're saying "decide to continue paying for data elements," you mean decide to continue paying CGS for data elements?
Q. Correct.
A. Yes. Some of them might do so, but they would pay less than they would in the actual world.
Q. How much less?
A. I have not quantified that. It was not necessary for me to do so to find anticompetitive effects, and it wasn't necessary for me to do so to find injury to class members and damages since the class members are defined to exclude those who are purchasing those other data elements.
MR. STOCK: Okay. We can introduce Exhibit 3.

(Exhibit No. 3 marked for identification.)

MR. STOCK: For the record, this

[redacted]

BY MR. STOCK:

Q. Professor Elhauge, have you seen this document before?

A. (Witness reviews document.)

I don't believe so. I don't recall it.

Q. Could you skim this declaration and let us know when you're done.

A. (Witness reviews document.)

MR. ARENSON: I would suggest you read the whole thing.

A. (Witness reviews document.)

Okay.

BY MR. STOCK:

[redacted]

[redacted]

[redacted]

[redacted]

A. At least I would say my opinions don't rest on any -- or rely on any premise that they wouldn't pay CGS something for the other data elements, just that any payment would be less.

Q. But you don't know how much less?

A. I haven't quantified that.

Q. Let's hypothesize that CGS decided in

Okay? Do you have that hypothetical in mind?
A. Well, they have the ability to do so in the but-for world, you're saying?
Q. Correct. That's the hypothetical.
A. Okay.
Q. And -- but I'm going to hypothesize that instead of charging $5 per end user, they shift that cost to the data vendor.
Do you have that hypothetical in mind?
A. Okay.
Q. And your opinion is that the amount they could charge the data vendor in that situation might be $5, or it might be less than $5 depending on the circumstances of the data vendor; is that correct?
A. We would have to know more, but knowing nothing else, those seem conceivable.
Q. And so that might be a situation where the costs of the -- the total costs faced by the data vendor go up in the but-for world if CGS chooses to move from an indirect licensing model to a direct licensing model where it's

imposing the charges on the data vendor instead of the end user, correct?

A. I'd have to think more about it, but I don't think that's correct.

Q. Why?

A. Well, because if a data vendor's end users are charged $5 each, that is something they would have to take into account in figuring out how much to pay the data vendor for the services it's providing.

Q. Okay. And so if CGS decided to move that cost to the data vendor, then CGS could charge, let's say, the data vendor $3, and the data vendor could pass that charge on to end users itself, $3, correct?

MR. ARENSON: Objection.

A. I don't know. I would have to think more about the extent to which they could pass on such a charge to end users in a world where the end users themselves are not restrained.

BY MR. STOCK:

Q. Okay. But you're not saying that situation is impossible, correct?

MR. ARENSON: Objection.

A. I think -- I think if you start with the hypothesis in the but-for world -- they're charging $5 for the other data fields -- it's possible that that $5 might be charged at different levels. But that's a comparison between two different but-for worlds, not a measure of the anticompetitive effects of the difference between the but-for world and the actual world.

BY MR. STOCK:

Q. I understand that. But a difference between the but-for world -- two but-for worlds might be that CGS charges the data vendor $3 and the data vendor passes along that charge to end users in the data vendor charge, correct?

A. I suppose it could conceivably be the case. I don't have any evidence to support it, though.

Q. Okay. You're not -- sitting here today, you don't know which one of those but-for worlds we would be in for those end users that continue to acquire CGS data for the non-CUSIP data elements, correct?

A. No. I just know that in the end, the price paid by the end user will be less. Whether it's less directly or less indirectly, I'm not opining on.

Q. And you don't disagree that if the charges were shifted to the distributors or the data vendors instead of the end users, that one possible outcome would be that the data vendors pass along that charge to the end users in their fees, correct?

MR. ARENSON: Objection.

A. There could be some pass-through of the lower charge. But to the extent there was, it would still be the net effect is that the end users would pay less than they do in the actual world.

BY MR. STOCK:

Q. Understood. But they wouldn't pay zero in that hypothetical, correct?

A. Well, in your hypothetical where they are willing to pay $5 without any anticompetitive restraints, yes, they wouldn't pay zero in the but-for world by definition.

Q. How would you go about identifying the

end users that are willing to pay for the remaining data fields in the CGS data?

A. I wouldn't. It's not necessary for any of my conclusions.

Q. Let's say you had to. How would you do it?

A. Well, I think we can exclude anybody who doesn't take data fields now, that they are not interested in the other data fields. You wouldn't expect them to be interested in the but-for world.

Q. So you would exclude anyone who doesn't use the 60-plus data elements in the CGS data. Okay? Correct?

A. Well, if they don't use -- there's other data products that aren't all 60 of them. So if they're just taking a basic license right now, then I wouldn't expect them to be paying for the other data fields from CGS in the but-for world.

Q. What did you mean when you said "a basic license"?

A. That's just the basic license which just covers the CUSIP identifiers.

Q. Is that an important element of your opinion, that there's a basic license that covers just the CUSIP identifiers?

A. Yes, it's an important part of my opinion with regard to why all the class members suffer an anticompetitive overcharge and to measure what their overcharge is.

Q. So tell me the difference between the basic license that covers just the CUSIP identifiers and the other types of licenses offered by CGS.

A. Well, there's other type of contracts that I exclude from the class, and I also exclude from the class any observations that involve the purchase of data products beyond the basic license, other than free web-based products.

(Exhibit No. 4 marked for identification.)

BY MR. STOCK:

[redacted]

[redacted]

Do you recognize this document,
Professor Elhauge?

A. No.

Q. Did you review this document in the -- during the course of your work?

A. Not that I recall.

[redacted]

[redacted]

[redacted]

MR. STOCK: I assume you're going to be okay with us coaching our witnesses by --

MR. ARENSON: I'm not trying to coach the witness.

MR. STOCK: Okay.

[redacted]

MR. STOCK: Okay.

MR. ARENSON: If you -- if you qualify your question that way, I have no problem with your asking it.

MR. STOCK: Okay.

BY MR. STOCK:

[redacted]

[redacted]

MR. ARENSON: Objection.

A. It would have to have...

MR. ARENSON: My colleague says we need it expedited.

MR. KOVACS: Yes.

MR. HINES: Yes.

(Deposition concluded at 6:52 p.m.)

CERTIFICATION

I, DARLENE M. COPPOLA, a Notary Public, do hereby certify that EINER ELHAUGE, after having satisfactorily identifying himself, came before me on the 21st day of October, 2025, in Newton, Massachusetts, and was by me duly sworn to testify to the truth and nothing but the truth as to his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath and said examination reduced to writing by me; and that the statement is a true record of the testimony given by the witness, to the best of my knowledge and ability.

I further certify that I am not a relative or employee of counsel/attorney for any of the parties, nor a relative or employee of such parties, nor am I financially interested in the outcome of the action.

WITNESS MY HAND THIS 22nd day of October, 2025.

Darlene M. Coppola

Dinosaur Financial Group Llc v. S&P Global, Inc, Et Al

Einer Elhauge (#7663764)

ACKNOWLEDGEMENT OF DEPONENT

I, Einer Elhauge, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Einer Elhauge Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DINOSAUR FINANCIAL GROUP, LLC, HILDENE CAPITAL MANAGEMENT, LLC, and SWISS LIFE INVESTMENT MANAGEMENT HOLDING AG on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>S&P GLOBAL, INC., AMERICAN BANKERS ASSOCIATION, and FACTSET RESEARCH SYSTEMS INC.,<br><br>Defendants. | X<br>:<br>:<br>:<br>:<br>:<br>X | Case No. 1:22-cv-1860-KPF<br><br>ERRATA TO DEPOSITION OF EINER ELHAUGE, TAKEN ON OCTOBER 21, 2025 |

I have read the transcript of my deposition on October 21, 2025, and, except for the corrections noted below in this errata sheet, the transcript is, to the best of my knowledge, an accurate record of the statements made by me. The reason for all corrections is to reflect the video and audiotape of the deposition, other than for one exception that is marked "[misspoke]."

| **Page** | **Line** | **Transcript** | **Correction** |
|---|---|---|---|
| 13 | 13 | Ruben | Reuben |
| 16 | 15 | you | do you |
| 16 | 16 | market. | market? |
| 19 | 9 | staff in | staff – in |
| 19 | 10 | backup, | backup – |
| 21 | 4 | too describing | too, describing |
| 21 | 17 | but rather than | but rather on |
| 23 | 4 | errors or | errors – or |
| 23 | 5 | data are | data – are |

| | | | |
|---|---|---|---|
| 23 | 15 | see | see, |
| 23 | 20 | have | have, |
| 23 | 21 | has | has, |
| 23 | 22 | did and | did – and |
| 23 | 23 | possible so | possible – so |
| 27 | 9 | undergrad yes. | undergrad, yes. |
| 28 | 13 | law and economics | Law and Economics |
| 28 | 14 | law | Law, |
| 28 | 15 | economics and organization | Economics, and Organization |
| 30 | 2 | economic topics | on economic topics |
| 30 | 17 | antitrust | Antitrust |
| 30 | 18 | economics in U.S. and antitrust law | Economics U.S. and Antitrust Law |
| 30 | 19 | economics global | Economics Global |
| 30 | 21 | economics or economics | economics, or the economics |
| 30 | 22 | theory, corporate | theory, or corporate |
| 32 | 9 | economics, gotten Nobel Prizes | economics – gotten Nobel Prizes – |
| 33 | 24 | issues and again been | issues, and again, been |
| 34 | 19 | as -- at Sweet William's, so there | and at Sweet William's. There |
| 36 | 3 | time might have and also foreign | tying might have and those are also a form of |
| 37 | 6 | a discount was itself economically flawed | a discount, was itself economically flawed, |
| 39 | 21 | because can | because, can |
| 40 | 8 | pricing -- competitive prices to | pricing – competitive prices – to |
| 41 | 1 | Kaplan Fox | the Kaplan Fox |
| 41 | 19 | but "Journal | but the "Journal |

| | | | |
|---|---|---|---|
| 42 | 24 | I did, but to the extent I could, | I did, but -- to the extent I could. |
| 43 | 9 | as part | at part |
| 46 | 18 | them. I | them – I |
| 47 | 11 | analysis, there | analysis there, |
| 47 | 16 | marked. | market. |
| 50 | 3 | including the CINs and Canadian | including the CINs, and the Canadian |
| 50 | 4 | CUSIPs and ISINs | CUSIPs, and ISINs, |
| 51 | 15 | assurer? | issuer? |
| 53 | 10 | which | for which |
| 54 | 14 | interest | interests |
| 56 | 3 | and forgotten | and have forgotten |
| 57 | 16 | all complete | whole complete |
| 59 | 9 | set, as, | set, as |
| 59 | 10 | compiled in that order | compiled, in that order, |
| 64 | 23 | in a euro [sic] | in the New York |
| 78 | 13 | property, right, over | property right over |
| 97 | 9 | is the appropriate license | is the “appropriate license” |
| 104 | 1 | investigation | investigation – |
| 108 | 3 | Independent -- indirect licensing might | Independent – indirect – licensing might |
| 110 | 7 | not something I would opine on, but whether -- | not something I would opine on. But, whether -- |
| 112 | 1-2 | sometimes a price directly or indirectly in the prices can vary | sometimes a price == directly or indirectly unit prices can vary |
| 117 | 16 | Antitrust damages class | The antitrust damages class |
| 120 | 6 | end users to | end users, to |

| | | | |
|---|---|---|---|
| 120 | 7 | restraints and | restraints, and |
| 121 | 20 | that’s | that it’s |
| 129 | 5 | say in | say that in |
| 139 | 15 | same price. It could | same price they could |
| 140 | 5 | because it would | because there would |
| 149 | 13 | cost once | cost – once |
| 149 | 14 | identifiers for | identifiers – for |
| 168 | 18 | fees | FIGIs |
| 169 | 2 | fees | FIGIs |
| 175 | 8 | challenge | challenged |
| 178 | 20 | given that data, vendors | given that, data vendors |
| 180 | 3 | complaint | report [misspoke] |
| 180 | 11 | issuance of business | issuance business |
| 180 | 13 | issuance of business | issuance business |
| 180 | 14 | issuance of business | issuance business |
| 180 | 18 | now which | now, which |
| 182 | 1 | If it's a case, it has | If it's a case that has |
| 183 | 15 | objecting | objecting -- |
| 186 | 2 | it's not pretty | it's pretty |
| 188 | 2 | if | if, |
| 188 | 3 | prediction you | prediction, you |
| 190 | 5 | As I recall, looking through | As I recall, it was looking through |
| 194 | 18 | there be | there’d be |
| 208 | 13-14 | not to serve | not just a repeat |

| | | | |
|---|---|---|---|
| 208 | 16-17 | It's going to be used as a -- it's going to -- we're going to predict | What's key is that it be -- it's going to recur – we'd want to predict that |
| 213 | 7 | issuing | issuance |
| 220 | 10 | not for | that for |
| 225 | 9 | that if | that – if |
| 225 | 10 | market power, | market power – |
| 227 | 20 | about that, | about – that |
| 227 | 22 | free and freely, | free, and freely |
| 227 | 23 | restraints, indicated | restraints -- indicated |
| 231 | 6 | evidence that was | evidence was that |
| 232 | 10 | based and does not rely on | based, and does not rely, on |
| 234 | 4 | that whereas | that, whereas |
| 236 | 24 | Information numbers that | Information Numbers, that |
| 237 | 10 | what the precise format | what -- the precise format |
| 240 | 2 | at least | at at least |
| 244 | 20 | products, in | products, and in |
| 244 | 22-23 | because they're -- they're restrained | because they're restrained – in the United States they're restrained |
| 244 | 24 | in the way they | in a way that |
| 245 | 12 | information that's being | information is being |
| 250 | 13-14 | attachments. So the subscription agreement, then the distribution agreement, | attachments to the subscription agreement and the distribution agreement, |
| 259 | 10 | So the review | So I did a review |
| 259 | 11 | had and they had | had, and they had |
| 260 | 14 | it and | it and it |

| | | | |
|---|---|---|---|
| 275 | 17 | in the but-for world engaged | – in the but-for world – engaged |
| 277 | 15 | products which | products in which |
| 278 | 19 | that the relative | that their relative |
| 287 | 12 | not only on actual | not only on the actual |
| 288 | 9 | upon the extent to | upon the extent to which you |
| 288 | 11 | So they sold -- I think | So they sold – they would, I think, |
| 288 | 12 | world sell | world, sell |
| 289 | 24 | databased | database |
| 293 | 18 | in that there | in -- that there |
| 294 | 20 | in accounting, for profits | in accounting for profits |
| 296 | 3 | as a -- protect | has a -- protect |
| 297 | 8 | think they pay | think they'd pay |
| 298 | 22-23 | any CUSIP U.S. or Canadian | any CUSIP -- U.S. or Canadian -- |
| 306 | 20 | And on | And, on |
| 306 | 21 | checked, it | checked, they |
| 307 | 5 | thus would be | thus there'd be |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 21, 2025.



Einer Elhauge