**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

DINOSAUR FINANCIAL GROUP LLC, HILDENE CAPITAL MANAGEMENT, LLC and SWISS LIFE INVESTMENT MANAGEMENT HOLDING AG, on behalf of themselves and all others similarly situated,

Plaintiffs,

-v-

S&P GLOBAL, INC., AMERICAN BANKERS ASSOCIATION, and FACTSET RESEARCH SYSTEMS INC.,

Defendants.

-------------------------------------------------------------x

Case No. 1:22-CV-1860 (KPF)

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW ON WHETHER "DISTRIBUTORS" WHO MEET THE CLASS DEFINITIONS SHOULD BE INCLUDED IN THE CERTIFIED CLASS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 2

A. The Subscription and Distribution Agreements impose the same basic license on users of CUSIP Identifiers. ........ 2

B. After discovery, with Court permission, Plaintiffs modified the class definition to include Distributors who purchased only the basic license. ........ 3

ARGUMENT ........ 4

I. The Court's class certification analysis supports inclusion of Distributors who meet the Class definitions. ........ 4

A. Rule 23(b) is satisfied. ........ 5

B. Rule 23(a) is satisfied. ........ 6

II. Differences between the Subscription and Distribution Agreements are immaterial to the claims and do not defeat predominance. ........ 6

A. The Subscription and Distribution Agreements are identical in all respects that are material to the claims at issue. ........ 6

B. Defendants mischaracterize the Distribution Agreement's terms. ........ 8

III. Defendants' other arguments fail. ........ 11

A. Defendants' claim that all Distributors need data elements from CGS is false. ........ 11

B. Defendants' citations to testimony by Third Party Data Vendors are irrelevant. ........ 12

CONCLUSION ........ 13

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Cox v. Spirit Airlines, Inc.*,
341 F.R.D. 349 (E.D.N.Y. 2022) ........ 7

*Hanks v. Lincoln Life & Annuity Co. of New York*,
330 F.R.D. 374 (S.D.N.Y. 2019) ........ 12

*In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*,
2021 WL 4481215 (S.D.N.Y. Sept. 30, 2021) ........ 11

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013) ........ 7, 11

*Iowa Pub. Emp. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024) ........ 4

## INTRODUCTION

The Classes[1] should be certified as they are defined in Plaintiffs' motion for class certification. The Classes include all entities who pay for only the "CGS License"—the license to use CUSIP Identifiers and standard security descriptions. Professor Elhauge terms this the "basic license." His analysis included entities that signed Distribution Agreements but pay for only this license. His analysis did not include—and Plaintiffs do not include in the Classes—any entity that pays for a data compilation from CGS.

Since each Class member pays only for a basic license, each is similarly situated regarding the claims at issue. All participate in the same product market Professor Elhauge identified, which Defendants have monopolized; all are subject to the same anticompetitive restrictions; CGS enforces those restrictions against them all through the same enforcement scheme; and all suffered antitrust injury according to Professor Elhauge's market analysis and zero-price model.

The Court found Professor Elhauge's analysis sufficient to show common issues predominate, and his inclusion of certain Distributors[2] in the Classes does not change that. The Distributors that are in the Classes did not pay for a database product, but only for the basic license like every other Class member. For the claims at issue, it does not matter which Agreement was signed to obtain the basic license. As CGS's witness admitted, CGS decides which agreement users sign and that decision could be arbitrary.

The Court should certify Classes that include Distributors who meet the Class definitions: (i) they paid a license fee to use CUSIP Identifiers during the class period; (ii) such payment was

---

[1] "Classes" includes the Damages and Injunctive Classes and the New York and Connecticut Subclasses. *See* Dkt. #216 at 21-23.

[2] "Distributors" means anyone who signs a Distribution Agreement. Only Distributors meeting the Class definitions are Class members.

pursuant to a Distribution Agreement; and (iii) they did not license a database product or service from CGS other than a web-based product offered without further charge. *See* Dkt. #216 at 21-23.

## BACKGROUND

### A. The Subscription and Distribution Agreements impose the same basic license on users of CUSIP Identifiers.

CGS forces users of CUSIP Identifiers to sign one of two types of agreements: (1) CUSIP Global Services Subscription Agreement ("Subscription Agreement") (Dkt. #217-17); or (2) CUSIP Global Services Distribution Agreement ("Distribution Agreement") (Dkt. #217-16).[3]

The "CGS License" (a.k.a. the basic license) is materially identical in both Agreements. It reads in relevant part: "**CGS License:** The CGS License service consists of CUSIP, CINS and/or CGS ISIN identifiers and standard security descriptions provided by either CGS directly or via a CGS-Licensed third-party vendor as part of Distributor's agreement with such vendor." Distribution Agreement, Order Schedule §7(A)(i); *see also* Subscription Agreement, Services Attachment §1.1 (same except "Subscriber" in place of "Distributor"). Both Agreements offer a largely identical menu of database products containing CUSIP Identifiers and other data elements CGS compiled. *Compare* Subscription Agreement, Services Attachment §§1.2-1.20, *with* Distribution Agreement, Order Schedule §7(A)(ii)-(xx).

The Distribution Agreement acknowledges the [redacted]

---

[3] Where possible, we cite exhibits by docket number. "Ex-" refers to Exhibits to the Declaration of Joshua Slocum, dated October 13, 2026, and are numbered so as to be consecutive with previously submitted Exhibits on the class certification motion.

[redacted] Distribution Agreement §1(A) (emphasis added); *see also* Mitnick Dep. (Dkt. #225-6) 200:3-201:23, 203:22-205:23.

Many entities who sign Subscription or Distribution Agreements buy only the basic license and do not buy database products from CGS. CGS charges these entities based solely on the number of CUSIP Identifiers used, not based on any other data elements. *See* Nagle Dep. (Dkt. #225-18) 84:22-88:22; Hunter Dep. (Dkt. #225-19) 25:14-27:16.

**B. After discovery, with Court permission, Plaintiffs modified the class definition to include Distributors who purchased only the basic license.**

The Second Amended Complaint, drafted pre-discovery, proposed certain class definitions. SAC ¶135. During discovery, Plaintiffs learned about the Distribution Agreement and that many Distributors were situated similarly to the proposed classes because they were forced to buy the basic license but did not buy data elements from CGS. After a hearing, the Court permitted Plaintiffs to modify the class definitions to add these Distributors. Dkt. #193 at 24-25.

On April 25, 2025, in compliance with the Court's order, Dkt. #198 ¶3, Plaintiffs disclosed to Defendants the modified class definitions. Dkt. #369-9. The original and modified class definitions for the Damages Class are:

| Original | Modified |
|---|---|
| All persons or entities (other than Third-Party Data Vendors) that directly paid a so-called "license fee" to S&P or FactSet pursuant to the Subscription Agreement and the Use of Services Statement at any time beginning March 4, 2018 until the anticompetitive acts end (the "Class Period") and did not license the CUSIP_DB compilation. | All persons or entities that paid a license fee to S&P or FactSet for the use of CUSIP Identifiers pursuant to a CUSIP Global Services Subscription Agreement or a CUSIP Global Services Distribution Agreement at any time from March 4, 2018, until March 14, 2025, and did not license a database product or database service from CGS offered under such agreement, other than web-based products or services offered without further charge. |

The other class definitions were amended similarly. *See id*.

Although the modified class definitions broadened the Classes to include all entities that signed a basic-license agreement for CUSIP Identifiers (including a Distribution Agreement), it narrowed the originally proposed classes by eliminating any entity that purchased any database product from CGS—in addition to eliminating those who purchased the CUSIP_DB database.

As authorized by the Court, Dkt. #198 ¶4, Defendants took discovery regarding the inclusion of Distributors in the modified Class definitions. *See* Dkt. #321-33, -35-40, -42-44, -48, -61-62. On August 14, 2025, Plaintiffs filed their motion for class certification, which used the modified Class definitions.[4] Dkt. #216 at 21-23. The motion relied on Professor Elhauge's analysis, which was based on the modified Class definitions. *See* Dkt. #225-86 (Corrected Elhauge Report) ¶¶6-9 (hereinafter, "Elhauge Report"). Defendants opposed class certification relying on the modified Class definitions. *See, e.g.*, Dkt. #236 at 15.

In a Sealed Opinion and Order dated August 28, 2026, the Court granted Plaintiffs' motion for class certification. Dkt. #410 (the "Opinion"). After Plaintiffs raised a question about the class definition used in the Opinion, the Court vacated the Opinion on September 10, 2026, and requested briefing limited to "whether Distributors should be certified in the class." Dkt. #417.

## ARGUMENT

### I. The Court's class certification analysis supports inclusion of Distributors who meet the Class definitions.

In the Opinion, the Court concluded that users who purchased the "CGS License" but did not purchase the entire CUSIP_DB database should be certified as a class. That conclusion remains

---

[4] A certifying court is not bound by the class definition proposed in the complaint and may adopt a broader or narrower class definition. *See Iowa Pub. Emp. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2024 WL 5004632, at *21 (S.D.N.Y. Dec. 6, 2024) (Failla, J.).

true for entities who purchased the CGS License, but no database products, through a Distribution Agreement. Including them would not undermine any Rule 23 element or prejudice Defendants.[5]

**A. Rule 23(b) is satisfied.**

Professor Elhauge's analysis addressed the modified Class definitions, and it included Distributors who met those definitions. Elhauge Report ¶¶6-9, 103-06; Dkt. #297-17 (Elhauge Ex-Q). He identified a relevant product market for the use of CUSIP Identifiers. Elhauge Report ¶¶36-67. He excluded from the Classes entities that paid for database products from CGS beyond the basic license. *Id.* ¶¶103-06. The Court accepted this evidence and concluded that common issues would predominate concerning Defendants' monopolization of the relevant market. Opinion at 53-55, 91-96.

Professor Elhauge opined that all members of the Classes suffered antitrust injury because Defendants' exclusionary conduct allowed CGS to charge fees for CUSIP Identifier use, which would otherwise be free, and denied users the benefits of innovation. Elhauge Report ¶¶92-93. He presented two methods for calculating Class-wide damages. *Id.* ¶¶109-25. The Court accepted Professor Elhauge's evidence, finding that common issues predominated on the issues of antitrust injury and damages. Opinion at 56-70, 96-107.

Including Class members who purchased the basic license through Distribution Agreements would not change these conclusions. They all bought the same product—the basic license—and participated in the relevant product market Professor Elhauge identified. All suffered

---

[5] Plaintiffs timely disclosed the modified Class definitions to Defendants; Defendants took discovery into Distributors; the class certification motion used the modified Class definitions; and Defendants' arguments in opposition to class certification were all premised on the modified Class definitions. *See* Background §B.

antitrust injury and damages according to Professor Elhauge's zero-price model. These common issues will continue to predominate if these Distributors are included in the Classes.

Common issues also predominate for the state law claims. The CUTPA claim mirrors the Sherman Act claim. Opinion at 109. Regarding the New York GBL claim, the Court found that "Defendants' allegedly misleading claims of IP rights in CUSIP identifiers in the Subscription and Distribution Agreements" constitute "common evidence." *Id*. at 107. The injury suffered by Class members remains the same, regardless of the name of the agreement they signed: "measurable economic harm in the form of license fee payments." *Id*. at 108.

Defendants did not contest the element of superiority, and the standard is satisfied here. *See* Opinion at 111-12.

**B. Rule 23(a) is satisfied.**

Defendants did not challenge any Rule 23(a) element in their opposition to class certification. Dkt. #236. A challenge now would be untimely. Plaintiffs therefore incorporate their briefing on these elements and Professor Elhauge's opinions cited therein, which all addressed the modified Class definitions that included Distributors. Dkt. #216 at 23-30. The Rule 23(a) elements remain satisfied for the reasons stated in the Opinion at 82-88.

**II. Differences between the Subscription and Distribution Agreements are immaterial to the claims and do not defeat predominance.**

**A. The Subscription and Distribution Agreements are identical in all respects that are material to the claims at issue.**

Defendants are expected to argue that purported differences between the Subscription and Distribution Agreements defeat predominance. They do not.

The relevant contract terms for the basic license are identical. And while certain other contractual terms (such as [redacted]) are not identical, differing contract terms do not undermine class treatment where the contracts are "substantially similar in all

*material* respects." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 124-26 (2d Cir. 2013) (emphasis added) (affirming class certification despite differing contractual definitions and governing laws); *see also Cox v. Spirit Airlines, Inc.*, 341 F.R.D. 349, 369 (E.D.N.Y. 2022) (certifying class despite differences in disclosures and applicable terms and conditions), *modified*, 2023 WL 1994201 (E.D.N.Y. Feb. 14, 2023). Materiality is determined by reference to the claims at issue. *See id.*

For the claims at issue, the material terms of the Subscription and Distribution Agreements are that they: (i) impose the identical basic license to use CUSIP Identifiers and (ii) give licensees the *option* to buy database products from CGS, which Class members, by definition, do not buy. For purpose of the state law claims, both agreements also contain misleading IP claims. In all these key respects, the Subscription and Distribution Agreements are materially identical:

- *Basic License*. The Distribution Agreement and Subscription Agreement contain an identical "CGS License." *See* Distribution Agreement, Order Schedule §7(A)(i); Subscription Agreement, Services Attachment §1.1. In both, the basic license covers use of CUSIP Identifiers and standard security descriptions but not the other 60+ data elements. *Cf.* Opinion at 54-56, 98-99.
- *Menu of database products*. The Subscription and Distribution Agreements offer a nearly verbatim menu of optional database products. *Compare* Subscription Agreement, Services Attachment §§1.2-1.20, *with* Distribution Agreement, Order

Schedule §7(A)(ii)-(xx). Professor Elhauge excludes from the Classes anyone who paid for one of these products.[6]

- *False IP claims*. Both Agreements contain false IP claims. Opinion at 107.

**B. Defendants mischaracterize the Distribution Agreement's terms.**

Defendants claim Distribution Agreements always grant a license to the entire CUSIP database, not just the basic license. That is wrong.

First, the Court has already rejected Defendants' argument that the basic license does not exist (*see* Dkt. #416 at 2-3): "[T]here is factual support for the existence of such a license" including "the language of CGS's own agreements." Opinion at 98; *accord id.* at 54-55. The language of the "CGS License" is materially identical in the Subscription and Distribution Agreements, so the Court's conclusion should apply to both Agreements.

Second, Defendants' intellectual property expert admitted that Subscription Agreement, Services Attachment §1.1 and Distribution Agreement, Order Schedule §7(A)(i) are "pretty similar," and, by their terms, license *only* the use of CUSIP Identifiers and standard security descriptions. Contreras Dep. (Dkt. #307-2) 177:7-178:15, 205:9-208:2.

Third, Defendants mischaracterize the terms of the Distribution Agreement in claiming that it [redacted] Dkt. #416 at 2 (quoting Dkt. #321-25 §2(B)). [redacted] Contreras Dep. 165:4-166:13. And the Distribution Agreement makes clear that, for any licensee, the particular licensed data is

[6] CGS includes with the basic license for both types of agreements at no extra charge, the CUSIP Access product, which is a web-based lookup service. Receiving this freebie does not disqualify one from Class membership. Elhauge Report ¶¶103-06.

[redacted] Distribution Agreement §2(B) (emphasis added). This clause unambiguously refers to [redacted].[7] Nor does this language contradict the existence of the basic license, since CUSIP Identifiers are a subset of what CGS calls "CGS Data"—a subset that does not include the 60+ other data elements.

Fourth, the preface to Section 7(A) of the Order Schedule, which is an exhibit to the Distribution Agreement, states: "DISTRIBUTOR shall receive a license to access and use the CGS Master File Database described in 7(A) below. In addition, any other CGS Services described below that DISTRIBUTOR elects to receive shall be listed in Section 10(A)."[8] Distribution Agreement, Order Schedule §7(A). Defendants argue this preface grants a license to the full CUSIP database, not only "three pieces of data." Dkt. #416 at 2. Common evidence refutes their argument.

Defendants' misreading of the Distribution Agreement contradicts the testimony of their IP expert, Professor Contreras, who admitted that the license grant is specified in [redacted]. Contreras Dep. 150:24-151:11, 152:3-8, 184:21-185:17. Section 7 describes the data sets for which a Distributor may pay, from a set limited to CUSIP Identifiers and standard security descriptions in §7(A)(i), a set consisting of all the data in the CGS CUSIP Master File in §7(A)(ii), to subject matter datasets

---

[7] Section 3 of the Distribution Agreement states: "[redacted]"

[8] No product bearing the name "CGS Master File Database" is "described" or listed in §§ 7(A)(i)-(xx).

in §§7(A)(iii) through (xix). The Class members that signed a Distribution Agreement paid only for the service described in §7(A)(i) of the Order Schedule, which Professor Contreras admitted is limited to identifiers and security descriptions (*i.e.*, the basic license). Contreras Dep. 180:8-16.

Consistent with this structure, CGS records whether Distributors pay for only the basic license, or also for one or more database products, and charges Distributors accordingly—just like Subscribers. As an example, this is how CGS records in its Master Books of Business ("MBoBs") Distributors who purchase only the basic license (and are Class members):

[redacted]

Ex-120.[9] And this next example shows how CGS records in the MBoBs Distributors who purchase both the basic license and a database product (and are not Class members):

[redacted]

Ex-121. The MBoBs are common evidence that Professor Elhauge used to exclude from the Classes any Distributor (and any Subscriber) who paid for a product other than the basic license. Elhauge Report ¶¶103-06.

Indeed, [redacted]

---

[9] The MBoBs refer to the CGS License/basic license as the "CUSIP License."

[redacted] This arbitrariness confirms that CGS considers the basic license terms in the two Agreements to be interchangeable.

Defendants' new interpretation of the Distribution Agreement also would improperly render all of Section 7(A) surplusage. If every Distributor licensed the use of all the data in the CUSIP Database there would be no need to describe the 20 services listed in Section 7(A), all but one of which are subsets of the full database. Courts disfavor such interpretations of contracts. *See In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*, 2021 WL 4481215, at *15 (S.D.N.Y. Sept. 30, 2021) (Failla, J.).

In any event, because Defendants' new interpretation is inconsistent with how CGS conducts its business, as the excerpted examples above demonstrate, that interpretation is not material to the claims and does not defeat predominance. *See U.S. Foodservice*, 729 F.3d at 126 (varying contractual minimum purchase requirements "were not enforced by [defendant] and thus are not material" to claims at issue). A dispute over the meaning of the Distribution Agreement also does not defeat predominance; differing "interpretations of a form contract" present a common question and "the classic case for treatment as a class action." *Hanks v. Lincoln Life & Annuity Co. of New York*, 330 F.R.D. 374, 380 (S.D.N.Y. 2019) (quotations and citations omitted).

## III. Defendants' other arguments fail.

### A. Defendants' claim that all Distributors need data elements from CGS is false.

Defendants claim Distributors all "require broad access to CGS Data" because they "access a broad set of data elements from CGS and redistribute those data elements to their end users." Dkt. #416 at 2-3. That is wrong. The Distributors who are in the Classes purchased only the basic license and did not purchase any other data elements from CGS. Elhauge Report ¶¶103-06. They obtain whatever data they need from Third-Party Data Vendors ("TPDVs"). Opinion at 98-99. To

be sure, many entities who sign Distribution Agreements elect to buy database products from CGS, but they are not Class members.

While certain Class-member Distributors use CUSIP Identifiers in products and services, that is immaterial to the claims at issue. In the Opinion, the Court recognized that Class members operate in different industries or areas of commerce but explained the "various use cases for CUSIP Identifiers" do not predominate because "common evidence of the indispensable function of CUSIP identifiers in processing, clearing, and settling most, if not all, financial transactions establishes a relevant market for their use in the United States that predominates over any differences in individual use cases." Opinion at 94.

**B. Defendants' citations to testimony by Third Party Data Vendors are irrelevant.**

Defendants' September 10 letter cited testimony by [redacted]. Dkt. #416 at 3. That is irrelevant: they purchase database products from CGS, and "the proposed classes do not include putative members who want or would pay for those additional data elements from CGS." Opinion at 99. All such entities [redacted] are excluded from the Classes.

Although [redacted] is listed among the class members in Professor Elhauge's Exhibit Q, it was a Class member for only part of the Class period, while it took only the basic license. Ex-122 [redacted] Agreement) at -017; *cf.* Elhauge Report ¶106 (Class membership determined on month-by-month basis); Elhauge Dep. (Ex-123) 260:25-261:20 (same). [redacted] left the Classes by [redacted], when it purchased a database product from CGS. Ex-124 at -029. Defendants' attempt to portray [redacted] testimony (taken in 2025, years *after* it left the Classes) that it uses "all" CGS Data elements (Dkt. #321-36 at 4) as having come from "one of the new Distributor class members at issue" (Dkt. #416 at 3) is misleading.

By definition, the only Distributors who would be Class members are those who purchased only the basic license and no additional data elements from CGS and only during the time that they purchased it.

## CONCLUSION

The Court should certify the Classes requested in Plaintiffs' motion for class certification (Dkt. #216 at 21-23), including Distributors who meet the Class definitions.

Dated: October 13, 2026

Respectfully submitted,

/s/ *Joshua M. Slocum*
Ronald J. Aranoff
Ryan A. Kane
Joshua M. Slocum
Lyndon M. Tretter
Reuben R. Bauer
Russell B. Filip
WOLLMUTH MAHER & DEUTSCH LLP

500 Fifth Avenue, 12th Floor
New York, New York 10110
Telephone: (212) 382-3300
raranoff@wmd-law.com
rkane@wmd-law.com
jslocum@wmd-law.com
ltretter@wmd-law.com
rbauer@wmd-law.com
rfilip@wmd-law.com

*/s/ Leiv Blad*
Leiv Blad
Jeffrey Blumenfeld (*pro hac vice*)
Meg Slachetka
COMPETITION LAW PARTNERS PLLC

601 Pennsylvania Avenue NW
Washington, DC 20004
Telephone: (202) 742-4300
Email: leiv@competitionlawpartners.com
jeff@competitionlawpartners.com
meg@competitionlawpartners.com

*/s/ Robert N. Kaplan*
Robert N. Kaplan
Gregory K. Arenson
Elana Katcher
KAPLAN FOX & KILSHEIMER LLP

800 Third Ave., 38th Floor New York, NY 10022
Telephone: (212) 687-1980
Email: rkaplan@kaplanfox.com
garenson@kaplanfox.com
ekatcher@kaplanfox.com

## **WORD COUNT CERTIFICATION**

Pursuant to the Court's order entered September 11, 2026 (ECF No. 417), Plaintiffs certify that this computer-generated memorandum of law was prepared using Microsoft Windows and Microsoft Word. The total number of words in this memorandum, exclusive of the caption, table of contents, table of authorities, glossary, the signature block, and this certificate of compliance is 3500, which complies with the maximum 3,500 words permitted by the Court's order.

By: *<u>/s/ Joshua M. Slocum</u>*

**CERTIFICATE OF SERVICE**

I certify that on October 13, 2026, I caused a true and correct copy of the foregoing to be served on all parties through their counsel of record via email to each counsel of record's known email address.

*/s/ Joshua M. Slocum*